**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB<br><br>Honorable Timothy J. Corrigan<br><br>Honorable Patricia D. Barksdale |

**LEAD PLAINTFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... iii

I.      INTRODUCTION.......................................................................................1

II.     STATEMENT OF FACTS ..........................................................................7

        A.      Background ......................................................................................7

        B.      Defendants Misled Investors About the Success of the Worldpay
                Acquisition and the Value of Worldpay's Goodwill ...........................8

        C.      Defendants Were Motivated to Commit Securities Fraud....................9

        D.      The Truth is Revealed....................................................................10

III.    ARGUMENT ..........................................................................................11

        A.      Legal Standards on a Motion to Dismiss..............................................11

        B.      The Complaint Adequately Alleges Falsity .........................................11

                1.      Defendants Misled Investors About the Success of the
                        Worldpay Acquisition and Integration ....................................12

                        a.      Defendants Misled Investors About Revenue
                                Synergies..........................................................................12

                        b.      Defendants Misled Investors About Integrating
                                Worldpay ...................................................................19

                2.      Defendants Misled Investors About Worldpay's Goodwill .......22

                        a.      The Complaint Adequately Alleges Defendants
                                Violated GAAP and Issued False and Misleading
                                Statements About Worldpay's Goodwill Value ..............22

                        b.      Defendants' Additional Arguments Should be
                                Rejected .........................................................................27

        C.      The Complaint Adequately Alleges Scienter ......................................33

                1.      The Complaint Adequately Alleges Scienter for the Worldpay
                        Acquisition and Integration Misstatements .............................34

i

         a.     The Individual Defendants' Bonus Compensation Supports Scienter ..............................................................34

         b.     Core Operations Allegations Establish Scienter ..............36

         c.     Norcross's and Woodall's Departures Support Scienter .........................................................................37

         d.     Defendants' Selective Disclosure of Key Performance Indicators Establishes Scienter .......................................38

         e.     Defendants' Competing Inference Is Without Merit .......38

    2.     The Complaint Adequately Alleges Scienter for the Goodwill Misstatements ........................................................................39

         a.     The Magnitude of the Impairment Supports Scienter......39

         b.     Defendants Were Motivated to Misrepresent Goodwill .........................................................................40

         c.     Defendants' Knowledge of Impairment Triggers ............41

         d.     Defendants' Competing Inferences Are Meritless ...........42

  D.     The Complaint Adequately Alleges Loss Causation ...........................42

IV.   CONCLUSION .......................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
   2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ....................................44

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)..................................................................39

*Anastasio v. Internap Network Servs. Corp.*,
   2011 WL 13124500 (N.D. Ga. Sept. 30, 2011) .............................. 3, 22

*In re BellSouth Corp. Sec. Litig.*,
   355 F. Supp. 2d 1350 (N.D. Ga. 2005)................................................26

*Bryant v. Dupree*,
   252 F.3d 1161 (11th Cir. 2001)............................................................45

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001).......................................................41

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
   321 F. Supp. 2d 1342 (N.D. Ga. 2004)............................................ 6, 26

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019).............................................................27

*In re Chic. Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018)................................. 26, 28

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ........................................................ 32, 33

*City of Omaha, Neb. Civilian Emps'Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) ..................................................................31

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
   806 F. Supp. 2d 1267 (N.D. Ga. 2011).................................................43

*Dudley v. Haub*,
   2013 WL 1845519 (D.N.J. Apr. 30, 2013)...............................26, 33, 40

iii

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ...................................................................43

*FindWhat Inv'r Grp. v. FindWhat.com,*
    658 F.3d 1282 (11th Cir. 2011)..............................................12, 15, 17

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
    270 F.3d 645 (8th Cir. 2001) ......................................................40

*In re HD Supply Holdings, Inc. Sec. Litig.,*
    341 F. Supp. 3d 1342 (N.D. Ga. 2018)..............................................42

*In re Immucor Inc. Sec. Litig.,*
    2006 WL 3000133 (N.D. Ga. Oct. 4, 2006).....................................22, 36

*In re Jiangbo Pharms., Inc., Sec. Litig.,*
    884 F. Supp. 2d 1243 (S.D. Fla. 2012)..............................................42

*In re JPMorgan Chase & Co. Sec. Litig.,*
    2007 WL 4531794 (N.D. Ill. Dec. 18, 2007).......................................30

*In re LDK Solar Sec. Litig.,*
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........................................39, 42

*In re Leapfrog Enter., Inc. Sec. Litig.,*
    2017 WL 4877451 (N.D. Cal. Aug. 10, 2017) ....................................32

*Meyer* v. *Greene,*
    710 F.3d 1189 (11th Cir. 2013).....................................................43

*Mild v. PPG Indus., Inc.,*
    2018 WL 6787351 (C.D. Cal. Dec. 21, 2018) ....................................37

*Mizzaro v. Home Depot, Inc.,*
    544 F.3d 1230 (11th Cir. 2008)..............................................11, 30, 34

*Mogensen* v. *Body Cent. Corp.,*
    15 F. Supp. 3d 1191 (S.D. Fla. 2014) ..............................................21

*In re Nevsun Res. Ltd.,*
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013)......................................35

*In re Nielsen Holdings PLC Sec. Litig.,*
    510 F. Supp. 3d 217 (S.D.N.Y. 2021)..............................................28

*In re Okta, Inc. Sec. Litig.*,
  2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) ....................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................... 27, 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
  2005 WL 735937 (S.D.N.Y. Mar. 30, 2005)......................................................31

*Phillips v. Scientific-Atlanta, Inc.*,
  374 F.3d 1015 (11th Cir. 2004).........................................................................34

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...................................................16

*Primavera Inv's* v. *Liquidmetal Techs., Inc.*,
  403 F. Supp. 2d 1151 (M.D. Fla. 2005)..............................................................21

*Pub. Emps.' Ret. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
  564 F. Supp. 3d 1272 (N.D. Ga. 2021)......................................................... 16, 42

*S.E.C. v. Morgan Keegan & Co.*,
  678 F.3d 1233 (11th Cir. 2012)..........................................................................12

*In re Sci. Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010)...............................................................44

*Strougo v. Trivity Health, Inc.*,
  551 F. Supp. 3d 839 (M.D. Tenn. 2021).............................................................41

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ..............................................................................41

*Tellabs Inc. v. Makor Issuers & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................11, 30, 34

*Tung v. Dycom Indus., Inc.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020)...............................................................19

*In re Tupperware Brands Corp. Sec. Litig.*,
  2023 WL 5091802 (11th Cir. Aug. 8, 2023).......................................................30

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .............................................................................37

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)............................................................ 35, 40

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015)........................................................37

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)............................................... 6, 28

**Statutes**

Private Secutities Litigation Reform Act ("PLSRA") ..............................................42

    15 U.S.C. § 78u-4(b)(2)(A) ................................................................................33

    15 U.S.C. § 78u-4(b)(1)(B) ................................................................................11

**Rules**

Fed. R. Civ. P. 8........................................................................................................42

Fed. R. Civ. P. 9........................................................................................................42

    9(b)......................................................................................................................11

Fed. R. Civ. P. 12(b)(6)..............................................................................................11

Fed. R. Civ. P. 15 ......................................................................................................45

Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans ("Lead Plaintiffs"), respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint. *See* ECF No. 55.[1]

## I.   INTRODUCTION

In a knee-jerk reaction to an acquisition by its biggest competitor, FIS acquired Worldpay for $48 billion, the largest acquisition ever in the financial technology ("fintech") industry at that time. To justify this massive price and gain shareholder approval for the deal, Defendants claimed the combination of FIS and Worldpay would deliver significant revenue synergies based on the combined company's ability to cross-sell each other's products. Throughout the Class Period, Defendants misleadingly touted their revenue synergies and cross-selling with Worldpay, leading investors to believe the acquisition was a roaring success when, in reality, it was an abject failure from the start. But rather than come clean about their expensive mistake, Defendants secretly tried to dispose of the declining asset to private equity firms at a substantially discounted price. All the while, Defendants continued misleading investors that the acquisition was a success without disclosing the significant

---

[1]Capitalized terms herein have the same meaning as set forth in the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 46) (the "Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "Motion at __" are to Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 55). References to "Defendants" are to Defendants Fidelity National Information Services ("FIS" or the "Company"), Gary Norcross, James Woodall, Stephanie Ferris, and Thomas Warren.

challenges Defendants faced. Defendants further fraudulently propped up the value of Worldpay and misled investors by failing to write down the value of Worldpay's goodwill, despite knowing of several facts demonstrating that the asset was worth many billions less than what they publicly claimed. Indeed, it was only after the Individual Defendants collected millions in bonus compensation from a purportedly successful acquisition that the truth about the failed acquisition was revealed, causing investors billions in losses when FIS announced it was spinning off Worldpay and taking a massive **$17.6 billion write-down** on the value of Worldpay.

Defendants now argue they never misled investors about the acquisition, and the billions of dollars investors lost had nothing to do with any alleged misrepresentations about the success of the Worldpay acquisition. This self-serving narrative is simply not credible. Indeed, the central logic behind Defendants' Motion is fundamentally flawed. On the one hand, Defendants ask the Court to believe they truthfully told investors the Worldpay acquisition was a roaring success. On the other hand, Defendants ask the Court to believe that, despite this supposed success, the value of Worldpay somehow dropped from $48.2 billion to $18.5 billion just a few years later in an economy where FIS's competitors flourished. Worse, Defendants secretly attempted to unload the declining asset for a total value of around $30 billion—a 38% discount to its $48.2 billion purchase price—while continuing to publicly tout the acquisition as a success. Unable to get rid of the asset for that price, and knowing it was worth significantly less than that, their argument now that the asset became impaired by **$17.6 billion** basically overnight is not credible. Tellingly this massive

2

write-down came only *after* Defendants cashed in, receiving millions in bonus compensation from the purportedly successful Worldpay acquisition. Defendants' alternative story defies logic, and their Motion should be denied.

Moreover—and importantly for the purposes of this motion—Defendants' alternative story is belied by the Complaint's well-pled allegations, which demonstrate that Defendants knew the Worldpay acquisition was a failure from the start but falsely told investors it was a success. Specifically, the Complaint alleges that following the acquisition, Defendants repeatedly and falsely touted the Company's revenue synergies, claiming they were presently exceeding their revenue synergy targets based on successful cross-selling of FIS and Worldpay products. But unbeknownst to investors, Defendants were only able to keep the appearance of a successful acquisition by manipulating the Company's revenue synergy calculations. Specifically, although revenue synergies are universally calculated as additional revenues that would not have been achieved without the business combination, Defendants simply counted *any new revenue following the acquisition* as a revenue synergy, regardless of whether that revenue was the result of combining FIS and Worldpay. Such manipulation allowed Defendants to falsely claim the merger was a roaring success (and cash in on millions in bonuses) when behind the scenes the opposite was true. Defendants' statements "about how well [the Company] [wa]s integrating [Worldpay]" and the success of the Company's cross-selling were false and misleading because they "sen[t] a clear signal to investors about the state of affairs at [the Company]" that did not align with the true

3

state of affairs. *Anastasio v. Internap Network Servs. Corp.*, 2011 WL 13124500, at \*10 (N.D. Ga. Sept. 30, 2011).

Defendants' Motion ignores the well-pled allegations that it was misleading to include any new business in the Company's calculation of revenue synergies. Rather, Defendants' Motion attacks the Complaint's confidential witness ("CW") allegations, arguing that the CWs were low-level employees who did not have knowledge of the Company's calculations of revenue synergies. Not so. First, one former employee of Worldpay, CW 4, was personally responsible for tracking revenue synergies for Worldpay's U.K. small to medium sized business ("SMB") segment, and specifically stated that FIS defined a synergy as *any* new business obtained by Worldpay following the acquisition, and not necessarily new revenue generated as a direct result from cross-selling with FIS or from leveraging the FIS brand. Second, the Complaint contains corroborative allegations from seven additional CWs—spanning different business segments and locations—demonstrating that hardly any cross-selling occurred between FIS and Worldpay, further supporting the fact that Defendants only reached their revenue synergy targets by manipulating the calculations.

Defendants also argue that, even if their statements touting their revenue synergies and cross selling were false and misleading, they should not be held liable for them because they did not have knowledge of contrary information, i.e., scienter. This argument is belied by the Complaint's well-pled allegations. To start, it is simply not credible to claim that Defendants were not aware of the performance of their $48 billion acquisition, especially when they made repeated, specific statements to

4

investors about its performance following the acquisition. Moreover, the Individual Defendants were all motivated to misrepresent the success of the Worldpay acquisition because they received large bonuses tied to achieving revenue synergies within the first three years of the acquisition. Unsurprisingly, Defendants Norcross and Woodall—the key executives behind the Worldpay acquisition who were responsible for its integration—left the Company *right after* they each received millions in bonus compensation from the supposedly successful Worldpay integration and *right before* the truth about the failed Worldpay acquisition was revealed. These facts, among others, strongly support an inference that Defendants acted with scienter.

In addition, in order to further maintain the appearance that the acquisition was an ongoing success (and worth the $48 billion dollar price tag), throughout the Class Period, Defendants continued to falsely claim in SEC filings that Worldpay's $38 billion in goodwill remained unimpaired despite several red flags demonstrating that Worldpay's goodwill was not worth anywhere near the amount Defendants publicly claimed. Most notably, in the summer of 2022, Defendants secretly shopped Worldpay to private equity firms; however, no one expressed any interest in buying Worldpay for a $30 billion price tag. Because nobody was willing to pay that price, Defendants knew Worldpay's entire true value in the open market was worth no more than $30 billion (over $18 billion less than their purchase price), and internally knew it was worth potentially much less than $30 billion. However, at the very same time, Defendants continued to publicly tell investors that Worldpay's goodwill—by itself—was worth $35 billion. By failing to take an impairment charge, Defendants violated

5

generally accepted accounting principles ("GAAP") and issued materially false and misleading financial statements in their quarterly and annual reports. The Complaint's "allegations ma[k]e clear that the need to write down was so apparent to Defendants that a failure to take earlier write downs amounted to [securities] fraud." *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342, 1352 (N.D. Ga. 2004).

In an effort to excuse their known, calculated efforts to mislead investors about Worldpay's true value, Defendants now argue that their goodwill statements were merely opinions that they cannot be held liable for. Not so because it also ignores the Complaint's well-pled allegations—namely, that Defendants' repeated assurances that Worldpay's goodwill was not impaired "did not reasonably align with the information [d]efendants had at the time." *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018). Specifically, the Complaint alleges that Defendants knew or recklessly disregarded several massive red flags—such as Worldpay's struggling business performance, declining market capitalization, and Defendants' attempts to dispose of Worldpay—that demonstrated that Worldpay's goodwill was impaired by the third quarter of 2021 at the latest. Thus, Defendants statements about Worldpay's goodwill are actionably false and misleading. *Id.*

Finally, Defendants argue that the Complaint does not plead loss causation because the corrective disclosures that revealed the fraud (and caused investors billions in losses) did not mention anything about the Company's revenue synergies, cross-selling, or market share. However, courts do not require such a mirror-image disclosure of fraud. Rather, loss causation allegations, which are not subject to any

6

heightened pleading standards, need only show a causal connection between the misrepresentation and the loss. The Complaint meets this low burden. The corrective disclosures revealed new information that Defendants' prior misstatements concealed: that the Worldpay acquisition was a failure and Worldpay's value had deteriorated considerably since FIS purchased it. This is sufficient to plead loss causation.

Defendants' Motion should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     Background

FIS is a fintech company, who, before its acquisition of Worldpay in 2019, primarily focused on providing technology solutions and services for banks and other financial institutions. ¶54. In January 2019, FIS tried to expand its offerings in the E-Commerce and physical point-of-sale transaction processing space by acquiring a merchant processor called First Data Corporation ("First Data"), but lost the bid to its rival, Fiserv. ¶¶55-56. In an attempt to one-up its main competitor, FIS scrambled to acquire its own merchant processor, and less than two months after Fiserv acquired First Data, FIS announced that it was acquiring Worldpay for a whopping $48 billion. ¶¶57-59, 93. Understanding the need to justify the acquisition and mitigate investors' sticker shock, Defendants claimed that Worldpay's goodwill—the value associated with "expected synergies of combining operations, the acquired workforce, and growth opportunities"—was worth $38.4 billion, more than 80% of the overall purchase price. ¶¶60-61. Most importantly, Defendants told investors that the acquisition would drive long-term shareholder value through the attainment of

7

revenue synergies, which Defendants claimed were "expected to come primarily from cross-selling to merchants and financial institutions globally." ¶¶62-63.

**B.    Defendants Misled Investors About the Success of the Worldpay Acquisition and the Value of Worldpay's Goodwill**

Immediately after FIS purchased Worldpay, it became clear that the acquisition was a disaster. Specifically, Defendants failed at every turn to integrate the once-nimble merchant processor into FIS's legacy operations, causing the companies to function as two separate entities (¶¶72-74); starving out Worldpay through a lack of investment in key talent and product innovation (¶¶87-92); and foundering in their efforts to drive cross-sales of Worldpay and FIS products (¶¶72-74). However, rather than coming clean about their expensive mistake, Defendants repeatedly misled investors by claiming that the integration was seamless, and that the Company was realizing synergies above and beyond Defendants' goals and projections. ¶183-84. Indeed, despite Defendants' claims that FIS had "***done an excellent job driving cross sales through the Worldpay acquisition and [] exceeded . . . more than $700 million in cross sales***," (¶99) several CWs confirm that cross-sales were virtually non-existent, and that in reality, Defendants were internally manipulating revenue synergy calculations to include any new sale after the acquisition***, regardless of whether it was a cross-sale or the result of leveraging the FIS brand***. ¶102. Specifically, according to CW 4, FIS defined a synergy as any new business obtained by Worldpay following its merger with FIS, and not necessarily new revenue generated as a direct result from cross-selling with FIS or leveraging the FIS brand. ¶103. CW 11 similarly stated that, as a former employee

8

responsible for tracking synergies for an initiative in 2022, she considered a revenue synergy as any incremental new business and not necessarily new revenue generated as a direct result from cross-selling. ¶104.

Despite continuing to tout the success of the Worldpay acquisition and the health of Worldpay's business, Defendants were aware of several red flags that indicated Worldpay's goodwill carrying value was nowhere near the $38.4 billion Defendants publicly claimed. Specifically, Defendants knew Worldpay was losing market share (including some of its largest clients) to competitors; that the Company's stock price and market capitalization had declined significantly; and that the Company had lost key Worldpay personnel. ¶¶122-37. Moreover, Defendants tried to sell Worldpay for a total price of around $30 billion—which was far less than what Defendants publicly claimed its goodwill value was worth by itself—but private equity firms balked at even the discounted asking price. ¶¶152-53. Despite their awareness of these red flags, Defendants unreasonably delayed conducting a full goodwill analysis as required by GAAP, avoiding an impairment charge for over a year and a half, and therefore materially overstated the value of Worldpay's goodwill—and consequently, its total assets—in the Company's quarterly and annual reports. ¶¶138-50, 154-55.

### C.   Defendants Were Motivated to Commit Securities Fraud

Defendants were motivated to conceal the truth about the Worldpay acquisition and delay taking an impairment charge because they stood to receive substantial bonuses for achieving revenue synergies and keeping the Company's stock price inflated. ¶¶263-73. Indeed, in anticipation of the Worldpay acquisition, Defendants

created a compensation plan that would reward some of the Individual Defendants if certain revenue synergy targets were met during the first three years after the acquisition. ¶¶263-64. Because these revenue synergy targets were met (based on the manipulated revenue synergy calculations), by the end of the compensation plan, Norcross received approximately $14.8 million in stock, Woodall received approximately $9.9 million, and Ferris received approximately $6.5 million. ¶¶269-71. Moreover, Defendants were further motivated to conceal from the market that the failed integration had significantly harmed the value of Worldpay because they were secretly shopping Worldpay to private equity firms in the Summer of 2022, and therefore wanted to justify a higher purchase price to potential buyers. ¶278.

D.    **The Truth is Revealed**

Investors finally learned the truth about the failed acquisition and true value of Worldpay through three corrective disclosures. First, on August 4, 2022, Defendants announced disappointing results for FIS's Merchant Solutions segment—which was made up almost entirely of Worldpay—and abruptly stopped disclosing key performance metrics, which obscured the full extent of Worldpay's struggles. ¶¶244-45. On this news, FIS's common stock price dropped *over 7%* in a single day. ¶246. Then, on November 3, 2022, Defendants once again disclosed disappointing results for the Merchant Solutions segment, including quarter-over-quarter contractions in adjusted EBITDA within the Merchant Solutions segment. ¶¶250-51. On this news, FIS's common stock declined another *28%*. ¶252. Although the market started to understand that the Company's poor performance was a sign of foundational problems

related to the Worldpay acquisition, the full truth was not revealed until February 13, 2023, when the Company announced that it was recording a "non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit" and planned to spin off Worldpay. ¶¶253-56. On this news, FIS's common stock declined another *12%*. ¶257. Indeed, following this news, analysts finally realized the falsity of Defendants' previous statements. For example, Mizuho analysts reported that the $17.6 billion write-down and spinoff meant that the acquisition of Worldpay in 2019 "was a huge failure," explaining that FIS's merchant business had "deteriorated considerably since the merger[.]" ¶259.

## III.    ARGUMENT

### A.    Legal Standards on a Motion to Dismiss

In reviewing Defendants' Motion under Rule 12(b)(6), the Court "must consider the Complaint in its entirety," "accept all factual allegations . . . as true," and construe all reasonable inferences in Lead Plaintiffs' favor. *Tellabs Inc. v. Makor Issuers & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007). In securities fraud cases, complaints must meet the pleading standards of Rule 9(b) and the PSLRA by pleading with particularity all facts supporting falsity, as well as all facts giving rise to a strong inference of scienter. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237-38 (11th Cir. 2008).

### B.    The Complaint Adequately Alleges Falsity

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A misrepresentation or omission

11

is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012). Thus, "[a] statement is misleading if 'in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it.'" *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011). Moreover, the Eleventh Circuit has held that "a duty to disclose all material information relating to a particular subject arises by voluntarily 'touting' the subject to investors." *Id.* at 1299 (citation omitted).

Here, the Complaint adequately alleges that Defendants made material misstatements and omissions regarding: (1) the success of the Worldpay acquisition and integration; and (2) the value of Worldpay's goodwill.

### 1. Defendants Misled Investors About the Success of the Worldpay Acquisition and Integration

#### a. Defendants Misled Investors About Revenue Synergies

Throughout the Class Period, Defendants touted their revenue synergies, leading investors to believe that the Worldpay acquisition was a success and delivering long-term shareholder value. Specifically, Defendants repeatedly claimed that they met or exceeded their revenue synergy expectations. *See* ¶¶184, 186, 188, 190, 192, 197, 232. Defendants also specifically told investors that they exceeded their revenue synergy expectations **because of** successful cross-selling of FIS and Worldpay products. For example, on August 3, 2021, Defendants raised the 2021 revenue synergy

12

expectation to $700 million based on purportedly "*strong cross-selling performance during the second quarter*." ¶197. Similarly, on February 15, 2022, Defendants stated they had "*done an excellent job driving cross sales through the Worldpay acquisition and [FIS] exceeded . . . more than $700 million in cross sales*." ¶209; *see also* ¶218.

Such representations were material to investors because when Defendants asked them to approve the Worldpay acquisition, Defendants told investors the high purchase price for Worldpay was justified because of "expected synergies" from the business combination, which would "come primarily from cross-selling." ¶¶61, 63. Thus, following the acquisition, investors closely monitored the Company's cross selling and attainment of revenue synergies because it was the metric by which investors could measure the progress of the acquisition and the Company's ability to deliver on its promises to generate long term shareholder value. ¶283. However, the rosy picture painted by Defendants was not true. Unbeknownst to investors, the Worldpay acquisition was a failure from the start. As detailed by several former employees, hardly any cross selling occurred between FIS and Worldpay, Worldpay lost significant customers and market share, and several crucial Worldpay employees left the Company following the acquisition. ¶¶64-94.

Indeed, *eight* former employees each offer highly corroborative accounts explaining that hardly any cross-selling occurred between FIS and Worldpay. ¶¶65-76. Importantly, these former employees worked in different business segments across the United States and the U.K., demonstrating the scale of these issues. For example, on the FIS side, CW 1—who ran sales and receivables in North America for FIS

13

GETPAID—stated that FIS made no attempts to cross-sell Worldpay products after a failed attempt led them to realize there were no synergies with Worldpay (*see* ¶¶43, 67), and CW 9—who led the profit and loss of the Integrated Payables division at FIS—stated that she attended monthly meetings with five different FIS businesses and not a single one of these businesses (which generated approximately $1 billion in annual revenue) met their revenue synergy targets (¶¶51, 76). On the Worldpay side, CW 4—who was responsible for tracking revenue synergies for Worldpay's U.K. SMB segment—stated that cross-selling was almost non-existent within the U.K. SMB business (*see* ¶¶46, 66), and CW 7—who personally managed Worldpay's six largest E-Commerce accounts—stated that she was not aware of *any* cross sales between FIS and Worldpay (*see* ¶¶49, 66).

Moreover, these former employees provide insight into why hardly any cross selling occurred. To start, Defendants rushed to acquire Worldpay to keep up with FIS's main competitor, and as such, underestimated the time and effort it would take to integrate a company like Worldpay. For example, according to CW 5, a cross-selling initiative was dropped shortly after November 2021 because it was immensely more expensive and difficult to put together than FIS originally hoped. ¶68. Similarly, Defendants did not integrate FIS and Worldpay, which made cross-selling extremely difficult. According to CW 2 and CW 3, FIS never integrated the two companies' customer relationship management systems, which made it difficult to get the information necessary to cross-sell. ¶72.

14

At bottom, the Complaint's CW allegations provide specific, first-hand, and detailed allegations regarding the failed acquisition and integration initiatives. These corroborative CW allegations demonstrate that Defendants were not achieving the revenue synergy targets that were needed to make the Worldpay acquisition a success. However, investors knew none of this. Indeed, investors did not know that Defendants manipulated revenue synergy calculations by including *any* new business acquired after the acquisition as a "synergy," regardless of whether that revenue was the result of the FIS-Worldpay business combination. ¶¶102-05. Because revenue synergies are, by definition, *additional* revenues obtained after an acquisition that the two companies could not have achieved alone, Defendants led investors to believe that their revenue synergy numbers only included revenue that was the direct result of combining the two companies—e.g., through cross-selling or leveraging FIS's brand, existing customers, or presence in a new territory—when in reality that was not true. ¶¶5, 198.

Therefore, Defendants' statements about the Company's revenue synergies were materially false and misleading because "[a] reasonable investor, in the exercise of due care, would have been misled by [them]." *FindWhat*, 658 F.3d at 1298 (citation and quotation omitted). Specifically, a reasonable investor would have believed, based on Defendants' statements, that the Company's revenue synergies came from successful cross-selling or by leveraging FIS's brand and existing customers, and that Defendants had successfully integrated Worldpay and were delivering on their justification for the $38.4 billion goodwill assigned to Worldpay. However,

15

unbeknownst to investors, Defendants hid the lack of cross-selling and failed integration by manipulating the revenue synergy calculations.[2]

Courts in this Circuit and elsewhere routinely find similar statements actionable when defendants tout their success but fail to disclose all material facts on the subject. *See Mohawk*, 564 F. Supp. 3d at 1290-93 (statements touting improving margins were false and misleading for failing to disclose that Defendants over-produced products to artificially inflate margins); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022) (statements touting positive revenues as the result of acquisition synergies held to be false and misleading because defendants omitted that "the positive revenue results were a byproduct of [an] undisclosed sales practice, which was resulting in sales to distributors at a rate that was unsustainable in the long term.").

Notably, Defendants' Motion ignores the allegations that it was misleading to include *any* new business in their calculation of revenue synergies. *See* Motion at 14-19. Rather, Defendants spill much ink attacking CW 4's credibility to undermine her allegations. *Id.* at 16-18. This makes sense, as CW 4's allegations are highly probative of falsity. Specifically, according to CW 4—who was responsible for calculating and

---

[2] Indeed, the reaction of market analysts supports a finding that the market was misled by Defendants' statements. ¶¶100-01. For example, on May 7, 2020, directly after the first false and misleading statement, Canaccord Genuity issued an analyst report stating that "[t]he integration with Worldpay remains on plan and *continued to deliver cross-sell wins*." ¶100. Later in the Class Period, on February 3, 2022, RBC Capital Markets issued a favorable rating on the stock and explained that "[u]nderlying [their] estimates are expectations" of, among other things, "mid- to high- single-digit growth in merchant acquiring *plus synergies from the merger with Worldpay*." ¶101. *See Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1293 (N.D. Ga. 2021) (finding statements material because analysts were encouraged by Defendants' margin improvements and record sales).

16

sending the U.K. SMB's share of revenue synergies to FIS's Integration Management Office—FIS defined a synergy as *any* new business obtained by Worldpay following its merger with FIS, and not necessarily new revenue generated as a direct result from cross-selling with FIS or from leveraging the FIS brand. ¶103.

Defendants primarily argue that the Court should not credit CW 4's allegations because the Complaint does not specify her exact dates of employment, but merely states that she was employed during the relevant period. Motion at 16. The argument is meritless. *First*, the relevant period refers to the Class Period generally, which is when the facts of this case took place. *Second*, it is clear CW 4 was employed at the time of the May 2021 statement because of the facts she alleges. For example, CW 4 had firsthand knowledge that FIS brought in a large consulting firm in April or May 2021. ¶85. The reasonable inference, therefore, is that CW 4 was employed during the May 2021 statement. *See FindWhat*, 658 F.3d at 1296 ("all well-pleaded facts [in the Complaint] are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

Defendants next argue that CW 4's allegations should be discredited because they are limited to the U.K. SMB. Motion at 16-18. However, Defendants ignore that CW 4's allegations are corroborated by CW 11, who stated that this conduct similarly occurred in the United States. ¶104. Defendants attempt to attack CW 11, arguing that CW 11 did not start working at FIS until January 2022. However, that is still during the Class Period when Defendants were making false and misleading statements about

the Company's achievement of revenue synergies. *See* ¶218 (on March 9, 2022, Defendants stated that "*revenue exceeded well over $700 million of cross-sales*").

Defendants next argue that CW 4 never said that non-cross-selling revenue synergies were invalid. Motion at 17. But this argument mischaracterizes the Complaint. The Complaint does not allege that cross-selling was the only revenue synergy. Indeed, the Complaint acknowledges that there are other ways to realize post-acquisition synergies such as leveraging FIS's brand, existing customers, or presence in a new territory. ¶193. Rather, the Complaint adequately alleges that revenue "synergies" Defendants touted were in fact standalone sales that were unrelated to the FIS-Worldpay combination. According to CW 4, who was responsible for tracking revenue synergies for an entire segment of Worldpay's business, "FIS defined a synergy as any new business obtained by Worldpay following its merger with FIS, and not necessarily new revenue generated as a direct result from cross-selling with FIS *or from leveraging the FIS brand*." ¶103 (emphasis added). The plausible (and correct) inference is that FIS's revenue synergy numbers included revenue that was not the result of combining FIS and Worldpay in order to make it appear as if the acquisition was successful, which, in turn, misled investors.

Defendants also argue generally that the Complaint's CW allegations do not establish the falsity of Defendants' statements in February and March 2022 (i.e., the statements in paragraphs 209 and 218) because they were low level employees that did not have knowledge of "Company-wide calculation or reporting of cross-sales." Motion at 21-22. However, the Complaint's allegations are corroborated by several

18

CWs—spanning different business segments and countries—which sufficiently establishes that FIS and Worldpay were not cross-selling at the rates Defendants claimed. "Indeed, circuit courts have recognized information from multiple confidential sources can be meaningful when corroborated by one another." *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020).

Finally, Defendants challenge CW 9's allegations that she attended meetings with leaders from five businesses—which generated $1 billion in annual revenue— where it was discussed that none of these businesses were hitting their revenue synergy numbers. Defendants argue that the Court should not credit these allegations because the five businesses represented less than 8% of FIS's total annual revenue. *See* Motion at 18. Defendants are wrong. Contrary to the cases cited by Defendants, here $1 billion is surely more than "a few stores" or a "few calls," and, together with the myriad other allegations from other CWs about different departments and business lines at FIS and Worldpay, can support an inference about the Company's entire business.

When properly credited the corroborative CW allegations, taken together with the Complaint's other detailed and particularized facts, render Defendants' statements about revenue synergies false and misleading.

### b.   Defendants Misled Investors About Integrating Worldpay

Defendants also misled investors about their purported success in integrating Worldpay. For example, on June 10, 2021, Defendant Norcross claimed they "***really haven't had negative surprises with Worldpay***" and "***everything [ha]s . . . hit as we expected,***

19

*and many reasons and many examples have exceeded our expectations.*" ¶195. Similarly, on November 16, 2021, Defendant Norcross stated that FIS had the "*Worldpay [integration] predominately behind us now*" and "*[w]e've got all of our segments really hitting on all cylinders.*" ¶205.

These statements were misleading because they led investors to believe that the integration was seamless and that FIS had already successfully integrated Worldpay, when in reality, it was far from complete. For example, Defendants *never* integrated FIS's and Worldpay's client relationship management ("CRM") software, which prevented employees from gaining the customer information necessary to cross-sell. ¶72. Similarly, Defendants *never* created a unified experience for customers, including the fact that they had separate contracts and systems that could not talk to one another. ¶¶73-74. And because of these integration challenges, Worldpay lost customers following the acquisition. *See, e.g.,* ¶73; *see also* ¶¶87-88 (FIS did not invest in Worldpay's innovation, which caused customers to switch to competitors that were quicker and more agile in developing new products to address customer needs). Indeed, Worldpay's business had declined so rapidly following the acquisition that Defendants brought in a large consulting firm in April or May 2021 to help turn the business around. ¶85.

Defendants argue that they cannot be held liable for the misstatements in paragraphs 195 and 205 because they are corporate puffery that no investor would rely

20

on. Motion at 23-24.[3] Defendants are wrong. While "corporate puffery – generalized, non-verifiable, vaguely optimistic statements" are sometimes not actionable, "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule." *Mogensen* v. *Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211-12 (S.D. Fla. 2014). "Statements that might be considered puffery in one context can be actionable in another, especially when defendants allegedly knew or recklessly disregarded facts contradicting their statements." *Id.* at 1212; *see also In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *13 (N.D. Cal. Mar. 31, 2023) (statements describing integration as "seamless" and stating sales teams were "fully integrated" not puffery).[4]

Viewed in context, the statements in paragraphs 195 and 205 are materially false and misleading. The Worldpay acquisition was extremely important for FIS's future growth and the expected synergies from it were supposed to unlock significant shareholder value. Indeed, investors closely monitored Worldpay's performance following the acquisition and analysts asked specific questions about it. For example, on November 16, 2021, an analyst asked about the Merchant Solutions segment—i.e., Worldpay—because "most people [were] dialed in" to that segment of the business

---

[3] Defendants do not argue that the statements in ¶¶184. 186, 188, 190, 192, 207, 209, and 218 are puffery, and thus, waive any right to challenge those statements as puffery.

[4] Moreover, whether a statement is puffery turns on whether an investor would have considered the statement material. "A statement or omission qualifies as 'material' if full and truthful disclosure of the facts would have been 'viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Primavera Inv's* v. *Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1157 (M.D. Fla. 2005) (quoting *Oxford Asset Mgmt.* v. *Jaharis*, 297 F.3d 1182 (11th Cir. 2002)). "A statement or omission is immaterial only if reasonable minds cannot differ in finding that the statement or omission lacks importance." *Id.* Here, the statements were material given the importance of the acquisition.

and "[e]veryone want[ed] to hear about [it]." ¶207. The fact that analysts asked specific questions about Worldpay following the acquisition demonstrates that the statements in paragraphs 195 and 205 were material and not puffery. *See In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *14 (N.D. Ga. Oct. 4, 2006) (that analysts were "concerned" about a subject "as evidenced by their questions," indicates materiality).

Investors were dialed into Worldpay because, in order for FIS to realize the benefits and justify the high price it paid for Worldpay—which, at the time, was the largest fintech deal ever—Defendants needed to successfully integrate Worldpay into its business. Given this context, the statements in ¶¶195 and 205 were material and thus more than mere corporate optimism. Courts in this circuit have held that under the same circumstances such statements are not puffery. *See, e.g., Anastasio*, 2011 WL 13124500, at *10 ("[i]t is not mere puffery to state that [defendants] had made significant progress in the integration of a newly acquired business unit" because "[i]t is a statement about how well [the company] is integrating [its acquisition] and it sends a clear signal to investors about the state of affairs at [the company].").

### 2. Defendants Misled Investors About Worldpay's Goodwill

#### a. The Complaint Adequately Alleges Defendants Violated GAAP and Issued False and Misleading Statements About Worldpay's Goodwill Value

In order to further maintain the appearance that the Worldpay acquisition was an ongoing success—and worth the $48 billion price tag—during the Class Period Defendants knowingly failed to perform a quantitative goodwill impairment test (as was required by GAAP under these circumstances). Instead, Defendants told investors

that the carrying value of Worldpay's goodwill remained north of $35 billion despite knowing of several impairment triggers that indicated that the fair value of Worldpay's goodwill was far lower than $35 billion. ¶¶111-37. By failing to timely write down the value of Worldpay's goodwill, Defendants' reported goodwill was misleading because it was materially overstated. ¶¶200, 215, 221, 227, 235. Moreover, these misstatements were material because they led investors to believe that Worldpay was performing well and remained a significant asset to the Company.

Contrary to Defendants' argument that Lead Plaintiffs merely allege fraud by hindsight (*see* Motion at 37-41), the Complaint explains in great detail how Defendants violated GAAP throughout the Class Period by delaying the goodwill impairment charge, and sets forth the specific facts existing at the time of Defendants' statements which indicated that the Merchant Solutions—i.e., Worldpay—goodwill was impaired as early as the second quarter of 2021, but no later the third quarter of 2021, yet no write-down was taken. Specifically, by that point: (i) Worldpay's business had declined substantially, lost market share and many critical customers to competitors (including its second largest E-Commerce client, Sony), causing FIS to bring in a large consulting firm in April or May 2021 to help turn the business around and make up for lost customers (¶¶123-29, 136-37); (ii) the Company's stock price and market capitalization had declined significantly in the second half of 2021 (¶¶130-33); and (iii) the Company had lost key Worldpay personnel following the acquisition (¶¶134-35).

Moreover, although Defendants were required to perform the full quantitative goodwill impairment test and write-down Worldpay's goodwill in 2021, at an absolute

23

minimum, Defendants were required to perform the full impairment test and recorded a goodwill impairment charge during each quarter of 2022, as Defendants continued ignoring several red flags that put them on notice that the Merchant Solutions segment's goodwill was materially overstated.[5] ¶¶151-53. Indeed, FIS's stock continued its significant, sustained decline into 2022, declining nearly 50% between July 2021 and September 2022, which corresponded to a $45.1 billion decline in market capitalization in just over one year.[6] ¶151.

Critically, in the summer of 2022, Defendants tried to get rid of the underperforming asset and secretly shopped Worldpay to private equity firms. ¶152. According to a New York Times article, these private equity firms "balked at the asking price of at least $30 billion." *Id.* This was a clear impairment trigger indicating that goodwill was impaired. According to ASC 350-20-35-3C(f), "a more-likely-than-not expectation of selling or disposing . . . of a reporting unit" is an impairment trigger that requires a quantitative goodwill impairment analysis. ¶116. Thus, since

---

[5] As explained in the Complaint, by the end of 2021, FIS's market capitalization indicated a fair value of approximately 10.9x earnings before interest taxes depreciation and amortization ("EBITDA") for the entire Company. If you applied that 10.9x EBITDA multiple to the Company's Merchant Solutions segment only (which contributed $2.3 billion of the Company's total EBITDA), the implied fair value of the Merchant Solutions segment was only $24.6 billion at that time—significantly below the $36.4 billion Defendants claimed Worldpay's goodwill was at that time. ¶¶146-49. In other words, Defendants led investors to believe that Worldpay deserved to be valued at a higher multiple than the EDITDA for the entire Company. ¶149. However, that was false, as the Worldpay part of the business was struggling and should have been valued at a lower multiple, if anything.

[6] It is worth noting that the substantial decline in FIS's stock price in 2021 stands in direct contradiction to Defendants' contention in their Motion that the acquisition was a success and produced strong revenues and profits. *See* Motion at 7 (arguing that "FIS continued to thrive in 2021").

24

Defendants were trying to dispose of the reporting unit, Defendants should have done a full impairment analysis at that time, but they did not. Had Defendants tested for impairment—which they were required to under GAAP—they would have been forced to take an impairment charge by that point. Indeed, the carrying value (i.e., reported value) of Worldpay's goodwill was $35 billion at that time—plainly higher than its fair value since Defendants could not even sell the *entire asset* for $30 billion (which they purchased for $48 billion). There is simply no justification for certifying to investors that Worldpay's goodwill value is $35 billion when Defendants knew that the entire asset was not even worth that much.

Defendants make the absurd argument that these allegations do not provide grounds to conclude that goodwill was impaired by August 2022 because the $30 billion "range" could have included the $35.2 billion in goodwill. *See* Motion at 38. This argument makes no sense. FIS bought Worldpay for $48 billion. ¶60. At that time, $10 billion was attributable to tangible assets and the remaining $38 billion was attributed to goodwill. *Id.* Yet in making their $30 billion dollar "range" argument Defendants completely ignore Worldpay's tangible assets. When you include the roughly $10 billion of tangible assets in the $30 billion "range," FIS was actually shopping Worldpay with a goodwill value of just $20 billion—nearly half of the $35 billion in goodwill Defendants falsely certified in their quarterly filings. Notwithstanding, the standard is not whether Defendants knew for certain that goodwill was impaired. Rather, impairment testing is required when it is "more likely

25

than not" that the carrying value exceeds the fair value.[7] Here, the fact that nobody was interested in Worldpay at a $30 billion asking price made it *at least* more likely than not that Worldpay's goodwill was less than the $35 billion carrying value.

Therefore, the Complaint's "allegations ma[k]e clear that the need to write down was so apparent to Defendants that a failure to take earlier write downs amounted to fraud." *Carpenters Health & Welfare Fund*, 321 F. Supp. 2d at 1352. Multiple courts in this circuit and across the country have upheld similar claims. *See In re Chic. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7-8 (S.D.N.Y. May 24, 2018) (holding falsity adequately alleged where defendants knew of, *inter alia*, the company's contemplation of a "quitclaim deed to relieve itself of liabilities associated with [the asset]" yet failed to take the goodwill impairment until after the sale); *Dudley v. Haub*, 2013 WL 1845519, at *3 (D.N.J. Apr. 30, 2013) (holding that falsity adequately alleged where four triggering events existed during the two quarters prior to when the impairment was taken); *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1369 (N.D. Ga. 2005) (plaintiff adequately alleged a material misstatement or omission in company's financial statements with regard to the goodwill of the company's Latin American operating segment).

---

[7] Moreover, according to ASC 350-20-35-3C(f), "a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit" is a triggering circumstance requiring testing for goodwill impairment. ¶¶116, 152. Here, Defendants' decision to sell Worlday required them to test for goodwill impairment, but they did not.

### b.      Defendants' Additional Arguments Should be Rejected

Defendants make a number of unpersuasive arguments to avoid liability for issuing false and misleading statements about Worldpay's goodwill, all of which should be swiftly rejected. *First*, Defendants' entire argument is premised on a misreading of the law. Defendants argue that the goodwill statements are statements of opinion, and thus, are actionable only if Defendants "did not actually believe their statements about goodwill." Motion at 35. This is wrong. The Supreme Court held in *Omnicare* that statements of opinion are actionable under any of three alternative scenarios: (1) the speaker did not hold the belief he professed, (2) supporting facts supplied were untrue, *or* (3) the stated opinion omits material information rendering it misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-85 (2015); *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322-23 (11th Cir. 2019) (recognizing that "when statements of opinion 'contain embedded statements of fact,' a speaker may be liable 'if the supporting fact she supplied were untrue.'") (citation omitted).[8] Here, at a minimum the third prong is

---

[8] Defendants argue that Lead Plaintiffs "do not allege that the goodwill statements contained untrue embedded facts." Motion at 35 n. 10. This is wrong. In *Carvelli*, the Eleventh Circuit explained that "if a CEO states that 'we believe that our product, which contains a state-of-the-art 2019 gadget, is the best on the market,' she can be liable if she knows that the product actually contains a refurbished 2015 gadget—in other words, if the embedded statement of fact (here, the gadget's newness) is false." *Carvelli*, 934 F.3d at 1322-23. Similarly, here, Defendants claimed that "based on [their] interim impairment assessment" goodwill was not impaired. ¶¶203, 224, 230, 238. The embedded statement of fact—that there were no impairment triggers indicating impairment—was false because several impairment triggers were present and known by the Defendants that indicated that goodwill was impaired as early as the second quarter of 2021, but at least by the third quarter of 2021.

satisfied, as the Complaint adequately alleges that Defendants omitted known, material information which demonstrated the value of Worldpay's goodwill was significantly lower than what Defendants publicly claimed, rendering the goodwill statements misleading to a reasonable investor.

The court's decision in *Zwick Partners* is instructive. There, the court rejected the defendant's argument that under *Ominicare*, "determinations of whether and when goodwill . . . [was] impaired are statements of *opinion*, not fact." *Zwick Partners*, 2018 WL 2933406, at *5 (emphasis in original). The court found that the plaintiff adequately alleged false and misleading statements because the complaint "allege[d] that the decisions not to test and write down impairments in Q1 2016 did not reasonably align with the information [d]efendants had at the time." *Id.* Specifically, the plaintiff alleged triggering events known to defendants—such as "a sustained, significant decline in share prices," a decline in overall financial performance, increased competition, and a deterioration in the entire industry—were sufficient to allege that Defendants misled investors by failing to take an impairment charge. *Id.*; *see also Chic. Bridge & Iron Co. N.V.*, 2018 WL 2382600, at *7-8 (same).

Likewise, in *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217 (S.D.N.Y. 2021), the court clarified that under the third *Omnicare* prong—i.e., where the stated opinion omits material information rendering it misleading to a reasonable investor—whether the defendants "may have believed the accounting estimate to be accurate is irrelevant, even when read as an opinion statement." *Id.* at 233. "The core inquiry when determining whether an omission renders an opinion misleading is whether the

omitted facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 233-34 (finding those standards met where the complaint alleged "that Defendants failed to disclose certain accounting elements, utilized baseless assumptions, and failed to take successive write-downs during the Class Period").

The Complaint here alleges the goodwill statements are actionably false and misleading. As described above, Defendants had undisclosed information regarding numerous triggering events demonstrating that goodwill was impaired. These facts were clear evidence of impairment that made it more likely than not that the carrying value of the Merchant Solutions segment's goodwill was less than its true value. But none of this was disclosed to investors. Instead, Defendants falsely claimed that goodwill was not impaired in order to maintain the appearance that the Worldpay acquisition was an ongoing success while they collected millions in bonus compensation and secretly tried to dispose of the asset for far less than they told investors it was worth. Thus, Lead Plaintiffs have adequately alleged that Defendants' assurances on unimpaired goodwill did ***not*** "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189.

Defendants' Motion also attempts to isolate each of the red flags to argue that goodwill was not impaired during the Class Period. Motion at 37-41. As an initial matter, this argument is improper because under GAAP the impairment indicators must be considered holistically. ¶118. Nevertheless, Defendants' attacks on each impairment triggers fail.

***The New York Times Article.*** Defendants argue that the Court should not credit the Complaint's allegation that Defendants secretly shopped Worldpay because it "is founded on confidential sources" and Lead Plaintiffs "cannot evade the Eleventh Circuit's standards for pleading securities claims based on confidential sources by pointing to a newspaper article." Motion at 38-39. This is simply wrong. The allegation comes from the New York Times, which is a credible—and not confidential—source.[9]

Indeed, other courts have rejected the very same argument. For example, in *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007), the court rejected the argument that "because the sources of the New York Times are confidential" the sources were not described with "sufficient particularity" under *Tellabs*. The Court held that "the [*Tellabs*] standard is applied to plaintiffs counsels' confidential sources, not the confidential sources of a reliable and independent newspaper." *Id.* The court further noted that "[a] reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting" and "the confidential nature of a journalist's source is used to encourage reporting and accuracy." *Id.* The Court should similarly reject this baseless argument.

***Market Capitalization.*** The Complaint adequately alleges that a sustained decrease in FIS's share price was an impairment trigger under ASC 350-20-35-3C(g). ¶¶130-33, 151. Indeed, between July 2021 and September 2022, FIS's stock price

---

[9] Thus, Defendants' reliance on *Mizzaro* and *Tupperware* is misplaced because those courts addressed confidential witnesses alleged in a complaint, and not allegations from a credible news source. *See Mizzaro*, 544 F.3d at 1239; *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *7 (11th Cir. Aug. 8, 2023).

declined nearly 50%, which was a $45.1 billion decline in market capitalization. ¶151.

Defendants argue that FIS's rapidly declining market capitalization cannot support

Lead Plaintiffs' fraud claim because FIS's stock price was "obviously known to

investors." Motion at 39. This argument misses the point. Goodwill is a holistic

assessment. In this case, that holistic assessment was required to take into account **both**

public information (such as market capitalization) **and undisclosed** red flags known

only to the Defendants (such as Worldpay's poor performance and Defendants'

decision to shop Worldpay). Defendants' statements misled investors into believing

goodwill remained unimpaired (despite the declining stock price). *See, e.g., In re

Omnicom Grp., Inc. Sec. Litig.*, 2005 WL 735937, at *7 (S.D.N.Y. Mar. 30, 2005)

(rejecting argument that information relevant to taking an impairment charge of an

asset was sufficiently disclosed to the market).[10]

> ***Other Indictors of Impairment***. Defendants argue that Worldpay's poor

performance, declining business, and loss of market share should not be considered

impairment triggers because FIS's business achieved record years in each of 2020 and

2021, with 2021's revenue of nearly $14 billion representing FIS's strongest operating

performance. Motion at 40. This argument is a red herring. These cherry-picked

financial metrics about ***company-wide*** performance are completely unrelated to what

---

[10] *City of Omaha, Nebraska Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64 (2d Cir.
2012) is distinguishable because there "all of the information alleged to constitute 'red flags'
calling for interim impairment testing . . . were matters of public knowledge." *Id.* at 69. Here,
on the other hand, the Complaint alleges several impairment triggers that were not known to
the public. For example, investors did not know that Defendants were shopping Worldpay
for $30 million when they claimed its goodwill value was worth $35 million by itself.

this case is about: ***Worldpay's*** declining value based on Defendants' failure to integrate it. Indeed, Defendants conveniently ignore the poor performance of the Merchant Solutions segment in 2022 and do not even deny that Defendants secretly shopped Worldpay at a substantial discount. Selling off the asset at a steep discount makes no sense if, as Defendants suggest, just months earlier Worldpay was supposedly thriving.

Defendants then argue that the loss of key Worldpay employees, like Shane Happach (Worldpay's Executive Vice President and Head of Global E-Commerce) and 50% of Worldpay's senior engineers, was not an impairment trigger because "[t]here is no allegation that FIS had any trouble hiring replacement engineers, or an explanation for why the replacements impacted Worldpay's value." Motion at 41. Not so. The Complaint specifically alleges that Mr. Happach grew Worldpay's E-Commerce business from $80 million to over $1 billion and that he had relationships with Worldpay's biggest customers, but left shortly after the acquisition. ¶¶44, 90. The Complaint further alleges that Defendants replaced departing Worldpay management with FIS people who did not understand Worldpay's business. ¶92. Indeed, CW 7 explained that the person Defendants put in charge of Merchant Solutions (i.e., Worldpay) following the merger, Jim Johnson, was not able to repair the relationship with Sony. ¶124. Thus, contrary to Defendants' argument, the Complaint does explain how "the replacements impacted Worldpay's value." *See* Motion at 41.

Finally, Defendants' heavy reliance on the Ninth Circuit decision in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) is misplaced. Contrary to Defendants' argument, *Align* does not require a

32

plaintiff to allege "actual assumptions that Defendants relied upon" in their goodwill analysis. Motion at 36; *see also In re Leapfrog Enter., Inc. Sec. Litig.*, 2017 WL 4877451, at *1 (N.D. Cal. Aug. 10, 2017) ("Nothing in *Align* makes a blanket ruling that . . . a plaintiff must make allegations about the assumptions that the defendants used in the accounting analysis."). The Ninth Circuit noted that actual assumptions were relevant in *Align* only because the "positive and mitigating events" could "balance or outweigh the events and circumstances" alleged there. *Align*, 856 F.3d at 618. Here, Defendants do not point to any mitigating events that would balance or outweigh Plaintiff's allegations, nor could they because they never did the analysis that was required.

At bottom, the arguments in Defendants' Motion are illogical and contrary to both common-sense and the well-pled allegations in the Complaint. Defendants argue that none of the impairment indicators actually indicated that Worldpay's goodwill was impaired, yet the simple fact is FIS abruptly and without warning took a massive $17.6 billion impairment charge at the end of the Class Period, and as *Dudley* acknowledged, "[g]oodwill does not go from being unimpaired to fully impaired overnight." *Dudley*, 2013 WL 1845519, at *12.

## C.    The Complaint Adequately Alleges Scienter

A Complaint adequately pleads scienter when it "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To satisfy the scienter requirement, a complaint must state facts giving rise to an inference that the defendant acted with the required state of mind, which can be an "intent to deceive, manipulate, or defraud," or "severe

33

recklessness." *Mizzaro*, 544 F.3d at 1238. Importantly, courts must consider the complaint in its entirety. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations *holistically*." *Tellabs,* 551 U.S. at 310. The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (italics in original). As the Eleventh Circuit has directed, the "question . . . boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount." *Mizzaro*, 544 F.3d at 1249. The Eleventh Circuit has also directed that the PSLRA's heightened pleading standard does not place "unrealistic burdens on plaintiffs." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).

### 1. The Complaint Adequately Alleges Scienter for the Worldpay Acquisition and Integration Misstatements

As the Court must consider the Complaint's scienter allegations holistically, and not individually, *see Tellabs*, 551 U.S. at 326, there are a number of facts pled that contribute to a strong inference of scienter. Although many of the Complaint's allegations are sufficient on their own to establish scienter, considered holistically, these facts establish that Defendants acted with scienter.

### a. The Individual Defendants' Bonus Compensation Supports Scienter

Although not required to plead scienter, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 310. As such, courts

consider incentive compensation in the scienter analysis. *See In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) (finding scienter where defendants earned "'concrete and personal benefits'" in the form of cash bonuses); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (same).

Here, the Individual Defendants were all motivated to misrepresent the success of the Worldpay acquisition because they received large bonuses tied to achieving revenue synergies for the first three years of the Worldpay acquisition. ¶263. Indeed, when the bonus compensation plan expired in September 2022, Norcross received $14.8 million in bonus compensation for purportedly achieving synergies, and Woodall had received $9.9 million in extra compensation for the supposedly successful acquisition. ¶¶269-70. Contrary to Defendants' argument, *see* Motion at 27, the Complaint ties these allegations to the manipulation of revenue synergies. As discussed by several former employees, there was little to no cross selling happening between FIS and Worldpay (despite Defendants' public statements to the contrary). ¶¶65-77. Indeed, according to CW 9—who attended meetings with five FIS businesses that generated $1 billion in annual revenue—none of these businesses were meeting their respective revenue synergy targets. ¶76. The only way Defendants could keep the illusion that the Worldpay acquisition was a success was by manipulating the revenue synergy calculations to make it appear as if the Company was successfully cross selling and exceeding revenue synergy targets. Unsurprisingly, investors were left holding the bag when the truth was revealed mere months after Defendants collected their millions

35

and left the Company. Given these circumstances, the Individual Defendants' financial gain supports a strong inference of scienter.

### b.      Core Operations Allegations Establish Scienter

The Complaint's core operations allegations further add to a strong inference of scienter. The Worldpay acquisition was critically important for FIS's growth, as they called it "strategic and transformational," and highlighted that it was the "[l]argest FinTech acquisition in history." ¶281. Defendants told investors that the Company's integration plan was "designed to create $9 – $17 billion in shareholder value" driven by the "achievement of permanent and recurring revenue and expense synergies related to the Worldpay acquisition[.]" *Id.* Given this it would be absurd to suggest that Defendants were not aware of the failed integration and Worldpay's struggles. *See Immucor*, 2006 WL 3000133, at *18 ("knowledge of facts relating to the core functions of a company can be imputed to a company's key officers").

The Complaint's core operations allegations are bolstered by the fact that Defendants tried to sell Worldpay in the summer of 2022. It would strain credulity to suggest that the Individual Defendants were not aware of and involved in FIS's efforts to sell Worldpay. And Defendants did not just wake up one day in the summer of 2022 and learn that the acquisition was a failure and decide to sell. Rather, Defendants knew at least in the spring of 2021 that Worldpay's business had struggled greatly, which is why they hired a large consulting firm to help turn the business around. ¶128.

36

Notwithstanding this knowledge, Defendants continued to publicly tout the acquisition as a success and failed to take a timely impairment charge on the asset.[11]

### c.   Norcross's and Woodall's Departures Support Scienter

Norcross's and Woodall's departures support an inference of scienter because they were accompanied by circumstances indicating their departures were related to their wrongdoing. Specifically, these Individual Defendants—the key executives behind the Worldpay acquisition and responsible for its integration—left the Company *directly after* they received millions in bonus compensation from the supposedly successful Worldpay integration (at least based on their false and misleading statements) and *directly before* the truth about the failed Worldpay acquisition was revealed. Indeed, these Individual Defendants consistently told investors Worldpay was thriving and refused to conduct a goodwill impairment analysis—in violation of GAAP—yet as soon as they left, the Company took a massive $17.6 billion write-down on that asset. This supports a strong inference of scienter. *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) (inference of scienter where "timing of [defendant's] termination and [the company's] announcement of remedial measures" coincided); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL

---

[11] Moreover, the specificity with which Defendants Norcross, Woodall, and Ferris made the misrepresentations supports a strong inference of scienter. For example, Norcross specifically spoke about the Company's revenue synergies, cross selling, and integration. ¶¶186, 190, 205, 209, 218; *see also* ¶188 (Woodall discussing revenue synergies); ¶232 (Ferris discussing revenue synergies). *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("public statements celebrating the merger as an unprecedented success" support scienter).

3755218, at *17 (E.D. Pa. June 16, 2015) (when considered holistically, "the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior").

### d. Defendants' Selective Disclosure of Key Performance Indicators Establishes Scienter

The Individual Defendants knew that metrics indicative of the performance of Worldpay, such as volume data, were critical to the market's ability to determine the success of Worldpay following the acquisition, but Defendants disclosed those metrics on a selective basis to conceal that Worldpay's business was actually failing. ¶¶289-91. For example, Defendants started disclosing the performance metrics in November 2021 after investors expressed concerns over the lack of transparency in the Merchant Solutions segment, however, Defendants abruptly stopped disclosing these metrics on August 4, 2022, two fiscal quarters later. ¶¶290-91. The timing of Defendants' decision to withhold Merchant volume data—at a time when the Company was trying to sell Worldpay—was suspicious and adds to a strong inference of scienter.

### e. Defendants' Competing Inference Is Without Merit

Defendants argue that their competing, nonfraudulent inference is more compelling because the Company's revenue synergies, market share, and cross sale metrics were validated by the Company's board of directors and auditor. *See* Motion at 29-30. This argument fails. As an initial matter, this is pure conjecture. There are no facts regarding what the Company's board of directors or auditor validated. Rather,

the Complaint specifically alleges that the Company's employees calculated and tracked revenue synergies, and that the Company's auditor merely reviewed the numbers given to them with potentially no knowledge of how FIS defined or calculated revenue synergies. *See* ¶¶211, 268 n.26. Thus, any revenue synergy numbers the auditor reviewed would have been fruit from the poisonous tree after the Company's employees incorrectly counted any new business as a synergy. Moreover, Defendants' nonfraudulent explanation fails as a matter of law because "officers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008). Indeed, "[t]o rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement." *Id.*; *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (same).

### 2. The Complaint Adequately Alleges Scienter for the Goodwill Misstatements

The allegations above in Section III(C)(1) support an inference of scienter for the goodwill misstatements as well because they demonstrate that Defendants knew about Worldpay's struggles (which was a red flag demonstrating goodwill was impaired). In addition to those facts, the Complaint pleads several other facts supporting scienter for the goodwill misstatements.

### a. The Magnitude of the Impairment Supports Scienter

Courts have long recognized large write-downs or goodwill impairment charges can establish scienter because "[g]oodwill does not go from being unimpaired to fully

39

impaired overnight." *Dudley*, 2013 WL 1845519, at *12 (finding a $321.8 million impairment charge supported the fact that the defendants "knew that it was more likely than not that the goodwill of the Pathmark business was overvalued in the relevant quarters"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("the sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing.").

Here, the sheer size of Worldpay's impairment charge—more than 45 times larger than the impairment charges in *Green Tree Fin.* and *Dudley*—provide additional evidence of scienter. FIS's impairment charge reduced its goodwill value by a staggering ***$17.6 billion*** overnight, a ***51% reduction*** from the goodwill value Defendants reported just one quarter earlier. The timing of the impairment charge further supports scienter, as it came just three months after Defendant Woodall stepped down from his CFO position and less than two months after Defendants Norcross abruptly departed as the Company's CEO. *See Vivendi*, 381 F. Supp. 2d at 176-77 (sudden goodwill impairment charge shortly after previous management left the company, "support[ed] a reasonable belief that" the goodwill impairment charge should have been recorded earlier "and that former management concluded not to do so.").

### b.    Defendants Were Motivated to Misrepresent Goodwill

Defendants' motive to delay the goodwill impairment charge further bolsters the inference that they knowingly or recklessly disregarded the need for the charge. Specifically, Defendants were motivated to delay taking the goodwill impairment charge while they secretly shopped Worldpay in the summer of 2022. ¶¶152-53. Had

40

Defendants taken the impairment charge when they should have, they would not have been able to shop Worldpay for $30 billion, as the impairment charge would have alerted the market that Worldpay's value declined substantially from the $48 billion price tag FIS paid only a few years earlier. But rather than admit that the value had declined, Defendants delayed taking the impairment charge—in violation of GAAP—and tried to pawn off the declining asset (which, if successful, could have prevented their fraud from being revealed). This motive is not the sort of generalized corporate motive to maintain profitability that courts have found inadequate to support scienter; rather, Defendants were unusually motivated to sell Worldpay and keep their fraud hidden. Such a motive provides additional evidence that Defendants acted with scienter by delaying the goodwill impairment charge. Thus, "[Lead] Plaintiffs have not just alleged GAAP violations, . . . but also evidence of 'corresponding fraudulent intent.'" *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 598 (D.N.J. 2001).

### c.    Defendants' Knowledge of Impairment Triggers

As explained above, Defendants knew of several impairment triggers indicating that Worldpay's goodwill was impaired as early as the second quarter of 2021, but no later than the third quarter of 2021. *See* Section III(B)(2). Although these impairment triggers demonstrated that Worldpay's goodwill was impaired, Defendants ignored them and failed to do a full goodwill impairment test. *See Strougo v. Trivity Health, Inc.*, 551 F. Supp. 3d 839, 852 (M.D. Tenn. 2021) (scienter adequately pled where the defendants "turned a blind eye to the . . . impairment indicators present" and failed to take a timely goodwill impairment); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d

41

256, 279 (3d Cir. 2006) ("[a]t the pleading stage, courts have recognized that allegations of GAA[P] violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss").

### d.    Defendants' Competing Inferences Are Meritless

Defendants argue that the more cogent inference is "that Defendants performed the appropriate assessment of each quarter under GAAP, considered all relevant factors" and concluded that goodwill was not impaired. Motion at 41-42. This is not plausible. Goodwill does not go from unimpaired to being impaired by $17.6 billion overnight. Further, Defendants were motivated to delay the impairment so they could sell Worldpay (effectively an admission that the Worldpay acquisition was a failure, since they would not have tried to sell if it was successful). Finally, Defendants cannot hide behind their auditors to avoid liability. *See LDK Solar*, 584 F. Supp. 2d at 1246 ("officers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices.").

### D.    The Complaint Adequately Alleges Loss Causation

Loss causation allegations are "not subject to heightened pleading standards." *In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1264 (S.D. Fla. 2012); *Mohawk*, 564 F. Supp. 3d at 1305 (N.D. Ga. 2021) ("Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA."). Further, "loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1364 n.7 (N.D. Ga. 2018).

42

Loss causation is simply the "causal connection between the material misrepresentation and the loss" incurred. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). It may be pled in any number of ways, including by alleging "that the share price of the security at issue fell significantly after the truth became known" *or* that "[d]efendants' misstatements or omissions concealed a foreseeable risk that ultimately materialized. *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1297 (N.D. Ga. 2011). Moreover, a plaintiff "need not rely on a single, complete, corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013).

Here, the Complaint adequately alleges a causal connection between Defendants' misrepresentations and the loss incurred by Lead Plaintiffs. Specifically, Defendants' misrepresentations led investors to believe that the Worldpay acquisition was a roaring success. However, investors learned the truth about the Worldpay acquisition through three partial disclosures that revealed that the acquisition was a failure and Worldpay's value had declined substantially since the acquisition.

Defendants argue the Complaint does not adequately allege loss causation because they claim the August 4 2022, November 3, 2022, and February 10, 2023 corrective disclosures do not discuss the Company's revenue synergies, cross-selling, or market share.[12] *See* Motion at 31-33; 45. However, courts do not require a mirror-

---

[12] Defendants concede that loss causation is adequately pled with respect to the February 13, 2023 disclosure and their goodwill misstatements. *See* Motion at 45.

43

image disclosure of fraud. *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1368-70 (N.D. Ga. 2010) (a "corrective disclosure need not specifically address the falsity of prior statements" because such a "rule would allow wrongdoers to avoid liability by merely refusing to admit the falsity of prior misstatements"); *see also In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *30 (N.D. Ga. Aug. 12, 2019) (same). Rather, "[s]o long as a later disclosure reveals new information which an earlier omission fraudulently concealed, it is immaterial whether the disclosure contains an express admission of prior fraudulent conduct." *Sci. Atlanta*, 754 F. Supp. 2d at 1370.

Here, the partial disclosures each revealed new information about the failed Worldpay acquisition and the true value of Worldpay. *First*, on August 4, 2022, Defendants announced disappointing results for its Merchant Solutions segment which is Worldpay. ¶157. Specifically, Defendants announced that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%, which JP Morgan analysts noted was "far below [street] expectations," of 50%. *Id.* Moreover, Defendants abruptly stopped disclosing key performance metrics for WorldPay, which obscured the full extent of its struggles. ¶¶158-59. *Second*, on November 3, 2022, Defendants disclosed further disappointing results for the Merchant Solutions business unit, telling investors that Worldpay's segment suffered from a 430 basis-point margin contraction during the quarter—far more than the previous quarter. ¶¶169-72. Finally, on February 10, 2023, investors learned the full truth when Defendants disclosed that they were spinning off Worldpay and taking a massive $17.6 billion write-down on the value of Worldpay. ¶¶173-75. On these

44

disclosures—which each revealed new information about the extent of Worldpay's downfall—FIS's stock price dropped substantially—7%, 28%, and 12%, respectively—which analysts attributed to the announcements. ¶¶160-64, 170-71, 175-80.[13] Therefore, the Complaint adequately alleges loss causation.

## IV.   CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety. If the Court grants Defendants' motion, in part or in full, Lead Plaintiffs respectfully request leave to amend pursuant to Rule 15. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court's discretion to dismiss a complaint without leave to amend is severely restricted by Fed. R. Civ. P. 15(a), which directs that leave to amend shall be freely given when justice so requires.").

Dated:  November 13, 2023          Respectfully submitted,

**LABATON SUCHAROW LLP**

By: */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

---

[13] Defendants argue that "[n]one of the analyst reports discussed in the Complaint even references revenue synergies, market share, or cross sales." Motion at 32. But this argument self-servingly misconstrues the Complaint's allegations as being solely about revenue synergies, market share, or cross sales as opposed to what it really is about, which is the failure of the Worldpay acquisition and Defendants' attempts to cover it up. When viewed through the proper lens the common-sense causal connection between Defendants' statements falsely touting the success of the acquisition and the disclosures revealing its failure is readily established. In any event, Defendants argument is belied by the Complaints allegations. Following the final corrective disclosure, Bloomberg News stated "the [Worldpay] business has lost market share to both traditional rivals and upstarts alike." ¶177.

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com

*Lead Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

**GRAY ROBINSON, P.A.**
David S. Oliver (FL Bar No. 521922)
301 East Pine Street
Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
david.oliver@gray-robinson.com

*Liaison Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

46

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 13, 2023, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2023.

*/s/ Michael P. Canty*
Michael P. Canty
