**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

NEBRASKA INVESTMENT
COUNCIL, NORTH CAROLINA
RETIREMENT SYSTEMS, &
NORTH CAROLINA
SUPPLEMENTAL RETIREMENT
PLANS,

    Plaintiffs,

v.

                                            Case No. 3:23-cv-252-TJC-PDB

FIDELITY NATIONAL
INFORMATION SERVICES, INC.,
GARY NORCROSS, JAMES
WOODALL, STEPHANIE FERRIS,
and THOMAS WARREN,

    Defendants.

## **O R D E R**

This securities fraud case is before the Court on the Defendants' Motion to Dismiss, Doc. 55.[1] The Plaintiffs have responded, Doc. 57, and the

---

[1] The Defendants are financial technology company Fidelity National Information Services, Inc., and four of its executives: former Chief Executive Officer Gary Norcross, former Executive Vice President and Chief Financial Officer James Woodall, current Chief Executive Officer and former President Stephanie Ferris, and former Chief Accounting Officer and Corporate Senior Vice President Thomas Warren.

The Plaintiffs are three investors who purchased Fidelity's stock: Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans.

Defendants have replied to the response, Doc. 58. The Plaintiffs allege the following facts in the Amended Complaint, assumed as true on a motion to dismiss.

In 2019, financial technology company Fidelity National Information Services, Inc., acquired a merchant transaction processing company, Worldpay, for $48 billion. Doc. 46 ¶ 2. At the time, the acquisition was the largest deal in fintech history. Id. Eighty percent of the purchase price—i.e., $38.4 billion—consisted of goodwill.[2] Id. ¶ 3. Fidelity told investors that the acquisition would generate $500 million in revenue synergies [3] over the next three years—primarily from cross-selling Fidelity and Worldpay products—and during that three-year period, executives touted the acquisition as a success. Id. ¶¶ 7, 62–64, 186, 188, 190, 192, 195, 197, 205, 207, 209, 218, 232. At conferences, on earnings calls, and in reports filed with the United States Securities and Exchange Commission (SEC), Fidelity identified nine-digit revenue synergies, described the synergies as "ahead of schedule," boasted of "strong cross-selling performance," denied any "negative surprises with Worldpay," and indicated

---

[2]Goodwill is an intangible asset and represents the value of brand name, customer base, customer relations, employees, and proprietary technology. Goodwill is calculated by subtracting the fair market value of a business from the purchase price.

[3]Revenue synergies are additional revenues obtained after an acquisition that the acquiring company and acquired company could not have achieved on their own.

that goodwill remained unimpaired.[4] Id. ¶¶ 7, 10, 15, 33, 35, 38, 97, 98, 140, 143, 165, 172, 183, 184, 186, 188, 190, 192, 195, 197, 203, 213, 224, 230, 238. Some of their statements were in direct response to investors' questions, including about the success of the acquisition. Id. ¶¶ 137, 194, 207, 209, 218. Based on their representations about revenue synergies and cross-sales, investors believed the acquisition was a "smashing" success. Id. ¶ 8.

Behind the scenes, though, Worldpay was struggling. See generally id. Key employees left and were replaced by Fidelity executives' friends and others who did not understand Worldpay's business, have the same relationship with Worldpay's customers, or have a grasp on Worldpay's complex technology. Id. ¶ 9, 89–94, 122. Fidelity failed to integrate the companies' systems, so employees of each could not see the other's customer data. Id. ¶ 72. Cross-selling initiatives failed or were abandoned due to difficulty and expense, and cross-sales were virtually non-existent. Id. ¶¶ 66–72, 103, 196, 206. Customers had expected to be able to go to Fidelity as a "one stop shop" for both Fidelity and Worldpay products, but because of the lack of communication between the companies and failure to integrate the companies' systems, they still had to deal with Fidelity and Worldpay largely as they had before, including by signing separate contracts for the companies' products. Id. ¶¶ 69, 70, 72–74. And

---

[4]Impairment occurs when a company's goodwill is worth less than the value recorded on the company's balance sheet.

3

although executives were publicly describing hundreds of millions of dollars in revenue synergies, the synergies were improperly assessed—instead of calculating the synergies based on cross-sales or sales resulting from leveraging the Fidelity brand, Fidelity artificially inflated the numbers by defining a synergy as <u>any</u> new Worldpay sale after the acquisition. Id. ¶¶ 11, 102, 103, 185, 193, 198, 233.

Apart from failing to achieve significant cross-sales or revenue synergies, Worldpay was losing customers, who were leaving for competitors. Id. ¶¶ 79–84, 86, 87. Among the lost accounts was Sony, Worldpay's second-largest eCommerce customer, which had generated $500,000 a week for Worldpay. Id. ¶¶ 14, 80, 81, 122, 124, 129, 284. The Sony loss was a "huge deal" that "became an all-hands-on-deck situation," including personal involvement from Fidelity's President, Head of Merchant Solutions. Id. ¶¶ 80, 81, 124, 284. And in the United Kingdom, Worldpay's Small and Medium Business segment saw negative net customer growth, forcing Fidelity to hire a large consulting firm for six months to help Worldpay "turn the books positive" and "try to gain more customers than they were losing." Id. ¶¶ 83–85, 128, 129, 208.

Worldpay's business failures and declining value culminated in a covert and unsuccessful attempt by Fidelity to sell Worldpay in the summer of 2022. Id. ¶¶ 16, 152, 153, 278. Fidelity asked for only $30 billion, which was less than two-thirds of the price Fidelity had paid only three years before and billions of

4

dollars below the value the executives were still publicly assigning to Worldpay's goodwill alone. Id. ¶¶ 2, 16, 152, 153, 236, 279.

Despite the many indicators that Worldpay's goodwill had deteriorated, Fidelity executives performed insubstantial interim goodwill impairment tests—though more thorough tests were required under Generally Accepted Accounting Principles—and continued to report to the SEC and investors that goodwill was unimpaired.[5] Id. ¶¶ 154, 224, 230, 238. This continued even as Fidelity announced a decrease in profitability in its Merchant Solutions segment—which consisted primarily of Worldpay—in August 2022, resulting in stock declining $7.56 per share, and a further decrease in profitability in November 2022, resulting in stock declining $22.29 per share. Id. ¶¶ 244–47, 250–52. With goodwill reportedly—but not genuinely—still intact, Chief Executive Officer Gary Norcross and Executive Vice President and Chief Financial Officer James Woodall received their final bonuses under a three-year incentive plan that offered them millions based on revenue synergies and expenses related to the Worldpay acquisition. Id. ¶¶ 263–65, 269, 270.

---

[5] Under Generally Accepted Accounting Principles, a company must perform an interim goodwill impairment test when circumstances making impairment more likely than not exist. Accounting Standards Codification ¶ 350-20-35-30.

Norcross's bonuses under the plan totaled $14.8 million, and Woodall's bonuses under the plan totaled $9.9 million.⁶ Id. ¶¶ 269, 270.

Woodall stepped down when Fidelity announced the quarterly results that secured him his final bonus. Id. ¶¶ 35, 36, 272. Norcross stepped down six weeks later. Id. ¶¶ 33, 34, 272. At the end of the next quarter, Fidelity recorded a "non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit"—in other words, Worldpay—and announced that it planned to "spin off" its Merchant Solutions business.⁷ Id. ¶¶ 173, 174. Fidelity's stock price immediately plummeted $9.43 per share, which was more than 12 percent. Id. ¶ 175.

Plaintiffs–investors filed suit shortly after Fidelity announced the sudden, substantial goodwill impairment and intended spinoff. The investors in this case allege fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. See generally id. In a detailed 123-page complaint, they identify by date and speaker multiple statements that they

---

⁶ Another Defendant, current CEO and former President Stephanie Ferris, collected $6.5 million under the same incentive plan. Doc. 46 ¶¶ 263–65, 271. The plan incentivized the executives to achieve $700 million in revenue synergies before September 30, 2022. Id. ¶¶ 6, 264. Several months before the deadline, the executives announced that the companies had achieved more than $700 million in cross-sales. Id. ¶¶ 10, 99, 209, 218.

⁷A "spinoff" occurs when a parent company sells part of its business to create a new, independent company.

6

allege are false or misleading. Id. ¶¶ 183–239. Some statements pertain to revenue synergies, cross-sales, the overall success of the Worldpay acquisition, and the value of Worldpay's goodwill. See id. Other statements are certifications that Fidelity's SEC reports comply with the law and accurately reflect the value of the company, including goodwill. See id. The investors also provide testimony from eleven confidential witnesses to substantiate the circumstances after the acquisition and to establish that the executives knew or should have known that the Worldpay integration was failing, cross-sales were barely occurring, revenue synergies were being miscalculated, and goodwill was impaired. See generally id. The confidential witnesses include five Fidelity employees and six Worldpay employees. Id. ¶¶ 43–53. The investors describe each employee's role, responsibilities, and basis for personal knowledge. Id.

Fidelity and the executives move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (PSLRA). Doc. 55. Broadly, they argue that the investors fail to adequately plead (1) that the identified statements were false, (2) scienter, and (3) loss causation. See generally id.

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance in contravention of" SEC rules or regulations in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). SEC Rule 10b-5 prohibits three activities in connection with the purchase or sale of

a security: (1) employing "any device, scheme, or artifice to defraud"; (2) making an untrue statement of material fact or omitting to state a material fact necessary to prevent a statement from being misleading under the circumstances in which it was made; and (3) engaging in an act, practice, or course of business that operates or would operate as fraud or deceit. 17 C.F.R. § 240.10b-5. Section 20(a) of the Exchange Act creates liability for anyone who controls a violator of the Exchange Act, unless the controller acted in good faith and did not induce the violation. 15 U.S.C. § 78t(a).

"To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called 'loss causation.'" Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317 (11th Cir. 2019) (cleaned up). "A misrepresentation or omission is material if, in the light of the facts existing at the time, a reasonable investor, in the exercise of due care, would have been misled by it." Id. (cleaned up). "In other words, materiality depends on whether a substantial likelihood exists that a reasonable investor would have viewed a misrepresentation or omission as significantly altering the total mix of information made available." Id. (cleaned up).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the securities-fraud context, a plaintiff must "allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." Carvelli, 934 F. 3d at 1318.

The PSLRA further requires a plaintiff alleging that a defendant made an untrue statement or omission of material fact in violation of Rule 10b-5 to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). If state of mind is a condition to liability, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A).

On a Rule 12(b)(6) motion to dismiss a § 10(b) action, a court must consider the complaint in its entirety and accept all factual allegations as true. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322–23. To determine whether the

pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." Id. at 323. But the defendant will prevail only if a reasonable person could not infer from the alleged facts that the defendant acted with the required intent. Id.

Here, the Plaintiff–investors have satisfied the described pleading requirements. Over 123 pages comprising 327 paragraphs, they set forth detailed, particularized allegations giving rise to the reasonable inference that Fidelity's acquisition of Worldpay was unsuccessful and costly, Fidelity was not achieving significant cross-sales with Worldpay, Fidelity improperly defined revenue synergies to bolster the numbers, Worldpay was losing substantial numbers of customers to competitors and thus losing market share, Fidelity's goodwill was clearly impaired and yet leaders refused to perform impairment tests at various times, Fidelity's executives knew how poorly Worldpay was doing, and—most crucially—Fidelity's executives lied to investors about all of this for years, resulting in a significant drop in the value of the investors' shares when the truth came out. They identify specific false or misleading statements and lay a thorough foundation for why the statements are false or misleading, for the defendants' knowledge of falsity, and for the bases for the confidential witnesses' knowledge. They also allege a steep decline in stock value following the disclosure of truthful information allegedly previously concealed by fraud. Whether the investors' allegations are accurate—and whether the evidence will

10

actually bear out that Fidelity and its executives committed fraud—is for another day. But at this stage, the Court takes the Amended Complaint's allegations as true. And taken as true, they adequately establish a claim for securities fraud.

The Court will not separately address each argument in the Motion to Dismiss, but four arguments merit brief discussion. First, Fidelity and the executives argue that employees whose employment dates are described as "during the relevant period" are unreliable because they may not have been employed at the time a particular statement was made and thus may lack knowledge about the accuracy of the statement.[8] Doc. 55 at 16, 21. Fidelity and the executives cite <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1239, 1250 (11th Cir. 2008). <u>Id.</u> at 16. But <u>Mizzaro</u> does not require specific dates of employment. Under <u>Mizzaro</u>, the question is whether a complaint "fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." 544 F.3d at 1240. The investors provide the required information here. <u>See</u> Doc. 46 ¶¶ 43–53. Viewing the allegations in the light most favorable to the

---

[8]Fidelity and the executives also suggest that "low-level" employees lack a basis for personal knowledge. Doc. 55 at 2, 15, 21, 22. That may be true in some cases, but not here. The employees here worked directly on matters they described. <u>See</u> Doc. 46 ¶¶ 43–53. Being "low-level" undermines the reliability of an employee's information only if <u>by virtue of his level</u> he is unlikely to have access to such information.

11

investors, "during the relevant period" means "for the whole period." Moreover, the Amended Complaint contains numerous allegations establishing bases for the employees' personal knowledge even if they were not employed at the time of a specific statement, including descriptions of their roles and responsibilities, information they obtained from others in the course of their work, and facts giving rise to reasonable inferences about their access to relevant documents and knowledge about their own jobs. See, e.g., Doc. 46 ¶¶ 43–53.

Second, Fidelity and the executives describe certain statements as "puffery" because they are "generalized, vague, nonquantifiable statements of corporate optimism." Doc. 55 at 23–24 (quoting Carvelli, 934 F.3d at 1318). But as Carvelli makes clear, puffery does not include all non-specific "statements of corporate optimism." Carvelli, 934 F.3d at 1318–20. A statement is puffery only if it is immaterial because it is so exaggerated and vague that no reasonable investor would rely on it "considering the total mix of available information." Id. at 1320 (cleaned up). "Materiality is . . . a mixed question of law and fact," and "when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. (cleaned up). Here, three of the statements Fidelity and the executives describe as puffery were made in response to specific questions from investors. Compare Doc. 55 at 23,

with Doc. 46 ¶¶ 194, 195, 205, 232, and Doc. 55-1 at 19 (2Q2022 earnings call transcript). A fourth described "strong cross-selling performance" and was made in a press release announcing that Fidelity was raising its revenue synergy estimate because of cross-sales. See Doc. 55 at 23; Doc. 46 ¶ 197. Considering the "total mix of available information," a reasonable investor could have relied on these statements.

Third, Fidelity and the executives argue that the investors never challenge the specific revenue synergy figures. See, e.g., Doc. 55 at 3, 15–16. But the investors allege that the revenue synergy figures were calculated using sales that were not revenue synergies. Doc. 46 ¶¶ 11, 103, 105, 198. This is sufficient for pleading purposes.

Fourth, Fidelity and the executives argue that auditors confirmed the values Fidelity calculated. Doc. 55 at 15–17, 27, 29, 34, 42–43. But the investors allege—and the Court must take as true—that Fidelity was submitting inaccurate numbers to at least some of the auditors. E.g., Doc. 46 at ¶ 103 & 101 n.26.

The Court has considered Fidelity and the executives' remaining arguments but is unpersuaded.[9] Considering the Amended Complaint in its

---

[9]The Court also rejects Fidelity and the executives' contention that the investors have waived or abandoned any allegation in the Amended Complaint.

entirety, as well as the documents attached to the Motion to Dismiss,[10] and taking the allegations as true, the investors have stated viable claims in both Counts I and II of the Amended Complaint. Accordingly, it is hereby

**ORDERED:**

1. Defendants' Motion to Dismiss, Doc. 55, is **DENIED**.

2. Defendants must answer the Amended Complaint no later than **October 23, 2024**.

3. The parties must file a case management report no later than **October 23, 2024**.

**DONE AND ORDERED** in Jacksonville, Florida, the 30th day of September, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

vng

Copies to:

Counsel of record

---

[10] The documents attached to the motion may properly be considered under Eleventh Circuit precedent. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1275 (11th Cir. 1999); Harris v. Ivax Corp., 182 F. 3d 799, 802 n.2 (11th Cir. 1999). In any case, the investors do not challenge the documents.