**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | No. 3:23-cv-252-TJC-PDB<br><br>Honorable Timothy J. Corrigan<br><br>Honorable Patricia D. Barksdale |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Defendants Fidelity National Information Services, Inc. ("FIS" or the "Company"), Stephanie Ferris, Gary Norcross, James Woodall, and Thomas Warren (together, "Defendants") submit the following Answer and Affirmative Defenses (the "Answer") to the Consolidated Amended Class Action Complaint (Dkt. 46, the "Complaint") in the above-captioned action.

This Answer is based on present knowledge and information, and Defendants reserve all rights to supplement or otherwise amend the Answer, including to add affirmative defenses, as discovery proceeds and as otherwise may be appropriate during the course of the litigation.

The Answer restates the allegations in the Complaint (including the headings, subheadings, and footnotes from the Complaint) solely for the convenience of the Court and the parties. Any allegation not expressly admitted is denied. In addition, the headings and prefatory material contained in the Complaint, as well as any footnotes in the headings and prefatory material, are not substantive allegations to which an answer is required; to the extent that these items are intended as substantive allegations, Defendants deny them.

Allegations throughout the Complaint refer generically to "Defendants." None of the responses in the Answer should be taken as a waiver of any arguments that the Complaint improperly engages in group pleading, or as an admission that the knowledge of any Defendant can be imputed to any other Defendant.

1

Defendants deny any allegation in the Complaint that suggests that any Defendant made any false or misleading statement or acted with scienter at any time, or that suggests that any Defendant in any way committed wrongdoing, misconduct, or a violation of the federal securities laws.

Accordingly, for their Answer and Affirmative Defenses, Defendants state as follows:

## I.      NATURE OF THE ACTION

1.      This securities fraud case arises from FIS's failed $48 billion acquisition of Worldpay and Defendants' fraudulent scheme to prop up the value of Worldpay following the acquisition despite knowing it was an abject failure. Ultimately, FIS was forced to write down and then sell off a majority stake of Worldpay for just $11.7 billion—a fraction of what FIS paid for it. Worse, investors were left holding the bag as FIS's stock price collectively plummeted 47% while the Individual Defendants personally made millions through a farcical executive compensation plan that somehow rewarded them for a "successful" acquisition even though Worldpay was on the scrap heap.

**ANSWER**:  Denied.

2.      FIS is a financial technology ("fintech") company whose legacy business provides banks with software to process daily banking transactions and post updates to accounts and financial records. In early 2019, FIS tried to acquire First Data Corporation ("First Data"), a merchant transaction processing company, to expand its product offerings in the e-commerce and physical point-of sale transaction processing space. However, FIS lost out on First Data when FIS's main competitor, Fiserv, Inc. ("Fiserv"), beat FIS and acquired First Data for $22 billion in January 2019. In response, FIS moved quickly to find its own merchant processing company, and less than two months later, FIS announced that it had acquired Worldpay for $48 billion—the largest fintech deal ever at that time. Despite concerns about the motives for the deal, Defendants assured investors that it was "purely for strategic purposes" and not a knee-jerk reaction to Fiserv's acquisition of First Data.

**ANSWER**:  Defendants admit that FIS is a fintech company whose legacy business provided banks with software to process daily banking transactions and

post updates to accounts and financial records, among other things. Defendants

deny the remaining allegations in Paragraph 2.

3.      To justify the massive $48 billion purchase price, Defendants claimed that $38.4 billion of the purchase price was attributed to "goodwill." Under Generally Accepted Accounting Principles ("GAAP"), goodwill is considered an intangible asset associated with the purchase of one company by another and represents the value of the acquired company's brand name, customer base, customer relations, employees, and proprietary technology.

**ANSWER**:  Denied.

4.      Here, Defendants stated that Worldpay's massive goodwill value (representing over 80% of the total purchase price) came from "expected synergies of combining operations, the acquired workforce, and growth opportunities." In other words, Defendants told investors that the $38.4 billion in goodwill was justified because Worldpay would now have access to new growth and sales opportunities that would drive revenue growth.

**ANSWER**:  Denied.

5.      Specifically, at the time of the acquisition, Defendants claimed that the FIS-Worldpay business combination would deliver over $500 million in "revenue synergies" over the first three years of the acquisition. Revenue synergies are additional revenues obtained after an acquisition that the two companies could not have achieved on their own.

**ANSWER**:  Denied, except Defendants admit that FIS has defined

revenue synergies as non-organic incremental annualized revenue realized by FIS

from specific actions taken in connection with the acquisition of Worldpay.

6.      Indeed, Defendants even created a compensation plan that would reward some of the Individual Defendants if certain revenue synergy targets were met during the three years after the acquisition. For example, under the terms of the incentive plan, Defendant Norcross stood to gain $27 million in bonus compensation if the Company delivered $700 million in revenue synergies.

**ANSWER**:  Denied, except Defendants admit that, under the terms of the

Worldpay Integration Incentive Plan, Norcross had a maximum equity incentive

opportunity of $27 million, and the maximum revenue synergy target was $700 million.

7.      Unsurprisingly, throughout the Class Period, Defendants repeatedly touted the Company's revenue synergies—claiming they were presently exceeding the revenue synergy targets based on successful cross-selling of FIS and Worldpay products—and along the way collected millions of dollars in bonus compensation. For instance, on August 3, 2021, Defendants stated that FIS "[r]ais[ed] [the] year-end 2021 revenue synergy target . . . to approximately $700 million on an annual run-rate basis, *in order to reflect strong cross-selling performance during the second quarter*[.]"

**ANSWER**:  Defendants admit that the second sentence of Paragraph 7 purports to quote and characterize statements made in an FIS press release dated August 3, 2021, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 7.

8.      Based on Defendants' representations about the revenue synergies and cross-selling, investors (wrongly) believed that the Worldpay acquisition was a smashing success and the massive purchase price was justified. But in reality, the acquisition was a failure from the start.

**ANSWER**:  Denied.

9.      Unbeknownst to investors, the Worldpay acquisition was a failure. FIS did not understand the merchant solutions market in which Worldpay operated, and shortly after the acquisition, multiple key Worldpay employees left and were replaced by friends of FIS executives who, like Defendants, did not understand Worldpay's business. As a result, Worldpay's business struggled after the acquisition and it lost customers at an alarming rate. Moreover, FIS and Worldpay employees were not able to cross-sell as promised because there was no plan in place or incentive to cross-sell. Indeed, multiple confidential witnesses ("CWs") confirm that they did not see *any* cross sales occurring whatsoever during their time working at the Company.

4

**ANSWER**:  Defendants deny the first, second, third, and fourth sentences of paragraph 9. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the fifth sentence of Paragraph 9 and therefore deny them.

10.     Despite these struggles and the lack of cross-selling, Defendants falsely claimed that they were meeting their revenue synergy targets—which investors viewed as an indicator of the success of the Worldpay acquisition—because of successful cross-selling. For example, on February 9, 2021, Defendants claimed that the Company "***exited the year [2020] generating more than $200 million in revenue synergies***." Similarly, on February 15, 2022, Defendants claimed that the Company had "***done an excellent job driving cross sales through the Worldpay acquisition and we exceeded . . . more than $700 million in cross sales***."

**ANSWER**:  Defendants admit that the second and third sentences of Paragraph 10 purport to quote and characterize statements made on earnings calls on February 9, 2021, and February 15, 2022, but state that the quoted documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 10.

11.     However, these and similar statements made throughout the Class Period were materially false and misleading. In reality, Defendants were manipulating revenue synergy calculations to include ***any new sales after the acquisition, regardless of whether it was a cross-sale or the result of leveraging the FIS brand***. Specifically, according to CW 4—whose responsibilities included calculating revenue synergies for Worldpay's UK SMB[1] business—FIS defined a synergy as any new business obtained by Worldpay following its merger with FIS, and not necessarily new revenue generated as a direct result from cross-selling with FIS or from leveraging the FIS brand. Moreover, FIS was using the same misleading synergy measurement in the United States. For example, CW 11—a former FIS employee in the United States

---

[1] SMB means small to medium sized businesses.

who was responsible for tracking synergies for an initiative in 2022—stated that she considered a revenue synergy between FIS and Worldpay any incremental new business and not necessarily new revenue generated as a direct result from cross-selling with FIS.

**ANSWER**: Defendants deny the first, second, and fourth sentences of Paragraph 11. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the third and fifth sentences of Paragraph 11 and therefore deny them. Defendants admit the allegations in the footnote associated with Paragraph 11.

12.     Therefore, Defendants knowingly misled investors about the success of the acquisition by falsely claiming that the revenue synergies came from successful cross-selling, when in reality, Defendants were simply manipulating the numbers and counting ordinary sales that would have happened without the acquisition in their reported revenue synergy figures, making the acquisition seem like a success when in fact it was a failure.

**ANSWER**:  Denied.

13.     In addition, in order to maintain the appearance that the acquisition was an ongoing success (and worth the $48 billion dollar price tag), throughout the Class Period Defendants continued to falsely claim in SEC filings that Worldpay's $38 billion in goodwill remained unimpaired.[2] Indeed, in addition to the lack of any cross-selling and revenue synergies that were being generated from the acquisition, several massive red flags were raised prior to and during the Class Period that signaled to Defendants that Worldpay's goodwill carrying value was nowhere near the $38.4 billion FIS paid for it. Nonetheless, Defendants continued to falsely certify in their SEC filings that goodwill remained unimpaired.

---

[2] GAAP rules required that public companies like FIS test goodwill for impairment annually at a minimum. However, GAAP rules also required that FIS test for goodwill impairment more frequently if circumstances changed that would more likely than not reduce the fair value of a reporting unit below the carrying value that is recorded on its balance sheet.

**ANSWER**:  Defendants deny the allegations in Paragraph 13. Defendants admit the allegations in the footnote in Paragraph 13.

14.    Starting in late 2020, several critical events transpired that raised red flags about the true value of Worldpay and its goodwill, requiring FIS to write down the value of Worldpay's goodwill (which at the time they failed to do). For example, since before the Class Period, Worldpay's important small and medium business ("SMB") segment observed a negative "net customer growth" rate, meaning it was losing more customers than it was gaining—a sure sign that growth was not headed in the direction Defendants promised. Moreover, in November of 2020, Worldpay's eCommerce business lost its second largest client, Sony, which caused severe concern amongst FIS executives. Things were so bad behind the scenes that in May 2021, FIS brought in a large consulting firm to help turn around Worldpay's SMB business in the UK. During this entire time, FIS was rapidly losing merchant customers and market share to competitors, sparking concern within the Company.

**ANSWER**:  Denied.

15.    Another huge red flag was FIS's poor stock price performance, a clear indication from an accounting perspective that the recorded carrying value of an asset does not match the true value and needs to be written down. Specifically, FIS's stock price tumbled in the second half of 2021 and into 2022, resulting in a massive $45.1 billion loss in market capitalization, firmly signaling that the true value of Worldpay was well below its $38 billion carrying value. Yet, in its annual report filed on SEC form 10-K on February 23, 2022, Defendants again falsely stated "***for all periods presented, goodwill was not impaired***." Tellingly, Defendants decided that they did not even need to go through with a full, thorough goodwill impairment analysis under GAAP and instead relied only on Defendants' own qualitative assessment of FIS's business to certify to investors that goodwill was not impaired.

**ANSWER**:  Denied.

16.    Confirmation that the acquisition had failed and that Worldpay's goodwill was not worth the amount the Company claimed came in the summer of 2022. During that time, FIS began secretly shopping Worldpay to private equity investors at a total asking price of around $30 billion. Because nobody was willing to pay that, Defendants knew, without a doubt, that the entire Worldpay asset's true value in the open market was worth no more than $30 billion. However, at the very same time, Defendants publicly continued to fraudulently tell investors that goodwill remained unimpaired, even though the reported value of goodwill was larger than Worldpay's total true value in the open market.

**ANSWER**:  Denied.

17.    But misleading investors about the reality of the Worldpay acquisition was of no bother to the Individual Defendants by that point because they had already been compensated to the tune of over $30 million collectively for supposedly successfully implementing Worldpay—the very same asset that that they were now shopping at a deep discount. Specifically, under an executive integration incentive plan which ran from April 2019 through September 2022, Defendant Norcross was awarded $14.9 million worth of bonus compensation, Defendant Woodall $9.9 million, and Defendant Ferris $6.5 million. Having collected their millions, Defendants soon began revealing information about the reality behind the acquisition.

**ANSWER**:  Denied, except as to the second sentence of Paragraph 17,

Defendants admit that the performance period of the Worldpay Integration

Incentive Plan ran from April 1, 2019 to September 30, 2022.

18.    The truth regarding the failed acquisition and the true value of Worldpay started to reveal itself on August 4, 2022, when Defendants announced disappointing results for its Merchant Solutions[3] segment—which was made up of Worldpay—and abruptly stopped disclosing key performance metrics, which obscured the full extent of Worldpay's struggles. On this news, FIS's common stock price dropped ***over 7%*** in a single day.

**ANSWER**:  Defendants deny the allegations in Paragraph 18. As to the

footnote in Paragraph 18, Defendants admit that FIS reorganized its reportable

segments as a result of its acquisition of Worldpay and that one of its new

segments was Merchant Solutions, and deny the remaining allegations in the

footnote.

19.    Then, on November 3, 2022, Defendants once again disclosed disappointing results for the Merchant Solutions business unit, leaving investors

---

[3] Prior to the acquisition FIS did not have a merchant solutions segment. It was created as part of the acquisition. Accordingly, Worldpay made up a vast majority of the Merchant Solutions segment's revenues.

to wonder if the results were caused by more serious structural problems with Worldpay and FIS. On this news, FIS's common stock declined another **28%**.

**ANSWER**: Denied.

20.     Finally, on February 13, 2023, investors learned the full truth when Defendants disclosed that they were spinning off Worldpay and taking a massive **$17.6 billion** write down on the value of Worldpay. On this news, the Company's common stock dropped another **12%**.

**ANSWER**: Denied.

21.     Following the final corrective disclosure, investors finally fully understood that the Worldpay acquisition was a failure and Defendants had been overstating the true value of the Worldpay asset by **billions of dollars**. Indeed, after news of the write down, Mizuho analysts stated that the write down and spinoff meant that the acquisition of Worldpay in 2019 "was a huge failure," explaining that FIS's merchant business had "deteriorated considerably since the merger[.]"

**ANSWER**: Denied.

22.     Finally, in July of 2023, FIS announced that it would be selling a majority stake in Worldpay to a private equity group for just $11.7 billion, valuing the company at no more than $18.5 billion total—far less than half of the $48 billion FIS paid for it just four years earlier.

**ANSWER**: Defendants admit that FIS announced in a press release in July 2023 that it had signed a definitive agreement to sell a majority stake in its Worldpay Merchant Solutions business to private equity funds in a transaction valuing Worldpay at $18.5 billion, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize or take out of context statements made in the press release.

23.     All told, while Defendants personally made millions in incentives for this failed acquisition, **investors lost over 45% of the value of their FIS investments**. This Action seeks to re-coup those losses caused by Defendants' fraud.

9

**ANSWER**:  Denied.

## II.   JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of
the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated
thereunder by the SEC (17 C.F.R. § 240.10b-5).

**ANSWER**:  Defendants admit that Plaintiffs purport to bring this suit
pursuant to the provisions referenced in Paragraph 24, but deny any liability to
Plaintiffs or the putative class, deny that Defendants have caused any injury to
the putative class, and deny that a class may properly be certified.

25.     This Court has jurisdiction over the subject matter of this action
pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C.
§ 78aa).

**ANSWER**:  Admitted.

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C.
§ 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). FIS is
headquartered in this Judicial District. Substantial acts in furtherance of the
alleged fraud or the effects of the fraud have occurred in this Judicial District,
and many of the acts and omissions charged herein, including the dissemination
of materially false and misleading information to the investing public, and the
omission of material information, occurred in substantial part in this Judicial
District. Further, FIS's securities trade on the NYSE stock market under the
ticker symbol "FIS."

**ANSWER**:  Defendants admit that venue is proper in the Middle District
of Florida pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act.
Defendants admit that FIS is headquartered in Jacksonville, Florida, and that its
stock is traded on the New York Stock Exchange under the ticker symbol "FIS."
Defendants deny the remaining allegations in Paragraph 26.

27.     In connection with the acts, transactions, and conduct alleged
herein, Defendants, directly and indirectly, used the means and instrumentalities

of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**ANSWER**:  Denied.

## III.   PARTIES

### A.   Lead Plaintiffs

28.    Lead Plaintiff Nebraska Investment Council is an unincorporated instrumentality of the State of Nebraska that has the statutory responsibility for the investment management of the assets of the State of Nebraska, including the public employee retirement plans administered by the Nebraska Public Employee Retirement System. As set forth in the certification attached as Exhibit A to the Declaration of David S. Oliver in Support of the Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel (ECF No. 24-1), Nebraska Investment Council on behalf of the Defined Benefit Plan, the Cash Balance Benefit Plan, and the General Endowments, purchased FIS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 28, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 28.

29.    Lead Plaintiff North Carolina Retirement Systems ("NCRS") is a division of the North Carolina State Treasurer's office, with the Treasurer serving as the sole trustee of NCRS' assets. NCRS administers the pension benefits for public employees. As set forth in the certification attached as Exhibit A to the Declaration of David S. Oliver in Support of the Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel (ECF No. 24-1), NCRS purchased FIS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first and second sentences

of Paragraph 29, and therefore deny those allegations. Defendants deny the

remaining allegations in Paragraph 29.

30. Lead Plaintiff North Carolina Supplemental Retirement Plans ("NCSRP") provides supplemental retirement savings options for public employees in North Carolina. NCSRP is administered by the Department of State Treasurer and the Supplemental Retirement Board of Trustees ("SRBT"). The SRBT is the sole trustee of the assets of the NCRS. The SRBT consists of nine members, including the State Treasurer or their designee, two individuals appointed by the North Carolina General Assembly, and six other individuals appointed by the North Carolina Governor. As set forth in the certification attached as Exhibit A to the Declaration of David S. Oliver in Support of the Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel (ECF No. 24-1), NCSRP purchased FIS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**ANSWER**: Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in the first, second, third, and

fourth sentences of Paragraph 30, and therefore deny those allegations.

Defendants deny the remaining allegations in Paragraph 30.

## B.  Defendants

31. Defendant FIS is incorporated under the laws of Georgia, with its principal executive offices located in Jacksonville, Florida. The Company's common stock is traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "FIS."

**ANSWER**: Defendants admit that FIS is incorporated under the laws of

the State of Georgia, that FIS is headquartered in Jacksonville, Florida, and that

its stock is traded on the NYSE under the trading symbol "FIS." Defendants deny

the remaining allegations in Paragraph 31.

32. FIS is a global provider of technology solutions for financial institutions and businesses of all sizes and across any industry globally. During

the Class Period, FIS had three primary operating segments: (1) Banking Solutions; (2) Merchant Solutions; and (3) Capital Market Solutions.[4]

**ANSWER**: Defendants admit that FIS is a global provider of financial services technology solutions for financial institutions, businesses and developers. Defendants admit that, during the putative Class Period, FIS reported its financial performance based on the following segments: Banking Solutions, Merchant Solutions, Capital Market Solutions, and Corporate and Other. Defendants deny the remaining allegations in Paragraph 32. Defendants admit the allegations in the footnote in Paragraph 32.

33.    Defendant Norcross served as the Company's Chief Executive Officer ("CEO") from January 1, 2015 to December 16, 2022 and as Chairman of the Board of Directors from May 30, 2018 to December 16, 2022. In his role as CEO of FIS, Norcross participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the success of FIS's acquisition of Worldpay and the value of Worldpay's goodwill. Norcross also falsely certified in the Company's 2021 Annual Report that the Merchant Solutions segment's goodwill was not impaired as of December 31, 2021. Also, in his role as CEO, Norcross signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX") which falsely certified that the Company's quarterly and annual reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**: Defendants admit the first sentence of Paragraph 33. Defendants deny the remaining allegations in Paragraph 33.

34.    Defendant Norcross started at FIS in 1988, beginning his work as an entry-level programmer at Systematics, which is now known as FIS. Norcross was

---

[4] FIS's fiscal year coincided with the ordinary calendar year, and ended on December 31 of each year. Accordingly, the first quarter ("1Q") of FIS's fiscal year was from January 1 through March 31; the second quarter ("2Q"), from April 1 through June 30; the third quarter ("3Q"), from July 1 through September 30; and the fourth quarter ("4Q"), from October 1 through December 31.

promoted to Vice President in 1996, and then took over as Chief Operating Officer ("COO") in 2007. Then in 2012, Norcross became President of FIS before stepping into the role of CEO in 2015. On October 18, 2022, Norcross announced that he would step down as CEO, effective January 1, 2023, and become the Chairman of the Board of Directors. However, on December 15, 2022, FIS announced that Norcross would actually step down as CEO the next day, December 16, 2022, and would not serve on the Board as previously reported. In total, Norcross worked for FIS for a total of 35 years.

**ANSWER**:  Defendants admit the first sentence of Paragraph 34. As to the second and third sentences of Paragraph 34, Defendants admit that Norcross served at FIS as: Senior Vice President of Integrated Financial Solutions from June 1996 to February 2006; Executive Vice President, Integrated Financial Solutions from February 2006 to November 2007; President and Chief Operating Officer, Transaction Processing Services from November 2007 to September 2009; Corporate Executive Vice President and Chief Operating Officer from October 2009 to March 2012; President and Chief Operating Officer starting in March 2012; and President and CEO effective January 1, 2015.

As to the fourth sentence of Paragraph 34, Defendants admit that FIS issued a press release on October 18, 2022, announcing that, effective January 1, 2023, Ferris would succeed Norcross as President and CEO of FIS, and Norcross would take on the role of Executive Chairman of FIS's Board of Directors. As to the fifth sentence of Paragraph 34, Defendants admit that on December 15, 2022, FIS announced that Ferris would succeed Norcross as CEO effective December 16, 2022, and that Norcross would depart from FIS's Board on the same date. Defendants deny the remaining allegations in Paragraph 34.

35.     Defendant Woodall served as the Company's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from March 18, 2013 to November 4, 2022. In his role as CFO of FIS, Woodall participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the success of FIS's acquisition of Worldpay and the value of Worldpay's goodwill. Defendant Woodall also falsely certified in FIS's filings with the SEC that the Company's goodwill was not impaired as of September 30, 2021, December 31, 2021, March 31, 2022, and June 30, 2022. Also, in his role as CFO, Woodall signed certifications pursuant to SOX which falsely certified that the Company's quarterly and annual reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**:  Defendants admit that Woodall served as Corporate Executive Vice President and Chief Financial Officer of FIS from March 18, 2013, to November 4, 2022. Defendants deny the remaining allegations in Paragraph 35.

36.     Defendant Woodall joined FIS in 2008, serving as senior vice president, Chief Accounting Officer, and controller for FIS until 2013 when he assumed the role of CFO. On August 4, 2022, FIS announced that Woodall was stepping down as CFO, effective November 4, 2022, and that Erik Hoag ("Hoag") would be replacing him on that same day.

**ANSWER**:  Admitted.

37.     Defendant Ferris has served as the Company's President since February 8, 2022 and as CEO since December 16, 2023, when she took over for Norcross as CEO. Ferris previously served as the Company's COO from August 1, 2019 to September 2020 and as Chief Administrative Officer from September 2, 2021 to February 8, 2022. Prior to that, Ferris served as CFO of Worldpay, and its predecessor, from April 26, 2016 until the closing date of the Worldpay acquisition by the Company on July 31, 2019. In her role as President, Ferris participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating the success of FIS's acquisition of Worldpay and the value of Worldpay.

**ANSWER**:  Defendants admit that Ferris was appointed President of FIS effective February 8, 2022, and CEO effective December 16, 2022. Defendants

15

admit the second sentence of Paragraph 37. Defendants admit that Ferris served as CFO of Worldpay until July 31, 2019. Defendants deny the remaining allegations in Paragraph 37.

38.    Defendant Thomas Warren ("Warren") served as the Company's Corporate Senior Vice President and Chief Accounting Officer ("CAO") from June 1, 2021 until May 22, 2023. Prior to serving as CAO, Warren served as the Corporate Controller at the Company since 2016. As CAO, Defendant Warren falsely certified in FIS's filings with the SEC that the Company's goodwill was not impaired as of September 30, 2021, December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022.

**ANSWER**: Defendants admit the first two sentences of Paragraph 38. Defendants deny the remaining allegations in Paragraph 38.

39.    Defendants Norcross, Woodall, Ferris, and Warren (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of, *inter alia*, FIS's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

**ANSWER**: Denied.

40.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

**ANSWER**: Because no allegations are set forth in Paragraph 40, no response is required. To the extent a response is required, Defendants admit that the Complaint purports to define the term "Defendants."

16

41.     FIS is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

**ANSWER**:  Denied.

42.     The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to FIS under *respondeat superior* and agency principles.

**ANSWER**:  Denied.

## C.     Relevant Third Parties[5]

43.     CW 1 was a Vice President of Sales at FIS during the Class Period and was responsible for running sales and receivables in North America for FITS GETPAID, a web-based accounts receivable software solution.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 43, and therefore deny those allegations.

44.     CW 2 started working at Worldpay before the Class Period and left in February 2023. Starting in October 2021, CW 2 was a Strategic Sales Director, Financial Services for Worldpay. According to CW 2, the Strategic Sales Team at Worldpay oversaw cross-selling to other divisions within the company. CW 2 noted that former Worldpay Senior Vice President of Strategic Solutions and Global Enterprise eCommerce John O'Brien oversaw the strategic sales team and reported to former Worldpay Executive Vice President and Head of Global eCommerce Shane Happach. CW 2 advised that she met with the Strategic Sales Team annually and explained that they were not meeting with FIS, nor were they focused on cross-selling with FIS.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 44, and therefore deny those allegations.

---

[5] All CWs are described in the feminine to protect their identity.

45.     CW 3 started at FIS before the Class Period and left in January 2023. CW 3 was an Enterprise Sales Executive that was responsible for overseeing more than 40 treasury SunGuard accounts at FIS.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 45, and therefore

deny those allegations.

46.     CW 4 was employed by Worldpay as a Lead Finance Partner during the relevant period. CW 4 advised that she worked on the UK SMB team. According to CW 4, UK SMB's month-to-month net customer growth was being tracked by Worldpay, and explained that this data showed that net customer growth was negative during her entire tenure at Worldpay. UK SMB's revenue synergies were reported to FIS's Integration Management Officer ("IMO").

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in the first, second, and third

sentences of Paragraph 46, and therefore deny those allegations. Defendants

deny the remaining allegations in Paragraph 46.

47.     CW 5 joined Worldpay before the Class Period and left the Company in November 2021. During the Class Period, CW 5 was a Director, Product. Shortly after FIS acquired Worldpay, CW 5 was informed that team leaders were asked to provide roadmaps on how to cross-sell and to provide estimates. CW 5 noted that she was tasked with providing information for her division.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 47, and therefore

deny those allegations.

48.     CW 6 started at Worldpay before the acquisition and remained there until January 2021. During the Class Period, CW 6 worked primarily on integrating card acquiring systems and on airline payment solutions, and reported to the Global eCommerce Division.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 48, and therefore

deny those allegations.

49.    CW 7 started working at Worldpay before the Class Period and
departed in December 2021. During the Class Period, CW 7 was an eCommerce,
Global Strategic Account Director at Worldpay. CW 7 explained that as a Global
Strategic Account Director, she personally managed Worldpay's six largest
eCommerce accounts, and also managed a team of five individuals. CW 7 noted
that she and an eCommerce colleague together managed the top 15 revenue
driving eCommerce accounts at Worldpay. CW 7 reported to Senior Vice
President Strategic Solutions, Global Enterprise eCommerce John O'Brien, who
initially reported to former Worldpay Executive Vice President and Head of
Global eCommerce Shane Happach, and later reported to current FIS President
of the Merchant Solutions, Jim Johnson.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 49, and therefore

deny those allegations.

50.    CW 8 joined FIS before the acquisition and left in August 2021.
During the Class Period, CW 8 was a Senior Sales Executive, Managed Risk
Services.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 50, and therefore

deny those allegations.

51.    CW 9 joined FIS before the Class Period and left the second quarter
of 2021. As a Senior Vice President, GM Commercial Digital Payments, CW 9 led
the profit and loss of the Integrated Payables division at FIS. As part of her
responsibilities, CW 9 was tasked with generating approximately $60 million in
annual revenue synergies with Worldpay and approximately $125 million of total
annual revenue within three years after the acquisition. According to CW 9, these
revenue goals were "so egregious" because the Integrated Payables division had
no ability to meet these targets. CW 9 stated that FIS did not provide any
roadmap on how the Integrated Payables division could grow its business to
reach those targets. CW 9 responded to FIS that the division could potentially

19

reach between $2.3 and $2.7 million in annual revenue synergies with Worldpay. CW 9 recalled that FIS subsequently revised its targets and tasked the Integrated Payables division with generating approximately $23 million in annual revenue synergies with Worldpay within three years. CW 9 noted that during her tenure at FIS, the Integrated Payables division generated between approximately $2.5 million and $3 million in annual revenue synergies with Worldpay and that the $23 million annual target was out of the question.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 51, and therefore deny those allegations.

52.     CW 10 was employed at Worldpay since before the Class Period until January 2021. CW 10 was a Senior Vice President, Product Management.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 52, and therefore deny those allegations.

53.     CW 11 was employed by FIS in the United States as a Finance Business Partner from January 2022 through the end of the Class Period. Part of her responsibilities included forecasting and budgeting for Worldpay and other FIS divisions, as well as tracking revenue synergies for an omni commerce business solutions initiative between FIS and Worldpay in the middle of 2022.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 53, and therefore deny those allegations.

## IV.   SUBSTANTIVE ALLEGATIONS

54.     FIS is a global fintech company headquartered in Jacksonville, Florida. Prior to the Worldpay acquisition, FIS primarily provided technology solutions and services for banks and other financial institutions—providing them with software for transaction and account processing, digital channel solutions, fraud prevention tools, and card issuing services.

**ANSWER**: Defendants admit the first sentence of Paragraph 54.

Defendants deny the remaining allegations in Paragraph 54.

55.     FIS's main competitor is Fiserv. As one senior FIS employee described it, FIS and Fiserv are "the Coke and Pepsi of legacy fintech." Nevertheless, over the last few years, this market has undergone a digital transformation, with declining cash usage, the growth of online shopping, and disruptive new fintech companies entering the market with new point-of-sale terminals allowing SMBs to process card payments more cheaply. As a result, legacy players like Fiserv and FIS sought to win back market share and add capabilities through various acquisitions.

**ANSWER**: Denied.

56.     In January 2019, Fiserv acquired First Data, a payment processing company that provides merchants with point-of-sale hardware, which enables merchants to accept electronic and digital payments. For Fiserv, the addition of First Data gave it access to one of the largest fintech markets of the past few years—portable, point-of-sale terminals for SMBs.

**ANSWER**: As to the first sentence of Paragraph 56, Defendants admit

that in January 2019, Fiserv, Inc. and First Data Corp. issued a press release

stating that their boards of directors had approved a definitive merger agreement

under which Fiserv would acquire First Data. Defendants lack knowledge or

information sufficient to form a belief about the truth or falsity of the remaining

allegations in Paragraph 56, and therefore deny those allegations.

57.     FIS, on the other hand, still did not have a merchant processing business and lacked similar access to SMBs. Therefore, FIS moved quickly to find a different merchant acquiror to buy. Less than two months later, on March 18, 2019, FIS announced that it was acquiring Worldpay in a deal that ultimately valued Worldpay at $48 billion. At the time, it was the largest fintech and payment processing deal ever.

**ANSWER**: Defendants admit that on March 18, 2019, FIS and Worldpay

announced that they had entered into a definitive merger agreement. Defendants

21

admit that the total purchase price for FIS's acquisition of Worldpay was $48.245 billion and that, at the time, this acquisition was the largest fintech acquisition in history. Defendants deny the remaining allegations in Paragraph 57.

58.   Like First Data, Worldpay is a payment processing company that provides online and in-store payment processing services to merchants. Its client base includes customers in markets such as retail, restaurant, government, e-commerce, supermarket, drug store, business to business, and consumer services.

**ANSWER**:  Admitted, except that Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations about First Data in Paragraph 58 and therefore deny those allegations.

59.   Shortly after the acquisition was announced, the market questioned the motives behind the deal. However, Defendants assured investors that the deal was not reactionary or made simply to keep up with the industry. As noted in an article from finance and stock market outlet, the Motley Fool, "Norcross insisted the deal was made purely for strategic purposes for the two companies' sake, not because of how the industry was moving." Thus, investors believed that the Worldpay acquisition was strategic and would complement FIS's business.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 59, and therefore deny those allegations. Defendants deny the second sentence of Paragraph 59. Defendants admit that the third sentence of Paragraph 59 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants lack knowledge or information sufficient to form a belief

22

about the truth or falsity of the allegations in the fourth sentence of Paragraph

59, and therefore deny those allegations.

60.    When the Worldpay acquisition closed on July 31, 2019, the total purchase price was $48.2 billion. However, because of the steep price, Defendants attributed $38.4 billion of the price to "goodwill," accounting for 80% of the overall purchase price.[6]

| The preliminary purchase price allocation was as follows (in millions): | | |
|---|---|---|
| Cash acquired | $ | 305 |
| Settlement deposits and merchant float (1) | | 2,447 |
| Trade receivables | | 1,619 |
| Goodwill | | 38,428 |
| Intangible assets | | 13,682 |
| Computer software | | 1,293 |
| Other noncurrent assets (2) | | 1,386 |
| Accounts payable, accrued and other liabilities | | (1,013) |
| Settlement payables | | (3,167) |
| Deferred income taxes | | (2,822) |
| Long-term debt, subsequently repaid | | (1,805) |
| Other liabilities and noncontrolling interest (3) | | (2,108) |
| Total purchase price | $ | 48,245 |

**ANSWER**:  Defendants admit that the total purchase price for Worldpay

was $48.245 billion, that $38.428 billion of the total purchase price was

attributed to goodwill in the preliminary purchase price allocation, and that the

table in Paragraph 60 appears in FIS's Form 10-Q for the quarter ended

September 30, 2019. Defendants deny the remaining allegations in Paragraph 60.

As to the footnote in Paragraph 60, Defendants admit that goodwill is defined in

---

[6] Under GAAP, goodwill is an intangible asset that is associated with the purchase of one company by another. It is the portion of the purchase price that is higher than the sum of the net fair value of all the assets purchased in the acquisition and the liabilities assumed in the process. It is calculated by taking the purchase price of a company and subtracting the fair market value of all assets and liabilities of that company: Goodwill = Purchase price — (assets and liabilities).

23

the Accounting Standards Codification and generally refers to an intangible asset that represents the excess of cost over the fair value of identifiable assets acquired and liabilities assumed in business combinations, and deny the remaining allegations in the footnote.

61.    Thus, Defendants paid a $38.4 billion premium to acquire Worldpay.[7] Moreover, Defendants told investors that Worldpay's $38.4 billion worth of "[g]oodwill consists primarily of expected synergies of combining operations, the acquired workforce, and growth opportunities."

**ANSWER**:  Defendants admit that Paragraph 61 purports to quote statements made in FIS's Form 10-Q for the quarter ended September 30, 2019, but state that the Form 10-Q speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 61 and the associated footnote.

62.    Specifically—and most important to this securities fraud case—Defendants told investors that the combined company would deliver significant revenue synergies moving forward. Revenue synergies are simply ***additional*** revenues from combining two companies that each company would not have been able to achieve separately. Defendants told investors that FIS and Worldpay would generate no less than $500 million in revenue synergies over the first three years of the acquisition, meaning the combination of FIS and Worldpay would generate an additional $500 million in revenue that FIS and Worldpay would not have been able to achieve on their own.

**ANSWER**:  As to the second sentence of Paragraph 62, Defendants admit that FIS has defined revenue synergies as non-organic incremental annualized

---

[7] In other words, because the sum of the net fair value of all assets purchased (and liabilities assumed) in the Worldpay acquisition was only $9.8 billion, Defendants justified the $48.2 billion purchase price by claiming that Worldpay's goodwill value was worth $38.4 billion.

revenue realized by FIS from specific actions taken in connection with the acquisition of Worldpay. Defendants deny the remaining allegations in Paragraph 62.

63.     Critically, Defendants claimed in the Company's Joint Proxy Statement asking investors to approve the FIS-Worldpay business combination that the $500 million in "revenue synergies are expected to come primarily from cross-selling to merchants and financial institutions globally."

**ANSWER**:  Defendants admit that FIS and Worldpay issued a joint proxy statement asking FIS and Worldpay shareholders to vote on certain matters relating to the business combination of FIS and Worldpay and that Paragraph 63 purports to quote statements in that joint proxy statement, but state that the joint proxy statement speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the remaining allegations in Paragraph 63.

64.     Although Defendants falsely touted the success of the Worldpay acquisition, in reality, the Worldpay acquisition was a failure from the start. As described by multiple former employees, hardly any cross-selling occurred, and FIS's business was losing customers and market share by the day as a result of Defendants' failure to integrate Worldpay. Moreover, several crucial Worldpay employees left the Company following the acquisition, further damaging Worldpay's value.

**ANSWER**:  Denied.

65.     As explained above, FIS needed to achieve significant revenue synergies through cross-selling to justify the large premium that the Company paid to acquire Worldpay. However, that simply did not happen, as employees struggled to make *any* cross sales, let alone the amount necessary to meet the revenue synergy targets and justify the acquisition price.

**ANSWER**:  Denied.

25

66.    For example, CW 7, who personally managed Worldpay's six largest eCommerce accounts, stated that she was not aware of ***any*** cross sales between FIS and Worldpay during her tenure. Similarly, CW 4 noted that cross sales between FIS and Worldpay were almost non-existent within the UK SMB business during her tenure. And CW 2, who was a Strategic Sales Director at Worldpay, stated that there was no integration between FIS and Worldpay and that cross sales between the two companies were few and far between. According to CW 8, a Senior Sales Executive at FIS, FIS and Worldpay did not have success cross-selling during her tenure and noted that cross-selling was non-existent after the acquisition.

**ANSWER**: Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 66, and therefore

deny those allegations.

67.    Indeed, Defendants abandoned certain cross-selling efforts because there were no synergies between the two companies. For example, according to CW 1, FIS GETPAID tried to integrate a couple Worldpay products shortly after the acquisition, however, she was informed by Worldpay Vice President and current GETPAID Senior Enterprise Solutions Executive Laura Silver that the integration was not successful because FIS GETPAID tried to integrate the wrong products and, as a result, FIS made no additional attempts to cross-sell Worldpay products with FIS GETPAID.

**ANSWER**:  Defendants deny the first sentence of Paragraph 67.

Defendants lack knowledge or information sufficient to form a belief about the

truth or falsity of the remaining allegations in Paragraph 67 and therefore deny

them.

68.    Similarly, CW 5 explained that FIS attempted to create an initiative with Worldpay in 2021 to cross-sell. CW 5 explained that FIS attempted to package different FIS and Worldpay products together and sell them under one umbrella to clients. However, CW 5 heard from her FIS supervisor that this initiative was dropped shortly after she left in November 2021 because it was immensely more difficult to put together than FIS originally thought, and it was not properly funded since it was more expensive than FIS had hoped.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 68, and therefore

deny those allegations.

69.     Other FIS employees actually lost business because they tried to cross-sell incompatible Worldpay products. For example, CW 3 explained that she lost business in January 2022 because she was forced to include Worldpay's payment processing products in the transaction. CW 3 explained that she worked on a $6 million payment management deal with an insurance client for two years, but it was derailed when she was forced to include Worldpay's products in the deal. CW 3 noted that due to the lack of training on Worldpay products, it looked to the insurance client like we were not united, which killed the deal. CW 3 noted that selling legacy FIS products and Worldpay products was like speaking different languages.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 69, and therefore

deny those allegations.

70.     Likewise, CW 7 recalled that she tried to cross-sell a payments project with FIS for Netflix, but they could not get that project to happen because it required cohesion with FIS and Worldpay, which was nonexistent between the two culturally different companies.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 70, and therefore

deny those allegations.

71.     Making matters worse, Defendants provided no incentive for cross-selling. According to CW 3, there was no incentive for FIS employees, like herself, to refer or cross sale Worldpay products. Indeed, Defendants scrapped a cross-selling incentive plan in 2020. CW 2 explained that in 2020, FIS and Worldpay discussed a Sales Performance Incentive Fund (SPIF) to boost cross-selling by providing salespeople an extra commission to cross-sell Worldpay and FIS products.[8] However, CW 2 explained that SPIF was dropped in August 2020—

---

[8] CW 2 noted that she learned about SPIF directly from her supervisor, former Worldpay Vice President Jeffrey Benson, who was informed about the SPIF by

and therefore never went into place—which negatively impacted potential cross sales because there was no incentive to do so.

**ANSWER**:  Defendants deny the first and third sentences of Paragraph 71. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the second, fourth, and fifth sentences of Paragraph 71 and in the associated footnote and therefore deny them.

72.     Even if employees wanted to cross-sell, it was difficult for them to get the information necessary to cross-sell because Defendants never integrated the companies' customer relationship management systems ("CRMs"). For example, CW 2 explained that Worldpay used Salesforce and FIS used Microsoft Dynamics, which created an information hurdle. CW 2 further explained that sharing of information between the two companies was extremely limited and it was hard to get any kind of accurate customer data from the other company to cross-sell. Likewise, CW 3 recalled that her colleagues had no clue what they were doing because FIS had a different CRM than Worldpay.

**ANSWER**:  Defendants deny the first sentence of Paragraph 72. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 72 and therefore deny them.

73.     Moreover, cross-selling was difficult because the two companies continued operating as separate entities. According to CW 2, customers approached FIS and Worldpay because they assumed it was a one stop shop following the July 2019 acquisition and wanted unified systems that could talk to one another. According to CW 2, there was an assumption in the market about what could be offered with FIS and Worldpay following the acquisition, but the reality was that it was still as if the two companies were separate companies. For example, customers left to competitors after they learned that FIS and Worldpay had separate contracts, among other things. So, if a cross sale were to take

---

current Worldpay Division Executive and Head North America Acceptance Jason Pavona, who reported directly to FIS's President, Merchant Solutions Jim Johnson.

place—which CW 2 noted never happened during her entire tenure—the customer would have had to sign two separate contracts.

**ANSWER**: Defendants deny the first and fourth sentences of Paragraph 73. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the second, third, and fifth sentences of Paragraph 73 and therefore deny them.

74.   Likewise, CW 1 stated that FIS and Worldpay had separate contracts which were never synergized. Similarly, CW 8 explained that it was difficult to get anything on paper because the two companies had a different commercial process, including pricing and quotes. Therefore, CW 8 further recalled that it was challenging for FIS and Worldpay to provide quotes to each other's clients.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 74, and therefore deny those allegations.

75.   For all the reasons discussed above, FIS and Worldpay were not cross-selling each other's products, and as a result, FIS was not achieving its revenue synergies.

**ANSWER**: Denied.

76.   The lack of revenue synergies was discussed during company meetings during the Class Period. For example, CW 9 attended monthly meetings with five FIS businesses—which generated a total of approximately $1 billion in annual revenue—to discuss revenue synergies with Worldpay. CW 9 stated that *none* of these five businesses hit their revenue synergy targets with Worldpay during her tenure. CW 9 further explained that she reported the Integrated Payables division's revenue synergies with Worldpay to current FIS Division Executive, Head of Products & Services – B2B & Money Movement Mike Kresse, who led the monthly remote meeting via Microsoft Teams to discuss each business line's revenue synergies. CW 9 explained that these meeting were attended by leaders from each of the five businesses and some Worldpay employees. CW 9 further recalled that she attended every monthly revenue synergy meeting during her tenure, and noted that the meetings started just prior to the acquisition.

29

**ANSWER**: Defendants deny the first sentence of Paragraph 76. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 76 and therefore deny them.

77.    At bottom, FIS was simply not hitting their revenue synergy targets that were needed to make the Worldpay acquisition a success. However, investors knew none of this because Defendants manipulated their revenue synergy calculations to make it appear as if the Company was successfully cross-selling and exceeding revenue synergy targets. *See* Section IV(D).

**ANSWER**:  Denied.

78.    In addition to knowing that there were no cross-selling synergies between FIS and Worldpay, Defendants also knew that Worldpay's value declined substantially during the Class Period, as the company lost significant market share following the acquisition and during the Class period, a fact corroborated by several former Worldpay employees.

**ANSWER**:  Denied.

79.    CW 7, a Global Strategic Account Director in Worldpay's eCommerce business, stated that following the acquisition, she saw a lot of bleed at the top of the book, which she explained meant a lot of customers left Worldpay to go to competitors, like Adyen, Stripe, Pay.com, and Checkout.com.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 79, and therefore deny those allegations.

80.    Specifically, and most notably, Worldpay lost its second largest eCommerce client in November 2020 to Adyen. According to CW 7, Sony—which was Worldpay's second largest eCommerce client behind Google and which generated $500,000 weekly for Worldpay—left Worldpay in November 2020. According to CW 7, losing Sony was a huge deal for Worldpay and FIS and became an all-hands-on-deck situation.

30

**ANSWER**:  Defendants deny the first sentence of Paragraph 80.
Defendants lack knowledge or information sufficient to form a belief about the
truth or falsity of the remaining allegations in Paragraph 80 and therefore deny
them.

81.    Indeed, CW 7 explained that FIS's President, Head of Merchant
Solutions Jim Johnson personally spoke with Sony in an unsuccessful attempt to
retain them as a client. According to CW 7, losing Sony spoke to FIS's lack of
understanding of how quickly customers in the merchant business could leave
and switch to another company. CW 7 suggested that Sony previously split its
eCommerce business between Worldpay and Adyen and subsequently took its
entire eCommerce business to Adyen in November 2020. CW 7 added that
Worldpay also lost Netflix's business in Australia and Canada, but noted it
retained Netflix's business in the U.S. At bottom, the loss of two major Netflix
customers and retention of the U.S. did not reflect the supposed growth in
customers and revenue synergies that Defendants touted to investors.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a
belief about the truth or falsity of the allegations in the first, second, third, and
fourth sentences of Paragraph 81, and therefore deny those allegations.
Defendants deny the remaining allegations in Paragraph 81.

82.    At the same time, Worldpay's SMB business also struggled and was
losing customers. CW 4 stated that Worldpay's UK SMB's customers were
declining quite rapidly during her tenure and explained that customers were
taking their business to Worldpay's competitors, including Square and Stripe.

**ANSWER**:  Defendants deny the first sentence of Paragraph 82.
Defendants lack knowledge or information sufficient to form a belief about the
truth or falsity of the remaining allegations in Paragraph 82 and therefore deny
them.

83.    Indeed, Worldpay's SMB business had negative customer growth
during the Class Period. Specifically, CW 4 was aware that UK SMB's month-to-
month net customer growth was being tracked by Worldpay, and explained that

31

this data showed that net customer growth was negative during her entire tenure. CW 4 added that UK SMB customer growth was never positive during her tenure at Worldpay and specified that UK SMB customers declined at Worldpay by 25 percent annually. CW 4 further recalled that the data she viewed during her employment with Worldpay indicated that U.S. SMB was facing similar challenges as UK SMB.

**ANSWER**:  Defendants deny the first sentence of Paragraph 83.

Defendants lack knowledge or information sufficient to form a belief about the

truth or falsity of the remaining allegations in Paragraph 83 and therefore deny

them.

84.     Similarly, CW 11 recalled that Worldpay lost more clients than it gained during her tenure, which she noted was a trend that began before she started, and noted that these client departures included Worldpay's SMB clients.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in Paragraph 84, and therefore

deny those allegations.

85.     Worldpay's SMB business was struggling so much that FIS brought in a large consulting firm in the spring of 2021 to help turn the business around. According to CW 4, beginning in approximately April or May 2021, FIS brought in a big team from a large consultancy firm for approximately six months to help Worldpay turn the books positive, i.e., try to gain more customers than they were losing.

**ANSWER**:  Defendants deny the first sentence of Paragraph 85.

Defendants lack knowledge or information sufficient to form a belief about the

truth or falsity of the remaining allegations in Paragraph 85 and therefore deny

them.

86.     Other CWs corroborated the fact the Worldpay lost significant market share to competitors. For example, CW 2 recalled that Worldpay often lost customers and price wars to competitors during the Class Period and explained that Worldpay lost sales to JPMorgan Chase because JPMorgan Chase

had the financial flexibility to give away merchant processing products at a discount, which Worldpay could not afford to do.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 86, and therefore deny those allegations.

87.    Similarly, other CWs have explained that some customers left Worldpay following the acquisition because FIS did not invest in Worldpay's innovation, leaving the customers to switch to competitors that provided new, innovative solutions. For example, CW 6 explained that FIS completely destroyed any product innovation at Worldpay, and explained that Worldpay lost customers following the acquisition to nimble competitors because FIS did not invest in product innovation and thus could not keep up with young tech stocks, which was well known throughout the company.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 87, and therefore deny those allegations.

88.    CW 5 recalled that Worldpay was slow to market in everything because it was impossible to get anything approved by FIS. CW 5 noted this was a problem because Worldpay's clients expected Worldpay to be quick and agile. Therefore, CW 5 noted that she did not have answers for clients when they inquired about new product availability, which ultimately led to her departure from FIS.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 88, and therefore deny those allegations.

89.    Defendants did not retain essential Worldpay employees—such as executives with key relationships with clients and engineers that helped build and maintain Worldpay's complex technology. These critical departures further harmed Worldpay's business following the acquisition and also raised another red flag to Defendants regarding the value of Worldpay's goodwill, which they ignored.

33

**ANSWER**:  Denied.

90.    For example, Worldpay's former EVP, Head of Global eCommerce, Shane Happach, left the Company shortly after the acquisition. According to CW 10, Shane Happach had the relationships with Worldpay's biggest customers. CW 10 further noted that Happach grew Worldpay's Global E-Commerce business from approximately $80 million to over $1 billion over the course of his ten years at Worldpay, and then he was pushed out by FIS.

**ANSWER**:  As to the allegations in the first sentence of Paragraph 90, Defendants admit that Shane Happach was formerly Worldpay's Executive Vice President and Head of Global Enterprise eCommerce, and deny the remaining allegations. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 90 and therefore deny them.

91.    Defendants also lost key engineers from Worldpay. According to CW 7, the major decline in the eCommerce business at Worldpay following the acquisition was partly because FIS lost approximately 50 percent of Worldpay's senior engineers towards the end of 2021 and early 2022.[9] CW 7 explained that this mass exodus of senior engineers negatively impacted Worldpay's business because Worldpay had a complicated ecosystem and was loaded with tech debt, meaning it had several pieces of technology, including several gateways and platforms and dozens of acquiring platforms, which required technical expertise from those that built the systems. CW 7 explained that Worldpay had a very complicated ecosystem that was complicated for people that worked there, let alone for a new engineer without the same knowledge.

**ANSWER**:  Defendants deny the first sentence of Paragraph 91. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 91 and the associated footnote and therefore deny them.

---

[9] CW 7 noted that the 50 percent number was a conservative estimate.

34

92.    Losing key employees was made worse by the fact that Defendants did not understand the merchant solutions business and replaced legacy Worldpay employees with their friends who also did not understand Worldpay's business. For example, CW 6 stated that shortly after the acquisition, FIS replaced departing Worldpay management with FIS's friends and its own leadership. CW 6 stated that this negatively impacted business because employees who knew merchant and global payment products were replaced with FIS employees who did not have knowledge of that business or Worldpay's ecosystem.

**ANSWER**:  Defendants deny the first sentence of Paragraph 92. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 92 and therefore deny them.

93.    Similarly, CW 6 noted that FIS did not have any concept of merchant payments. According to CW 6, FIS did not truly understand merchant or global payments because it had never worked in that business before. CW 3 described the Worldpay integration as a complete disaster and recalled that FIS tried to force the two companies to integrate without a go to market strategy. CW 10 stated that FIS reacted to the First Data Fiserv deal by buying Worldpay without fully understanding the market that Worldpay operated in.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 93, and therefore deny those allegations.

94.    CW 5 also noted that FIS and Worldpay had very different customers. Likewise, CW 3 explained that legacy FIS salespeople were trained to sell to multibillion dollar organizations and asking them to integrate merchant payment processing products was like forcing a square peg into a round hole.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 94, and therefore deny those allegations.

35

95.     Worst of all, despite all the struggles identified above, Defendants falsely told investors that the integration was a full-blown success.

**ANSWER**:  Denied.

96.     Because Defendants used revenue synergies and cross-selling as proxies for the success of the Worldpay acquisition, investors closely monitored the Company's revenue synergies and cross-selling efforts to determine whether the Worldpay acquisition was a success. Throughout the Class Period, Defendants repeatedly told investors that their purportedly successful cross-selling was driving significant revenue synergies for the combined company.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 96, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 96.

97.     For example, on May 7, 2020, the first day of the Class Period, Defendants claimed they had already achieved "***[r]evenue synergies of approximately $100 million***."

**ANSWER**:  Defendants admit that Paragraph 97 purports to quote and characterize statements made in an FIS press release dated May 7, 2020, and that May 7, 2020, is the first day of the putative class period, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 97.

98.     A year later, Defendants claimed that cross-selling was so successful that they were raising revenue synergy targets. On August 2, 2021, Defendants claimed FIS was "rais[ing] year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, ***in order to reflect strong cross-selling performance during the second quarter***."

36

**ANSWER**:  Defendants admit that Paragraph 98 purports to quote and characterize statements made in an FIS press release dated August 3, 2021, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 98.

99.    The next year, on February 15, 2022, Defendants claimed that the Company had exceeded those increased targets, claiming that they "***done an excellent job, driving cross sales through the Worldpay acquisition and we exceeded . . . more than $700 million in cross sales***."

**ANSWER**:  Defendants admit that Paragraph 99 purports to quote and characterize statements made on an earnings call that FIS held on February 15, 2022, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 99.

100.   As a result, investors believed that the Worldpay acquisition was a success and driving revenue synergies for the Company throughout the Class Period. For example, on May 7, 2020, Canaccord Genuity stated that "[t]he integration with Worldpay remains on plan and continues to deliver cross-sell wins." Likewise, on November 4, 2021, after FIS affirmed prior targets of 7 to 9 percent annual organic revenue growth and 50 to 100 basis points of earnings before interest tax depreciation and amortization ("EBITDA") margin expansion, William Blair stated that "We believe management's confidence is driven by strong new sales activity, ***revenue synergies from the acquisition of Worldpay***, new products, and a $22 billion of backlog."

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of

37

Paragraph 100, and therefore deny those allegations. Defendants admit that the

second and third sentences of Paragraph 100 purport to quote and characterize

statements made in documents written by non-parties and on an earnings call

that FIS held on November 4, 2021, but state that the documents speak for

themselves and deny the allegations to the extent they mischaracterize, take out

of context, inaccurately quote, modify, or add emphasis to the statements.

Defendants deny the remaining allegations in Paragraph 100.

101.   This continued later in the Class Period. For example, on February 3, 2022, RBC Capital Markets issued an "outperform" rating[10] on FIS's stock, stating that "[u]nderlying our estimates are expectations for organic growth in the high-single digits based on mid-single-digit growth in overall bank tech spending and mid- to high-single-digit growth in merchant acquiring ***plus synergies from the merger with Worldpay***."

**ANSWER**:  Defendants admit that Paragraph 101 and the associated

footnote purport to quote and characterize statements made in a document

written by a non-party, but state that the document speaks for itself and deny the

allegations to the extent they mischaracterize, take out of context, inaccurately

quote, modify, or add emphasis to the statements. Defendants deny the

remaining allegations in Paragraph 101.

102.   However, Defendants' portrayal of revenue synergies was inherently false. In reality, Defendants were manipulating their revenue synergy calculations by including ***any new revenue*** after the acquisition as a revenue synergy, regardless of whether that revenue was the result of the FIS-Worldpay business combination. Thus, Defendants fraudulently led investors to believe that the Company was meeting its revenue synergy targets when that was not the case.

---

[10] RBC Capital Market's Equity Rating System defined "outperform" as "[e]xpected to materially outperform sector average over 12 months."

**ANSWER**:  Denied.

103.   Specifically, according to CW 4—whose responsibilities included calculating and sending the UK SMB's share of revenue synergies to FIS's Integration Management Office—FIS defined a synergy as any new business obtained by Worldpay following its merger with FIS, and not necessarily new revenue generated as a direct result from cross-selling with FIS or from leveraging the FIS brand. Certain channels were automatically deemed to be a synergy—Republic of Ireland and IP business were new business and automatically reported as a synergy. Indeed, CW 4 noted that cross sales between FIS and Worldpay were almost non-existent within the UK SMB business during his tenure.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the first and third sentences of Paragraph 103 and therefore deny them. Defendants deny the second sentence of Paragraph 103.

104.   This conduct was not limited to the UK SMB. For example, CW 11, a former FIS employee in the United States who was responsible for tracking synergies for an initiative in 2022, stated that she considered a revenue synergy between FIS and Worldpay any incremental new business and not necessarily new revenue generated as a direct result from cross-selling with FIS.

**ANSWER**:  Defendants deny any allegations related to any purported "conduct" alleged in the first sentence. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the second sentence of Paragraph 104 and therefore deny them.

105.   In doing so, Defendants misled investors into believing that the Company was achieving revenue synergies based on successful cross-selling or by leveraging FIS's brand and existing customers, when in reality, the revenue synergies were not the result of either. As a result, investors (wrongly) believed that the Worldpay acquisition was successful, and that Defendants were delivering on their justification for the $38.4 billion goodwill assigned to Worldpay.

**ANSWER**: Denied.

39

106.   Defendants' fraud arises from their scheme to prop up the value of FIS's prized acquisition despite clear evidence that it was an abject failure and not worth the $38.4 billion goodwill value Defendants attributed to it. Specifically, because Worldpay's business had declined following the acquisition, *see* Section IV(C), Defendants were required to reassess Worldpay's goodwill to determine if it was impaired. Goodwill impairment simply means that the carrying value of an asset (i.e., the amount on which it is carried on a company's books and records) has become greater than the fair value of the asset. When impairment occurs, a company is required to write off the difference between the carrying value and its fair value in order to reflect the changed value.

**ANSWER**:  Denied, except Defendants admit that, as provided in the Accounting Standards Codification ("ASC"), an impairment of goodwill is defined as the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value, and that, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess, limited to the total amount of goodwill allocated to that reporting unit.

107.   Here, although Defendants knew that Worldpay's value had declined substantially following the acquisition, they unreasonably delayed and avoided an impairment charge for over a year and a half. As a result of Defendants' unreasonable failure to properly conduct goodwill impairment testing in the third and fourth quarters of 2021 and throughout 2022, FIS's quarterly and annual reports materially overstated goodwill and total assets on FIS's balance sheet, rendering those statements materially false and misleading.

**ANSWER**:  Denied.

108.   As a U.S. public company, FIS is required by the SEC to comply with GAAP in compiling and filing its annual and interim financial statements with the SEC. GAAP is a series of authoritative standards (set out by policy boards, including the Financial Accounting Standards Board, or "FASB") that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable. This makes it easier for investors to analyze and extract useful information from a company's financial

40

statements and facilitates the comparison of financial information across different companies.

**ANSWER**:  Defendants admit the first sentence of Paragraph 108. As to the second sentence of Paragraph 108, Defendants admit that GAAP is a series of authoritative standards (set forth by boards, including the FASB) that standardizes and regulates definitions, assumptions, and methods used in accounting across industries. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in the second sentence of Paragraph 108 and the last sentence of Paragraph 108, and therefore deny those allegations.

109.   FASB's Accounting Standards Certification ("ASC") is the current source of U.S. GAAP. The GAAP provisions for goodwill are presented in ASC 350, *Intangibles – Goodwill and Other*.

**ANSWER**:  Denied.

110.   Goodwill is an intangible asset that is associated with the purchase of a business by another. Specifically, goodwill is the portion of the purchase price that is higher than the sum of the net fair value of all of the assets purchased in the acquisition and the liabilities assumed in the process. Essentially, once the fair value of assets and liabilities acquired in a business combination is determined, goodwill is the residual or plug amount to balance the equation.

**ANSWER**:  Defendants admit that goodwill is an intangible asset that represents the excess of cost over the fair value of identifiable assets acquired and liabilities assumed in business combinations. Defendants deny the remaining allegations in Paragraph 110.

111.   Goodwill impairment is an accounting charge that companies record when goodwill's carrying amount on the financial statements exceeds its implied

41

fair value.[11] Goodwill impairment arises when there is deterioration in the capabilities of the acquired asset—here, Worldpay—to generate the cash flows anticipated at the time of acquisition—here, the revenue synergies expected at the time of the acquisition—and thus the fair value of the goodwill dips below its book value.

**ANSWER**:  Defendants admit that an impairment of goodwill is defined as the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value. Defendants deny the remaining allegations in Paragraph 111. As to the footnote in Paragraph 111, Defendants admit that the footnote purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements.

112.    Public companies like FIS are required to test for goodwill at least annually. According to FIS's annual reports, the Company assessed goodwill for impairment during the fourth quarter of each fiscal year.

**ANSWER**:  Admitted.

113.    However, goodwill should also be tested for impairment between annual tests when certain red flags, or impairment triggers, are present, such as adverse changes in the acquired asset that might negatively impact the value of that asset/reporting unit.[12] Interim goodwill impairment testing is therefore

---

[11] "Fair value" is defined as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is an exit price – e.g. the price to sell an asset instead of the price to buy that asset." *See* KPMG Handbook, Impairment of Nonfinancial Assets, § 8.2.10.

[12] GAAP requires goodwill impairment testing to be performed at a level of reporting referred to as a reporting unit. Here, FIS had three reporting units: (1) Banking Solutions; (2) Merchant Solutions, i.e., the Worldpay business; and (3) Capital Market Solutions.

required if circumstances exist that indicate that it is more likely than not that a goodwill impairment exists. *See* ASC 350-20-35-30.

**ANSWER**: Defendants admit that goodwill of a reporting unit should be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Defendants deny the remaining allegations in Paragraph 113 and the associated footnote.

114.    Indeed, Defendants understood the need to conduct interim goodwill impairment testing if certain red flags were present, as they acknowledged in their 2021 Annual Report when they stated that "[t]he Company assesses goodwill for impairment by reporting unit on an annual basis during the fourth quarter ***or more frequently if circumstances indicate potential impairment***."

**ANSWER**: Defendants admit that Paragraph 114 purports to quote statements made in FIS's 2021 Form 10-K, but state that the Form 10-K speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statement. Defendants deny the remaining allegations in Paragraph 114.

115.    ASC 350 outlines a multi-step process for assessing whether goodwill is impaired. During the relevant period here, ASC 350 permitted companies to conduct a threshold qualitative assessment of goodwill as a preliminary step to evaluate whether or not the carrying amount (i.e., book value) of a reporting unit was more likely than not greater than its fair value. If the fair value of the reporting unit was more likely than not greater than its carrying amount, then no impairment was deemed to exist and no further assessment was necessary. If, however, the carrying amount was more likely than not greater than the fair value of the asset, then ASC 350 requires more rigorous quantitative testing.

**ANSWER**:  Defendants admit the first sentence of Paragraph 115. As to the second sentence of Paragraph 115, Defendants admit that, during the relevant

43

period, ASC 350 provided that an entity may first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. As to the third sentence of Paragraph 115, Defendants admit that if an entity determines that it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, then a quantitative goodwill impairment test is unnecessary. As to the fourth sentence of Paragraph 115, Defendants admit that if an entity determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, then ASC 350 provides that the entity shall perform a quantitative goodwill impairment test. Defendants deny the remaining allegations in Paragraph 115.

116. The qualitative assessment for goodwill impairment requires impairment testing for any quarter when certain qualitative factors of impairment are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30. These qualitative factors are often referred to as "triggers," "triggering events," or "impairment indicators." Pursuant to ASC 350-20-35-3C, examples of such triggering events include, but are not limited to:

> a. Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets[;]

> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development[;]

*   *   *

44

d.      Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods[;]

e.      Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation[;]

f.      Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit[; and]

g.      If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers)[.]

**ANSWER**:  Defendants admit that Paragraph 116 purports to quote and characterize provisions in ASC 350-20-35-30 and ASC 350-20-35-3C, but state that the provisions speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the provisions. Defendants deny the remaining allegations in Paragraph 116.

117.    ASC 350-20-35-3E required Defendants to test for goodwill impairment if *any* triggering events, including but not limited to any of the examples above, alone or in combination, made it more likely than not that the fair value of a reporting unit—including the Merchant Solutions unit—was less than the reported amount.

**ANSWER**:  Denied.

118.    ASC 350-20-35-3E also provides that the triggering events must be considered holistically. In other words, even if no individual triggering event is sufficient, on its own, to make it more likely than not the fair value of the reporting unit has declined below its book value, if the "totality" of the events and circumstances described above, made it more likely than not that the fair value of

45

a reporting unit during an interim quarter was less than its carrying amount, then Defendants were required to perform a goodwill impairment test.

**ANSWER**:  Denied.

119.   If, after assessing the totality of events and circumstances, a company determines that it is more likely than not the carrying value of a reporting unit is greater than its fair value, GAAP requires a quantitative test to identify potential goodwill impairment and measure the amount of a goodwill impairment loss to be recognized. *See* ASC 350-20-35-3; *see also*, ASC 350-20-35-4 through 35-20-35-19.

**ANSWER**:  Admitted.

120.   The quantitative goodwill impairment test starts with comparing the fair value of a reporting unit with its carrying amount, including goodwill. ASC 350-20-35-4. As described above, the fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date. If the carrying amount of a reporting unit exceeds its fair value, a further step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any. ASC 350-20-35-8.

**ANSWER**:  Defendants admit that ASC 350-20-35-22 states that the fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date. Defendants deny the remaining allegations in Paragraph 120.

121.   To measure the amount of an impairment loss, a company must compare the implied fair value of reporting unit's goodwill with the carrying amount of that goodwill (i.e., the amount recorded at the time of the acquisition absent any impairment already recorded). ASC 350-20-35-9.[13] If the carrying amount of a reporting unit's goodwill is greater than the implied fair value of that goodwill, the company must recognize an impairment loss in an amount equal to

---

[13] To estimate the implied fair value of goodwill, an entity shall assign the fair value of a reporting unit to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination. ASC 350-20-35-16. The excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill. ASC 350-20-35-16.

that excess. ASC 350-20-35-11. Such an impairment charge must be immediately recognized by a charge against earnings. ASC 350-20-35-2, 4, 8, 9, 11, 14-17. After a goodwill impairment loss is recognized, the adjusted carrying amount of goodwill shall be its new accounting basis. ASC 350-20-35-12.

**ANSWER**:  Defendants admit that after a goodwill impairment loss is recognized, the adjusted carrying amount of goodwill shall be its new accounting basis under ASC 350-20-25-12. Defendants deny the remaining allegations in Paragraph 121 and the associated footnote.

122.    Here, Defendants had actual knowledge of multiple impairment triggers, or red flags, as described in specific detail below, indicating that it was more likely than not that the Merchant Solutions segment's goodwill—i.e., Worldpay's goodwill—was impaired by the third quarter of 2021. Specifically, by that point, Worldpay's business had declined substantially, Worldpay had lost market share to competitors (including its second largest e-commerce client, Sony), the Company's stock price and market capitalization had declined significantly, and the Company had lost key Worldpay personnel. These facts— including Worldpay's poor and deteriorating performance and FIS's declining share price—were clear evidence of impairment triggers that made it more likely than not that the carrying value of the Merchant Solutions segment's goodwill was greater than its true value (and thus Defendants were required under GAAP to write down the value of Worldpay's goodwill).

**ANSWER**:  Denied.

123.    As noted above, ASC 350-20-35-3C(d) indicates that "[o]verall financial performance" of a reporting unit can be a key impairment trigger. Here, Worldpay's poor performance following the acquisition was a key impairment trigger. As explained above, throughout 2020 and 2021, Worldpay's business was declining and losing market share to competitors. *See* Section IV(C). Indeed, both Worldpay's eCommerce and SMB businesses struggled and lost customers during that time.[14]

---

[14] During the Class Period, the Company's Merchant Solutions segment (i.e., Worldpay) included the following three business lines: (1) Global eCommerce solutions; (2) Software-led SMB acquiring solutions; and (3) Enterprise solutions.

**ANSWER**:  Defendants deny the allegations in Paragraph 123. As to the footnote in Paragraph 123, Defendants admit that, at times during the putative class period, the business lines in FIS's Merchant Solutions segment included Global eCommerce solutions, software-led SMB acquiring solutions, and Enterprise solutions. Defendants deny the remaining allegations in the footnote.

124.   Most notably, FIS's eCommerce business lost its second largest customer in November 2020. CW 7 explained that Sony—which was Worldpay's second largest eCommerce client, and which generated $500,000 weekly for Worldpay—left Worldpay in November 2020. CW 7 suggested that Sony took its entire eCommerce business to Adyen. According to CW 7, losing Sony was a huge deal for Worldpay and FIS, and became an all-hands-on-deck situation. CW 7 explained that FIS's President, Head of Merchant Solutions, Jim Johnson, personally spoke with Sony in an unsuccessful attempt to retain them as a client. CW 7 added that Worldpay also lost Netflix's business in Australia and Canada.

**ANSWER**:  Defendants deny the first sentence of Paragraph 124. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 124 and therefore deny them.

125.   Therefore, by no later than the third quarter of 2021, Worldpay's eCommerce business had suffered through nine months of lost sales from its second largest customer (and others) as compared to the comparable period of 2020.

**ANSWER**:  Denied.

126.   Worldpay's eCommerce business lost additional key customers during the Class Period as well. According to CW 7, who was personally responsible for managing eCommerce's six largest clients, Worldpay lost a lot of other clients during her tenure to competitors like Adyen, Stripe, Pay.com, and Checkout.com. CW 7 explained that Worldpay's eCommerce platform had multiple layers of technology that need to all work together, which can get confusing. CW 7 explained that Worldpay needed a stylist to say how the system should work and how the layers should speak to each other. However, CW 7 explained that Worldpay's competitors, like Adyen, Stripe, Pay.com, and

Checkout.com, only required a single layer of technology, making it easier to connect and get merchant processing live and running.

**ANSWER**: Defendants deny the first sentence of Paragraph 126. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 126 and therefore deny them.

127.   Worldpay's SMB business also lost a large volume of customers throughout the Class Period. According to CW 4, the UK SMB's net customer growth was negative during her entire tenure at Worldpay. CW 4 further specified that UK SMB customers declined at Worldpay by 25 percent annually and explained these customers were taking their business to Worldpay's competitors, including Square and Stripe. CW 4 recalled that the data she viewed during her employment with Worldpay indicated that U.S. SMB was facing similar challenges as UK SMB.

**ANSWER**: Defendants deny the first sentence of Paragraph 127. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 127 and therefore deny them.

128.   Worldpay's SMB business was struggling so badly that Defendants brought in a large consulting firm in the spring of 2021 to help turn the business around. According to CW 4, beginning in approximately April or May 2021, FIS brought in a big team from a large consultancy firm for approximately six months to help Worldpay turn the books positive, i.e., try to gain more customers than they were losing.

**ANSWER**: Defendants deny the first sentence of Paragraph 128. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 128 and therefore deny them.

49

129.   Thus, by the third quarter of 2021, Worldpay's eCommerce business had lost several customers, including Sony, and Worldpay's SMB business was struggling so much that FIS brought in a consultant in the second quarter of 2021 to try to turn the business around. This poor performance across at least two of Worldpay's three business units was by itself an impairment trigger. However, as explained below, there were other impairment triggers throughout 2021 that also required Defendants to write down the value of Worldpay's goodwill.

**ANSWER**:  Denied.

130.   In addition to poor performance and an increased competitive environment, FIS's stock price tumbled in the second half of 2021, which was also an impairment trigger.

**ANSWER**:  Denied.

131.   ASB 350-20-35-3C(g), as detailed at ¶116, indicates that "a sustained decrease in share price (consider[ed] in both absolute terms and relative to peers)," can be a key triggering circumstance requiring testing for goodwill impairment. Similarly, because a decrease in share price always creates a corresponding decrease in market capitalization,[15] a decrease in market cap is also a potential indicator of impairment. Indeed, Defendants' own disclosure in FIS's 2021 Annual Report confirms their view of the central role that market capitalization plays in the Company's goodwill impairment testing:

> As of December 31, 2021, goodwill aggregated to $53.3 billion, or 64% of total assets, and intangible assets aggregated to $11.5 billion, or 14% of total assets. Current accounting rules require goodwill to be assessed for impairment at least annually or whenever changes in circumstances indicate potential impairment and require intangible assets with finite useful lives to be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. **Factors that may be considered a change in circumstance include significant underperformance relative to historical or projected future operating**

---

[15] Market Capitalization, commonly referred to as "market cap," is calculated by multiplying the total number of a company's outstanding shares by the current market price of one share. *See* Jason Fernando, Samantha Silberstein, and Pete Rathburn, *Market Capitalization: How Is It Calculated and What Does It Tell Investors?*, Investopedia (Mar. 16, 2023), https://www.investopedia.com/terms /m/marketcapitalization.asp#:~:text=Market%20capitalizaton%20refers%20to %20the,market%20price%20of%20one%20share.

**results, a significant decline in our stock price and market capitalization**, and negative industry or economic trends.

**ANSWER**: Defendants admit that Paragraph 131 purports to quote and characterize provisions in ASC 350-20-35-3C(g) and statements made in FIS's 2021 Form 10-K, but state that the provisions and the Form 10-K speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the provisions and statements. Defendants deny the remaining allegations in Paragraph 131. Defendants admit the allegations in the footnote in Paragraph 131.

132.    In FIS's case, a stock price decline triggering event was clearly present in 2021, as FIS experienced an immediate, significant, and sustained decline in its stock price and market capitalization starting on July 27, 2021. From July 27, 2021 to December 1, 2021, the price of FIS's common stock fell from a closing price of $150.86 per share on July 27, 2021 to a closing price of $102.36 per share on December 1, 2021—a steady and substantial 32% decline in value and loss of approximately $29.6 billion in market capitalization. As illustrated by the chart below, FIS's stock continued its significant, sustained decline into 2022, closing at a price of $76.80 per share on September 27, 2022, a 49% decline since July 27, 2021. This stock decline corresponded to a $45.1 billion decline in market capitalization in just over one year.

51



**ANSWER**: Denied.

133.   FIS's massive stock price and market capitalization decline was a key indicator of likely Merchant Solutions segment goodwill impairment. Indeed, the SEC's Office of the Chief Accountant has explained the significance of recent stock price declines in goodwill impairment analysis:

> [I]t would not be reasonable for a registrant to simply ignore recent declines in their stock price, as the declines are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in a higher required rate of return or a decline in the market's estimated future cash flows of the company.[16]

---

[16] Robert G. Fox III, Professional Accounting Fellow, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments, Washington, D.C. (Dec. 8, 2008), available at https://www.sec.gov/news/speech/2008/spch120808rgf.htm.

**ANSWER**: Defendants deny the first sentence of Paragraph 133. Defendants admit that the remaining allegations in Paragraph 133 and the associated footnote purport to quote and characterize statements made by a non-party, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

134.   ASC 350-20-35-3C(e), as noted above, indicates that "[o]ther relevant entity-specific events such as changes in management [or] key personnel" can be a key triggering circumstance requiring testing for goodwill impairment.

**ANSWER**: Defendants admit that Paragraph 134 purports to quote and characterize provisions in ASC 350-20-35-3C(e), but state that the provisions speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the provisions.

135.   As explained above, FIS lost key Worldpay employees after the acquisition. *See* Section IV(C)(3). Specifically, FIS lost Shane Happach, who was responsible for growing Worldpay's eCommerce and had key relationships with Worldpay's largest clients. Moreover, FIS lost over 50 percent of Worldpay's senior engineers by the end of 2021 and early 2022, which negatively impacted Worldpay's business given its complicated tech infrastructure. The loss of these key employees was a key impairment trigger, especially considering Defendants claimed that Worldpay's "[g]oodwill consists primarily of expected synergies of combining operations, ***the acquired workforce***, and growth opportunities."

**ANSWER**: Denied.

136.   ASC 350-20-35-3C(b), as explained above, indicates that "[i]ndustry and market considerations such as . . . an increased competitive environment," can be a key triggering circumstance requiring testing for goodwill impairment.

**ANSWER**: Defendants admit that Paragraph 136 purports to quote and characterize provisions in ASC 350-20-35-3C(b), but state that the provisions

53

speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the provisions.

137.    As explained above by several CWs, Worldpay lost significant market share to competitors after the acquisition. S*ee* Section IV(C)(2). Indeed, Defendants themselves admitted that they knew about increased competition throughout 2020 and 2021. For example, on November 16, 2021, Defendant Norcross attended the 2021 RBC Global Technology, Internet, Media and Telecom Conference and was asked about competition concerns in the Merchant Solutions business because it was on the minds of most investors. Specifically, one analyst stated: "so that brings me to the competitive narrative and merchant, which is why I think most people dialed in, right? Everyone wants to hear about this." In response, Defendant Norcross explained that FIS had provided additional detail about their Merchant Solutions segment during their second quarter 2021 earnings call based on the "narrative that we're losing share and . . . being disrupted."

**ANSWER**:  Defendants admit that Norcross participated in a conference hosted by RBC on November 16, 2021. Defendants admit that Paragraph 137 purports to quote and characterize statements made during the conference, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 137.

138.    The triggering events and circumstances described in Section IV(E)(2) above, individually and collectively, clearly constituted indicators that it was more likely than not that the Merchant Solutions segment's goodwill was impaired no later than the third quarter of 2021. Accordingly, GAAP rules required Defendants to perform the full quantitative impairment test and write down the value of Worldpay's goodwill prior to filing the Company's quarterly report on Form 10-Q for the third quarter of 2021 (the "Q3 2021 Report").

**ANSWER**:  Denied.

139.    Despite the clear language of ASC 350, its SEC disclosures, and its internal accounting controls, policies, and procedures, Defendants ignored the objective evidence of impairment. Instead, Defendants conducted a cursory,

subjective, and self-serving qualitative assessment to conclude that the Merchant Solutions segment's goodwill was not impaired.

**ANSWER**:  Denied.

140.   In the Q3 2021 Report, Defendants claimed that their subjective, qualitative assessment determined that "it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired." Defendants claimed that they considered the following factors when arriving at this conclusion: "(1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization."

**ANSWER**:  Defendants admit that Paragraph 140 purports to quote and characterize statements in the Q3 2021 Report, but state that the Q3 2021 Report speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the remaining allegations in Paragraph 140.

141.   However, this statement was false and misleading because the Company's Merchant Solutions segment's goodwill was impaired at that point and Defendants did not have a reasonable basis to manufacture a rosy forecast reliant on revenue growth and profits to delay recording the impairment. As explained above, Defendants were aware of several impairment triggers that made it clear that the Merchant Solutions reporting unit (i.e., Worldpay) was impaired by the end of the third quarter of 2021, requiring an impairment charge in the Company's Q3 2021 Report. By failing to record goodwill impairment on a timely basis, Defendants violated GAAP rules as described herein and materially overstated the Company's goodwill in the Company's Q3 2021 Report, which in turn materially overstated FIS's total assets (especially considering the Merchant Solution segment's goodwill accounted for 43.9% of the Company's total assets in 2021). *See infra* ¶¶199-200, 203.

**ANSWER**:  Denied.

142.   Moreover, although the Q3 2021 Report contained generic warnings that "future developments related to the economic impact of the COVID-19 pandemic on our Merchant Solutions business . . . could result in future goodwill

impairment," such boilerplate warnings were meaningless because Defendants were aware of several red flags indicating that goodwill was ***presently*** impaired—i.e., that risk had already materialized—and thus Defendants were required under GAAP to have already taken an impairment charge by that point. Such "warnings" were also completely negated by Defendants' repeated statements to the contrary about the supposed success of the acquisition, achievement of revenue synergies, and statements such as "we've got really Worldpay predominately behind us now" and "[w]e really successfully completed the Worldpay integration."

**ANSWER**:  Denied.

143.    Defendants continued delaying the goodwill impairment charge in the fourth quarter of 2021. On February 23, 2022, the Company filed with the SEC its annual report on Form 10-K for the fiscal year 2021 (the "2021 Annual Report"). The 2021 Annual Report also falsely claimed that goodwill was not impaired. Specifically, in the 2021 Annual Report, Defendants claimed that their subjective, quantitative analysis considered "actual results for 2021 and updated internal forecasts as compared to prior internal forecasts and other assumptions used in the 2020 quantitative annual assessment" in order to falsely claim that "***for 2021 it remained more likely than not that the fair value of the Merchant Solutions reporting unit continued to exceed its carrying amount.***"

**ANSWER**:  Denied, except Defendants admit the second sentence of

Paragraph 143.

144.    This, too, was false and misleading because had Defendants considered the impairment triggers alleged in Section IV(E)(2) (which they should have under GAAP), it would have been obvious that goodwill was significantly impaired in the fourth quarter of 2021.

**ANSWER**:  Denied.

145.    Indeed, FIS previously performed a quantitative assessment for the Merchant Solutions business in 2020. At that time, FIS concluded that the fair value of the Merchant Solutions was in excess of the carrying amount by 4%, meaning that the fair value was somehow *more* than previously reported in connection with the Worldpay acquisition. However, Defendants did not perform a quantitative assessment for the Merchant Solutions business during its annual impairment testing in 2021. Instead, the 2021 Annual Report stated that management only performed a qualitative assessment and simply concluded the

56

fair value of the reporting unit was "in excess of the carrying amount by a similar percentage as determined by the prior year's quantitative assessment."

**ANSWER**:  Defendants admit the first sentence of Paragraph 145. As to the second sentence of Paragraph 145, Defendants admit that as a result of the quantitative assessment for Merchant Solutions in 2020, the fair value of the reporting unit was estimated to be in excess of the carrying amount by approximately 4%. Defendants admit the third sentence of Paragraph 145. As to the last sentence of paragraph 145, Defendants admit that in 2021, for Merchant Solutions, FIS performed a qualitative assessment for the annual assessment and that as a result of the assessment, FIS determined that the indicated fair value of the reporting unit was estimated to be in excess of carrying amount by a similar percentage as determined by the prior year's quantitative assessment. Defendants deny the remaining allegations in Paragraph 145.

146.    However, this claim was highly misleading when the figures are investigated. As of December 31, 2020, FIS's market capitalization was approximately $88 billion. As of December 31, 2021, however, FIS's market capitalization had fallen 24% to approximately $67 billion. Consequently, FIS's "qualitative" assessment that the fair value of the Merchant Solutions reporting unit continued to exceed the carrying amount would be nearly impossible given the Company's reported financial results.

**ANSWER**:  Denied, except Defendants admit the second sentence of Paragraph 146.

147.    In fact, during 2021, FIS generated adjusted earnings before interest taxes depreciation and amortization ("EBITDA"—a common metric used in the market for measuring a Company's profitability) of approximately $6.1 billion for the entire company. Therefore, FIS's market capitalization indicated a fair value of approximately 10.9x EBITDA (i.e., $67 billion divided by $6.1 billion) for the Company.

**ANSWER**:  Defendants admit the first sentence of Paragraph 147.

Defendants deny the remaining allegations in Paragraph 147.

148.    However, during 2021, the Merchant Solutions (i.e., Worldpay) produced approximately $2.3 billion of the company's total EBITDA. If you apply the same company-wide 10.9x EBITDA multiple, the implied fair value of the Worldpay's goodwill was only $24.6 billion at that time—significantly below the then-current carrying value of Worldpay's goodwill balance of $36.4 billion.

**ANSWER**:  Defendants admit that adjusted EBITDA for Merchant

Solutions as of and for the year ended December 31, 2021, was approximately

$2.3 billion. Defendants deny the remaining allegations in Paragraph 148.

149.    In other words, in order to justify an implied fair value of Worldpay's goodwill balance of $36.4 billion, one would necessarily have to assume that it deserved to be valued at a higher EBITDA multiple than the EBITDA multiple for the entire company. However, Defendants had no basis to believe the Merchant Solutions segment should be valued at a higher multiple. Quite the opposite. As explained above, the Merchant Solutions segment struggled during that time, as integration challenges caused Worldpay business to suffer after the acquisition. *See* Section IV(C). Thus, it was clear that Merchant Solutions segment's goodwill was impaired by that point since its carrying value was higher than the entire segment's implied fair value using the company-wide EBIDTA multiple for 2021.[17]

---

[17] This fact is strengthened when one performs the same analysis for the Company's 2022 fiscal year—when Defendants belatedly took the $17.6 billion impairment charge. According to the 2022 Annual Report, on December 31, 2022, FIS had a company-wide 6.5x EBITDA multiple. Applying that EBITDA multiple to the $2.3 billion of EBITDA generated by the Merchant Solutions reporting unit for 2022 implied a fair value of the reporting unit of approximately $14.6 billion. However, as explained above, the implied fair value of the Merchant Solutions segment for 2021 (using the Company-wide EBIDTA multiple for 2021) was $24.6 billion, meaning that goodwill had declined by $10 billion from the end of 2021 to the end of 2022. However, Defendants took a $17.6 billion impairment charge—i.e., much larger than the $10 billion decline in fair value—in the 2022 Annual Report. Therefore, it is clear that the start of the goodwill impairment started before the end of 2021.

**ANSWER**:  Defendants deny the allegations in Paragraph 149 and the associated footnote.

150.    Although it seemed clear that Worldpay's business had declined and its goodwill was impaired by December 31, 2021, Defendants nonetheless continuously reassured investors throughout the remainder of the Class Period that "***the fair value of the Merchant Solutions reporting unit continued to exceed its carrying amount***" based on Defendants' "updated internal forecasts." Thus, investors did not know that Worldpay's goodwill was impaired by the third quarter of 2021 and continued being impaired throughout 2022.

**ANSWER**:  Denied.

151.    Although Defendants should have performed the full quantitative goodwill impairment test and written down Worldpay's goodwill in 2021, at an absolute minimum, Defendants should have performed the impairment test and recorded a goodwill impairment charge during each quarter of 2022, as Defendants continued ignoring several red flags that put them on notice that they the Merchant Solutions segment's goodwill was materially overstated. Indeed, as detailed above, FIS's stock continued its significant, sustained decline into 2022, declining nearly 50% between July 2021 and September 2022, which corresponded to a $45.1 billion decline in market capitalization in just over one year.

**ANSWER**:  Denied.

152.    Moreover, GAAP also clearly require a goodwill impairment test if a company expects to sell a reporting unit. According to ASC 350-20-35-3C(f), as detailed in ¶116 above, "a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit" can be a key triggering circumstance requiring testing for goodwill impairment. Here, Defendants were secretly shopping Worldpay to private equity firms in the summer of 2022. As detailed by a December 23, 2022 article from the New York Times, "[o]ver the summer, efforts by JP Morgan Chase to sell Worldpay, a payment processing unit of Fidelity National Information Services, to private equity firms fell through, according to two sources with knowledge of the matter." The New York Times article went on to state that the private equity firms "balked at the asking price of at least $30 billion, the people said."

**ANSWER**:  Defendants admit that Paragraph 152 purports to quote and characterize provisions in ASC 350-20-35-3C(f) and statements in a document

written by a non-party, but state that the provisions and the quoted document speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 152.

153.    Defendants' efforts to sell Worldpay was clearly an impairment trigger indicating that Defendants were continuing to overstate the value of Worldpay. While Defendants were shopping Worldpay for a **total** price in the $30 billion range, they were still reporting $35.2 billion and $34.3 billion in goodwill for its Merchant Solutions segment in the second and third quarters of 2022, respectively. *See infra* ¶¶227, 235. In other words, Defendants were shopping Worldpay for **less** than they were publicly reporting its goodwill value. Thus, Defendants clearly knew that the fair value of its goodwill was significantly less than the carrying value, which required them to perform a goodwill impairment analysis by that point. By failing to take a goodwill impairment charge at that time, Defendants violated GAAP rules and significantly overstated the value of Worldpay.

**ANSWER**:  Denied.

154.    The triggering events and circumstances described in Sections IV(E)(2) and IV(E)(5) above, individually and collectively, clearly constituted indicators that it was more likely than not that the Merchant Solutions segment's goodwill continued to be impaired in 2022. Despite the presence of these indicators of impairment, Defendants unreasonably concluded that no interim quantitative test was necessary throughout 2022.

**ANSWER**:  Denied.

155.    Instead, Defendants continued to carry at least $34 billion of goodwill for the Merchant segment as unimpaired and carried forward the fraudulent number in FIS's financial statements from the third and fourth quarters of 2021, resulting in material misstatements and omissions in FIS's quarterly reports filed on Form 10-Qs for the first three quarters of 2022. *See infra* ¶¶220-21, 224, 226-27, 230, 234-35, and 238. As a result, the Company's quarterly reports for the first three quarters of 2022 all materially overstated the Company's assets—improperly assuring investors that the purported initial value of Worldpay that had been acquired would continue to be realized.

**ANSWER**:  Denied.

156.    Defendants were motivated to mislead investors about the success of the Worldpay integration and hide from the market the true value of Worldpay. As explained in Section VII(A), Defendants stood to receive substantial bonuses for achieving revenue synergies and keeping the Company's stock price inflated through false and misleading statements about the success of the Worldpay acquisition. Moreover, Defendants were secretly trying to sell Worldpay, and thus, did not want to reveal to the market that the failed integration had significantly harmed the value of Worldpay. Unfortunately for investors, they knew none of this. Rather, investors slowly learned the truth about the failed integration, lack of synergies, and significant decline in Worldpay's value throughout the second half of 2022 and into 2023.

**ANSWER**:  Denied.

157.    On August 4, 2022, Defendants partially revealed the true state of the Merchant Solutions segment and the failure of the Worldpay acquisition upon release of the Company's second quarter earnings results.[18] On that day, Defendants revealed mixed results for the Merchant Solutions segment. Particularly, Defendants announced that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%, which JP Morgan analysts noted was "far below [street] expectations," of 50%.

**ANSWER**: Defendants deny the first and second sentences of Paragraph 157. Defendants admit that on August 4, 2022, FIS announced that adjusted EBITDA margin for the Merchant Solutions segment had contracted by 280 basis points to 47%. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in the third sentence of Paragraph 157 and therefore deny those allegations. As to the footnote in Paragraph 157, Defendants admit that Woodall would step down as FIS's Corporate EVP and CFO effective November 4, 2022, and that Hoag would

---

[18] On the same day the problems in the Merchant Solutions segment began to surface, the Company announced that Woodall planned to "step down" as FIS's Corporate EVP and CFO effective November 4, 2022, and that Hoag would replace him on that same day.

succeed Woodall as Corporate EVP and CFO effective November 4, 2022.

Defendants deny the remaining allegations in the footnote.

158.   Moreover, Defendants abruptly removed a slide from FIS's earnings call presentation containing key performance indicators ("KPIs") related to its Merchant segment—including U.S. and global volumes and transaction growth— even though Defendants had presented that information to investors in the three previous quarters. The omission was a stark departure from FIS's decision, made only a few months earlier in November 2021, to enhance Merchant segment disclosures based on feedback received from investors that there was not enough visibility into the Merchant Solutions segment.

**ANSWER**:  Denied.

159.   However, Defendants made no mention of the missing Merchant data during the Company's August 4, 2022 earnings call until an analyst asked: "did you guys not disclos[e] the merchant volume and transaction growth this quarter? I might have missed it but curious on that." Woodall responded by revealing that FIS "saw sequential volume decreases" during the quarter, but downplayed the volume decreases in Merchant Solutions by claiming that the deceleration was "in line with . . . Visa, Mastercard and global[.]"

**ANSWER**: Defendants admit that Paragraph 159 purports to quote and characterize statements made on an earnings call that FIS held on August 4, 2022, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 159.

160.   Following news of the Merchant Solutions segment's underperformance, FIS's stock price dropped $7.56 per share, or more than 7%, from a closing price of $104.13 per share on August 3, 2022, to a closing price of $96.57 per share on August 4, 2022.

**ANSWER**:  Denied, except Defendants admit that FIS's stock price closed at $104.13 per share on August 3, 2022, and at $96.57 per share on August 4, 2022.

161.   Following the earnings presentation, numerous analysts noted in analyst reports that while global volume growth for FIS has historically tracked the networks, purchase and payment volumes in the Merchant Solutions segment were decelerating faster and seeing a greater divergence—both from the major card networks and its competitors—than in previous quarters. Analysts at Deutsche Bank noted that during the second quarter of 2022, "global volumes gr[ew] at roughly half the rate seen by the networks," adding "[w]hile FIS opted not to publish volume data in its presentation this q[uarter], m[anagement] revealed on the earnings call that global volumes decelerated to [around] 4%" a notable decrease compared to the two preceding quarters when the year-over-year growth rates were around 10%, and 17%, respectively.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 161, and therefore deny those allegations. Defendants admit that the second sentence of Paragraph 161 purports to quote and characterize statements made in a document written by non-parties, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 161.

162.   The abrupt change in FIS's Merchant disclosures on August 4, 2022 sparked concerns among many analysts. For example, Jeffries stated "[n]otably, no volume disclosures were provided," and JP Morgan wrote that the move was "discouraging[.]" Additionally, analysts at JP Morgan later wrote that they "fielded lots of questions and concerns on management's decision to exclude the merchant volume slide/KPIs from its earnings presentation."

**ANSWER**:  Defendants admit that Paragraph 162 purports to quote and characterize statements made in documents written by non-parties, but state that

63

the documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 162.

163.   Based on Defendants' selective disclosures, investors did not yet fully understand that the Worldpay acquisition was a failure. For example, on August 5, 2022, analyst William Blair stated that "[w]hile the guidance reduction is disappointing, we continue to believe FIS's long-term opportunities remain solidly intact, and we believe that its platform, competitive position, and growth opportunities should enable the company to reach its long-term targets of 7% to 9% organic revenue growth and 50-100 basis points of annual margin expansion over time."

**ANSWER**:  Defendants deny the first sentence of Paragraph 163. Defendants admit that the second sentence of Paragraph 163 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

164.   On August 15, 2022, J.P. Morgan believed that Defendants removed KPIs because they were no longer indicators of performance, stating that "[management] removed volume slides as they no longer feel that volume growth is an accurate indicator of performance, and given hard to predict results post pandemic with 2Q better on revenue and weaker on volume, we tend to agree." Similarly, on September 27, 2022, William Blair noted that even though "FIS stock has struggled due to competitive fears in the payments space," it still "continue[d] to believe competitive fears in the payments space are overblown" and that "[t]he FIS/Worldpay combination (closed July 2019) has generated synergies ahead of expectations, and we continue to believe the merger lends the company structural advantages."

**ANSWER**:  Defendants admit that Paragraph 164 purports to quote and characterize statements made in documents written by non-parties, but state that the documents speak for themselves and deny the allegations to the extent they

64

mischaracterize, take out of context, inaccurately quote, or modify the

statements. Defendants deny the remaining allegations in Paragraph 164.

165.    Moreover, in the Company's quarterly report on Form 10-Q for the second quarter of 2022 (the "Q2 2022 Report"), Defendants falsely stated that based on their qualitative goodwill impairment analysis, goodwill was not impaired in the second quarter of 2022. Therefore, investors still did not know that Defendants were continuing to fraudulently overstate the value of Worldpay's goodwill by billions of dollars in violation of GAAP.

**ANSWER**: Denied.

166.    Making matters worse, despite the considerable volume deceleration and margin contractions in Merchant Solutions, during the Company's accompanying earnings conference call, then-President Ferris continued to mislead investors by claiming that FIS had been "***hugely successful in terms of driving revenue synergies on the Worldpay transaction***."

**ANSWER**: Denied.

167.    Then, on October 18, 2022, the Company issued a press release announcing that Norcross, the primary architect behind the Worldpay acquisition, would end his tenure as CEO, effective January 1, 2023. The Company also announced that Ferris, who had been appointed President of FIS in February 2022, would become the new CEO effective January 1, 2023. As a result, outgoing-CEO Norcross, who had been with the Company since 1988 and in the CEO role since 2015, became Executive Chairman of the Board of Directors.

**ANSWER**:  Defendants admit that FIS issued a press release on October 18, 2022, announcing that Norcross would end his tenure as CEO effective January 1, 2023. Defendants admit the allegations in the second sentence of Paragraph 167. Defendants deny the remaining allegations in Paragraph 167.

168.    FIS portrayed the move as a long and carefully thought-out CEO transition plan. For example, the Company's Lead Independent Director, Jeffrey Goldstein, claimed that "[u]nder Gary[] [Norcross's] leadership and in partnership with the FIS Board, we have worked closely together for several years to develop and implement a thoughtful and strong CEO transition plan."

65

**ANSWER**:  Defendants admit that Paragraph 168 purports to quote and characterize statements made in FIS's October 18, 2022 press release, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

169.   The truth behind the Worldpay acquisition was further revealed on November 3, 2022, when the Company announced disappointing results for the third quarter of 2022. During the earnings conference call, Norcross announced that profit margins in the Merchant Solutions business "saw a continued pressure in the quarter." In addition, the Company's new CFO, Hoag, explained more specifically that the Company's Merchant Solutions segment suffered from a 430 basis-point margin contraction during the quarter—far more than the previous quarter.

**ANSWER**:  Defendants deny the first sentence of Paragraph 169. As to the second and third sentences of Paragraph 169, Defendants admit that FIS held an earnings conference call on November 3, 2022, and that those sentences in Paragraph 169 purport to quote and characterize statements made on the earnings conference call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the remaining allegations in Paragraph 169.

170.   Investors were shocked by these results, as FIS's stock price plummeted by ***more than 28%***, as the persistent volume deceleration and quarter-over-quarter contractions in adjusted EBITDA within the Merchant Solutions segment was another sign of foundational problems related to the Worldpay acquisition, rather than a short-term result of macroeconomic setbacks.

**ANSWER**: Denied.

66

171.   The reaction among analysts was largely in line with investors. For example, Raymond James analysts reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some." Further, analysts at UBS emphasized the "underperformance from Merchant Solutions" as a key driver of the problem, noting that "[w]hile we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems." Analysts at JP Morgan started to tie the Merchant Solutions segment's declining results to the failed Worldpay acquisition, noting that the "[c]ost of [the] Worldpay [a]cquisition [was] sinking in[.]"

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 171, and therefore deny those allegations. Defendants admit that the remaining sentences in Paragraph 171 purport to quote statements made in documents written by non-parties, but state that the documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 171.

172.   Despite these revelations, Defendants continued to obscure the full extent of their fraud by failing to take a goodwill impairment charge and thus continuing to hide the true value of the Worldpay asset. The next day, November 4, 2022, FIS filed its quarterly report for the third quarter, which claimed that "goodwill was not impaired" as to any reporting segment, including Merchant Solutions. Thus, investors did not know at that time that the value of the Worldpay asset continued to be overstated by ***billions of dollars***.

**ANSWER**:  Defendants deny the first sentence of Paragraph 172. As to the second sentence of Paragraph 172, Defendants admit that FIS filed its Q3 2022 Report on November 4, 2022, and that Paragraph 172 purports to quote and characterize statements made in the Q3 2022 Report, but state that the Q3 2022

67

Report speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the remaining allegations in Paragraph 172.

173.    Finally, on February 10, 2023—the Friday before the Company was set to release its fourth quarter and full year 2022 results—Reuters published an article after the market closed that claimed the Company was planning to spin off its Merchant Solutions segment, namely Worldpay, and that FIS "could announce the spinoff as early as next week, unveiling the results of a strategic review it embarked upon in December following pressure from hedge funds D.E. Shaw and JANA Partners, according to the sources."

**ANSWER**:  Defendants admit that February 10, 2023, was the Friday before FIS was set to release its fourth quarter 2022 and full year 2022 results. Defendants admit that Paragraph 173 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 173, and therefore deny those allegations.

174.    The Reuters article forced FIS to move up the date it had planned to release its financial results, from Wednesday, February 15, 2023, to Monday morning before the market opened. On Monday morning, February 13, 2023, FIS filed a Current Report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2022 results. The Form 8-K included a press release that stunned investors by disclosing that the Company was recording a "non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit" and planned to spin off its Merchants Solutions business. This massive write-down constituted more than 40% of FIS's purchase price for Worldpay just a few years earlier.

68

**ANSWER**:  Defendants deny the first sentence of Paragraph 174. Defendants admit the second sentence of Paragraph 174. Defendants admit that FIS's Form 8-K filed on February 13, 2023 included a press release and that the third sentence of Paragraph 174 purports to quote and characterize statements made in the press release, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the allegations in the fourth sentence of Paragraph 174.

175.    On these revelations, the price of FIS's stock dropped $9.43 per share, or more than 12%, from a closing price of $75.43 per share on the prior trading day of February 10, 2023, down to a closing price of $66.00 per share on February 13, 2023.

**ANSWER**:  Denied.

176.    Analyst coverage following this shocking news confirms that investors were reacting to new information on the failed Worldpay acquisition. For example, on February 13, 2023, Deutsche Bank Research wrote that "all focus was on the announcement of a spinoff of the Merchant business, in effect reversing the merger joining FIS and Worldpay in 2019."

**ANSWER**:  Defendants admit that Paragraph 176 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the remaining allegations in Paragraph 176.

177.    In a Bloomberg News article on February 13, 2023, author Jenny Surane stated that "[FIS] plummeted after it booked a $17.6 billion writedown on the payment-processing business it bought for $41 billion just four years ago, a unit it now plans to dump." The article went on to state "the [Worldpay] business has lost market share to both traditional rivals and upstarts alike. In 2018,

69

Worldpay was the country's top acquirer, according to the Nilson Report. By last year, it had slipped behind JPMorgan Chase & Co., which had double the growth in transactions in that time, the industry publication found."

**ANSWER**: Defendants admit that Paragraph 177 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

178.   Following this corrective disclosure, investors finally learned the full truth about the failed Worldpay acquisition—specifically, that the Worldpay acquisition was a failure from the start, that Worldpay's business had suffered as a result of the acquisition, and that Defendants had fraudulently overstated the value of Worldpay for years. For example, Mizuho analysts stated that the $17.6 billion write down and spinoff meant that the acquisition of Worldpay in 2019 "was a huge failure," explaining that FIS's merchant business has "deteriorated considerably since the merger[.]"

**ANSWER**: Defendants admit that Paragraph 178 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 178.

179.   Moreover, investors finally learned that—despite Defendants' repeated false statements about the success of the Worldpay acquisition—Worldpay's poor performance following the acquisition had significantly deteriorated the value of the business. Specifically, investors learned that Worldpay's struggling SMB business was the reason for the massive $17.6 billion impairment charge. As Oppenheimer wrote in a February 13, 2023 analyst report, "FIS took a $17.6 [billion] goodwill impairment due to the SMB subsegment of merchant."

70

**ANSWER**:  Defendants admit that Paragraph 179 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 179.

180.   Investors also finally understood that FIS's lack of investment in Worldpay contributed to the failed acquisition. As FIS's new CFO, Hoag, stated during the Company's earnings call on February 13, 2023, "there has been a lack of new product investment driving compression and attrition in our SMB sub-segment." However, Hoag further explained that "[t]hese trends in SMB reflect a lack of new product investment, which we believe the [demerger] will best enable us to remedy."

**ANSWER**: Defendants admit that Paragraph 180 purports to quote and characterize statements made on an earnings call that FIS held on February 13, 2023, and admit that Hoag was FIS's CFO as of that date, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 180.

181.   Following FIS's announcement that it was spinning off Worldpay and recording a $17.6 billion write-down on the asset, analysts cited under-investment and operational missteps for its unsuccessful integration of Worldpay. For example, on March 2, 2023, the Financial Times posted an article entitled "Worldpay and FIS: the 'original sin' that tore up a $43bn merger," which criticized the Worldpay acquisition. The article contained quotes from "[c]urrent employees at the company who spoke to the Financial Times on condition of anonymity [who] said the two businesses were ultimately incompatible." The Financial Times article also quoted several analysts who now realized that "FIS was holding back Worldpay due to internal conflicts pitting its traditional bank clients against the merchants."

71

**ANSWER**:  Defendants admit that Paragraph 181 purports to quote and characterize statements made in a document written by a non-party, but state that the document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 181.

182.   Then, just a few months after Defendants told investors they were going to spin off Worldpay, FIS shifted strategies when, on July 5, 2023, the Company entered into an agreement with private equity firm CTGR LLC to sell Worldpay in a deal that valued Worldpay at only $18.5 billion—*less than half* of what FIS paid for Worldpay a few years earlier, and almost the same as the $17.6 billion write down FIS took on Worldpay's goodwill just a few months prior.

**ANSWER**:  Denied.

## V.   DEFENDANTS' ALLEGEDLY MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[19]

### A.   May 7, 2020 – First Quarter 2020 Statements

183.   The Class Period starts on May 7, 2020. On that day, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "Q1 2020 Report"), which was signed by Defendant Woodall. The Q1 2020 Report stated that "[a]s of the end of the first quarter of 2020, our achievement of expense and revenue synergies is ahead of schedule."

**ANSWER**:  Defendants admit that Plaintiffs seek to bring claims on behalf of a putative class and that Plaintiffs have defined the term "Class Period" to begin on May 7, 2020, but deny that a class may properly be certified. Defendants

---

[19] Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.

admit that FIS filed the Q1 2020 Report with the SEC on May 7, 2020, and that

the Q1 2020 Report was signed by Woodall. Defendants admit that Paragraph

183 purports to quote statements made in the Q1 2020 Report, but state that the

Q1 2020 Report speaks for itself and deny the allegations to the extent they

mischaracterize, take out of context, inaccurately quote, or modify the

statements.

184.   On the same day, the Company filed a press release announcing its
first quarter 2020 results. The press release provided an update on the Worldpay
integration, stating that FIS had already achieved "***[r]evenue synergies of
approximately $100 million, an increase of $20 million compared to
the fourth quarter of 2019***." Thus, "the Company reiterated its previously-
announced revenue synergy targets . . . [of] $200 million exiting 2020 . . . [and]
$550 million exiting 2022."

**ANSWER**:  Defendants admit that FIS issued a press release on May 7,

2020, announcing its first quarter 2020 results, among other things. Defendants

admit that Paragraph 184 purports to quote and characterize statements made in

the press release, but state that the press release speaks for itself and deny the

allegations to the extent they mischaracterize, take out of context, inaccurately

quote, modify, or add emphasis to the statements. Defendants deny the

remaining allegations in Paragraph 184.

185.   However, the statement in ¶184 was materially false and misleading
because Defendants manipulated the revenue synergy calculations and calculated
revenue synergies as ***any*** new business acquired after the acquisition, as
opposed to additional revenue that was the result of combining operations. *See*
Section IV(D). Indeed, this conduct was described in detail by CWs, who
confirmed that FIS defined a revenue synergy as any new business obtained after
the acquisition, regardless of whether that revenue was the result of the FIS-
Worldpay combination. *See* ¶¶102-04. Thus, Defendants led investors to
(wrongly) believe that they achieved the revenue synergies because of FIS's

73

successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration.

**ANSWER**:  Denied.

### B.    August 4, 2020 – Q2 2020 Earnings Call

186.    On August 4, 2020, FIS held an earnings conference call discussing the Company's financial results for the second quarter of 2020 (the "Q2 2020 Earnings Call"). During the Q2 2020 Earnings Call, Norcross told investors that the Company had exceeded its expected synergies because the teams at FIS and Worldpay successfully came together right away. Specifically, Norcross stated:

> We continue to outpace expectations on our synergy goals and are well ahead of schedule to meet our aggressive three-year synergy targets. ***At the end of the quarter, our teams have achieved more than*** . . . ***$115 million in annual revenue synergies.*** We have an additional $60 million in revenue synergies that we are in the process of implementing now and we have a growing pipeline of cross-sell opportunities that will continue to drive additional growth. Our ability to exceed our synergy goals so early is a testament to the value our colleagues are creating by winning as one team.

**ANSWER**:  Defendants admit that FIS held an earnings conference call on August 4, 2020, discussing financial results for the second quarter of 2020, among other things. Defendants admit that Paragraph 186 purports to quote statements made on the earnings call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 186.

187.    Defendant Norcross's statement about the Company's achievement of revenue synergies was false and misleading for the reasons discussed in ¶185.

**ANSWER**:  Denied.

74

## C.    October 29, 2020 – Q3 2020 Earnings Call

188.    On October 29, 2020, FIS held an earnings conference call discussing the Company's financial results for the third quarter of 2020 (the "Q3 2020 Earnings Call"). During the Q3 2020 Earnings Call, Defendant Woodall touted the Company's integration of Worldpay and revenue synergies from combining the two companies. Specifically, Woodall stated:

> Touching on our Worldpay integration we are more than two years ahead of schedule. ***We have achieved $150 million in revenue synergies*** as we continue to see really strong traction with our premium payback solution and we are significantly outperforming our initial expectations for merchant bank referrals.

**ANSWER**:  Defendants admit that FIS held an earnings conference call on October 29, 2020, discussing financial results for the third quarter of 2020, among other things. Defendants admit that Paragraph 188 purports to quote statements made on the earnings conference call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 188.

189.    Defendant Woodall's statement about the Company's achievement of revenue synergies was false and misleading for the reasons discussed in ¶185.

**ANSWER**:  Denied.

## D.    February 9, 2021 – Q4 2020 Earnings Call

190.    On February 9, 2021, FIS held an earnings conference call discussing the Company's financial results for the fourth quarter and full year 2020 (the "Q4 2020 Earnings Call"). During the Q4 2020 Earnings Call, Defendant Norcross told investors that FIS "made great progress with the Worldpay integration remaining well ahead of plan and ***exited the year generating more than $200 million in revenue synergies***, and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021."

75

**ANSWER**:  Defendants admit that FIS held an earnings conference call on February 9, 2021, discussing financial results for the fourth quarter of 2020, among other things. Defendants admit that Paragraph 190 purports to quote and characterize statements made on the earnings call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements.

191.    Defendant Norcross's statement about the Company's achievement of revenue synergies was materially false and misleading for the reasons discussed in ¶185.

**ANSWER**:  Denied.

### E.    May 6, 2021 – Q1 2021 Statements

192.    On May 6, 2021, the Company filed a press release announcing its financial results for the first quarter of 2021. The press release announced "[s]trong results and exceptional new sales performance across all operating segments drive increased outlook for full-year 2021." The press release also provided an update on the Worldpay acquisition, stating that "The Company achieved annual run-rate synergies related to the Worldpay acquisition, exiting the first quarter 2021" with "***[r]evenue synergies of approximately $300 million on an annual run-rate basis, including ongoing execution of cross-sell opportunities, bank referral agreements, geographic expansion, ramping volumes and Merchant SMB sales initiatives***."

**ANSWER**:  Defendants admit that FIS issued a press release on May 6, 2021, announcing financial results for the first quarter of 2021, among other things. Defendants admit that Paragraph 192 purports to quote and characterize statements made in the press release, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of

context, inaccurately quote, modify, or add emphasis to the statements.

Defendants deny the remaining allegations in Paragraph 192.

193.    Defendant Norcross's statement about achieving revenue synergies of $300 million on an annual run-rate basis was materially false and misleading for the reasons discussed in ¶185. Moreover, Defendant Norcross's statement in ¶192 about the reasons why FIS achieved those revenue synergies was materially false and misleading for the additional reason that it led investors to believe Defendants had met their revenue synergy targets based on successful cross-selling, when in reality, Defendants met their revenue synergy targets because they calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. *See* Section IV(D). Indeed, former Worldpay and FIS employees have explained that little to no cross-selling was happening due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. *See* Section IV(C)(1). According to CW 7, a Global Strategic Account Director at Worldpay, she was not aware of any cross sales between FIS and Worldpay during her tenure, which ended in December 2021. Similarly, CW 9—who was responsible for reporting FIS' Integrated Payables divisions' revenue synergies—attended monthly meetings with five lines of business at FIS where revenue synergies with Worldpay were discussed. According to CW 9, none of these five businesses hit their revenue synergy targets with Worldpay during her tenure, which ended in April 2021. Thus, Defendants led investors to (wrongly) believe that FIS achieved the revenue synergies because of successful cross-selling, when in reality, these so-called revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory.

**ANSWER**:  Defendants deny the first, second, and last sentences of Paragraph 193. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 193 and therefore deny them.

### F.    June 10, 2021 – The Baird Conference

194.    On June 10, 2021, Defendants Norcross and Woodall attended the Baird Global Consumer, Technology & Services Conference (the "Baird Conference"). During the Baird conference, an analyst asked Norcross the following question about the Worldpay integration:

Yes. Great. And [i]f we move to one of the other just big events of the last couple of years, the Worldpay acquisition, I often think of your legacy business, your historical [] business about two-thirds the banking business and then one-third now is Worldpay. How has that gone, where are the things that went better or worse than expected? And where are you today as a merger?

**ANSWER**:  Defendants admit that Norcross and Woodall attended the Baird Conference on June 10, 2021. Defendants admit that Paragraph 194 purports to quote and characterize statements made during the conference, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

195.    In response, Norcross stated:

We couldn't be more pleased with it. I hate to say it this way, ***but we really haven't had negative surprises with Worldpay.*** We typically do – as you go through due diligence, especially as you're starting to dig in on your revenue synergies and where you're going to see opportunities come with cross-sell and upsells to our base. ***But frankly, everything [ha]s . . . hit as we expected, and many reasons and many examples have exceeded our expectations. And frankly, that's why you saw Woody and I both raise our overall revenue synergy guidance coming out of last quarter***.

**ANSWER**:  Defendants admit that Paragraph 195 purports to quote statements made during the Baird Conference, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements.

78

196.    Defendant Norcross's statement was materially false and misleading because it portrayed the Worldpay integration as a roaring success without any hiccups, when in reality, FIS struggled to integrate Worldpay from the start, which caused Worldpay's business to suffer and lose market share to competitors. *See* Section IV(C). For example, following the acquisition, FIS lost several important Worldpay employees after the acquisition, including Worldpay executives with key relationships with clients and engineers that helped build and maintain Worldpay's complex technology. *See* Section IV(C)(3). Moreover, several CWs have confirmed that cross-selling—a key rationale for the acquisition—was non-existent due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. *See* Section IV(C)(1).

**ANSWER**:  Denied.

### G.    August 3, 2021 – Q2 2021 Statements

197.    On August 3, 2021, the Company filed a press release announcing its financial results for the second quarter of 2021. In the press release, Defendant Norcross stated, "FIS delivered an exceptional quarter." The press release further announced that FIS was "rais[ing] year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, ***in order to reflect strong cross-selling performance during the second quarter***."

**ANSWER**:  Defendants admit that FIS issued a press release on August 3, 2021, announcing financial results for the second quarter of 2021, among other things. Defendants admit that Paragraph 197 purports to quote and characterize statements made in the press release, but state that the press release speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements.

198.    The statement in ¶197 was materially false and misleading because it claimed that FIS had achieved significant revenue synergies based on successful cross-selling, when in reality, Defendants' cross-selling was not successful. According to multiple former Worldpay and FIS employees, little to no cross-selling was happening by that point due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. *See* Section IV(C)(1). Thus, Defendants led investors to (wrongly) believe that FIS achieved the revenue synergies

because of successful cross-selling, when in reality, these so-called revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory. Moreover, Defendants met their revenue synergy targets not because of cross-selling, but because they fraudulently calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. *See* Section IV(D).

**ANSWER**: Denied.

### H.    November 4, 2021 – Q3 2021 Report

199.   On November 4, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2021 (the "Q3 2021 Report"), which was signed by Defendants Woodall and Warren. Appended as exhibits to the Q3 2021 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q3 2021 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q3 2021 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**: Defendants admit the first sentence of Paragraph 199, and admit that Norcross and Woodall signed certifications pursuant to SOX appended as exhibits to FIS's Q3 2021 Report. Defendants admit that Paragraph 199 purports to quote statements made in the certifications, but state that the certifications speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

200.   The Q3 2021 Report included an income statement reporting the Company's net earnings of $161 million for the third quarter 2021, and $52.8 billion in goodwill included as an asset on the Company's balance sheet as of September 30, 2021. Of that $52.8 billion in goodwill, Defendants reported $35.9

billion in goodwill for its Merchant Solutions segment (Worldpay):

| | Merchant Solutions | | Banking Solutions | | Capital Market Solutions | | Corporate And Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2020 | $ | 36,267 | $ | 12,279 | $ | 4,702 | $ | 20 | $ | 53,268 |
| Foreign currency adjustments | | (413) | | (26) | | (33) | | — | | (472) |
| Balance, September 30, 2021 | $ | 35,854 | $ | 12,253 | $ | 4,669 | $ | 20 | $ | 52,796 |

**ANSWER**:  Defendants admit that FIS's Q3 2021 Report included a statement of earnings that reported net earnings of $161 million for the third quarter of 2021, and a balance sheet that reported approximately $52.8 billion in goodwill as an asset as of September 30, 2021. Defendants admit that FIS's Q3 2021 Report reported approximately $35.9 billion in goodwill for FIS's Merchant Solutions segment as of September 30, 2021. Defendants admit that the table in Paragraph 200 appears in FIS's Q3 2021 Report. Defendants deny the remaining allegations in Paragraph 200.

201.   The representations in ¶200 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the third quarter 2021 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. *See* Section IV(E)(2).

**ANSWER**:  Denied.

202.   Moreover, Defendant Norcross and Woodall's certifications that FIS's financial statement were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.

81

**ANSWER**:  Denied.

203.   Defendants Woodall and Warren also falsely certified that goodwill was not impaired. Specifically, the Q3 2021 Report stated:

> Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of September 30, 2021, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization*. **Based on our interim impairment assessment as of September 30, 2021, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired***.

**ANSWER**:  Defendants deny the first sentence of Paragraph 203.

Defendants admit that the remaining sentences of Paragraph 203 purport to

quote statements made in FIS's Q3 2021 Report, but state that the Q3 2021

Report speaks for itself and deny the allegations to the extent they

mischaracterize, take out of context, inaccurately quote, or add emphasis to the

statements.

204.   The statement in ¶203 was materially false and misleading because the Merchant Solution segment's goodwill was impaired by September 30, 2021. *See* Section IV(E)(2). Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q3 2021 Report despite knowing of significant

impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point.[20]

**ANSWER**:  Defendants deny the allegations in Paragraph 203 and the associated footnote.

### I.        November 16, 2021 – 2021 RBC Conference

205.    On November 16, 2021, Defendants Norcross and Woodall attended the 2021 RBC Global Technology, Internet, Media and Telecom Conference (the "2021 RBC Conference"). During the 2021 RBC Conference, Defendant Norcross discussed the Worldpay integration, stating that it was predominantly behind the Company at that point. Specifically, Norcross stated, "it just felt like when you look at where we are on the world pay integration, ***we've got really Worldpay predominately behind us now. We've got all of our segments really hitting on all cylinders***."

**ANSWER**:  Defendants admit that Norcross and Woodall attended the 2021 RBC Conference on November 16, 2021. Defendants admit that Paragraph 205 purports to quote and characterize statements made during the conference, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements.

206.    Norcross's statement was materially false and misleading because the Worldpay integration was not complete or "behind" the Company by that point. Indeed, Defendants had yet to even integrate FIS's and Worldpay's CRMs, which made cross-selling extremely difficult. *See* ¶72-74. Cross-selling was non-existent for the additional reason that Defendants never implemented a program to incentivize it. *See* ¶71. Moreover, Defendants had not even integrated FIS and Worldpay's contracts into a unified contract, which made it difficult to include the other company's product in a cross-sale since the customer would have to

---

[20] Moreover, as explained in ¶142, the Company's generic risk disclosures—which were repeated in the 2021 Annual Report, the Q1 2022 Report, the Q2 2022 Report, and the Q3 2022 Report—are meaningless and do not absolve Defendants from liability for fraudulently certifying that goodwill was not impaired.

sign two separate contracts. *See* ¶73-74. Indeed, customers left after the acquisition because the two companies continued operating as separate entities. ¶73.

**ANSWER**: Denied.

207.   Later during the November 2021 RBC Conference, Defendant Norcross tried to dispel any investor concerns over the Company's loss of market share in the Merchant Solutions segment. Specifically, an analyst asked Norcross directly about the "competitive narrative [in] merchant," since, according to the analyst, he "think[s] most people [are] dialed in" to that issue, and further noted that "[e]veryone wants to hear about [it]." In response to that question, Norcross claimed that FIS was actually gaining share in the Merchant Solutions space. Specifically, Norcross stated:

> And so I think what people see when they look and really dig through all of that, ***no way you can say that FIS is losing share, just the exact opposite***. No way to think that we can – when you look, we're actually a leader in the disruption, not going to be disrupt[ed], and that's hopefully the narrative that people are going to start realizing as they do their work.

**ANSWER**:  Defendants deny the first sentence of Paragraph 207. As to the remaining sentences in Paragraph 207, Defendants admit that Paragraph 207 purports to quote statements made during the conference, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements.

208.   Defendant Norcross's statement was materially false and misleading because, as described by several former employees, Worldpay was losing share to competitors throughout the Class Period. *See* Section IV(C)(2). Indeed, the SMB business in particular had negative net customer growth throughout the entire Class Period. *See* ¶¶83-84, 127-28.

**ANSWER**:  Denied.

84

### J.      February 15, 2022 – Q4 2021 Earnings Call

209.   On February 15, 2022, FIS held an earnings conference call discussing the Company's financial results for the fourth quarter and full year 2021 (the "Q4 2021 Earnings Call"). During the Q4 2021 Earnings Call, an analyst asked Defendant Norcross about cross-selling, and Norcross responded by emphasizing that the Company's sales team had "***done an excellent job driving cross sales through the Worldpay acquisition and we exceeded . . . more than $700 million in cross sales***."

**ANSWER**:  Defendants admit that FIS held an earnings conference call on February 15, 2022, discussing financial results for the fourth quarter and full year 2021, among other things. Defendants admit that Paragraph 209 purports to quote and characterize statements made on the earnings call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 209.

210.   Defendant Norcross's statement was materially false and misleading because FIS had not "done an excellent job driving cross sales" with Worldpay. According to former Worldpay and FIS employees, little to no cross-selling was happening. *See* Section IV(C)(1). According to CW 7, a Global Strategic Account Director at Worldpay, she was not aware of any cross sales between FIS and Worldpay during her tenure, which ended in December 2021. Similarly, CW 9—who was responsible for reporting FIS' Integrated Payables divisions' revenue synergies—attended monthly meetings with five lines of business at FIS where revenue synergies with Worldpay were discussed. According to CW 9, none of these five businesses hit their revenue synergy targets with Worldpay during her tenure, which ended in April 2021.

**ANSWER**:  Defendants deny the first sentence of Paragraph 210. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 210 and therefore deny them.

85

211.   Moreover, several former employees have stated that revenue synergies were tracked internally using spreadsheets. According to CW 4, FIS's U.S.-based Integration Management Office (IMO) tracked revenue synergies with Worldpay via an Excel spreadsheet, which was not password protected and maintained on a served server, thereby accessible to all finance employees and Company managers. Similarly, CW 1 noted that FIS GETPAID tracked its cross-sales dollar figures with Worldpay in an excel spreadsheet. CW 1 suggested that Norcross and Woodall had access to this spreadsheet. CW 2 also noted that Paymetric tracked cross-selling revenue synergies with Worldpay during his tenure through Excel spreadsheets and weekly meetings where cross-selling was discussed.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations of Paragraph 211 and therefore deny them.

### K.   February 23, 2022 – The 2021 Annual Report

212.   On February 23, 2022, FIS filed with the SEC its annual report on Form 10-K for the fiscal year 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by Defendants Norcross, Woodall, and Warren. Appended as exhibits to the 2021 Annual Report were signed certifications pursuant SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [2021 Annual Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**:  Defendants admit the first and second sentences of Paragraph 212, and admit that Norcross and Woodall signed certifications pursuant to SOX appended as exhibits to FIS's 2021 Form 10-K. Defendants admit that Paragraph 212 purports to quote statements made in the certifications, but state that the certifications speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

213.   The 2021 Annual Report stated that FIS's Merchant Solutions segment was not impaired for 2021. In the 2021 Annual Report, Defendants Norcross, Woodall, and Warren claimed that their qualitative assessment of goodwill—which only considered the Company's "actual results for 2021 and updated internal forecasts"—determined that a full quantitative assessment was not required. Specifically, Defendants Norcross, Woodall, and Warren stated the following about the Company's annual assessment of its goodwill:

### *Goodwill Impairment*

The Company assesses goodwill for impairment by reporting unit on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. Our reporting units are the same as our primary operating segments, with additional reporting units for certain non-strategic businesses within the Corporate and Other segment. Goodwill impairment assessments require a significant amount of management judgment, and a meaningful change in one or more of the underlying forecasts, estimates, or assumptions used in testing goodwill for impairment could result in a material impact on the Company's results of operations and financial position. Based on the results of our assessments, $94 million of goodwill related to certain non-strategic businesses within the Corporate and Other segment was impaired in 2020. ***For all other reporting units for all periods presented, goodwill was not impaired.***

*   *   *

***For Merchant Solutions in 2021, we performed a qualitative assessment for our annual assessment. In addition to the factors noted above that are considered when performing such an assessment, we considered actual results for 2021 and updated internal forecasts as compared to prior internal forecasts and other assumptions used in the 2020 quantitative annual assessment. As a result of the assessment, we determined that the indicated fair value of the reporting unit was estimated to be in excess of carrying amount by a similar percentage as determined by the prior year's quantitative assessment. We concluded for 2021 that it remained more likely than not that the fair value of the***

87

*Merchant Solutions reporting unit continued to exceed its carrying amount.*

**ANSWER**: Defendants deny the first two sentences of Paragraph 213.

Defendants admit that the remaining sentences of Paragraph 213 purport to

quote statements made in FIS's 2021 Form 10-K, but state that the Form 10-K

speaks for itself and deny the allegations to the extent they mischaracterize, take

out of context, inaccurately quote, modify, or add emphasis to the statements.

214.    The statement in ¶213 was materially false and misleading because the Merchant Solutions segment's goodwill was impaired by December 31, 2021. *See* Section IV(E)(2). Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the 2021 Annual Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point.

**ANSWER**: Denied.

215.    The 2021 Annual Report included an income statement reporting the Company's net earnings of $424 million for the year ended December 31, 2021, and $53.3 billion in goodwill included as an asset on the Company's balance sheet as of December 31, 2021. Of that $53.3 billion in goodwill, Defendants reported $36.4 million in goodwill for its Merchant Solutions segment.

| | Merchant Solutions | Banking Solutions | Capital Market Solutions | Corporate and Other | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2019 | $ 35,553 | $ 12,217 | $ 4,358 | $ 114 | $ 52,242 |
| Goodwill attributable to acquisitions | (11) | 57 | 253 | — | 299 |
| Foreign currency adjustments | 725 | 5 | 91 | — | 821 |
| Asset impairments | — | — | — | (94) | (94) |
| Balance, December 31, 2020 | 36,267 | 12,279 | 4,702 | 20 | 53,268 |
| Goodwill attributable to acquisitions | 620 | — | — | — | 620 |
| Foreign currency adjustments | (484) | (35) | (39) | — | (558) |
| Balance, December 31, 2021 | $ 36,403 | $ 12,244 | $ 4,663 | $ 20 | $ 53,330 |

**ANSWER**: Defendants admit that FIS's 2021 Form 10-K included a

statement of earnings that reported net earnings of $424 million for the year

ended December 31, 2021, and a balance sheet that reported approximately $53.3

billion in goodwill as an asset as of December 31, 2021. Defendants admit that

FIS's 2021 Form 10-K reported approximately $36.4 billion in goodwill for FIS's Merchant Solutions segment as of December 31, 2021. Defendants admit that the table in Paragraph 215 appears in FIS's 2021 Form 10-K. Defendants deny the remaining allegations in Paragraph 215.

216.   The representations in ¶215 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the full year 2021 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. *See* Section IV(E)(2).

**ANSWER**:  Denied.

217.   Moreover, Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.

**ANSWER**:  Denied.

### L.    March 9, 2022 – Wolfe Fintech Forum

218.   On March 9, 2022, Defendants Norcross and Woodall attended the Wolfe Fintech Forum. During the forum, an analyst asked Norcross about "what positively surprised [him] about the year, whether it's the industry and how that was trending or it's specific to FIS?" Norcross touted the Company's integration of Worldpay and the accompanying revenue synergies, stating:

> We really successfully completed the Worldpay integration. We blew out many of our operating synergies going into that, [] w[he]ther it was on an expense takeout or revenue. *Revenue exceeded well over $700 million of cross-sales*, we ended up getting over $900 million of costs takeout. So we feel great about that integration how that went.

**ANSWER**: Defendants admit the first sentence of Paragraph 218 and admit that Paragraph 218 purports to quote and characterize statements made during the Wolfe Fintech Forum, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 218.

219. Defendant Norcross's statement about achieving over $700 million of cross-sales revenue synergies was materially false and misleading for the same reasons identified in ¶185.

**ANSWER**: Denied.

**M.    May 3, 2022 – Q1 2022 Report**

220. On May 3, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2022 (the "Q1 2022 Report"), which was signed by Defendants Woodall and Warren. Appended as exhibits to the Q1 2022 Report were signed certifications pursuant to SOX, wherein Defendants Norcross and Woodall certified that the "[t]he [Q1 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q1 2022 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**: Defendants admit the first sentence of Paragraph 220, and admit that Norcross and Woodall signed certifications pursuant to SOX appended as exhibits to FIS's Q1 2022 Report. Defendants admit that Paragraph 220 purports to quote statements made in the certifications, but state that the certifications speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

90

221. The Q1 2022 Report included an income statement reporting the Company's net earnings of $121 million for the quarter ended March 31, 2022, and $53 billion in goodwill included as an asset on the Company's balance sheet as of March 31, 2022. Of that $53 billion in goodwill, Defendants reported $36.1 billion[21] in goodwill for its Merchant Solutions segment:

| | Merchant Solutions | | Banking Solutions | | Capital Market Solutions | | Corporate And Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2021 | $ | 36,403 | $ | 12,244 | $ | 4,663 | $ | 20 | $ | 53,330 |
| Foreign currency adjustments | | (323) | | (7) | | (23) | | - | | (353) |
| Goodwill attributable to acquisitions | | 11 | | - | | - | | - | | 11 |
| Balance, March 31, 2022 | $ | 36,091 | $ | 12,237 | $ | 4,640 | $ | 20 | $ | 52,988 |

**ANSWER**: Defendants admit that FIS's Q1 2022 Report included a statement of earnings that reported net earnings of $121 million for the first quarter of 2022, and a balance sheet that reported approximately $53 billion in goodwill as an asset as of March 31, 2022. Defendants admit that FIS's Q1 2022 Report reported approximately $36.1 billion in goodwill for FIS's Merchant Solutions segment as of March 31, 2022. Defendants admit that the table in Paragraph 221 appears in FIS's Q1 2022 Report. Defendants deny the remaining allegations in Paragraph 221 and the associated footnote.

222. The representations in ¶221 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by ***billions of dollars*** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the first quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. *See* Section IV(E)(2) and IV(E)(5).

---

[21] Although the Merchant Solutions segment's goodwill balance was $36.4 billion as of December 31, 2021, *see* ¶215, and it was only $36.1 billion as of March 31, 2022, that difference was attributed to "[f]oreign currency adjustments" and ***not*** any sort of intermittent impairment charge.

**ANSWER**:  Denied.

223.   Moreover, Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.

**ANSWER**:  Denied.

224.   The Q1 2022 Report also falsely stated that goodwill was not impaired. Specifically, the Q1 2022 Report stated:

> We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of March 31, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of March 31, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired***.

**ANSWER**:  Defendants deny the first sentence of Paragraph 224.

Defendants admit that the remaining sentences in Paragraph 224 purport to

quote statements made in FIS's Q1 2022 Report, but state that the Q1 2022

Report speaks for itself and deny the allegations to the extent they

92

mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements.

225.   The statement in ¶224 was materially false and misleading because goodwill was impaired by March 31, 2022. *See* Section IV(E)(2) and IV(E)(5). Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q1 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point.

**ANSWER**:  Denied.

### N.     August 4, 2022 – Q2 2022 Statements

226.   On August 4, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2022 (the "Q2 2022 Report"), which was signed by Defendants Woodall and Warren. Appended as exhibits to the Q2 2022 Report were signed certifications pursuant to SOX, wherein Defendants Norcross and Woodall certified that the "[t]he [Q2 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2022 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**:  Defendants admit the first sentence of Paragraph 226, and admit that Norcross and Woodall signed certifications pursuant to SOX appended as exhibits to FIS's Q2 2022 Report. Defendants admit that Paragraph 226 purports to quote statements made in the certifications, but state that the certifications speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

227.   The Q2 2022 Report included an income statement reporting the Company's net earnings of $280 million for the quarter ended June 30, 2022, and $52 billion in goodwill included as an asset on the Company's balance sheet

as of June 30, 2022. Of that $52 billion in goodwill, Defendants reported $35.2 billion[22] in goodwill for its Merchant Solutions segment:

| | Merchant Solutions | Banking Solutions | Capital Market Solutions | Corporate And Other | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2021 | $ 36,403 | $ 12,244 | $ 4,663 | $ 20 | $ 53,330 |
| Foreign currency adjustments | (1,213) | (37) | (87) | — | (1,337) |
| Goodwill attributable to acquisitions | 11 | — | — | — | 11 |
| Balance, June 30, 2022 | $ 35,201 | $ 12,207 | $ 4,576 | $ 20 | $ 52,004 |

**ANSWER**: Defendants admit that FIS's Q2 2022 Report included a statement of earnings that reported net earnings of $280 million for the second quarter of 2022, and a balance sheet that reported approximately $52 billion in goodwill as an asset as of June 30, 2022. Defendants admit that FIS's Q2 2022 Report reported approximately $35.2 billion in goodwill for FIS's Merchant Solutions segment as of June 30, 2022. Defendants admit that the table in Paragraph 207 appears in FIS's Q2 2022 Report. Defendants deny the remaining allegations in Paragraph 227 and the associated footnote.

228.   The representations in ¶227 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the second quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. *See* Section IV(E)(2) and IV(E)(5).

**ANSWER**:  Denied.

---

[22] Although the Merchant Solutions segment's goodwill balance was $36.1 billion as of March 31, 2021, *see* ¶221, and it was only $35.2 billion as of June 30, 2022, that difference was attributed to "[f]oreign currency adjustments" and not any sort of intermittent impairment charge.

229.   Moreover, Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.

**ANSWER**:  Denied.

230.   The Q2 2022 Report also falsely stated that the Company's goodwill was not impaired. Specifically, the Q2 2022 Report stated:

> We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of June 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of June 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.***

**ANSWER**:  Defendants deny the first sentence of Paragraph 230. Defendants admit that the remaining sentences of Paragraph 230 purport to quote statements made in FIS's Q2 2022 Report, but state that the Q2 2022 Report speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements.

231.   The statement in ¶230 was false and misleading because goodwill was impaired by June 30, 2022. *See* Section IV(E)(2) and IV(E)(5). Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q2 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point.

**ANSWER**:  Denied.

232.   Also on August 4, 2022, the Company held an earnings conference call discussing the Company's financial results for the second quarter of 2021 (the "Q2 2022 Earnings Call"). During the Q2 Earnings Call—which came as Defendants had just announced disappointing results for its Merchant Solutions segment, *see supra* ¶¶157-59—Defendant Ferris continued claiming that the Worldpay acquisition was a success, stating that FIS was "***hugely successful in terms of driving revenue synergies on the Worldpay transaction***."

**ANSWER**:  Defendants admit that FIS held an earnings conference call on August 4, 2022, discussing financial results for the second quarter of 2022, among other things. Defendants admit that Paragraph 232 purports to quote and characterize statements made on the earnings call, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 232.

233.   Defendant Ferris's statement was materially false and misleading because it led investors to believe that the Worldpay acquisition was successful because FIS was able to drive revenue synergies with Worldpay, when in reality, the acquisition was a failure from the start, *see* Section IV(C), and Defendants were only able to deliver revenue synergies because they manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. *See* Section IV(D).

**ANSWER**:  Denied.

96

### O.   November 4, 2022 – Q3 2022 Report

234.   On November 4, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2022 (the "Q3 2022 Report"), which was signed by Defendant Warren. Appended as exhibits to the Q3 2022 Report were signed certifications pursuant to SOX, wherein Defendant Norcross certified that the "[t]he [Q3 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q3 2022 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**ANSWER**:  Defendants admit the first sentence of Paragraph 234, and admit that Norcross signed certifications pursuant to SOX appended as an exhibit to FIS's Q3 2022 Report. Defendants admit that Paragraph 234 purports to quote statements made in the certifications, but state that the certifications speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements.

235.   The Q3 2022 Report included an income statement reporting the Company's net earnings of $254 million for the quarter ended September 30, 2022, and $51 billion in goodwill included as an asset on the Company's balance sheet as of September 30, 2022. Of that $51 billion in goodwill, Defendants reported $34.3 billion[23] in goodwill for its Merchant Solutions segment:

|  | Banking Solutions | Merchant Solutions | Capital Market Solutions | Corporate And Other | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2021 | $   12,244 | $   36,403 | $   4,663 | $   20 | $   53,330 |
| Foreign currency adjustments | (66) | (2,108) | (153) | — | (2,327) |
| Goodwill attributable to acquisitions | — | 11 | — | — | 11 |
| Balance, September 30, 2022 | $   12,178 | $   34,306 | $   4,510 | $   20 | $   51,014 |

---

[23] Although the Merchant Solutions segment's goodwill balance was $35.2 billion as of June 30, 2022, *see* ¶227, and it was only $34.3 billion as of September 30, 2022, that difference is attributable to "Foreign currency adjustments" and ***not*** any sort of intermittent impairment charge.

**ANSWER**:  Defendants admit that FIS's Q3 2022 Report included a statement of earnings that reported net earnings of $254 million for the third quarter of 2022, and a balance sheet that reported approximately $51 billion in goodwill as an asset as of September 30, 2022. Defendants admit that FIS's Q3 2022 Report reported approximately $34.3 billion in goodwill for FIS's Merchant Solutions segment as of September 30, 2022. Defendants admit that the table in Paragraph 235 appears in FIS's Q3 2022 Report. Defendants deny the remaining allegations in Paragraph 235 and the associated footnote.

236.  The representations in ¶235 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by ***billions of dollars*** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the third quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. *See* Section IV(E)(2) and IV(E)(5). Furthermore, by November 4, 2022, Defendants had already failed to find a buyer for Worldpay at a total price of around $30 billion, clearly indicating that its goodwill—which was higher than the total sale price—was impaired. *See* ¶¶152-53, 278-79.

**ANSWER**:  Denied.

237.  Moreover, Defendant Norcross's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.

**ANSWER**:  Denied.

238.  The Q3 2022 Report also falsely stated that the Company's goodwill was not impaired. Specifically, the Q3 stated:

98

We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of September 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of September 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired***.

**ANSWER**:  Defendants deny the first sentence of Paragraph 238. Defendants admit that the remaining sentences of Paragraph 238 purport to quote statements made in FIS's Q3 2022 Report, but state that the Q3 2022 Report speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements.

239.  The statement in ¶238 was materially false and misleading because goodwill was impaired by September 30, 2022. *See* Section IV(E)(2) and IV(E)(5). Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q3 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point.

**ANSWER**:  Denied.

99

## VI.   ALLEGATIONS OF LOSS CAUSATION

240.    Defendants' materially false and misleading statements and omissions alleged above directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of FIS and its business, prospects, operations, and results which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period. Lead Plaintiffs and other Class members purchased or otherwise acquired FIS common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.

**ANSWER**:  Denied.

241.    As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact regarding: the Worldpay acquisition, the Company's cross-selling efforts, the revenue synergies the combined Company had achieved, and the value of Worldpay's goodwill. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired their shares of FIS common stock at the artificially inflated prices at which they were offered.

**ANSWER**:  Denied.

242.    As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of FIS's common stock, causing the losses of Lead Plaintiffs and other Class members. The timing and magnitude of FIS's common stock price declines negates any inference that the losses suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

**ANSWER**:  Denied.

243.    Specifically, on August 4, 2022, November 3, 2022, and February 13, 2023, the foreseeable risks and relevant truth concealed by Defendants' Class Period misstatements and omissions concerning the value of FIS's goodwill and the success of the Worldpay acquisition materialized and was revealed. Indeed, each of these partial corrective disclosures, discussed above in ¶¶157-66, 169-80 and herein, partially revealed the relevant truth and foreseeable risks previously

100

misrepresented and/or concealed by Defendants' materially false and misleading statements and omissions.

**ANSWER**:  Denied.

### A.    August 4, 2022 – First Alleged Partial Corrective Disclosure/Materialization of the Concealed Risk

244.   On August 4, 2022, Defendants partially revealed the truth about the failed Worldpay acquisition. Despite the Company's repeated assurances that the Worldpay acquisition was a success and FIS was seeing significant synergies due to successful cross-selling, investors began to learn of Worldpay's struggles when the Company announced disappointing results in its Merchant Solutions segment and stopped providing key performance metrics for that unit.

**ANSWER**:  Denied.

245.   Before the market opened on August 4, 2022, FIS issued a press release announcing the Company's second quarter 2022 results. The August 4, 2022 press release announced that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%, which was far below Street expectations of 50%. Moreover, Defendants abruptly stopped disclosing key KPIs related to the Merchant Solutions segment, including U.S. and global volumes and transaction growth, thereby further obscuring the full extent of Worldpay's struggles. When asked about the missing data during the Company's earnings conference call, which also occurred before the market opened, Defendant Woodall admitted that the Merchant segment "saw sequential volume decreases" during the quarter.

**ANSWER**:  Defendants admit that FIS issued a press release before the market opened on August 4, 2022, announcing FIS's second quarter 2022 results, among other things. Defendants admit that the press release announced that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%, but deny the remaining allegations in the second sentence of Paragraph 245. Defendants deny the allegations in the third sentence of Paragraph 245. Defendants admit that the fourth sentence of Paragraph 245 purports to quote and characterize statements made in an earnings conference

101

call that FIS held on August 4, 2022, but state that the quoted document speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements.

246.   As a direct and proximate result of this partial corrective disclosure and materialization of the concealed risk, shares of FIS's common stock declined $7.56 per share, or more than 7%, from a closing price of $104.13 per share on August 3, 2022, to a closing price of $96.57 per share on August 4, 2022.

**ANSWER**:  Denied.

247.   Defendants' decision to stop disclosing this key performance data sparked concerns amongst investors. For example, analysts at JP Morgan wrote that they "fielded lots of questions and concerns on management's decision to exclude the merchant volume slide/KPIs from its earnings presentation." At the same time, however, Defendants continued misleading investors about the Worldpay acquisition. During the Company's earnings call after the market closed on August 4, 2022, Defendant Ferris claimed that FIS had been "***hugely successful in terms of driving revenue synergies on the Worldpay transaction***."

**ANSWER**:  Defendants admit that Paragraph 247 purports to quote and characterize statements made in a document written by non-parties and on an earnings call that FIS held on August 4, 2022, but state that the quoted documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or add emphasis to the statements. Defendants admit that FIS held an earnings call on August 4, 2022. Defendants deny the remaining allegations in Paragraph 247.

248.   Thus, despite the partial disclosure of previously misrepresented and/or concealed material facts, the price of FIS common stock remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning Worldpay's ongoing struggles, the extent and magnitude of those issues, and the massive $17 billion impairment charge that FIS was required to take in relation to Worldpay's goodwill.

**ANSWER**: Denied.

249. For example, on August 5, 2022, analyst William Blair stated that "[w]hile the guidance reduction is disappointing, we continue to believe FIS's long-term opportunities remain solidly intact." Similarly, on August 15, 2022, J.P. Morgan believed that Defendants removed KPIs because they were no longer indicators of performance, stating that "[management] removed volume slides as they no longer feel that volume growth is an accurate indicator of performance, and given hard to predict results post pandemic with 2Q better on revenue and weaker on volume, we tend to agree."

**ANSWER**: Defendants admit that Paragraph 249 purports to quote statements made in documents written by non-parties, but state that the documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 249.

### B.   November 3, 2022 – Second Alleged Partial Corrective Disclosure/Materialization of the Concealed Risk

250. The impact of the failed Worldpay acquisition was further revealed on November 3, 2022, when, before the market opened, the Company issued a press release announcing more disappointing results for the third quarter of 2022 which began to reveal the true extent of the issues with the Worldpay acquisition.

**ANSWER**: Denied.

251. During the earnings conference call, which took place on November 3, 2022 at 8:30 a.m., Defendant Norcross announced that "we are not pleased with the profitability performance of the business and are taking actions to address them." In addition, the Company's new CFO, Hoag, explained more specifically that the Company's Merchant Solutions segment suffered from a 430 basis-point margin contraction during the quarter—significantly more than the 280 basis-point contraction announced the prior quarter.

**ANSWER**: Defendants admit that FIS held an earnings conference call on November 3, 2022, starting at or around 8:30 a.m. Eastern Time, and that

103

Paragraph 251 purports to quote and characterize statements made on the

earnings conference call, but state that the quoted document speaks for itself and

deny the allegations to the extent they mischaracterize, take out of context, or

inaccurately quote the statements. Defendants deny the remaining allegations in

Paragraph 251.

252.   As a direct and proximate result of this partial corrective disclosure and materialization of previously concealed risks, shares of FIS's common stock declined $22.29 per share, or over 28%, from a closing price of $79.47 per share on November 2, 2022, to a closing price of $57.18 per share on November 3, 2022, thereby removing some artificial inflation from the price of FIS common stock.

**ANSWER**:  Denied.

253.   Following the earnings conference call, investors started to question whether Worldpay's struggles were the result of something more than macro conditions. For example, UBS issued an analyst report stating that "[w]hile we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems." Similarly, analysts from Raymond James reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some." However, unfortunately for investors, there were structural problems, and the kitchen sink had yet to drop.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a

belief about the truth or falsity of the allegations in the first sentence of

Paragraph 253, and therefore deny those allegations. Defendants admit that the

second and third sentences of Paragraph 253 purport to quote and characterize

statements made in documents written by non-parties, but state that the

documents speak for themselves and deny the allegations to the extent they

mischaracterize, take out of context, inaccurately quote, or modify the

statements. Defendants deny the remaining allegations in Paragraph 253.

254.    Because Defendants failed to fully disclose known adverse material facts concerning the value of Worldpay—including that Worldpay's goodwill was significantly overstated and, as a result, Defendants were required to take a $17 billion impairment charge—the price of FIS common stock remained artificially inflated, as investors did not understand that Worldpay's value was significantly overstated or that Merchant Solution's poor quarter was indeed the result of undisclosed "structural problems" between FIS and Worldpay that had prevented FIS from realizing the benefits of the acquisition. Moreover, as alleged above in ¶¶234-35 and 238, Defendants made additional materially false and misleading statements on this date—including overstating the value of the Company's goodwill—which kept the full truth from investors.

**ANSWER**:  Denied.

### C.    February 13, 2023 – Final Alleged Corrective Disclosure/Materialization of the Concealed Risk

255.    On February 13, 2023, the full truth and foreseeable risks regarding Worldpay's value and the integration challenges that had precipitated the Company's preceding disappointing quarter was revealed and materialized. On this date, before the markets opened, FIS filed a Current Report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2022 results. The Form 8-K included a press release that stunned investors by disclosing that the Company was recording a "non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit" in the quarter and at the same time was getting rid of its Merchants Solutions business by spinning it off to create two independent companies.

**ANSWER**:  Defendants deny the first sentence of Paragraph 255.

Defendants admit the second sentence of Paragraph 255. Defendants admit that

FIS's Form 8-K filed on February 13, 2023 included a press release and that the

third sentence of Paragraph 255 purports to quote and characterize statements

made in the press release, but state that the press release speaks for itself and

deny the allegations to the extent they mischaracterize, take out of context, or

inaccurately quote the statements.

256.   This massive write-down on Worldpay constituted more than 40% of FIS's purchase price for Worldpay just a few years earlier and was a 52% decline from the $34.3 billion goodwill FIS had recorded just a few months earlier in the Company's Q3 2022 Quarterly Report.

**ANSWER**:  Denied.

257.   As a direct and proximate result of this corrective disclosure and risk materialization, shares of FIS common stock declined another $9.43 per share, or more than 12%, from a closing price of $75.43 per share on the prior trading day of February 10, 2023 down to a closing price of $66.00 per share on February 13, 2023, thereby removing the artificial inflation in the price of FIS common stock.

**ANSWER**:  Denied.

258.   Analyst coverage of this shocking news confirms that investors were reacting to new information on the failed Worldpay acquisition. For example, on February 13, 2023, RBC Capital Markets wrote the "[s]pinoff and guidance are all that matters, as the Worldpay (Merchant) spinoff is designed to course correct its share-losing SMB Business." Similarly, on the same day, Deutsche Bank Research wrote that "all focus was on the announcement of a spinoff of the Merchant business, in effect reversing the merger joining FIS and Worldpay in 2019."

**ANSWER**:  Defendants admit that Paragraph 258 purports to quote and

characterize statements in documents written by non-parties, but state that the

documents speak for themselves and deny the allegations to the extent they

mischaracterize, take out of context, inaccurately quote, or modify the

statements. Defendants deny the remaining allegations in Paragraph 258.

259.   In response, market analysts finally came to understand that the Worldpay acquisition was a complete failure, which was markedly different than the rosy picture Defendants had falsely painted for years. Indeed, Mizuho analysts stated that the $17.6 billion write-down and spinoff meant that the acquisition of Worldpay in 2019 "was a huge failure," explaining that FIS's merchant business has "deteriorated considerably since the merger[.]" Additionally, analysts at Morningstar blamed the spinoff on the poor integration

106

of the Company's Merchant Solutions business, writing that FIS's "recent issues stem more from operational missteps and that the strategy behind the combination was not necessarily flawed from a long-term perspective." In a report titled "FIS: The Struggle is Real," Wells Fargo analysts reported "The $17.6B impairment charge and the volume growth in Merchant both stood out." Argus Research wrote "the unwinding of the large Worldpay acquisition is a black eye on the company's former strategy."

**ANSWER**:  Defendants admit that Paragraph 259 purports to quote and characterize statements made in documents written by non-parties, but state that the documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 259.

260.   Moreover, investors finally learned that—despite Defendants' repeated false statements about the success of the Worldpay acquisition—Worldpay's poor performance following the acquisition had significantly deteriorated the value of the business. Specifically, investors learned that Worldpay's struggling SMB business was the reason for the massive $17.6 billion impairment charge. As Oppenheimer wrote in a February 13, 2023 analyst report, "FIS took a $17.6 [billion] goodwill impairment due to the SMB subsegment of merchant." Investors also finally learned that FIS's lack of investment in Worldpay from the start contributed to the failed acquisition. As FIS's new CFO, Hoag, stated during the Company's earnings call on February 13, 2023, that "there has been a lack of new product investment driving compression and attrition in our SMB sub-segment."

**ANSWER**:  Defendants admit that Paragraph 260 purports to quote and characterize statements made in a document written by a non-party and on an earnings call that FIS held on February 13, 2023, but state that the quoted documents speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 260.

107

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

261.   As alleged herein, Defendants acted with scienter in that Defendants: (i) knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; (ii) knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**ANSWER**:  Denied.

262.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FIS, their control over, receipt, and/or modification of FIS's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning FIS, participated in the fraudulent scheme alleged herein.

**ANSWER**:  Denied.

263.   Defendants Norcross, Woodall, and Ferris were all motivated to misrepresent the success of the Worldpay acquisition because they received large performance stock bonuses tied to the Company's purported achievement of synergies. Through the Worldpay Integration Incentive Plan (the "Incentive Plan"), these defendants received bonuses tied to achieving revenue synergies for the first three years of the Worldpay acquisition. Thus, Defendants Norcross, Woodall, and Ferris were motivated to conceal from investors the truth about the failed Worldpay acquisition and mislead investors about revenue synergies until the plan expired in September 2022. As explained above, this is exactly what happened, as the full truth emerged shortly after the Incentive Plan ended and after these defendants had received millions of dollars in bonus compensation.

**ANSWER**:  Defendants deny the first sentence of Paragraph 263.

Defendants admit that under the Incentive Plan, Norcross, Woodall, and Ferris

received incentive awards that were based on achieving certain revenue synergies

in the first three years after the Worldpay acquisition, among other things.

Defendants deny the remaining allegations in Paragraph 263.

108

264.   Specifically, under the terms of the Incentive Plan, Defendant Norcross stood to gain $27 million in incentive awards (based on grant date fair value) if FIS achieved $700 million in revenue synergies and $550 million in expense synergies (the "Maximum") before the program expired on September 30, 2022. Defendants Woodall and Ferris stood to gain $18 million each if the Maximum synergies were reached. Additionally, these defendants would receive lower awards if FIS achieved $500 million in revenue synergies and $400 million in expense savings (the "Target"), or if FIS achieved $375 million in revenue synergies and $300 million in expense synergies (the "Threshold"), as outlined in the Company's proxy materials filed with the SEC on April 17, 2020:

|  | Threshold | Target | Maximum |
|---|---|---|---|
| Gary A. Norcross | $4,500,000 | $9,000,000 | $27,000,000 |
| James W. Woodall | $3,000,000 | $6,000,000 | $18,000,000 |
| Stephanie L. Ferris | $3,000,000 | $6,000,000 | $18,000,000 |

**ANSWER**:  Defendants admit that the Worldpay Integration Incentive Plan had a revenue synergy target of $500 million in annual run rate, with a threshold of $375 million and a maximum of $700 million, and an expense savings synergy target of $400 million in annual run rate, with a threshold of $300 million and a maximum of $550 million. Defendants admit that, under the terms of the Incentive Plan, Norcross had a maximum equity incentive opportunity of $27 million, and Woodall and Ferris each had a maximum equity incentive opportunity of $18 million. Defendants admit that the table in Paragraph 264 appears in FIS's proxy statement filed with the SEC on April 17, 2020. Defendants deny the remaining allegations in Paragraph 264.

265.   Defendants claimed that the Incentive Plan was designed to create "***$9 – $17 billion in shareholder value***" driven by the "achievement of ***permanent and recurring*** revenue and expense synergies related to the Worldpay acquisition[.]" Defendants also claimed that the Incentive Plan was designed for Defendants Norcross, Woodall, and Ferris because they "would play critical roles in driving the revenue and expense synergies necessary to meet the expectations of the investor community following the close of the Worldpay

acquisition." In other words, Defendants stated that they would "play critical roles" in driving revenue and cost synergies after the acquisition, which they claimed would result in a successful acquisition for shareholders that drove long-term growth.

**ANSWER**:  Defendants admit that Paragraph 265 purports to quote and characterize statements made in FIS's April 17, 2020 proxy statement and May 18, 2020 supplemental proxy statement, but state that the proxy statement and supplemental proxy statement speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, modify, or add emphasis to the statements. Defendants deny the remaining allegations in Paragraph 265.

266.    However, by using synergies as a proxy for the overall success of the Worldpay acquisition, Defendants obscured the fact that the Worldpay was never successful and was not generating any actual or long-term value to shareholders or financial or operational benefits to the Company. It was only after the Incentive Plan ended that investors came to learn that the synergies that Defendants repeatedly touted were not actually correlated with any meaningful, long term strategic or financial benefits that Defendants promised investors.

**ANSWER**:  Denied.

267.    Notably, Defendants Norcross, Woodall, and Ferris never achieved the Maximum bonus ***only because*** FIS's stock price underperformed during the relevant period. Under the terms of the Incentive Plan, vesting of the Maximum was conditioned on the Company's Total Shareholder Returns ("TSR")[24]—a financial metric that measures the overall return generated for shareholders over a specific period—being at or above the median compared to other companies in the S&P 500. Thus, even though Defendants had claimed that they had achieved revenue and costs synergies above the Maximum target (i.e., over $700 million and $550 million, respectively), they could not receive the full

---

[24] Total Shareholder Return expresses the total gain or loss experienced by investors relative to their initial investment or the starting stock price, considering both changes in the company's stock price and any dividends paid to shareholders during that time. TSR is expressed as a percentage, providing a holistic assessment of the investment's performance.

Maximum bonus because FIS's stock price had underperformed relative to other companies in the S&P 500.

**ANSWER**:  Defendants deny the allegations in Paragraph 267 and the associated footnote.

268.   Critically, the internal factors—i.e., the manipulated measure of revenue synergies, which only Defendants had access to—was the only factor that showed that Defendants had supposedly created enough value to justify very large bonuses.[25]

**ANSWER**:  Defendants deny the allegations in Paragraph 268. As to the footnote in Paragraph 268, Defendants admit that the first and second sentences of the footnote purport to quote statements made in FIS's proxy statement filed on April 17, 2020, but state that the proxy statement speaks for itself and deny the allegations to the extent they mischaracterize, take out of context, or inaccurately quote the statements. Defendants deny the allegations in the third sentence of the footnote.

269.   Nonetheless, by any measure, Defendants Norcross, Woodall, and Ferris still received very large bonus compensation due to their false claims that they achieved over $700 million in revenue synergies. Specifically, Norcross's bonus compensation first vested on August 6, 2020, when he was granted 65,982 performance stock units, which were worth approximately $9.7 million based on

---

[25] The Company's Proxy Statement filed on April 17, 2020 states that "Revenue and expense synergies are tracked as the actions are taken and are initially validated by the FIS Integration Management Office and Finance Department. All revenue and expense calculations are then reviewed and validated by an independent accounting firm, PwC." However, this statement fails to address some critical issues, including: (1) whether PwC merely reviewed and validated the calculations for accuracy; (2) if PwC was allowed to object to or change the way FIS defined or calculated revenue synergies; or (3) if the omission of the word synergies from the statement that PwC "reviews and validates all revenue and expense calculations" is just another way of saying that the auditor performs its annual audit of the Company's revenues and expenses generally, as would be expected at any publicly traded company.

111

the value of the stock on that day. Then, on August 5, 2021, Norcross received an additional 16,497 performance stock units, which was worth approximately $2.1 million. Finally, on November 7, 2022, Norcross received an additional grant of 49,495 stock units, which were worth approximately $3 million based on the value of FIS's stock at that point. In total, the value of the stock Defendant Norcross received for purportedly achieving synergies with Worldpay was $14.8 million.

**ANSWER**:  Denied, except Defendants admit that under the Worldpay Integration Incentive Plan, Norcross was granted 65,982 performance stock units on August 6, 2020; 16,497 performance stock units on August 5, 2021; and 49,495 performance stock units on November 7, 2022.

270.   Defendant Woodall's bonus compensation first vested on August 6, 2020, when he was granted 43,986 performance stock units worth approximately $6.5 million based on the value of the stock on that day. Then, on August 5, 2021, Woodall received an additional 10,998 performance stock units, which were worth approximately $1.4 million based on the value of the stock on that day. Finally, on November 7, 2022, Woodall received an additional grant of 32,998 stock units, which were worth approximately $2 million based on the value of FIS's stock at that point. In total, the value of the stock Defendant Woodall received for purportedly achieving synergies with Worldpay was $9.9 million.

**ANSWER**:  Denied, except Defendants admit that under the Worldpay Integration Incentive Plan, Woodall was granted 43,986 performance stock units on August 6, 2020; 10,998 performance stock units on August 5, 2021; and 32,998 performance stock units on November 7, 2022.

271.   Defendant Ferris's bonus compensation vested on August 6, 2020, when she was granted 43,986 performance stock units, worth approximately $6.5 million (based on the value of the Company's stock on that day), for purportedly delivering synergies with Worldpay.

**ANSWER**:  Denied, except Defendants admit that under the Worldpay Integration Incentive Plan, Ferris was granted 43,986 performance stock units on August 6, 2020.

112

272.    Furthermore, the timing of Norcross, Woodall, and Ferris's departures from the Company are suspicious when viewed in conjunction with the Incentive Plan's measurement period and vesting schedule. The performance period of the Worldpay Integration Incentive Plan ran from April 1, 2019 to September 30, 2022. Woodall stepped down from his role as EVP and CFO on November 4, 2022—mere weeks after the end of the third and final Incentive Plan measurement period. Similarly, Norcross announced his resignation as CEO on October 18, 2022 and ended his tenure on December 16, 2022. The third and final Worldpay Integration incentive awards vested for Norcross and Woodall on November 9, 2022. Additionally, Ferris resigned her position as FIS's COO, effective September 2, 2020, less than four weeks after $6,465,942 worth of performance stock units vested for the first measurement period on August 6, 2020.

**ANSWER**:  Defendants deny the first sentence and admit the second sentence of Paragraph 272. As to the third sentence of Paragraph 272, Defendants admit that Woodall stepped down from his position as Corporate Executive Vice President and CFO on November 4, 2022, which was after the end of the third and final measurement period under the Worldpay Integration Incentive Plan. As to the fourth sentence of Paragraph 272, Defendants admit that Norcross ended his tenure as CEO on December 16, 2022. Defendants deny the fifth sentence of Paragraph 272. As to the sixth sentence of Paragraph 272, Defendants admit that Ferris stepped down from her position as Chief Operating Officer on September 2, 2020, and that Ferris was granted performance stock units that vested on August 6, 2020. Defendants deny the remaining allegations in Paragraph 272.

273.    Additionally, the closeness in time between the final vesting of the Incentive Plan bonuses on November 9, 2022 and the revelation that the Company was abandoning its failed acquisition, spinning off Worldpay, and taking a $17.6 billion impairment charge, which happened just three months later, supports an inference that Defendants Norcross, Woodall, and Ferris knew

that Worldpay was failing and its goodwill value was not over $34 billion, but were motivated to continue misrepresenting the progress of the integration and Worldpay's value in order to receive the integration bonuses.

**ANSWER**: Denied.

274. As alleged above, Defendants improperly delayed recognizing a $17.6 billion impairment charge to the value of Worldpay's goodwill despite the fact that Defendants knew of or recklessly disregarded triggering events that should have required FIS to conduct a goodwill impairment test beginning in 2021.

**ANSWER**: Denied.

275. Notably, this impairment charge was the second largest impairment charge of any public company listed on a United States stock exchange since the start of 2020. Moreover, this massive impairment charge accounted for over half of the $34.3 billion goodwill value assigned to the entire Merchant Solutions segment in the Company's Q3 2021 Report, which was filed with the SEC on November 4, 2022. Thus, in just over three months, Defendants cut the value of Worldpay asset in half. The fact that over half the value of a multi-billion dollar, highly publicized asset could just vanish abruptly overnight without Defendants knowing about it earlier is simply implausible.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 275, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 275.

276. Indeed, the huge magnitude of the impairment charge suggests that it should have been recorded earlier, as goodwill does not go from being unimpaired for nearly four years to fully impaired overnight. Therefore, Defendants knew or were reckless in not knowing that it was more likely than not that the goodwill attributed to Worldpay's business was overvalued in the relevant quarters.

**ANSWER**: Denied.

277. However, Individual Defendants were motivated to conceal the indicators that Worldpay's goodwill was impaired because, as explained in Section VII(A), the Individual Defendants each stood to receive millions in

114

performance stock bonuses conditioned on the achievement of cost and revenue synergies during the Worldpay integration phase.

**ANSWER**:  Denied.

278.   By no later than the Summer of 2022, FIS was secretly shopping Worldpay (presumably because the integration was going poorly and there were not synergies between FIS and Worldpay)—a process the Individual Defendants would have clearly been intimately involved with based on the importance of the segment they were seeking to sell. Thus, Defendants were further motivated to delay the goodwill impairment charge so that FIS could justify a higher purchase price to potential buyers. The fact that taking the impairment charge sooner and thereby disclosing the significantly diminished value of Worldpay would both jeopardize Defendants Norcross and Woodall's bonus payouts and force the Company to sell Worldpay for a fraction of what it paid to acquire it just a few years earlier contributes to a strong inference of scienter.

**ANSWER**:  Denied.

279.   Moreover, because nobody was willing to purchase Worldpay for $30 billion, Defendants knew that Worldpay's reported goodwill value—which was around $35 billion at the time—was impaired since the fair value of the *entire* business was less than its goodwill value. As explained above, fair value is defined as "the price that would be received to sell an asset." Thus, the fair value of the entire business was clearly less than the carrying amount, and Defendants knew that goodwill was impaired at that time, requiring them to take an impairment charge (which they failed to do).

**ANSWER**:  Denied.

280.   The Individual Defendants' knowledge of the problems with the Worldpay acquisition can be inferred from the fact that, as the Company's highest executives, the Individual Defendants architected the Worldpay acquisition strategy and were deeply involved in the Company's efforts to integrate Worldpay. Additionally, because the Company assigned 80% of Worldpay's purchase price to goodwill, and explicitly stated that the goodwill consisted of cross-selling opportunities and revenue synergies, Defendants knew they needed to show that synergies were being realized during the post-acquisition integration phase in order to justify the amount of goodwill assigned to Worldpay on the Company's balance sheet. As such, the Individual Defendants had knowledge of all material facts regarding the integration of Worldpay and associated cost and revenue synergies during the Class Period.

**ANSWER**:  Denied.

281.    The Individual Defendants' knowledge of the integration problems can also be inferred from the fact that the success of the Worldpay acquisition was critically important to investors. Understanding the need to justify the $48 billion dollar acquisition, Defendants touted the sheer size of the acquisition and its potential to drive shareholder returns, calling it "strategic and transformational," and repeatedly highlighting that as the "[l]argest FinTech acquisition in history," the acquisition "[p]ositioned FIS as a global leader in the fast-growing and structurally-advantaged merchant acquiring segment." With respect to its commitments to investors, FIS claimed that its integration plan was "designed to create $9 – $17 billion in shareholder value" driven by the "achievement of permanent and recurring revenue and expense synergies related to the Worldpay acquisition[.]" The Company included these shareholder value projections in its proxy materials filed with the SEC on May 18, 2020.

**ANSWER**:  Defendants deny the first sentence of Paragraph 281. As to the remaining sentences in Paragraph 281, Defendants admit that those sentences purport to quote and characterize statements made in supplemental proxy materials, which FIS filed with the SEC on May 18, 2020, but state that the supplemental proxy materials speak for themselves and deny the allegations to the extent they mischaracterize, take out of context, inaccurately quote, or modify the statements. Defendants deny the remaining allegations in Paragraph 281.

282.    Additionally, Defendants knew or were reckless in not knowing about the attainment of synergies because the company monitored synergies and cross sales internally. According to CW 4, FIS's U.S.-based Integration Management Office (IMO) tracked revenue synergies with Worldpay via an Excel spreadsheet, which was not password protected and maintained on a served server, thereby accessible to all finance employees and Company managers. CW 1 noted that FIS GETPAID tracked its cross-sales dollar figures with Worldpay in an excel spreadsheet. CW 1 suggested that Norcross and Woodall had access to this spreadsheet. Similarly, CW 2 noted that Paymetric tracked cross-selling revenue synergies with Worldpay during his tenure through Excel spreadsheets and weekly meetings where cross-selling was discussed.

**ANSWER**:  Defendants deny the first sentence of Paragraph 282.

Defendants lack knowledge or information sufficient to form a belief about the

116

truth or falsity of the allegations in the second, third, fourth, and fifth sentences

of Paragraph 282 and therefore deny them.

283.   As evidenced in numerous filings, earnings calls, and analyst reports, reported synergies and statements made by senior officials regarding the success of the integration were key drivers of FIS's valuation during the Class Period. Further, during the Class Period, the Company's statements about cost and revenue synergy attainment were one of the only metrics by which investors could measure the progress of the acquisition and the Company's ability to deliver on its promises that the acquisition would generate long term shareholder value.

**ANSWER**:  Denied.

284.   Furthermore, Defendants knew or were reckless in not knowing that Worldpay was underperforming because senior level executives and managers at FIS were personally involved in efforts to stem rampant customer attrition in the Merchant segment. Specifically, CW 7 recalled that Sony, which was Worldpay's second largest eCommerce client behind Google and which generated $500,000 weekly for Worldpay, left Worldpay in November 2020. According to CW 7, losing Sony was a huge deal for Worldpay and FIS and became an all-hands-on-deck situation. Indeed, CW 7 explained that FIS's President, Head of Merchant Solutions Jim Johnson personally spoke with Sony in an unsuccessful attempt to retain them as a client. The fact that high level employees were keeping track of, and personally involved in, the Company's efforts to retain Worldpay's largest clients, further adds to an inference of scienter.

**ANSWER**:  Defendants deny the first and fifth sentences of Paragraph

284. Defendants lack knowledge or information sufficient to form a belief about

the truth or falsity of the allegations in the second, third, and fourth sentences of

Paragraph 284 and therefore deny them.

285.   The timing and circumstances of Defendants Woodall and Norcross's departures, the key executives behind the Worldpay acquisition and responsible for its integration, are highly suspicious and further support an inference of scienter.

**ANSWER**:  Denied.

117

286.   First, on August 4, 2022, the Company announced that after over 14 years at FIS and nine years as the Company's CFO, Woodall would "step down" from his position as Corporate EVP and CFO, effective November 4, 2022. The circumstances and timing of Woodall's termination—which was announced on the same day the Company revealed disappointing second quarter earnings results for the Merchant Solutions segment and reduced 2022 revenue guidance—are unusual and suspicious and further add to a strong inference of scienter.

**ANSWER**:  Denied, except Defendants admit that on August 4, 2022, FIS announced that, after over 14 years with the Company, Woodall would step down from his position as Corporate EVP and CFO effective November 4, 2022.

287.   Then, on October 18, 2022, the Company announced that Norcross, who had been with FIS since 1988 and in the CEO role since 2015, would "step down" from his position as CEO, effective December 31, 2022, and assume a new role as Executive Chairman of the Company's Board of Directors on January 1, 2023. The Company also announced that Ferris, then the Company's President, was appointed to the Company's Board of Directors, effective October 18, 2022, and that she would assume the role of President and CEO, effective January 1, 2023.

**ANSWER**:  Admitted.

288.   Despite this clear succession plan, FIS abruptly announced on December 15, 2022 that Norcross would "depart" as CEO and a member of Board right away and that he would not serve as Executive Chairman of the Board as previously planned. The announcement of Norcross's accelerated termination came on the same day the Company announced that it entered into a cooperation agreement with activist investors D.E. Shaw and JANA Partners, and that it would make several widescale changes, including embarking on a strategic review of its business including a "comprehensive assessment of the Company's strategy, business, operations and structure" with a "focus on identifying and optimizing incremental revenue generation, margin improvement and cost reduction opportunities."

**ANSWER**:  Defendants admit that Paragraph 288 purports to quote and characterize statements made in press releases issued by FIS on December 15, 2022, but state that the press releases speak for themselves and deny the

118

allegations to the extent they mischaracterize, take out of context, or inaccurately

quote the statements. Defendants deny the remaining allegations in

Paragraph 288.

289.   Scienter can also be inferred from the fact that Individual Defendants knew that metrics indicative of the performance of Merchant Solutions, such as volume data, were critical to the Company's valuation, but disclosed those metrics on a selective basis in order to further conceal the truth that the Merchant Solutions segment was failing.

**ANSWER**:  Denied.

290.   On November 4, 2021, the Company began disclosing volume data for its Merchant Solutions segment in its earnings reports after investors voiced concerns over the lack of transparency in the Merchant Solutions segment. Analysts at Truist Securities "applaud[ed] management's improved segment disclosure which allows investors to track vol[ume] and yield, and use these KPIs to drive models."

**ANSWER**:  Defendants deny the first sentence of Paragraph 290.

Defendants admit that the second sentence of Paragraph 290 purports to quote

statements made in a document written by a non-party, but state that the

document speaks for itself and deny the allegations to the extent they

mischaracterize, take out of context, inaccurately quote, or modify the

statements.

291.   The Company continued to disclose Merchant volumes in its Fourth Quarter 2021 and First Quarter 2022 earnings reports. However, the Company changed course and chose to stop disclosing merchant volume on August 4, 2022. The timing and circumstances of the Company's decision to withhold Merchant volume data—which came at a time when the Company was trying to sell Worldpay and on the same day the Company released its disappointing second quarter earnings results and announced that Woodall would "step down,"—was highly suspicious and adds to a strong inference of scienter.

**ANSWER**:  Defendants admit the first sentence of Paragraph 291.

Defendants deny the remaining allegations in Paragraph 291.

## VIII. CLASS ACTION ALLEGATIONS

292.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities who or which, during the period from May 7, 2020 through February 10, 2023, inclusive (the "Class Period"), purchased the publicly traded common stock of FIS, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of FIS during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) FIS's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

**ANSWER**:  Defendants admit that Plaintiffs purport to bring this action

pursuant to Rule 23, and that Plaintiffs purport to exclude the individuals and

entities listed in Paragraph 292 from the putative class, but deny that any

putative class may properly be certified.

293.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members in the proposed Class and that its members are widely dispersed geographically. Throughout the Class Period, FIS common stock actively traded on the NYSE (an open and efficient market) under the symbol "FIS." Millions of FIS shares were traded publicly during the Class Period on the NYSE. As of February 22, 2023, the Company had more than 591 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by FIS or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

**ANSWER**:  Defendants admit that FIS common stock is actively traded on

the NYSE under the symbol "FIS," that millions of FIS shares were traded

publicly on the NYSE, during putative class period, that FIS had more than 591 million shares outstanding as of February 22, 2023. Defendants admit that FIS maintains certain records regarding shareholders, but lack knowledge or information sufficient to form a belief about the truth or falsity as to how Plaintiffs intend to identify and notify potential putative class members, and therefore deny those allegations. Defendants deny the remaining allegations in Paragraph 293.

294.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER**:  Denied.

295.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 295, and therefore deny those allegations.

296.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to:

A.      whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

121

B.      whether the statements Defendants made to the investing

public during the Class Period contained material misrepresentations or omitted

material information;

C.      whether, and to what extent, the market price of FIS common

stock during the Class Period was artificially inflated because of the material

misrepresentations alleged herein;

D.      whether Defendants acted with the requisite level of scienter;

E.      whether the Individual Defendants were controlling persons of

FIS; and

F.      whether the members of the Class have sustained damages as

a result of the conduct complained of herein and if so, the proper measure of

damages.

**ANSWER:**  Denied.

297.    A class action is superior to all other available methods for the fair
and efficient adjudication of this controversy since joinder of all members is
impracticable. Furthermore, as the damages suffered by individual Class
members may be relatively small, the expense and burden of individual litigation
make it impossible for members of the Class to individually redress the wrongs
done to them. There will be no difficulty in the management of this suit as a class
action.

**ANSWER**:  Denied.

## IX.   STATUTORY SAFE HARBOR

298.    The statutory safe harbor provided by the PSLRA for forward-
looking statements under certain circumstances does not apply to any of the
materially false and misleading statements alleged in this pleading. First, many of
the statements alleged to be false and misleading relate to historical facts or
existing conditions. Second, to the extent any of the allegedly false and
misleading statements may be characterized as forward-looking, they were not

122

adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

**ANSWER**:  Denied.

299.   To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

**ANSWER**:  Denied.

300.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

**ANSWER**:  Denied.

301.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants made materially false statements to investors about the success of FIS's post-merger integration with Worldpay and the value of Worldpay's goodwill.

**ANSWER**:  Denied.

302.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FIS who knew that the statement was false when made.

123

**ANSWER**:  Denied.

## X.   PRESUMPTION OF RELIANCE

303.   To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

A.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

B.   the omissions and misrepresentations were material;

C.   the Company's securities traded in an efficient market;

D.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

E.   Lead Plaintiffs and other members of the Class purchased FIS's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

F.   FIS's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

G.   As a regulated issuer, FIS filed periodic public reports with the SEC and/or the NYSE;

H.   FIS regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other

124

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

I.      FIS was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Robert W. Baird & Co., Raymond James, UBS Securities, Credit Suisse Securities, LLC, Mizuho Securities, Citigroup, and Wells Fargo Securities, LLC, all of whom wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace.

**ANSWER**:  Defendants admit that Plaintiffs purport to rely on the presumption of reliance under the fraud-on-the-market doctrine, but deny that Plaintiffs may properly rely on that presumption.

304.   As a result of the foregoing, the market for FIS common stock promptly digested current information regarding FIS from all publicly available sources and reflected such information in FIS's stock price. Under these circumstances, all purchasers of FIS common stock during the Class Period suffered similar injury through their purchase of FIS common stock at artificially inflated prices, and thus, the presumption of reliance applies.

**ANSWER**:  Denied.

305.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of FIS common stock.

**ANSWER**:  Denied.

306.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of FIS common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

**ANSWER**:  Denied.

307.  To the extent that Defendants concealed or improperly failed to disclose material facts with respect to FIS's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**ANSWER**:  Denied.

## XI.   COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

308.  Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER**:  Defendants incorporate and restate each and every response

contained above as if fully set forth herein.

309.  During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FIS common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase FIS common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

**ANSWER**:  Denied.

310.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FIS common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER**:  Denied.

126

311.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FIS's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FIS's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FIS and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

**ANSWER**:  Denied.

312.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

**ANSWER**:  Denied.

313.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FIS's operating conditions, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants'

127

overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

**ANSWER**:  Denied.

314.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FIS common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased FIS common stock during the Class Period at artificially inflated prices and were damaged thereby.

**ANSWER**:  Denied.

315.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that FIS was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their FIS common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

**ANSWER**:  Denied.

316.    By virtue of the foregoing, FIS and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER**:  Denied.

317.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**ANSWER**:  Denied.

128

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

318.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER**:  Defendants incorporate and restate each and every response contained above as if fully set forth herein.

319.   The Individual Defendants acted as controlling persons of FIS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER**:  Denied.

320.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER**:  Denied.

321.   As set forth above, FIS and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**ANSWER**:  Denied.

129

## XII.   PRAYER FOR RELIEF

322.   WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

**ANSWER**:  Defendants deny that Plaintiffs are entitled to any relief in this case, including the relief sought in their prayer for relief.

323.   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

**ANSWER**:  Defendants deny that Plaintiffs are entitled to any relief in this case, including the relief sought in their prayer for relief.

324.   Awarding Lead Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

**ANSWER**:  Defendants deny that Plaintiffs are entitled to any relief in this case, including the relief sought in their prayer for relief.

325.   Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

**ANSWER**:  Defendants deny that Plaintiffs are entitled to any relief in this case, including the relief sought in their prayer for relief.

326.   Awarding such other relief as this Court deems appropriate.

**ANSWER**:  Defendants deny that Plaintiffs are entitled to any relief in this case, including the relief sought in their prayer for relief.

## XIII. JURY DEMAND

327.   Lead Plaintiffs demand a trial by jury.

**ANSWER**:  Defendants admit that Plaintiffs demand a trial by jury, but deny that any trial is appropriate.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative and other defenses, without assuming the burden of proof on any such defenses or portions thereof which would otherwise rest with Plaintiffs or any members of the putative class. Defendants expressly reserve the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or as otherwise may be appropriate during the course of litigation.

### First Affirmative Defense

Pursuant to 15 U.S.C. § 78u-5(c), Defendants are not liable for any forward-looking statements because any such forward-looking statements were (i) accompanied by meaningful cautionary language, (ii) immaterial, and/or (iii) made without actual knowledge that the statements were false or misleading.

### Second Affirmative Defense

Defendants are not liable because any alleged statements of material fact, alleged omissions of material fact, or other challenged statements were contained or were made in the context of sufficient cautionary language or risk disclosure and thus are nonactionable under the "bespeaks caution" doctrine.

### Third Affirmative Defense

Defendants are not liable because some or all of the matters now claimed by the Complaint to be the subject of the alleged misstatements or omissions were publicly disclosed or were in the public domain and, as such, those matters

131

were at all relevant times reflected in the market price of FIS's stock and the alleged misstatement or omissions thus had no price impact.

## Fourth Affirmative Defense

Defendants are not liable because at all times, and with respect to all matters contained herein, they acted in good faith, exercised reasonable care, reasonably relied upon the work, opinions, information, representations, and advice of others upon whom they were entitled to rely, did not directly or indirectly induce, and did not know, and could not have known, of the purported misstatements and/or omissions alleged in the Complaint.

## Fifth Affirmative Defense

Plaintiffs' and the putative class members' claims are barred, in whole or in part, or are subject to offset, to the extent Plaintiffs and/or putative class members contributed to or failed to mitigate any losses, or benefited from the complained-of conduct.

## Sixth Affirmative Defense

Pursuant to 15 U.S.C. § 78u-4(f), Defendants are not liable and any purported damages must be apportioned to the extent that others caused or contributed to any losses incurred by Plaintiffs and/or putative class members, including to the extent any Defendant lacked control over any alleged misstatement.

WHEREFORE, Defendants request that judgment be entered in their favor and against Plaintiffs, that this action be dismissed with prejudice in its entirety,

132

that Defendants be awarded their costs and attorneys' fees, and that Defendants

be awarded any other appropriate relief.


Dated: November 22, 2024                Respectfully submitted,

                                        */s/ Hille R. Sheppard*
                                        Hille R. Sheppard*
                                        John M. Skakun III*
                                        Caroline A. Wong*
                                        Takayuki Ono*
                                        SIDLEY AUSTIN LLP
                                        One South Dearborn
                                        Chicago, IL 60603
                                        T: (312) 853-7000
                                        F: (312) 853-7036
                                        hsheppard@sidley.com
                                        jskakun@sidley.com
                                        caroline.wong@sidley.com
                                        tono@sidley.com
                                        *Pro Hac Vice*

                                        Ian M. Ross (FL Bar No. 91214)
                                        SIDLEY AUSTIN LLP
                                        1001 Brickell Bay Drive, Suite 900
                                        Miami, FL 33131
                                        T: (305) 391-5100
                                        F: (305) 391-5191
                                        iross@sidley.com

                                        R. Eric Bilik (FL Bar No. 987840)
                                        MCGUIREWOODS LLP
                                        50 North Laura Street
                                        Suite 3300
                                        Jacksonville, FL 32202
                                        T: (904) 798-2685
                                        F: (904) 360 6304
                                        ebilik@mcguirewoods.com

                                        *Counsel for Defendants*

133

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Hille R. Sheppard*