IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE: FIDELITY NATIONAL      Jacksonville, Florida
INFORMATION SERVICES, INC.
SECURITIES LITIGATION,      Case No. 3:23-cv-252-TJC-PDB
_____

CITY OF HIALEAH EMPLOYEES'
RETIREMENT SYSTEM,

        Plaintiff,

v.      Case No. 3:23-cv-1223-TJC-LLL

STEPHANIE L. FERRIS, et al.,

        Defendants,

and

FIDELITY NATIONAL INFORMATION
SERVICES, INC.,

        Nominal Defendant.
_____

PORTIA E. MCCOLLUM on behalf of
Fidelity National Information
Services,

        Plaintiff,

v.      Case No. 3:24-cv-1090-TJC-MCR

GARY A. NORCROSS, et al.,

        Defendants,

and

FIDELITY NATIONAL INFORMATION
SERVICES, INC.,

        Nominal Defendant.
_____

STATUS CONFERENCE
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

       Heather Randall, RPR
       221 North Hogan Street, #185
       Jacksonville, Florida 32202
       Telephone:  (904) 549-1307
       randall4817@yahoo.com

    (Proceedings recorded by mechanical stenography; transcript
                                         produced by computer.)

                    A P P E A R A N C E S


FOR PLAINTIFFS NEBRASKA INVESTMENT COUNCIL, NORTH CAROLINA
RETIREMENT SYSTEMS, AND NORTH CAROLINA SUPPLEMENTAL RETIREMENT
PLANS:

       NICHOLAS MANNINGHAM, ESQUIRE
       MICHAEL ROGERS, ESQUIRE
            Labaton Keller Sucharrow, LLP
            140 Broadway
            New York, New York 1005

       JOHN BOUDET, ESQUIRE
            GrayRobinson, PA
            301 East Pine Street
            Suite 1400
            Orlando, Florida 32801


FOR PLAINTIFF HIALEAH:

       DAVID WALES, ESQUIRE
       ADAM WARDEN, ESQUIRE
            Saxena White, PA
            7777 Glades Road
            Suite 300
            Boca Raton, Florida 33434


FOR PLAINTIFF PATRICIA MCCOLLUM:

       TIMOTHY MACFALL, ESQUIRE
            Rigrodsky Law, PA
            825 East Gate Boulevard
            Suite 300
            Garden City, New York 11530

FOR THE DEFENDANT FIDELITY NATIONAL INFORMATION SERVICES, INC.:

HILLE SHEPPARD, ESQUIRE
JOHN SKAKUM, ESQUIRE
     Sidley Austin, LLP
     One South Dearborn
     Chicago, Illinois 60603

Eric Bilik, ESQUIRE
     McGuireWoods, LLP
     50 North Laura Street
     Suite 3300
     Jacksonville, Florida 32202

DEBBIE SEGERS, Vice President and Senior Deputy General Counsel
of Fidelity National Information Services, Inc.


FOR THE DEFENDANTS JAMES WOODALL, STEPHANIE FERRIS, AND GARY NORCROSS

ERIC BILIK, ESQUIRE
     McGuire Woods, LLP
     50 North Laura Street
     Suite 3300
     Jacksonville, Florida 32202


DEBORAH BIRNBACH, ESQUIRE
CHARLIE BROWN, ESQUIRE
     Goodwin Procter, LLP
     100 Northern Avenue
     Boston, Massachusetts 02210


LAWREN ZANN, ESQUIRE
     Greenspoon Marder, LLP
     200 East Broward Boulevard
     Suite 1800
     Fort Lauderdale, Florida 33301


FOR FIDELITY INFORMATION SERVICES BOARD:

SCOTT SHERMAN, ESQUIRE
EDGAR NEELY, IV ESQUIRE
     Nelson Mullins
     201 17th Street Northwest
     Suite 1700
     Atlanta, Georgia 30363

4

P R O C E E D I N G S

March 21, 2025                                        10:06 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session, the Honorable Timothy J. Corrigan presiding.

Please be seated.

THE COURT:  I'm a little concerned that we don't have enough lawyers working on this case as I look out.

Good morning.  We are here today at my instance to try to see where we are in these cases and to try to have a path forward here, and -- a couple of things going on.  The -- as we were working on the only real motion before the Court, which was the motion to dismiss in one of the shareholder derivative cases, I started to look at the case in its entirety, I realized that I probably need to manage it a little better than I have.  As you may know, I just came off of a term of chief judge of our court for the last four years and -- so I'm trying to play catchup and get ahold of my cases.  And these cases were on the list of those that needed some attention.

So -- and then I started to look a little further and I realized that I had two shareholder derivative actions, one of them in which a stay was agreed to and the other one in which it was resisted pretty strongly.  I started to wonder why

I had two shareholder derivative suits in the first place.  And so I just decided to see if I could get everybody in the room to figure out what's going on here.

What I want to do is start with the original action and kind of go from there.  So this is now styled In Re: Fidelity National Information Services, Inc., Securities Litigation.  It's case number 3:23-cv-252.  We have so many lawyers and I know some of them wear a number of hats, but let me go ahead and get appearances in just that case, which was 3:23-cv-252.  If I can get appearances from the plaintiff's side first and then from the defendant.

MR. BOUDET:  Good morning, Your Honor.  John Boudet of GrayRobinson as local counsel of behalf of the lead plaintiffs.

MR. MANNINGHAM:  Good morning, Your Honor.  Nicholas Manningham from Labaton, Keller, Sucharrow, on behalf of the lead plaintiffs in the class.

MR. ROGERS:  Good morning, Your Honor.  Michael Rogers also from Labaton, Keller, Sucharrow, also on behalf of lead plaintiffs, Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans in the class.

THE COURT:  Anybody else on this case?

On the defendants' side.

MR. BILIK:  Good morning, Your Honor.  Eric Bilik

with McGuire Woods for the defendants.  Nice to see you.

THE COURT:  Good to see you.

MR. BILIK:  With me is my co-counsel from Sidley Austin, Hille Sheppard and John Skakum.  Ms. Sheppard will be doing most of the talking today.  And also with me from the client, Fidelity National Information Services, is Debbie Segers, who is the senior vice president and deputy general counsel.

THE COURT:  All right.  And I'll get appearances in the other cases when we get to them.  So I'm aware that you-all provided me -- first of all, obviously back in September I did deny the motion to dismiss.  The case is now at issue.  And I did get back in late October a joint case management report from you.  And I -- as I said, I started to review it and also looked to see where it fit into everything.  And I had a little bit of concern about the fact that it doesn't get us to trial until two years from now.

I also saw, and I think this is true, and maybe you-all can confirm this from the plaintiff's side, I saw you-all filed your motion for class certification earlier this month.  The time for the defendants to respond to it hasn't come yet, so it's not at issue.  I'm not proposing to take that up this morning.

But it looked to me like you were -- even though I hadn't actually formally entered the scheduling order, that

the -- you were trying to follow that schedule, because that's the -- the day you filed it was the deadline that was listed in your proposed case management report.

So I guess my questions are, is that true?  Have you been following the deadlines even though I hadn't formally entered the order yet?  Has any discovery occurred?  Are you governing yourself by these deadlines even though I hadn't formally entered the order?  Is this the schedule that you're still supporting, questions like that?

So let me hear from the plaintiff.

MR. MANNINGHAM:  Sure, Your Honor.  So up to this point the parties have been complying with the deadlines that are in the proposed case management report.  We are engaging in discovery.  We've been -- since we filed this we've been meeting, conferring with defendants.  We've sent multiple requests for the production of documents, interrogatories. Defendants have already started producing documents on a rolling basis.

We've come to an agreement on almost all of the issues, I believe, including the scope of discovery, the relevant time period, the number of custodians.  And we've been doing our best to adhere to this schedule in good faith.

And the parties have discussed the schedule up to this point.  And we -- you know, we have been pushing -- moving this case forward, but defendants raised the concern that they

may not be able to meet certain deadlines.  So the parties have come to an agreement that if Your Honor were to give us 45 more days for this date of substantial completion of the document production -- which right now is May 25, 2025.  And that is just based on the negotiations we have had with defendants, the number of custodians, the length of the time period of this case.  That's why we think -- or the defendants asked us for a little more time, and we agreed.  We thought it was reasonable.

THE COURT:  What's -- which entry -- is that on the proposed schedule?

MR. MANNINGHAM:  That is the date for substantial completion of document production, which is May 25, 2025.

THE COURT:  I'm looking at the -- okay.  So I guess you actually gave me a setup for an order and you also gave me one in chronological order, I guess, here, right?

MR. MANNINGHAM:  That's right, Your Honor.

THE COURT:  All right.

MS. SHEPPARD:  Your Honor, if I may?  We are proposing to have the entire schedule -- not this class certification motion.  That will be fully briefed on July 1st -- but the rest of the schedule shifted by 45 days.

We've already collected over two terabytes of data, over -- we're almost up to 10,000,000 documents collected. I've had contract attorneys -- I've had more than 13- -- more than 13,000 contract attorney hours so far reviewing documents.

And it's just -- it's a much bigger document-intensive case than we were anticipating. And if we can get 45 additional days, Your Honor, I think we can meet those scheduling issues and proceed with the case.

THE COURT: Are you-all okay with that?

MR. MANNINGHAM: Yes. We've met and conferred on this before today, Your Honor, and we agreed.

THE COURT: All right. Well, I'm a little late to the party too. And so I hate -- I mean, I don't love it when cases get filed in 2023 and we are not talking about a trial until May of '27. But sometimes that's just the way it goes, and I have to recognize the complexity of the case.

So I think what I'll do, then, are you literally -- we can do this one of two ways. I can literally go through -- when I enter the order, I can literally go through and just add 45 days to everything and put it on a trial term, which, I guess, would be probably July of '27, or you-all can submit a revised proposal to me that -- I think I'm going to do it that way so I make sure I'm getting what you got.

So why don't you-all tell me -- give me a date by which you can submit a supplemental or amended joint case management report with your revised requested deadlines.

MS. SHEPPARD: I think we can do that by Tuesday.

MR. MANNINGHAM: I was going to say Monday or Tuesday.

MS. SHEPPARD:  Monday or Tuesday, that's fine.  That makes sense, Your Honor, because, otherwise, we will have dates falling on holidays or weekends.

THE COURT:  Right.  And then we stay away from that. I really try to -- so I'm just going to -- you can do it whenever you want, but no later than a week from today, March 28th.

MR. MANNINGHAM:  Thank you, Your Honor.

THE COURT:  You can have a seat for a second, and I'll talk to you.

What, if any, position -- effect do these shareholder derivative actions have on this litigation, the 252 case?

MR. MANNINGHAM:  They're completely separate cases, Your Honor.  Your Honor, they have different legal standards, different parties, different interests.  So the focus of the securities case is on the harm that was done to the shareholders, whether the defendants issued false and misleading statements to the investing public, and the harm is done to the individual investors.

Whereas in the derivative cases, obviously the case is brought on behalf of the company and the harm is done to the company.  But those cases deal more with the breaches of fiduciary duty, whether that was adequate due diligence in connection with the merger.

So we think they're different.  There are different

factual issues.  There are different parties.  There are different relevant facts in each case.  So, you know, we've already proceeded far along into discovery.  We've already produced documents.  We've already filed a class cert.  We're taking depositions of our clients next week.  We are far along into the process.  There is really no -- nothing from the derivative cases that would affect the securities case.

THE COURT:  Are you-all -- is your law firm and GrayRobinson, are you involved at all in the shareholder derivative cases?

MR. MANNINGHAM:  No, Your Honor.

THE COURT:  Let me ask you the same question.  What, if any, relationship is there to that -- have anything to do with what we are doing in this case or not?

MS. SHEPPARD:  So, Your Honor, the cases do arise --

THE COURT:  You can go ahead and sit down.  I confer on one at a time.

Go ahead.

MS. SHEPPARD:  The cases do all arise from the same operative facts.  And part of the theory of the derivative action is that FIS was harmed by the alleged securities fraud.  I represent FIS across all three cases, the three shareholder demands that were made -- that are being considered.  Plaintiff's counsel was correct that the securities class action is on behalf of investors, whereas the derivative

actions are about harm to FIS.

I would say one thing that we had argued in our original motion to stay the derivative action in the Hialeah case was we asked to be stayed in favor of the securities class action until it's over, because we saw harm to FIS from having the investigation go forward.

After Your Honor made your decision on the motion to dismiss, the FIS board did decide at that point that they wanted to go forward with an investigation by the Demand Review Committee that has been set up by the FIS board.  It is three independent directors.  And they're represented by independent Georgia counsel from Nelson Mullins.  Scott Sherman is the lead lawyer.  He's here today in the courtroom.

So that part -- those were very related.  That's no longer the case because the board has made the decision to go forward with that investigation.  And that's very far along right now, Your Honor, as you may have seen if you looked at the status report that we filed on Monday.

THE COURT:  Well, there may be some debate about that, but I hear what you're saying.

All right.  Well, let's stay with this case until we hopefully finish it.  All right.  So we've got a motion for class certification.  When is your response due to that?

MS. SHEPPARD:  I believe it's due on May 2nd.

THE COURT:  Is that going to change?

MS. SHEPPARD:  And the response is July 1st.  And I think we will meet those deadlines, Your Honor.

THE COURT:  All right.  But other than that, everything else is going to move by 45 days?

MS. SHEPPARD:  Correct.

THE COURT:  All right.  And is there anything else that we can do today?  Anything else pending?  Anything else that would make sense for us to address today, other than the issue of settlement, which I will ask about at the end of the hearing?  Anything else that we can do today in -- I just call it the main case, the securities case, that would be helpful?

MS. SHEPPARD:  No, Your Honor.  I'm really pleased that we've been able to work out an agreement on the time frames, the custodians, the manner of reviewing documents, things like that.  So at this point we are working together well and the case is progressing accordingly.

THE COURT:  Is there an electronic order in and a confidentiality -- I see a confidentiality order has been entered.  So you've gotten all the --

MS. SHEPPARD:  Yes, Your Honor.

THE COURT:  -- what you need from the magistrate judge?

MS. SHEPPARD:  Yes.

THE COURT:  All right.  Same question on the plaintiff's side.  Is there anything else in this case that we

need to do to manage this case and keep it moving, even though not as fast as I'd like, but I think I just have to accept that? I don't have -- I looked to see whether I had any -- because I don't hesitate sometimes to cut -- you know, to get you to trial sooner than requested if I think it's too long. But I looked to see what you were doing and I'm hearing all this -- how much was involved. So I don't think I have a basis to disagree with you. So we're going to set it for that.

And the only thing I will say is that, you know, as we get closer, I'll likely status it somewhere. And if it looks like the case is actually really going to trial -- of course, I'm sure we'll have summary judgment practice and everything. But I will at that point try to establish a date certain.

And I think the parties should assume that, given the length of the schedule and now I'm extending it by 45 more days, I think the parties should be -- I will never say never, but I don't think anybody should assume that those dates will get pushed any more. I just think we need to get about the business.

So is there anything else from the plaintiff's side on this case that would bear discussion before we turn to the other cases?

MR. MANNINGHAM: No, Your Honor.

THE COURT: Okay. So within a week I will get a

proposed revised schedule from you-all.  That will allow for me to enter a case scheduling order.  I will hopefully do that at pace, but you can assume, based on our discussion today, that I will enter that order, so you should govern yourselves accordingly.  And I'm assuming that all of the dates are going to be agreeable.

And, as I said, I perused the motion for class certification just to see what we're talking about.  And it looks like we're talking about the things that I thought we'd be talking about.  I don't have any prejudgment on that.

Now, I don't know whether the -- does the schedule -- I don't remember if the schedule assumed -- or had in there a place for a potential hearing on class cert or whether you are just leaving that up to me.

MS. SHEPPARD:  Your Honor, it does not right now.  We would welcome that.  Should you wish to schedule it, that would be great.

THE COURT:  Okay.  Any reaction?

MR. MANNINGHAM:  No, Your Honor.  We don't think it's necessary.  But if Your Honor wants to hold a hearing, that's fine.

THE COURT:  Okay.  I think -- I've done it all kinds of different ways.  I've actually held the class cert until I got to the merits.  I don't think I will do that in this case necessarily.  I think we will try to go ahead and decide the

class certification if we can.  Probably what I'll do is this, I will wait for the response and maybe even the reply.

You said July 1st is when it comes due?

MS. SHEPPARD:  July 1st is the reply.  May 2nd for defendants' opposition.

THE COURT:  Okay.  I think I will wait for the briefing to come in.  I will take a look at it and then I'll just make a decision as to whether to set it.  But I -- it is possible I will.  It is a pretty big decision.  I may need some help.  So we'll see.  But I will keep that in mind as I'm considering it.

All right.  Let me just say that, you know, I've had a lot of securities litigation over the years and I've had a lot of other complex litigation over the years, and I know there will be battles to be fought.  But I do appreciate, so far at least, that counsel are working cooperatively and that you've done a lot of the legwork that you need to do to move the case forward.  So I appreciate that, both sides.

Okay.  Unless there is anything else on that case? Going once?  Going twice?

(No response.)

THE COURT:  Let me turn to the derivative actions. I've got a number of questions, but let me just start with -- I know that the 3:23-cv-1223 case got filed first, but I wanted to -- let me start with the McCollum case, 3:24-cv-1090.

Let me get appearances in that case first, and then we'll go from there.

MR. MACFALL:  Good morning, Your Honor.  Timothy MacFall with Rigrodsky Law on behalf of --

THE COURT:  They wouldn't let you sit at the table or --

MR. MACFALL:  I didn't want to stop traffic.

THE COURT:  Okay.  Are you the only one here on that case?

MR. MACFALL:  I am, Your Honor.

THE COURT:  All right.  What about the defendant.

MR. BILIK:  Your Honor, Eric Bilik with McGuire Woods again, with my co-counsel from Sidley Austin.  We represent the nominal defendant, Fidelity National Information Services, Inc., along with the individual defendants, Ms. Ferris, Mr. Norcross, and Mr. Woodall, in both cases.

THE COURT:  So that's everybody?  You represent everybody in those cases?

MR. BILIK:  No.  There are several --

MS. SHEPPARD:  There are three individual defendants.

THE COURT:  Okay.  There's more.  Okay.  All right.

MR. BILIK:  The officers.

THE COURT:  All right.  So tell me again who you represent, then.

MR. BILIK:  The nominal defendant, FIS, or Fidelity

National Information Services, and the individual defendants, Stephanie Ferris, Gary Norcross, James Woodall.

THE COURT:  All right.  Who else -- thank you.

Who else represents somebody in that case?

MS. BIRNBACH:  Good morning, Your Honor.  Deborah Birnbach from Goodwin.  We represent the outside directors who are the remaining defendants.  I am happy to recite them, but there are many.

THE COURT:  Okay.  And is the reason for the separate representation, that your clients are not accused of doing anything wrong?  Is that why there's a separate defense or what?

MS. BIRNBACH:  Though I might characterize it that way, Your Honor, the outside directors, several of whom who are no longer even on the board, are differently situated than the nominal defendant, FIS, or the officer defendants.  And Your Honor is correct that there are not a lot of allegations that the outside directors did much of anything.  But that is why they have separate representation.

THE COURT:  Is that typical?

MS. BIRNBACH:  Yes, Your Honor.

MR. BROWN:  Good morning, Your Honor.  Charlie Brown also on behalf of the outside directors.

THE COURT:  Okay.

MR. ZANN:  Good morning, Your Honor.  Lawren Zann

with Greenspoon Marder, also on behalf of the outside directors.

THE COURT:  So the outside directors are well represented apparently.  Okay.  Does that mean you-all aren't on the same team or you are on the same team or what?

MS. BIRNBACH:  Well, Your Honor, we're coordinating with all counsel.  And certainly, to date, all of the defendants' side have tried to be coordinated in our approach. So the same team in the sense that we're not going to cause the Court any difficulty.  And we tried as often as possible to submit joint papers, particularly at this stage of the case.

THE COURT:  Well, is there a scenario in which you would take contrary positions to the other defendants in the case?

MS. BIRNBACH:  At this stage, no, Your Honor, because all defendants agree that the Demand Review Committee should do its work and that the case should be stayed.

THE COURT:  All right.  So let me ask the plaintiffs in this case.  I guess that's you, sir, right?

MR. MACFALL:  Yes, Your Honor.

THE COURT:  And remind me -- I'm sorry, say your name again, please.

MR. MACFALL:  Sure.  Timothy MacFall.

THE COURT:  We need to get you to a microphone.

MR. MACFALL:  I'm sorry.  It's Timothy MacFall.

THE COURT:  All right.  Can I ask you why you agree to a stay in the case that I was -- and just to tell you my process here, this case was originally in front of Judge Davis, and then we realized it was -- that they all probably should be in front of one judge, so it got sent over to me.  I think by the time I got it it had -- the stay had already been agreed to and it was in place.

So I realized I was looking at one shareholder derivative action where they were fighting like cats and dog about the stay and another one that had been agreed to.  And I was just interested in what the thinking was there.

MR. MACFALL:  Certainly, Your Honor.  Your Honor, the answer, I think, is fairly straightforward and simple.  We agreed to the stay because we filed so much later than the Hialeah case.  We filed approximately a year later.  Obviously Hialeah has undergone much more litigation activities, they've have extensive motion practice.

At the time we filed several days before the Demand Review Committee had recommended its work after it had been paused during the pendency of the motion to dismiss in the securities case, based on the fact that the committee had undertaken -- or re-undertaken its activities, we believed, for Ms. McCollum at least, that the statutory process should play out.  And, again, that arises from our belief that the same issues and concerns expressed by Hialeah simply don't pertain

to McCollum actually because the time of the filing.

THE COURT:  The second question is, what is the reason for a second shareholder derivative action?  Why is your suit -- why does your suit exist when you knew about the Hialeah suit?  Why isn't your client just a party to that suit?  Or what -- and this -- you know, I know this is an area that you've probably practiced in all the time.  And I have had shareholder derivative actions over the years, and I know enough to be dangerous.  But why do I need to have two of them?

MR. MACFALL:  Your Honor, strictly speaking, you probably don't.  We filed at the insistence of our client that we file.  We had made a demand.  The client requested quite vigorously that we get on file.

Certainly the outcome of Ms. McCollum's case will be either informed, if not determinatively decided, by the outcome of the Hialeah case.  We recognize, again, Your Honor, that they were filed well in advance of us.  They have undergone fairly extensive motion practice in that case.  We are relatively latecomers.  But that is the reason for the filing.

It is my understanding that, in all likelihood, barring anything that I -- that does not come to mind at the moment, that what happens in the first filing case will be determinative of what happens in ours.

THE COURT:  Does that mean that you intend to keep the stay in place pending the first derivative action, or that

you intend not to vigorously and independently litigate it?
How is this going to play out?

MR. MACFALL:  Yes, Your Honor.  Your Honor, it is complicated by the fact that the two cases are in different procedural postures.  Again, speaking solely for the McCollum case, our intent is to let the DRC process play out pursuant to statute in accordance with the time frame, the timelines set out in the most recent status report.  I understand the issues and concerns raised by the other case.  They just don't apply to us based on when we filed.  We think, given the timing of our filing, that the statutory process makes sense for Ms. McCollum.

THE COURT:  Well, that certainly is an answer to a question.  I'm not sure it's an answer to my question.  My question is, what's your -- I mean, at some point the case is going to -- I guess you're saying if the committee comes back and says what -- this committee comes back and says this is bad, we need to do something about it, are you inclined to just let that play out?  Are you planning to litigate the case?  I guess it seems a little odd to me that I've got two of these and that one of them is stayed and one of them isn't.  And that doesn't seem like it's making much sense.

Unless you say to me, "We are happy to just ride along, keep the stay in place, let the Hialeah folks slug it out and we will see what happens later," if that is what you're

saying to me, then I can at least understand it.

MR. MACFALL:  Your Honor, as a practical matter, I guess that is what I'm saying.  I can tell you that -- again, speaking for our case, DRC recommends going forward with the claims.  We hoped to participate with them in prosecution of such claims.  If they recommended against the pursuit of claims, again, in our case, we would have to assess what it was that they concluded, and we may well vigorously challenge that determination.  Again, I have seen the filings.  There is just no way to know.

As a practical matter, as Your Honor indicated, because we're so far behind Hialeah, if Hialeah reaches a point where there is a determination on the merits or otherwise, it obviously affects our case.  We may well step back based on the fact that we are the second filed case and so far behind Hialeah to await the outcome of that action.

THE COURT:  Okay.  Well, I think we can leave it there for now.  I may get back to you, though.

MR. MACFALL:  I appreciate it, Your Honor.

THE COURT:  Unless you have something else you want to say.

MR. MACFALL:  Nothing, Your Honor.  Thank you.

THE COURT:  Is it Mr. Sherman?  Is that right?

MR. SHERMAN:  Yes, Your Honor, Scott Sherman.

THE COURT:  You're the committee lawyer, right?

MR. SHERMAN:  Yes, Your Honor.

THE COURT:  Can you come talk to me a minute?

MR. SHERMAN:  Sure.

THE COURT:  We're now getting into the other case -- I'm really kind of into it now, but I'll get into it formally. So I've read your letter and -- I guess you were -- you've been in this from the beginning, right?  In other words, the pause that was put on while I pondered the motion to dismiss, that was -- you were representing the committee at that point as well?

MR. SHERMAN:  Yes, Your Honor.  We've been representing the committee since roughly September of a year before.

THE COURT:  And so when the pause was put on, you just -- nothing?  You just stopped?  Everything stopped?

MR. SHERMAN:  No.  We continued -- well, as far as the amount of kind of review of documents we had prior to -- first of all, prior to the decision to pause, we had undertaken a three- -- two-and-a-half month extensive review of board minutes, documents, as well as other communications and analysis of the law to determine whether or not there should be a continuation or pause in light of the motion.

After that decision was made to recommend that to the board, and the board agreed, during the proceeding months, we continued to discuss with the company through its counsel

issues, including preservation of documents, making sure that we understood, kind of looking at the time frame of what was happening with the current motions to stay and assessing the law and making sure that we continued to believe on an ongoing forward basis when Hialeah was filing its motions regarding the motion to stay, the opposition that, as a DRC, we believed that we were still in the correct position that it made sense in light of the overlap to undertake an extensive investigation once the Court rendered its ruling, because of what we believe could be valuable insight into the Court's, kind of, thought process that had overlapping issues.

So we continued to meet with the DRC on a quarterly basis pursuant to the resolutions that were set forth by the board.  We continued to speak with company counsel.  And we continued to -- kind of an assessment generally, making sure everything was ready to go, to the extent there was a ruling that we believed should then therefore have a startup again.

So we did do some work.  But, yes, we were largely paused in our investigation.  I can speak to the extensive nature, that as soon as Your Honor entered its order in October of last year, we quickly had an assessment of the order, made a determination that we needed to have a continuation of the investigation.  We recommended that to the board, and promptly the board ultimately decided that it was in agreement.

So since that time we've had engagement of roughly 20

timekeepers with over 1700 hours of time spent.  We've had -- requested extensive documentation amounting to about 1,000,000 documents from -- I'm sorry, 1,000,000 pages of documents from the company as well as 15 productions.  We've hired an accounting expert from Alex Partners, a former Chief Accountant from the SEC, Susan Markel, to help us in light of the goodwill impairment issues that are at play in this case.

As we continue to get documents, working through over a terabyte of information, we've continued to now start setting forth interviews.  And we are working to schedule up to -- at this point we are looking at potentially 14 to 16 interviews, if not more, between April, May, and June with the goal of completing a report thereafter and a recommendation to the board by the end of the summer, is our goal at this point, which was articulated in our update letter.

THE COURT:  So is it kind of my fault, then, that this isn't as far along as it could be?  In other words -- I mean, because you're talking about a fair amount of pause there.  This thing, as I recall -- I looked at it -- I guess the original demands were in the summer or fall of '23, I think, right?  So that's question one.

Question two is, is this the type of -- I assume that you do this kind of work?  I mean, this is what you do or part of what you do?

MR. SHERMAN:  Yes, Your Honor.

THE COURT:  This isn't your first rodeo.

MR. SHERMAN:  Yes, Your Honor.

THE COURT:  My question is, how often does this really result in anything that's other than nothing?

MR. SHERMAN:  Well, let me start with your first question, which is, first of all, no, it is not your fault of anything in the delay.  I would say, as a general matter, when you look -- in fairness to the law as well, when you look at case law across the country, there are many instances where derivative cases and investigations are paused throughout the entirety of an SEC action.

And I know from the last hearing we had there was concern from the Court, and raised by Mr. Wales, about indefinite pauses.  But that does happen, and there is that time period that plays in.  So there certainly was a pause.

But from a time period and the expeditious nature of where we're at, I can tell you because of the work that the securities case -- you heard there was some overlap.  If you think through the process, over the last year as that case has been going, they've been working between Sidley Austin and the other side getting documents together, pulling information.

So while there was data that theoretically we could have jumped into -- although we felt the pause was important, Sidley Austin, because of the work that was going on with the SEC action already, securities action, they were collecting

data and having that ready.  So by the time the pause stopped and we kind of worked through that, we were literally getting documents and talking through, doing analytics with FIS and getting productions within three weeks.  So there was a lot of time it takes to get documents together.  And I will tell you that that would have happened anyway.  And we were quickly able to jump into it last fall.  So there was not actually a lot of time lost in the grand scheme of things.

Secondly, with the nature of my practice -- I mentioned this during the last hearing, but just to give context.  It's very often that in cases -- while some may think that only cases get dismissed or the DRC -- or the special committee says the case was not appropriate, but we take our job seriously, looking for both sides and analyzing the issues.

So, for example, in the 2018/'19 case I had in the Southern District of New York, we did an analysis.  We represented a special litigation committee.  And we ultimately decided that there were certain benefits and other issues that then-sitting CEO -- and this is public.  This is all publicly filed.  We did a 180-page report.  But ultimately we determined that there was concern and a viable litigation with respect to the then-sitting CEO.

And so what we ultimately did was, we had to coordinate with -- not just -- there was no securities class action.  We had to coordinate with the company.  We had

to coordinate with their outside auditors, KPMG, on going-concern issues with the then sitting CEO. We had to engage in discussions whether there was going to be settlement. We worked hand and glove with the demand plaintiffs who determined that there were issues that they thought should proceed.

And in that same investigation, the reason why the report is so important, when we -- none of this happened until the report was done. And after the report was done, everyone got a copy. So we had communications and ultimately determined, in consultation with the demand plaintiffs, that certain claims they thought they should proceed on were not viable. But they agreed with us on the ones we felt we had concerns about and ultimately rendered a settlement between the company, the CEO, who stayed in place and paid back certain funds. And ultimately the company went forward.

So that report is what drives the next step in this case. So very much so, this -- you know, our analysis is utilizing the same undertaking to be an independent review.

With respect to -- one other point I think is helpful, we've hired Susan Markel from Alex Partners. She's a former Chief Accountant for the SEC. One of the things we liked about her and her background, in addition to dealing with things from the government's perspective, was that she also, and Alex Partners, had worked on a case -- it was a MiMedx case

in Georgia, so it was another Georgia corporation.

In that case they had actually determined that there were at least some potential issue -- in consultation with the law firm, that there were certain potential issues with the company -- not suggesting that in every instance there is an issue with the company.

But the fact of the matter is, is that when you look at people who are going to be your independent experts, you want to know that they looked at everything fairly. And we felt that Susan Markel and Alex Partners takes an independent view on goodwill. So they are going to be a very good partner for us and for the DRC to assess.

THE COURT: Does the Court in these cases -- in these types of cases does the Court have the authority to impose a deadline on the committee, or is that outside of the Court's purview and the only choice the Court has is whether to let the case go on while the committee is doing its work?

MR. SHERMAN: Your Honor, I had that kind of viewed as a partnership between the DRC and the Court. And this is why when we suggested early on -- in many cases, like my New York case, we decided that we would provide regular updates to the Court so that the Court could understand and the DRC, the Demand Review Committee, and the demand plaintiffs could understand what the time frame was.

So, generally speaking, I've had courts do it two

ways.  One is that we provide regular updates.  For example, we said up to six months.  So, for example, if Your Honor said today, Mr. Sherman, we're going to put a stay in place for six months, but I'd like to report in three or four months on exactly where things are at, do you believe you'll be completed in six months so that we can readdress whether or not we are going to continue the pause -- or the stay, I'm sorry, of the derivative case, or if we need to -- we feel that you're doing your job and you're moving things forward.  So I have had it where it has been more amorphous and kind of as we go.

And I've had some Courts that have said, "Okay.  We are going to give you a time frame and kind of an order to show cause concept and say, Should you ultimately need more time, you need to come to us."

I prefer the first only in the sense that we are going to end up doing whatever that Your Honor needs.  Those letters are the typical type of letters that I have written to courts in the past that give them updates.

So my suggestion today would be to take us at our word, if the Court would be amenable, that we believe we will be done in six months, and within three or four months we will provide a further update to the extent we believe that if we need more time, we'll explain why.  And, if not, allow them to continue so that within six months the Court will get a copy of the order along with a resolution from the board as to the

decision on our recommendation which will also go to the other parties, including Hialeah. And then, thereafter, we will engage, along with the company, in discussions about what the report means, where it's going.

And I'll tell you, between then and now we'll be in still communication with each of the demand plaintiffs. By the way, there are five demand plaintiffs. Only two have filed lawsuits. Just this week we spoke with the newest one, which is representing Michelle Luther. The first question that came out -- now, mentally it was a late -- long-time-in-coming demand. But when we spoke to them, the first comment out of the other side's mouth was, How can we help you? You know, tell us what's going on, we have information that we think -- if we think it would be useful, we will let you know. We've had conversations with them.

We've had conversations with Southfield. We've had conversations with the Young Living Trust. So we will have conversations probably at least once a month to the extent anyone wants it or thereafter explaining where we're at.

But that is the process that I would recommend to the Court. And it is one I felt is a very good partnership to get us through this promptly and to a resolution on the derivative cases.

THE COURT: What's the current state of the document production from -- that you're seeking from the defendants in

the case or from the corporation in the case?  Where are you on that?

MR. SHERMAN:  Where we've come -- so as you heard from the -- in the securities class action, there's a number of custodians that have been added over their discussions.  We started with our own list of custodians that we believe were important from documents we had early on.  And so the company has worked readily with us.  We have weekly calls to walk through where we're at, if not biweekly in some instances.

We've received, as I said in my letter, 15 productions totalling about 1,000,000 pages of documents.  So we continue to get information.  Just to kind of break it down a little bit, there is documentation -- if you look at the complaint that relates to the integration of the company, of WorldPay, there is documentation that relates to Synergy's -- when I say documentation, I mean kind of noncustodial as well as e-mails.  There is technical accounting documents.  There is also documents relating to the acquisition of WorldPay.  We have gotten a steady flow of organized discussion of documents -- so we continue to get documents on a weekly, if not biweekly, basis.

So to explain where we're at, we are now at the point where even though we are getting documents still, we are in a position where we can begin interviews.  So we expect -- we've already had communication with the company to start doing

interviews by mid April depending on people's schedules.

Just to give you a little bit of detail, we even assessed the fact that the company has a 10-Q coming up at the end of April and so we need to speak with some of the individuals in Goodwill. And we expect that as soon as that 10-Q is done, we will be interviewing people with Goodwill in the early part of May. In coordination with that, we've got Alex Partners that is helping us to assess and quickly get to the bottom line on points.

I will tell you that we continue to get information. There's some custodians that we are still waiting on some of the documents. As you heard from Ms. Sheppard, we have 13,000 hours. I mean, they are going as quickly as they can to get through their documents. They are going as quick as they can to get us documents. And nothing is being delayed to get us to the end so we can get a report and recommendation and decision from the board.

THE COURT: What would be a reason not for me to require the defendants in the City of Hialeah, the 1223 case, to produce the same documents to the plaintiff in that case that they produced to you?

MR. SHERMAN: I will give you a two-part answer to that. The first is a general framework of how these cases work and what makes sense as far as how the process works. So if you think about the amount of time spent and where you're

looking at cost and what makes the most sense for the Court -- and, candidly, if you look down the line, what Hialeah may ask for, including in legal fees, let's talk about the concept that I received 1,000,000 pages of documents -- I can't speak for exactly how much has been produced in the securities case, but let's assume it's something like that as well.

So from a concept of every document that we've received that we're going to review and then decipher into organized fashion for our analysis, that is obviously going to take a lot of time and effort by the folks at the Hialeah firm to review, which is something that will come back to the company in the sense of asking for all that time and effort. Because that's -- if you look down the line, that's -- I'm not just talking about legal fees. I'm talking generally about the process of time spent as well as looking at pretty much everything under the sun that came to us that we asked for.

So on one hand you see this volume and this concept and the cost that is going to be incurred by Hialeah. And then you look at, okay, well, what is the practical reality of how these cases flow? Well, normally what happens is, when we get our report done, there is going to be some stuff -- let's assume we agree with everything that Hialeah says, let's assume we agree with half of it, let's assume we agree with none of it, there are different litmus tests that will play into what is actually relevant for Hialeah to look at, potentially, if

they want to argue against the position.

Because what happens is, we submit the report, and let's assume ultimately there is a filing from the company to dismiss all of the cases, well, they may need certain documents.  And the law across the country is that you -- the Court focuses on what limited is needed -- and limited is the key -- limited discovery is needed and if Hialeah wants to contest some aspect of the report.

I can tell you that in the case from 2019 there was no production along the way.  And by the time we got to the report, what we ended up with was -- and we had discussions with demand plaintiffs.  We shared certain information and documents we thought were relevant.  And we ultimately limited the time that was necessary to actually get to a decision on what we were going to do.  And that case settled.

But I think the idea of giving every last document that's going to add time and cost to the Hialeah folks that they will ask in return for FIS to pay, you know, is not a practical, nor is it what other Courts do.  And that's because the report that we present and the decision of the board is what drives everything.  And that focus, what the report says, will help limit what really is needed in any discovery.  So they are not going to be affected necessarily.

And we will work very promptly and efficiently with each of the demand plaintiffs, including Hialeah, on the issues

as well the company.  That is why, from a practical and a legal standpoint, it makes the most sense to let us finish our report.  We are going to be done by the end of the summer.  And if not, you will know exactly why and what the issue is, and we will give you the information, as much as you need and when you need it.

THE COURT:  What is the format of these witness interviews and what -- do they become part of the report?  How are they shared?  And what's the legal status of them going forward?  Can they be used as admissions?  How does that work? What does it look like?

MR. SHERMAN:  Okay.  So the reports -- I'm sorry.

The interviews are done, I mean, on an -- I won't say informal.  We, as the lawyers, take notes and we have to -- we have work product.

THE COURT:  So there is no court reporter?

MR. SHERMAN:  There is no court reporter.

Now, I will tell you that when it -- and this gets into a nuance also of what's discoverable down the line.  There is an aspect of -- for example, we have our own privilege as counsel with the DRC and the work we share with DRC, just like our own work product.  Right.  And so when we share the report with anyone, including the company, that is something that we would expect the Court to see and everyone else to see.

When it comes to interview notes or the rest,

generally speaking, those have been viewed as not discoverable, but we're not here to hide the ball.  When we go through and lay out certain issues -- as I said, in the 2019 case, it was a 180-page report.  This isn't a quick, you know, short shrift of the issues.

We will -- as far as the interviews go, they are informal.  There is not a court reporter.  We do take notes.  And certainly if there are questions on any particular issue down the line when -- ultimately if there is a question from Hialeah or otherwise on a particular witness, you know -- for example, we can share information with the Court in camera if necessary.  And, ultimately, if the Court determines that under a work product protection there there's -- a witness is qualified, that there should be a sharing of interview notes, then those will be shared.  We are not here to do anything other than get to the right answer and what's in the best interest of the company.

THE COURT:  Do people ever say, "I don't want to talk to you"?

MR. SHERMAN:  In my experience you have -- that is rare.  I would say that -- for example, we are in a position now where we have each of the people we believe are appropriate to talk to, so far are still with the company.  There are some that are not.  So we are in the process of determining whether or not they will speak with us.  But I've rarely had that

situation.

You know, we do know, for example, in the securities case who the confidential witnesses are because of the discovery. You know, I will say that, you know, to the extent -- for example, Mr. Wales believes that the CWs that he has -- the confidential witnesses he's identified are important for us to talk to. We have asked for that information. We haven't received it. But I would suggest that, you know, if he believes that we should speak to any of the confidential witnesses that he's identified, he should provide them to us.

Generally speaking, we do not run into the issue of having conversations with people. They are generally represented by counsel. We go through the documents. We have a list of documents we've shown. So it's very well recorded. So while there's not a technical transcript, there are our notes coupled with the document lists.

THE COURT: And I haven't said this is what I'm going to do. But if I were to say to you that I would expect a report to be finalized by September 1st and that there be an interim report two months or so before that, what would you say?

MR. SHERMAN: I would say that with respect to the September 1st, that would be in accordance with kind of what we were aiming for. I was thinking September 30th, but we will do whatever Your Honor suggests.

It's interesting because the concept of interim report has been mentioned to me a couple of times by folks --

THE COURT:  I don't mean interim report.  I don't mean substantive report.  I mean interim report, like your letter.

MR. SHERMAN:  I would say that is absolutely fine.  I'm sorry.

THE COURT:  I didn't mean substantive.

MR. SHERMAN:  That would be absolutely in accordance with roughly what we suggested.

THE COURT:  Okay.  All right.  I appreciate your time.  I may call on you again.  I appreciate you being here.

All right.  If it wasn't obvious, we are now on record in the City of Hialeah versus Ferris.  That's 3:23-cv-1223:  I've been speaking with Mr. Sherman who is the counsel for the independent committee.

Let me go ahead and get official appearances in the City of Hialeah case from plaintiffs first, please.

MR. WALES:  Good morning, Your Honor.  David Wales and Adam Warden from Saxena White.

THE COURT:  And the same crew here, right?

MR. BILIK:  Good morning, Your Honor.  Eric Bilik with McGuire Woods once again for the three individual officer defendants, Woodall, Norcross, and Ferris, and also the nominal defendant, Fidelity Information Services, along with Mr. Skakum

and Ms. Sheppard from Sidney Austin.

THE COURT:  Thank you.

MS. BIRNBACH:  Yes, Your Honor.  Deborah Birnbach and Charlie Brown and Lawren Zann for outside defense.

THE COURT:  Do you-all represent the exact same people in both suits?

MS. BIRNBACH:  I believe there's an additional one or two in the Hialeah case that were not named in the McCollum case for reasons unknown.

THE COURT:  Ms. Sheppard, you-all represent the same parties in both cases, right?

MS. SHEPPARD:  That is correct.

THE COURT:  Okay.  The issue in this case is whether I'm going to stay the case or not.  The motion to dismiss is also an issue.  I have -- I have done some writing on that, and I think I know where I want to go on that.  We'll see if we talk about that.

But let's talk about the motion to stay, because that seems to be the biggest issue right now that I need to resolve.  So who wants to be heard by the -- from the plaintiff?

MR. WALES:  I would, Your Honor, David Wales.

THE COURT:  And obviously I wanted to get a view of the committee's counsel just to see where we were and whatever help that might be to me and to you.  Let's -- I've read -- there are lots on the stay.  I read motions and replies and I

read updates and supplemental reports and all kinds of stuff, so I think I get the drift.  But I'm happy to hear from you.

MR. WALES:  Thank you for today's conference.  We're obviously deeply concerned about the long delays that the Fidelity board took in first commencing and now conducting the investigation, which has held everything up despite Your Honor's very clear guidance to them when we had our phone conference in February of 2024, 13 months ago.

We are now 20 months after we served our demand, 17 months after the complaint and after the defendants waited to commence their investigation over a year.  Now they want six months more.  This delay that will take over two years is absolutely unprecedented.  Your Honor said you've been through the briefs.  You can see there is nothing like that at all. This is a real problem because of the prejudice here.

And the prejudice is toward our claims because they go back so long.  And, you know, part of our claims go to the actual acquisition of WorldPay.  And the merger was agreed to in March of 2019.  That's six years ago.  We made our demand in July 2023.  I mean, memories fade.  We all try cases.  If you think about it -- it's a rhetorical question, but can you remember a conversation you had in March of 2019?  It's extremely difficult.

And witnesses leave.  They retire.  That is particularly a problem here.  We know that -- and we have

alleged in our complaint, eight of the nine top executives left. Many of the other people left. When the inspiration failed, people were going to competitors. So -- and then WorldPay was sold off. So you have people leaving, executives leaving, companies spun off. And especially, can you imagine now, if we have to go to next year after some report that we hope is coming some day to go to the third parties and say, Oh, yeah, 2019, we are now at 2026, can you tell me about this? I mean, we all live in the real world. This is a huge problem.

So we need to address how do we address the prejudice caused by the defendants' delay. They waited over a year to investigate. If they had done this, if they had started their investigation in July of 2023, we wouldn't be having this conversation. This is a problem that they're making.

So I thought one of the things you said was very interesting. I raised with defense counsel, I said, "Look, what about giving us the documents that are being produced to the securities plaintiffs and the committee?" And they said -- we've discussed it and they declined. Although they said there was a very substantial overlap.

Now, I thought that would be very helpful for us, because, number one, we know whatever process is going to happen next, we're going to have to get a bunch of documents and we're going to have to review them, and that takes time. This will help speed up that process.

Also, for example, the documents they produced in the securities case, they've already been collected and reviewed. They just hit a button. And giving us the documents will not prejudice them at all, will not interfere with their investigation, and it will allow us to start getting up to speed.

Now, this is particularly important for a couple of reasons. Number one, we can go through the documents. If we see there are third parties that we think need to be reached out to -- we don't have to spend -- like, if we get the documents six months or nine months from now, it will be less -- we will be speeding through that process. If we have to do depositions, as you know it always takes a long time to go through a lot of documents before you are ready to do the depositions.

Additionally, there are other things. If they want to discuss a settlement, having the facts, understanding what the facts are is going to help us get a proper settlement. Similarly, while there is some overlap and some differences with the securities case, they are covered by common D&O insurance. So if there is going to be mediation and there are other parties there, we need to be up to speed.

So I do think your suggestion was a good one, a very good one. It addresses some of the issues -- or some of the problems that have been caused by this unprecedented delay, and

so that's kind of the starting point for me.

Now, I know you've read -- you said you are well into the motion to dismiss. So I'm not going to go into the facts unless you have questions, because I think we are really here to talk about the stay and how do we go forward. If I'm wrong, please let me know. I will answer whatever questions you want obviously.

You know, Georgia law says you can't -- you have to make a demand and you have to wait 90 days before you can sue. We are up to 600 days now and they want another 180 days. I mean, as we mentioned in the papers, we have a lot of concerns about the DRC. As we discussed in our phone hearing last year, you know, they had this required SEC filing where they said the demand was without merit and they vigorously opposed it. And that filing was reviewed by the audit committee -- and, remember, the audit committee is on the DRC -- and was also certified as accurate by the CEO, who's also a board member.

And then in the October 18, 2023, minutes, they say, in determining their own independence they concluded that, quote, There's not a substantial likelihood of personal liability based on the allegations in the demand. It sounds to me like they've made some determinations. And that was without making -- the investigation. That's October 2023.

Now, this --

THE COURT: Is that unusual or is that --

MR. WALES:  I've never --

THE COURT:  -- is that kind of the way it works?

MR. WALES:  I've never seen that before.  I think it's incredibly unusual.  I think this sort of bias is what undermines and it's their burden to prove ultimately that they -- their independence.

I mean, would you want -- I mean, just plain -- you know, if I was talking to a jury, I would say, "Would you want someone deciding it who said, 'Your claims are without merit, we're going to oppose it, we've already determined we don't have liability'" -- "'personal liability but we are going to go take a look at it, don't you worry'?"  I mean, there is a certain reality here, and that's why judges in, like, the declining court here in Florida rejected a special committee.

Now, we were hoping when we filed the demand in October -- our complaint in 2023 after the 90 days, because they weren't doing anything and they said our demand was without merit, that would prompt them to do something.  You have a complaint now, are you going to do an investigation?  No.  They didn't do anything.

And then we had our hearing in February of 2024 and they wanted to bifurcate, which would just delay things longer.  And some of your comments were very telling, "This was all the board's doing," "Now I'm realizing the committee is not doing anything right."  And you said, "You are asking me on the one

hand to wait for the committee to do its work and then you're telling me on the other hand the committee is not doing its work."  And then you concluded by saying, "I don't think it's the Court's function to tell the committee what it should or shouldn't be doing.  If the committee, after having this hearing, decides maybe it is in the interest of the mission that they're supposed to fulfill to open their inquiry and to proceed with it, then that's fine.  But I'm not ordering it."

Despite that guidance, they didn't start up the investigation.  They waited.  When he talked about how diligently they're doing, they should have started collecting the documents when we made our demand in the summer of 2023. We wouldn't have all of this delay.  It's all their doing.

And this is what's harming us here.  It is kind of ironic that one of our allegations about breaches of fiduciary duty of the Fidelity board and approving the acquisition is that despite all the problems and issues, they only had access to the data room for nine days.  Here we're at 20 months and we have nothing to show.

There is no case with this sort of extraordinary delay.  You can look at our briefs.  Never.

Now, whether to grant a stay or not is within your discretion.  And the things here, which, you know, if they had started their investigation summer, fall 2023, that would have been appropriate.  Then we wouldn't be having this motion to

stay, but they didn't.  So we are at 20 months.  It's going to be 26 months, 27 months, and then we are going to get a report on a 2003 [verbatim] cv case.  And I just heard Your Honor talking about, "Gee, I would like to get the case" -- "the securities case trial" -- it's a 2023 cv case, and we are talking about maybe getting a report later this year which will just start the process.  So there is incredible delay.

THE COURT:  Tell me what happens if I agree with you and I deny the stay and I assume the committee keeps doing its thing, what happens if they come back and say, Yeah, we are -- it's bad, we are going to do something about it?  How does that work?

MR. WALES:  I haven't had that actually happen.  I can tell you about my experiences.  One experience I had was with First Energy.  We decided to use the First Energy case where Chief Judge Marbley up in Ohio denied the motion to dismiss.  I think you aptly put it, there was fighting like cats and dogs.  But ultimately we worked with the special committee, we worked with the defendants, and there was a settlement that everyone was happy with, and it was approved.

Similarly I was in the McKesson derivative case a few years before that with Judge Claudia Wilken out in the Middle District of California in the City of Oakland.  That arised out of the illegal sale of opioids, the distribution of opioids.  After the motion to dismiss was denied, there was an SLC for

them.  And she denied the stay for the SLC and said, "No depositions for nine months."  Again, we went through their discovery and then we reached a settlement.

So the answer is, I mentioned the experience I've seen with reports generally are pretty negative.  And the more recent literature is that the results are less favorable than litigation.  I do know -- Mr. Sherman mentioned the MiMedx case, if I remember correctly, the officers there were actually convicted criminally.  There was a judgment in the securities case.  And there was a report from a special committee that was pretty negative on the claims and so it settled for no cash, not even any endorsement.

So the answer is, you know, we've had tremendous delay.  I understand why there would be some -- you know, if Your Honor --

THE COURT:  So if I deny the motion to stay, what's going to happen then?  What's going to -- tell me how it's going to play out.

MR. WALES:  Well, part of it is going to be -- depends on when the decision is on the motion to dismiss, right?  Because when the decision on the motion to dismiss is granted or denied, that will determine what happens with the case, right?  Like, if it's granted, we all go home on Hialeah. If it's denied, then there is going to be litigation and we go into litigation.

And, frankly, the first thing I would do is say, "Please give me the documents that were produced to the securities plaintiffs.  Please provide me the hit reports from all the searches so we can see, you know, what was done."  So this is obviously some benefits in coordinating, because they both arise out of the same nucleus of facts, although ours goes back earlier.

What happens if the stay is denied prior to -- and then -- let's say you deny it today and then there is not a decision on the motion to dismiss on the securities case for 20 days, 30 days, 40 days, the answer is, I don't know.  I haven't experienced that to be frank about it.

So I would ask then -- I would repeat that the defendants should be providing to us the documents in the securities case because of this delay.  But I don't know -- I don't think I can point you to a case that says this is exactly what happened.

And, frankly, that's one of the reasons why we propose getting the documents produced in the securities case, because it would allow us to start moving forward to start minimizing or dealing with the prejudice.  I think older cases are a problem when you want to litigate them.

THE COURT:  What about the contention by Mr. Sherman that if I were to authorize the -- or require the defendants to produce the same documents to you that they've already given to

him, that it's just going to end up being double billing?  What about that issue?

MR. WALES:  Well, my view is, we get paid if we add value.  We don't get paid if we don't add value.  And I would like to think that we are diligent and hardworking attorneys with a strong track record of getting substantial results.  And if people don't think I bring value, he ultimately doesn't think I bring value, he can come and say that to the Court.  I have no problem with that, and I will deal with it.  Because anything would be based on either the results, and it would be up to Your Honor whether or not we get a fee.  And I have no problem with that and I would sit down.  If Mr. Sherman or anyone else wants to say that we didn't add value, we will put that before you.

I must say that I think he knows that -- I think you've seen that we are pretty aggressive and hardworking on behalf of our clients to achieve a good result.  And you've already seen it from our briefing.  And I think Your Honor appreciates, based on your comments, that this sort of delay is an enormous problem.

THE COURT:  What's your view of the second derivative action?

MR. WALES:  I didn't really understand why it was filed frankly.  We thought about, should we -- you know, should we move to consolidate, and we said no, because not only are

some of the claims different than ours earlier, but they consented to a stay, which we thought was problematic.

I mean, I think we have to put this in a little bit of context. We spoke about this at the hearing last February. Originally Ms. McCollum filed a derivative complaint, apparently unaware of Georgia's demand requirements. And then counsel advised them, No, you're not allowed to do that, so they immediately dismissed it and sent a demand. It's -- their demand just tracks the class case at that time. There was no CWs. There was no -- I don't want to be -- it was just -- it was basically a copy. And they immediately consented to a stay, which we didn't think was appropriate, of course.

And then there was the SEC filing saying that the demand was without merit, and they didn't react. If you look at the minutes of the 18th of October, the committee reached out to McCollum's counsel a couple of times, and they didn't respond. And then when the motion to dismiss was denied in the securities case, they just filed basically a derivative case that was a copycat and stayed. I didn't really understand the purpose frankly, because they already made a demand and they weren't litigating. So I don't know really know what else to say.

THE COURT: Is there anything else you want to say?

MR. WALES: Yes. I just want to say there was some discussion about what we would get after -- if there was a

report issued.  I've certainly had experiences -- I mean, like, I know -- not in Georgia but in other places, I know we usually get what the committee reviewed and relied upon at a minimum, because it's hard to, like, evaluate, Did they do a fair investigation?  If you don't know what they looked at or what they relied on, why they made their decision.  If they say, "Well, we looked at some of the documents and this is our decision," you kind of have to know what they relied on, right?

So I know, like, one of the cases I was reading back through was, like, the Big Top case out in Ohio.  There was an SLC set up and there was a short pause, I think 90 days, and then it continued and the judge ordered that they turn over everything that the SLC reviewed.

I've had some similar experiences in Delaware and elsewhere, obviously, whether -- if there was -- if there's a report with a recommendation, ultimately if they bring it to the Court, the Court has the discretion whether or not to approve their recommendation.  And then it goes to both the independence and the investigation.

And obviously I think there's been similar issues raised about their independence.  I respectfully disagree.  I don't think we are there yet.  There is not a report to look at.  There is not something to say -- because of what they do.  So, you know, I think, kind of, the elegant way to deal with the problem they caused is turn over the documents that have

been produced in the securities case.  That will get us starting to run with, you know, avoiding some --

THE COURT:  You referenced the securities case as opposed to the documents that the defendants have produced to the committee counsel?

MR. WALES:  You know, when I originally made the proposals to the defense counsel, I actually recommended both. And they said there are -- it's almost the same.  It's very, very heavily overlapped.  And I figured, as kind of a practical matter, the stuff in the securities case has been reviewed for privilege.  It's already up.  It's been produced.  They can produce it with a push of a button or a few buttons, but, you know, there is no prejudice.  There is no difficult burden on them.  Producing those documents wouldn't interfere with the investigation and allow us to start dealing with the problems that they caused.

I hope I answered your questions.

THE COURT:  Thank you, sir.  We are going to take a five-minute comfort break, and then we will come out and I'll hear from the defendants.

COURTROOM SECURITY OFFICER:  All rise.

(Brief recess from 11:29 a.m. to 11:38 a.m.)

COURT SECURITY OFFICER:  All rise.

Court's back in session.  You can be seated.

THE COURT:  Ms. Sheppard, are you up on deck?

MS. SHEPPARD:  Yes.  Thank you, Your Honor.  We believe, on behalf of the company, that the stay should remain in place until the demand committee completes its work and the board makes a determination, not just on the Hialeah demand and the McCollum demand.  There are three other demands.

You were asking Mr. Wales what's common in this circumstance.  I think we can see that the Hialeah case is -- they're the outlier.  We have four other shareholders.  They were not the first to make a demand.  There were four other shareholders, including Ms. McCollum, but three other shareholders who are not before the Court today who made demands.

And Mr. MacFall, on behalf of Ms. McCollum, and the three other shareholders have all recognized that the Georgia process, the Georgia legislature, made a determination to vest decision-making within the board of directors for a company.  And it is the company -- company's board of directors, which has been collected by the shareholders, that should be deciding in the first instance whether claims should be brought on behalf of the company.

Fundamentally that's what we're talking about.  Mr. Wales and Hialeah are seeking to stand in the shoes of FIS and to bring claims on behalf of the company against its officers -- former officers and -- former officers and former directors.

So what happens here under Georgia law?  The Georgia legislature has made a determination, as I said, that boards of directors should be the one making the decision.  They require demands to be made.  They give the Court discretion to stay any derivative actions that get filed.

And at the end of the process -- and Mr. Wales relied a lot on Delaware law, both in his brief and when he spoke today.  The Georgia process is quite different than Delaware, which in Georgia the Court will have an opportunity, after the investigation is complete and the board makes the decision -- I suspect you might have five separate derivative cases at that point.  But what will happen is the Court will need to assess the good faith and the independence of the members of the board who actually make the decision as well as the reasonableness of the process.

This is not something where there will be a substantive review into all discovery.  That would be not called for.  As Mr. Sherman said, we start with the investigation and look at what the board and the Demand Review Committee decide and then evaluate to what extent there are questions concerning the process.  The focus for the Georgia legislature is on the process and the reasonableness of the process and not on the ultimate outcome.

If you were to allow the Hialeah case to go forward, I respectfully would submit I think that would be encouraging a

rush to the courthouse.

THE COURT:  How so?

MS. SHEPPARD:  Well, because I think the other four would not have waited until after the demand review committee completes its work and the board functioned on the demand.  I think they would have all rushed in to try and say, We want to go forward now, because, as you heard, there is a potential fee associated with reviewing documents and getting started and getting out in front.

I think the other four shareholders have all recognized that under Georgia law --

THE COURT:  Wouldn't, though, one would have expected that a demand in a suit which was filed in, I think, the fall of '23, that we are now in mid -- early to mid '25, wouldn't one have expected that something would happen?  I mean, the Georgia law talks about 90 days.  I agree with you it is not a deadline.  But it doesn't contemplate, I don't think, the type of delay we've had here.  And to the extent that I'm at fault that I didn't rule on the motion to dismiss until I could get to it and you-all decided to pause, well, I guess you decided that.  I think I expressed some concern about that a year ago. It didn't seem to matter too much.

So now here we are.  And, you know, in a perfect world, sure, I would have waited.  I would have been happy to hear what this committee had to say.  I would have been happy

to hear what they had to say 18 months ago.  I would be happy to hear what they had to say a year ago.  I would be happy to hear what they have to say six months ago.  And now I'm being told it's going to be another six months, and they are not really promising that.  They said, "Well, we will set for that and we will tell you in three months."  It wouldn't be unusual for lawyers to come in and say, "We need three more months or six more months."  You know, I'm just not sure -- to the extent that the Court has played a role in the delay, then I guess I have to own that.

But as a practical matter, we are talking about a long time.  And if the board had really wanted the committee to tell it what it -- what to do, it sure had an opportunity to do that before now.  Did it not?

MS. SHEPPARD:  Your Honor, the board of directors of FIS, as with the Georgia statutory framework, the board of directors is -- and everybody here is trying to figure out what is in the best interest of the corporation.  And the board of directors made a determination that the size and scope of the investigation that would be needed could be dramatically impacted by what Your Honor held in the motion to dismiss and also that doing things in coordination with the securities class action should that be necessary.

THE COURT:  Well, didn't the company make filings which already said that these claims weren't meritorious?

MS. SHEPPARD:  So, Your Honor, I completely disagree with that.  Mr. Wales has pointed to a 10-Q filing that the company made in August of 2023.  The company -- not any member of the board of directors, other than Stephanie Ferris who is the CEO assigned.  Ms. Ferris has been recused from this whole process.

But the company filed a 10-Q which described the litigation and included a boilerplate statement that we think that the claims are without merit.  That was not a statement by any member of the board.  It was not signed by the board.  And I think the board's decision thereafter to set up a Demand Review Committee and have them hire independent counsel and do an investigation belies the idea -- and there was a specific finding by the board, and Mr. Sherman also investigated whether there had been prejudgment.

But I'll submit that right now the real focus for Your Honor is going to be the board, as it is situated, when the decision is made, the determination is made, concerning the demands.  And the board has had very significant turnover since the summer of 2023.  In fact, there were six members of the audit committee that were -- they were focused on the audit committee, because the audit committee receives a draft of the 10-Q prior to its filing.  Four of those members will be gone and will have departed the board by the summer.  Three of them have already left, and one is not standing for reelection at

the annual meeting that's coming up shortly.  So those people are different.  The new board includes -- after FIS sold WorldPay, a number of the board members departed.  There were some additional brand-new board members as well.

And your focus at the end of this process will be on the people that make the decision regarding the demands, not on the 10-Q or the board that was in place in the summer of 2023. It's the people that make the decision.  Georgia law is very clear, the statute says you should look at the independence and in good faith of the group that makes the determination with respect to the litigation and the demands.  So that's a different group.

I think the 10-Q -- I mean, that was, frankly, a mistake by the company to have that statement in there.  But I don't think it, at any time, reflected a prejudgment by the board.  But it certainly is not something that should be dispositive with respect to the board that ultimately makes the decision.

Another question that Mr. Wales raised had to do with -- again, that was the original board that was in place early on, that they made a determination that they did not face a substantial likelihood of personal liability, so that's completely unprecedented.

I will tell you in every single case, it is incumbent upon the board to think through whether or not there are people

who should be recused from the investigation, whether there are people who face independence issues.

And this board did that.  Mr. Sherman did that as well when he first came in.  And Ms. Ferris was asked to be recused from the process.  Ms. Ferris is the CEO.  She was sued in the securities class action.  And they determined that she should not participate in the process.

It is incumbent on the board at every stage to think about what is being uncovered, whether there is somebody who has a personal -- any personal gain in the case and should be recused from the process because they would be not independent.

The statute makes very clear under the plain language of the statute that merely being a defendant in a derivative action is not enough to cause the board members who make the ultimate decision not to be independent.  And the statute also specifies that being a decisionmaker in the underlying issues is also not something that casts down on independence unless you have a personal benefit from the transaction.

THE COURT:  Is there any case that you know of where it's gone on this long?

MS. SHEPPARD:  Oh, Your Honor, I would say the vast majority of situations -- frankly, there was a stay until the end of the securities class action.  And the reason is because when a company is both a defendant and a plaintiff at the same time against its officers and directors, that is usually not

considered to be in the best interest of the company.  It is very, very, very common for these cases to be stayed in their entirety until the securities class action is over.

This board heard what you said, I think, and after you made your decision on the motion to dismiss, they determined, We're going to get started here and we're going to investigate.  And, you know, as you've heard from Mr. Sherman, there has been substantial work done by his firm so far with respect to the investigation.

In terms of the thought of giving documents to the Hialeah plaintiffs at this time, I mean, under Georgia law, as Mr. Sherman started to explain, at the end of the process the inquiry will not be a full-scale redoing the work or looking at the -- all of the documents that have been received.  We will be asking Your Honor to look at the report, and the challenge will be to whether or not that investigation was reasonable.  I mean, maybe you will order very broad discovery, but you may also look at the report and say, Okay, their challenge is to very specific pieces.

Mr. Wales talked about, if we were to get documents at this stage -- by the way, I don't think it would work for Your Honor to order any -- I think he agreed.  You can't order -- under the statute, the Private Securities Litigation Reform Act, there actually should be a stay of discovery in place right now in the Hialeah case unless and

until you were to deny the motion to dismiss.

And, you know, we can talk about the motion to dismiss, of course.  I think that's a motion that you will probably never need to rule upon, because the board's decision will supersede what you would decide with respect to this particular complaint, because once the board has completed its work, the board is entitled to make the decision on behalf of the company as to whether claims should go forward or not.

But there is a stay of discovery under the Private Securities --

THE COURT:  I understand that.  But are you saying that if the board says everything is fine, then this suit can't go forward?

MS. SHEPPARD:  I think -- right, exactly.  Well, the board gets to make the decision on behalf of the company as to whether the company should pursue claims.  The Hialeah plaintiff -- and maybe the other four shareholders that have made demands certainly are entitled to challenge whether that was appropriate.  In doing that, the Georgia statute, which is Georgia Code 14-2-744, the Georgia Code specifies that the inquiries that Your Honor would go through in assessing whether the board's decision is entitled to respect is, you would look at the good faith and the independence of the board members who make that determination and then you would look at the reasonableness of the investigation.  This is a process

question under Georgia law.

Under Delaware law, frankly, it's a substantive question where you can second-guess the actual decision made by the board.

Under Georgia law, the Georgia legislature made the decision they want this to be a process-oriented question, and so the amount of discovery that would be appropriate would have to do with the process, quite frankly.

I also was quite dismayed to hear Mr. Wales say that if you were to allow there to be documents produced at this time, his first step would be to come and negotiate and second-guess the search terms and the work that's been done. We already have two different groups that have been negotiating with respect to the production of documents.  And what he's proposing would be very disruptive for the company and engage in delays.

THE COURT:  Well, I think he said -- he said a couple of things.  But I think he said that production of the documents that have already been produced in the securities litigation would be potentially -- it would undo it.  And that wouldn't necessarily require you to go back and adjust search terms, would it?

MS. SHEPPARD:  The very first thing -- I wrote it down.  The very first thing he said is, "I would look at those documents and I would want to have conversations with counsel

concerning the hit reports for the search terms that were used to generate the document productions."  That is something -- I would submit we have had very robust discussions with the Labaton firm.  I don't see a basis at all in the Hialeah case for that ever to be an issue.  The Hialeah case will be focused ultimately on -- and maybe -- we don't know how the board is going to come out.

Some other examples of situations where boards have moved forward that I've been involved in, one of them was the Oracle case where the board committee made a decision to allow the derivative case to go forward.  I know that the Hertz Corporation sued its former CEO, Mark Frissora -- you may remember that a few years ago -- and other officers.  It certainly happens, Your Honor.

We don't know how this board is going to come out or what the parameters will be once they make the decision.  I do think they are very much on track to be done.  I was kind of hoping for July, honestly.  But I think they are very much on track and will be able to conclude their work.  I don't think this will be one where a year from now we will still be holding this in abeyance.

I think this is a situation where the Georgia legislature has made the determination that the board should be making the decision.  And the appropriate time to review what that decision is is after that's done, not to prejudge it and

to allow one of five shareholders to come in and start pushing the process.  I think that would be very wasteful.

THE COURT:  Thank you.

Do you want to be heard separately, Counsel?

MS. BIRNBACH:  No, Your Honor.  We concur.

THE COURT:  All right.

MR. WALES:  David Wales again.  Your Honor, I will do this briefly.  Thank you.

I just want to respond to a couple of things.  One thing that struck me was, in the whole presentation there was never the issue of prejudice from any delay addressed or frankly taking ownership for a pause in the delay.  I was kind of struck when they said, "We heard what you said at the hearing."  Well, what I heard you say was, "You should really get going on your investigation."  What apparently they heard was, "You don't have to do the investigation.  Keep waiting." And I don't think that's right.

THE COURT:  Well, I'm told by Ms. Sheppard that it's not uncommon for shareholder derivative cases to be stayed during the entire pendency of the securities litigation.  And, of course, if that's true, then there would be all kinds of delays in that, because these things take forever as we are finding out already.

So I'm kind of -- I mean, I hear what you're saying, and I -- sure, any delay is a long delay.  And I don't know if

anybody would have known -- maybe they would have remembered more in 2024 about what they did in 2019 than they do now.  But they might have remembered just as little of it, because that would still be a long time.  And so it's probably really more of documents and things that are going to be needed.

So what about that?  I mean, if that's -- and that doesn't -- I guess what Ms. Sheppard was saying was, to the extent that they listened at all to what I was saying, that compelled them to go ahead and try to initiate the investigation after I denied the motion to dismiss and -- otherwise they might have just sought to delay it until the end of the securities case.

So talk to me about that a minute.

MR. WALES:  Sure.  Okay.  That is a separate basis for a stay, right?  And we addressed that obviously in our brief, which is, there are certainly some cases where derivative actions are stayed.  Those very commonly are when you have the class case and the securities case in different courts.  You have different jurists so it is harder for one judge to oversee it.

Or if the derivative case -- sometimes people just file a derivative case saying if there is a liability in the securities case, then there is liability in the derivative case.  It is just a pure indemnification type.  And those are the ones that sometimes get stayed.  And they cited a few in

their brief.

We cited to a number of cases in our brief where the Court's saying, "No.  In these" -- "These are real cases.  We can go forward."  There is one judge overseeing it.  There is no prejudice on the ruling on the motion to dismiss.  There is no prejudice in document demand.  If there is ever an issue of prejudice coming up, we will deal with it when we can when it comes up, not some theoretical.

And we've cited quite a few cases in our brief where that is -- the stays are routinely denied.  And the derivative cases and class cases routinely go forward.

THE COURT:  That's fine.

MR. WALES:  It is in the brief.

THE COURT:  I was interested in reading the briefing that pretty much you can find a case that will say whatever you want it to say, right?

MR. WALES:  100 percent.

THE COURT:  And I think the reason for that probably is that judges like me are just sitting here and listening and then just trying to make the best call they can make.  And there's not really any necessarily doctrinal consistency.  It kind of depends on the case and how it's playing out and what's going on and whether it's in front of the same judge or not.

MR. WALES:  Yes.

THE COURT:  So one thing I'm fairly confident in

whatever I do is probably something someone else has done before.

So Ms. Sheppard said that -- if I'm kind of -- I will probably put words in her mouth, that more or less, this suit, your suit, isn't going to mean anything if the board gets the report and says everything's good and that all you're able to do then is to, under Georgia law, question the process by which they reached that conclusion. So talk to me about that a minute.

MR. WALES: Well, one of the things we are going to have to look at is the independence of the board. And she said, "Oh, that SEC filing, no board member was involved," blah, blah, blah. What she didn't tell you was that one of the members of the audit committee that reviewed that was Defendant Ken Lamneck, and he's on the DRC. So a member of the demand review committee reviewed the 10-Q saying this demand was without merit and they vigorously oppose it. And obviously they had their own determination that they make of their own -- they don't face substantial likelihood of liability, number one. Number two, we are not there.

Number two, I mean, we're not there. There's no report. We're talking about what the conditions really -- for a stay being continued -- obviously they have given themselves a long stay.

I do want to read the Georgia statute. It is very

short.  It says, "If the corporation commences an inquiry into the allegations made in the demand or a complaint, the Court may stay any derivative proceedings for such period of time as the Court deems appropriate."

So I think that's pretty directly saying it's well within your discretion, Your Honor, based on facts and circumstances.  And what are the facts and circumstances here?  There's been an inordinate delay.  There's been prejudice.

THE COURT:  So what happens if -- okay.  So let's say I deny the stay, I deny the motion to dismiss, I tell them to answer, I tell you-all to file a case management report, all of that stuff will take a little bit of time, and Mr. Sherman tells me I can be expecting his report -- I was pleased to hear Ms. Sheppard say that she thought it should be July.  I kind of thought it should be too, but he was thinking it might be later.

MR. WALES:  He is the one writing the report.

THE COURT:  Yeah.  And they come out with their report and I've unstayed the case and now they've got this report, what happens?

MR. WALES:  Well, the answer is I don't know because I don't know what the report is going to say.  It's kind of -- you asked me at the last hearing, you said, "Well, Mr. Wales, could it be possible that maybe something I say in the motion to dismiss in the securities case might be informative for

them?"  And I said to you, "I don't know, because I don't know what you're going to say."  And you said, "That makes three of us," or something to that effect.

THE COURT:  I'm kind of clever that way.

MR. WALES:  I mean, it's just rather frank about what's going to happen.

And just so we're clear, I want to do a couple of things.  My proposal, which was kind of along the lines what you were thinking was, we would just take what was produced in the securities case now and we would sit and wait for the report.  When I talked about search terms and stuff like that, that's what I was talking about, if the motion -- if the stay was gone and the motion to dismiss was denied and we are in litigation.

Obviously as a litigant I get to look and see, do I think the searches were adequate or whatever.  But that -- because you were asking me, you know, further down the road. For now, absolutely not.  We are not doing that.

So you have -- and I must say, on the other demands, all of them were filed, other than Ms. McCollum, after February 2024, after our complaint was filed and after Your Honor ordered the briefing to go forward together.  So there was -- we were well down our path.  I don't think that reflects anything.

So here we have the 90 days.  Obviously we'll go a

little longer if they are actually doing their investigation, but sadly they did not.  They raised at the last second obviously the PSLRA to stay.  I don't think that's applicable.  We are talking about conditions for a stay continuing.  But in any event, the PSLRA says that the Court can order discovery for particularized discovery if necessary to prevent undue prejudice.  I mean, it's hard to -- that seems to fit our avenue here.

So obviously we prefer that the stay just be lifted and the motion to dismiss denied.  What's kind of a compromise to get this thing on track is, produce what's been produced to the securities folks.

THE COURT:  Okay.  Thank you.

MR. WALES:  Thank you.

THE COURT:  Mr. Sherman?

MR. SHERMAN:  Yes, Your Honor.

THE COURT:  When's -- when are you going -- what's the earliest you can issue this report?

MR. SHERMAN:  In looking at the timing, we're in interviews right now -- for example, if we have between 14 and 16, that is where we are at right now and we are trying to get those done between people's schedules in April, May, and June. We are still finalizing and getting documents, including some new custodians.

If Mr. Wales gives us the CWs, which I would ask the

Court to ask him to do so we can see if we want to interview those people, that would be important.  That would put us --

THE COURT:  CWs, I take it, are confidential witnesses?

MR. SHERMAN:  Yes, Your Honor.  For example, in the securities class action, as soon as that started, the first interrogatory is, who are your confidential witnesses?

THE COURT:  Mr. Wales, you-all have declined that request earlier.  What's your position on that?

MR. WALES:  Our position is, discovery is a two-way street.  If we got these documents, we would be more interested in working with the committee on that issue.

THE COURT:  What's the reason -- you're going to need to get to a microphone.

Mr. Sherman, I will let you give way here.

What's the reason you don't want to do it?  What are you worried about?  These are folks -- you know, I think I mentioned in my order that I was -- I mean, it's a reasonably impressive display of people who seem to have knowledge about it.  I mean, wouldn't they already be guessing who they are?  I guess, what's the reason for keeping that arrow in your quiver?

MR. WALES:  I guess there was a couple of things.  Number one, obviously we have some pause and skepticism based on statements and the inordinate delay.  And the other thing is, you know, there's hopefully something we could -- they want

certain things, we want certain things, and so, you know, if we got the documents, certainly that would be on the table so we can all kind of move forward.

THE COURT:  Okay.  Thank you.

So, Mr. Sherman, I -- you were answering my question. When's the earliest you can issue this report?  Ms. Sheppard said you can do it by July.

MR. SHERMAN:  I think there are a few discussions we have certainly had on timing.  I will tell you that with respect to -- looking at -- we talked about July.  If -- like I said, where I see things in June finishing -- again, it's not going to be a short report, that ultimately my sense is that I was hopeful it could be done by August.

THE COURT:  August 1st or August 30th?

MR. SHERMAN:  I would say at the end of August.  With the notion we would -- certainly we will be drafting portions along the way and working with our consultant.  I would suggest, from my own experience in working through it, it takes some time to work with the DRC.  So I would say that August 30th is about as early -- if I can get it done sooner, I certainly will.

There are two different types of scenarios.  One is when you are a special committee where you make all of the decisions, one is when you make a recommendation to the board. For example, one question is -- I mean, typically what we do in

this scenario is we would issue the report and then go to the board -- because it's a recommendation, right?  We have to make a recommendation to the board.  Typically it would be packaged to the Court, assuming the board agreed, as a recommendation report coupled with a resolution of the board.

Now, if the Court wants to see a copy of the report before we are able to hold a board meeting to -- for them to vote and assess --

THE COURT:  I mean, I don't want to see it.  I mean, I do -- if I have to, I will.

MR. SHERMAN:  Maybe a summary.

THE COURT:  I'm just trying to understand -- we are all about time here, right, how long things have taken and how much longer they are going to be and whether I should wait around or whether, because it has taken so long or not, I should go ahead and undo the case.  I'm just trying to get -- because there's a path forward, I think, that I'm probably close to adopting, and that's why I was asking Mr. Wales what happens if I unstay the case.  I rule on the motion to dismiss, I tell the parties to start doing the things you do when you're talking about discovery and all of that, while all of that would take a while and your report may come in about then, and then people might know where -- what to do.

MR. SHERMAN:  Let me make this simple to help Your Honor.  We put the date as August 30th.  If there's a reason

that I need to suggest at any point that I think it's going to take longer, that would require any length of time, it would have to be something that I would present to you through the company with pretty darn good reasons to extend it beyond that time period.

THE COURT:  Thank you, sir.  I appreciate it.  Is that all you wanted to say?

MR. SHERMAN:  No.  The last thing I want to say is, I just want to pull my phone out to cite the rule so the Court has it.  Under the Georgia -- there has been a lot of discussions on the Georgia Statute, Section 14-2-744.  It specifically -- and this talks about, If we've decided and the board's agreed that some or all of the cases should be dismissed.  That's in F, that "The corporation shall have the burden of proving the independence and good faith of the group making the determination and the reasonableness of the investigation."  That's what it cites.

So in a sense, it's kind of like business judgment. I always say to everyone, it's about the process and the independence.  And that is when we deal with those issues.  And we certainly took the front-end assessment on independence very seriously just because, like with anything else, the Georgia statute, for example, you can't name every officer and director and then they are all excluded.  They are deemed to be viewed independent unless otherwise determined.  We took that

seriously.

The last thing, since it was raised, when Your Honor made the decision -- and I asked the question about getting guidance from the Court and obviously you made a point about what should happen with respect to -- in the February time period. We reviewed everything at that time. We looked at -- had a DRC meeting. And it was my call and my recommendation that when we looked at everything that was happening in the securities case with all of the multitude of crossover between the investigation on the different factual and legal claims, but also the factual kind of arguments about certain misrepresentations on 11, which cross over, my recommendation was we really need to see if some of those go away or are kept, you know, in the securities case, because when we're trying to pull documents and we are trying to figure out who to interview, that crossover matters.

Like, if I'm going to spend $1,000,000, which I've spent so far, of the company's money and they don't have much -- and the insurance is very limited when it comes to investigation. If we are going to jump into this, I really need to know exactly what I'm looking at. Because of that crossover, it's very important it was a very thoughtful process. There was no ignoring Your Honor's words back in February. We took a very deep assessment of that.

The last thing I will say besides that, I conducted

investigations.  It all depends on how much volume there is.
They can take a year.  They can take a year and a half.  They
can take six months.  So this idea that somehow six months is
an outlier, it is not accurate in the 20 years I've been doing
this.

THE COURT:  Thank you.  All right.  This is a call --
it really is a call, and I'm going to have to make it.  I think
I'm going to -- and I don't think further delay is in anybody's
interest, meaning delay by the Court.  There has been enough of
that.  And so, frankly, I was prepared to rule on this maybe a
month or so ago.  And then I realized there was this other suit
that had been brought into my fold and I realized they had
agreed to a stay, and then I realized I had one shareholder
pursued the stay and another without it.  I wanted to just make
sure I understood what was going on.  I appreciated the
arguments here today.  And there is no perfect answer.  I'm
just going to do the best I can with this.  But I do think we
need to move the ball forward.

And so I'm going to do -- I'm going to do this first,
and I don't -- I wouldn't typically do this, but in the
interest of moving the matter forward, I think -- I think I'm
going to go ahead and rule on the motion to dismiss.  And I was
prepared to do that in writing, and I'm just going to do it
from the bench.  I will be parroting essentially the order I
would have entered.  And that way it will be done and you don't

have to wait for me to write further.

So I have the motion to dismiss, and I went -- in the securities action I kind of went through the allegations in that case. It was very similar allegations, but I also know there are some distinct allegations. So I have considered all of those allegations in the complaint to the extent that they are well pleaded.

And based on those allegations, Hialeah asserts seven counts under Georgia and federal law. And Fidelity is incorporated under the laws of Georgia. You have breach of fiduciary duty against the directors, breach of fiduciary duty against the officers, breach of fiduciary duty for insider selling, and misappropriation of confidential information against the officers, violation of the 10 -- Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) against the officers and directors, violation of 14(a) of the Exchange Act and SEC Rule 14(a)(9) against the directors, unjust enrichment against the officers, contribution and indemnification against the officers and directors.

The defendants have taken the position that the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim upon relief can be granted.

Regarding the Section 10(b) claims, which are based primarily on Fidelity's repurchase of its shares, they argue that the defendants' knowledge is imputed to Fidelity, and

Fidelity, thus, could not have been deceived by the defendants' false or misleading statements.  They also argue that Hialeah fails to adequately allege falsities and enter false causation.

Regarding the 14(a) claims, which are based on the proxy statements, the defendants argue that the exculpation provisions and Fidelity's Articles of Incorporation preempt the claims that Hialeah fails to allege an essential link between the challenge of proxy statements and a transaction that caused harm and that Hialeah fails to adequately allege falsity.

Finally, the defendants argue that the remaining claims are uniquely state law claims that are best addressed by the state courts and that the breach of fiduciary duty claims are inadequate.

The Court has carefully considered the complaint, the parties' arguments, and the applicable statutes and case law. And the Court determines that Hialeah has satisfied that the pleading requirements and dismissal under 12(b)(6) is unwarranted.  The Court rejects the defendants' arguments that the state law claims are inadequately pleaded without any further comment, but I will briefly address the Exchange Act claims.

Regarding Count 4, 10(b) and Rule 10(b)(5) claim, the argument that the defendants' knowledge is imputed to Fidelity and thus fraud is factually impossible.  It is in my view inconsistent with the Fifth Circuit's holding in Shell versus

Hensley, 430 F.2d 819, 827, Fifth Circuit, 1970. And, of course, that case is applicable in the Eleventh Circuit because it was decided prior to the split. And I'm not going to go through my discussion of Shell. But in my view, the argument -- and there are other reasons that the argument is not appropriate. But I'll stick to that.

And I do note that, although Shell involved a conspiracy between directors and an outsider, the circumstances underlying the decision, that is the director's knowledge, are sufficiently similar to the alleged facts here to at least allow the 10(b) claims to proceed past the pleading stage.

Regarding the 14(a) and Rule 14(a)(9) claim, the Court recognizes the exculpation argument may have some force, but it views it more in the nature of an affirmative defense that must be further developed.

Accordingly, the Court will deny the motion to dismiss as it relates to the shareholder derivative complaint, Doc 42. And it will deny the individual defendants' motion to dismiss the shareholder derivative complaint under Rule 12(b)(6), Doc 43.

And I will require the defendants to answer the complaint no later than April 15th. I want to make sure April 15th -- yes, April 15th is a day of the week. The parties must submit a case management report no later than that date as well.

With respect to the motion to stay, I hear what the defendants are saying.  And in a perfect world I would go ahead and wait.  And I think I'm going to do it this way, I'm going to, in effect, partially grant the continued stay, but in this fashion, I think we need to have an answer to the complaint.  I think the parties need to engage in additional -- any discussions about discovery and scope of discovery and agree on what they can agree on.  And if it's producing the securities file, maybe that's a good answer.  I don't know.  But I think discovery can be developed.  I think it can be propounded.  I think it can be discussed.

But I'm not going to require actual discovery production until I get this report or until the report is made available and actions can be taken on that.

I'm told by Mr. Sherman -- and I'm not going to allow any depositions or anything like that.  We are -- I know we're talking about time and memory is fading and so forth, but what I'm hoping to do is to position the case by getting an answer to the complaint, by having the parties engage in preliminary -- by having them file a case management report, by having the parties prepare and discuss and propound discovery. They can talk about objections with each other.  They can be ready to go, but I'm not going to actually require the productions until I see what this report is and until the parties can advise me as to how I should proceed.

In the event the committee determines that some action needs to be taken, then, from what I'm hearing, it can be done in conjunction with some of the shareholders who have made demands.

I don't know how all of that would play out.  In the event the committee determines not to go forward, then I think it just has to take its course under the Georgia law and under the -- and the parties will have to file appropriate pleadings in that regard.

So that's what I'm inclined to do.  I hope it's clear enough what I'm saying, but I want to ask -- I will start with the defendants who likely have more questions -- maybe have questions about what I'm saying.  But I want to get those questions resolved before I leave here today.

MS. SHEPPARD:  Your Honor, I thank you for your decision.  I'm disappointed obviously.  But I think, at a minimum, it would be nice to get the CW names from Hialeah so that they can be considered as part of the investigation.

THE COURT:  Okay.  Mr. Wales, what's your position on that?

MR. WALES:  It would also be nice to get the documents produced in the securities action.  It is no burden.  We're not -- it's hard to propose discovery if I don't see what's been produced and what are the hit terms and all of that, search terms.  So I think to even be prepared for, like,

the next step, like you described, it would be appropriate.

THE COURT:  Ms. Sheppard?

MS. SHEPPARD:  Your Honor, in every case there are document requests propounded and interrogatories propounded before there's receipt of documents.  So I think we should use the standard process here.  Your Honor said they can go ahead and propound some discovery and then we will wait and see what's necessary down the road after the Demand Review Committee and the board make their decision.

THE COURT:  So why are you asking them to give their names and you don't have to do anything?

MS. SHEPPARD:  Your Honor, I think the confidential witness names, frankly, I think they've made allegations about my clients and about the officers -- the officers and directors of the company.  And I think it would be helpful as we go to get to the truth of what happened to understand who are these people, what's their basis for their allegations.  This is actually not information that I need.  It's information for Mr. Sherman to consider in the first instance as he conducts the -- as he conducts the investigation.

MR. SHERMAN:  Your Honor, in every case that I've dealt with where I've been the -- working for the DRC or special committee, the plaintiffs, who are the demand plaintiffs, will bring information and make allegations.  And it's informal.  This is not in the sense of serving

interrogatories.  They have made a demand and asked it to be investigated.  And it strikes me as incredibly odd.  And, also, at the end of the day, what kind of response are we going to get with whatever rule -- the decision the DRC makes when they say, "Well, you didn't get to hear from our confidential witnesses."  It is an informal process.  So they've made the demand that is then supposed to be investigated, and so the reality is that it should be provided.

Now, the first interrogatory that Ms. Sheppard will probably -- or someone will serve -- I guess it would be the Goodwin firm, but would be to give us the confidential witnesses, but that is because they said that is relevant to the investigation.  That's all.  And we should be able to -- if we think we should interview them because of it, we will let you know.  And if we don't, then we will address it in the report as to why.

THE COURT:  Mr. Wales?

MR. WALES:  Your Honor, like I said, we should -- we are prepared to turn those over.  I think it's appropriate that they also give us the discovery and the search terms that were used.  Because, frankly, you heard Ms. Sheppard --

THE COURT:  Wait.  Wait.  Wait.  I thought you told me that -- you keep talking about the search terms.  I thought you told me that you were seeking, at least initially, the documents that were produced in the securities action, right?

MR. WALES:  100 percent.  100 percent.

THE COURT:  Right.

MR. WALES:  I agree with that.  If you want me to stop -- the next thing you said is we should propound discovery, and I want to know what was already propounded.  I don't want to reinvent the wheel if they've already asked it and produced it.

So I will withdraw that and just -- just the documents that were already produced, and I will turn over the CWs.

THE COURT:  I am sorely tempted to leave you-all to your own devices, except I'm afraid it would just all boomerang back to me, because we are closely approaching the limit of human endurance here.

I mean, I guess it's a quid pro quo.  I don't know if it's a right to pro quo or not.  I guess I can order it, but I would prefer to --

Ms. Sheppard, what would be the reason not to turn over the discovery that has been turned over in the securities case?

MS. SHEPPARD:  Well, Your Honor, again, the ultimate question will be focused on the Demand Review Committee's work and process and the board's decision, so the independence and good faith of the decision makers and the process of the investigation.  And without knowing in advance what the

investigation will turn up, I think the scope of discovery could be very different.

I think also there is potential disruption with the productions and also, as we've been inferring, that Mr. Wales will want to generate a fee based on the work that he does reviewing the very, very large production of documents.  And it is frankly -- the question that ultimately will be asked here, which will be focused on the board's process, just does not require review of all of those documents.

THE COURT:  And I hear you.  I would be more sympathetic if I felt like we weren't two years out on a committee inquiry that could have been over by now.  I'm reluctant, because I don't really know what I'm doing.  If I said, "Give them everything," I don't know what I would be saying.  And I don't want to do that either.  I want to be smart about it.

So I guess, Mr. Wales, I'm having a little -- I mean, these folks aren't in witness protection or anything, are they?  I'm having a little trouble understanding what the big secret is, unless you're worried they are going to change their mind or they are going to somehow get to them or something.  I don't really know what the big secret is.  It would seem to me -- you know, you are critical of Mr. Sherman's efforts, but if I was him, I would sure want to talk to those folks, wouldn't you?

MR. WALES:  Yes.  I hear you loud and clear, Your

Honor.  I said I'm prepared to turn them over.  I think it is appropriate, especially since the motion to dismiss has been denied, that we get the discovery that was produced.  It is no burden to them.  And we'll -- just getting the documents would not -- frankly, it would allow me to have a much more informed conversation with Mr. Sherman in the process.

MR. SHERMAN:  Your Honor, at the end of the day I agree with your point, that given everything, it doesn't make sense.  We've talked through it.  Ms. Sheppard has talked through it.  We are going to do a report.

If you want to leave it to us, I would say this.  We are going to do an investigation.  If Mr. Wales thinks his CWs are an important part of what the board should decide, then he should give them to us.  If he doesn't, then you take that into account and we finish our report.  And it's on him of whether or not that ultimately he didn't give us information that he thought was valuable and leave it at that.

THE COURT:  All right.  Okay.  I'm not going to order it.  And I'm not going to flyspeck the discovery at this point. I've tried to give you a framework to work in in these next few months while we're waiting on the board's report so that at least the process can get started.  I'm going to ask you to do that.

If you fail spectacularly at it, then I'll take charge of it, or I will ask Judge Lambert to or I'll get a

special master to do it if I have to.  I just feel like I'd be -- you know, each of you can make it sound good.  But I don't really know what I'm talking about, and I'd have to get a lot more deeply into it to know what I'm talking about.  We are not doing that today.

So I have made a ruling.  I've denied the motion to dismiss.  I have unstayed the case to a limited extent, to require an answer, to require a case management report, to require the parties to, in good faith, confer and propound discovery to each other and to at least have those discussions, and hopefully you can agree on something.  And if you can't and then the report comes out, then we will figure out where we are.  That is all I can do.

Unless there is something else that -- and so the rule is that discovery can be propounded, it can be discussed, it can be agreed upon, it can be disagreed upon, whatever it is, but no discovery actually has to be given over until further order of the Court.

I am sure that if a report isn't available by August 30th or things haven't happened relatively quickly, I am sure the plaintiffs will be back in front of me asking me to do more, and I will strongly consider doing more at that point.

Everybody understand where we are?

(Affirmative responses.)

THE COURT:  All right.  Good to see you-all.

I'm going to enter a short written order, but it will just be very short.  If you want to know what the deal is, you are going to need to get the transcript.  All right.

COURTROOM SECURITY OFFICER:  All rise.

(Proceedings concluded at 12:36 p.m.)

- - -

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


        DATED this 21st day of March, 2025.


                        s/Heather N. Randall_____
                        Heather Randall, RPR