**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

|  |  |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | No. 3:23-cv-00252 <br><br> Honorable Timothy J. Corrigan <br><br> Honorable Patricia D. Barksdale |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................3

    A.  FIS And Its Merchant Solutions Segment............................................3

    B.  The Challenged Statements..................................................................4

    C.  The Alleged Corrective Disclosures.....................................................5

ARGUMENT...................................................................................................6

   I.  The Legal Framework After *Goldman.* .............................................6

    A.  The Rebuttable Presumption Of Reliance............................................6

    B.  *Goldman*'s Mismatch Analysis..............................................................8

  II.  The Mismatch Between The Challenged Statements And Alleged
     Corrective Disclosures Rebuts The Presumption Of Reliance................... 10

    A.  The Revenue Synergies And Cross Sales Statements Do Not
       Match Any Of The Alleged Corrective Disclosures. ............................11

    B.  The Generic Statements About Worldpay And Market Share Do
       Not Match Any Of The Alleged Corrective Disclosures. ...................... 15

    C.  The Goodwill Statements Do Not Match The First Or Second
       Alleged Corrective Disclosure. ......................................................... 17

  III. Plaintiff Nebraska Investment Council Lacks Standing. ..........................20

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*In re Allstate Corp. Sec. Litig.*,
   966 F.3d 595 (7th Cir. 2020).........................................................................7, 8

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ........................................................... *passim*

*Basic v. Levinson*,
   485 U.S. 224 (1988) .........................................................................7

*Brown v. Electrolux Home Prods., Inc.*,
   817 F.3d 1225 (11th Cir. 2016)...........................................................6

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ..........................................................17

*In re Concho Resources Inc. Sec. Litig.*,
   No. 21-2473, Dkt. 121, slip op., 2025 WL 1040379
   (S.D. Tex. Apr. 7, 2025) .......................................................... *passim*

*Cutsforth v. Renschler*,
   235 F. Supp. 2d 1216 (M.D. Fla. 2002) ...............................................17

*Ferris v. Wynn Resorts Ltd.*,
   2023 WL 2337364 (D. Nev. Mar. 1, 2023) ...........................................20

*In re Fibrogen Sec. Litig.*,
   2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)........................................20

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   594 U.S. 113 (2021)................................................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ................................................................. 6, 7, 8

*Hattaway v. Apyx Med. Corp.*,
   2023 WL 4030465 (M.D. Fla. June 15, 2023) ....................................... 14

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .......................................... *passim*

*Local 703 v. Regions Fin. Corp.,*
762 F.3d 1248 (11th Cir. 2014) ...........................................................................6

*MacPhee v. MiMedx Grp., Inc.,*
73 F.4th 1220 (11th Cir. 2023)........................................................................ 18

*Meyer v. Greene,*
710 F.3d 1189 (11th Cir. 2013) ....................................................................... 14

*Mogensen v. Body Cent. Corp.,*
15 F. Supp. 3d 1191 (M.D. Fla. 2014) ...............................................................17

*Prado-Steiman v. Bush,*
221 F.3d 1266 (11th Cir. 2000)........................................................................20

*In re Qualcomm Inc. Sec. Litig.,*
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023)....................................... 9, 11, 16

*Ramirez v. Exxon Mobil Corp.,*
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .......................................14, 19, 20

**Rules**

Fed. R. Civ. P. 23(c)(1)(B).................................................................................. 6

## INTRODUCTION

This appears to be the first case in this Circuit to require application of the "mismatch" test for class certification in securities cases, which was recently adopted by the Supreme Court in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021). Plaintiffs' Motion for Class Certification (Dkt. 75, "Motion" or "Mot.") ignores *Goldman*. But *Goldman* is controlling law, and it requires limiting the class and the class claims here.

In securities cases, Rule 23(b)(3) predominance turns on the element of reliance. Reliance can be a highly individualized inquiry that precludes certification, if each investor must have actually relied on each alleged misrepresentation. To address this, the Supreme Court has authorized a shortcut for plaintiffs via a "rebuttable presumption of reliance": reliance can be presumed class-wide if the defendant's stock traded in an efficient market and the alleged false statements had "price impact." The theory is: investors rely on the stock price; the price in an efficient market reflects all public information; therefore investors rely on any public misrepresentation that in fact impacted the price.

The Supreme Court has repeatedly emphasized that defendants must have an opportunity to rebut this presumption at class certification. But for years, courts struggled with how to evaluate rebuttal attempts. Both trial and appellate courts found the analysis – in the words of the Seventh Circuit – "confusing." Many decisions concluded that price impact analysis had to wait until the merits stage of the case, because it overlaps with the merits issues of loss causation and

materiality. This effectively eliminated defendants' ability to rebut the presumption as a practical matter. As a result, plaintiffs were able to obtain certification in virtually every securities case that survived a motion to dismiss.

*Goldman* restored order and clarity. It reaffirmed that defendants can rebut the presumption of reliance through "*any* showing" that "severs the link" between a misrepresentation and the stock price. It expressly discussed one way defendants can sever that link: by showing a "*mismatch*" between the front-end misrepresentation and the back-end corrective disclosure (*i.e.*, a disclosure that "corrected" the misrepresentation by revealing the truth). And it clarified that courts "*must*" consider "*all* probative evidence" and "determine" the price impact issue at class certification, "regardless" of any overlap with merits questions.

Applying *Goldman*, Plaintiffs' theory of price impact collapses – and so does the presumption of class-wide reliance. Their theory is that price impact for the front-end alleged misrepresentations can be inferred from a negative stock price reaction after back-end alleged corrective disclosures. But that theory only works – that is, the legal concept of *price impact* can only be inferred from the bare fact of *price reaction* – if the misrepresentations and corrective disclosures "match," meaning they address the "same subject" and stand on "equal footing."

That match is missing for most of Plaintiffs' case. The alleged misrepresentations were about (A) revenue synergies and cross sales, (B) FIS's acquisition of Worldpay and market share, and (C) goodwill. By contrast, the alleged corrective disclosures were about adjusted EBITDA, volume growth,

2

profitability, a planned spin-off, and goodwill. Comparing those topics side by side – see the Appendices attached to this brief, especially Appendix III – the mismatch is obvious. The first two categories of challenged statements do not match *any* alleged corrective disclosure. And the third category (goodwill) matches only the last corrective disclosure (goodwill). So only claims about the goodwill statements can support an inference of price impact at this stage of proceedings, and only as to the last alleged corrective disclosure. *Goldman* requires that this limitation be reflected in any class and claims that are certified.

Additionally, Plaintiff Nebraska Investment Council cannot be a class representative because it never owned FIS stock and thus lacks standing.

## BACKGROUND

### A.    FIS And Its Merchant Solutions Segment.

FIS is one of the largest payment processing companies in the world. In July 2019, it acquired Worldpay, another global payment technology company, to expand into new geographic and product markets. *See* Ex. 2, 2019 Form 10-K at 2. FIS reorganized its financial reporting segments after the acquisition, creating a new Merchant Solutions segment (often shortened to "Merchant"). *Id.* at 4. Most of Worldpay became part of the Merchant Solutions segment, while some of it became part of FIS's Banking Solutions segment. *See id.* at 44–45, 78.

FIS thrived in 2020 and 2021. It expanded to new countries, launched dozens of new products, and achieved substantial revenue and expense synergies as a result of the Worldpay acquisition. *See, e.g.*, Ex. 3, 3Q20 Earnings Call Tr. at

3

5–7. FIS and its Merchant segment achieved record financial performance those years. For example, FIS's annual revenue for 2021 increased 11% above the all-time high in 2020. Ex. 4, 4Q21 Earnings Call Tr. at 4. It was "a record year for FIS and the strongest operating performance in [its] 53-year history." *Id*. at 5. This record financial performance in 2020 and 2021 is not disputed in this case.

In 2022, however, the market changed. Rising interest rates, inflation, and slowing economic growth negatively affected revenue growth and profitability, and demand for different kinds of payment technologies shifted after the COVID-19 pandemic. *See, e.g.*, Ex. 5, 2022 Form 10-K at 69. In the fourth quarter of 2022, the market outlook continued to deteriorate. *Id*. In February 2023, in light of these changes and other factors affecting internal projections, FIS announced a $17.6 billion goodwill impairment for the Merchant segment. Dkt. 46 ("AC") ¶ 174. FIS's stock price declined approximately 12% that day. *Id*. ¶ 175.

### B. The Challenged Statements.

Plaintiffs filed this case a month later. They claim that 27 statements by FIS or its officers were false or misleading in violation of federal securities laws. *Id*. ¶¶ 308–17. They seek to bring these claims on behalf of investors who bought FIS stock from May 7, 2020, through February 10, 2023, alleging the statements "artificially inflated or maintained" the stock price during that period. Mot. 2–3.

The challenged statements consist of the following, which are grouped into Categories A, B, and C, and are listed in full in Appendix I:

| Category | Challenged Statements | AC ¶¶ |
|----------|----------------------|-------|
| A | 8 statements about the amount of revenue synergies or cross sales that FIS achieved | 184, 186, 188, 190, 192, 197, 209, 218 |
| B | 4 generic statements about Worldpay or FIS's market share | 195, 205, 207, 232 |
| C | 15 statements about goodwill for the Merchant Solutions segment | 199–204, 212–17, 220–25, 226–31, 234–39 |

*See also* AC ¶ 241 (discussing categories of challenged statements).

## C.    The Alleged Corrective Disclosures.

Plaintiffs claim that FIS's stock price remained artificially high until three alleged "corrective disclosures" purportedly "revealed the relevant truth and foreseeable risks previously misrepresented and/or concealed" by the challenged statements. *Id.* ¶¶ 242–43; Mot. 6–7, 17. Specifically, Plaintiffs argue the "truth" was revealed by the following information in three quarterly earnings releases:

| Date | Allegedly Corrective Information | AC ¶ |
|------|--------------------------------|------|
| 8/4/22 | • "Adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%" during 2Q22.<br>• FIS "saw sequential volume decreases" during 2Q22. | 245 |
| 11/3/22 | • Adjusted EBITDA margins in the Merchant Solutions segment had a "430 basis-point margin contraction" during 3Q22.<br>• The CEO "announced that 'we are not pleased with the profitability performance of the business and are taking actions to address them.'" | 251 |
| 2/13/23 | • FIS recorded a "non-cash goodwill impairment charge of $17.6 billion related to [the] Merchant Solutions reporting unit" as of December 31, 2022.<br>• FIS planned to "spin[] off" Merchant Solutions. | 255 |

The full text of the alleged corrective disclosures is set forth in Appendix II.

5

## ARGUMENT

The Supreme Court in *Goldman* recently held that defendants can defeat class certification in securities cases by showing a "mismatch" between the contents of a challenged statement and an alleged corrective disclosure. 594 U.S. at 123. Understanding and applying that rule require unpacking the interplay among Rule 23, the theory underlying the presumption of reliance, and *Goldman*'s reasoning. Section I below does that. Section II then applies *Goldman*'s mismatch test to the facts of this case and shows why Plaintiffs' proposed class cannot be certified.

## I.     The Legal Framework After *Goldman*.

### A.     The Rebuttable Presumption Of Reliance.

Plaintiffs must meet Rule 23(a)'s four requirements: numerosity, commonality, adequacy, and typicality. In addition, they must show that common questions "predominate" under Rule 23(b)(3). *Local 703 v. Regions Fin. Corp.*, 762 F.3d 1248, 1253 (11th Cir. 2014). Predominance must be established for *each* claim to be litigated on a class-wide basis. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235–37 (11th Cir. 2016); Fed. R. Civ. P. 23(c)(1)(B).

The element of reliance is the critical inquiry for class certification in securities cases. If each investor must show they actually relied on each misrepresentation, those individualized questions "overwhelm the common ones." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 268 (2014). The Supreme Court held in *Basic v. Levinson* that plaintiffs may

6

establish reliance class-wide through a rebuttable presumption, on the theory that investors generally purchase stock in reliance on the market price, and "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. 224, 246 (1988).

The "essential precondition" for the presumption of reliance to apply is the legal concept of "price impact." *Halliburton II*, 573 U.S. at 282. If the alleged misrepresentation did not in fact impact the price, there is "no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price," and the presumption "completely collapses." *Id*. at 278, 282 (cleaned up). Thus, "[a]ny showing" that "severs the link" between a challenged statement and the stock price will "rebut the presumption" as to that statement. *Goldman*, 594 U.S. at 125.

Put simply: if a misrepresentation "did not . . . actually affect the market price," the presumption of reliance does "not apply," and certification is "inappropriate." *Halliburton II*, 573 U.S. at 269, 283. Before *Goldman*, many courts found this price impact analysis "confusing," as it "overlap[s]" with merits issues like loss causation and materiality. *See, e.g.*, *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608 (7th Cir. 2020). *Goldman* clarified that courts "should be open to *all* probative evidence" when analyzing price impact at this stage, "regardless whether the evidence is also relevant to a merits question," and "aided by a good dose of common sense." 594 U.S. at 122 (quoting *Allstate*, 966 F.3d at 613 n.6).

7

### B.   *Goldman*'s Mismatch Analysis.

Plaintiffs have no direct evidence of price impact. Rather, they rely on an "indirect" inference of price impact based on stock drops after alleged corrective disclosures, as is typical in securities cases. *See Halliburton II*, 573 U.S. at 283. They claim each price drop is "equal to the amount of inflation maintained by the earlier misrepresentation[s]." *Goldman*, 594 U.S. at 123; *see also* Mot. 6–7. But evidence of a "price *reaction* (the simple movement of the price in response to a given statement)" is "quite different from the legal concept of price *impact*." *Allstate*, 966 F.3d at 612. "At most," a stock price *reaction* is only "backward-looking, indirect evidence" that plaintiffs can use to infer "price *impact* at the time of purchase." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 93 (2d Cir. 2023) (emphasis added, cleaned up).[1]

In *Goldman*, the Supreme Court recognized that this inference – that a back-end price reaction can show front-end price impact – "break[s] down" when there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." 594 U.S. at 123. A "mismatch between th[ose] contents" makes it "less likely" that the back-end disclosure "actually corrected" the challenged statements, which in turn means "there is less reason to infer front-

---

[1] Plaintiffs seek to prove market efficiency, a prerequisite of the presumption of reliance, through their expert Chad Coffman. Mot. 18–22. Coffman's market efficiency opinion shows nothing about price impact. He admitted that his event study does not show whether any of the challenged statements actually impacted the price of FIS's stock, and he is not giving an opinion in this case on price impact. *See* Ex. 6, Coffman Dep. 132:15–18, 224:6–13. The only other opinion he offers is that damages may be calculated using a common methodology, and that opinion is also irrelevant to price impact. *See* Dkt. 75-2, ¶¶ 7–8.

end price inflation – that is, price impact – from the back-end price drop." *Id.*

Thus, the "central focus" in assessing price impact "is ensuring that the front-end disclosure and back-end event stand on equal footing." *Goldman II*, 77 F.4th at 102. A challenged statement and a corrective disclosure do not stand on "equal footing" – and thus, claims about them cannot be certified for class treatment – if there is a "mismatch" between their contents "as written." *Id.*; *see also id.* at 99 ("*Goldman* requires that any gap among the front- and back-end statements as written be limited."); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (courts must "compare[] the information in the alleged misrepresentations to the information in the corrective disclosures to determine whether there is such a mismatch").

Courts applying *Goldman* have focused on two kinds of mismatch. First, a challenged statement may be a "substantive mismatch" for an alleged corrective disclosure, meaning the corrective disclosure was about a different topic and thus "did not actually correct the information" in the challenged statement. Ex. 10, *In re Concho Resources Inc. Sec. Litig.*, No. 21-2473, Dkt. 121, slip op. at *22, 2025 WL 1040379 (S.D. Tex. Apr. 7, 2025)[2]; *see also Goldman II*, 77 F.4th at 94 (statements did not address the "same topics"). Second, there can be a "genericness mismatch," meaning the challenged statement was "too generic to be corrected by the specific corrective disclosure," even if the two were about the same topic. *Concho*, slip op. at *22 (lowercased); *see also, e.g., In re Kirkland*

---

[2] *Concho* is attached as Exhibit 10 because Westlaw does not properly render the opinion's charts.

*Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at \*11 (S.D.N.Y. Mar. 29, 2024) (assessing both "genericness" and "substantive mismatch[es]"). Courts evaluate mismatches on a statement-by-statement basis for each corrective disclosure, and deny certification as to any statements or corrective disclosures for which there is no match. *See, e.g.*, *Concho*, slip op. at \*36–45 (explaining in detail the inquiry required by *Goldman*); *Kirkland*, 2024 WL 1342800, at \*7–10 (same).

Ultimately, *Goldman* requires a close fit between each challenged statement and alleged corrective disclosure – an even "closer fit" than is required for the element of loss causation. *Goldman II*, 77 F.4th at 99 n.11. It is not enough for a statement and an alleged corrective disclosure to merely "touch[] upon a similar subject." *Id.* at 101. Otherwise, plaintiffs would be able to manufacture claims by pointing to stock drops after almost "any previous disclosure from the company," which would turn securities cases into the "game of litigation-by-hindsight" that *Goldman* sought to curb. *Id.*

## II.    The Mismatch Between The Challenged Statements And Alleged Corrective Disclosures Rebuts The Presumption Of Reliance.

Plaintiffs seek to certify claims about three categories of challenged statements and three alleged corrective disclosures. *See* App'x I (statements); App'x II (corrective disclosures). They claim that the back-end price reactions on the three corrective disclosure dates are indirect evidence of price impact. Mot. 6–7, 17. Their Motion focuses on Rule 23 requirements and prerequisites for the presumption of reliance that Defendants do not contest at this stage.

10

But Plaintiffs' Motion misses a critical issue: whether the alleged misrepresentations "match" the alleged corrective disclosures. They do not. There is "a mismatch between the[ir] contents," and any inference of price impact thus "break[s] downs," making certification of Plaintiffs' proposed class inappropriate. *Goldman*, 594 U.S. at 123; *see also* App'x III (comparing statements).

### A. The Revenue Synergies And Cross Sales Statements Do Not Match Any Of The Alleged Corrective Disclosures.

Plaintiffs challenge 8 statements between May 2020 and March 2022 about specific amounts of revenue synergies or cross sales that FIS achieved:

- **A-1 (5/7/20):** "The Company achieved . . . [r]evenue synergies of approximately $100 million."
- **A-2 (8/4/20):** "At the end of the quarter, our teams have achieved more than . . . $115 million in annual revenue synergies."
- **A-3 (10/29/20):** "We have achieved $150 million in revenue synergies."
- **A-4 (2/9/21):** "We . . . exited the year generating more than $200 million in revenue synergies."
- **A-5 (5/6/21):** "The Company achieved . . . [r]evenue synergies of approximately $300 million on an annual run-rate basis."
- **A-6 (8/3/21):** "[FIS] [r]aises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, in order to reflect strong cross-selling performance during the second quarter."
- **A-7 (2/15/22):** "[W]e exceeded more than $700 million in cross sales."
- **A-8 (3/9/22):** "Revenue exceeded well over $700 million of cross-sales."

App'x I (Category A); AC ¶¶ 184, 186, 188, 190, 192, 197, 209, 218.

There is no match whatsoever between the contents of these challenged statements and the alleged corrective disclosures. Upon "compar[ing] the information" on the face of each, *Qualcomm*, 2023 WL 2583306, at *12, the

11

difference is obvious: The alleged misrepresentations reported specific Company-wide revenue synergies or cross sales achieved at specific points in time during May 2020–March 2022. *See* App'x I (Category A). By contrast, the alleged corrective disclosures say nothing at all about revenue synergies or cross sales. Instead, they were about (1) "adjusted EBITDA margin" and "sequential volume decreases"[3] for Merchant in April–June 2022, (2) "adjusted EBITDA margin" and "profitability" in July–September 2022, and (3) a "goodwill impairment" for Merchant as of December 31, 2022, and plans to pursue a "spinoff" of Merchant as of February 2023. App'x II; AC ¶¶ 245, 251, 255.

These are simply different topics, as well as different time periods – not just an apples-to-oranges comparison, but apples-to-zebras. The disconnect is evident from the statements "as written." *Goldman II*, 77 F.4th at 99; *see also* App'x III (comparing the statements to the alleged corrective disclosures as written). This "substantive mismatch" on the face of the statements forecloses any inference of price impact for them. *See, e.g.*, *Concho*, slip op. at *44 (presumption of reliance rebutted for statements about financial projections in 2018 because they were a "substantive mismatch" for a later disclosure regarding "results in a different year"); *Kirkland*, 2024 WL 1342800, at *11 (same because there was a "mismatch in content" between a challenged statement about "performance targets" and a later-in-time disclosure announcing an acquisition).

---

[3] "Volume" in this context refers to the total monetary value of transactions processed during a given quarter. Ex. 1, Skinner Rpt. ¶ 69 & n.105 (citing FIS 1Q22 Earnings Press Release).

Moreover, Defendants' expert, Douglas Skinner, evaluated the disclosures as a matter of financial economics, and concluded that revenue synergies and cross sales are "conceptually distinct" from the topics covered in the alleged corrective disclosures. Ex. 1, Skinner Rpt. ¶¶ 13–14; *see also id.* ¶¶ 56–90, 106–11. For example, as Skinner explains, revenue synergies are "non-organic incremental annualized revenue" from specific actions related to the Worldpay acquisition, whereas adjusted EBITDA margin equals "revenues minus operating expenses . . . divide[d] by revenues." *Id.* ¶ 62. A disclosure about adjusted EBITDA margin says nothing about the amount of revenue – let alone revenue *synergies* – because adjusted EBITDA margin depends on both revenue *and* expenses as inputs, and is a *ratio. Id.* ¶¶ 62–63. Indeed, the two do not even correlate: adjusted EBITDA margin can decrease even while revenues *increase*, if expenses increase faster than revenues. *Id.* ¶ 63 & n.100 (noting this happened at FIS). Widening the gap even further, the challenged statements were about *annualized* revenue synergies and cross sales for FIS *as a whole,* whereas each alleged corrective disclosure was about *a specific quarter* and focused on *Merchant. Id.* ¶¶ 64–65. These differences – different financial measures, for different time periods and different entities – mean that these statements do not match. *See id.* ¶¶ 60–65; *see also id.* ¶¶ 56–90, 106–11.

Additional evidence further confirms the mismatch. Defendants' expert Skinner reviewed more than 150 analyst reports covering FIS in the one-week period following each alleged corrective disclosure. *See, e.g., id.* ¶¶ 57–59, 91–92,

13

101–02, 111. Not a single report associated any of those disclosures with the amount or even the existence of revenue synergies or cross sales, much less referenced any of the challenged statements on those topics. *See, e.g.*, *id.*

The fact that no analyst commentary "referred back to" or otherwise linked the challenged statements to the alleged corrective disclosures is powerful corroborative evidence that "supports the absence of price impact." *Kirkland*, 2024 WL 1342800, at *12. It confirms the market did not understand the disclosures to convey anything about revenue synergies or cross sales, *see* Ex. 1, Skinner Rpt. ¶¶ 97–98 – much less to "actually correct[]" any statement on those topics. *Goldman II*, 77 F.4th at 89, 104 (lack of analyst commentary "sever[s] the link"); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *16 (N.D. Tex. Aug. 21, 2023) ("dearth of analyst commentary" confirms lack of price impact).

Furthermore, in the days and weeks after the last alleged corrective disclosure, analysts continued to report on FIS's $750 million revenue synergies – the total it had announced **before** any of the alleged corrective disclosures. *See* Ex. 1, Skinner Rpt. ¶¶ 92–97. In other words, market participants still believed the revenue synergies and cross-sales statements were true even after the last alleged corrective disclosure. *See id.* This is definitive: the alleged corrective disclosures were in fact "not corrective" and therefore do not match those statements. *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *see also Hattaway v. Apyx Med. Corp.*, 2023 WL 4030465, at *14–15 (M.D. Fla. June 15, 2023) (disclosures were not "corrective" because they did not "reveal to the

14

market the falsity of a prior misstatement"). Plaintiffs thus cannot certify claims based on these statements.

**B.    The Generic Statements About Worldpay And Market Share Do Not Match Any Of The Alleged Corrective Disclosures.**

Plaintiffs challenge three statements about Worldpay (B-1, B-2, B-4), and one statement about market share (B-3):

- **B-1 (6/10/21):** "[W]e really haven't had negative surprises with Worldpay. . . . [F]rankly, everything [ha]s . . . hit as we expected, and many reasons and many examples have exceeded our expectations. And frankly, that's why you saw [us] raise our overall revenue synergy guidance coming out of last quarter."

- **B-2 (11/16/21):** "And so it just felt like when you look at where we are on the Worldpay integration, we've got really Worldpay predominately behind us now. We've got all of our segments really hitting on all cylinders, really have a competitive stack across the board.

- **B-3 (11/16/21):** "[N]o way you can say that FIS is losing share, just the exact opposite."

- **B-4 (8/4/22):** "[W]e are hugely successful in terms of driving revenue synergies on the Worldpay transaction."

App'x I (Category B); AC ¶¶ 195, 205, 207, 232.

These four challenged statements do not match any of the alleged corrective disclosures, either. The statements were high-level assertions about the Worldpay transaction or FIS's market share. App'x I (Category B). By contrast, the alleged corrective disclosures gave particularized information about financial performance (adjusted EBITDA, volume, and profitability in 2Q22 and 3Q22), an accounting judgment (the goodwill impairment for 4Q22), and a potential M&A transaction (announced in 1Q23). App'x II; AC ¶¶ 245, 251, 255. None of the disclosures "as written" "expressly and specifically negat[ed] the alleged false statement[s]," or

15

even addressed the "same topic" as any of the alleged false statements. *Goldman II*, 77 F.4th at 97–99; *see also* App'x III. This "mismatch in content" "rebut[s] the *Basic* presumption of reliance for all [four] of the statements." *Kirkland*, 2024 WL 1342800, at *11–12; *see also, e.g., Concho*, slip op. at *43–44.

These challenged statements also exemplify a "genericness" mismatch. As *Goldman* teaches, the inference of price impact breaks down when a challenged statement is "generic" and the corrective disclosure is "specific," 594 U.S. at 123, even if both are about the "same subject," *Goldman II*, 77 F.4th at 102. A "considerable gap in specificity" severs the "link between the corrective disclosures and the alleged misrepresentations," and thus shows a lack of price impact. *Id.* at 99, 105. Here, these challenged statements were generalized positive sentiments, devoid of financial details or not tethered to particular time periods. They are at least as generic as the statements that other courts have found cannot support an inference of price impact. *See id.* at 82 (statements like "the basic reason for our success[] is our extraordinary focus on our clients" were too generic); *Qualcomm*, 2023 WL 2583306, at *12 (back-end disclosures were "far more specific").

This genericness analysis is supported by "case law bearing on materiality," which *Goldman* invites courts to consider. 77 F.4th at 102; *see also Concho*, slip op. at *36–37 (analogizing generic statements to "puffery," and using puffery case law to inform the genericness analysis). Under that case law, statements that FIS "ha[dn't] had negative surprises" (B-1) or was doing "just the exact opposite" of losing market share (B-3) are "generalized, vague, nonquantifiable statements of

16

corporate optimism." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir.

2019); *see also, e.g.*, *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1213

(M.D. Fla. 2014) (statements like "results reflect continued strength in our

business" were "too generalized" to be relied on); *Cutsforth v. Renschler*, 235 F.

Supp. 2d 1216, 1238–39 (M.D. Fla. 2002) (same for statements that acquisition

"continues" a company's "dynamic growth" and "adds enhanced value"). No

claims can be certified for these statements.

## C.    The Goodwill Statements Do Not Match The First Or Second Alleged Corrective Disclosure.

Plaintiffs challenge 15 statements about goodwill, three in each of FIS's five

quarterly SEC filings for 3Q21 through 3Q22. For each filing, they challenge the

reported amount of goodwill for the Merchant segment, statements that

"goodwill was not impaired" (and thus that the reported amount of goodwill was

correct), and certifications that the financial statements (and thus the amount of

goodwill) complied with GAAP. For example, in FIS's 3Q21 Form 10-Q filed with

the SEC on November 4, 2021, the earliest SEC filing relevant to these

statements, Plaintiffs challenge the following:

- **C-1:** The amount of goodwill reported for Merchant ($35.9 billion).
- **C-2:** "Based on our interim impairment assessment as of September 30, 2021, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired."
- **C-3:** "The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company."

App'x I (Category C); AC ¶¶ 199–204, 212–17, 220–25, 226–31, 234–39.

17

At this stage, Defendants are not challenging price impact for the goodwill statements based on the third alleged corrective disclosure, *i.e.*, the Merchant goodwill impairment announced in February 2023. But there is no match between the goodwill statements and the first two alleged corrective disclosures, and that limits the claims that can be certified for class treatment. *See* App'x III.

The mismatch is apparent from the face of the statements: the alleged misrepresentations were about goodwill, but the first and second alleged corrective disclosures said nothing whatsoever about goodwill. Instead, those alleged corrective disclosures were about "adjusted EBITDA margin," "sequential volume decreases," and "profitability." AC ¶¶ 245, 251. "[A]s written," those disclosures are just not about goodwill. *Goldman II*, 77 F.4th at 99.

Defendants' expert confirmed this, explaining that these topics are "conceptually distinct." Ex. 1, Skinner Rpt. ¶ 15; *see also id.* ¶¶ 121–32. Goodwill is an accounting matter under GAAP that relies on management judgment about forward-looking projections and represents "future economic benefits." *Id.* ¶ 122. By contrast, adjusted EBITDA margin, volume, and profitability are non-GAAP measures of "past financial performance." *Id.* ¶ 123; *see also id.* ¶¶ 23–28. Those non-GAAP operating performance measures do not imply anything about a goodwill asset, as assessments of goodwill require "inputs and assumptions that go beyond" them. *Id.* ¶¶ 122–24. Because they addressed different topics, the first and second alleged corrective disclosures did not "actually correct[]" and do not match the goodwill statements. *Goldman*, 594 U.S. at 123; *see also MacPhee v.*

18

*MiMedx Grp., Inc.*, 73 F.4th 1220, 1243 (11th Cir. 2023) (disclosures are not "corrective" if they are not about "the subject of the misrepresentation").

Analyst reports confirm the lack of price impact. Defendants' expert reviewed 91 analyst reports covering FIS that were issued during the one-week periods following the first and second alleged corrective disclosures. Ex. 1, Skinner Rpt. ¶¶ 132–34. Not a single report concluded that FIS should have recorded a goodwill impairment – much less connected those alleged corrective disclosures to any statements about goodwill. *Id.* The fact that "none" of these reports "reference" the goodwill statements confirms "there is an insufficient link between the corrective disclosures and the alleged misrepresentations." *Goldman*, 77 F.4th at 104.

* * *

Plaintiffs' Motion should be denied in part. Any class must be limited to the appropriate "class claims [and] issues" under Rule 23(c). Specifically, any class should be certified solely "with respect to [the] remaining claims after adjusting the class period to reflect the Court's analysis of price impact," including by "set[ting] the starting date of the class period on the date of the first alleged misstatement relevant to [the] certified claims." *Ramirez*, 2023 WL 5415315, at *22. That means any class should be defined as follows – and certified solely as to claims based on the goodwill statements, and solely as to the alleged corrective disclosure on February 13, 2023 (the only one that can support price impact for these statements):

> All persons and entities who or which, during the period from November 4, 2021, through February 10, 2023, inclusive, purchased the publicly traded common stock of Fidelity National Information Services, Inc., and were damaged thereby.

*See id.* at *22–23 (limiting class to specific statements and a "sole alleged Corrective

Disclosure"); *Concho*, slip op. at *45 n.19, *55  (certifying subclasses for specific

statements where defendants rebutted the presumption of reliance as to the

others); *In re Fibrogen Sec. Litig.*, 2024 WL 1064665, at *12–15 (N.D. Cal. Mar. 11,

2024) (limiting class period to end on first corrective disclosure); *Ferris v. Wynn*

*Resorts Ltd.*, 2023 WL 2337364, at *11 (D. Nev. Mar. 1, 2023) (certifying class but

holding as to one alleged corrective disclosure that the class "may not proceed on

this allegation as a corrective disclosure" based on a *Goldman* mismatch analysis).

## III.    Plaintiff Nebraska Investment Council Lacks Standing.

A proposed class representative needs Article III standing to meet Rule

23's adequacy and typicality requirements. *Prado-Steiman v. Bush*, 221 F.3d

1266, 1279 (11th Cir. 2000). Plaintiff Nebraska Investment Council cannot meet

these because it never owned FIS common stock. Ex. 7, 30(b)(6) Dep. Tr. 149:10–

150:11. Plaintiffs had no substantive response when Defendants raised this issue.

Exs. 8 & 9 (correspondence). The Nebraska Investment Council has no claims

and thus cannot be a class representative.

**CONCLUSION**

Plaintiffs' Motion should be denied in part. If any class is certified, it should

be limited to the period from November 4, 2021, to February 10, 2023, and the

claims and issues certified for class treatment should be limited to claims about the

goodwill statements and the alleged corrective disclosure on February 13, 2023.

Additionally, the Nebraska Investment Council should not be a class representative.

20

Dated: May 2, 2025

Respectfully submitted,

*/s/ Hille R. Sheppard*
Hille R. Sheppard*
John M. Skakun III*
Caroline A. Wong*
Takayuki Ono*
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
T: (312) 853-7000
F: (312) 853-7036
hsheppard@sidley.com
jskakun@sidley.com
caroline.wong@sidley.com
tono@sidley.com
*\*Pro Hac Vice*

Ian M. Ross (FL Bar No. 91214)
**SIDLEY AUSTIN LLP**
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
T: (305) 391-5100
F: (305) 391-5191
iross@sidley.com

R. Eric Bilik (FL Bar No. 987840)
**MCGUIREWOODS LLP**
50 North Laura Street
Suite 3300
Jacksonville, FL 32202
T: (904) 798-2685
F: (904) 360 6304
ebilik@mcguirewoods.com

*Counsel for Defendants*

21

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


*/s/ Caroline A. Wong*

22