# Exhibit 1

## Expert Report of Douglas J. Skinner

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB |

**EXPERT REPORT OF DOUGLAS J. SKINNER**

**May 2, 2025**

# Table of Contents

I.   Qualifications ........................................................................................................... 1

II.  Assignment ............................................................................................................... 2

III. Summary of Opinions ............................................................................................... 4

IV.  Background on FIS and Selected Financial Metrics ................................................. 6

    A.   FIS and the Worldpay Acquisition ............................................................... 6

    B.   Introduction to Select Financial Concepts ................................................... 9

        1.   Revenue Synergies and Cost Synergies ........................................... 9

        2.   Adjusted EBITDA and Adjusted EBITDA Margin ......................... 10

        3.   Goodwill and Goodwill Impairment ............................................... 12

    C.   FIS Recorded Goodwill for the Worldpay Acquisition ................................ 14

    D.   FIS Identified Multiple Sources of Revenue Synergies, Raised Its Revenue and
        Cost Synergies Targets, and Announced That It Had Achieved These Targets
        Ahead of Schedule ....................................................................................... 15

V.   The Allegedly Corrective Information ..................................................................... 17

    A.   August 4, 2022:  Q2 2022 Earnings Disclosures ........................................ 17

    B.   November 3, 2022:  Q3 2022 Earnings Disclosures .................................... 19

    C.   February 13, 2023:  Q4 and FY 2022 Earnings Disclosures and the
        Announcement of Plans to Spin Off the Merchant Solutions Segment ................ 20

VI.  From the Perspective of a Financial Economist, the Information Plaintiffs Allege as
    Corrective Was Different from the Relevant Truth Allegedly Concealed by the Revenue
    Synergies Statements ............................................................................................... 21

    A.   The Alleged Misrepresentations:  Revenue Synergies Statements ........................ 22

    B.   The Allegedly Corrective Information Was Conceptually Distinct from the Truth
        Allegedly Concealed by the Revenue Synergies Statements .............................. 23

        1.   August 4, 2022:  Adjusted EBITDA Margin for the Merchant Solutions
            Segment for Q2 2022 ................................................................................. 25

        2.   August 4, 2022:  Mr. Woodall's Statement Regarding "Sequential Volume
            Decreases" in the Q2 2022 Earnings Call ............................................... 27

        3.   November 3, 2022:  Adjusted EBITDA Margin for the Merchant Solutions
            Segment, and Adjusted EBITDA Margin and Profitability for FIS as a
            Whole for Q3 2022 ................................................................................. 30

        4.   February 13, 2023:  Q4 2022 Goodwill Impairment Charge Related to the
            Merchant Solutions Reporting Unit ......................................................... 33

5.    February 13, 2023:  Planned Spin-Off of the Merchant Solutions Segment ..................................................................................................... 36

C.    Analysts Did Not Reevaluate the Revenue Synergies Amounts Related to the Worldpay Acquisition After the Alleged Corrective Disclosure Dates ................ 40

VII.   From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective Was Different from the Relevant Truth Allegedly Concealed by the Cross-Selling Statements ................................................................................................... 43

A.    The Alleged Misrepresentations:  Cross-Selling Statements ............................... 44

B.    The Allegedly Corrective Information Was Conceptually Distinct from the Truth Allegedly Concealed by the Cross-Selling Statements ........................................ 45

C.    Analysts Did Not Reevaluate the Extent of Cross-Selling Between the Legacy FIS and Worldpay Businesses After the Alleged Corrective Disclosure Dates .......... 48

VIII.  From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective on August 4, 2022 and November 3, 2022 Was Different from the Relevant Truth Allegedly Concealed by the Goodwill Statements ................................................. 48

A.    The Alleged Misrepresentations:  Goodwill Statements ..................................... 49

B.    The Allegedly Corrective Information on August 4, 2022 and November 3, 2022 Was Conceptually Distinct from the Truth Allegedly Concealed by the Goodwill Statements .......................................................................................................... 50

C.    Analysts Did Not Indicate That FIS Should Have Recorded a Goodwill Impairment Charge in the Merchant Solutions Segment After the August 4, 2022 and November 3, 2022 Alleged Corrective Disclosure Dates .............................. 55

## I.    Qualifications

1.      I am the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business.  I have been a tenured full professor at the University of Chicago since 2005, and previously served as Deputy Dean for Faculty and Interim Dean.  Prior to my appointment at the University of Chicago, I was the KPMG Professor of Accounting at the Ross School of Business, University of Michigan, where I held tenured and tenure-track appointments from 1989 until 2005 and served as chair of the accounting department.

2.      I hold a B. Econ. (First Class Honors in Accounting and Finance) from Macquarie University in Sydney, Australia, and an M.S. and Ph.D. (Applied Economics:  Accounting and Finance) from the University of Rochester.  I have taught undergraduate upper-class students, full-time and part-time MBA students, Executive MBA ("EMBA") students, executives, consultants, and Ph.D. students.  I have taught introductory financial accounting, intermediate financial accounting, accounting for financial instruments, corporate financial reporting and analysis, financial statement analysis, managerial (cost) accounting, corporate finance, investments, valuation, and empirical methods in accounting research.  Most recently, I have taught Corporate Finance and Valuation, as well as Managerial Accounting, in the University of Chicago's EMBA program at campuses in Chicago, London, and Hong Kong and a Ph.D. class in empirical capital markets research.

3.      From 2006 to 2021, I was a Senior Editor of the *Journal of Accounting Research*, one of the preeminent academic accounting journals in the world.  Before moving to Chicago, I was Co-Editor of the *Journal of Accounting and Economics*, also one of the world's leading academic accounting journals.  I also served as editor of the *Review of Accounting Studies*, and for several terms on the editorial board of *The Accounting Review*.  I am a member of the American Accounting Association and the American Finance Association.  I frequently present my research at major accounting and finance conferences and prominent universities.  I have supervised doctoral students who have accepted faculty positions at major business schools including Stanford, Harvard, Wharton, MIT, Columbia, Cornell, Michigan, Yale, and Chicago.

4.      I have published research on a variety of topics in accounting, auditing, capital markets, investments, and corporate finance, including how security prices respond to corporate disclosures (including event studies of earnings disclosures); corporate managers' incentives to disclose forward-looking information including guidance; the payout practices of public companies (i.e., firms' dividend and repurchase decisions); corporate managers' financial reporting, disclosure, and capital management decisions; how accounting information is used in contracts between the various corporate stakeholders; and the nature of corporate debt agreements.

5.      My research is published in leading accounting and finance journals, including *The Accounting Review*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, the *Journal of Business*, *The Journal of Finance*, and the *Journal of Financial Economics*.  My research has been featured in articles in *The Wall Street Journal*, *The New York Times*, *The Financial Times*, *The Economist*, and *Bloomberg Businessweek*.

6.      I serve as an Independent Trustee and chair of the Audit Committee for Harbor Funds, Harbor Funds II, and Harbor ETF Trust.

7.      A copy of my curriculum vitae, including my publications, is attached as **Appendix A**.  A list of my expert testimony over the past four years is attached as **Appendix B**.

## II.      Assignment

8.      I have been retained by counsel for Fidelity National Information Services, Inc. ("FIS" or the "Company"), Stephanie Ferris, Gary Norcross, James Woodall, and Thomas Warren (collectively, the "Defendants") to analyze and opine on certain aspects of the alleged misrepresentations and alleged corrective disclosures in this matter, for purposes of analysis relating to Plaintiffs' Motion for Class Certification.[1]

9.      I understand that the Complaint[2] alleges that various public statements made between May 7, 2020 and November 4, 2022 were false or misleading, including a set of Revenue Synergies Statements, Cross-Selling Statements, and Goodwill Statements (defined below).  I

---

[1] Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Fidelity National Information Services, Inc. Securities Litigation*, March 3, 2025 ("Plaintiffs' Motion for Class Certification").
[2] Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *In Re Fidelity National Information Services, Inc. Securities Litigation*, August 2, 2023 ("Complaint").

further understand that Plaintiffs allege that certain statements made on August 4, 2022, November 3, 2022, and February 13, 2023 revealed the alleged relevant truth that was purportedly concealed by the alleged misrepresentations. I discuss my understanding of the allegedly corrective information, as well as the Revenue Synergies Statements, Cross-Selling Statements, and Goodwill Statements in **Sections V**, **VI.A**, **VII.A**, and **VIII.A** of this report, respectively. I have been asked by counsel for Defendants to:

- Compare the alleged relevant truth that Plaintiffs claim was concealed by the Revenue Synergies Statements to the information that Plaintiffs allege as corrective on August 4, 2022, November 3, 2022, and February 13, 2023, to evaluate the extent to which they address the same or distinct economic and accounting concepts, and assess whether analyst commentary reflects an understanding by analysts that the allegedly corrective information on those dates revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

- Compare the alleged relevant truth that Plaintiffs claim was concealed by the Cross-Selling Statements to the information that Plaintiffs allege as corrective on August 4, 2022, November 3, 2022, and February 13, 2023, to evaluate the extent to which they address the same or distinct economic and accounting concepts, and assess whether analyst commentary reflects an understanding by analysts that the allegedly corrective information on those dates revealed that the Cross-Selling Statements, including about the extent of cross-selling between the legacy FIS and Worldpay businesses, were inaccurate when made.

- Compare the alleged relevant truth that Plaintiffs claim was concealed by the Goodwill Statements to the information that Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022, to evaluate the extent to which they address the same or distinct economic and accounting concepts, and assess whether analyst commentary reflects an understanding by analysts that the allegedly corrective information on those dates revealed that the Goodwill Statements were inaccurate when made, including whether the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.[3]

---

[3] As I discuss in footnote 139, footnote 157, and footnote 172, counsel also asked me to analyze a February 13, 2023 statement by the then-Chief Financial Officer of FIS, under the same framework that I use to analyze the allegedly corrective information in **Section V** with respect to the Revenue Synergies Statements, Cross-Selling Statements, and Goodwill Statements. As I discuss in footnote 93, counsel also asked me to consider an August 4, 2022 statement that Plaintiffs allege was false or misleading.

For purposes of this assignment, counsel asked me to assume that FIS' common stock traded in a semi-strong form efficient market[4] during the period from May 7, 2020 through February 10, 2023 (the "Proposed Class Period"[5]).

10.    In formulating my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, experience as a journal editor reviewing academic research articles, and formal training in economics, finance, and accounting.  A list of the materials I have considered in preparing this report is attached as **Appendix C**.

11.    I am being compensated at my standard billing rate of $1,200 per hour in this case.  I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.  My work on this case is ongoing; I reserve the right to modify or supplement my opinions in the event I become aware of additional information.

### III.    Summary of Opinions

12.    Based on my analysis to date, as well as my skills, knowledge, expertise, education, and training, I have formed the following opinions.

13.    From the perspective of a financial economist, the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by the Revenue Synergies Statements.

- Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective relative to the relevant truth allegedly

---

[4] Financial economists differentiate among three forms of market efficiency:  weak form, semi-strong form, and strong form.  Weak form efficiency requires that "past price (or return) histories" cannot be used to predict future prices.  Under semi-strong form efficiency, stock prices react fully and rapidly to newly available public information.  Strong form efficiency requires that prices also reflect non-public information possessed by "any investor or groups." *See* Fama, Eugene F., "Efficient Capital Markets:  A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970), pp. 383–417 at pp. 383, 388.

[5] I understand from counsel that Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 and seek to certify a class consisting of "[a]ll persons and entities who or which, during the period from May 7, 2020 through February 10, 2023, inclusive … purchased the publicly traded common stock of [FIS]." Plaintiffs' Motion for Class Certification, p. 2.  I have not been asked to evaluate Plaintiffs' claim that FIS common stock traded in an efficient market during the Proposed Class Period.  *See* Plaintiffs' Motion for Class Certification, pp. 17–22.  I reserve the right to evaluate the market efficiency of FIS common stock at a later time if asked by counsel for Defendants.

concealed by the Revenue Synergies Statements. For the allegedly corrective information on each of the three alleged corrective disclosure dates, I conclude that what Plaintiffs allege as corrective information was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

- Analysis of analyst commentary in the one-week period following each of the alleged corrective disclosure dates supports my conclusion. I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies. I also did not identify *any* discussion in analyst reports after either of the first two alleged corrective disclosure dates (on August 4, 2022 and November 3, 2022) indicating that analysts had reevaluated the Revenue Synergies Statements, including questioning the existence or amount of revenue synergies that FIS had reported earlier in the Proposed Class Period. There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

- Following the last alleged corrective disclosure date (on February 13, 2023), and even following FIS' Q1 2023 earnings disclosures (on April 27, 2023), more than two months after the end of the Proposed Class Period, analysts continued to discuss the approximately $750 million of revenue synergies FIS had previously reported. There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

14.    From the perspective of a financial economist, the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by the Cross-Selling Statements.

- Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective relative to the relevant truth allegedly concealed by the Cross-Selling Statements. For the allegedly corrective information on each of the three alleged corrective disclosure dates, I conclude that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.

- Analysis of analyst commentary in the one-week period following each of the alleged corrective disclosure dates supports my conclusion. I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Cross-Selling Statements, or to the extent of cross-selling that resulted from the Worldpay acquisition. Moreover, I did not identify *any* discussion in these reports indicating that analysts had reevaluated the extent of cross-selling that had occurred earlier in the Proposed Class Period. There is no analyst commentary that reflects an

understanding that the allegedly corrective information revealed that the Cross-Selling Statements, including about the extent of cross-selling between the legacy FIS and Worldpay businesses, were inaccurate when made.

15.    From the perspective of a financial economist, the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 was different from the relevant truth allegedly concealed by the Goodwill Statements.

- Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 relative to the relevant truth allegedly concealed by the Goodwill Statements. For the allegedly corrective information on both of these dates, I conclude that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements.

- Analysis of analyst commentary in the one-week periods following the two alleged corrective disclosure dates supports my conclusion. I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information on August 4, 2022 and November 3, 2022 to the Goodwill Statements, or to the goodwill amounts FIS reported for the Merchant Solutions reporting unit. In addition, I did not identify *any* discussion in these reports indicating that the Company was required to record a goodwill impairment charge for the Merchant Solutions reporting unit in Q2 2022, Q3 2022, or any prior quarter. There is no analyst commentary that reflects an understanding that the allegedly corrective information on August 4, 2022 and November 3, 2022 revealed that the Goodwill Statements were inaccurate when made, including that the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.

## IV.    Background on FIS and Selected Financial Metrics

### A.    FIS and the Worldpay Acquisition

16.    FIS described itself as "a leading provider of technology solutions for merchants, banks, and capital markets firms globally" that "help[s] [its] clients use technology in innovative ways to solve business-critical challenges and deliver superior experiences for their customers."[6] FIS is incorporated in Georgia, with headquarters in Jacksonville, Florida.[7] During the Proposed

---

[6] Fidelity National Information Services, Inc., Form 10-K for Fiscal Year Ended December 31, 2020, filed February 18, 2021 ("FIS 2020 Form 10-K"), p. 2.
[7] FIS 2020 Form 10-K, p. 2.

Class Period, FIS common stock traded on the New York Stock Exchange under the ticker symbol FIS.[8]

17.    FIS announced on March 18, 2019 that it had entered into a merger agreement with Worldpay.[9]  At the time, Worldpay was "one of the world's top payment technology companies" and processed "over 40 billion transactions annually" for merchants, businesses, and financial institutions globally.[10]  FIS stated that the transaction with Worldpay (the "Worldpay acquisition") was expected to expand FIS' "capabilities by enhancing its acquiring and payment offerings and significantly [increase] Worldpay's distribution footprint, accelerating its entry into new geographies."[11]

18.    FIS stated that the Worldpay acquisition would generate synergies that would boost the combined company's organic revenue growth and earnings before interest, taxes, depreciation, amortization ("EBITDA") margin.  Specifically, when the transaction was announced, FIS anticipated "$500 million of revenue synergies [and] $400 million of run-rate expense synergies."[12]  During a conference call on March 18, 2019, following the announcement of the Worldpay acquisition, FIS described how revenue and cost synergies were expected to increase operating profitability and free cash flow:

> First, our organic revenue growth will increase by adding Worldpay revenue growth and synergies.  We expect our organic revenue growth to increase to 6% to 9% over the next 3 years on a significantly larger base of total revenue. Second, we expect $400 million of cost synergies that will continue to drive incremental margin expansion.  Higher revenue growth combined with the realization of the cost synergies will drive our pro forma EBITDA margin to increase 500 basis points over 3 years post close.  Third, the enhanced revenue growth and margin profile will significantly increase our free cash flow, almost doubling the combined company free cash flow to nearly $4.5 billion by the end of 3 years.[13]

---

[8] FIS 2020 Form 10-K, p. 2.
[9] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed March 18, 2019 ("FIS Merger Announcement Press Release").
[10] FIS Merger Announcement Press Release.
[11] FIS Merger Announcement Press Release.
[12] FIS Merger Announcement Press Release.
[13] "Fidelity National Information Services Inc and Worldpay Inc Entered into a Definitive Merger Agreement - M&A Call," *Thomson Reuters*, March 18, 2019, 8:30 AM ("FIS M&A Call"), pp. 4–5.

19.    The Worldpay acquisition closed on July 31, 2019.[14]  FIS paid a total of $48.2 billion in cash and FIS common stock to acquire Worldpay.[15]  In conjunction with the Worldpay acquisition, the Company reorganized its business into three reportable segments:  (1) Banking Solutions, (2) Merchant Solutions, and (3) Capital Markets Solutions.[16]  FIS described these segments in its 2019 Form 10-K:

- The Banking Solutions segment was "focused on serving all sizes of financial institutions for core processing and ancillary applications solutions; digital solutions; fraud, risk management and compliance solutions; electronic funds transfer and network services solutions; payment solutions; wealth and retirement solutions; item processing and output services solutions; and services capitalizing on the continuing trend to outsource these solutions."[17]  Services included core processing software, internet and mobile banking solutions, card and retail payment technology and services, and other client management and processing solutions.  The Banking Solutions segment served clients such as global financial institutions, U.S. regional and community banks, and credit unions and commercial lenders.[18]

- The Merchant Solutions segment was "focused on serving merchants of all sizes globally, enabling them to accept electronic payments, including credit, debit and prepaid payments originated at a physical point of sale as well as in card-not-present environments such as eCommerce and mobile."[19]  Services included payment processing for traditional point-of-sale merchants, integrated payment solutions with independent software vendors, and global e-commerce solutions for merchants selling goods and services digitally.  The Merchant Solutions segment also offered various value-added services such as security and fraud prevention solutions.[20]

- The Capital Markets Solutions segment was "focused on serving global financial services clients with a broad array of buy- and sell-side solutions."  Services included applications for "record keeping, data and analytics, trading, financing and risk management."[21]  The Capital Markets Solutions segment serviced clients such as asset managers, buy- and sell-side securities brokerage and trading firms, and insurers.[22]

---

[14] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed July 31, 2019.

[15] Fidelity National Information Services, Inc., Form 10-K for Fiscal Year Ended December 31, 2019, filed February 20, 2020 ("FIS 2019 Form 10-K"), pp. 73–74.

[16] FIS 2019 Form 10-K, p. 96.  FIS also had a fourth segment, Corporate and Other, that consisted of "corporate overhead expense, certain leveraged functions and miscellaneous expenses that [were] not included in the operating segments, as well as certain non-strategic businesses."  FIS 2019 Form 10-K, p. 6.

[17] FIS 2019 Form 10-K, p. 4.

[18] FIS 2019 Form 10-K, pp. 4–5.

[19] FIS 2019 Form 10-K, p. 4.

[20] FIS 2019 Form 10-K, p. 4.

[21] FIS 2019 Form 10-K, p. 6.

[22] FIS 2019 Form 10-K, p. 6.

20.    FIS stated that for FY 2019, the fiscal year that included the Worldpay acquisition, the

Banking Solutions, Merchant Solutions, and Capital Markets Solutions segments comprised

56.8%, 19.5%, and 23.7% of FIS' total annual revenue, respectively.[23]  During its Q3 2021

earnings call, FIS discussed three sub-segments within the Merchant Solutions segment.[24]  The

Global eCommerce sub-segment was described as serving "[d]igital only merchants with global

ambitions and complex needs."[25]  The Enterprise sub-segment was described as serving

"[p]hysical merchants including [North American] Enterprise (>$5M volume) and all

International clients."[26]  The Software-led SMB (small and medium sized businesses) sub-

segment was described as serving "[s]mall merchants with <$5M annual volume."[27]

### B.    Introduction to Select Financial Concepts

### 1.    Revenue Synergies and Cost Synergies

21.    A common reason for a company to merge with or acquire another company is to realize

synergies, which result from the combination of their businesses and operations.  Financial

economists define synergies as the incremental economic value created by combining entities—

as a result of synergies, the value of the combined entity is greater than the sum of its parts.[28]

Synergies can be achieved in a number of ways, including the generation of additional revenues

("revenue synergies") and the reduction of costs ("cost synergies").[29]  Revenue synergies can be

generated in a variety of ways, including by cross-selling, under which products and services of

one entity are sold to customers of the other entity, and vice versa (resulting in aggregate

---

[23] FIS 2019 Form 10-K, p. 98.  In 2019, revenue for the Banking Solutions, Merchant Solutions, and Capital Markets Solutions segments was $5.873 billion, $2.013 billion, and $2.447 billion, respectively, for total revenues of $10.333 billion.  These are pro forma amounts (i.e., calculated as-if the entities had been combined for the full fiscal year).

[24] FIS Presentation, "Third Quarter 2021 Earnings Call," November 4, 2021 ("FIS Q3 2021 Earnings Call Presentation"), p. 17. *See also* "Q3 2021 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 4, 2021, 8:30 AM, pp. 6–7.

[25] FIS Q3 2021 Earnings Call Presentation, p. 17.

[26] FIS Q3 2021 Earnings Call Presentation, p. 17.

[27] FIS Q3 2021 Earnings Call Presentation, p. 17.

[28] *See, e.g.*, Berk, Jonathan, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, 2nd ed. (Prentice Hall, 2010) ("Berk et al. (2010)"), p. 653, emphasis in original ("The basis of the assumption that [the] value of the combined companies will be worth more than the sum of the two companies' individual values is the assumption that they will create *synergies*."); Ross, Stephen, Randolph W. Westerfield, and Bradford D. Jordan, *Fundamentals of Corporate Finance*, 13th ed. (McGraw Hill, 2022) ("Ross et al. (2022)"), p. 876, emphasis removed ("The difference between the value of the combined firm and the sum of the values of the firms as separate entities is the incremental net gain from the acquisition.…  When [this] is positive, the acquisition is said to generate synergy.").

[29] *See, e.g.*, Berk et al. (2010), p. 653 ("[Large] synergies usually fall into two categories:  cost reductions and revenue enhancements."); Ross et al. (2022), p. 877 ("The possible cash flow benefits of mergers and acquisitions fall into four basic categories:  revenue enhancement, cost reductions, lower taxes, and reductions in capital needs.").

revenues that exceed the sum of the revenues of the entities operating independently).[30]  Other sources of revenue synergies include marketing gains, improved competitive positioning in the relevant product markets, and new strategic opportunities.[31]  Cost synergies are typically achieved through enhanced efficiencies, including the consolidation of overlapping resources.[32]

22.     For its acquisition of Worldpay, FIS defined revenue synergies as "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with the acquisition of Worldpay" and cost synergies as "incremental annualized expense savings realized by the Company from specific actions taken in connection to the acquisition of Worldpay."[33]

## 2.     Adjusted EBITDA and Adjusted EBITDA Margin

23.     EBITDA is a common measure of operating profitability.[34]  As with all accounting-based measures, EBITDA is measured and reported for a specific fiscal period (typically a quarter or a year); it is defined as revenues generated during the fiscal period net of certain operating expenses, which typically include cost of goods sold ("COGS") and selling, general, and administrative ("SG&A") expenses.[35]  Adjusted EBITDA is a related, commonly used "non-

---

[30] *See, e.g.*, Holthausen, Robert W. and Mark E. and Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, 1st ed. (Cambridge Business Publishers, 2014) ("Holthausen and Zmijewski (2014)"), p. 682 ("Sharing brands or customer lists in order to grow revenues into a new customer base—especially globally—is another common type of revenue synergy.  This is often referred to as cross-selling; the acquirer sells its products to the customers of the target, and the target sells its products to the customers of the acquirer.").

[31] *See, e.g.*, Ross et al. (2022), pp. 877–878 ("One important reason for an acquisition is that the combined firm may generate greater revenues than two separate firms.  Increases in revenue may come from marketing gains, strategic benefits, and increases in market power.").

[32] *See, e.g.*, Holthausen and Zmijewski (2014), p. 681 ("When companies combine, they have a variety of ways to share their existing infrastructures and other fixed costs in order to reduce their post-merger cost structure.  Companies can share research and development functions to reduce headcount, gain other cost reductions, and share patents in order to increase patent utilization.").

[33] Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41.  In its SEC filings, FIS referred to cost synergies as "cost synergies" or "expense synergies" and appeared to use these terms interchangeably.  *See, e.g.*, Fidelity National Information Services, Inc., Form 8-K, filed August 3, 2021 ("Annual run-rate cost synergies are expected to be approximately $900 million exiting 2021….  Forward-Looking Statements … including … projected revenue or expense synergies … are forward-looking statements.").

[34] *See, e.g.*, Berk et al. (2010), p. 37 ("Financial analysts often compute a firm's earnings before interest, taxes, depreciation, and amortization, or EBITDA."); Holthausen and Zmijewski (2014), p. 513, emphasis removed ("[B]oth EBIT and EBITDA are measures of earnings before interest, so they represent flows that relate to total firm value as opposed to the value of the equity.").

[35] Importantly, however, as implied by the name ("EBITDA" stands for "earnings before interest, taxes, depreciation, and amortization"), EBITDA does not subtract depreciation and amortization expenses, which are typically considered operating expenses.  *See, e.g.*, Welch, Ivo, *Corporate Finance*, 5th ed. (Anderson Graduate School of Management, UCLA, 2022), pp. 425–427, emphasis removed ("COGS abbreviates costs of goods sold.  SG&A abbreviates selling, general, & administrative expenses.  Both of these are expenditures that have to be subtracted from sales (or revenues) to arrive at EBITDA (earnings before interest, taxes, depreciation, and amortization).").

GAAP"[36] measure that reflects certain adjustments to EBITDA, typically to provide a measure of an entity's ongoing operating profitability by removing items that are nonrecurring or that do not reflect the entity's underlying operations.[37]  Consistent with this usage, FIS stated in its Q4 2022 earnings press release that its adjusted EBITDA metric was meant to "improve the comparability of operating results across reporting periods":

> Adjusted EBITDA reflects net earnings (loss) before interest, other income (expense), taxes, equity method investment earnings (loss), and depreciation and amortization, and excludes certain costs, such as impairment expense, and other transactions that management deems non-operational in nature, or that otherwise improve the comparability of operating results across reporting periods by their exclusion.  For 2021, it also excludes incremental and direct costs resulting from the COVID-19 pandemic.[38]

24.     EBITDA margin and adjusted EBITDA margin (expressed as percentages of revenue) are common measures of an entity's profitability for a given fiscal period.[39]  EBITDA margin and adjusted EBITDA margin for a fiscal period are calculated as the amounts of EBITDA and adjusted EBITDA, for the relevant fiscal period, respectively, divided by the fiscal period's revenues.

---

[36] Non-GAAP measures are metrics that some capital market participants find more useful in assessing firms' economic performance than the corresponding GAAP-based measures (i.e., metrics drawn directly from an entity's financial statements that have been prepared in accordance with GAAP).  According to Black et al. (2018):  "Managers, financial analysts, investors, lenders, compensation committees, and other stakeholders often evaluate a company's earnings performance using metrics other than GAAP-based net income.  These stakeholders generally start with GAAP earnings and back out (or exclude) earnings components that they deem to be transitory or noncash.  They argue that these excluded items are less relevant for assessing firm performance and that the 'non-GAAP' performance number is more appropriate for their intended purposes.  The growth in these non-GAAP metrics over the past 20 years reflects a widespread acceptance of non-standard performance metrics as a way to evaluate firm performance."  These measures are often used by sell-side analysts in measuring and discussing firm performance.  *See* Black, Dirk E., et al., "Non-GAAP Reporting: Evidence from Academia and Current Practice," *Journal of Business Finance and Accounting* 45, nos. 3–4, March 2018, pp. 257–508.  *See also* footnote 40.

[37] "Adjusted EBITDA," *Corporate Finance Institute*, https://corporatefinanceinstitute.com/resources/valuation/adjusted-ebitda/, accessed April 30, 2025 ("Adjusted EBITDA is a financial metric that includes the removal of various one-time, irregular, and non-recurring items from EBITDA.…  The purpose of adjusting EBITDA is to get a normalized number that is not distorted by irregular gains, losses, or other items.  It is frequently used in valuation by financial analysts, investment bankers, and other finance professionals.").

[38] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed February 13, 2023 ("FIS Q4 2022 and FY 2022 Earnings Press Release").

[39] *See, e.g.*, Rosenbaum, Joshua and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, 2nd ed. (Wiley, 2013) ("Rosenbaum and Pearl (2013)"), p. 38, emphasis removed ("EBITDA and EBIT margin are accepted standards for measuring a company's operating profitability.…  Accordingly, they are used to frame relative performance both among peer companies and across sectors.").

### 3.      Goodwill and Goodwill Impairment

25.      Goodwill is an intangible asset that arises and is recognized as the result of a business combination.  Goodwill is recognized, measured, and reported in accordance with the relevant accounting rules—here, U.S. Generally Accepted Accounting Principles ("GAAP").  GAAP consists of a body of generally accepted accounting principles (or "standards"). The Financial Accounting Standards Board ("FASB") is the designated U.S. accounting standards setter for GAAP for non-governmental entities.[40]  All public companies are required to file annual and quarterly reports with the SEC (i.e., Forms 10-K and 10-Q).[41]  These reports must include financial statements prepared in accordance with GAAP.  The SEC requires that the financial statements in annual reports of public companies are audited by independent, external auditors.[42]

26.      GAAP defines goodwill as an "asset representing the future economic benefits arising from other assets acquired in a business combination or an acquisition by a not-for-profit entity that are not individually identified and separately recognized."[43]  In general, goodwill reflects that an acquirer is "willing to pay more for a business than the sum of the fair values of the individual assets and liabilities because of other inherent value associated with an assembled business."[44]  Under GAAP, goodwill is initially measured as of the date of a business

---

[40] The FASB is recognized by the SEC as the designated accounting standard setter for public companies.  *See, e.g.*, "About the FASB," *Financial Accounting Standards Board*, https://www.fasb.org/facts, accessed April 30, 2025.  The FASB Accounting Standards Codification ("ASC") is the source of authoritative GAAP recognized by the FASB for public companies.  *See* "105-10-05: Overview and Background," *Financial Accounting Standards Board*, available at https://asc.fasb.org/1943274/2147479442, accessed April 30, 2025 ("This Topic establishes the *Financial Accounting Standards Board (FASB) Accounting Standards Codification*® (Codification) as the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities.  Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.  In addition to the SEC's rules and interpretive releases, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and it utilizes SEC Staff Announcements and Observer comments made at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants.").

[41] "Exchange Act Reporting and Registration," *U.S. Securities and Exchange Commission*, https://www.sec.gov/resources-small-businesses/going-public/exchange-act-reporting-registration, accessed April 30, 2025; "Financial Reporting Manual: Topic 1 – Registrant's Financial Statements," *U.S. Securities and Exchange Commission*, https://www.sec.gov/corpfin/cf-manual/topic-1, accessed April 30, 2025.

[42] "All About Auditors: What Investors Need to Know," *U.S. Securities and Exchange Commission*, June 23, 2002, https://www.sec.gov/about/reports-publications/investorpubsaboutauditorshtm, accessed April 30, 2025; "Financial Reporting Manual: Topic 1 – Registrant's Financial Statements," *U.S. Securities and Exchange Commission*, https://www.sec.gov/corpfin/cf-manual/topic-1, accessed April 30, 2025.

[43] FASB, "ASC Master Glossary," https://asc.fasb.org/MasterGlossary, accessed April 30, 2025 ("FASB, ASC Master Glossary").

[44] PwC, "Overview: Accounting for Goodwill Post Acquisition," in *Business Combinations and Noncontrolling Interests*, May 31, 2024, Ch. 9.1, https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/business_combination/business_combination__28_US/chapter_9_accounting_US/91_overviewaccounting-for-goodwill-postacquisitionUS.html, accessed April 30, 2025.  The FASB defines fair

combination as the excess of (a) the consideration transferred by the acquirer (the purchase price) over (b) the net of the acquisition-date fair values of the identifiable assets acquired and liabilities assumed.[45]  In other words, goodwill is a residual asset (i.e., in simple terms, the difference between the fair value of a business as a whole and the net fair values of its identifiable assets and liabilities assumed).[46]  A reporting unit may be an operating segment or a component of an operating segment.[47]

27.    The relevant accounting guidance requires that goodwill be tested for impairment at least annually.[48]  As evident from the relevant accounting guidance, the process for evaluating whether goodwill is impaired is complex and requires considerable professional judgment.[49]  An impairment of goodwill is recognized when there is an assessment and determination by management—performed in accordance with the relevant guidance under GAAP—that, in management's judgment, the carrying amount[50] of the relevant reporting unit exceeds its assessed fair value at the goodwill impairment testing date.[51]

28.    The impairment test consists of two steps.[52]  At the first step, management has the option to perform an assessment of "qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill."[53]  If management determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, it proceeds to the second step, under which management conducts a quantitative assessment to estimate the fair value of the reporting unit at the goodwill impairment testing date and compares that amount to the

---

value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  *See* FASB, ASC Master Glossary.

[45] FASB, ASC, at 805-30-30-1.

[46] FIS reported details of its purchase price accounting for the Worldpay acquisition, including the goodwill it recorded, in its 2019 Form 10-K.  FIS stated that "[g]oodwill was recorded as the residual amount by which the purchase price exceeded the provisional fair value of the net assets acquired."  FIS 2019 Form 10-K, p. 74.

[47] FASB, ASC Master Glossary.  FIS stated that its "reporting units are the same as [its] primary operating segments, with additional reporting units for certain non-strategic businesses within the Corporate and Other segment."  FIS 2020 Form 10-K, p. 38.

[48] FASB, ASC, at 350-20-35-1.

[49] FASB, ASC, at 350-20-35-2; FASB, ASC, at 820-10-35-37A.

[50] The FASB defines carrying amount as "[t]he amount of an item as displayed in the financial statements."  *See* FASB, ASC Master Glossary.

[51] FASB, ASC, at 350-20-35-2.

[52] FASB, ASC, at 350-20-35-3.  According to FASB, ASC, at 350-20-35-3B, an entity may choose to bypass the qualitative assessment and proceed directly to the quantitative assessment of goodwill.

[53] FASB, ASC, at 350-20-35-3A.

reporting unit's carrying amount.[54]  For GAAP reporting, the "fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date."[55]  GAAP provides guidance on how management might assess fair value (e.g., the relevant guidance discusses the use of the market approach and/or the income approach).[56]

### C.      FIS Recorded Goodwill for the Worldpay Acquisition

29.      FIS completed the Worldpay acquisition on July 31, 2019.[57]  Consistent with the relevant accounting guidance, FIS recorded the acquisition as a business combination.[58]  FIS recorded goodwill of $38.1 billion as of December 31, 2019 in connection with the Worldpay acquisition, the excess of the purchase price of $48.2 billion over the fair value of the net assets acquired of $10.2 billion.[59]  Of the $38.1 billion of goodwill recorded in connection with the Worldpay acquisition, $34.7 billion was allocated to the Merchant Solutions segment and $3.4 billion was allocated to the Banking Solutions segment.[60]  When FIS initially recorded the Worldpay acquisition, it stated that "[g]oodwill consists primarily of expected synergies of combining operations, the acquired workforce, and growth opportunities, none of which qualify as separately identifiable intangible assets."[61]

30.      Before and during the Proposed Class Period, FIS' external auditor, KPMG, opined that FIS' financial statements (which included the amounts reported for goodwill) were fairly presented in conformity with GAAP.[62]  As of the date of this report, I am not aware of any restatement of FIS' financial statements during or after the Proposed Class Period, including any restatement of the amounts reported for goodwill, nor am I aware of any SEC investigation or

---

[54] FASB, ASC, at 350-20-35-4.

[55] FASB, ASC, at 350-20-35-22.

[56] FASB, ASC, at 820-10-35-16BB; FASB, ASC, at 350-20-35-24.

[57] FIS 2019 Form 10-K, p. 73.

[58] FIS 2019 Form 10-K, p. 74.

[59] FIS 2019 Form 10-K, p. 74.

[60] FIS 2019 Form 10-K, p. 78.

[61] Fidelity National Information Services, Inc., Form 10-Q for Quarterly Period Ended September 30, 2019, filed November 5, 2019 ("FIS Q3 2019 Form 10-Q"), p. 10.

[62] FIS 2020 Form 10-K, p. 51; Fidelity National Information Services, Inc., Form 10-K for Fiscal Year Ended December 31, 2021, filed February 23, 2022 ("FIS 2021 Form 10-K"), p. 46; Fidelity National Information Services, Inc., Form 10-K for Fiscal Year Ended December 31, 2022, filed February 27, 2023 ("FIS 2022 Form 10-K"), p. 46.  KPMG has served as the Company's external auditor since 2004 and continues to do so.  *See* Fidelity National Information Services, Inc., Form 10-K for Fiscal Year Ended December 31, 2024, filed February 13, 2025, p. 49.

enforcement action regarding the Company's goodwill accounting in connection with the Worldpay acquisition.

> **D.   FIS Identified Multiple Sources of Revenue Synergies, Raised Its Revenue and Cost Synergies Targets, and Announced That It Had Achieved These Targets Ahead of Schedule**

31.    FIS stated that the Worldpay acquisition would result in revenue synergies from a number of sources, including cross-selling between the legacy FIS and Worldpay businesses, as well as from other sources, such as leveraging the data of both businesses to improve fraud detection and increase authorization rates and expanding into emerging markets.[63]  When the acquisition was announced, the Company stated:

> To give you some more color on these revenue synergies, we have clear line of sight on global expansion of payment solutions in high growth markets such as India and Brazil, where we have existing presence at scale; enhancing fraud solutions and increasing authorization rates for our customers; driving significant increase in dollar volumes processed; cross-selling of payment processing; enabling faster payment initiatives and alternative payment types; and expanding into B2B commercial payments, and capturing the high demand for data analytics and insights.[64]

32.    In certain of its quarterly earnings disclosures, the Company reported the amounts of revenue and cost synergies it had achieved, on an annualized run-rate basis, through the end of each quarter as well as updated revenue and cost synergies targets.[65]  **Exhibit 1** summarizes the reported and targeted revenue and cost synergies amounts that FIS announced over time beginning with the initial merger announcement, which occurred before the Proposed Class Period.

---

[63] FIS M&A Call, pp. 3, 7.

[64] FIS M&A Call, p. 5.

[65] FIS stated that the revenue and cost synergies from the Worldpay acquisition were validated internally, by an independent accounting firm, and by the Audit Committee of the board of directors.  *See* Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41 ("Revenue and expense synergies are tracked as the actions are taken and are initially validated by the FIS Integration Management Office and Finance Department.  All revenue and expense calculations are then reviewed and validated by an independent accounting firm, PwC.  Finally, the Audit Committee reviews all revenue and expense calculations and the Compensation Committee approves the vesting of any integration incentive awards based on the validated revenue and expense synergy calculations.").

33.    Although FIS initially targeted $500 million and $400 million in revenue and cost synergies, respectively,[66] the Company raised those targets a number of times before and during the Proposed Class Period.  FIS ultimately increased the revenue and cost synergies targets to $700 million and $900 million, respectively, announced as part of its Q2 2021 earnings disclosures.[67]  During its Q4 2021 earnings call, FIS announced it had achieved revenue and cost synergies of approximately $750 million and $900 million on an annualized run-rate basis, respectively, before the end of the three-year period that FIS had initially planned to achieve the synergies from the Worldpay acquisition.[68]

34.    At different points during the Proposed Class Period, both the Company and analysts discussed different sources of revenue synergies across multiple business segments.  For example, in discussing the performance of its Banking Solutions segment during its Q4 2020 earnings call, FIS stated that "[c]ross-selling of new solutions into [its] existing client base is also up," which indicated that revenue synergies were accruing to the Banking Solutions segment.[69] Analysts also discussed FIS' cross-selling efforts—for example, a February 9, 2021 Loop report stated, with regards to FIS' Banking Solutions segment, that the "Banking [Solutions segment] is coming off a record sales year [and that] cross-selling is up (23% increase to top 100 clients)."[70] Similarly, a May 6, 2021 Cowen report stated that FIS "continues to see cross-selling opportunities across the Merchant [Solutions] segment."[71]  Another source of revenue synergies that FIS discussed was its use of the combined entity's data to improve authorization rates, which

---

[66] FIS M&A Call, pp. 4–5.  FIS typically discussed revenue and cost synergies amounts in terms of annualized run rates (once achieved, these synergies are expected to be ongoing).  For ease of exposition, I will not explicitly state "annualized run rate" each time I discuss synergies amounts because, unless otherwise noted, all references to synergies amounts in this report are in terms of annualized run rates.

[67] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed May 6, 2021 ("Raises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, in order to reflect strong cross-selling performance during the second quarter…. Annual run-rate cost synergies are expected to be approximately $900 million exiting 2021.").

[68] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed February 15, 2022; FIS M&A Call, p. 4 ("The combination of Worldpay and revenue synergies will drive organic growth to high single digits by the end of the 3-year synergy plan, generating approximately $15 billion of revenue.").

[69] "Q4 2020 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, February 9, 2021, 8:30 AM ("FIS Q4 2020 Earnings Call"), p. 3 ("In Banking Solutions, we continue to win share and accelerate revenue growth.  Our investments have enabled us to build a differentiated offering, winning new logos across markets of all sizes and actively expanding wallet share with existing clients.  As a result, our backlog within the Banking [Solutions] business expanded by 8% organically and generated $3.5 billion in new sales during 2020, which is our largest selling year ever.  Cross-selling of new solutions into our existing client base is also up, including a 23% increase in cross-selling solutions to our top 100 clients.").

[70] "Tough 4Q Caps a Difficult 2020, Though Progress Apparent," *Loop*, February 9, 2021, p. 1.

[71] "FIS 1Q21 Follow Up: Merchant Growth Entering Whipsaw Phase," *Cowen*, May 6, 2021, p. 1.

it stated was starting to "come online" in September 2020.[72]  Analysts discussed this source of revenue synergies—for example, a September 9, 2020 Baird report stated that FIS "[c]ontinue[s] to execute on … reducing fraud (increasing authorization rates)."[73]  Similarly, a June 15, 2020 BNP Paribas report stated that the acquisition could "leverage the combined entity's enormous amount of data to enhance [authorization] rates and fraud in merchant acquiring, thereby driving revenue synergies."[74]

## V.    The Allegedly Corrective Information

35.    Counsel has instructed me that Plaintiffs allege that certain disclosures made by the Company on August 4, 2022, November 3, 2022, and February 13, 2023 revealed the relevant truth that purportedly had previously been concealed by the alleged misrepresentations (i.e., Plaintiffs allege certain "corrective information").  In this section, I summarize my understanding of what Plaintiffs allege as corrective information and the context in which those disclosures were made.

### A.    August 4, 2022:  Q2 2022 Earnings Disclosures

36.    Before market open on August 4, 2022, FIS released its Q2 2022 earnings disclosures, including its reported results for the quarter, and held its quarterly earnings call.[75]  I understand from counsel that Plaintiffs allege that certain of these disclosures revealed (or partially revealed) the relevant truth that purportedly had previously been concealed by the alleged

---

[72] "Fidelity National Information Services Inc at Autonomous Research Future of Commerce Symposium," *Refinitiv*, September 17, 2020, p. 9 ("[W]e're very focused on, is now how do we take the data FIS has to provide around the issuer base and our core banking base and everything we know about the end consumer?  And how do we leverage that data to further take our auth rates and our approval rates even higher?  And so we're actually working on that a lot.…  And we're starting to see some of that come online.  But we do believe and have got a lot of internal work that's going on that we're going to be able to raise our authorization rates very significantly across the e-com market.").

[73] "Presented at a Competitor Conference," *Baird*, September 9, 2020, p. 1 ("Synergies on revenue side have been as expected with some nice surprises including premium payback (noted implementation backlog in the product).  Continue to execute on debit routing, reducing fraud (increasing authorization rates), geo expansion.").

[74] "Fidelity National Inf Svc," *BNP Paribas*, June 15, 2020, p. 2.  *See also* "Initiate on Payments: Digitization of Payments and COVID in Focus; Buy MA and FISV (both on CL)," *Goldman Sachs*, July 14, 2020, p. 37 ("We believe FIS's assets are differentiated relative to peers due to the combination of legacy FIS's world-class core processing assets with Worldpay's world-class merchant acquiring assets.  This end-to-end connectivity should allow FIS to increase authorization rates without increasing fraud rates.").

[75] FIS' quarterly earnings disclosures included its earnings press releases, earnings calls, and the presentations that management used for the earnings calls.  *See* Fidelity National Information Services, Inc., Form 8-K, filed August 4, 2022; "Q2 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, August 4, 2022, 8:30 AM ("FIS Q2 2022 Earnings Call"); FIS Presentation, "Second Quarter 2022 Earnings Call," August 4, 2022.

misrepresentations. As described in Plaintiffs' Motion for Class Certification, these earnings disclosures "announced disappointing results for FIS' Merchant Solutions segment—which was made up almost entirely of Worldpay—and abruptly stopped disclosing key performance metrics, which obscured the full extent of Worldpay's struggles."[76]

37.     The Complaint states:

> Before the market opened on August 4, 2022, FIS issued a press release announcing the Company's second quarter 2022 results. The August 4, 2022 press release announced that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%, which was far below Street expectations of 50%. Moreover, Defendants abruptly stopped disclosing key KPIs [(key performance indicators)] related to the Merchant Solutions segment, including U.S. and global volumes and transaction growth, thereby further obscuring the full extent of Worldpay's struggles. When asked about the missing data during the Company's earnings conference call, which also occurred before the market opened, Defendant Woodall admitted that the Merchant [Solutions] segment "saw sequential volume decreases" during the quarter.[77]

38.     I have been instructed by counsel that Plaintiffs allege the following as corrective:

- Reported Q2 2022 adjusted EBITDA margin for the Merchant Solutions segment of 47.1%, which was 280 basis points lower than the number reported for the corresponding quarter of 2021 and below analyst expectations.

- That, in response to an analyst's question during the earnings call (regarding volumes and transactions numbers for the Merchant Solutions segment), Mr. Woodall stated that "[o]n the volume side, [the Company] *saw sequential volume decreases* in line with Fiserv, Visa, MasterCard and Global, very similar."[78]

39.     According to the Complaint, "[a]s a direct and proximate result of this partial corrective disclosure and materialization of the concealed risk, shares of FIS' common stock declined $7.56 per share, or more than 7% … on August 4, 2022."[79]

---

[76] Plaintiffs' Motion for Class Certification, pp. 6–7.

[77] Complaint, ¶ 245.

[78] "Q2 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, August 4, 2022, 8:30 AM, p. 9 ("[Q:] … And then did you guys not disclose the merchant volume and transaction growth this quarter? I might have missed it, but curious on that. … [A:] On the volume side, we saw sequential volume decreases in line with Fiserv, Visa, MasterCard and Global, very similar. Constant currency volume is about 6%, and we saw yields at a plus 5%."). The bold italic portion of the text is quoted in Complaint, ¶ 245.

[79] Complaint, ¶ 246.

### B.    November 3, 2022:  Q3 2022 Earnings Disclosures

40.    Before market open on November 3, 2022, FIS released its Q3 2022 earnings disclosures, including its reported results for the quarter, and held its quarterly earnings call.[80]  I understand from counsel that Plaintiffs allege that certain of these disclosures revealed (or partially revealed) the relevant truth that purportedly had previously been concealed by the alleged misrepresentations.  As described in Plaintiffs' Motion for Class Certification, these earnings disclosures announced "disappointing results for the Merchant Solutions segment, including quarter-over-quarter contractions in adjusted EBITDA within the Merchant Solutions segment."[81]

41.    The Complaint states:

> During the earnings conference call, which took place on November 3, 2022 at 8:30 a.m., Defendant Norcross announced that "we are not pleased with the profitability performance of the business and are taking actions to address them." In addition, the Company's new CFO, Hoag, explained more specifically that the Company's Merchant Solutions segment suffered from a 430 basis-point margin contraction during the quarter—significantly more than the 280 basis-point contraction announced the prior quarter.[82]

42.    I have been instructed by counsel that Plaintiffs allege the following as corrective:

- The reported Q3 2022 adjusted EBITDA margin for the Merchant Solutions segment of 47.4%, which was higher than the 47.1% margin reported in the prior quarter[83] but 430 basis points lower than the number reported for the corresponding quarter in 2021.

- Mr. Norcross' statement during the earnings call that the Company was "not pleased with the profitability performance of the business and [is] taking actions to address [it]."[84]

43.    According to the Complaint, "[a]s a direct and proximate result of this partial corrective disclosure and materialization of previously concealed risks, shares of FIS's common stock

---

[80] FIS' quarterly earnings disclosures included its earnings press release, an earnings call, and the presentation that management used for the earnings call.  *See* Fidelity National Information Services, Inc., Form 8-K, filed November 3, 2022; "Q3 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 3, 2022, 8:30 AM; FIS Presentation, "Third Quarter 2022 Earnings Call," November 3, 2022 ("FIS Q3 2022 Earnings Call Presentation").

[81] Plaintiffs' Motion for Class Certification, p. 7.

[82] Complaint, ¶ 251.

[83] Fidelity National Information Services, Inc., Form 8-K, filed November 3, 2022 ("FIS Q3 2022 Earnings Press Release"), p. 5. *See also* ¶ 37 above.

[84] Complaint, ¶ 251.

declined $22.29 per share, or over 28% … on November 3, 2022, thereby removing some artificial inflation from the price of FIS common stock."[85]

### C.    February 13, 2023:  Q4 and FY 2022 Earnings Disclosures and the Announcement of Plans to Spin Off the Merchant Solutions Segment

44.    Before market open on February 13, 2023, FIS issued a press release that announced its Q4 and full year 2022 results, which included a non-cash goodwill impairment charge of $17.6 billion related to the Merchant Solutions segment, and a separate press release that announced the Company's plans to pursue a tax-free spin-off of the Merchant Solutions segment within the next 12 months.[86]  The Company held its quarterly earnings call in which management discussed these results and the planned spin-off.[87]  I understand from counsel that Plaintiffs allege that certain of these disclosures revealed the relevant truth that purportedly had previously been concealed by the alleged misrepresentations.  As described in Plaintiffs' Motion for Class Certification, these earnings disclosures "announced that [FIS] was recording a 'non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit' and planned to spin off Worldpay."[88]

45.    The Complaint states:

> On this date, before the markets opened, FIS filed a Current Report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2022 results.  The Form 8-K included a press release that stunned investors by disclosing that the Company was recording a "non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit" in the quarter and at the same time was getting rid of its Merchants Solutions business by spinning it off to create two independent companies.[89]

46.    I have been instructed by counsel that Plaintiffs allege the following as corrective:

- A non-cash goodwill impairment charge of $17.6 billion related to the Merchant Solutions segment as of December 31, 2022.

---

[85] Complaint, ¶ 252.
[86] FIS Q4 2022 and FY 2022 Earnings Press Release.
[87] "Q4 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, February 13, 2023, 8:30 AM ("FIS Q4 2022 Earnings Call").
[88] Plaintiffs' Motion for Class Certification, p. 7.
[89] Complaint, ¶ 255.

- Announcement of plans to pursue a tax-free spin-off of FIS' Merchant Solutions business, which was expected to be completed in the next 12 months.

47. According to the Complaint, "[a]s a direct and proximate result of this corrective disclosure and risk materialization, shares of FIS common stock declined another $9.43 per share, or more than 12% … on February 13, 2023, thereby removing the artificial inflation in the price of FIS common stock."[90]

## VI. From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective Was Different from the Relevant Truth Allegedly Concealed by the Revenue Synergies Statements

48. I understand from counsel that Plaintiffs identify six statements from May 7, 2020 through March 9, 2022 allegedly concealing the relevant truth that the revenue synergies amounts related to the Worldpay acquisition as reported by the Company had been manipulated and thus were inaccurate when made ("Revenue Synergies Statements").[91] The Revenue Synergies Statements discussed revenue synergies amounts at specific points in time from Q1 2020 through Q4 2021.

49. Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective relative to the relevant truth allegedly concealed by the Revenue Synergies Statements. For the allegedly corrective information on each of the three alleged corrective disclosure dates, I conclude that what Plaintiffs allege as corrective information was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

50. Analysis of analyst commentary in the one-week period following each of the alleged corrective disclosure dates supports my conclusion. I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies. I also did not identify *any*

---

[90] Complaint, ¶ 257.
[91] Plaintiffs allege that the May 6, 2021 Revenue Synergies Statement also concealed the relevant truth that (1) there was "little to no cross-selling," and (2) FIS' "revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory." Complaint, ¶¶ 185, 192–193. My analyses and opinions regarding the Cross-Selling Statements in **Section VII** below also apply to the May 6, 2021 Revenue Synergies Statement.

discussion in analyst reports after either of the first two alleged corrective disclosure dates (on August 4, 2022 and November 3, 2022) indicating that analysts had reevaluated the Revenue Synergies Statements, including questioning the existence or amount of revenue synergies that FIS had reported earlier in the Proposed Class Period. There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

51.    Moreover, following the last alleged corrective disclosure date (on February 13, 2023), and even following FIS' Q1 2023 earnings disclosures (on April 27, 2023), more than two months after the end of the Proposed Class Period, analysts *continued* to discuss the approximately $750 million of revenue synergies FIS had previously reported.[92]  There is *no* analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

52.    Based on this analysis, from the perspective of a financial economist, I conclude that the information Plaintiffs allege as corrective on each of the three alleged corrective disclosure dates was different from the relevant truth allegedly concealed by the Revenue Synergies Statements.[93]

### A.    The Alleged Misrepresentations:  Revenue Synergies Statements

53.    In the Complaint, Plaintiffs identify six Revenue Synergies Statements on six dates from May 7, 2020 (the beginning of the Proposed Class Period) through March 9, 2022.  I understand from counsel that Plaintiffs allege that these statements concealed the relevant truth that the revenue synergies amounts related to the Worldpay acquisition as reported by the Company had

---

[92] *See* **Exhibits 3, 4**.

[93] Counsel also asked me to consider an August 4, 2022 statement that Plaintiffs allege was false or misleading (Complaint, ¶ 232) because it purportedly concealed the relevant truth that "Defendants were only able to deliver revenue synergies because they manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations" (Complaint, ¶ 233, emphasis in original).  My analyses and opinions regarding the Revenue Synergies Statements in this section also apply to this August 4, 2022 statement because I understand from counsel the relevant truth allegedly concealed by the August 4, 2022 statement is the same relevant truth that is allegedly concealed by Revenue Synergies Statements.  In addition, my opinions with respect to the Revenue Synergies Statements also apply to the February 13, 2023 statement by Mr. Erik Hoag (discussed in footnote 139), which counsel asked me to analyze under the same framework that I use to analyze the allegedly corrective information in **Section V**.

been manipulated and thus were inaccurate when made.  According to the Complaint, the following relevant truth was allegedly concealed by the Revenue Synergies Statements:

> … Defendants manipulated the revenue synergy calculations and calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations.…  Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration.[94]

54.     Plaintiffs further allege that "there were *no* [revenue] synergies between FIS and Worldpay."[95]

55.     **Exhibit 2** displays the Revenue Synergies Statements and the alleged relevant truths that I understand from counsel that Plaintiffs claim were concealed by these statements.

### B.     The Allegedly Corrective Information Was Conceptually Distinct from the Truth Allegedly Concealed by the Revenue Synergies Statements

56.     As discussed in **Section V**, Plaintiffs allege that corrective information was released to the market through alleged corrective disclosures on three FIS earnings announcement dates (August 4, 2022, November 3, 2022, and February 13, 2023).  Based on principles of financial economics and accounting, I analyzed the information Plaintiffs allege as corrective relative to the relevant truth allegedly concealed by the Revenue Synergies Statements.  For the allegedly corrective information on each of the three dates, which I consider in turn, I conclude that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

57.     In addition, to further support this opinion, I analyzed how sell-side securities analysts assessed the allegedly corrective information.  I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.  There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue

---

[94] *See, e.g.*, Complaint, ¶ 185, emphasis in original.
[95] Complaint, ¶ 67, emphasis added.  *See also* Plaintiffs' Motion for Class Certification, p. 5, emphasis added.

Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

58.    Sell-side securities analysts (hereafter "analysts") are important capital market intermediaries whose commentary serves as a proxy for how market participants assessed information about FIS, including the allegedly corrective information.  Analyst reports are prepared and disseminated by banks and other financial institutions for the benefit of their clients (often large "buy-side" institutional investors) and other market participants.[96]  These institutions employ teams of analysts to monitor and research publicly traded companies and their industries. Analyst reports provide commentary and analysis on information released from or about a company or group of companies within a sector.  It is common for analysts to provide forecasts of earnings and other financial metrics (e.g., sales, EBITDA, margins), target prices, and investment recommendations.  Some investors rely on these reports to understand and synthesize publicly available information about a company.

59.    I reviewed all analyst reports covering FIS available to me that were issued during the one-week periods that begin with the dates of the three alleged corrective disclosures; there are a total of 151 such reports issued by 35 unique contributors (analyst firms).[97]  For each report, I analyzed (1) whether the analyst commented on or mentioned the information Plaintiffs allege as corrective; and (2) whether the analyst linked that information to the Revenue Synergies Statements or otherwise to revenue synergies, including whether the analyst expressed doubt about the existence of revenue synergies or the amounts FIS had previously reported as realized revenue synergies.  I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Revenue Synergies Statements, or to the existence or amount of

---

[96] *See* Brown, Lawrence D., et al., "Inside the 'Black Box' of Sell-Side Financial Analysts," *Journal of Accounting Research* 53, no. 1, 2015, pp. 1–47 at p. 1 ("Sell-side financial analysts are of significant interest to academic researchers because of their prominent role in analyzing, interpreting, and disseminating information to capital market participants.").

[97] I obtained analyst reports covering FIS from counsel, the materials produced by Mr. Coffman, LSEG Workspace, and S&P Capital IQ.  These reports do not include industry reports and quantitative or technical analysis reports (i.e., reports that do not contain commentary on company performance or investment recommendations).  I reviewed 40 analyst reports covering FIS issued by 30 unique contributors during the week beginning August 4, 2022, 51 analyst reports covering FIS issued by 34 unique contributors during the week beginning November 3, 2022, and 60 analyst reports covering FIS issued by 34 unique contributors during the week beginning February 13, 2023.  Academic research finds that analysts are incentivized to comment on new, value-relevant information quickly.  *See, e.g.*, Livnat, Joshua and Yuan Zhang, "Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More?" *Review of Accounting Studies* 17, no. 3, 2012, pp. 612–641 at p. 616 ("[A]nalysts have incentives to compete for trading volume.… Thus when analysts receive public disclosures from the firm, they have incentives to process the information and issue revisions as soon as possible.").

previously reported revenue synergies.  I discuss my analyses in detail below; the sub-sections discuss each item of allegedly corrective information in turn (and in chronological order).

### 1.      August 4, 2022:  Adjusted EBITDA Margin for the Merchant Solutions Segment for Q2 2022

60.      As I discuss in **Section V**, Plaintiffs allege that the adjusted EBITDA margin that FIS reported for its Merchant Solutions segment in its Q2 2022 earnings disclosures on August 4, 2022 was corrective information that revealed (or partially revealed) the relevant truth purportedly concealed by the alleged misrepresentations.  The Company attributed the decline in adjusted EBITDA margin for the Merchant Solutions segment to "high contribution margins associated with e-commerce revenue affected by the Russia/Ukraine conflict, investment in geographic expansion to support [its] Global eCommerce business, and accelerated investment in ecommerce and Payrix sales channels to capitalize on developing secular growth trends."[98]

61.      From my perspective as a financial economist with expertise in accounting, this allegedly corrective information (i.e., the adjusted EBITDA margin for a specific segment in a specific quarter, including that this margin had declined and/or was disappointing to market participants) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

62.      First, adjusted EBITDA margin and revenue synergies are distinct constructs with different meanings.  As I discuss in **Section IV.B.2**, adjusted EBITDA in a particular fiscal period is a non-GAAP measure typically calculated as revenues minus operating expenses for that period, adjusted to remove certain non-operating items; the corresponding adjusted EBITDA margin (i.e., a percentage) simply takes this amount and divides by revenues.  In contrast, revenue synergies, including as defined by FIS, are "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with [an] acquisition"—here, FIS' acquisition of Worldpay—stated in dollar amounts and on an annualized basis.[99]  As a definitional matter, adjusted EBITDA margin and revenue synergies are conceptually distinct from one another.

---

[98] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed August 4, 2022.
[99] Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41.

63.     Unpacking these concepts underscores the distinction.  A statement that adjusted EBITDA margins (which are in essence revenues minus expenses) are, say, lower or have declined, does not necessarily imply that *revenues* (much less revenue *synergies*, which are but one component of revenues) were lower or declined—it could simply be that expenses (costs) increased faster than revenues.  In fact, revenues for the Merchant Solutions segment for Q2 2022 exceeded the corresponding analyst consensus estimate by 1.6%,[100] which indicates that Q2 2022 revenues for the Merchant Solutions segment—and by extension any Q2 2022 revenues that might be attributable to synergies in the Merchant Solutions segment—were not the cause of the market disappointment regarding the adjusted EBITDA margin for the Merchant Solutions segment in that quarter.  As a matter of economics and accounting, information about the adjusted EBITDA margin for the Merchant Solutions segment for Q2 2022 (including that it was lower and/or disappointing) does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition.

64.     Second, there is an important timing difference between the Revenue Synergies Statements and the adjusted EBITDA margin for the Merchant Solutions segment that Plaintiffs allege as corrective.  The allegedly corrective information about adjusted EBITDA margin for the Merchant Solutions segment in Q2 2022 refers to a measure of profitability for a specific segment in the then-most recent fiscal quarter (i.e., the three months ended June 30, 2022).  In contrast, the Revenue Synergies Statements refer to synergies amounts stated on an *annualized* basis at the time the statement was made (e.g., approximately $100 million of revenue synergies on an annualized run-rate basis exiting Q1 2020).  The relevant periods differ between the two. This timing difference is another reason why information about the adjusted EBITDA margin being lower than expected in Q2 2022 does not necessarily imply anything about *annualized* revenue synergies previously reported—a reported adjusted EBITDA margin in a given quarter is the result of numerous economic factors, as reflected in the transactions and events in that quarter.  As a matter of economics and accounting, information about the adjusted EBITDA margin for Q2 2022 (including that it was lower and/or disappointing) does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition.

---

[100] *See* "FIS: Mixed Results & New CFO Announced," *Northcoast*, August 5, 2022, p. 1 ("Merchant: The segment reported revenues of $1,302 million and organic growth of 14%, which was ahead of our expectations of $1,271 million and consensus forecast of $1,282 million.").

65.     Third, while the adjusted EBITDA margin that Plaintiffs allege as corrective is specific to the Merchant Solutions segment, the Revenue Synergies Statements relate to revenue synergies that benefit the Company *as a whole*.  As a general matter, there is no reason to expect that revenue synergies from the Worldpay acquisition would flow exclusively to the Merchant Solutions segment.  By definition, synergies are economic benefits that accrue to the *overall entity, across* its various businesses (in this case, synergies were generated by combining Worldpay with FIS' existing business and operations, including the Banking Solutions and Capital Markets Solutions segments).  Further, as I discuss in **Section IV.D**, during the Proposed Class Period the Company and analysts both discussed revenue synergies accruing outside the Merchant Solutions segment, such as cross-selling in the Banking Solutions segment.[101]  As a matter of economics and accounting, information about the adjusted EBITDA margin for the Merchant Solutions segment for Q2 2022 (including that it was lower and/or disappointing) does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition, as those synergies could be realized in other business segments.

66.     Analyst commentary following the Q2 2022 earnings disclosures on August 4, 2022 supports my opinion that the allegedly corrective information regarding the adjusted EBITDA margin for the Merchant Solutions segment in Q2 2022 (including that the margin had declined and/or was disappointing to market participants) was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.  I did not find *any* commentary in the 40 analyst reports issued in the one-week period following the release of the adjusted EBITDA margin for the Merchant Solutions segment in Q2 2022 that linked that quarterly adjusted EBITDA margin information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

### 2.     August 4, 2022:  Mr. Woodall's Statement Regarding "Sequential Volume Decreases" in the Q2 2022 Earnings Call

67.     As I discuss in **Section V.A**, Plaintiffs allege that Mr. Woodall's statement during the Q2 2022 earnings call on August 4, 2022 that the Merchant Solutions segment "saw sequential volume decreases in line with Fiserv, Visa, MasterCard and Global" was corrective information

---

[101] *See* **Section IV.D**; FIS Q4 2020 Earnings Call, p. 3; "Tough 4Q Caps a Difficult 2020, Though Progress Apparent," *Loop*, February 9, 2021, p. 1.

that revealed (or partially revealed) the relevant truth purportedly concealed by the alleged misrepresentations.[102] Mr. Woodall made this statement in response to an analyst's question.[103]

68.     From my perspective as a financial economist with expertise in accounting, this allegedly corrective information (i.e., a decline in volume for the Merchant Solutions segment in Q2 2022) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.[104]

69.     First, volume (the monetary value of transactions processed during a given quarter) is a metric that, as a matter of economics and accounting, is distinct from revenue synergies. In the context of FIS' Merchant Solutions segment, volume in a given fiscal period measures the dollar value of "buying and selling a good or service in exchange for money."[105] Volume for the Merchant Solutions segment is distinct not only from revenue synergies but also from revenues themselves. In discussing volume, FIS also discussed a metric it called "yield," which I understand relates to the difference between revenue growth and volume growth in a given period.[106] My understanding is that payments processed in a higher-yield type of merchant business, such as travel, would generate proportionally more revenue than payments processed for the same volume in a lower-yield type of merchant business, such as groceries.[107] As a result, there is no necessary relation between volume growth and revenue growth—much less a necessary relation between volume growth and revenue synergies.

---

[102] FIS Q2 2022 Earnings Call, p. 9.

[103] FIS Q2 2022 Earnings Call, p. 9 ("[Q:] … And then did you guys not disclose the merchant volume and transaction growth this quarter? I might have missed it, but curious on that. … [A:] On the volume side, we saw sequential volume decreases in line with Fiserv, Visa, MasterCard and Global, very similar. Constant currency volume is about 6%, and we saw yields at a plus 5%.").

[104] I note that the Complaint does not specify what information Plaintiffs allege was conveyed to the market by FIS' alleged *non*-disclosure regarding the Merchant Solutions segment volumes and transactions data. The Complaint asserts only that the alleged non-disclosure in Q2 2022 was "a stark departure from FIS's decision … in November 2021, to enhance Merchant [Solutions] segment disclosures based on feedback received from investors that there was not enough visibility into the Merchant Solutions segment" (Complaint, ¶ 158). Even if Plaintiffs allege that FIS' non-disclosure (like Mr. Woodall's statement) conveyed negative news to the market regarding volumes for the Merchant Solutions segment during the Q2 2022 fiscal quarter, that does not change my analysis or conclusions.

[105] *See, e.g.*, Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed May 3, 2022 ("Volume refers to the total dollar value of the transactions processed during the stated period[.] Transaction refers to an instance of buying or selling a good or service in exchange for money[.]").

[106] *See, e.g.*, FIS Presentation, "First Quarter 2022 Earnings Call," May 3, 2022, p. 13; FIS Presentation, "First Quarter 2021 Earnings Call, May 6, 2021, p. 6 ("Slide 13 shows the significant ramp in volumes and revenue that the Merchant business generated throughout the quarter. Importantly, as volumes rebounded, yields grew significantly. We ultimately exited the quarter generating approximately 70% revenue growth during the last week of March, including 5 percentage points of positive yield contribution.").

[107] *See, e.g.*, "Sudden Headwinds Cause Guidance Cut," *Deutsche Bank*, August 4, 2022, p. 1 ("[Y]ields improved to ~5ppts aided in large part by the recovery in travel and airlines."); "FIS 2Q22: The State of the All-Important Merchant Solutions Business - Market Shares, Yields, Volumes," *Moffett Nathanson*, August 8, 2022, p. 3 ("…lower-yielding spend categories like grocery.").

70.    For example, even if volumes in a given quarter decline (or are disappointing), it could be that changes in the *mix* of business with different yields (e.g., more payments processed in the travel sector and less payments processed for groceries) mean that overall revenues of the Merchant Solutions segment do not decline (or could even increase).[108]  Indeed, some analysts noted that higher Q2 2022 yields helped to explain why that quarter's Merchant Solutions segment *revenues exceeded expectations* even though that quarter's volume fell below expectations.[109]  Moreover, I understand that myriad factors can affect the Merchant Solutions segment's volumes, and those factors have no necessary relation to revenue synergies, which are "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with the acquisition of Worldpay."[110]

71.    Second, here as well there is an important timing difference between the Revenue Synergies Statements and disclosures about volumes that Plaintiffs allege as corrective.  The revenue synergies were, as discussed above, reported on an ongoing *annualized* basis, whereas FIS disclosed volume growth rates as year-over-year changes for a given quarter (e.g., volume for Q2 2022 relative to volume in Q2 2021).  As a matter of economics and accounting, disclosures about volumes for the Merchant Solutions segment for Q2 2022 (including that the growth may have been disappointing) does not necessarily imply anything about the existence or amount of annualized revenue synergies from the Worldpay acquisition.

72.    Third, while information about volumes for the Merchant Solutions segment related only to that segment, the reported revenue synergies were for the Company *as a whole* and could be realized in other business segments as well.  As I discuss above and in **Section IV.D**, during the Proposed Class Period both the Company and analysts discussed revenue synergies accruing

---

[108] The following hypothetical example may be instructive.  Consider a company that generates fee revenues by processing merchant transactions for two types of merchants, grocery and airlines.  The company charges a fee of 8% on the value of transactions (i.e., volume) from grocery and a fee of 15% on volume from airlines.  In month 1, total merchant volume is $20,000, evenly split between grocery and airlines.  This results in $2,300 of revenues ($10,000 x 8% + $10,000 x 15%).  In month 2, total merchant volume declines to $18,000, with $4,000 from grocery and $14,000 from airlines.  This results in $2,420 of revenues ($4,000 x 8% + $14,000 x 15%).  In this example, even though volume decreased in month 2, the amount of revenue generated increased due to a change in the mix of business, where a larger percentage of the total volume in month 2 came from a type of merchant that is charged higher fees.

[109] *See, e.g.*, "2Q Wrap: Lots of Moving Pieces," *Jefferies*, August 4, 2022, p. 1 ("Merchant volumes underwhelm, decelerating to 6% Y/Y FXN growth and 4% Y/Y on a reported basis implying 1ppt of Q/Q improvement to 130% of '19 levels.  Yields acted as a ~6% tailwind Y/Y, bridging to 12% organic FXN growth in Merchant."); "Sudden Headwinds Cause Guidance Cut," *Deutsche Bank*, August 4, 2022, p. 1 ("Merchant results were mixed as revenue came in stronger than expected despite global volumes growing at roughly half the rate seen by the networks this qtr.  Positively, yields improved to ~5ppts aided in large part by the recovery in travel and airlines.").

[110] Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41.

outside the Merchant Solutions segment. As a matter of economics and accounting, disclosures about volume for the Merchant Solutions segment in Q2 2022 (including that the growth may have been disappointing) does not necessarily imply anything about the existence or amount of revenue synergies for the Company *as a whole* from the Worldpay acquisition, as those synergies could be realized in other business segments as well. This is an additional reason why the allegedly corrective information was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements when made.

73.    Analyst commentary following the Q2 2022 earnings disclosures on August 4, 2022 supports my opinion that the allegedly corrective information regarding Mr. Woodall's statement on August 4, 2022 that the Merchant Solutions segment "saw sequential volume decreases" in Q2 2022 was conceptually distinct from the relevant truth allegedly concealed by the Revenues Synergies Statements. I did not find *any* commentary in the 40 analyst reports issued in the one-week period following FIS' Q2 2022 earnings disclosures that linked any information regarding the Merchant Solutions segment's volume growth to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

### 3.    November 3, 2022:  Adjusted EBITDA Margin for the Merchant Solutions Segment, and Adjusted EBITDA Margin and Profitability for FIS as a Whole for Q3 2022

74.    As I discuss in **Section V.B**, Plaintiffs allege that the adjusted EBITDA margin for the Merchant Solutions segment and Mr. Norcross' statement in FIS' Q3 2022 earnings disclosures on November 3, 2022 were corrective information that revealed (or partially revealed) the relevant truth purportedly concealed by the alleged misrepresentations. The Company stated that the adjusted EBITDA margin contraction in the Merchant Solutions segment was due to "inflationary cost pressures and accelerated investment in e-commerce and Payrix sales channels to capitalize on developing secular growth trends."[111]

75.    Before discussing the conceptual distinctions between these pieces of allegedly corrective information and the relevant truth allegedly concealed by the Revenue Synergies Statements, I consider Mr. Norcross' allegedly corrective statement that the Company was "not pleased with

---

[111] FIS Q3 2022 Earnings Press Release.

the profitability performance of the business and [is] taking actions to address [it]"[112] in the context of the November 3, 2022 earnings call during which the statement was made. A profitability margin measures a firm's "ability to convert sales into profit" calculated using a "measure of profit in the numerator, such as gross profit, EBITDA, EBIT, or net income, and sales in the denominator."[113] Mr. Norcross' statement was made as part of his discussion of slide 5 of the earnings call presentation and the Company's overall financial performance, including its adjusted EBITDA margin, for Q3 2022.[114] In discussing the slide, Mr. Norcross stated that while revenue and adjusted EPS were "in line with [the Company's] expectations," profit margins in the Banking Solutions and Merchant Solutions segments "resulted in an overall adjusted EBITDA margin contract[ion]."[115] Mr. Norcross then made the statement about the profitability performance of the business that Plaintiffs identify as allegedly corrective. In the context of the earnings call and slide 5, I understand Mr. Norcross' statement to be addressing the adjusted EBITDA margin for FIS as a whole for Q3 2022.[116] However, for purposes of my analysis, I consider Mr. Norcross' statement as both a statement specific to FIS' adjusted EBITDA margin for Q3 2022 and as a statement about other measures of FIS' profitability for Q3 2022.

76.    From my perspective as a financial economist with expertise in accounting, this allegedly corrective information (i.e., adjusted EBITDA margins for one specific segment in one specific quarter, the adjusted EBITDA margin for FIS as a whole in one specific quarter, and/or FIS'

---

[112] Complaint, ¶ 251.

[113] Rosenbaum and Pearl (2013), p. 21.

[114] "Q3 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 3, 2022, 8:30 AM, pp. 2–3, emphasis added ("I'll begin on Slide 5 for a quick overview of results. In the quarter, we delivered revenue and adjusted EPS in line with our expectations, a testament to the fundamental resiliency of our business. Organic revenue growth for the quarter was 5%. Banking Solutions grew 6%, [M]erchant Solutions grew 5% and [C]apital [M]arkets [Solutions] grew 6%, all on an organic basis. Our profit margins in the Banking and Merchant Solutions businesses saw a continued pressure in the quarter. This resulted in an overall adjusted EBITDA margin contracting by 150 basis points year-on-year, primarily a function of inflationary cost pressures such as wage inflation and downstream supplier increases as well as incremental macro headwinds such as consumer weakness in the U.K. [¶] *We are not pleased with the profitability performance of the business and are taking actions to address [it]*. We did want to provide you some insight on the underlying performance of the businesses because given the backdrop we operate in and the continued economic slowdown we are seeing in certain geographies around the world. On the slide, you will see we provided some key growth trends with minor adjustments to help investors see the underlying performance of these businesses. As you can see, the underlying growth trends of the businesses are good in this backdrop. [¶] If you adjust for pandemic services, our [B]anking [Solutions] revenue grew 8% during the quarter. Merchant Solutions grew 6% adjusting for Russia, Ukraine, with our eCom business growing 22%. Capital Markets [Solutions] had an impressive 9% growth adjusting for the volatility of license fees, which we have discussed on numerous calls.").

[115] "Q3 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 3, 2022, 8:30 AM, p. 3.

[116] This is consistent with the slide in the Q3 2022 earnings call presentation Mr. Norcross was discussing at the time of his statement—the only measure of profitability on slide 5 is the adjusted EBITDA margin in Q3 2022 for FIS, as well as for the Banking Solutions, Merchant Solutions, and Capital Markets Solutions segments. *See* FIS Q3 2022 Earnings Call Presentation, November 3, 2022, p. 5.

profitability in one specific quarter, including that these profitability measures had declined and/or were disappointing to market participants) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

77.     First, measures of profitability (including adjusted EBITDA margin) and revenue synergies are distinct constructs with different meanings.  As I discuss in **Section IV.B.2**, the adjusted EBITDA margin in a particular fiscal period is a function of revenue, operating expenses, and non-operating items for that period.  Similarly, other measures of profitability are in essence revenues minus expenses, sometimes with other line items that are added or subtracted.  In general, numerous factors affect revenue, operating expenses, and other line items in a given fiscal period, all of which may affect adjusted EBITDA margins and other measures of profitability.[117]  As a matter of economics and accounting, information about adjusted EBITDA margins and profitability for Q3 2022 (including that these measures were lower and/or disappointing) does not necessarily imply anything about revenue—much less about the existence or amount of revenue *synergies* from the Worldpay acquisition.

78.     Second, here again, there is an important timing difference between the Revenue Synergies Statements and the reported quarterly information about the adjusted EBITDA margins or profitability that Plaintiffs allege as corrective.  Specifically, while the adjusted EBITDA margin for the Merchant Solutions segment, the adjusted EBITDA margin for FIS as a whole, and profitability measures for FIS as a whole all refer to the respective amounts reported for the Company's *Q3 2022* (i.e., the three months ended September 30, 2022), the Revenue Synergies Statements refer to synergies amounts stated on an *annualized* basis at the time each statement was made, which means the relevant periods are different.  This timing difference is another reason why information about, for example, the Company's reported adjusted EBITDA margin being lower than expected for Q3 2022 does not necessarily imply anything about *annualized* revenue synergies previously reported; once again, the adjusted EBITDA margin and profitability in a given quarter are the result of numerous economic factors, as reflected in the transactions and events in that quarter.  As a matter of economics and accounting, information about adjusted EBITDA margins and profitability more generally for Q3 2022 (including that

---

[117] For example, in its Q3 2022 earnings press release, FIS stated that the change in the adjusted EBITDA margin for the Merchant Solutions segment in Q3 2022 was "primarily due to inflationary cost pressures and accelerated investment in e-commerce and Payrix sales channels."  *See* FIS Q3 2022 Earnings Press Release.

these measures were lower and/or disappointing) does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition, including at the time each statement was made.

79.     Analyst commentary following the Q3 2022 earnings disclosures on November 3, 2022 supports my opinion that the allegedly corrective information regarding the adjusted EBITDA margin for the Merchant Solutions segment in Q3 2022, the adjusted EBITDA margin for FIS as a whole in Q3 2022, and profitability for FIS as a whole in Q3 2022 was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.  I did not find *any* commentary in the 51 analyst reports issued in the one-week period following the release of this information that linked the allegedly corrective information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

### 4.     February 13, 2023:  Q4 2022 Goodwill Impairment Charge Related to the Merchant Solutions Reporting Unit

80.     As I discuss in **Section V.C**, Plaintiffs allege that the Q4 2022 goodwill impairment charge of $17.6 billion for the Merchant Solutions reporting unit announced on February 13, 2023 was corrective information that revealed the relevant truth purportedly concealed by the alleged misrepresentations.  FIS stated that the goodwill impairment was "due [to the Merchant Solutions segment's] estimated fair value being less than its carrying amount based on slowing growth projections for the business driven by worsening macroeconomic conditions, including rising interest rates, inflation, and slowing growth in the U.S. and Europe, as well as a sustained decline in [the Company's] share price and the effects of changing market dynamics affecting [its] SMB portfolio which is migrating from card-present offerings to embedded payments."[118]

81.     From my perspective as a financial economist with expertise in accounting, this allegedly corrective information (i.e., the Company's announcement of a non-cash goodwill impairment charge of $17.6 billion for its Merchant Solutions reporting unit) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.  On the one hand, revenue synergies, including as defined by FIS, are "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with the acquisition of

---

[118] Fidelity National Information Services, Inc., Form 8-K, Exhibit 99.1, filed February 13, 2023, p. 8.

Worldpay" stated in dollar amounts and on an annualized basis.[119]  On the other hand, the goodwill impairment related to the Merchant Solutions reporting unit was the result of FIS management determining, based on the relevant accounting guidance and associated management judgment, as of December 31, 2022, that:  (1) the carrying amount of the Merchant Solutions reporting unit, which included goodwill, exceeded its fair value; and (2) the assessment resulted in a goodwill impairment charge of $17.6 billion for Q4 2022, the excess of the carrying amount of the reporting unit over its fair value.[120]  Revenue synergies and the goodwill impairment charge are different concepts as a matter of economics and accounting.  As I discuss below, the goodwill impairment charge results from the application of accounting guidance and requires considerable professional judgment.

82.     Under the relevant accounting guidance (GAAP), the process by which management tests goodwill for possible impairment is a complex accounting determination that requires considerable professional judgment.[121]  The fair value of the reporting unit may be determined using a market approach or an income approach.[122]  The FASB states that "[a] reporting entity shall use valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs."[123]  As evident from the relevant accounting guidance (ASC 350 *Intangibles – Goodwill and Others* and ASC 820 *Fair Value Measurement*), the necessary assessments in making these determinations are complex and require considerable professional judgment, including numerous estimates and assumptions.  Estimates and assumptions used in determining the fair value of a reporting unit using the market approach can include estimating relevant multiples and identifying comparable entities.[124]  Estimates and assumptions that can be used in the income approach include forward-looking information, such as forecasts of future cash flows, as well as estimated discount rates, terminal value assumptions,

---

[119] Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41.
[120] The amount of goodwill impairment is limited to the amount of goodwill allocated to the reporting unit.  *See* FASB, ASC, at 350-20-35-2.
[121] For example, the FASB notes that "[d]etermining whether a component of an operating segment is a reporting unit is a matter of judgment based on an entity's individual facts and circumstances."  FASB, ASC, at 350-20-55-1.  With regard to fair value measurements, the FASB adds that "[a]ssessing the significance of a particular input to the entire measurement requires judgment, taking into account factors specific to the asset or liability."  FASB, ASC, at 820-10-35-37A.
[122] FASB, ASC, at 820-10-35-24A.  The cost approach generally does not apply to the determination of the fair value of a reporting unit.
[123] FASB, ASC, at 820-10-35-24.
[124] FASB, ASC Master Glossary.

and growth rates.[125]  Thus, a multitude of factors, including those that are inherently forward-looking, underlie both the impairment determination and the amount of any impairment.

83.     When it announced the $17.6 billion goodwill impairment charge for the Merchant Solutions reporting unit, FIS disclosed information about the process it followed, including its complexity and the underlying estimates and assumptions.[126]  Importantly, synergies (including revenue synergies) between the Merchant Solutions reporting unit and the rest of FIS (the Banking Solutions and Capital Markets Solutions reporting units) were not necessarily included in the fair value determination made as part of the goodwill impairment assessment because fair value is an estimate of the exit value of the business—i.e., the amount for which the Merchant Solutions reporting unit could be sold on a stand-alone basis.[127]  Because GAAP defines fair value as an estimated *exit* value, only synergies that would be available to a potential buyer of the Merchant Solutions reporting unit on a stand-alone basis (i.e., separate from the rest of FIS) could enter the fair value assessment.[128]  In other words, the analysis that resulted in the $17.6 billion goodwill impairment charge in Q4 2022 did not necessarily take into account revenue synergies from the Worldpay acquisition to the extent potential buyers of the Merchant Solutions reporting unit (i.e., market participants) would not be able to benefit from, and thus would not be willing to pay for, those synergies.

---

[125] FASB, ASC Master Glossary.

[126] For example, FIS disclosed that it "typically engage[s] third-party valuation specialists to assist [it] in determining the fair value of the reporting unit based on the weighted average of two valuation techniques:  an income approach (also known as the discounted cash flow method) and a market approach."  FIS added that "[t]he income approach involves the use of significant estimates and assumptions regarding forecasted revenue, growth rates, operating margins, capital expenditures, and other factors used to calculate estimated future cash flows.  In addition, risk-adjusted discount rates and future economic and market conditions and other assumptions are applied.  The market approach involves the selection of guideline public companies and earnings multiples considering factors such as markets of operation, solutions offered, and risk profiles."  KPMG LLP, FIS' independent external audit firm, identified the Company's assessment of the goodwill impairment charge for the Merchant Solutions reporting unit as a "critical audit matter."  According to KPMG, critical audit matters represent "matters arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that:  (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments."  KPMG noted "[a] high degree of subjective auditor judgment was required to evaluate the reporting unit's forecasted revenue growth rates and discount rate used in the income approach.  Changes to these assumptions could have had a significant impact on the estimated fair value of the Merchant Solutions reporting unit."  FIS 2022 Form 10-K, pp. 35, 46–47.

[127] "[T]he objective of a fair value measurement in both cases is the same to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability)."  FASB, ASC, at 820-10-05-1B.

[128] FASB, ASC, at 820-10-55-3 ("The fair value of the asset might be the same whether the asset is used on a standalone basis or in combination with other assets or with other assets and liabilities.  That might be the case if the asset is a business that market participants would continue to operate.  In that case, the transaction would involve valuing the business in its entirety.  The use of the assets as a group in an ongoing business would generate synergies that would be available to market participants (that is, market participant synergies that, therefore, should affect the fair value of the asset on either a standalone basis or in combination with other assets or with other assets and liabilities).").

84.    Given the complexity of the goodwill impairment assessment under the relevant accounting guidance, including the many estimates and assumptions necessary to make the relevant determinations, and that this assessment did not even necessarily account for existing revenue synergies, it follows that, as a matter of economics and accounting, the Q4 2022 goodwill impairment charge related to the Merchant Solutions reporting unit does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition.

85.    Analyst commentary following the Q4 2022 earnings disclosures on February 13, 2023 supports my opinion that the allegedly corrective information regarding the goodwill impairment charge related to the Merchant Solutions reporting unit was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.  I did not find *any* commentary in the 60 analyst reports issued in the one-week period following the disclosure of the goodwill impairment charge related to the Merchant Solutions reporting unit that linked this information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

### 5.    February 13, 2023:  Planned Spin-Off of the Merchant Solutions Segment

86.    As I discuss in **Section V.C**, Plaintiffs allege that FIS' announcement on February 13, 2023 that it planned to pursue a tax-free spin-off of the Merchant Solutions segment in the next 12 months was corrective information that revealed the relevant truth purportedly concealed by the alleged misrepresentations.  The Company stated that its board of directors and management had determined that "a spin-off of Merchant Solutions, to be named Worldpay, offers the best path to enhance shareholder value, including by:

- Increasing strategic and operational focus to capitalize on growth and margin potential

- Aligning capital allocation and capital structures with long-term growth targets and underlying market needs, including potentially participating in M&A

- Enhancing the ability to align talent with shareholder returns, including through competitive and focused equity compensation programs."[129]

Ms. Ferris, the Company's new CEO, explained that the spin-off would "deliver a superior outcome" by creating two more focused entities that could pursue different capital allocation strategies.

> We will create two more focused, agile companies that can pursue tailored strategies that are aligned with specific long-term growth opportunities. Both companies will be market leaders in their own right, and we believe that, as separate companies with a commercial relationship, we will deliver a superior outcome. Specifically, the separation will enable FIS to target a strong investment grade credit rating, while allowing Worldpay to invest more aggressively for growth. We believe this approach will best position us to drive innovation and deliver the most competitive products and solutions, benefitting our employees, clients, partners and shareholders.[130]

87. From my perspective as a financial economist with expertise in accounting, this allegedly corrective information (i.e., the planned spin-off of the Merchant Solutions segment in the next 12 months) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements.

88. A planned spin-off of a business segment and revenue synergies are different as a matter of economics and accounting. According to a well-known corporate finance text, a spin-off "is a new, independent company created by detaching part of a parent company's assets and operations. Shares in the new company are distributed to the parent company's stockholders."[131] Financial economists have identified and studied a variety of motivations for companies' decisions to undertake spin-offs, including to realize regulatory and tax benefits,[132] to increase in managerial effectiveness in a smaller and more focused firm,[133] and to better align incentives and

---

[129] Fidelity National Information Services, Inc., Form 8-K, filed February 13, 2023.

[130] Fidelity National Information Services, Inc., Form 8-K, filed February 13, 2023.

[131] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011), p. 828.

[132] *See, e.g.*, Schipper, Katherine and Abbie Smith, "Effects of Recontracting on Shareholder Wealth: The Case of Voluntary Spin-Offs," *Journal of Financial Economics* 12, no. 4, 1983, pp. 437–467 ("Schipper and Smith (1983)") at p. 448 ("The second contract considered is that between shareholders and regulators (including tax authorities). Contracts with, for example, the Internal Revenue Service, labor unions, or rate regulators, that presume the existence of one firm, are altered upon a spin-off. Such alterations may relax regulatory and tax constraints to the benefit of shareholders.").

[133] *See, e.g.*, Schipper and Smith (1983), p. 448 ("[R]educing the size and diversity of the asset base under a given management may improve managers' productivity, and increase their efforts to direct resources effectively. The separation of lines of business by a spin-off may improve the efficiency of total asset management.").

internal controls.[134]  Another potential motivation explored by academic researchers is the ability for the two firms to pursue distinct strategic, operational, and financial strategies that are better suited for each firm.[135]  These motivations are also recognized outside academia—for example, the Financial Industry Regulatory Authority ("FINRA") states that "situations where executives might believe a spinoff makes sense" include "[m]anagement expertise or focus," "[s]eparating growth trajectories and strategies," "[e]nhanced coverage from securities analysts," and "[u]nlocking shareholder value."[136]  Indeed, FIS stated that the planned spin-off of the Merchant Solutions segment would "enhance shareholder value" by "[i]ncreasing strategic and operational focus to capitalize on growth and margin potential," "[a]ligning capital allocation and capital structures with long-term growth targets and underlying market needs, including potentially participating in M&A," and "[e]nhancing the ability to align talent with shareholder returns, including through competitive and focused equity compensation programs."[137]  On the other hand, revenue synergies are "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with the acquisition of Worldpay."[138]  Given the myriad potential reasons for which firms may pursue spin-offs, information about the planned spin-off of the Merchant Solutions segment disclosed on February 13, 2023 does not

---

[134] *See, e.g.*, Seward, James K. and James P. Walsh, "The Governance and Control of Voluntary Corporate Spin-Offs," *Strategic Management Journal* 17, no. 1, 1996, pp. 25–39 at p. 36 ("Our basic research hypothesis was that we expected to see efficient internal controls put in place in these spun-off companies.  Our empirical evidence clearly supports this prediction…. [C]orporate restructurings that take the form of voluntary corporate spin-offs appear to be good for the governance and control of these spun-off firms.").

[135] *See, e.g.*, Hite, Gailen L. and James E. Owers, "Security Price Reactions to Spin-off Announcements," *Journal of Financial Economics* 12, no. 4, 1983, pp. 409–436 at p. 413 ("For a firm involved in a variety of disparate activities, the optimal set of contracts for the combined operations may preclude use of contracts that would be optimal for the separate activities were they carried out by free-standing units.  This would become especially important as the various units' opportunity sets shift through time.  A spin-off would allow the parent and subsidiary to specialize in the contracts in which they have a comparative advantage.  For example, consider an electric utility company with an electronics subsidiary which has developed a specialized technology.  If utilities use substantial amounts of debt because they have few discretionary investment opportunities and if electronic firms use little debt because of the perverse investment incentives, then a spin-off may be an efficient solution allowing each unit to exploit its unique optimal financial structure.").

[136] "What Are Corporate Spinoffs and How Do They Impact Investors?" *FINRA*, https://www.finra.org/investors/insights/corporate-spinoffs, accessed April 30, 2025, emphasis removed.  *See also* Division of Corporation Finance, "Staff Legal Bulletin No. 4 (CF)," *U.S. Securities and Exchange Commission*, September 16, 1997, sec.gov/interps/legal/slbcf4.txt, accessed April 30, 2025 ("The Division has recognized the following as examples of valid business purposes for a spin-off: * allowing management of each business to focus solely on that business; * providing employees of each business stock-based incentives linked solely to his or her employer; * enhancing access to financing by allowing the financial community to focus separately on each business; or * enabling the companies to do business with each other's competitors.").

[137] Fidelity National Information Services, Inc., Form 8-K, filed February 13, 2023.

[138] Fidelity National Information Services, Inc., Form DEF 14A, filed April 17, 2020, p. 41.

necessarily imply anything about the existence or amount of revenue synergies from the
Worldpay acquisition.[139]

89.    Analyst commentary following the Q4 2022 earnings disclosures on February 13, 2023
supports my opinion that the allegedly corrective information regarding the planned spin-off of
the Merchant Solutions segment was conceptually distinct from the relevant truth allegedly
concealed by the Revenue Synergies Statements.  Consistent with the academic literature,
analysts discussed various motivations for the planned spin-off, such as improved capital
allocation and operational simplification.  For example, an Evercore report noted that the two
companies "would have better flexibility in allocat[ing] capital for M&A" and improved
"operational simplification and management focus."[140]  Similarly, an RBC report commented that
the spun-off entity "intends to pursue more aggressive investment opportunities, including
M&A, in order to expand its ecommerce offerings, stronger enterprise solutions and shift its
SMB business towards more of a software-led payments focus."[141]  A UBS report stated that
"[t]he spin provides a path for FIS to simplify and appropriately invest in each business," and
would "potentially driv[e] higher growth."[142]

90.    I did not find *any* commentary in the 60 analyst reports issued in the one-week period
following the announcement of the planned spin-off of the Merchant Solutions segment on
February 13, 2023 that linked FIS' announcement to the Revenue Synergies Statements, or to the
existence or amount of previously reported revenue synergies.  As I discuss in **Section VI.C**,

---

[139] Counsel also asked me to analyze a February 13, 2023 statement by Mr. Erik Hoag, then-Chief Financial Officer of FIS, under the same framework that I use to analyze the allegedly corrective information in **Section V** with respect to the Revenue Synergies Statements.  Specifically, during the February 13, 2023 earnings call, Mr. Hoag stated:  "Accounting for two known headwinds, we believe [the Merchant Solutions segment's] normalized growth is 4% to 6%.  The first of these headwinds *has been a lack of new product investment, driving compression and attrition in our SMB subsegment*, accounting for approximately 3 points of headwind in our Merchant [Solutions segment] guide.  We're confident this is near term in nature and will be directly addressed with the successful spin of Worldpay as it transitions to a growth-oriented capital structure and investment philosophy." *See* FIS Q4 2022 Earnings Call, pp. 6–7, emphasis added to the portion of the sentence quoted in the Complaint, ¶ 260.  From my perspective as a financial economist with expertise in accounting, this statement by Mr. Hoag (i.e., disclosure that a lack of new product investment had negatively impacted the 2023 business outlook for the Merchant Solutions segment) is conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements because the two are different economic concepts.  A lack of new product investment in the Merchant Solutions segment may imply that FIS had spent less than what some viewed as necessary during the period of under-investment, which may lead to lower revenues for that segment.  Indeed, Mr. Hoag's statement on February 13, 2023 indicated that a lack of new product investment had the effect of reducing expected FY 2023 organic revenue growth for the Merchant Solutions segment by 3%.  *See* FIS Q4 2022 Earnings Call, p. 6; FIS Presentation, "Fourth Quarter 2022 Earnings Call," February 13, 2023, p. 18.  However, lower product investment expenditures during the Proposed Class Period and lower expected organic revenue growth in FY 2023 for the Merchant Solutions segment do not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition for FIS as a whole.

[140] "Lower, More Predictable Growth Ahead," *Evercore*, February 13, 2023, p. 2.

[141] "Will Spin off Merchant; Q4/22 Results Slightly Ahead but Guidance Disappointing," *RBC*, February 13, 2023, p. 1.

[142] "Merchant Spin Winds Back the Clock," *UBS*, February 13, 2023, p. 1.

following the spin-off announcement, analysts continued to discuss (and did not question) revenue synergies the Company had reported related to the Worldpay acquisition after the February 13, 2023 alleged corrective disclosure date. In fact, analysts expressed concern regarding the possible *loss* of synergies (including revenue synergies attributable to the Worldpay acquisition) that could result from the planned spin-off of the Merchant Solutions segment. There is no analyst commentary that reflects an understanding that the allegedly corrective information about the planned spin-off of the Merchant Solutions segment revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.[143]

#### C.    Analysts Did Not Reevaluate the Revenue Synergies Amounts Related to the Worldpay Acquisition After the Alleged Corrective Disclosure Dates

91.    As I discuss in **Section VI.B**, I reviewed a total of 151 analyst reports covering FIS issued by 35 unique contributors during the one-week periods following each of the three alleged corrective disclosure dates. I did not find *any* analyst commentary that linked any of the allegedly corrective information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

92.    I also did not identify *any* discussion in analyst reports after each of the first two alleged corrective disclosure dates (August 4, 2022 and November 3, 2022) indicating that analysts had reevaluated the existence or amount of revenue synergies that FIS had reported earlier in the Proposed Class Period. Moreover, following the last alleged corrective disclosure date (February 13, 2023), and even following FIS' Q1 2023 earnings disclosures (on April 27, 2023), more than two months after the end of the Proposed Class Period, analysts continued to discuss the approximately $750 million of revenue synergies that FIS had previously reported. There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.

---

[143] In addition, analyst commentary following the Q4 2022 earnings disclosures on February 13, 2023 supports my opinion that the statement by Mr. Hoag on February 13, 2023, referenced above in footnote 139, was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements. I did not find *any* commentary in the 60 analyst reports issued in the one-week period following Mr. Hoag's statement that linked the lack of new product investment in the Merchant Solutions segment or the negative impact on the 2023 business outlook for the Merchant Solutions segment to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.

93.     Following the first two alleged corrective disclosure dates, analysts continued to discuss the $750 million in revenue synergies that FIS had previously reported.  For example, following the August 4, 2022 and November 3, 2022 disclosures, Argus stated that the "Worldpay acquisition has generated revenue synergies of $750 million on an annual run-rate basis."[144]

94.     FIS and analysts continued to discuss revenue synergies related to the Worldpay acquisition after the February 13, 2023 alleged corrective disclosures.  On the February 13, 2023 earnings call, FIS discussed how it planned to retain, as much as possible, the synergies, including revenue synergies, realized from the Worldpay acquisition after the planned spin-off of the Merchant Solutions segment.  Ms. Ferris stated:

> It is expected that FIS and Worldpay will maintain a close commercial partnership to deliver critical capabilities like embedded finance and loyalty through premium payback preserving a key value proposition for clients of both businesses and ***limiting potential dis-synergy***.[145]

When asked by an analyst whether cross-selling would be incorporated into a commercial partnership between FIS and a post-spin-off Worldpay, Ms. Ferris responded that she expected a commercial partnership to "have incentives on both sides to continue to cross-sell each other's products and mitigate the dis-synergy."[146]  A February 13, 2023 UBS analyst report stated that "FIS reported $750 million in revenue synergies tied to the Worldpay acquisition"[147] and a William Blair analyst report issued on the same day "note[d] that FIS garnered over $750 million of revenue and $900 million of expense synergies exiting 2021 from the FIS/Worldpay combination."[148]

95.     Following the February 13, 2023 alleged corrective disclosure date, analysts commented on potential loss of synergies (i.e., dis-synergies) resulting from the planned spin-off and the effect on revenue synergies.  Regarding the planned spin-off of the Merchant Solutions segment, a Bernstein report stated that it "does appear that a lot of details still need to be ironed out e.g., impact on synergies ($900m in costs, $750m in revenues)," and, regarding synergies, it

---

[144] "Analyst's Notes," *Argus*, August 10, 2022, p. 2; "Analyst's Notes," *Argus*, November 4, 2022, p. 2.
[145] FIS Q4 2022 Earnings Call, p. 3, emphasis added.
[146] FIS Q4 2022 Earnings Call, p. 8.
[147] "Updated SOTP Analysis Shows Downside Largely Priced-In," *UBS*, February 13, 2023, p. 1.
[148] "Disappointing Results and Guide, but Spin of Underperforming Merchant Business Could Lead to Significant Multiple Expansion," *William Blair*, February 13, 2023, p. 1.

"believe[s] revenue synergies can be protected by a commercial agreement."[149]  Likewise, a Deutsche Bank report stated that "FIS had previously announced it achieved revenue synergies of ~$750m and cost synergies of ~$900m associated with the merger and while questions remain around how much of these synergies will be reversed, [management] expects to mitigate synergy erosion through commercial partnerships with Worldpay and continued cost discipline."[150]  **Exhibit 3** provides analyst commentary in the one-week period following the February 13, 2023 alleged corrective disclosure date on the potential for the loss of revenue synergies from the planned spin-off of the Merchant Solutions segment.

96.      After FIS' Q1 2023 earnings disclosures on April 27, 2023—more than two months after the end of the Proposed Class Period—analysts continued to discuss the approximately $750 million of revenue synergies that FIS had previously reported.  During FIS' Q1 2023 earnings call on April 27, 2023, Ms. Ferris stated in regards to the planned spin-off of the Merchant Solutions segment that the Company "expect[s] to maintain the majority of the $750 million revenue synergy achievement with Worldpay continuing to act as an important distribution partner for FIS post spin."[151]  Following FIS' Q1 2023 earnings disclosures, analysts continued to discuss and refer to the $750 million of revenue synergies that FIS had reported during the Proposed Class Period.  A Morgan Stanley report stated that it was "encouraged … that the company expects to retain the majority of the $750M of revenue synergies it achieved with the [Worldpay] deal."[152]  Likewise, a Barclays report stated that "FIS achieve[d] $750M of revenue synergies … from the integration, and now expects to maintain a majority of the revenue synergies, as Worldpay will act as a distribution partner for FIS."[153]  A Credit Suisse report stated that "management believes the majority of the $750mm of revenue synergies will be maintained with a commercial partnership arrangement to preserve distribution channels along with a brand agreement."[154]  **Exhibit 4** provides analyst commentary discussing the potential for loss of FIS' reported revenue synergies related to the Worldpay acquisition in the one-week period following the April 27, 2023 earnings disclosures.

---

[149] "Quick Take: FIS – Ugly Guide (And Merchant). How Does This Change SOTP Math? Are the Numbers De-risked?" *Bernstein*, February 13, 2023, p. 1.

[150] "Searching for Answers," *Deutsche Bank*, February 13, 2023, p. 1.

[151] "Q1 2023 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, April 27, 2023, p. 3.

[152] "Steadying the Ship," *Morgan Stanley*, April 28, 2023, p. 1.

[153] "1Q23 Beat: A Good First Step on the Road to Recovery," *Barclays*, April 27, 2023, p. 1.

[154] "Q1 2023 Recap; Updated 2019-Base CAGR Analysis," *Credit Suisse*, April 28, 2023, p. 3.

97.    Collectively, my analysis of the available analyst reports further supports my opinion that the allegedly corrective information was different from the relevant truth allegedly concealed by the Revenue Synergies Statements.  In my analysis of analyst reports following each of the alleged corrective disclosure dates, I did not identify *any* discussion in the analyst reports that I reviewed indicating that analysts had reevaluated the existence or amount of revenue synergies that FIS reported earlier in the Proposed Class Period.  The references to FIS' previously reported revenue synergies in analyst reports following each of the alleged corrective disclosure dates, as well as in analyst reports more than two months after the end of the Proposed Class Period, did not reflect an understanding that the allegedly corrective information revealed that the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made.[155]

98.    In sum, from the perspective of a financial economist, the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by the Revenue Synergies Statements.

### VII.    From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective Was Different from the Relevant Truth Allegedly Concealed by the Cross-Selling Statements

99.    I understand from counsel that Plaintiffs identify two statements about FIS' cross sales as of different points in time in 2021—made on August 3, 2021 and February 15, 2022—that Plaintiffs allege concealed the relevant truth that there was "little to no cross-selling" resulting from the Worldpay acquisition, and thus were inaccurate when made ("Cross-Selling Statements").[156]

100.    Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective relative to the relevant truth allegedly concealed by the Cross-Selling Statements. For the allegedly corrective information on each of the three alleged corrective disclosure dates, I

---

[155] I also reviewed 38 analyst reports between February 21, 2023 and April 26, 2023.  I did not identify any commentary in these reports that change my opinions.
[156] Complaint, ¶¶ 198, 210.

conclude that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.

101.    Analysis of analyst commentary in the one-week period following each of the alleged corrective disclosure dates supports my conclusion.  I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information to the Cross-Selling Statements, or to the extent of cross-selling that resulted from the Worldpay acquisition.  Moreover, I did not identify *any* discussion in these reports indicating that analysts had reevaluated the extent of cross-selling that had occurred earlier in the Proposed Class Period.  There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Cross-Selling Statements were inaccurate when made, including about the extent of cross-selling between the legacy FIS and Worldpay businesses.

102.    Based on this analysis, from the perspective of a financial economist, I conclude that the information Plaintiffs allege as corrective on each of the three alleged corrective disclosure dates was different from the relevant truth allegedly concealed by the Cross-Selling Statements.[157]

## A.    The Alleged Misrepresentations:  Cross-Selling Statements

103.    In the Complaint, Plaintiffs identify two Cross-Selling Statements—made on August 3, 2021 and February 15, 2022—which, as I understand from counsel, Plaintiffs allege concealed the relevant truth that there was "little to no cross-selling" resulting from the Worldpay acquisition and thus misled investors about revenue synergies.[158]  I understand that Plaintiffs also allege that the Cross-Selling Statements concealed the relevant truth about the extent of cross-sales that FIS achieved, cross-sales being one of the sources of FIS' revenue synergies.

104.    For example, Plaintiffs allege that the Company's revenue synergies were not due to "successful cross-selling" or "the result of combining operations [between FIS and Worldpay]" but instead "included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory."[159]  I understand that Plaintiffs allege that the Cross-Selling Statements also concealed the same relevant truth as the Revenue Synergies

---

[157] My analysis and opinions with respect to the Cross-Selling Statements also apply to the February 13, 2023 statement by Mr. Erik Hoag (discussed in footnote 139), which counsel asked me to analyze under the same framework that I use to analyze the allegedly corrective information in **Section V**.

[158] Complaint, ¶¶ 197–198, 209–210.

[159] Complaint, ¶ 198.

Statements—namely, that the revenue synergies reported by the Company had been manipulated and thus were inaccurate when made.[160]  According to the Complaint, the following relevant truth was concealed:

> [The Company] claimed that FIS had achieved significant revenue synergies based on successful cross-selling, when in reality, Defendants' cross-selling was not successful.  According to multiple former Worldpay and FIS employees, little to no cross-selling was happening by that point due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. … Thus, Defendants led investors to (wrongly) believe that FIS achieved the revenue synergies because of successful cross-selling, when in reality, these so-called revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory.  Moreover, Defendants met their revenue synergy targets not because of cross-selling, but because they fraudulently calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations.[161]

> … FIS had not "done an excellent job driving cross sales" with Worldpay. According to former Worldpay and FIS employees, little to no cross-selling was happening.[162]

105.    **Exhibit 5** displays the Cross-Selling Statements and the alleged relevant truths that I understand from counsel that Plaintiffs claim were concealed by these statements.

### B.    The Allegedly Corrective Information Was Conceptually Distinct from the Truth Allegedly Concealed by the Cross-Selling Statements

106.    As an initial matter, I note that the Complaint does not clearly state how Plaintiffs assess and measure cross-selling when they allege that "little to no cross-selling" occurred as a result of the Worldpay acquisition.[163]  In general, cross-selling occurs when two entities, once combined, sell their products and services to each other's customers, which results in incremental revenues

---

[160] Complaint, ¶ 198.
[161] Complaint, ¶ 198, emphasis in original.
[162] Complaint, ¶¶ 210.
[163] Complaint, ¶¶ 198, 210.

(i.e., synergies).[164]  In the context of the Worldpay acquisition, one of the ways in which FIS could generate revenue synergies was to cross-sell legacy Worldpay products to legacy FIS customers, and vice versa.  However, the Complaint does not specify how Plaintiffs assess or measure the amount of cross-selling when they allege "little to no cross-selling" was occurring.[165] To the extent Plaintiffs assess or measure the amount of cross-selling based on the amount of revenue synergies generated through cross-selling, the relevant truth allegedly concealed by the Cross-Selling Statements would have the same financial implications as the relevant truth allegedly concealed by the Revenue Synergies Statements.

107.    From my perspective as a financial economist with expertise in accounting, the allegedly corrective information disclosed on August 4, 2022, November 3, 2022, and February 13, 2023 was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.  As discussed in **Section V**, Plaintiffs allege that corrective information was released to the market through Company disclosures on these three earnings announcement dates.  Based on principles of financial economics and accounting, I analyzed those items that Plaintiffs allege as corrective relative to the relevant truth allegedly concealed by the Cross-Selling Statements. Because I understand that Plaintiffs allege the Cross-Selling Statements misled investors about one of the sources of FIS' revenue synergies, any inference one might claim to draw from the allegedly corrective information about the extent of cross-selling is *even more tenuous* than any such inference regarding the existence or amount of revenue synergies discussed in **Section IV.D** because cross-selling is only one of several possible sources of revenue synergies.

108.    As I discuss in **Section IV.D**, FIS and analysts discussed other sources of revenue synergies during the Proposed Class Period, including, for example, how the combined entity's data could be used to improve authorization rates.[166]  Even if one were to assume, *for the sake of argument only*, that the allegedly corrective information implies that the revenue synergies realized by the Company were lower than what FIS had stated (which, to be clear, is not the case, as I discuss above in **Section VI**), that implication would not necessarily imply the shortfall was

---

[164] *See, e.g.*, Holthausen and Zmijewski (2014), p. 682 ("Sharing brands or customer lists in order to grow revenues into a new customer base—especially globally—is another common type of revenue synergy.  This is often referred to as cross-selling; the acquirer sells its products to the customers of the target, and the target sells its products to the customers of the acquirer.").

[165] Complaint, ¶¶ 198, 210.

[166] *See* **Section IV.D**; "Fidelity National Information Services Inc at Autonomous Research Future of Commerce Symposium," *Refinitiv*, September 17, 2020, p. 9; "Presented at a Competitor Conference," *Baird*, September 9, 2020, p. 1.

due to "little to no cross-selling."[167]  This is because lower revenue synergies could be due to a shortfall in or a failure to realize one (or several) of the other sources of revenue synergies.  In other words, under Plaintiffs' allegations, the amount (or extent) of cross-selling that had occurred is a further step removed from revenue synergies in any chain of inference that begins with the allegedly corrective information and ends with the relevant truth allegedly concealed by the Cross-Selling Statements.

109.    Therefore, based on my analysis and reasoning with respect to the Revenue Synergies Statements,[168] I conclude that the allegedly corrective information on each of the three dates was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.  In short, none of the allegedly corrective information necessarily implies anything about the cross-selling (or lack thereof) that resulted from the Worldpay acquisition.

110.    Plaintiffs' claim that there was "little to no cross-selling" only sharpens the conceptual difference between what Plaintiffs allege as corrective information, which is principally the Company's reporting of clearly defined and specific financial measures (such as quarterly adjusted EBITDA margins, volume growth rates, and a goodwill impairment), and the relevant truth allegedly concealed by the Cross-Selling Statements, which Plaintiffs do not describe with any specificity (i.e., they do not provide a well-defined metric one might use to measure or assess the amount of cross-selling).[169]

111.    Analyst commentary supports my opinion that the allegedly corrective information was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.  I reviewed all analyst reports covering FIS available to me that were issued during the one-week periods that begin with dates of the three alleged corrective disclosures.[170]  For each report, I analyzed (1) whether the analyst commented on or mentioned the information Plaintiffs allege as corrective; and (2) whether the analyst linked that information to the Cross-Selling Statements or otherwise to cross-selling, including whether analysts expressed doubt about the extent of cross-selling that resulted from the Worldpay acquisition.  I did not find *any*

---

[167] Complaint, ¶¶ 198, 210.
[168] *See* **Section VI.B**.
[169] Complaint, ¶¶ 198, 210.
[170] *See* footnote 97.

commentary that linked any of the allegedly corrective information to the Cross-Selling

Statements or to the extent of cross-selling between the legacy FIS and Worldpay businesses.

        **C.**      **Analysts Did Not Reevaluate the Extent of Cross-Selling Between the Legacy FIS and Worldpay Businesses After the Alleged Corrective Disclosure Dates**

112.    As I discuss in **Section VII.B**, I reviewed all analyst reports covering FIS available to me that were issued during the one-week periods following each of the three alleged corrective disclosure dates.  I also reviewed 48 analyst reports covering FIS issued by 33 unique contributors during the one-week period following FIS' Q1 2023 earnings disclosures on April 27, 2023, more than two months after the end of the Proposed Class Period.

113.    I did not identify *any* discussion in these reports indicating that analysts had reevaluated the extent of cross-selling that occurred earlier in the Proposed Class Period.  Collectively, my analysis of these analyst reports further supports my opinion that the allegedly corrective information was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.  There is no analyst commentary that reflects an understanding that the allegedly corrective information revealed that the Cross-Selling Statements were inaccurate when made, including about the extent of cross-selling between the legacy FIS and Worldpay businesses.

114.    In sum, from the perspective of a financial economist, the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by the Cross-Selling Statements.

**VIII.**  **From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective on August 4, 2022 and November 3, 2022 Was Different from the Relevant Truth Allegedly Concealed by the Goodwill Statements**

115.    I understand from counsel that Plaintiffs identify 15 disclosures in FIS' Form 10-Qs and 10-K filed from November 4, 2021 through November 4, 2022 that Plaintiffs allege concealed the relevant truth that "the Merchant Solutions segment's goodwill was impaired by billions of

dollars" from Q3 2021 through Q3 2022 (as further defined in **Section VIII.A** below, "Goodwill Statements").[171]

116.    Based on principles of financial economics and accounting (including my understanding of the relevant economic and accounting concepts), I analyzed the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 relative to the relevant truth allegedly concealed by the Goodwill Statements.  For the allegedly corrective information on both of these dates, I conclude that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements.

117.    Analysis of analyst commentary in the one-week periods following the two alleged corrective disclosure dates supports my conclusion.  I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information on August 4, 2022 and November 3, 2022 to the Goodwill Statements, or to the goodwill amounts FIS reported for the Merchant Solutions reporting unit.  In addition, I did not identify *any* discussion in these reports indicating that the Company was required to record a goodwill impairment charge for the Merchant Solutions reporting unit in Q2 2022, Q3 2022, or any prior quarter.  There is no analyst commentary that reflects an understanding that the allegedly corrective information on August 4, 2022 and November 3, 2022 revealed that the Goodwill Statements were inaccurate when made, including that the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.

118.    Based on this analysis, from the perspective of a financial economist, I conclude that the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 was different from the relevant truth allegedly concealed by the Goodwill Statements.[172]

### A.    The Alleged Misrepresentations:  Goodwill Statements

119.    In the Complaint, Plaintiffs identify 15 Goodwill Statements made in FIS' Form 10-Qs and 10-K filed from November 4, 2021 through November 4, 2022.  I understand from counsel that Plaintiffs allege that these statements concealed the relevant truth that "the Merchant Solutions segment's goodwill was impaired by billions of dollars" from the Q3 2021 through Q3

---

[171] Complaint, ¶¶ 201–202, 204, 214, 216–217, 222–223, 225, 228–229, 231, 236–237, 239, emphasis omitted.

[172] My analysis and opinions with respect to the Goodwill Statements also apply to the February 13, 2023 statement by Mr. Erik Hoag (discussed in footnote 139), which counsel asked me to analyze under the same framework that I use to analyze the allegedly corrective information in **Section V**.

2022, that "[FIS] violated GAAP by failing to record a goodwill impairment charge" in its reported financial statements for these fiscal periods, and that FIS had "falsely inflat[ed] the value of the Worldpay asset."[173]  I understand from counsel that Plaintiffs allege that the Goodwill Statements concealed the relevant truth that "FIS belatedly recognized the $17.6 billion charge on February 13, 2023"[174] and should have recorded a goodwill impairment charge of "billions of dollars" in the Merchant Solutions reporting unit as early as Q3 2021, or at least earlier than Q4 2022.  According to the Complaint, the following relevant truth was concealed:

> Defendants failed to disclose that:  (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge …; (ii) the Merchant Solutions segment's goodwill was impaired by ***billions of dollars*** …; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated … which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations.[175]

> … Defendants violated GAAP by failing to record a goodwill impairment charge … despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired….[176]

> … Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023.[177]

120.    **Exhibit 6** displays the Goodwill Statements and the alleged relevant truths that I understand from counsel that Plaintiffs claim were concealed by these statements.

### B.    The Allegedly Corrective Information on August 4, 2022 and November 3, 2022 Was Conceptually Distinct from the Truth Allegedly Concealed by the Goodwill Statements

121.    As discussed in **Section V**, Plaintiffs allege that corrective information was released to the market through alleged corrective disclosures on August 4, 2022 and November 3, 2022.

---

[173] Complaint, ¶¶ 201–202, 204, 214, 216–217, 222–223, 225, 228–229, 231, 236–237, 239, emphasis omitted.
[174] Complaint, ¶¶ 202, 217, 223, 229, 237.
[175] *See, e.g.*, Complaint, ¶ 201, emphasis in original.
[176] *See, e.g.*, Complaint, ¶ 204.
[177] *See, e.g.*, Complaint, ¶ 202.

Based on principles of financial economics and accounting, I analyzed the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 relative to the relevant truth allegedly concealed by the Goodwill Statements. For the allegedly corrective information on each of these two alleged corrective disclosures dates, I conclude that what Plaintiffs allege as corrective is conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements.

122.    First, goodwill is a distinct construct with a different meaning from what Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022. As discussed above in **Section IV.B.3**, goodwill is an intangible asset that arises and is recognized as the result of accounting for a business combination; accordingly, goodwill is recognized, measured, and reported in accordance with the relevant accounting rules (here, U.S. GAAP, promulgated by the FASB). According to U.S. GAAP, goodwill is an "asset representing the future economic benefits arising from other assets acquired in a business combination or an acquisition by a not-for-profit entity that are not individually identified and separately recognized."[178]

123.    In contrast, as discussed above, the alleged corrective information on August 4, 2022 and November 3, 2022 comprises specific measures of past financial performance for specific quarters: the adjusted EBITDA margins reported by the Company for its Merchant Solutions segment for Q2 2022 and Q3 2022; volume growth for the Merchant Solutions segment during Q2 2022; and the Company's profitability (including the adjusted EBITDA margin) for Q3 2022. Those specific measures of past performance are conceptually distinct from the concept of goodwill (and any impairment thereof) as recognized, measured, and reported in accordance with GAAP.

124.    Second, because I understand that Plaintiffs allege the Goodwill Statements concealed the relevant truth that "FIS belatedly recognized the $17.6 billion charge on February 13, 2023" and should have recorded a goodwill impairment charge of "billions of dollars" in the Merchant Solutions segment as early as Q3 2021,[179] I analyzed whether the allegedly corrective information on August 4, 2022 and November 3, 2022 necessarily implies the Company was required, based on the relevant accounting guidance and determinations, to record a goodwill impairment charge for the Merchant Solutions reporting unit in the financial statements it filed for each of the

---

[178] FASB, ASC Master Glossary.
[179] Complaint, ¶¶ 202, 217, 223, 229, 237.

relevant fiscal periods from Q3 2021 through Q3 2022.[180]  I conclude that this allegedly corrective information does not necessarily imply this—assessments of goodwill under the relevant accounting guidance requires, among other things (that include the associated accounting judgments and determinations), inputs and assumptions that go beyond and were not included in what Plaintiffs allege as corrective on August 4, 2022 or November 3, 2022.  For both of these dates, this further supports my conclusion that what Plaintiffs allege as corrective was conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements.

125.    I first considered fiscal quarters prior to those addressed by the allegedly corrective information.  From my perspective as a financial economist with expertise in accounting, the allegedly corrective information on August 4, 2022 and November 3, 2022 (which addressed specific aspects of the Merchant Solutions segment and/or the Company's performance in Q2 2022 and Q3 2022 respectively) does not necessarily imply that the Company was required, based on the relevant accounting guidance and determinations, to record a goodwill impairment charge for the Merchant Solutions reporting unit in the financial statements it filed for earlier fiscal periods.  A goodwill impairment test is performed based on information available on the "as of" date of the test in the relevant fiscal quarter.

126.    For example, a test for impairment of the Merchant Solutions reporting unit's goodwill as of the end of Q3 2021 would have been based on information available as of September 30, 2021 (the end of that fiscal period) and would not (and could not) reflect allegedly corrective information released several quarters later, on August 4, 2022 or November 3, 2022.  The allegedly corrective information on August 4, 2022—namely, the Q2 2022 adjusted EBITDA margin for the Merchant Solutions reporting unit (including that this margin had declined and/or was disappointing to market participants) and decline in volume for the Merchant Solutions reporting unit during Q2 2022—was information regarding the economic performance of the Merchant Solutions reporting unit during Q2 2022 specifically.  Similarly, the allegedly corrective information on November 3, 2022—namely, the adjusted EBITDA margin for the Merchant Solutions reporting unit and the profitability of FIS as a whole in Q3 2022—was

---

[180] Specifically, this includes the financial statements in the Forms 10-Q for the third quarter of 2021 and the first, second, and third quarters of 2022, and in the Form 10-K for the 2021 fiscal year.  The alleged misrepresentations include the amounts reported for goodwill for the Merchant Solutions reporting unit as of the end of each of these fiscal periods (i.e., September 30, 2021, December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022) and related financial statement disclosures.

information regarding these entities' economic performance during Q3 2022 specifically. Any goodwill impairment test performed as of the end of Q3 2021, Q4 2021, or Q1 2022 would not (and could not) have incorporated the allegedly corrective information regarding the Company's performance during Q2 2022 that was disclosed on August 4, 2022. Likewise, any goodwill impairment test performed as of the end of Q3 2021, Q4 2021, Q1 2022, or Q2 2022 would not (and could not) have incorporated the allegedly corrective information regarding the Company's performance during Q3 2022 that was disclosed on November 3, 2022. Therefore, the allegedly corrective information disclosed on August 4, 2022 and November 3, 2022 does not necessarily imply that the Company was required, based on the relevant accounting guidance and determinations, to record a goodwill impairment charge for the Merchant Solutions reporting unit in the financial statements it filed for earlier fiscal periods.

127.    I also considered the fiscal quarters to which the Company's disclosures on the two alleged corrective disclosure dates related—i.e., Q2 2022 and Q3 2022, respectively. Whether the allegedly corrective information disclosed on August 4, 2022 and November 3, 2022 would necessarily imply that FIS was required, based on the relevant accounting guidance and determinations, to record a goodwill impairment charge for the Merchant Solutions reporting unit in the financial statements it filed for Q2 2022 or Q3 2022, respectively, requires consideration of the relevant accounting guidance along with management judgment and analysis based on the facts and circumstances existing as of June 30, 2022 and September 30, 2022.

128.    As I discuss in **Section IV.B.3**, the assessments performed by management to determine whether goodwill is impaired and, if so, the amount of the impairment to be recognized are complex accounting determinations that require considerable management judgment. GAAP requires that goodwill be tested for impairment at least annually and more frequently if, based on the criteria specified by GAAP, management determines that circumstances warrant a test during interim quarters.[181] In addition, as I discuss in **Section VI.B.4**, the determination of fair value is complex and requires considerable management judgment, including numerous estimates and assumptions. If the fair value of the reporting unit is determined to be less than its carrying amount, then a goodwill impairment charge equal to the difference between those two values is recorded.[182]

---

[181] FASB, ASC, at 350-20-35-28.
[182] FASB, ASC, at 350-20-35-8.

129.    I was not asked to analyze and do not have an opinion on whether the goodwill reported by FIS for its Merchant Solutions reporting unit was impaired as of the ending dates of Q2 2022 and Q3 2022 (i.e., June 30, 2022 and September 30, 2022).  From my perspective as a financial economist with expertise in accounting, the allegedly corrective information on August 4, 2022 and November 3, 2022 does not necessarily imply that the Company was required, based on the relevant accounting guidance and determinations, to record a goodwill impairment charge for the Merchant Solutions reporting unit in the financial statements it filed for Q2 2022 and Q3 2022, respectively (or for any other fiscal period).

130.    The allegedly corrective information disclosed on August 4, 2022 and November 3, 2022 may have conveyed negative information about the economic performance of the Merchant Solutions reporting unit and FIS during Q2 2022 and Q3 2022.  However, that allegedly corrective information does not necessarily imply that management would (or should) have determined that, based on the relevant accounting guidance and determinations, as of the relevant dates (June 30, 2022 and September 30, 2022, respectively), goodwill for the Merchant Solutions reporting unit was impaired.  This is because the qualitative test requires "assessing the totality of events or circumstances" based on information available on the "as of" date of the test rather than certain events or circumstances in isolation.[183]  Events and circumstances that are considered in the qualitative test include macroeconomic conditions, industry and market considerations, cost factors, financial performance, and company-specific events known on the "as of" date of the assessment.[184]  The allegedly corrective information on August 4, 2022 and November 3, 2022 did not contain the inputs necessary (not to mention the associated accounting judgments, assumptions, and determinations, among other things) to conduct such a qualitative test for goodwill impairment.  They therefore do not necessarily imply that management would or should have determined from that information that, based on the relevant accounting guidance and determinations, goodwill for the Merchant Solutions reporting unit was impaired as of June 30, 2022 and September 30, 2022, respectively (or for any other date).

131.    Similarly, as I discuss in **Section VI.B.4**, estimates and assumptions used in determining the fair value of a reporting unit using the market approach can include the identification of comparable entities and the estimation of relevant multiples.  Estimates and assumptions that can

---

[183] FASB, ASC, at 350-20-35-3E.
[184] FASB, ASC, at 350-20-35-3C.

be used in the income approach include forecasts of future cash flows, discount rates, terminal value assumptions, and growth rates. Given the numerous estimates and assumptions that could enter into any assessment of the Merchant Solutions reporting unit's fair value, the allegedly corrective information on August 4, 2022 and November 3, 2022 does not necessarily imply that management would or should have determined, based on the relevant accounting guidance and determinations, that goodwill for the Merchant Solutions reporting unit was impaired as of June 30, 2022 and September 30, 2022, respectively (or as of any other date).

132.    Analyst commentary supports my opinion that the allegedly corrective information on August 4, 2022 and November 3, 2022 was conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements. I reviewed all analyst reports covering FIS available to me that were issued during the one-week periods that begin with the two alleged corrective disclosure dates; there are a total of 91 such reports issued by 35 unique contributors.[185] For each report, I analyzed (1) whether the analyst commented on or mentioned the information Plaintiffs allege as corrective; and (2) whether the analyst linked that information to the Goodwill Statements. I did not find *any* analyst commentary that linked what Plaintiffs allege as corrective information on August 4, 2022 and November 3, 2022 to the Goodwill Statements, or to goodwill amounts FIS reported for the Merchant Solutions reporting unit.

### C.    Analysts Did Not Indicate That FIS Should Have Recorded a Goodwill Impairment Charge in the Merchant Solutions Segment After the August 4, 2022 and November 3, 2022 Alleged Corrective Disclosure Dates

133.    As I discuss in **Section VIII.B**, I reviewed all analyst reports covering FIS available to me that were issued during the one-week periods following the August 4, 2022 and November 3, 2022 alleged corrective disclosure dates. Some analyst reports discussed concerns about, among other things, the growth of the Merchant Solutions segment.[186] However, I did not identify *any* discussion in these reports indicating that the Company was required to record a goodwill impairment charge for the Merchant Solutions reporting unit in Q2 2022, Q3 2022, or any prior quarters. Collectively, my analysis of these analyst reports further supports my opinion that the

---

[185] I reviewed 40 analyst reports covering FIS issued by 30 unique contributors during the week beginning August 4, 2022 and 51 analyst reports covering FIS issued by 34 unique contributors during the week beginning November 3, 2022.

[186] *See, e.g.*, "Searching for Answers," *UBS*, November 3, 2022, p. 1 ("FIS's 3Q/22 results missed our and Street expectations driven by underperformance from Merchant Solutions. Additionally, FIS management cut its 2022 guide once again driven by macro headwinds and issues tied to sales timing & execution and the 3Q miss.").

allegedly corrective information on August 4, 2022 and November 3, 2022 was conceptually distinct from the relevant truth allegedly concealed by the Goodwill Statements. There is no analyst commentary that reflects an understanding that the allegedly corrective information on August 4, 2022 and November 3, 2022 revealed that the Goodwill Statements were inaccurate when made, including that the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.

134.    In sum, from the perspective of a financial economist, the information Plaintiffs allege as corrective on August 4, 2022 and November 3, 2022 was different from the relevant truth allegedly concealed by the Goodwill Statements.

Submitted on May 2, 2025

_____

Douglas J. Skinner, Ph.D.

**DOUGLAS J. SKINNER**
Sidney Davidson Distinguished Service Professor of Accounting
The University of Chicago Booth School of Business
5807 South Woodlawn Avenue
Chicago, IL 60637
Phone: 773-702-7137
dskinner@uchicago.edu
Google Scholar
SSRN

**Education**

B.Ec. (First Class Honours), Accounting/Finance, Macquarie University, 1985.
M.S., Applied Economics, University of Rochester, 1988.
Ph.D., Accounting (major area), Finance (minor area), University of Rochester, 1989.

**Appointments**

University of Chicago, Booth School of Business
    Sidney Davidson Distinguished Service Professor of Accounting, 2023-
    Deputy Dean for Faculty, 2015-2016, 2017-2024.
    Interim Dean, 2016-2017.
    Eric J. Gleacher Distinguished Service Professor of Accounting, 2014-2022.
    John P. and Lillian A. Gould Professor of Accounting, 2006-2013.
    Executive Director, Accounting Research Center, 2011-2016.
    Professor of Accounting and Neubauer Family Faculty Fellow, 2005-2006.
    Neubauer Faculty Fellow and Visiting Professor of Accounting, 2003-2004.

Independent Trustee and Audit Committee Chair, Harbor Funds, Harbor Funds II, and
    Harbor ETF Trust, 2020-

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), 2017-

University of Melbourne, Faculty of Business and Economics
    Professorial Fellow, 2010-.

*Journal of Accounting Research*
    Senior Editor, 2006-2021.

*Journal of Accounting & Economics*
    Editor, 2000-2005.
    Associate Editor, 1994-2000.

University of Michigan Business School (now Ross School of Business)
    KPMG Professor of Accounting, 1998-2005
    Accounting Area Chair, 2001-2003

**Appendix A**

Professor of Accounting, 1997-2005
Associate Professor of Accounting, 1993-1997
Assistant Professor of Accounting, 1989-1993

Coopers & Lybrand (Sydney)
Auditor, 1980-82.

## Scholarly Honors and Awards

FARS 2020 Best Paper Prize for "Run EDGAR Run: SEC Dissemination in a High
Frequency World." With Jonathan L Rogers and Sarah L. C. Zechman.

Distinguished Ph.D. Mentoring Award, 2020, Financial Reporting Section, American
Accounting Association.

BlackRock prize for best paper, 2015 Review of Accounting Studies conference ("The role
of the media in disseminating insider trading news." With Jonathan Rogers and Sarah
Zechman.)

Hillel J Einhorn Excellence in Teaching Award, 2014.

Emory Williams Award for Teaching Excellence, 2013.

FARS 2009 Best Paper Prize for "Earnings Momentum and Earnings Management." With
James Myers and Linda Myers.

Jensen Prize for best paper in Corporate Finance and Organizations published in the *Journal
of Financial Economics* in 2004. ("Are Dividends Disappearing? Dividend
Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda
DeAngelo.)

CQA/IBES Research Competition, 1998. ("Earnings Surprises, Growth Expectations, and
Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio." With Richard
Sloan. Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.)

KPMG Peat Marwick Faculty Fellow 1993-1996.
KPMG Peat Marwick Research Fellow 1991-1993.
Deloitte Haskins & Sells Foundation Doctoral Fellow 1986-88.
University of Rochester Sproull Fellow 1985-1987.

**Main Publications**

"Options Markets and Stock Return Volatility." Journal of Financial Economics 23, 1, June
        1989: 61-78.

"Options Markets and the Information Content of Accounting Earnings Releases." Journal of
        Accounting & Economics 13, 3, October 1990: 191-211.

"Dividends and Losses." With Harry DeAngelo and Linda DeAngelo. Journal of Finance 47, 5,
        December 1992: 1837-1863.

"The Investment Opportunity Set and Accounting Procedure Choice: Preliminary Evidence."
        Journal of Accounting & Economics 16, 4, October 1993: 407-445.

"Accounting Choice in Troubled Companies." With Harry DeAngelo and Linda DeAngelo.
        Journal of Accounting & Economics 17, 1-2, January 1994: 113-143.

"How Do Taxes Affect Investors' Stock Market Realizations? Evidence from Tax-Return Panel
        Data." With H. Nejat Seyhun. Journal of Business 67, 2, April 1994: 231-262.

"Why Firms Voluntarily Disclose Bad News." Journal of Accounting Research 32, 1, Spring
        1994: 38-60. (This article is abstracted in The CFA Digest 24, 4, Fall 1994.)

"Reversal of Fortune: Dividend Policy and the Disappearance of Sustained Earnings Growth."
        With Harry DeAngelo and Linda DeAngelo. Journal of Financial Economics 40, 3,
        March 1996: 341-371.

"Earnings Disclosures and Stockholder Lawsuits." Journal of Accounting & Economics 23, 3,
        November 1997: 249-282.

"Determinants of the Valuation Allowance for Deferred Tax Assets under SFAS-109." With
        Gregory S. Miller. The Accounting Review 73, 2, April 1998: 213-233.

"An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium." With
        Richard Frankel and Marilyn Johnson. Journal of Accounting Research 37, 1, Spring
        1999: 133-150.

"Earnings Management: Reconciling the Views of Accounting Academics, Practitioners, and
        Regulators." With Patricia Dechow. Paper delivered at the AAA/FASB Financial
        Reporting Issues Conference in December, 1999. Accounting Horizons, 14, 2, June
        2000: 235-250.

"Special Dividends and the Evolution of Dividend Signaling." With Harry DeAngelo and Linda
        DeAngelo. Journal of Financial Economics, 57, 3, September 2000: 309-354.

"Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio." With Richard Sloan. Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.

- *Winner, 1998 Chicago Quantitative Alliance/IBES Research Competition.*

"Large Sample Tests of the Debt Covenant Hypothesis." With Ilia Dichev. Journal of Accounting Research, 40, 4, September 2002: 1091-1123.

"The Role of Supplementary Statements with Management Earnings Forecasts." With Amy P. Hutton and Gregory S. Miller. Journal of Accounting Research 41, 5, December 2003: 867-890.

"Employee Stock Options, EPS Dilution, and Stock Repurchases." With Daniel Bens, Venky Nagar, and M. H. Franco Wong. Journal of Accounting and Economics, 36, 1-3, December 2003: 51-90.

"Are Dividends Disappearing? Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo. Journal of Financial Economics, 72, 3, June 2004: 425-456.

- *Jensen Prize for best paper, Corporate Finance and Organizations.*

"Earnings Momentum and Earnings Management." With James Myers and Linda Myers. Journal of Accounting, Auditing and Finance, 22, 2, Spring 2007: 249-284.

- *FARS Best paper prize, 2009.*

"Does Earnings Guidance Affect Market Returns? The Nature and Information Content of Aggregate Earnings Guidance." With Carol Anilowski and Mei Feng. Journal of Accounting and Economics 44, 1-2, September 2007: 36-63.

"The Evolving Relation between Earnings, Dividends, and Stock Repurchases." Journal of Financial Economics 87, 3, March 2008: 582-609.

"Accounting for Intangibles – A Critical Review of Policy Recommendations." Accounting and Business Research 38, 3, 2008: 191-204.

"A reply to Lev's rejoinder to 'Accounting for Intangibles – A Critical Review of Policy Recommendations.'" Accounting and Business Research 38, 3, 2008: 215-216.

"The Rise of Deferred Tax Assets in Japan: The Role of Deferred Tax Accounting in the Japanese Banking Crisis." Journal of Accounting and Economics 46, 2-3, 2008: 218-239. Lead article.

"Corporate Payout Policy." With Harry DeAngelo and Linda DeAngelo. Foundations and Trends in Finance 3, 2-3, 2008: 95-287.

"Management Forecasts in Japan: An Empirical Study of Forecasts that are Effectively Mandated" (Previously titled "When Voluntary Disclosure Isn't Voluntary: Management Forecasts in Japan.") With Kazuo Kato and Michio Kunimura. The Accounting Review 84, 5 (September 2009): 1575-1606.

"Earnings Guidance and Market Uncertainty." With Jonathan Rogers and Andrew Van Buskirk. Journal of Accounting and Economics 48, 1 (October 2009): 90-109.

"Implications for GAAP from an analysis of positive research in accounting." With S. P. Kothari and Karthik Ramanna. (Previously titled: "What Should GAAP Look Like? A Survey and Economic Analysis.") Journal of Accounting and Economics 50, 2-3 (December 2010): 246-286. (Invited review paper.)

"What Do Dividends Tell Us About Earnings Quality?" With Eugene Soltes. Review of Accounting Studies 16, 1 (March 2011): 1-28.

"Measuring Securities Litigation Risk." With Irene Kim. Journal of Accounting and Economics 53, 1-2 (February-April 2012): 290-310.

"Audit Quality and Auditor Reputation: Evidence from Japan." With Suraj Srinivasan. The Accounting Review 87, 5 (September 2012): 1737-1765.

"The Politics of Accounting Standard-Setting: A Review of Empirical Research." With Brandon Gipper and Brett J. Lombardi. Australian Journal of Management 38, 3 (December 2013): 523-551.

"Payout policy through the financial crisis: The growth of repurchases and the resilience of dividends." With Eric Floyd and Nan Li. Journal of Financial Economics 118, 2 (November 2015): 299-316.

"The role of the media in disseminating insider trading news." With Jonathan L. Rogers and Sarah L. C. Zechman. Review of Accounting Studies 21, 3 (September 2016): 711-739.
- *BlackRock prize for best paper, Review of Accounting Studies conference, 2015.*

"Is Japan Really a "Buy"? The Corporate Governance, Cash Holdings, and Economic Performance of Japanese Companies." With Kazuo Kato and Meng Li. Journal of Business Finance & Accounting 44, 3 & 4 (March/April 2017): 480-523.

"Run EDGAR Run: SEC Dissemination in a High Frequency World." With Jonathan L Rogers and Sarah L. C. Zechman. Journal of Accounting Research 55, 2 (May 2017): 459-505.
- *FARS Best paper prize, 2020.*

"Importing Activists: Determinants and Consequences of Increased Cross-border Shareholder Activism." With Mark G. Maffett and Anya Nakhmurina. Journal of Accounting & Economics 74, 2-3 (November-December 2022): 101538.
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3721680

"Corporate Managers' Perspectives on Forward-Looking Guidance: Survey Evidence." With
Andrew C. Call, Paul Hribar, and David Volant. Journal of Accounting & Economics,
78, 2-3 (November-December 2024): 101731.
https://doi.org/10.1016/j.jacceco.2024.101731.
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4214740

"Why Did the Big 4 Get So Large?  Evidence from Australia."  (Previous title, "The Evolution
of Audit Market Structure and the Emergence of the Big Four: Evidence from
Australia.") With Matthew Pinnuck and Colin Ferguson (deceased). Review of
Accounting Studies, 2025. https://link.springer.com/article/10.1007/s11142-025-09871-x
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2431727

## Conference Proceedings

"Stock Returns, Trading Volume, and Bid-Ask Spreads Around Earnings Announcements:
Evidence from the NASDAQ National Market System." Proceedings: Seminar on the
Analysis of Security Prices, 36, 1, May 1991: 289-329. SSRN version
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2143649

## Current Working Papers

"Moving Forward: Management Guidance and Earnings Announcement Returns." With Yao
Lu. April 2020, Revised September 2020.
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3687764

"Do Actions Speak Louder than Words? The Relation Between Payouts and Guidance Since
2000." With Yao Lu. August 2023. Revised November 2024. Under revision.
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4322036

## Invited Discussions and Commentaries (non-refereed)

"Are Disclosures About Bank Derivatives and Employee Stock Options 'Value Relevant'?"
Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 393-405.

"What Motivates Managers' Choice of Discretionary Accruals?" With Victor L. Bernard.
Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 313-325.

"Do Options Markets Improve Informational Efficiency?" Contemporary Accounting Research
14, 2, Summer 1997: 193-201.

"How Well Does Net Income Measure Firm Performance? A Discussion of Two Studies."
Journal of Accounting & Economics, 26, 1-3, January 1999: 105-111.

"Should Firms Disclose Everything to Everybody? A Discussion of 'Open versus closed conference calls: The determinants and effects of broadening access to disclosure.'" Journal of Accounting and Economics 34, 1-3, January 2003: 181-187.

'Comments on "The Effects of Taxes on Market Responses to Dividend Announcements and Payments: What Can We Learn from the 2003 Dividend Tax Cut?"' by Raj Chetty, Joseph Rosenberg, and Emmanuel Saez, in Alan J. Auerbach, James R. Hines, Jr., and Joel Slemrod, eds., Taxing Corporate Income in the 21st Century (Cambridge University Press, 2007): 36-40.

'Discussion of "The implications of unverifiable fair-value accounting: Evidence from the political economy of goodwill accounting"' Journal of Accounting and Economics 45, 2-3, August 2008, 282-288.

'Discussion of "Accounting standards and debt covenants: Has the "Balance Sheet Approach" led to a decline in the use of balance sheet covenants?"' Journal of Accounting and Economics 52, 2-3, November 2011: 203-208.

"Accounting research in the Japanese setting." The Japanese Accounting Review, 1, 2011: 135-140.

"How should we think about earnings quality? A discussion of "Earnings quality: Evidence from the field." With Mark W. Nelson. Journal of Accounting and Economics 56, 2-3 (December 2013): 34-41.

"The Evolving Disclosure Landscape: How Changes in Technology, the Media, and Capital Markets Are Affecting Disclosure." With Gregory S. Miller. Journal of Accounting Research 53, 2 (May 2015): 221-239.

## Other Publications

"Are the SEC's Safe Harbor Provisions Effective in Encouraging the Disclosure of Forward-Looking Information?" Financial Analysts Journal 51, 4, July-August 1995: 38-44.

"Issues in Foreign Exchange Hedge Accounting." With Michael H. Moffett. Journal of Applied Corporate Finance 8, 5, Fall 1995: 82-94.

"Bad News Rings True." With Amy P. Hutton and Gregory S. Miller. Investor Relations Quarterly 6, 2, 2004: 49-56.

"Japan's Window Dressing Hid Olympus Fraud," Bloomberg Opinion, November 30, 2011, https://www.bloomberg.com/opinion/articles/2011-12-01/japan-s-window-dressing-hid-olympus-fraud-commentary-by-douglas-skinner

**Appendix A**

"Why U.S. Companies Continue to Pay Dividends," Bloomberg Opinion, April 11, 2012, https://www.bloomberg.com/opinion/articles/2012-04-11/why-u-s-companies-continue-to-pay-dividends

"Corporate America is Enriching Shareholders at the Expense of the Economy." fivethirtyeight.com July 15, 2014. http://fivethirtyeight.com/features/corporate-america-is-enriching-shareholders-at-the-expense-of-the-economy/

The Financial Accounting Standards Committee of the AAA is charged with responding to requests by standards setters on issues related to financial reporting. As a member of that Committee from 1999 until 2002 I contributed to comment letters to the Financial Accounting Standards Board (FASB), the International Accounting Standards Committee (IASC), and the U.S. Securities and Exchange Commission (SEC). Published versions of these comment letters for which I served as principal author are as follows:

- Response to the FASB Preliminary Views: Reporting Financial Instruments and Certain Related Assets and Liabilities at Fair Value. (with J. M. Wahlen, Chair, J. R. Boatsman, R. H. Herz, G. J. Jonas, K. G. Palepu, S. G. Ryan, K. Schipper, and C. M. Schrand). Accounting Horizons December 2000, Vol. 14, No. 4, pp. 501-508.
- Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets. With L. A. Maines, Chair, E. Bartov, P. M. Fairfield, D. E. Hirst, T. E. Iannaconi, R. Mallett, C. M. Schrand, L. Vincent. Accounting Horizons June 2003, Vol. 17, No. 2, pp. 175-185.

**Selected Media Coverage**

"Dividends, Wall Street's Battered Status Symbol," The New York Times, February 13, 2016.

"As Stock Prices Slump, Don't Count on Buybacks," Wall Street Journal, January 25, 2016.

"Fast Traders Are Getting Data From SEC Seconds Early," Wall Street Journal, October 29, 2014.

"High-frequency traders said to get SEC filings early," Financial Times, October 29, 2014.

"Certain Traders May Get Early Looks at S.E.C. Filings, Paper Finds," The New York Times, October 29, 2014.

"Flush with Cash, Apple Plans Buyback and Dividend," The New York Times, March 19, 2012.

**Professional Activities**

*Journal of Accounting Research:* Senior Editor, 2006-2021.

*Accounting and Finance*, Editorial Board, 2012-2016.

*Asia-Pacific Journal of Accounting & Economics*, Associate Editor, 1999-2005.

*Journal of Accounting & Economics*:
      Editor, 2000-2005.
      Associate Editor, 1994-2000.

*The Accounting Review*, Editorial Advisory and Review Board, 1992-1996; 1997-1999.

*Review of Accounting Studies*, Co-Editor, 1999-2000.

Ad hoc referee for numerous accounting and finance journals.

Member: American Accounting Association, American Finance Association.

American Accounting Association Committees:
- Financial Accounting Standards Committee, 1999-2002.
- AAA/FASB Annual Financial Reporting Issues Conference Organizing Committee, 1999, 2000, 2005.
- 2001-2002 Competitive Manuscript Prize Committee.


**Ph.D. Committees (chronological order with initial placements)**

*At Michigan:*
Arun Kumar (Finance)
Christine Botosan. Washington University, St Louis.
Li Li Eng. Singapore National University.
Karen Nelson. Stanford.
Lillian Mills.  Arizona.
Brian Bushee. Harvard Business School.
Marlene Plumlee (Chair).  Utah.
David Heike (Finance). Western Ontario.
Timothy Burch (Finance). Miami (FL).
Gregory Miller (Chair). Harvard Business School.
Mark Bradshaw.  Harvard.
Anchada Charoenrook (Finance). Vanderbilt.
Darren Roulstone (Co-chair).  Chicago.
Linda Myers (Chair). Washington (Seattle).
Irem Tuna (Chair).  Wharton.
Scott Richardson.  Wharton.
Fai Cang (Finance). Vanderbilt.
Jef Doyle.  Utah.
Irene Kim (Chair).  Duke.
Mei Feng (Chair).  Pittsburgh.
Wei Tang (Chair). Georgetown.

**Appendix A**

*At Chicago:*

Regina Wittenberg Moerman. Wharton.
Yu Gao.  Minnesota.
Eugene Soltes (Chair). Harvard Business School.
Ningzhong Li. London Business School.
Lawrence Takeuchi (finance).
Pepa Kraft.  NYU.
Jeff Ng. Chinese University of Hong Kong.
Anna Costello. (Chair).  MIT.
Alon Kalay. Columbia.
Jonathan Milian. (Chair). Florida International University.
Meng Li (Co-chair). UT-Dallas.
Joao Granja. MIT.
Christine Cuny. NYU.
Joshua Madsen (Chair). Minnesota.
Marina Niessner (finance). Yale.
Eric Floyd. Rice.
Nan Li (Chair). Toronto.
Gerardo Perez Cavazos (Chair). Harvard Business School.
Frank Zhou (Chair). Wharton.
Matthew Bloomfield. Wharton.
Brett Lombardi (Chair). Monash (Australia).
Oleg Kuriukhin. Cornerstone Research.
Anya Nakhmurina. Yale SOM.
Johanna Shin. Capital Group.
Yao Lu. Cornell.
Yvonne (Yanzi) Han. Job market, 2024-25.


**Recent presentations, discussions, and talks**

2024: ABFER Singapore (discussant); FASB Financial Reporting Conference (discussant); Tulane mini-accounting conference; Japan Accounting Research Symposium, Tokyo (keynote), Yale School of Management.

2025: National University of Singapore, LSU Regional Research Conference.

**Appendix B**

**Douglas J. Skinner, Testimony, Last Four Years.**

Depositions. *SEB Investment Management AB, Individually and on behalf of others similarly situated v. Symantec Corporation and Gregory S. Clark*, United States District Court Northern District of California, Case No. 3:18-cv-02902-WHA (2021).

Deposition. *In re Allergan plc Securities Litigation*, United States District Court for the Southern District of New York, Civil Action No. 18-cv-12089 (2021).

Depositions. *Alexandre Pelletier, Individually and on behalf of others similarly situated v. Endo International plc et al.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:17-cv-05114-MMB (2021).

Depositions. *Purple Mountain Trust v. Wells Fargo & Company, et al.*, United States District Court Northern District of California, Civil Action No. 3:18-cv-03948-JD (2021).

Deposition. *Washtenaw County Employees Retirement System, Individually and on behalf of others similarly situated v. Walgreen Co. et al.,* United States District Court Northern District of Illinois Eastern Division, Case No. 1:15-cv-3187 (2021).

Deposition. *In re Novo Nordisk Securities Litigation*, United States District Court District of New Jersey, Master File No. 3:17-cv-00209-BRM-LHG (2021).

Deposition. *Badesha Harpreet and Cronos Group Inc., et al.*, Ontario Superior Court of Justice, Court File No. CV-20-00641990-00CP (2021).

Deposition. *Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzales Coronado Trust, Individually and on Behalf of All Others Similarly Situated v. Kevin Davis and Amir Rosenthal*, United States District Court Southern District of New York, Civil Action No. 1:16-CV-3591-GHW (2021).

Deposition and trial testimony. *In Re CVR Refining, LP Unitholder Litigation*, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2019-0062-KSJM (2021).

Depositions. *Christakis Vrakas, et al., v. United States Steel Corporation, et al.*, United States District Court Western District of Pennsylvania, Civil Action No. 17-579 (2021).

Deposition. *Gabby Klein et al., Individually and on behalf of others similarly situated v. Altria Group Inc., et al.*, United States District Court Eastern District of Virginia, Richmond Division, Civil Action No. 3:20-cv-00075-DJN (2021).

Deposition. *In Re Google Play Developer Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:20-cv-05792-JD (2022).

Deposition. *In Re Google Play Store Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:21-md-02981-JD (2023).

Trial testimony. *Epic Games, Inc. vs. Google LLC., et al.*, United States District Court Northern District of California, Case No. 3:20-cv-05671-JD (2023).

Deposition. *United States of America et al. vs. Google LLC*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:23-cv-00108 (2024).

Deposition. *Richard J. Tornetta, individually and on behalf of all others similarly situated and derivatively on behalf of nominal defendant Tesla, Inc., v. Elon Musk, et al., and Tesla, Inc., Nominal Defendant*, In the Court of Chancery of the State of Delaware, Civil Action No. 2018-0408-KSJM (2024).

Deposition. *The State of Texas, et al., vs. Google LLC.*, United States District Court Eastern District of Texas Sherman Division, Civil No. 4:20-CV-957-SDJ (2024).

Deposition. *John Harvey Schneider et al., Individually and on behalf of others similarly situated v. Natera, Inc., et al.*, United States District Court Western District of Texas, Austin Division, Civil Action No. 1:22-cv-00398-DAE (2024).

Deposition. *In re Upstart Holdings, Inc. Securities Litigation*, United States District Court Southern District of Ohio, Eastern Division, Case No. 2:22-cv-02935-ALM-EPD (2024).

Deposition. *In re: Google Digital Advertising Antitrust Litigation*, United States District Court for the Southern District of New York, Case No. 1:21-md-3010 (PKC) (2025).

**Appendix C**

# List of Materials Considered

**Academic Articles**

- Black, D. E., et al., "Non-GAAP reporting: Evidence from academia and current practice." *Journal of Business Finance & Accounting*, 45(3-4), March 2018, pp. 257–508

- Brown, L. D., et al., "Inside the 'Black Box' of Sell-Side Financial Analysts," *Journal of Accounting Research*, 53(1), 2015, pp. 1–47

- Fama, Eugene F., "Efficient Capital Markets:  A Review of Theory and Empirical Work," *The Journal of Finance*, 25, no. 2 (1970), pp. 383–417

- Hite, G. L., and J. E. Owers, "Security Price Reactions to Spin-Off Announcements," *Journal of Financial Economics*, 12(4), 1983, pp. 409–436

- Livnat, J., and Y. Zhang, "Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More?" *Review of Accounting Studies*, 17(3), 2012, pp. 612–641

- Schipper, K., and A. Smith, "Effects of Recontracting on Shareholder Wealth," *Journal of Financial Economics*, 12(4), 1983, pp. 437–467

- Seward, J. K., and J. P. Walsh, "The Governance and Control of Voluntary Corporate Spin-Offs," *Strategic Management Journal*, 17(1), 1996, pp. 25–39

**Analyst Reports**

- Analyst reports covering FIS that were published between May 7, 2020 and May 4, 2023 that were available from counsel, S&P Capital IQ, LSEG Workspace, and the production of Mr. Chad Coffman pursuant to his expert report dated March 3, 2025.  Analyst reports include those published by the following contributors:  Argus Research; Atlantic; Autonomous; Baird; Bank of America; Barclays; Berenberg; Bernstein; BNP Paribas; Canaccord Genuity; Citi; Compass Point Research & Trading; Cowen and Company; Credit Suisse; Crispidea; Deutsche Bank; Evercore ISI; Goldman Sachs; Jefferies; J.P. Morgan; Keefe, Bruyette, & Woods; KeyBanc; Loop; Mizuho; Moffett Nathanson; Morgan Stanley; Morningstar; Nasdaq; Northcoast Research; Oppenheimer; Raymond James; RBC; Rosenblatt Securities; Stephens; SunTrust; Susquehanna; Truist Securities; UBS; Valens Research; Wedbush Securities; Wells Fargo; William Blair & Company; and Wolfe Research.

**Books**

- Berk, J., P. DeMarzo, and J. Harford, "Fundamentals of Corporate Finance," Second Edition (Pearson Education, Inc., 2012)

- Brealey, R. A., S. C. Myers, and F. Allen, "Principles of Corporate Finance," Tenth Edition (McGraw-Hill/Irwin, 2011)

- Holthausen, R. W., and M. E. Zmijewski, "Corporate Valuation, Theory, Evidence & Practice," First Edition (Cambridge Business Publishers, LLC, 2014)

- Rosenbaum, J., and J. Pearl, "Investment Banking," Second Edition (John Wiley & Sons, Inc., 2013)

- Ross, S. A., R. W. Westerfield, and B. D. Jordan, "Fundamentals of Corporate Finance," Thirteenth Edition (McGraw Hill LLC, 2022)

- Welch, I., "Corporate Finance," Fifth Edition (Ivo Welch, 2022)

**Conference Call Transcripts**

- "Fidelity National Information Services Inc and Worldpay Inc Entered into a Definitive Merger Agreement - M&A Call," *Thomson Reuters*, March 18, 2019

- "Fidelity National Information Services Inc at Raymond James Institutional Investors Conference," *Thomson Reuters*, March 2, 2020

- "Fidelity National Information Services Inc at JPMorgan Technology, Media and Communications Conference (Virtual)," *Thomson Reuters*, May 13, 2020

- "Fidelity National Information Services Inc at Barclays Emerging Payments and Fintech Forum," *Thomson Reuters*, May 19, 2020

- "Fidelity National Information Services Inc at Bank of America Merrill Lynch Global Technology Conference (Virtual)," *Thomson Reuters*, June 2, 2020

- "Fidelity National Information Services Inc at Robert W Baird Global Consumer, Technology & Services Conference (Virtual)," *Thomson Reuters*, June 3, 2020

- "Fidelity National Information Services Inc at RBC Financial Technology Conference (Virtual)," *Thomson Reuters*, June 11, 2020

- "Fidelity National Information Services Inc at KeyBanc Capital Markets Future of Technology Series (Virtual)," *Refinitiv*, September 9, 2020

- "Fidelity National Information Services Inc at Deutsche Bank Virtual Technology Conference," *Refinitiv*, September 15, 2020

- "Fidelity National Information Services Inc at Autonomous Research Future of Commerce Symposium," *Refinitiv*, September 17, 2020

- "Fidelity National Information Services Inc at Stephens NASH Investment Conference (Virtual)," *Refinitiv*, November 16, 2020

**Appendix C**

- "Fidelity National Information Services Inc at Citi Financial Technology Conference (Virtual)," *Refinitiv*, November 18, 2020

- "Fidelity National Information Services Inc at Credit Suisse Technology Conference (Virtual)," *Refinitiv*, December 1, 2020

- "Fidelity National Information Services Inc at Wells Fargo TMT Conference (Virtual)," *Refinitiv*, December 2, 2020

- "Fidelity National Information Services Inc at Barclays Global Technology, Media and Telecommunications Conference (Virtual)," *Refinitiv*, December 9, 2020

- "Fidelity National Information Services Inc at KBW Payments FinTech Conference (Virtual)," *Refinitiv*, February 25, 2021

- "Fidelity National Information Services Inc at Evercore Payments and Fintech Innovators Forum (Virtual)," *Refinitiv*, March 4, 2021

- "Fidelity National Information Services Inc at Wolfe Research FinTech Forum (Virtual)," *Refinitiv*, March 9, 2021

- "Fidelity National Information Services Inc at Bank of America Electronic Payments Symposium," *Refinitiv*, March 22, 2021

- "Fidelity National Information Services Inc at Barclays Emerging Payments and Fintech Forum (Virtual)," *Refinitiv*, May 19, 2021

- "Fidelity National Information Services Inc at JPMorgan Global Technology, Media and Communications Conference (Virtual)," *Refinitiv*, May 25, 2021

- "Fidelity National Information Services Inc at William Blair Growth Stock Conference (Virtual)," *Refinitiv*, June 3, 2021

- "Fidelity National Information Services Inc at Robert W Baird Global Consumer, Technology & Services Conference (Virtual)," *Refinitiv*, June 10, 2021

- "Fidelity National Information Services Inc at RBC Capital Markets Financial Technology Conference (Virtual)," *Refinitiv*, June 17, 2021

- "Fidelity National Information Services Inc at Guggenheim Fintech and Software Conference (Virtual)," *Refinitiv*, August 24, 2021

- "Fidelity National Information Services Inc at Citi FinTech Conference (Virtual)," *Refinitiv*, November 15, 2021

- "Fidelity National Information Services Inc at RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference (Virtual)," *Refinitiv*, November 16, 2021

**Appendix C**

- "Fidelity National Information Services Inc at Stephens Investment Conference (Virtual)," *Refinitiv*, November 29, 2021

- "Fidelity National Information Services Inc at Wolfe Research Fintech Forum," *Refinitiv*, March 9, 2022

- "Fidelity National Information Services Inc at Bank of America Electronic Payments Symposium (Virtual)," *Refinitiv*, March 21, 2022

- "Fidelity National Information Services Inc at MoffettNathanson Payments, Processors, and IT Services Summit," *Refinitiv*, May 11, 2022

- "Fidelity National Information Services Inc at Barclays Emerging Payments and Fintech Forum," *Refinitiv*, May 17, 2021

- "Fidelity National Information Services Inc at RBC Capital Markets Financial Technology Conference," *Refinitiv*, June 14, 2022

- "Fidelity National Information Services Inc at Citi FinTech Conference," *Refinitiv*, November 15, 2022

- "Fidelity National Information Services Inc at UBS Global TMT Conference," *Refinitiv*, December 6, 2022

## Data

- LSEG Workspace
- S&P Capital IQ

## Depositions

- Deposition of Chad Coffman, CFA, dated April 10, 2025, and exhibits

## Earnings Call Transcripts and Presentations

- FIS Presentation, "First Quarter 2019 Earnings Call," April 30, 2019

- "Q1 2019 Fidelity National Information Services Inc Earnings Call," *Thomson Reuters*, April 30, 2019

- FIS Presentation, "Second Quarter 2019 Earnings Call," August 6, 2019

- "Q2 2019 Fidelity National Information Services Inc Earnings Call," *Thomson Reuters*, August 6, 2019

- FIS Presentation, "Third Quarter 2019 Earnings Call," November 5, 2019

**Appendix C**

- "Q3 2019 Fidelity National Information Services Inc Earnings Call," *Thomson Reuters*, November 5, 2019

- FIS Presentation, "Fourth Quarter 2019 Earnings Call," February 13, 2020

- "Q4 2019 Fidelity National Information Services Inc Earnings Call," *Thomson Reuters*, February 13, 2020

- FIS Presentation, "First Quarter 2020 Earnings Call," May 7, 2020

- "Q1 2020 Fidelity National Information Services Inc Earnings Call," *Thomson Reuters*, May 7, 2020

- FIS Presentation, "Second Quarter 2020 Earnings Call," August 4, 2020

- "Q2 2020 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, August 4, 2020

- FIS Presentation, "Third Quarter 2020 Earnings Call," October 29, 2020

- "Q3 2020 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, October 29, 2020

- FIS Presentation, "Fourth Quarter 2020 Earnings Call," February 9, 2020

- "Q4 2020 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, February 9, 2021

- FIS Presentation, "First Quarter 2021 Earnings Call," May 6, 2021

- "Q1 2021 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, May 6, 2021

- FIS Presentation, "Second Quarter 2021 Earnings Call," August 3, 2021

- "Q2 2021 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, August 3, 2021

- FIS Presentation, "Third Quarter 2021 Earnings Call," November 4, 2021

- "Q3 2021 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 4, 2021

- FIS Presentation, "Fourth Quarter 2021 Earnings Call," February 15, 2022

- "Q4 2021 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, February 15, 2022

- FIS Presentation, "First Quarter 2022 Earnings Call," May 3, 2022

- "Q1 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, May 3, 2022

**Appendix C**

- FIS Presentation, "Second Quarter 2022 Earnings Call," August 4, 2022

- "Q2 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, August 4, 2022

- "FIS Presentation, Third Quarter 2022 Earnings Call," November 3, 2022

- "Q3 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, November 3, 2022

- FIS Presentation, "Fourth Quarter 2022 Earnings Call," February 13, 2023

- "Q4 2022 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, February 13, 2023

- FIS Presentation, "First Quarter 2023 Earnings Call," April 27, 2023

- "Q1 2023 Fidelity National Information Services Inc Earnings Call," *Refinitiv*, April 27, 2023

**Expert Reports**

- Expert Report of Chad Coffman, CFA, March 3, 2025, and materials produced

**Online Content**

- Corporate Finance Institute, "Adjusted EBITDA," available at https://corporatefinanceinstitute.com/resources/valuation/adjusted-ebitda/, accessed on April 30, 2025

- FASB, "ASC Master Glossary," available at https://asc.fasb.org/MasterGlossary, accessed on April 30, 2025

- Financial Accounting Standards Board, "105-10-05: Overview and Background," available at https://asc.fasb.org/1943274/2147479442, accessed on April 30, 2025

- Financial Accounting Standards Board, "About the FASB," available at https://www.fasb.org/facts, accessed on April 30, 2025

- Financial Accounting Standards Board Accounting Standards Codification, available at https://asc.fasb.org/Home, accessed on April 30, 2025

- FINRA, "What Are Corporate Spinoffs and How Do They Impact Investors?," September 20, 2024, available at https://www.finra.org/investors/insights/corporate-spinoffs, accessed on April 30, 2025

- PwC, "Business Combinations and Noncontrolling Interests Guide," Ch. 9, May 31, 2024, available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/business_combination/busine

ss_combination__28_US/chapter_9_accounting_US/91_overviewaccounting-for-goodwill-postacquisitionUS.html, accessed on April 30, 2025

- United States Securities and Exchange Commission, "Staff Legal Bulletin No. 4 (CF)," September 16, 1997, available at https://www.sec.gov/interps/legal/slbcf4.txt, accessed on April 30, 2025

- United States Securities and Exchange Commission, "All About Auditors: What Investors Need to Know," June 24, 2002, available at https://www.sec.gov/about/reports-publications/investorpubsaboutauditorshtm, accessed on April 30, 2025

- United States Securities and Exchange Commission, "Exchange Act Reporting and Registration," June 24, 2024, available at https://www.sec.gov/resources-small-businesses/going-public/exchange-act-reporting-registration, accessed on April 30, 2025

- United States Securities and Exchange Commission, "Financial Reporting Manual: Topic 1 – Registrant's Financial Statements," November 18, 2020, available at https://www.sec.gov/corpfin/cf-manual/topic-1, accessed on April 30, 2025

**Pleadings**

- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *In Re Fidelity National Information Services, Inc. Securities Litigation*, August 2, 2023

- Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, with Exhibits, *In Re Fidelity National Information Services, Inc. Securities Litigation*, September 22, 2023

- Lead Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, *In Re Fidelity National Information Services, Inc. Securities Litigation*, November 13, 2023

- Reply in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, *In Re Fidelity National Information Services, Inc. Securities Litigation*, December 19, 2023

- Order, *In Re Fidelity National Information Services, Inc. Securities Litigation*, September 30, 2024

- Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Fidelity National Information Services, Inc. Securities Litigation*, March 3, 2025

**SEC Filings**

- FIS Form 8-K, filed March 18, 2019

- FIS Form DEF 14A, filed April 12, 2019

**Appendix C**

- FIS Form 8-K, filed April 30, 2019

- FIS Form 10-Q for Quarterly Period Ended March 31, 2019, filed April 30, 2019

- FIS Form 8-K, filed July 31, 2019

- FIS Form 8-K, filed August 6, 2019

- FIS Form 10-Q for Quarterly Period Ended June 30, 2019, filed August 6, 2019

- FIS Form 8-K, filed November 5, 2019

- FIS Form 10-Q for Quarterly Period Ended September 30, 2019, filed November 5, 2019

- FIS Form 8-K, filed February 13, 2020

- FIS Form 10-K for Fiscal Year Ended December 31, 2019, filed February 20, 2020

- FIS Form 8-K, filed April 13, 2020

- FIS Form DEF 14A, filed April 17, 2020

- FIS Form 8-K, filed May 7, 2020

- FIS Form 10-Q for Quarterly Period Ended March 31, 2020, filed May 7, 2020

- FIS Supplemental Form DEF 14A, filed May 18, 2020

- FIS Form 8-K, filed May 29, 2020

- FIS Form 8-K, filed June 12, 2020

- FIS Form 8-K, filed August 4, 2020

- FIS Form 10-Q For Quarterly Period Ended June 30, 2020, filed August 4, 2020

- FIS Form 8-K, filed August 28, 2020

- FIS Form 8-K, filed October 8, 2020

- FIS Form 8-K, filed October 29, 2020

- FIS Form 10-Q for Quarterly Period Ended September 30, 2020, filed October 29, 2020

- FIS Form 8-K, filed January 29, 2021

- FIS Form 8-K, filed February 9, 2021

- FIS Form 10-K for Fiscal Year Ended December 31, 2020, filed February 18, 2021

- FIS Form 8-K, filed February 23, 2021

- FIS Form 8-K, filed February 26, 2021

- FIS Form 8-K, filed March 2, 2021

**Appendix C**

- FIS Form 8-K, filed March 4, 2021

- FIS Form 8-K, filed March 9, 2021

- FIS Form 8-K, filed March 10, 2021

- FIS Form 8-K, filed March 31, 2021

- FIS Form DEF 14A, filed April 9, 2021

- FIS Form 8-K, filed May 6, 2021

- FIS Form 10-Q for Quarterly Period Ended March 31, 2021, filed May 6, 2021

- FIS Form 8-K, filed May 14, 2021

- FIS Form 8-K, filed May 21, 2021

- FIS Form 8-K, filed May 28, 2021

- FIS Form 8-K, filed June 9, 2021

- FIS Form 8-K, filed August 3, 2021

- FIS Form 10-Q for Quarterly Period Ended June 30, 2021, filed August 3, 2021

- FIS Form 8-K, filed September 3, 2021

- FIS Form 8-K, filed September 8, 2021

- FIS Form 8-K, filed September 23, 2021

- FIS Form 8-K, filed November 4, 2021

- FIS Form 10-Q for Quarterly Period Ended September 30, 2021, filed November 4, 2021

- FIS Form 8-K, filed January 14, 2022

- FIS Form 8-K, filed February 8, 2022

- FIS Form 8-K, filed February 15, 2022

- FIS Form 10-K for Fiscal Year Ended December 31, 2021, filed February 23, 2022

- FIS Form 8-K, filed March 21, 2022

- FIS Form DEF 14A, filed April 15, 2022

- FIS Form 8-K, filed April 22, 2022

- FIS Form 8-K, filed May 3, 2022

- FIS Form 10-Q for Quarterly Period Ended March 31, 2022, filed May 3, 2022

- FIS Revised Form DEF 14A, filed May 16, 2022

**Appendix C**

- FIS Form 8-K, filed May 26, 2022

- FIS Form 8-K, filed June 1, 2022

- FIS Form 8-K, filed July 11, 2022

- FIS Form 8-K, filed July 13, 2022

- FIS Form 8-K, filed August 4, 2022

- FIS Form 10-Q for Quarterly Period Ended June 30, 2022, filed August 4, 2022

- FIS Form 8-K, filed August 17, 2022

- FIS Form 8-K, filed October 19, 2022

- FIS Form 8-K, filed November 3, 2022

- FIS Form 10-Q for Quarterly Period Ended September 30, 2022, filed November 4, 2022

- FIS Form 8-K, filed December 15, 2022

- FIS Form 8-K, filed January 20, 2023

- FIS Form 8-K, filed January 25, 2023

- FIS Form 8-K, filed February 13, 2023

- FIS Form 10-K for Fiscal Year Ended December 31, 2022, filed February 27, 2023

- FIS Form 8-K, filed March 3, 2023

- FIS Form DEF 14A, filed April 14, 2023

- FIS Form 8-K, filed April 21, 2023

- FIS Form 8-K, filed April 27, 2023

- FIS Form 10-Q for Quarterly Period Ended March 31, 2023, filed May 2, 2023

- FIS Form DEF 14A, filed April 26, 2024

- FIS Form 10-K for Fiscal Year Ended December 31, 2024, filed February 13, 2025

**In addition to the documents on this list, I considered all documents and data cited and referenced in my report, appendices, and exhibits in forming my opinions.**

# Exhibit 1

## Fidelity National Information Services, Inc.

## Reported and Projected Revenue and Cost Synergies[1]

*(dollar figures in millions, in terms of annualized run-rate)*

| Date | Event[2] | Revenue Synergies | | | | Cost Synergies | | | |
|------|----------|-------------------|---|---|---|---------------|---|---|---|
| | | Reported | Projected by End of 2020 | Projected by End of 2021 | Projected by End of 2022 | Reported | Projected by End of 2020 | Projected by End of 2021 | Projected by End of 2022 |
| 3/18/19 | Worldpay Merger Announcement | – | – | – | $500 [3] | – | – | – | $400 [3] |
| 4/30/19 | Q1 2019 Earnings Disclosures | – | $100 [4] | – | $500 [5] | – | – | – | $400 [6] |
| 8/6/19 | Q2 2019 Earnings Disclosures | – | $150 [7] | – | $500 [7] | $50 [8] | $300 [9] | $400 [10] | $500 [10] |
| 11/5/19 | Q3 2019 Earnings Disclosures | $30 [11] | $150 [11] | – | $500 [12] | $200 [11] | $350 [11] | – | $500 [13] |
| 2/13/20 | Q4 2019 Earnings Disclosures | $80 [14] | $200 [14] | – | $550 [14] | $465 [14] | $600 [14] | – | $675 [14] |
| 5/7/20 | Q1 2020 Earnings Disclosures | $100 [15] | $200 [15] | – | $550 [15] | $580 [15] | $700 [15] | – | – |
| 8/4/20 | Q2 2020 Earnings Disclosures | $115 [16] | $200 [16] | – | $550 [16] | $700 [16] | $700 [16] | – | – |
| 10/29/20 | Q3 2020 Earnings Disclosures | $150 [17] | $200 [17] | – | – | $700 [17] | – | – | – |
| 2/9/21 | Q4 2020 Earnings Disclosures | $200 [18] | – | $400 [18] | $550 [18] | $750 [18] | – | – | – |
| 5/6/21 | Q1 2021 Earnings Disclosures | $300 [19] | – | $600 [19] | $700 [19] | $800 [19] | – | – | – |
| 8/3/21 | Q2 2021 Earnings Disclosures | $450 [20] | – | $700 [20] | – | $850 [20] | – | $900 [20] | – |
| 11/4/21 | Q3 2021 Earnings Disclosures | $600 [21] | – | $700 [21] | – | $875 [21] | – | $900 [21] | – |
| 2/15/22 | Q4 2021 Earnings Disclosures | $750 [22] | – | – | – | $900 [22] | – | – | – |

Source:  Consolidated Amended Complaint filed 8/2/23; FIS SEC filings and earnings disclosures

See notes on following page.

Note:

[1]  Revenue and cost synergies data was collected from the Worldpay merger announcement on 3/18/19 and FIS' earnings disclosures from Q1 2019 through Q4 2021.  Dashes indicate that FIS did not report a corresponding synergies figure.

[2]  FIS' quarterly earnings disclosures included its earnings press releases, earnings calls, and the presentations that management used for the earnings calls.

[3]  FIS Form 8-K filed 3/18/19.

[4]  In the Q1 2019 earnings call, FIS stated:  "[We'd] like to add some color regarding the synergy estimates we communicated in our recent Worldpay announcement.  In the first 12 to 18 months post close, we expect to drive around $100 million of revenue synergies."

[5]  In the Q1 2019 earnings call, FIS stated:  "[The Worldpay transaction] is a continuation of our historically successful M&A strategy to accelerate growth, while continuing to optimize margins and leverage synergies through effective integration.  This combination will provide significant revenue synergy opportunities of $500 million over 3 years."

[6]  In the Q1 2019 earnings call, FIS stated:  "Of the $400 million expense synergies identified during due diligence, we expect approximately $200 million to come from operational efficiencies, including vendor and facilities rationalization.  Another $100 million should come from technology savings, primarily driven by incremental data center consolidation and related costs over and above what we have committed to on a stand-alone basis.  And finally, we anticipate about $100 million to be achieved through functional corporate alignment."

[7]  In the Q2 2019 earnings call, FIS stated:  "We now have line of sight to exit 2020 at $150 million of annual run rate revenue synergies, $50 million more than our original expectations, making us even more confident in our ability to generate a total of $500 million in annual run rate synergies by the end of 2022."

[8]  In the Q2 2019 earnings call, FIS stated:  "Worldpay achieved $50 million in cost synergies during the quarter and completed its U.S. platform migration, keeping it on track to successfully complete its $250 million annualized cost synergy program by the end of the year."

[9]  In the Q2 2019 earnings call, FIS stated:  "[W]e expect to exit 2020 at $200 million of annual run rate cost synergies, in addition to generating over $100 million in net interest expense savings," indicating that the 2020 cost synergies target in Q2 2019 was $300 million.  The next quarter, in the Q3 2019 earnings call, FIS stated:  "[We're] very pleased to increase our 2020 cost synergy target by $50 million to more than $350 million in annual run rate savings," further indicating that the 2020 cost synergies target in Q2 2019 was $300 million.

[10]  In the Q2 2019 earnings call, FIS stated:  "Through integration planning, we validated the time line that we expect to deliver cost synergies, including increasing our total expected expense savings to more than $500 million on an annual run rate basis by the end of 2022.  This includes more than $100 million in net interest expense savings annually due to our successful refinancing of Worldpay's debt.  We will quickly begin executing our operational synergies by achieving operational efficiencies, technology optimization, and corporate alignment now that the transaction is closed and expect to exit 2020 at a $200 million annual run rate.  This annual run rate will step up to $300 million and $400 million by the end of 2021 and 2022, respectively."  Total cost synergies of $400 million projected by the end of 2021 were calculated based on the $100 million in annual net interest expense savings and the $300 million in operational synergies projected by the end of 2021.

[11]  FIS Form 8-K filed 11/5/19.

[12]  In the Q3 2019 earnings call, FIS stated:  "[W]e are ahead of our planned revenue goals, which puts us clearly on track to achieve our $500 million revenue synergy goal by the end of 2022."

[13]  FIS Q3 2019 earnings call presentation.  In the Q3 2019 earnings call, FIS stated:  "[G]iven the outstanding results to date and our current plans, we are very confident in delivering more than $500 million in total cost synergies."

[14]  FIS Form 8-K filed 2/13/20.

[15]  FIS Form 8-K filed 5/7/20.

[16]  FIS Form 8-K filed 8/4/20.  In its Form 8-K, FIS reported that it achieved $115 million in revenue synergies and $700 million in cost synergies.  In addition, the Form 8-K stated:  "the Company remains on track to meet or exceed its previously stated revenue and expense synergy targets for both year-end 2020 and 2022."

[17]  FIS Form 8-K filed 10/29/20.

[18]  FIS Form 8-K filed 2/9/21.

[19]  FIS Form 8-K filed 5/6/21.

[20]  FIS Form 8-K filed 8/3/21.

[21]  FIS Form 8-K filed 11/4/21.

[22]  FIS Form 8-K filed 2/15/22.

# Exhibit 2
## Fidelity National Information Services, Inc.
## Allegedly False or Misleading Revenue Synergies Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 1. | 5/7/20 | Q1 2020 Press Release | "The Company achieved annual run-rate synergies exiting the first quarter 2020 as follows:<br>• ***Revenue synergies of approximately $100 million, an increase of $20 million compared to the fourth quarter of 2019***<br>• Expense synergies of approximately $580 million, inclusive of approximately $275 million in interest expense savings, an increase of $115 million compared to the fourth quarter of 2019<br>As a result, the Company reiterated its previously-announced revenue synergy targets and increased its expense synergy target as follows:<br>• $200 million exiting 2020<br>• $550 million exiting 2022."  (bold and italic emphasis in Complaint, ¶ 184) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration." (Complaint, ¶ 185) |
| 2. | 8/4/20 | Q2 2020 Earnings Call Transcript | "We continue to outpace expectations on our synergy goals and are well ahead of schedule to meet our aggressive 3-year synergy targets. ***At the end of the quarter, our teams have achieved more than ... $115 million in annual revenue synergies***. We have an additional $60 million in revenue synergies that we are in the process of implementing now, and we have a growing pipeline of cross-sell opportunities that will continue to drive additional growth."  (bold and italic emphasis in Complaint, ¶ 186) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration." (Complaint, ¶ 187, citing ¶ 185) |
| 3. | 10/29/20 | Q3 2020 Earnings Call Transcript | "Touching on our Worldpay integration[,] [w]e are more than 2 years ahead of schedule. ***We have achieved $150 million in revenue synergies*** as we continue to see really strong traction with our Premium Payback solution. And we are significantly outperforming our initial expectations for merchant bank referrals."  (bold and italic emphasis in Complaint, ¶ 188) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration." (Complaint, ¶ 189, citing ¶ 185) |
| 4. | 2/9/21 | Q4 2020 Earnings Call Transcript | "We also made great progress with the Worldpay integration, remaining well ahead of plan and ***exited the year generating more than $200 million in revenue synergies*** and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021." (bold and italic emphasis in Complaint, ¶ 190) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration." (Complaint, ¶ 191, citing ¶ 185) |

# Exhibit 2
# Fidelity National Information Services, Inc.
# Allegedly False or Misleading Revenue Synergies Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 5. | 5/6/21 | Q1 2021 Press Release | "Strong results and exceptional new sales performance across all operating segments drive increased outlook for full-year 2021[.] Increased revenue synergy targets as ramping volumes, cross-selling execution and continued geographic expansion accelerated first quarter synergy achievement[.] ... The Company achieved annual run-rate synergies related to the Worldpay acquisition, exiting the first quarter of 2021 as follows: *Revenue synergies of approximately $300 million on an annual run-rate basis, including ongoing execution of cross-sell opportunities, bank referral agreements, geographic expansion, ramping volumes and Merchant SMB sales initiatives*." (bold and italic emphasis in Complaint, ¶ 192) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration."  (Complaint, ¶ 193, citing ¶ 185)<br><br>"Moreover, Defendant Norcross's statement in ¶192 about the reasons why FIS achieved those revenue synergies was materially false and misleading for the additional reason that it led investors to believe Defendants had met their revenue synergy targets based on successful cross-selling, when in reality, Defendants met their revenue synergy targets because they calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. ... Indeed, former Worldpay and FIS employees have explained that little to no cross-selling was happening due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. ... According to CW 7, a Global Strategic Account Director at Worldpay, she was not aware of any cross sales between FIS and Worldpay during her tenure, which ended in December 2021. Similarly, CW 9—who was responsible for reporting FIS' Integrated Payables divisions' revenue synergies—attended monthly meetings with five lines of business at FIS where revenue synergies with Worldpay were discussed. According to CW 9, none of these five businesses hit their revenue synergy targets with Worldpay during her tenure, which ended in April 2021. Thus, Defendants led investors to (wrongly) believe that FIS achieved the revenue synergies because of successful cross-selling, when in reality, these so-called revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory." (Complaint, ¶ 193) |

**Exhibit 2**
**Fidelity National Information Services, Inc.**
**Allegedly False or Misleading Revenue Synergies Statements**

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 6. | 3/9/22 | Wolfe Fintech Forum Transcript | Analyst: "When you – if you could look back in the year and tell us what you think what positively surprised you about the year, whether it's the industry and how that was trending or it's specific to FIS or for that matter, negatively surprised you through the year before we go into '22 and looking forward, I think that would be helpful."<br><br>Norcross: "Well, let's look at positives first ... We really successfully completed the Worldpay integration. We blew out [m]any of our operating synergies going into that, whether it was on expense takeout or revenue. ***Revenue exceeded well over $700 million of cross-sales*** . We ended up getting over $900 million of cost takeout. So we feel great about that integration and how that went." (bold and italic emphasis in Complaint, ¶ 218) | "Defendants manipulated the revenue synergy calculations and calculated revenue synergies as ***any*** new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations. … Indeed, this conduct was described in detail by CWs, who confirmed that FIS defined a revenue synergy as any new business obtained after the acquisition, regardless of whether that revenue was the result of the FIS-Worldpay combination. ... Thus, Defendants led investors to (wrongly) believe that they achieved the revenue synergies because of FIS's successful integration of Worldpay, when in reality, these so-called revenue synergies included revenue completely unrelated to the acquisition or integration." (Complaint, ¶ 219, citing ¶ 185) |

Source: Consolidated Amended Complaint filed 8/2/23; Defendants' Motion to Dismiss filed 9/22/23; FIS SEC filings and earnings calls; Wolfe Fintech Forum Transcript

Note:
[1] Statements as quoted in Exhibit A of Defendants' Motion to Dismiss. Internal references have been removed for clarity. The bold and italic emphasis is in the Complaint. The Complaint states that "Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics ... were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing." (Complaint, fn. 20)
[2] Internal references have been removed for clarity. The bold and italic emphasis is in the Complaint.

# Exhibit 3

## Fidelity National Information Services, Inc.
## Selected Analyst Commentary About
## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q4 2022 Earnings Release on February 13, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 1. | 2/13/23 | Autonomous | FIS: 7 Autonobites | "We're concerned that the synergies that FIS/Worldpay achieved through their merger might turn into dis-synergies once the Merchant spin is complete." (p. 2)<br><br>"FIS and Worldpay will enter into as many commercial agreements as possible to limit dis-synergies. We believe that makes sense on the revenue synergy side, and management remains committed to Project Amplify and the cross-sell opportunity." (p. 2) |
| 2. | 2/13/23 | Barclays | Merchant Spin-Off is Underway, As F23 Guide Misses Expectations | "Management also flagged the importance of commercial agreements between the two businesses to ensure continued cross-selling capabilities as well as minimizing the impact of spin dis-synergies." (p. 1) |
| 3. | 2/13/23 | Bernstein | Quick Take: FIS — Ugly Guide (And Merchant). How Does This Change SOTP Math? Are the Numbers De-Risked? | "It does appear that a lot of details still need to be ironed out e.g., impact on synergies ($900m in costs, $750m in revenues), nature of commercial agreement between the two companies, target leverage ratio for the merchant etc. Re synergies, we believe revenue synergies can be protected by a commercial agreement." (p. 1) |
| 4. | 2/13/23 | BNP Paribas | Feedback from Q4 Calls | "**Dyssynergies** will be mitigated through special contracts on the revenue side." (emphasis in original, p. 2) |
| 5. | 2/13/23 | Deutsche Bank | Searching for Answers | "FIS had previously announced it achieved revenue synergies of ~$750m and cost synergies of ~$900m associated with the merger and while questions remain around how much of these synergies will be reversed, mgmt. expects to mitigate synergy erosion through commercial partnerships with Worldpay and continued cost discipline (new cost saving target of ~$1.25bn by YE 2024)." (p. 1) |
| 6. | 2/13/23 | Jefferies | 4Q First Cut: '23 Outlook Underscores Ongoing Pressure; Merchant to be Spun Out | "Worldpay will maintain a commercial relationship with FIS in order to limit potential revenue dissynergies…" (p. 1) |

# Exhibit 3

## Fidelity National Information Services, Inc.

## Selected Analyst Commentary About

## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q4 2022 Earnings Release on February 13, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 7. | 2/13/23 | Jefferies | 4Q Wrap: Barren Catalyst Path Ahead | **"Dis-synergies a key variable; commercial agreement expected to protect debit routing.** Mgmt. appeared confident in being able to protect the lion's share of the $600mn in rev synergies from the original FIS/WP deal, but we expect most of the $625mn cost synergies (excl. interest expense saves) as dis-synergies." (emphasis in original, p. 1) |
| 8. | 2/13/23 | Oppenheimer | 2023 Guidance ~11% Below Consensus | **"Dis-synergies:** In the FIS/Worldpay merger they targeted $700M/$800M revenue/expense synergies. Through corporate contracts between companies most revenue synergies are expected to remain." (emphasis in original, p. 1) |
| 9. | 2/13/23 | UBS | Updated SOTP Analysis Shows Downside Largely Priced-In | "Our analysis estimates adjusted EBITDA dis-synergies of $900 million associated with the spinout. FIS reported $750 million in revenue synergies tied to the Worldpay acquisition, which we assumed at a 60% EBITDA margin based on margins FIS utilized in its Worldpay acquisition presentation." (p. 1) |
| 10. | 2/13/23 | William Blair & Company | Disappointing Results and Guide, but Spin of Underperforming Merchant Business Could Lead to Significant Multiple Expansion | "Management plans to mitigate any revenue and cost dis-synergies from the spin via corporate agreements. Recall that Ferris's initial strategy was to promote cross-selling by leveraging the FIS platform and by expanding its embedded finance initiatives, which include providing issuing, deposit, and lending capabilities to its customers via its three business segments. Further, we note that FIS garnered over $750 million of revenue and $900 million of expense synergies exiting 2021 from the FIS/Worldpay combination." (p. 1) |
| 11. | 2/14/23 | Northcoast Research | FIS: Lack of Accretive M&A Leads to Spin-Off | "The company did not provide details about the dis-synergies that will be created because of the separation of the two companies. The two companies will have a commercial agreement to minimize revenue dis-synergies and will try to manage cost increases." (p. 1) |

Source:  Analyst Reports

Note:
[1]  Analysis considers the 60 FIS analyst reports issued by 34 unique contributors during the one-week period following FIS' Q4 2022 earnings release on February 13, 2023.

# Exhibit 4

## Fidelity National Information Services, Inc.
## Selected Analyst Commentary About
## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q1 2023 Earnings Release on April 27, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 1. | 4/27/23 | Autonomous | FIS 1Q23 Call - 4 Autonobites | "...[T]opic of dis-synergies received a lot of air-time on today's call with management feeling confident about retaining the full $750mn of revenue synergies achieved since the Worldpay deal and a good portion of the OpEx synergies. The company noted that most of the revenue synergies were achieved by having Worldpay serve as a distribution partner for Banking and Capital Markets (e.g., selling the Treasury Solutions from Capital Markets into the Worldpay merchant base), and they will have a commercial agreement in place to maintain this relationship." (p. 2) |
| 2. | 4/27/23 | Baird | Details on Q1 Results | "**Expectations of synergies**<br>- **Worldpay acquisition synergies:** The company previously disclosed it achieved a total of $750 million in revenue synergies and $500 million of operating expense synergies post-Worldpay acquisition.<br>- **Expectations:** Management expects to maintain the majority of the $750 million revenue synergy and a meaningful portion of the operating expense synergies post-spin." (emphasis in original, p. 7) |
| 3. | 4/27/23 | Barclays | 1Q23 Beat: A Good First Step on the Road to Recovery | "Lastly, management believes disruption and dis-synergies from the spin-off of Worldpay will be manageable. FIS achieve $750M of revenue synergies and $500M of cost synergies from the integration, and now expects to maintain a majority of the revenue synergies, as Worldpay will act as a distribution partner for FIS, and a meaningful portion of the cost synergies." (p. 1) |
| 4. | 4/27/23 | Bernstein | FIS 1q23: Beat and Raise; Is That Enough? | "The company didn't provide the much anticipated dis-synergy number and capital structure for the spinco but reassured investors that the revenue synergies ($750m) and meaningful portion of cost synergies ($500m) will be retained." (p. 1) |
| 5. | 4/27/23 | Deutsche Bank | Finding A Way Forward | "While mgmt. did not provide further updates on the Worldpay spinoff, they expect to keep most of the ~$750m revenue synergies as it works to establish a commercial partnership with Worldpay while it attempts to salvage what is possible of the cost synergies while executing on its ~$1.25bn Future Forward efficiency program, where it has achieved ~$100m+ annual run-rate efficiencies so far." (p. 1) |

# Exhibit 4

## Fidelity National Information Services, Inc.

## Selected Analyst Commentary About

## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q1 2023 Earnings Release on April 27, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 6. | 4/27/23 | Evercore | The Last Cut was the Deepest | "**Spin Off:** Management expects to minimize potential revenue and cost dis-synergies resulting from the spin-off of WorldPay but did confirm they expect the process to be completed in early 2024." (emphasis in original, p. 2) |
| 7. | 4/27/23 | Jefferies | 1Q Wrap: Solid First Step; Still a Long Way to Go | "Base Case … Worldpay revenue and expense dis-synergies impact is contained at less than 50% of the realized FIS/WP merger synergies." (p. 2) |
| 8. | 4/27/23 | Keefe, Bruyette & Woods | 1Q23 Wrap-Up: Constructive Print Should Help Reset the Tone; Raising 2023 Estimate | "**Early commentary on dis-synergies from spin-off is generally positive** ... While the company has yet to finalize these estimates, FIS is confident that it can retain the majority of $750 million in revenue synergies and meaningful portion of operating expense synergies of $500mn that were achieved from the FIS/Worldpay merger." (emphasis in original, p. 1) |
| 9. | 4/27/23 | KeyBanc | FIS - ALERT: 1Q23 Earnings First Take | "The Company called out its intention to maintain most of the $750M revenue synergies and a portion of the $500M operating expense synergies post the Worldpay spin-off and will try to mitigate any impact from dis-synergies." (p. 1) |
| 10. | 4/27/23 | UBS | Merchant Driven Beat; '23 Guide Remains Conservative | "While little detail was revealed on the Merchant spin, CEO Stephanie Ferris did positively comment that she expects to retain the majority of the $750M revenue synergies and a significant portion of the $500M of expense synergies attained from Worldpay." (p. 1) |
| 11. | 4/27/23 | Wells Fargo | FIS: Solid 1Q Results, and Providing Clarity on Banking Helps the Narrative | "Management expects to maintain the majority of the $750M revenue synergy achievement post spin-off, as well as 'a meaningful portion' of the $500M operating expense synergies from the Worldpay acquisition." (p. 2) |
| 12. | 4/27/23 | William Blair & Company | After Reset, New Leadership Is One-for-One in Returning to Beat-and-Raise Cadence | "Management expressed confidence in its ability to mitigate potential revenue and cost dis-synergies from the spin via corporate agreements. Recall that Ferris's initial strategy was to promote cross-selling by leveraging the FIS platform and by expanding its embedded finance initiatives, which include providing issuing, deposit, and lending capabilities to its customers via its three business segments. Further, we note that FIS garnered over $750 million of revenue and $900 million of expense synergies exiting 2021 from the FIS/Worldpay combination." (p. 1) |

# Exhibit 4

## Fidelity National Information Services, Inc.

## Selected Analyst Commentary About

## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q1 2023 Earnings Release on April 27, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 13. | 4/28/23 | Credit Suisse | Q1 2023 recap; Updated 2019-base CAGR analysis | "As it relates to dis-synergies, management believes the majority of the $750mm of revenue synergies will be maintained with a commercial partnership arrangement to preserve distribution channels along with a brand agreement." (p. 3) |
| 14. | 4/28/23 | Citi | FIS Delivers Expected Beat-and-Raise; Investors Await Spin Details | "What investors are really awaiting is more detail on the spin, either in terms of specificity on the forward-looking commercial agreement between FIS (RemainCo) and Worldpay (SpinCo); capital structure; details on dis-synergies (the notion presented today that there would be every attempt made to lower this number is good, but obvious)." (p. 1) |
| 15. | 4/28/23 | J.P. Morgan | 1Q23 Recap: Low Bar Cleared, Tweaked Up Outlook Seems Beatable; Maintain OW With $64 PT | "Mgmt. confirmed that opex savings are on track with prior targets as is timing of Worldpay spin, stating preliminary plans to maintain achieved revenue synergies and a "meaningful" amount of cost synergies." (p. 1)<br><br>"Previously, FIS disclosed that it had achieved $750M in revenue synergies and $500M in opex synergies post-Worldpay acquisition. Mgmt. expects to maintain the majority of the $750M revenue synergy given that Worldpay will remain important distribution partner for FIS post-spin and they are in the process of renegotiating a new commercial partnership arrangement to minimize disruption and dis-synergies." (p. 5) |
| 16. | 4/28/23 | Moffett Nathanson | FIS 1Q23: Thanks, Banks! | "They have not finished sizing the dis-synergies from the spin but indicated that they expect the $750 M in revenue synergies from the FIS-Worldpay combination to remain largely intact, and that they expect the cost dis-synergies to be a relatively small portion of the $500 M originally captured." (p. 5) |

# Exhibit 4

## Fidelity National Information Services, Inc.

## Selected Analyst Commentary About

## Revenue Dis-Synergies from the Planned Spin-Off[1]

Following the Q1 2023 Earnings Release on April 27, 2023

| No. | Date | Contributor | Title | Quote |
|---|---|---|---|---|
| 17. | 4/28/23 | Morgan Stanley | Steadying the Ship | **"Still waiting on more spin details, though we're encouraged by confidence around dis-synergies**. While we were hoping for new information around the pending spin-off (dis-synergies, capital structure, etc), which we believe can drive more investors into the stock, new information was limited. We were encouraged, however, that the company expects to retain the majority of the $750M of revenue synergies it achieved with the WorldPay deal and a meaningful portion of the $500M of achieved operating expense synergies as well." (emphasis in original, pp. 1–2) |
| 18. | 4/28/23 | Northcoast Research | FIS: 1Q23 - Beats & Raises 2023 Guidance - Revenue Growth Still Muted | "The company stated that it expects to realize most of the $750 million in revenue synergies upon completing Worldpay's spin-off. Furthermore, the company stated that it expects a significant portion of the $500 million in cost synergies to be realized following the spin-off." (p. 1) |
| 19. | 4/28/23 | Stephens | FIS: Achievable '23 Bar + Clearer Path to Value Creation; Upgrade to OW | **"Synergies**: While FIS did not quantify the dis-synergies associated with the split, it expects to retain most of the $750M in Worldpay revenue synergies through commercial agreements as well as a " meaningful portion" of the $500M in cost synergies." (emphasis in original, p. 1) |

Source: Analyst Reports

Note:

[1] Analysis considers the 48 FIS analyst reports issued by 33 unique contributors during the one-week period following FIS' Q1 2023 earnings release on April 27, 2023.

## Exhibit 5
## Fidelity National Information Services, Inc.
## Allegedly False or Misleading Cross-Selling Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 1. | 8/3/21 | Q2 2021 Press Release | "[FIS] [r]aises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, *in order to reflect strong cross-selling performance during the second quarter* ... 'FIS delivered an exceptional quarter,' said Gary Norcross, FIS chairman and chief executive officer. 'Our transformation has created strong demand with our clients. Even as the world slowed, we continued to invest in our talent and our cloud-native solutions portfolio, creating a significant pipeline with our clients and prospects. With strong new sales and our largest revenue synergy quarter to-date, we are raising our guidance for the second time this year.'" (bold and italic emphasis in Complaint, ¶ 197) | "The statement in ¶197 was materially false and misleading because it claimed that FIS had achieved significant revenue synergies based on successful cross-selling, when in reality, Defendants' cross-selling was not successful. According to multiple former Worldpay and FIS employees, little to no cross-selling was happening by that point due to, among other things, no training, no clear direction or plan to cross-sell, and lack of access to the other company's data necessary to make any cross sales. ... Thus, Defendants led investors to (wrongly) believe that FIS achieved the revenue synergies because of successful cross-selling, when in reality, these so-called revenue synergies included revenue completely unrelated to cross-selling or leveraging FIS's brand, reputation, or presence in a new territory. Moreover, Defendants met their revenue synergy targets not because of cross-selling, but because they fraudulently calculated revenue synergies as *any* new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations." (Complaint, ¶ 198) |
| 2. | 2/15/22 | Q4 2021 Earnings Call Transcript | "Let me take the cross-segment sales. I think the team has *done an excellent job driving cross sales through the Worldpay acquisition* . I mean, *we exceeded more than $700 million in cross sales* , and so far we exceeded our original guide of what we thought we would get." (bold and italic emphasis in Complaint, ¶ 209) | "Defendant Norcross's statement was materially false and misleading because FIS had not 'done an excellent job driving cross sales' with Worldpay. According to former Worldpay and FIS employees, little to no cross-selling was happening. … According to CW 7, a Global Strategic Account Director at Worldpay, she was not aware of any cross sales between FIS and Worldpay during her tenure, which ended in December 2021. Similarly, CW 9—who was responsible for reporting FIS' Integrated Payables divisions' revenue synergies—attended monthly meetings with five lines of business at FIS where revenue synergies with Worldpay were discussed. According to CW 9, none of these five businesses hit their revenue synergy targets with Worldpay during her tenure, which ended in April 2021. Moreover, several former employees have stated that revenue synergies were tracked internally using spreadsheets. According to CW 4, FIS's U.S.-based Integration Management Office (IMO) tracked revenue synergies with Worldpay via an Excel spreadsheet, which was not password protected and maintained on a served server, thereby accessible to all finance employees and Company managers. Similarly, CW 1 noted that FIS GETPAID tracked its cross-sales dollar figures with Worldpay in an excel spreadsheet. CW 1 suggested that Norcross and Woodall had access to this spreadsheet. CW 2 also noted that Paymetric tracked cross-selling revenue synergies with Worldpay during his tenure through Excel spreadsheets and weekly meetings where cross-selling was discussed." (Complaint, ¶¶ 210–211) |

Source:  Consolidated Amended Complaint filed 8/2/23; Defendants' Motion to Dismiss filed 9/22/23; FIS SEC filings and earnings calls

Note:
[1]  Statements as quoted in Exhibit A of Defendants' Motion to Dismiss.  Internal references have been removed for clarity.  The bold and italic emphasis is in the Complaint.  The Complaint states that "Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics ... were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing." (Complaint, fn. 20)
[2]  Internal references have been removed for clarity.  The bold and italic emphasis is in the Complaint.

# Exhibit 6
## Fidelity National Information Services, Inc.
## Allegedly False or Misleading Goodwill Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 1. | 11/4/21 | Q3 2021 Form 10-Q | $35.9 billion reported for Merchant Solutions goodwill as of 9/30/21.  (Complaint, ¶ 200) | "Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by ***billions of dollars*** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the third quarter 2021 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations."  (Complaint, ¶ 201) |
| 2. | 11/4/21 | Q3 2021 Form 10-Q | "Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of September 30, 2021, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of September 30, 2021, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired***."  (bold and italic emphasis in Complaint, ¶ 203) | "The statement in ¶203 was materially false and misleading because the Merchant Solution segment's goodwill was impaired by September 30, 2021. ... Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q3 2021 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point."  (Complaint, ¶ 204) |
| 3. | 11/4/21 | Q3 2021 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company."  (Complaint, ¶ 199) | "Defendant Norcross and Woodall's certifications that FIS's financial statement were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023."  (Complaint, ¶ 202) |

# Exhibit 6
## Fidelity National Information Services, Inc.
## Allegedly False or Misleading Goodwill Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 4. | 2/23/22 | FY 2021 Form 10-K | $36.4 billion reported for Merchant Solutions goodwill as of 12/31/21.  (Complaint, ¶ 215) | "Defendants failed to disclose that: (i) there were indicators of impairment that required Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by *billions of dollars* by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the full year 2021 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations."  (Complaint, ¶ 216) |
| 5. | 2/23/22 | FY 2021 Form 10-K | "Goodwill impairment assessments require a significant amount of management judgment, and a meaningful change in one or more of the underlying forecasts, estimates, or assumptions used in testing goodwill for impairment could result in a material impact on the Company's results of operations and financial position. Based on the results of our assessments, $94 million of goodwill related to certain non-strategic businesses within the Corporate and Other segment was impaired in 2020. *For all other reporting units for all periods presented, goodwill was not impaired*."<br><br>*"For Merchant Solutions in 2021, we performed a qualitative assessment for our annual assessment. In addition to the factors noted above that are considered when performing such an assessment, we considered actual results for 2021 and updated internal forecasts as compared to prior internal forecasts and other assumptions used in the 2020 quantitative annual assessment. As a result of the assessment, we determined that the indicated fair value of the reporting unit was estimated to be in excess of carrying amount by a similar percentage as determined by the prior year's quantitative assessment. We concluded for 2021 that it remained more likely than not that the fair value of the Merchant Solutions reporting unit continued to exceed its carrying amount*."  (bold and italic emphasis in Complaint, ¶ 213) | "The statement in ¶213 was materially false and misleading because the Merchant Solutions segment's goodwill was impaired by December 31, 2021. ... Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the 2021 Annual Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point." (Complaint, ¶ 214) |
| 6. | 2/23/22 | FY 2021 Form 10-K | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company."  (Complaint, ¶ 212) | "Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023."  (Complaint, ¶ 217) |

# Exhibit 6
# Fidelity National Information Services, Inc.
# Allegedly False or Misleading Goodwill Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 7. | 5/3/22 | Q1 2022 Form 10-Q | $36.1 billion reported for Merchant Solutions goodwill as of 3/31/22.  (Complaint, ¶ 221) | "The representations in ¶221 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars**  by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the first quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations." (Complaint, ¶ 222) |
| 8. | 5/3/22 | Q1 2022 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of March 31, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of March 31, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired***."  (bold and italic emphasis in Complaint, ¶ 224) | "The statement in ¶224 was materially false and misleading because goodwill was impaired by March 31, 2022. … Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q1 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point." (Complaint, ¶ 225) |
| 9. | 5/3/22 | Q1 2022 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." (Complaint, ¶ 220) | "Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023." (Complaint, ¶ 223) |

# Exhibit 6
# Fidelity National Information Services, Inc.
# Allegedly False or Misleading Goodwill Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 10. | 8/4/22 | Q2 2022 Form 10-Q | $35.2 billion reported for Merchant Solutions goodwill as of 6/30/22.  (Complaint, ¶ 227) | "The representations in ¶227 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the second quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations." (Complaint, ¶ 228) |
| 11. | 8/4/22 | Q2 2022 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of June 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. *Based on our interim impairment assessment as of June 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired* ." (bold and italic emphasis in Complaint, ¶ 230) | "The statement in ¶230 was false and misleading because goodwill was impaired by June 30, 2022. …  Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q2 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point." (Complaint, ¶ 231) |
| 12. | 8/4/22 | Q2 2022 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." (Complaint, ¶ 226) | "Defendants Norcross and Woodall's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023." (Complaint, ¶ 229) |

# Exhibit 6
# Fidelity National Information Services, Inc.
# Allegedly False or Misleading Goodwill Statements

| No. | Date | Source | Allegedly False or Misleading Statements (the Bold and Italic Portions)[1] | Plaintiffs' Reasons for Statements Being Allegedly False or Misleading[2] |
|---|---|---|---|---|
| 13. | 11/4/22 | Q3 2022 Form 10-Q | $34.3 billion reported for Merchant Solutions goodwill as of 9/30/22.  (Complaint, ¶ 235) | "The representations in ¶235 were materially false and misleading because Defendants failed to disclose that: (i) there were indicators of impairment that required that Defendants take a goodwill impairment charge by that point; (ii) the Merchant Solutions segment's goodwill was impaired by **billions of dollars** by that point; (iii) by not recording goodwill impairment on a timely basis, FIS's assets were materially overstated in the third quarter 2022 financial statements, which materially overstated the value of the Worldpay asset; and (iv) FIS lacked adequate internal controls concerning impairment evaluations. ... Furthermore, by November 4, 2022, Defendants had already failed to find a buyer for Worldpay at a total price of around $30 billion, clearly indicating that its goodwill—which was higher than the total sale price—was impaired."  (Complaint, ¶ 236) |
| 14. | 11/4/22 | Q3 2022 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of September 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. ***Based on our interim impairment assessment as of September 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired*** ."  (bold and italic emphasis in Complaint, ¶ 238) | "The statement in ¶238 was materially false and misleading because goodwill was impaired by September 30, 2022. … Thus, Defendants violated GAAP by failing to record a goodwill impairment charge in the Q3 2022 Report despite knowing of significant impairment triggers that made it clear that the Merchant Solutions segment's goodwill was impaired by that point."  (Complaint, ¶ 239) |
| 15. | 11/4/22 | Q3 2022 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company."  (Complaint, ¶ 234) | "Moreover, Defendant Norcross's representations that FIS's financial statements were prepared in conformity with GAAP were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of billions of dollars for its Merchant Solutions segment, thereby falsely inflating the value of the Worldpay asset during the Class Period until FIS belatedly recognized the $17.6 billion charge on February 13, 2023."  (Complaint, ¶ 237) |

Source:  Consolidated Amended Complaint filed 8/2/23; Defendants' Motion to Dismiss filed 9/22/23; FIS SEC filings

Note:
[1]  Statements as quoted in Exhibit B of Defendants' Motion to Dismiss.  Internal references have been removed for clarity.  The bold and italic emphasis is in the Complaint.  The Complaint states that "Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics ... were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing." (Complaint, fn. 20)
[2]  Internal references have been removed for clarity.  The bold and italic emphasis is in the Complaint.

Page 5