# Exhibit 6

**Transcript of the Deposition of
Chad Coffman (Excerpts)**

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION


IN RE FIDELITY NATIONAL          )

INFORMATION SERVICES, INC.       ) Case No.

SECURITIES LITIGATION            ) 3:23-cv-252-TJC-PDB


        The video-recorded deposition of CHAD COFFMAN, called by the Defendants for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, before Valerie Calabria, CSR, RPR, taken at 1 South Dearborn Street, Chicago, Illinois, on April 10, 2025, at 9:01 a.m.

Page 130

statements challenged as false or misleading about revenue synergies or cross-sales were, in fact, false or misleading, correct?

A. Correct.

Q. And you are not giving an opinion in this case about whether any of the statements about goodwill that are challenged as false or misleading were, in fact, false or misleading, correct?

A. Correct. I have not formed an opinion on that.

Q. And you are also not giving an opinion about whether the statement regarding market share that has been challenged as false or misleading in this case was, in fact, false or misleading, correct?

A. Correct.

Q. You're familiar with the term "corrective disclosure," yes?

A. Yes.

Q. Fair to say that a corrective disclosure is a disclosure that reveals the relevant truth that was allegedly concealed by an alleged material misrepresentation or omission?

A. Yes. That's consistent with language I've used often.

Page 131

Q. Do you know how many alleged corrective disclosure dates are identified in the plaintiffs' complaint?

A. I believe there were three.

Q. Do you recall when they are?

A. Not off the top of my head. But by making reference to one of my exhibits, I believe I can, because I think Exhibit 7, which lists out the earnings announcements, I believe what's listed as Event 10, 12, and 13 on here are the alleged corrective disclosures, if memory serves.

Q. So the record is clear, you're referring to announcements on August 4, 2022, November 3rd, 2022, and February 13th, 2023?

A. That's my recollection, yes.

Q. You are not giving an opinion in this report about whether any announcements on those dates were, in fact, corrective of any challenge statements?

A. Correct.

MR. MANNINGHAM: Objection.

THE WITNESS: Correct.

BY MS. WONG:

Q. And at this stage, you are not providing any opinions on loss causation in this case,

Page 132

correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think in my report I've described certain aspects of what are general approaches to loss causation that are used in these types of cases. But I'm not opining with respect to whether there was or wasn't loss causation in this case in this report.

BY MS. WONG:

Q. You're familiar with the term "price impact" in the securities context, yes?

A. Yes. I've seen it used in a variety of ways. But, generally speaking, yes, I -- I'm familiar with the concept.

Q. And you are not giving an opinion in this case on whether any challenge statement, in fact, had a price impact, correct?

A. Correct.

Q. Would you agree that whether a given public statement actually had an impact on stock price is irrelevant to the question of whether that stock trades in an efficient market?

MR. MANNINGHAM: Objection.

THE WITNESS: Could I have that read back, please.

Page 133

(Record read as requested.)

THE WITNESS: Well, I can certainly think of context where it wouldn't be irrelevant in the sense that if there were obvious evidence of cause and effect between a statement -- a public statement and the stock price moving, that could provide evidence related to market efficiency and at the same time be providing evidence about price impact. But I'm not drawing that link here with respect to any piece of information.

BY MS. WONG:

Q. Do you agree that, for purposes of your report here, the question of whether a given statement actually had an impact on FIS's stock price is irrelevant to whether FIS's stock traded in an efficient market?

MR. MANNINGHAM: Objection.

THE WITNESS: I just want to be clear. When you say "any public statement," are you talking about the alleged misstatements in this case or just any company public statement? Because I've certainly analyzed the earnings announcements, which are company public statements. So I just want to make sure I'm understanding your question appropriately.

34 (Pages 130 - 133)

Page 134

BY MS. WONG:

Q. That's fair. Let me -- let me reask the question, focusing on the specific challenge statements.

A. Okay.

Q. Do you agree that, in this case, whether any of the statements that the plaintiffs have challenged as false or misleading actually had any impact on FIS's stock price is irrelevant to the question of whether FIS's stock traded in an efficient market?

A. I think in -- in this case, given what I know, the answer to that is yes. In the sense that I'm reaching a conclusion about market efficiency, without reaching any conclusion whatsoever about whether there was a price impact from any of the alleged misstatements. I don't want to make a broad, general statement about that being irrelevant because maybe that's a crossover -- and could be a crossover in certain cases between those two things.

But here, I think whether or not there was price impact of the alleged misstatements is irrelevant to my conclusion of there being an efficient market.

Page 135

Q. Do you also agree that whether any of the statements challenged as false or misleading by the plaintiffs in this case actually had an impact on FIS's stock price is irrelevant to the question of whether any damages in this case could be calculated on a class-wide basis using a common methodology?

A. I think it's irrelevant, yes. I mean, to the extent none of the challenge statements are actually false or misleading, the -- the out-of-pocket methodology would still just yield damages of zero. So, yeah, I think it's -- that's irrelevant, yes.

Q. Are you familiar with what are sometimes called a price inflation theory and an inflation maintenance theory in the securities context?

A. I've heard those words used. I generally have an understanding of how people often use them. I hear them misused periodically, but I generally have an idea of what's being referenced there, yes.

Q. In an inflation maintenance case like this one, do you agree that a stock price decline can sometimes support an inference that an earlier challenge statement had an impact on the stock

Page 136

price?

MR. MANNINGHAM: Objection.

THE WITNESS: I haven't actually evaluated whether there might be any evidence of a price impact related to any of the challenge statements. So whether this is purely a price maintenance theory isn't something I've really drawn a conclusion about.

So I -- I don't want to take that portion of your question as a given that it's something I've concluded or is consistent with any analysis I've done.

But, generally speaking, in a price maintenance case where the allegation is not that the -- that the challenge statements move the price up in any way or contributed to the stock price moving up in any way, that a later alleged corrective disclosure materialization could serve as the basis as evidence that there was price impact from an earlier statement that maintained the stock price.

BY MS. WONG:

Q. Is it fair to say, though, that it's not always true that a stock price decline supports an inference that some earlier statement had an impact

Page 137

on a company's stock price?

MR. MANNINGHAM: Objection.

THE WITNESS: You could certainly construct examples where later stock price declines are unrelated to earlier alleged misstatements.

BY MS. WONG:

Q. Would you agree that to make an inference of price impact, there needs to be a direct connection between the company-specific information that is revealed to the market on the day of a stock price decline on the one hand and, on the other hand, the earlier statement that's at issue?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't know what you mean exactly by "direct connection." I generally understand there has to be some reasonable causal connection between an alleged misstatement and later losses that occur for there to be that evidence.

But I don't necessarily accept -- understand exactly what you mean by "direct connection," and I'm not assigning any particular specific meaning to what that is.

35 (Pages 134 - 137)

Page 222

most-often-used approach, but I haven't drawn any specific conclusion about exactly how it would be done in this particular case. I think that would be a natural starting point in this case, is to see how much the stock price declined when there were corrective disclosures, and use that as a starting point to calculate loss causation.

But I haven't been asked to do a loss causation yet. So even though that's the most-often-used technique, I don't know if I have -- I'm not certain that there aren't reasons to take an alternative approach.

Q. I see. So in opining that damages could be calculated class-wide using a common methodology in this case, you have not made a conclusion as to whether that methodology would or would not have to use an event study, fair?

A. I think there's a very high likelihood that it would and that that would be the -- the approach. But since I haven't been asked to perform that and look at all the things that would be necessary to evaluate that, I don't know that with certainty. But that -- if I were asked to do it, that's where I would start.

Q. Earlier today we were talking about an

Page 223

event study that you have conducted in connection with your market efficiency opinion, right?

A. Yes.

Q. To be clear, any event study that would be conducted pursuant to your proposed damages methodology in this case would be a different event study than the one you've conducted for market efficiency opinion, correct?

A. It might be, but it doesn't necessarily have to be. In other words, I've conducted an event study already that identifies the firm-specific portion of the stock price decline on what plaintiffs are alleging are the corrective disclosures.

Whether that event study by itself is sufficient or would need to be refined in some way to analyze loss causation, I don't know. But it -- for example, one of the things one would consider is whether or not there's -- you know, exactly what the timing of the corrective information was and whether an intraday pricing analysis might be necessary. Or if looking at a multiple-day window might be necessary. Or if there's confounding information that would have to be excluded would be necessary.

Page 224

But it may be that the event study I've already performed is a sufficient starting point and would be the same event study I would use in that circumstance, but I don't know for certain. I haven't been asked to do that yet.

Q. The event study you've already conducted for your market efficiency opinion does not show whether any of the challenge statements in this case -- so the statements challenged as false or misleading by the plaintiffs -- actually had any impact on the price of FIS's stock, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Correct.

BY MS. WONG:

Q. And in order to calculate damages, am I right in understanding that you would need to conduct an event study that does show whether and how much, if any, impact each challenge statement had on the price of FIS's stock?

A. Well, I don't know that it would necessarily be different for each challenge statement, but I think any loss causation analysis would have to -- and I think part of what you're doing is confounding the event study with more of the loss causation analysis.

Page 225

In other words, the part of the event study that's the regression itself and the identification of whether there's a statistically significant price movement on the alleged corrective disclosures dates is already part of my report; not because they were corrective disclosures or alleged corrective disclosures, but because they were earnings announcements. That may be the appropriate starting point for the loss causation analysis and, in my view, is a reasonable -- there's already a reasonable estimate of what the totality of the information released on those days -- how much of that the price movement of FIS is firm-specific on those days.

If there were an additional conclusion that what moved the stock price on that day was corrective information and there was nothing else moving it, that might be enough, then, to suggest that that price movement is the appropriate measure of how much inflation was dissipated.

But I think to even get to that conclusion, you would have to do a whole host of additional loss causation analyses of what's all the relevant new information on that day, was there

57 (Pages 222 - 225)

Page 226

any other negative information that's unrelated to the fraud, and do some sort of additional analyses, if there was, to remove the impact of that confounding information.

So I'm not saying that -- so I think the event study piece, just the regression piece of -- of measuring the firm's specific price movement, I already do have a model that does that. Now, whether that's the exact same model that would be the starting point of a loss causation analysis, I don't know because there might be other things I would want to look at. But then you would certainly have to do a further analysis beyond what I've done to evaluate whether any specific piece of information or the corrective information had an effect on that particular day.

Q.  So is it fair to say the event study that you've conducted for your market efficiency opinion may or may not be an appropriate starting point for a damages methodology and that you would have to do additional -- additional analysis to determine whether that event study would or would not be an appropriate starting point?

A.  That's a fair statement, yes.

Q.  And is it also fair to say that if it

Page 227

turned out that the event study you've already conducted for your market efficiency opinion did turn out to be an appropriate starting point for a damages methodology, even then, you would still have to do additional analyses to actually calculate damages reliably in this case?

A.  Absolutely, yes.

Q.  And you haven't done any of those additional analyses to date?

A.  Correct.

MS. WONG:  Let's go off the record for a little bit, if that's all right.

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are going off the record at 3:18 p.m. with the end of Media No. 5.

(Short recess.)

THE VIDEOGRAPHER:  We are back on the record with the beginning of Media No. 6 at 3:25 p.m.

Counsel, you may proceed.

MS. WONG:  Mr. Coffman, thank you very much for your time today.  We have no further questions.

THE WITNESS:  Okay.  Thank you.

MR. MANNINGHAM:  We have no questions.  Thank you.

THE VIDEOGRAPHER:  Thank you.  We are going

Page 228

off the record at 3:25 p.m. with the end of the deposition of Chad Coffman.  The total number of media was six and will be retained by Veritext.

FURTHER DEPONENT SAITH NAUGHT

(Proceedings concluded at 3:25 p.m.)

Page 229

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK   )

I, Valerie M. Calabria, CSR, RPR, do hereby certify that CHAD COFFMAN was duly sworn by me to testify the whole truth, and that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and that the deposition was submitted to Mr. Nicholas D. Manningham, Plaintiffs' counsel, for signature. Pursuant to Rule 30(e) of the Federal Rules of Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of April, A.D. 2025.

_Valerie Calabria_

Valerie M. Calabria, CSR, RPR
Illinois CSR License 084-003928

58 (Pages 226 - 229)