# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

|  |  |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB<br><br>Honorable Timothy J. Corrigan<br><br>Honorable Patricia D. Barksdale |

# LEAD PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

I.  INTRODUCTION.......................................................................... 1

II.  ARGUMENT ............................................................................. 4

    A.  Defendants Have Not Proven a Complete Lack of Price Impact .......... 4

        1.  *Goldman* Does Not Apply to This Case ..................................... 4

            (a)  There is Evidence Investors Relied on the Misstatements................................................................. 5

            (b)  Defendants' Misstatements are Specific, Not Generic...... 7

        2.  Even if *Goldman* Applied, There is a Direct Connection Between the Misstatements and Corrective Disclosures............. 8

            (a)  The Revenue Synergy Statements ................................... 9

            (b)  The Integration Statements........................................... 13

            (c)  The Goodwill Statements ............................................. 14

    B.  Defendants' Challenge to NIC's Standing is Without Merit............... 15

III.  CONCLUSION ......................................................................... 15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sep. 8, 2021) ....................................................... 7

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ........................................................................ 13

*In re Apple, Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) .......................................................5

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ...............................................................*passim*

*Basic v. Levinson*,
485 U.S. 224 (1988) ....................................................................................... 1

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
2023 WL 2932485 (D. Conn. Apr. 13, 2023) .................................................. 14

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020) .....................................................................6

*In re Concho Resources Inc. Sec. Litig.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025).................................................... 10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ..........................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ................................................................................1, 14

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024).................................................... 14

*Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*,
348 F.R.D. 35 (D.S.C. 2024)......................................................................9, 13

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024).................................................. 11

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ...................................................8, 13

*In re Nio, Inc. Sec. Litig.*,
2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) ............................................ 5, 7, 12

## Statutes

Neb Rev. Stat. § 72-1239.01 ..................................................................... 15

Neb. Rev. Stat. § 84-203 ............................................................................. 15

## I.    INTRODUCTION

The question here is simple: should the Court certify this case as a class action? The parties both agree on the answer: **yes**.

Defendants' Opposition concedes nearly all the requirements for class certification. Defendants do not challenge any of Rule 23(a)'s requirements, nor do they dispute that damages can be calculated using a common methodology. Defendants even admit that the Court should certify a Class for a certain subset of the alleged misstatements related to goodwill. Defendants' only challenge to class certification is related to Rule 23(b)'s predominance requirement, which requires that common questions predominate over individual ones. In securities fraud cases, this requirement revolves around the class-wide presumption of reliance created by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988). When invoked, courts can presume that investors relied on any material misstatements.

That is where the dispute starts (and ends). At the class certification stage, a defendant can try to rebut the *Basic* presumption for certain statements by proving, by a preponderance of the evidence, that the statements were so irrelevant to investors that they were incapable of having **any impact whatsoever** on the company's stock price—*i.e.* no investor relied on such statements. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014). This is known as a "price impact" challenge. *Id.* At the class certification stage, the district court's job in determining whether a defendant has met its burden of rebutting the presumption of reliance is "to assess all the evidence of price impact—direct and indirect—and determine whether it is more

likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021) ("*Goldman*"). This analysis must be "aided by a good dose of common sense." *Id.* at 122.

Here, both the law and common sense dictate that investors relied on the alleged misstatements, and thus, the statements had an impact on FIS's stock price. Unlike the highly generic boilerplate statements in *Goldman*, here, Defendants' misstatements were specific and touted the single most important thing to investors: whether FIS's massive $48 billion acquisition of Worldpay was a success. The statements here appeared in press releases and were made by the Individual Defendants in response to questions from analysts during earnings calls. Moreover, they are specific statements about important financial metrics (the primary information investors rely on), the performance of Worldpay, and the status of the integration. Indeed, analysts spoke **directly** about Defendants' false statements at the time and, in many instances, raised price targets and recommended FIS stock to investors **because of** them. It is hard to fathom what could be considered more direct evidence of price impact or investor reliance than an analyst **raising its price targets** in response to Defendants' repeated misstatements.

In their opposition (ECF No. 88, "Opp."), Defendants ask the Court to look past all the evidence of price impact and the highly-specific nature of the statements and go straight to a *Goldman* "mismatch" analysis. Under *Goldman*, when (i) there is no evidence that investors relied on the statements at the time (a fact not present

2

here), and (ii) the statements are highly generic (also a fact not present here), courts sometimes weigh the connection between the misstatements and corrective disclosures to determine price impact. *See id.* at 123.

Here, there is no need to conduct a mismatch analysis because there is direct evidence that investors relied on the specific statements at the time they were made. But even assuming the Court finds that there is no evidence that investors relied on the statements (it should not), and then also finds the statements are generic (again it should not), Defendants' price impact challenge would **still** fail because there is a clear, demonstrable connection between the statements and corrective disclosures.

Indeed, as set forth in detail below and in the rebuttal report of expert Chad Coffman ("Coffman Rebuttal"), there is a clear connection between the misstatements and corrective information because: (i) the Company's internal documents explicitly make the connection; (ii) analysts explicitly connected the two at the time of the statements; and (iii) investors explicitly made the connection after the corrective disclosures. *See generally* Ex. F.[1] Thus, the evidence shows that, far from a mismatch, the statements are directly related to the corrective information.

The only piece of "evidence" Defendants put forth to try to prove that there is no connection is the expert report of Dr. Douglas J. Skinner ("Skinner Rep."). *See* Ex. G. Critically, however, Skinner admitted during his deposition that he was "not asked to explicitly opine on whether the alleged misstatements . . . impacted the

---

[1] References to Ex. ___ refer to documents attached as Exhibits to the Declaration of James T. Christie submitted contemporaneously with this reply brief.

company's stock price." Ex. H, Skinner Dep. at 87:20-88:2. Instead, Skinner's analysis completely ignores FIS's internal documents and relies on cherry-picked analyst reports to summarily conclude that certain of the alleged statements are "not necessarily" connected to the corrective disclosures. This does not even come close to overcoming Defendants' burden of proving, by a preponderance of the evidence, a **complete** lack of price impact for any of the statements. *Goldman*, 594 U.S. at 125.

As set forth below, there are at least three independent reasons the Court should deny Defendants' attempts to prove a lack of price impact: (1) there is evidence showing investors relied on the misstatements, which is the relevant inquiry at this stage; (2) unlike *Goldman*, the statements are specific, not generic; and (3) in making their *Goldman* mismatch argument, Defendants overlook a mountain of evidence establishing the connection between the misstatements and corrective disclosures. The Court should reject Defendants' flawed arguments and certify the Class for all the alleged misstatements.

## II.    ARGUMENT

### A.    Defendants Have Not Proven a Complete Lack of Price Impact

#### 1.    *Goldman* Does Not Apply to This Case

Defendants rely almost exclusively on *Goldman*. However, the Supreme Court's short decision in *Goldman* did not require courts to simply start and end the price impact analysis by assessing whether a mismatch exists, as Defendants argue. Rather, the *Goldman* Court "explicitly premised its conclusion on the generic nature" of the misstatements and commented on what evidence a court can consider when

4

determining whether a **generic** misstatement had a price impact. *See In re Nio, Inc. Sec. Litig.*, 2023 WL 5048615, at *15 (E.D.N.Y. Aug. 8, 2023).

In *Goldman*, the plaintiffs alleged that extremely generic statements—such as "[o]ur clients interests always come first"—had an impact on Goldman's stock price. *Goldman*, 594 U.S. at 120. Importantly, though, plaintiffs there did not have evidence that investors relied on those generic misstatements at the time they were made. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("*Goldman II*"). In that situation, where a court cannot infer investors relied on the statements because they were so generic, the Court explained there must be some connection between the generic misstatement and specific corrective disclosure in order "to infer front-end price inflation—that is, price impact—from the back end price drop." *Goldman*, 594 U.S. at 123.

That is not the case here, and thus, *Goldman* does not apply for two reasons. **First**, there is direct evidence that investors relied on the misstatements. **Second**, the misstatements at issue here are detailed and specific, not generic.

### (a)    There is Evidence Investors Relied on the Misstatements

Here, there is evidence investors relied on the misstatements at the time they were made. This is known as front-end price impact. "Price impact can be observed either "on the 'front-end' (i.e., misstatements causing or maintaining inflation) or on the 'back-end' (i.e., a decline in price caused by the corrective disclosures)." *In re Apple, Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022). Thus, to rebut the *Basic* presumption, "Defendants must affirmatively disprove both to satisfy their

burden*." In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 209 (D. Minn. 2020). Defendants have done neither.

Unlike *Goldman*, there is direct evidence of front-end price impact here. As alleged in the Complaint, after Defendants' false statements touting revenue synergies and the purportedly successful integration of Worldpay (*see, e.g.*, ¶¶186, 188, 190, 192, 194, 197, 205), "investors believed that the Worldpay acquisition was a success and driving revenue synergies for the Company." ¶100. Analyst coverage supports this allegation. For example, on May 7, 2020 (after the first misstatement, ¶184), UBS wrote "while [FIS] continues to achieve revenue and cost synergies, we maintain our Buy rating." *See* Ex. I at 1. This continued throughout the Class Period after each misstatement.[2] Thus, unlike *Goldman*, there is a clear "indication that investors relied upon the [misstatements] *as written*." *Goldman II*, 77 F.4th at 100.[3]

Not surprisingly, Defendants' expert did not consider this evidence. *See, e.g.,* Ex. H, Skinner Dep. at 196:5-10 ("I was not asked to evaluate" whether investors

---

[2] *See, e.g.,* Ex. J at 1, May 7, 2020 RBC Capital Markets Report (increasing price target to $150 because of "$100M of annual run-rate revenue synergies"); Ex. K at 1, Aug. 4, 2020 Credit Suisse Report (increasing price target because FIS was "[o]ntrack with WP revenue [synergies]"; Ex. L at 1, Oct. 30, 2020 Goldman Sachs Report (raising price target because FIS "is well positioned to exceed the $200mn revenue synergy target"); Ex. M at 1, May 6, 2021 Baird Report (raising price target because of purportedly "good" and "clean" results, including "[r]evenue synergies raised"); Ex. N at 1, June 10, 2021 Baird Report (noting the Worldpay acquisition has "not really had any negative surprises"); Ex. O at 1, Aug. 3, 2021 Rosenblatt Securities Report (raising price target because the Company "had robust performance in its cross-selling segments"); Ex. P at 1, Nov. 16, 2021 RBC Capital Markets Report (reiterating Outperform rating because "the company reiterated that it is not losing share in merchant acquiring").

[3] The content of the analyst reports is far different than in *Goldman*. There, the court noted nothing the plaintiff provided some analyst commentary "on the *subject* of [the misstatements]," but "it does not suggest[ed] that the market relied on the [misstatement]." and "[t]he report itself suggest that the analyst relied on something other than the [misstatement]." *Goldman II*, 77 F.4th at 103-04. Here, analysts specifically referenced Defendants' misstatements as a justification for raising their price targets for FIS's stock.

relied on the statements at the time they were made). This is yet another fact distinguishing this case from *Goldman*, where the defendant's expert submitted an "analysis of 880 analyst reports published during the Class Period . . ., none of which reference the [misstatements]," to support his opinion that investors did not rely on the misstatements. *Goldman II*, <u>77 F.4th at 104</u>. As the court noted, "pre- or post-disclosure discussion in the market . . . can be a useful indicator of its inflation-maintaining capacity." *Id.* at 102-03.

The Court must end the inquiry there. *Goldman* does not apply here because there is ample evidence that investors relied on the specific statements at the time they were made. This evidence of price impact on the front end confirms that there was reliance, and thus, Defendants cannot rebut the *Basic* presumption of reliance. The class should be certified in full on this basis alone. *In re Allergan PLC Sec. Litig.*, <u>2021 WL 4077942</u>, at * 11 (S.D.N.Y. Sep. 8, 2021) (rejecting the defendants' price impact challenge because they could not disprove a lack of front-end price impact).[4]

**(b)     Defendants' Misstatements are Specific, Not Generic**

The specific nature of the statements at issue here, which differ wildly from the generic statements in *Goldman*, represent a second independent basis for the Court to end the *Goldman* inquiry, as *Goldman* does not even apply to cases with specific statements like here. *See NIO*, <u>2023 WL 5048615</u>, at *14-15 (holding Goldman's mismatch theory only applies to "generic" statements).

---

[4] Moreover, "a misrepresentation need not be associated with an uptick in inflation" as long as the "misrepresentation [] actually maintains inflation." *Goldman II*, <u>77 F.4th at 100</u>. Here, Defendants' misstatements artificially inflated and maintained FIS's inflated stock price. *See, e.g.*, ¶309.

In *Goldman*, boilerplate statements like "[o]ur reputation is one of our most important assets" were buried in the risk factor section of Goldman's Form 10-K. *Goldman II*, 77 F.4th at 82. Here, by contrast, Defendants overstated important financial metrics by billions of dollars, touted inflated revenue synergies in press releases, and repeatedly made false statements in press releases and earnings calls about the Worldpay acquisition and its success. These are highly specific, not generic, statements that led investors to believe the Worldpay acquisition was a success while concealing the same relevant truth: the acquisition was a failure, Worldpay's business had suffered because of it, and Defendants had fraudulently overstated Worldpay's value for years. *See* Ex. F, Coffman Rebuttal ¶¶13, 20-30. There is no question about whether investors would have relied on such statements, they plainly would have and did.

The Court should again end the inquiry here. *See e.g., In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) (not applying *Goldman*'s analysis because "the generic representations in *Goldman*" were "nothing like" defendants' "highly specific" audit report statements).

### 2. Even if *Goldman* Applied, There is a Direct Connection Between the Misstatements and Corrective Disclosures

Even if the Court were to ignore the evidence establishing that investors relied on the misstatements (*i.e.* price impact) and perform a *Goldman* mismatch analysis, Defendants still have not carried their burden of proving a **complete** lack of price impact for any of the misstatements because there is a clear connection between

8

them and the corrective disclosures. Indeed, contrary to Defendants' argument, Opp. at 10, nothing in *Goldman* requires a "precise match" between the misstatements and corrective disclosures. *Goldman II*, 77 F.4th at 98. Instead, courts uniformly agree that "*Goldman* . . . requires only that the misstatement and corrective disclosures be related or relevant to one another." *Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*, 348 F.R.D. 35, 53 (D.S.C. 2024) (collecting authority). Here, each category of misstatement is connected to each of the corrective disclosures.[5]

### (a) The Revenue Synergy Statements

Defendants' challenge to the Revenue Synergy Statements collapses under even minimal scrutiny. As an initial matter, Defendants fundamentally mischaracterize the Complaint's allegations and completely ignore **why** the Revenue Synergy Statements were false and misleading.

Specifically, the Complaint alleges that based on the Revenue Synergy Statements, "investors believed that the Worldpay acquisition was a success" ¶¶100, 105; *see also* Coffman Rebuttal at Section IV. This truth was revealed through the three corrective disclosures revealing Worldpay's declining performance and the acquisition's failure. *See* ¶¶156-80; *see also* Coffman Rebuttal at Section V(A). This is

---

[5] In making their mismatch argument, Defendants separate the misstatements into three categories. Although Lead Plaintiffs disagree with this approach, in order to clearly address Defendants' arguments, Lead Plaintiffs address them as follows: (1) statements about revenue synergies or cross sales, ¶¶184, 186, 188, 190, 192, 197, 209 218, 232 (the "Revenue Synergy Statements"); (2) statements about FIS's integration of Worldpay and market share, ¶¶195, 205, 207 (the "Integration Statements"); and (3) statements about the Merchant Solution segment's goodwill value, ¶¶199-200, 203, 212-13, 215, 220-21, 224, 226-27, 230, 234-35, 238 (the "Goodwill Statements").

a direct and causal connection.[6] Indeed, during his deposition, Skinner admitted that he did not consider the possibility that these statements concealed from investors the success of the Worldpay acquisition. *See* Ex. H, Skinner Dep. at 102-107. Notably, Skinner also conceded that he did not come up with the statement categories himself, but rather Defense counsel did. *Id.* at 88:13-19. Thus, Skinner's analysis is unreliable, as he simply considered what would help Defendants' conclusion and ignored everything else, including internal FIS documents and analyst reports making the connection.

Skinner's analysis is further flawed because he did not consider any evidence that connected revenue synergies to the corrective information. Skinner claims the corrective information—e.g., declining EBITDA margins, loss of market share, lower profitability, and a $17.6 billion goodwill impairment charge—"does not necessarily imply anything about" revenue synergies. *See* Ex. G, Skinner Rep. ¶¶ 63, 72, 77, 125. But, as he admitted during his deposition, Skinner has no idea if they are related in this particular case because he did not review **any** internal FIS documents. *See id.* at 54:23-25; 111:21-25. Had Skinner considered such documents, he would have seen there is a clear connection between revenue synergies and EBITDA margin. For example, one internal document from the Class Period notes that the Company's 2020 EBITDA margin was "negatively impacted by revenue losses in high margin merchant portfolios, increased merchant losses and incremental costs

---

[6] For this reason, this case is distinguishable from *In re Concho Resources Inc. Sec. Litig.*, 2025 WL 1040379, at *22 (S.D. Tex. Apr. 7, 2025). Here, the Revenue Synergy Statements—which disclosed purportedly **ongoing** synergies—hid the relevant truth about the failure of the Worldpay acquisition.

for growth initiatives," i.e., revenue synergies. Ex. Q at 2. Similarly, a May 13, 2021 internal presentation contains a slide detailing how revenue synergies contributed to EBITDA margins. *See* Ex. R at 46. Thus, internal documents plainly establish the connection between EBITDA margins and revenue synergies.

Skinner's analysis is further undermined by another glaring omission. To support his (already flawed) opinion, he only reviewed analyst reports from the one week after each corrective disclosure. *See* Ex. G, Skinner Rep. ¶¶66, 73, 85. Skinner offers no logical explanation for why he did not consider, for example, analyst reports from the time of the misstatements. Again, the reason is simple: analyzing more analyst reports would have prevented him from reaching the conclusion Defendants wanted him to.

The analyst reports that Skinner conveniently ignored clearly connect the Revenue Synergy Statements with the corrective information (e.g., declining EBITDA margins). For example, on December 7, 2020, Jeffries noted that "[c]ombined **revenue** and cost **synergies** should help . . . [increase] **EBITDA margin** to ~45% by 2022." Ex. S at 42-43 (emphasis added); *see also* Ex. T at 1, Aug. 3, 2021, Wedbush Report ("adjusted **EBITDA margin**" expanded because of "**ongoing revenue** and expense **synergies**." These reports directly contradict Skinner's carefully crafted, qualified opinion that EBIDTA margins "do[] not necessarily imply" anything about revenue synergies, as these analysts clearly connected the two.[7]

---

[7] Moreover, the analysts reports distinguish this case from *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *11 (S.D.N.Y. Mar. 29, 2024), which noted that "none of [the analysts]

11

And if that was not enough, Skinner's analysis is further flawed because he ignored evidence that investors questioned the Revenue Synergy Statements after the corrective disclosures. Skinner claims that "market participants still believed the revenue synergies and cross-sales statements were true even after the last alleged corrective disclosure." Opp. at 14. This is patently false. For example, on February 14, 2023, a Financial Times article noted it was "a little odd" that FIS took a $17.6 billion impairment charge, while claiming revenue synergies could be preserved, because "either tens of billions in synergy value are going to be lost in the spin-off, **or the value of the synergies was wildly overstated in the first place**. It can't be both." Ex. U at 6, 8 (emphasis added). The article goes on to say it is possible "**those synergies were never really worth all that much**." *Id.* at 8 (emphasis added).

Thus, both the Complaint, internal documents, and analyst coverage support the fact that the Revenue Synergy Statements are connected to the corrective disclosures. Although Defendants say that matching revenue synergies and EBITDA margins is like comparing "apples to zebras," Opp. at 12, this argument misses the point. There does not have to be an apples to apples, or "mirror image," connection. *NIO*, 2023 WL 5048615, at *14 ("corrective disclosure [need not] . . . be a mirror image tantamount to a confession of fraud"). Rather, they must simply be related to each other, which they are. Using Defendants' analogy, the Complaint alleges, and FIS's documents confirm, that the zebra (EBITDA margins) ate apples (revenue

---

indicated that [the statement] factored into their valuation of Kirkland's stock." *Id.* at * 12. Here, the misstatements did not just factor into analysts' valuation, they drove them.

12

synergies) to stay strong. But when the apple supply went rotten (revenue synergies and volumes declined) the zebra got sick (EBITDA margin compressed and FIS stock dropped in response). Defendants ask the Court to simply ignore common sense and the evidence supporting the connection between the two. The Court should reject Defendants' unsupported arguments. *See, e.g., Mattel,* 2021 WL 4704578, at *5 (finding, post *Goldman*, a sufficient link even though the disclosure was not a mirror image and did not reveal "the audit opinion's falsity"); *see also Deloitte*, 348 F.R.D. at 53 (same).

### (b)    The Integration Statements

Defendants argue the Integration Statements did not have a price impact because they are corporate optimism, i.e., puffery, that no investors would rely on. *See* Opp. at 16-17. However, the Court already found these statements are not puffery, *see* MTD Order at 12-13, and Defendants have produced no evidence that would undercut the Court's finding at this time.[8] Moreover, attempts to prove a lack of price impact typically involve an expert report. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n. 6 (7th Cir. 2020) ("[E]vent studies have come to be treated as the sine qua non for proving or disproving price impact"). But here, Skinner is silent on these statements. He did not submit an event study and does not offer **any** opinion on whether the Integration Statements had a price impact. *See* Ex. H,

---

[8] Indeed, the opposite is true. For example, on November 16, 2021 Norcross stated there is "***no way you can say that FIS is losing share, just the exact opposite***." ¶207. Analysts relied on this statement. *See, e.g.*, Ex. P, Nov. 16, 2021 RBC Capital Markets Report ("the company reiterated that it is not losing share in merchant acquiring" segment).

Skinner Dep. at 210: 5-10, 216:2-24. In contrast, Lead Plaintiffs' expert has opined that the Integration Statements had an impact on FIS's stock price. *See* Ex. F, Coffman Rebuttal at Sections V(A)(i) and (V)(C).

### (c)    The Goodwill Statements

Defendants admit that the Court should certify a Class for the Goodwill Statements because they match the final corrective disclosure. *See* Opp. at 19. Therefore, Defendants admit the Goodwill Statements had a price impact. That should be the end of the Court's analysis. But instead, Defendants wrongly attempt to convince the Court that it must determine whether the goodwill statements are mismatches with the first two corrective disclosures. But this fundamentally misses the point. The issue at class certification is whether the Goodwill Statements had a price impact, "not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage." *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024). By conceding price impact with respect to "at least some of the alleged corrective disclosures," *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023)—here the final corrective disclosure—Defendants conceded that the Goodwill Statements "affected the market price in the first place," i.e., had a price impact. *Halliburton*, 573 U.S. at 278. That is all that is required to certify the entire Class Period for the Goodwill Statements.[9]

---

[9] Even if the Court compared the Goodwill Statements and the interim corrective disclosures, it is not hard to see how the two are related. The Goodwill Statements hid from investors that

14

**B.    Defendants' Challenge to NIC's Standing is Without Merit**

Defendants argue that court-appointed Lead Plaintiff Nebraska Investment Council ("NIC") cannot be a class representative because it "never owned FIS common stock." Opp. at 20. Defendants are wrong. Defendants ignore that, like other public pension funds, Nebraska has established procedures and entities to oversee specific areas within the State's pension system. Here, NIC is the entity that is statutorily authorized, under Neb Rev. Stat. § 72-1239.01, to act as a fiduciary on behalf of the Nebraska's Retirement Plans and manage the assets of the State of Nebraska. Moreover, Defendants ignore that the Attorney General authorized NIC to be a lead plaintiff in this action. *See* Neb. Rev. Stat. § 84-203 (noting Nebraska Attorney General has the legal authority to participate in any securities litigation).[10] Therefore, NIC is the proper party to bring this action on behalf of Nebraska.

**III.    CONCLUSION**

For the foregoing reasons, the Court should grant Lead Plaintiffs' Motion for Class Certification in its entirety.

Dated:  July 15, 2025                                Respectfully submitted,

                                **LABATON KELLER SUCHAROW LLP**

                                By: */s/ James T. Christie*
                                Michael P. Canty (*pro hac vice*)

---

Worldpay's business deteriorated significantly after the acquisition. The truth regarding Worldpay's performance was partially revealed on August 4, 2022 and November 3, 2022, when Defendants disclosed declining financial fundamentals. *See also* Coffman Rebuttal at Section V(A)(iv).

[10] That is why the Attorney General made the decision to get involved in this case through NIC and signed the certification on behalf of NIC.  See ECF No. 24-1.

James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com

*Lead Counsel for Lead Plaintiffs Nebraska
Investment Council, North Carolina Retirement
Systems, and North Carolina Supplemental
Retirement Plans*

**GRAYROBINSON, P.A.**
John A. Boudet (FL Bar No. 515670)
301 East Pine Street
Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
john.boudet@gray-robinson.com

*Liaison Counsel for Lead Plaintiffs Nebraska
Investment Council, North Carolina Retirement
Systems, and North Carolina Supplemental
Retirement Plans*

16

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 15, 2025, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 15, 2025.

*/s/James T. Christie*
James T. Christie