# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

_____

IN RE FIDELITY NATIONAL
INFORMATION SERVICES, INC.
SECURITIES LITIGATION

Case No. 3.23-cv-252-TJC-PDB

_____

## <u>EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA</u>

**July 15, 2025**

## Table of Contents

**Page**

I.    **INTRODUCTION**.................................................................... 1

II.    **SUMMARY OF OPINIONS**.................................................... 2

III.    **DR. SKINNER'S ANALYSIS DOES NOT SUPPORT AN ARGUMENT THAT THERE IS A COMPLETE LACK OF PRICE IMPACT IN THIS MATTER**.......................................................................................... 8

IV.    **DR. SKINNER'S OPINIONS ARE DEPENDENT ON A MISCHARACTERIZATION OF PLAINTIFFS' THEORY OF LIABILITY** ........................................................................................... 11

V.    **THERE IS EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER**........................................................................................ 17

     A.    **THERE IS A CLEAR LOGICAL, ECONOMIC, AND CAUSAL LINK BETWEEN THE ALLEGED MISSTATEMENTS AND THE ALLEGED CORRECTIVE DISCLOSURES**................................... 20

         i.    **UNADDRESSED STATEMENTS** ........................................... 21

         ii.    **REVENUE SYNERGIES STATEMENTS** ........................... 23

         iii.    **CROSS-SELLING STATEMENTS**........................................ 32

         iv.    **GOODWILL STATEMENTS** ................................................. 37

     B.    **THERE WERE STATISTICALLY SIGNIFICANT PRICE DECLINES FOLLOWING THE ALLEGED CORRECTIVE DISCLOSURES** ....................................................................... 42

     C.    **ANALYST REPORTS RELIED ON BY DR. SKINNER DEMONSTRATE THAT THE MARKET WAS RELYING ON THE ALLEGED MISSTATEMENTS AND REACTING TO INFORMATION RELATED TO THE UNDISCLOSED WORLDPAY ISSUES AFTER THE ALLEGED CORRECTIVE DISCLOSURES** ....................................................................... 44

         i.    **ALLEGED MISSTATEMENTS** ........................................... 46

         ii.    **AUGUST 4, 2022** ................................................................ 49

         iii.    **NOVEMBER 3, 2022** ......................................................... 55

         iv.    **FEBRUARY 13, 2023** ........................................................ 58

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.

2.    On March 3, 2025, I submitted an expert report (the "Coffman Report" or my "Report") in this matter, in which I opined that the market for Fidelity National Information Services, Inc. ("FIS" or the "Company") Common Stock was efficient throughout the Class Period and that damages in this matter are subject to a common approach and a methodology that can be applied class-wide.[1]

3.    Following the submission of my Report, Lead Plaintiffs' Counsel provided me with the May 2, 2025 Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification (the "Defendants' Motion"), and the May 2, 2025 Expert Report of Douglas J. Skinner (the "Skinner Report").  Lead Plaintiffs' Counsel has asked me to review, evaluate, and respond to the Skinner Report.  My responses to the Skinner Report are set forth in this document (my "Rebuttal Report").

4.    In formulating my opinions set forth in this Rebuttal Report, I have relied upon the analyses already described in my Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this lawsuit.  I also have considered the sworn testimony from Dr. Skinner in a deposition taken

---

[1] Coffman Report ¶¶ 7 – 8, 87.  Unless otherwise noted, capitalized terms in this Rebuttal Report have the same meaning as in my Report, all emphasis in this Rebuttal Report is added, and all times cited in this Rebuttal Report are in Eastern Time.

on June 27, 2025 by counsel for Lead Plaintiffs (the "Skinner Deposition"). All of the materials I considered in forming my opinions are identified in **Appendix A** to this report.

5.      My qualifications and rate of compensation for work in this matter were identified in my Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix B**.

6.      I reserve the right to amend this Rebuttal Report to reflect new information that becomes available to me in light of further proceedings in this matter, including additional discovery and/or future rulings from the Court.

II.      **SUMMARY OF OPINIONS**

7.      In summary, nothing in the Skinner Report disturbs my opinions that the market for FIS Common Stock was efficient during the Class Period and that economic damages in this matter can be calculated on a class-wide basis using a common methodology. Furthermore, there is compelling economic evidence that the alleged misstatements and omissions had a price impact on FIS Common Stock.

8.      There are opinions I expressed in my Report that Dr. Skinner does not dispute. Dr. Skinner does not dispute my opinion, or any of the analysis supporting my opinion, that the market for FIS Common Stock was efficient during the Class Period, that is, May 7, 2020 through February 10, 2023.[2] In fact, Dr. Skinner states he was asked by Defendants' counsel "to

---

[2] Coffman Report Section VII.

2

assume that FIS's common stock traded in a semi-strong form efficient market during the period from May 7, 2020 through February 10, 2023."[3]

9.    Dr. Skinner also does not offer any criticism of the event study regression specified in my Report.[4] Dr. Skinner does not perform his own event study, nor does he dispute that I performed a valid event study regression that controls for market and industry effects and accurately measures the abnormal returns exhibited by FIS Common Stock during the Class Period and on the alleged corrective disclosure dates. He also does not dispute that an event study regression, like the one I conducted in my Report, is an economically valid method for conducting a loss causation and damages analysis.

10.    In addition, Dr. Skinner does not address my opinion regarding the availability of a Class-wide damages methodology. In my Report, I described how the standard and well-accepted out-of-pocket damages methodology can be applied uniformly, formulaically, and Class-wide in this matter. Dr. Skinner does not address this conclusion or proposed methodology.[5] Thus, there is no dispute that damages in this action are subject to a well-settled, common methodology that can be applied to all Class Members.

11.    Without contesting any of the above-mentioned elements of my Report, Dr. Skinner provides only one overarching argument in the Skinner Report: that from the perspective of a financial economist, some of the information Plaintiffs allege as corrective was different from

---

[3] Skinner Report ¶ 9. *See also*, Skinner Report footnote 5 ("I have not been asked to evaluate Plaintiffs' claim that FIS common stock traded in an efficient market during the Proposed Class Period"). *See also*, Skinner Deposition 31:12 – 16: ("As I stated before, I reviewed Mr. Coffman's report in its entirety, but I was not asked to analyze his opinions with respect to market efficiency, and so I have no opinion one way or another on any components of his analysis.")

[4] *See*, Skinner Deposition 31:19 – 22: ("I have not analyzed Mr. Coffman's event study methodology and so can't speak one way or another as to the validity or not of his event study.").

[5] *See*, Skinner Deposition 34:15 – 19: ("Q Are you in any way challenging Mr. Coffman's position that damages can be calculated on a class-wide basis? A I have not been asked to evaluate that at this time.").

the relevant truth allegedly concealed by some of the alleged false and misleading statements and omissions (the "Alleged Misstatements").[6,7] To support his opinion, Dr. Skinner relies on a categorization of 24 of the 27 Alleged Misstatements into three categories: (1) Revenue Synergies Statements (7 Alleged Misstatements);[8] (2) Cross-Selling Statements (2 Alleged Misstatements);[9] and (3) Goodwill Statements (15 Alleged Misstatements).[10] In addition, there are 3 Unaddressed Statements that Dr. Skinner does not categorize at all (see **Exhibit 1**).[11] To be clear, Dr. Skinner claims that he was instructed to categorize the Alleged Misstatements in this way; Plaintiffs do not allege that the Alleged Misstatements fall within these classifications.[12]

12. First and foremost, it is important to make clear that Dr. Skinner does *not* opine that there was an absolute lack of price impact from the Alleged Misstatements in this matter. Indeed, Dr. Skinner testified that he has not been asked to opine on price impact at this time.[13]

---

[6] Skinner Report ¶¶ 13 – 15. I specify "some of" because there are certain aspects of Plaintiffs' claims that Dr. Skinner does not address, as detailed below in **Section III**.

[7] The Alleged Misstatements are defined as those in Section V of the Complaint.

[8] Skinner Report Section VI.

[9] Skinner Report Section VII.

[10] Skinner Report Section VIII.

[11] *See*, Skinner Deposition 88:7 – 12: ("Q And there are other statements, misstatements alleged in the complaint that are not included in your report, correct? A That is my understanding, yes. There are statements beyond the set of three statements that I've been asked to consider.").

[12] *See*, Skinner Deposition 88:13 – 19: ("Q How did you determine which of the alleged misstatements fell into your defined categories? A I believe this categorization was something that was provided to me by counsel. It's summarized in the relevant exhibits. I will also say that the categorization made sense to me based on my reading of the complaint.").

[13] *See*, Skinner Deposition 87:23 – 88:2: ("So at this stage, I have not been asked to explicitly opine on whether the alleged misstatements, again, the three sets of misstatements that I specify in paragraph 9, impacted the company's stock price.").

Further, Dr. Skinner does not provide an opinion on the 3 Unaddressed Statements.[14]  And finally, as it relates to the third category, Goodwill Statements, Dr. Skinner argues that the alleged corrective information revealed on *only two* of the three alleged corrective disclosures was "conceptually distinct from the truth alleged concealed" by the Alleged Misstatements.[15]  In other words, Dr. Skinner does *not* argue that the alleged corrective information revealed on February 13, 2023 was different than the information concealed by the Alleged Misstatements. For these reasons alone, Dr. Skinner's opinions cannot support an argument that there is a complete lack of price impact in this matter.

13.    Second, Dr. Skinner's opinions are entirely dependent on his own narrow mischaracterization of Plaintiffs' allegations.  Dr. Skinner's reliance on a division of the Alleged Misstatements into different categories to suggest that they concealed distinct information is inconsistent with Plaintiffs' claims, which are much broader.  Specifically, Plaintiffs allege that each of the Alleged Misstatements concealed the same relevant truth: that the Worldpay acquisition was a failure from the start, that Worldpay's business had suffered as a result of the acquisition, and that Defendants had fraudulently overstated the value of Worldpay for years, ultimately leading to a goodwill impairment charge of $17.6 billion and a spin-off of the segment of FIS's business that Worldpay operated in.[16]  Dr. Skinner's misguided approach suggests that in order to establish price impact, one must show a mirror image between the specific wording of

---

[14] *See*, Skinner Deposition 99:7 – 21: ("Q I think earlier you stated that your report does not address all of the alleged misstatements in the complaint. Is that correct? A I do understand that there are some alleged misrepresentations, which are not included in the three sets of alleged misrepresentations I was asked to consider. Q And why did you not consider those? A That was not part of the assignment that I was provided. Q Did you -- do you have any opinion on whether those three misstatements that are not addressed in your report are connected to any of the three corrective disclosures? A I simply haven't evaluated that.")

[15] Skinner Report Section VIII.B.

[16] *See*, for example, Complaint ¶ 178.

an Alleged Misstatement and particular language contained in the alleged corrective disclosure. This is not a requirement I am aware of and it is inconsistent with Plaintiffs' allegations.  Dr. Skinner completely fails to appreciate in the Skinner Report that Alleged Misstatements related to revenue synergies and cross-selling, for example, are intertwined[17] with the Alleged Misstatements related to goodwill because all of the Alleged Misstatements failed to disclose that the Worldpay acquisition was fundamentally unsuccessful and impaired.

14.    Regardless, even if one were to accept the flawed categorization of the Alleged Misstatements used by Dr. Skinner, there is clear and compelling economic evidence of price impact in this matter that is not addressed in the Skinner Report.  Indeed, there is a clear economic causal link between the information that Plaintiffs allege was concealed by the Alleged Misstatements and the information that was revealed on the alleged corrective disclosure dates. Plaintiffs allege that Defendants portrayed the Worldpay acquisition as successful and that the goodwill from the acquisition was justified by revenue synergies and cross-selling opportunities,

---

[17] During the Skinner Deposition, Dr. Skinner acknowledged that the three categories of Alleged Misstatements he analyzed are connected to FIS's acquisition of Worldpay.  *See*, Skinner Deposition 91:2 – 92:3: ("Q Are all three categories of statements related in some way to the acquisition of Worldpay? MR. SKAKUN: Object to form. Ambiguous. A So I think I would say the following, which is: My understanding of plaintiffs' allegations with respect to the revenue synergy statements is that the allegations relate to statements the company made regarding revenue synergies that resulted from the Worldpay acquisition. Similarly, my understanding of the cross-selling statements is that they related to cross-selling that was related to the Worldpay acquisition. And then when we get to the goodwill statements, this is specifically related to goodwill in the merchant solutions unit of the business. The primary component of the merchant solutions unit, as I understand it, was the Worldpay business. Q So then you would agree, all three categories relate to Worldpay in some capacity? MR. SKAKUN: Object to form. *A So I would say that all three of those, as my previous answer indicated, are in some fashion connected to FIS's acquisition of Worldpay.*").  *See also,* Skinner Deposition 71:7 – 13: ("A I want to be precise. I am very clear about how this works, which is goodwill is the difference between the purchase price and the fair value of the net assets and liabilities assumed. That overall purchase price and the value of the entity that's being acquired could include revenue synergies.").  *See also*, Skinner Deposition 38:24 – 39:13: ("Q So is it fair to say that all three categories of statements have to do at least somewhat with Worldpay? MR. SKAKUN: Same objection. A So I believe, again, we want to be a little careful here just to be sure. But the revenue synergy statements, the cross-selling, I believe, relates to revenues and cross-selling that ultimately were related to the Worldpay acquisition and specifically the merchant solutions business, as well as the company as a whole. The goodwill statements, as I said, relate to goodwill that the company recorded specifically with respect to the merchant solutions unit.").

6

while the alleged corrective disclosures contained new information regarding the disappointing financial performance of the Merchant Solutions business (the segment in which Worldpay operated) and the ultimate need to take a $17.6 billion goodwill impairment charge and spin-off that portion of FIS's business, which revealed to investors the true value of Worldpay and the true extent to which the acquisition was a failure.[18]  Furthermore, the Skinner Report is devoid of any statistical analysis of the alleged corrective disclosure events.  Indeed, I find there are highly statistically significant declines in the market price of FIS Common Stock following the alleged corrective disclosures.[19]  Also, contemporaneously issued analyst reports identify the Alleged Misstatements as information that market participants relied upon and the allegedly corrective information as new negative information that impacted the value of FIS Common Stock.  Dr. Skinner has not even analyzed what caused the stock price declines on the alleged corrective disclosures.[20]  As a result of the foregoing, his analysis cannot support an argument that there is a lack of price impact in this matter and, indeed, there is compelling evidence of price impact in this matter.

---

[18] Complaint Section V and VI.

[19] *See*, Skinner Deposition 32:2 – 18: ("A I am aware that as part of his report, Mr. Coffman put forth Exhibit 7, I believe, in which he reports based on his event study methodology, among other things, abnormal returns on a variety of earnings announcement dates during the proposed class period, including the three earnings announcements dates that are also alleged corrective dates and that I believe on each of those three alleged corrective dates, he does find statistically significant and abnormal returns. Q Do you have any opinion on whether -- sorry. Let me rephrase the question. Do you dispute that finding? A Again, I haven't been asked to analyze Mr. Coffman's analyses, including his event study methodology, so I have no opinion one way or another.").

[20] *See*, Skinner Deposition 35:23 – 36:23: ("Q Okay. Do you have any opinion on what caused FIS's stock price to decline on the three alleged corrective disclosure dates? A So as my report indicates, I have reviewed a good number of analyst reports during the proposed class period, including at the alleged corrective dates and the days following those alleged corrective dates. And my report I think is quite explicit in that I have reviewed analyst reports for one-week periods for each of the three alleged corrective dates. In addition, as I've already observed, the three alleged corrective dates were also earnings disclosure dates, and so *I have not formally analyzed the determinants of stock price changes on those dates, other than to observe that they were earnings disclosure dates and a lot of information comes to the markets on earnings disclosure dates*. Q Now, I just want to be clear. So based on your review of analyst reports and the earnings disclosures, based on that review, did you form an opinion as to what caused FIS's stock price to decline on those three dates? A At this stage, I have not been asked to analyze that, no.").

**III.   DR. SKINNER'S ANALYSIS DOES NOT SUPPORT AN ARGUMENT THAT THERE IS A COMPLETE LACK OF PRICE IMPACT IN THIS MATTER**

15.    I understand that it is Defendants' burden to demonstrate an absolute absence of price impact to defeat class certification upon the basis of price impact.  If Defendants seek to establish that through the analysis of Dr. Skinner, he would need to show that the price of FIS Common Stock was unaffected by the Alleged Misstatements at both the time of the Alleged Misstatements and the alleged corrective disclosures.

16.    However, it is important to underscore that Dr. Skinner does not even attempt to dispute that the Alleged Misstatements had at least *some* price impact on FIS Common Stock during the Class Period.  Indeed, Dr. Skinner testified that he has not been asked to opine on price impact at this time.[21]  While Dr. Skinner makes various arguments attempting to sever the link between different categories of the Alleged Misstatements on certain alleged corrective disclosure dates (addressed below in **Section V.A**), nowhere in the Skinner Report does Dr. Skinner argue that there is a lack of price impact in this matter.

17.    In addition to not opining on price impact, Dr. Skinner does not even mention or address certain aspects of Plaintiffs' claims.  First, Plaintiffs allege that Defendants made 27 Alleged Misstatements during the Class Period (see **Exhibit 1**).  To support his opinion and as instructed by counsel for Defendants, as shown in **Exhibit 1**, Dr. Skinner relies on a categorization of 24 of the 27 Alleged Misstatements into three categories: (1) Revenue Synergies Statements (7 Alleged Misstatements);[22] (2) Cross-Selling Statements (2 Alleged

---

[21] *See*, Skinner Deposition 87:23 – 88:2: ("So at this stage, I have not been asked to explicitly opine on whether the alleged misstatements, again, the three sets of misstatements that I specify in paragraph 9, impacted the company's stock price.").

[22] Skinner Report Section VI.

8

Misstatements);[23] and (3) Goodwill Statements (15 Alleged Misstatements).[24]  I discuss below in **Section IV** how the categorization used by Dr. Skinner is inconsistent with Plaintiffs' claims, but setting that aside, there are 3 Alleged Misstatements that Dr. Skinner does not even address or categorize at all (the "Unaddressed Statements").[25]  In other words, Dr. Skinner does not put forth any argument that the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by the Unaddressed Statements.  In **Section V.A.i** below, I discuss the causal link between the Unaddressed Statements and the alleged corrective disclosures.

18.    Second, Dr. Skinner is noticeably silent on the clear logical, economic, and causal link between the so-called "Goodwill Statements" and the information revealed on the final alleged corrective disclosure, February 13, 2023.  Specifically, Dr. Skinner makes arguments regarding the Goodwill Statements only as they relate to the first and second alleged corrective disclosures, but does not mention the third and final alleged corrective disclosure in this context.[26,27]  Plaintiffs allege that the Alleged Misstatements touted the success of the Worldpay

---

[23] Skinner Report Section VII.

[24] Skinner Report Section VIII.

[25] Specifically, as shown in **Exhibit 1**¸ Dr. Skinner does not address or categorize the three false and misleading statements and omissions that Plaintiffs allege were made on June 10, 2021 (*see*, Complaint ¶ 195); November 16, 2021 (*see*, Complaint ¶ 205); and also on November 16, 2021 (*see*, Complaint ¶ 207).

[26] Section VIII of the Skinner Report is titled "From the Perspective of a Financial Economist, the Information Plaintiffs Allege as Corrective on August 4, 2022 and November 3, 2022 Was Different from the Relevant Truth Allegedly Concealed by the Goodwill Statements." Dr. Skinner does not opine that the alleged corrective information on February 13, 2023 was different from the relevant truth concealed by the Goodwill Statements.

[27] Dr. Skinner mentions that his analysis with respect to the Goodwill Statements also applies to a single statement made by CFO Erik Hoag on February 13, 2023, regarding a lack of new product investment negatively impacting the 2023 business outlook for the Merchant Solutions segment (*see* Skinner Report footnote 172). He explains that this statement should be analyzed under the same framework he used for the earlier alleged corrective disclosures, as discussed below in **Section V.A.iv**. However, Dr. Skinner was not asked by counsel for Defendants to assess whether the totality of information disclosed on that date revealed the alleged relevant truth concealed by the Goodwill Statements (*see* Skinner Report ¶ 9, footnote 3). Accordingly, he does not opine that there is no connection between the Alleged Misstatements and the February 13, 2023 alleged corrective disclosure.

acquisition and justified the more than $48 billion purchase price (and the goodwill value that entailed) by promising revenue synergies and cross selling opportunities.[28]  In contrast, on February 13, 2023, FIS disclosed that it would take a $17.6 billion goodwill impairment charge in connection with the Worldpay acquisition and that the segment of FIS's business that Worldpay had been operating in would be spun-off into a separate entity.[29]  This allowed investors to understand the true value of the Worldpay acquisition and the true extent to which it was a failure.[30]  As a result, there is a clear link between the Alleged Misstatements and the alleged corrective information revealed on February 13, 2023, which Dr. Skinner does not address.  Furthermore, as I discuss below in **Section V.B**, there is no dispute that the price of FIS Common Stock declined in a statistically significant manner on February 13, 2023 when FIS disclosed the goodwill impairment.

19.    In sum, Dr. Skinner does not make any arguments regarding: (1) the Unaddressed Statements or (2) the connection between the Goodwill Statements and the final alleged corrective disclosure.  For these reasons alone, there is no economic evidence suggesting a lack of price impact and Dr. Skinner's analysis cannot support an argument of a complete lack of price impact in this matter.

---

[28] *See*, for example, Complaint ¶ 61.

[29] "FIS Announces Plans to Spin Off Merchant Business," *Business Wire*, February 13, 2023, 6:58 AM and "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.

[30] I discuss February 13, 2023 in greater detail below in **Section V.C.iv**.

## IV.    DR. SKINNER'S OPINIONS ARE DEPENDENT ON A MISCHARACTERIZATION OF PLAINTIFFS' THEORY OF LIABILITY

20.    FIS announced that it would acquire Worldpay for approximately $43 billion, with Defendants justifying the purchase price based on $38.4 billion attributed to goodwill,[31] and stating that Worldpay's $38.4 billion worth of "[g]oodwill consists primarily of expected synergies of combining operations, the acquired workforce, and growth opportunities."[32]  FIS completed the acquisition of Worldpay prior to the start of the Class Period, on July 31, 2019.[33] After the closing of the transaction, FIS reported that the total purchase price for Worldpay was $48.245 billion.[34]

21.    As of the start of the Class Period, FIS reported its business in four segments: Merchant Solutions, Banking Solutions, Capital Market Solutions, and Corporate and Other.[35]

---

[31] *See*, Skinner Report ¶ 26: ("In general, goodwill reflects that an acquirer is 'willing to pay more for a business than the sum of the fair values of the individual assets and liabilities because of other inherent value associated with an assembled business.'").

[32] Complaint ¶ 61.  *See also*, Coffman Report ¶ 14; "FIS and Worldpay to Combine to Accelerate the Future of Finance and Commerce Globally," *Business Wire*, March 18, 2019; FIS SEC Form 10-Q for the quarterly period ended September 30, 2019, filed November 5, 2019, p. 10.

[33] "FIS Closes Acquisition of Worldpay, Enhancing its Global Technology Leadership Serving Merchants, Banks and Capital Markets," *Business Wire*, July 31, 2019, 8:45 AM.

[34] FIS SEC Form 10-Q for the quarterly period ended September 30, 2019, filed November 5, 2019, p. 9.

[35] *See*, FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020, p. 7.

11

The Merchant Solutions segment was created as a result of the Worldpay acquisition.[36] During the Class Period, FIS described its four segments as follows:

> The Merchant segment is focused on serving merchants of all sizes globally, enabling them to accept electronic payments, including credit, debit and prepaid payments originated at a physical point of sale, as well as contactless card, mobile wallet, and card-not present payments in eCommerce and mobile environments.[37]
>
> …
>
> The Banking segment is focused on serving all sizes of financial institutions for core processing and ancillary applications solutions; digital solutions; fraud, risk management and compliance solutions; electronic funds transfer and network services solutions; payment solutions; wealth and retirement solutions; item processing and output services solutions and services capitalizing on the continuing trend to outsource these solutions.[38]
>
> …
>
> The Capital Markets segment is focused on serving global financial services clients with a broad array of buy- and sell-side solutions.[39]
>
> …
>
> The Corporate and Other segment consists of corporate overhead expense, certain leveraged functions and miscellaneous expenses that are not included in the operating segments, as well as certain non-strategic businesses.[40]

---

[36] *See*, FIS SEC Form 10-K for the fiscal year ended December 31, 2019, filed February 20, 2020, p. 96: ("As a result of the Company's acquisition of Worldpay, the Company reorganized its reportable segments and recast all prior-period segment information presented to align with the new reportable segments. The new segments are Merchant Solutions, Banking Solutions, and Capital Market Solutions, which are organized based on the markets and clients served aligned with the solutions they provide, as well as the Corporate and Other segment. The reorganization primarily consisted of adding a new Merchant Solutions segment, renaming the former Integrated Financial Solutions segment to Banking Solutions and the former Global Financial Solutions segment to Capital Market Solutions, and moving certain of the Company's existing business lines to align with these new segments."). *See also*, Complaint footnote 4: ("Prior to the acquisition FIS did not have a merchant solutions segment. It was created as part of the acquisition. Accordingly, Worldpay made up a vast majority of the Merchant Solutions segment's revenues.").

[37] *See*, FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020, p. 17.

[38] *See*, FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020, p. 18.

[39] *See*, FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020, p. 18.

[40] *See*, FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020, p. 18.

22.   The table below shows FIS's revenue by segment during the Class Period, with Merchant Solutions comprising roughly one third of FIS's business by revenue.[41]

| Segment | Fiscal Year Revenue (millions) | | | Fiscal Year Revenue (% of total) | | |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2020 | 2021 | 2022 |
| Banking Solutions | $5,944 | $6,396 | $6,706 | 47% | 46% | 46% |
| Merchant Solutions | $3,767 | $4,496 | $4,773 | 30% | 32% | 33% |
| Capital Market Solutions | $2,440 | $2,624 | $2,763 | 19% | 19% | 19% |
| Corporate and Other | $401 | $361 | $286 | 3% | 3% | 2% |
| Total Consolidated Revenue | $12,552 | $13,877 | $14,528 | 100% | 100% | 100% |

23.   Plaintiffs allege that during the Class Period, which began on May 7, 2020, Defendants publicly issued false and misleading statements and omissions regarding: the Worldpay acquisition, the Company's cross-selling efforts, the revenue synergies the combined Company had achieved, and the value of Worldpay's goodwill.[42,43]  **Exhibit 1** contains a list of all the Alleged Misstatements alleged by Plaintiffs.

24.   Plaintiffs further allege that the false and misleading nature of the Alleged Misstatements ultimately became known through three alleged corrective disclosures (i.e., August 4, 2022; November 3, 2022; and February 13, 2023).[44]  Plaintiffs allege that on August 4,

---

[41] FIS SEC Form 10-K for the fiscal year ended December 31, 2022, filed February 27, 2023, p. 4.

[42] Complaint ¶ 241.

[43] Dr. Skinner discusses these concepts in the Skinner Report.  For example, he states the following regarding synergies: "Financial economists define synergies as the incremental economic value created by combining entities—as a result of synergies, the value of the combined entity is greater than the sum of its parts." (*see*, Skinner Report ¶ 21).  Regarding cross-selling, Dr. Skinner states: "Revenue synergies can be generated in a variety of ways, including by cross-selling, under which products and services of one entity are sold to customers of the other entity, and vice versa (resulting in aggregate revenues that exceed the sum of the revenues of the entities operating independently)." (*see*, Skinner Report ¶ 21).  As it relates to goodwill, Dr. Skinner notes: "GAAP defines goodwill as an 'asset representing the future economic benefits arising from other assets acquired in a business combination or an acquisition by a not-for-profit entity that are not individually identified and separately recognized.'" (*see*, Skinner Report ¶ 26).

[44] Complaint Section VI.

13

2022 and November 3, 2022, investors learned the partial truth about the failed acquisition and the true value of Worldpay when Defendants announced disappointing financial results for its Merchant Solutions segment.[45]  On the last alleged corrective disclosure, February 13, 2023, Defendants disclosed a $17.6 billion write down on the value of Worldpay and FIS's decision to spin-off the portion of its business that Worldpay comprised, which Plaintiffs allege allowed investors to understand the full extent to which the Worldpay acquisition was a failure and had been overvalued by billions of dollars.[46]  I discuss each of the alleged corrective disclosures below in **Section V.C** in detail.

25.    Dr. Skinner's overarching argument is that from the perspective of a financial economist, some of the information Plaintiffs allege as corrective was different from the relevant truth allegedly concealed by some of the Alleged Misstatements.[47]  As I stated above, to support his opinion, Dr. Skinner relies on a categorization of 24 of the 27 Alleged Misstatements into three categories: (1) Revenue Synergies Statements (7 Alleged Misstatements);[48] (2) Cross-Selling Statements (2 Alleged Misstatements);[49] and (3) Goodwill Statements (15 Alleged Misstatements).[50]  In addition, there are 3 Unaddressed Statements that Dr. Skinner does not categorize at all (see **Exhibit 1**).

26.    Dr. Skinner's opinions are flawed because his attempt to divide the Alleged Misstatements into different categories and suggest that they concealed distinct information from

---

[45] Complaint ¶¶ 18 – 19.

[46] Complaint ¶¶ 20 – 21.

[47] Skinner Report ¶¶ 13 – 15.  I specify "some of" because there are certain aspects of Plaintiffs' claims that Dr. Skinner does not address, as detailed above in **Section III**.

[48] Skinner Report Section VI.

[49] Skinner Report Section VII.

[50] Skinner Report Section VIII.

each other is inconsistent with Plaintiffs' claims, which are much broader.  Specifically, Plaintiffs allege that each and every one of the Alleged Misstatements concealed the same overall relevant truth: that the Worldpay acquisition was a failure from the start, that Worldpay's business had suffered as a result of the acquisition, and that Defendants had fraudulently overstated the value of Worldpay for years, ultimately leading to a goodwill impairment charge of $17.6 billion and FIS's decision to spin-off the portion of its business that Worldpay comprised (collectively, the "Undisclosed Worldpay Issues").[51]  Dr. Skinner completely fails to appreciate in the Skinner Report that Alleged Misstatements related to revenue synergies and cross-selling, for example, are intertwined with the Alleged Misstatements related to goodwill because *all* of the Alleged Misstatements failed to disclose the Undisclosed Worldpay Issues.

27.    For example, at the start of the Class Period, on May 7, 2020, FIS issued a press release announcing financial results for the first quarter of 2020, which included the following statement that Dr. Skinner categorizes as a Revenue Synergies Statement:

> Revenue synergies of approximately $100 million, an increase of $20 million compared to the fourth quarter of 2019[52]

28.    Plaintiffs allege that this statement was false and misleading and omitted information because it led investors to wrongly believe that FIS had achieved the revenue synergies because of FIS's successful integration of Worldpay.[53]  In reality, these so-called revenue synergies allegedly included revenue completely unrelated to the Worldpay acquisition or integration and when this statement was made, Defendants omitted the Undisclosed Worldpay

---

[51] *See*, for example, Complaint ¶ 178.

[52] "FIS Reports First Quarter 2020 Results," *Business Wire*, May 7, 2020, 7:00 AM; Complaint ¶ 184; and Skinner Report Exhibit 2.

[53] *See*, Complaint Section IV.D, ¶¶ 184 – 185.

Issues.[54] When Dr. Skinner analyzes this and other Revenue Synergies Statements, he is too narrowly focused on the semantics of the term revenue synergies, rather than the full economic context of the statement.

29. For example, Dr. Skinner discusses how on the first alleged corrective disclosure, Plaintiffs allege that the adjusted EBITDA margin that FIS reported for its Merchant Solutions segment was corrective information.[55] Dr. Skinner then argues, among other points, that "adjusted EBITDA margin and revenue synergies are distinct constructs with different meanings."[56] Dr. Skinner is missing the point. If the Undisclosed Worldpay Issues are causally tied to why the Company is reporting lower EBITDA margin, then there is nothing in his argument to suggest a lack of causal connection between the Alleged Misstatement and the alleged corrective disclosure. His suggestion that "revenue synergies" and "EBITDA margin" do not have the same economic meaning is completely irrelevant. Plaintiffs allege that Defendants' disclosure of the worse than expected adjusted EBITDA margin in the Merchant Solutions segment was corrective of the Alleged Misstatements because it conveyed to investors the partial truth about the failed acquisition and the true value of Worldpay.[57] In other words, Dr. Skinner's claim that EBITDA margin and revenue synergies are distinct constructs is beside the point, because if Plaintiffs allegations are correct, that Defendants concealed the Undisclosed Worldpay Issues, then Defendants' announcement of worse than expected adjusted EBITDA margin for the Merchant Solutions segment represents corrective information because it allowed

---

[54] *See*, Complaint Section IV.D.

[55] Skinner Report ¶ 60.

[56] Skinner Report ¶ 62.

[57] Complaint ¶ 157.

16

investors to begin to understand the Worldpay acquisition was not as successful as the Company had previously portrayed.

30.   In sum, Dr. Skinner divides the Alleged Misstatements into defined categories, inconsistent with Plaintiffs' claims, and then analyzes them too narrowly to conclude that there is a mismatch between the alleged corrective information and the Alleged Misstatements.  This renders his analysis unreliable from an economic standpoint.  When viewed from a broader lens that is consistent with Plaintiffs' theory of liability, it is clear that there is an economically coherent causal connection between the Alleged Misstatements and the information that was revealed through the alleged corrective disclosures.  This, combined with the statistically significant declines in the market price of FIS stock on the alleged corrective disclosures and the analyst commentary discussed in **Section V.C** provides economic evidence of price impact in this matter.  Even though the categorization used by Dr. Skinner of the Alleged Misstatements is narrow and inconsistent with Plaintiffs' allegations, for completeness, I discuss Dr. Skinner's arguments related to each of the defined categories below in **Section V.A**.

## V.   THERE IS EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER

31.   At a high level, Dr. Skinner's arguments can be summarized as follows:

1) The alleged corrective information on the alleged corrective disclosure dates was conceptually distinct from the relevant truth allegedly concealed by the Revenue Synergies Statements, the Cross Selling Statements, and the Goodwill Statements (however, Dr. Skinner does not make this argument as it relates to the Unaddressed Statements or the third alleged corrective disclosure and the Goodwill Statements, see **Section III**).[58]

---

[58] Skinner Report ¶¶ 13 – 15.

2) There is no analyst commentary that reflects an understanding that the alleged corrective information revealed that (1) the Revenue Synergies Statements, including the amounts of revenue synergies that FIS reported, were inaccurate when made;[59] (2) the Cross-Selling Statements, including about the extent of cross-selling between the legacy FIS and Worldpay businesses, were inaccurate when made;[60] and (3) the Goodwill Statements were inaccurate when made, including that the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.[61]

32.   As a threshold matter, and as I discussed in **Section III**, it is important to make clear that Dr. Skinner testified that he has not been asked to opine on price impact at this time.[62] Furthermore, I discussed above in **Section IV** how Dr. Skinner's opinions are dependent on a narrow view of Plaintiffs' theory and his attempt to frame the Alleged Misstatements as concealing different categories of distinct information. As I will discuss within this **Section V**, even if one were to agree with Dr. Skinner's flawed categorization of the Alleged Misstatements, there is evidence that the Alleged Misstatements impacted the price of FIS Common Stock in this matter.

33.   As will be discussed in **Section V.A** below, Dr. Skinner's argument that the alleged corrective information is "conceptually distinct" from the Alleged Misstatements ignores the clear economic connection between the Alleged Misstatements (touting the success and value of the Worldpay acquisition and justifying the purchase price, and thus goodwill, by promising revenue synergies and cross selling opportunities) and the alleged corrective disclosures (revealing that the Worldpay acquisition was a failure and overvalued by billions of dollars).

---

[59] Skinner Report ¶ 13.

[60] Skinner Report ¶ 14.

[61] Skinner Report ¶ 15.

[62] *See*, Skinner Deposition 87:23 – 88:2: ("So at this stage, I have not been asked to explicitly opine on whether the alleged misstatements, again, the three sets of misstatements that I specify in paragraph 9, impacted the company's stock price.").

Further, there is no dispute that the price of FIS Common Stock declined in a statistically significant manner on all of the alleged corrective disclosure dates (see **Section V.B**).  Dr. Skinner does not offer any alternative explanation for the undisputed statistically significant price declines on the alleged corrective disclosure dates.  Indeed, Dr. Skinner has not even analyzed what caused the stock price declines on the alleged corrective disclosures.[63]  Finally, Dr. Skinner's argument that there is no analyst commentary supporting that the alleged corrective information revealed that the Alleged Misstatements were inaccurate when made is flawed and based on his narrow self-constructed view of Plaintiffs' allegations.  Dr. Skinner himself relies on analyst reports that clearly demonstrate that (1) the market was relying on the Alleged Misstatements at the time they were made, and (2) the market was reacting to information related to the Undisclosed Worldpay Issues at the time of the alleged corrective disclosure dates, which provide evidence of price impact (see **Section V.C**).

34.    Simply put, Defendants portrayed the Worldpay acquisition as successful and supportive of the billions of dollars of goodwill paid for the Company; there is analyst commentary demonstrating that the market relied on the Alleged Misstatements when made; the alleged corrective disclosures contained new information that revealed the impact of the Undisclosed Worldpay Issues that contradicted Defendants' portrayal of the acquisition as a success; FIS Common Stock immediately experienced statistically significant price declines

---

[63] *See*, Skinner Deposition 35:23 – 36:23: ("Q Okay. Do you have any opinion on what caused FIS's stock price to decline on the three alleged corrective disclosure dates? A So as my report indicates, I have reviewed a good number of analyst reports during the proposed class period, including at the alleged corrective dates and the days following those alleged corrective dates. And my report I think is quite explicit in that I have reviewed analyst reports for one-week periods for each of the three alleged corrective dates. In addition, as I've already observed, the three alleged corrective dates were also earnings disclosure dates, and so *I have not formally analyzed the determinants of stock price changes on those dates, other than to observe that they were earnings disclosure dates and a lot of information comes to the markets on earnings disclosure dates*. Q Now, I just want to be clear. So based on your review of analyst reports and the earnings disclosures, based on that review, did you form an opinion as to what caused FIS's stock price to decline on those three dates? A At this stage, I have not been asked to analyze that, no.").

19

following the alleged corrective disclosures; and there is evidence that investors tied at least some of those price declines to the alleged corrective information. Therefore, there is strong evidence of price impact in this matter and Dr. Skinner has not established otherwise (nor does he even attempt to claim there is a complete lack of price impact).

> **A.    THERE IS A CLEAR LOGICAL, ECONOMIC, AND CAUSAL LINK BETWEEN THE ALLEGED MISSTATEMENTS AND THE ALLEGED CORRECTIVE DISCLOSURES**

35.    Dr. Skinner makes assertions about how certain pieces of information revealed on the alleged corrective disclosure dates were "conceptually distinct"[64] from information contained in the Alleged Misstatements, but Dr. Skinner's opinions cannot support an argument that there is a complete lack of price impact in this matter. It is undisputed that the first two alleged corrective disclosures revealed issues related to disappointing financial results for FIS's Merchant Solutions segment[65] and that the third and final alleged corrective disclosure revealed a $17.6 billion write down on the value of Worldpay and that FIS would spin off its Merchant Solutions segment.[66] Dr. Skinner instead tries to dispute that the alleged corrective information was "conceptually distinct" from the Alleged Misstatements.

36.    From an economic perspective, the causal connection between the Alleged Misstatements, the alleged corrective disclosures, and the resulting price declines in FIS Common Stock is clear and logical: Plaintiffs allege that Defendants portrayed the Worldpay acquisition as successful and valuable, justifying the purchase price (including the recorded goodwill) through revenue synergies and cross-selling opportunities. Assuming Plaintiffs

---

[64] *See*, for example, Skinner Report ¶¶ 13 – 15.

[65] *See*, Skinner Report Section V.A and Section V.B.

[66] *See*, Skinner Report Section V.C.

allegations are true, and that statements such as, "we really haven't had negative surprises with Worldpay... frankly, that's why you saw Woody [James Woodall, then CFO] and I both raise our overall revenue synergy guidance coming out of last quarter"[67] were false and misleading when made, then it is economically reasonable to conclude that the alleged corrective disclosures (revealing that the Worldpay acquisition was a failure and overvalued by billions of dollars) reflected new information contradicting the Alleged Misstatements (touting the success and value of the Worldpay acquisition and justifying the purchase price by promising goodwill through revenue synergies and cross selling opportunities).

37. Even if one were to agree with Dr. Skinner's flawed categorization of the Alleged Misstatements, which I do not (see **Section IV**), there is evidence that the Alleged Misstatements impacted the price of FIS Common Stock in this matter. I discuss each of Dr. Skinner's categories of the Alleged Misstatements below in turn.

### i. UNADDRESSED STATEMENTS

38. The Unaddressed Statements are identified in **Exhibit 1**. As I stated above in **Section III**, Dr. Skinner does not provide an opinion related to the three Unaddressed Statements in the Skinner Report or in the Skinner Deposition. Based on this alone, there is no evidence of a lack of price impact from the three Unaddressed Statements. Furthermore, the Unaddressed Statements discussed the Worldpay acquisition, and the revenue synergies and cross-selling supposedly made possible through the acquisition. Therefore, there is a direct link between the Unaddressed Statements and the information released on the alleged corrective disclosures that revealed the Undisclosed Worldpay Issues to investors.

---

[67] Complaint ¶ 195.

39.    The first of the Unaddressed Statements occurred during a Robert W. Baird conference on June 10, 2021, when a Robert W. Baird analyst asked how the Worldpay acquisition was faring, and then-CEO Gary Norcross ("Defendant Norcross") stated:

> We couldn't be more pleased with it. I hate to say it this way, **but we really haven't had any negative surprises with Worldpay.** We typically do – as you go through due diligence, especially as you're starting to dig in on your revenue synergies and where you're going to see opportunities come with cross-sell and upsells to our base. **But frankly, everything is not only hit as we expected, and many reasons and many examples have exceeded our expectations. And frankly, that's why you saw Woody and I both raise our overall revenue synergy guidance coming out of last quarter.**[68]

40.    The second and third Unaddressed Statements took place during an RBC conference on November 16, 2021, where Defendants affirmatively announced that Worldpay was fully integrated, and sought to dispel investors' concerns regarding FIS's market share in the Merchant Solutions space declining over time.  Specifically, Defendants stated:

> [I]t just felt like when you look at where we are on the Worldpay integration, **we've got really Worldpay predominantly working behind us now. We've got all of our segments really hitting on all cylinders.**[69]
>
> …
>
> And so I think what people see when they look and really dig through all of that, **no way you can say that FIS is losing share, just the exact opposite.** No way to think that we can – when you look, we're actually a leader in disruption, not going to be disrupt[ed], and that's hopefully the narrative that people are going to start realizing as they do their work.[70]

41.    From the statements above it is clear that Defendants understood that the value of FIS was dependent, at least in part, on the success of the Worldpay acquisition.  The statements,

---

[68] Complaint ¶ 195, "Company Conference Presentation," *S&P Capital IQ*, June 10, 2021, 9:30 AM.  Plaintiffs allege that the emphasized language is an Alleged Misstatement.

[69] Complaint ¶ 205, "Company Conference Presentation," *S&P Capital IQ*, November 16, 2021, 9:20 AM. Plaintiffs allege that the emphasized language is an Alleged Misstatement.

[70] Complaint ¶ 207, "Company Conference Presentation," *S&P Capital IQ*, November 16, 2021, 9:20 AM. Plaintiffs allege that the emphasized language is an Alleged Misstatement.

which reiterated the success of the integration of Worldpay, are in direct conflict with what Plaintiffs allege regarding the Undisclosed World Pay Issues and the alleged corrective information disclosed on August 4, 2022, November 3, 2022, and February 13, 2023, which revealed the true value of the Worldpay acquisition and the true extent to which the Worldpay acquisition was a failure. As a result of the foregoing, coupled with the fact that Dr. Skinner provides no opinion related to the Unaddressed Statements, there is no evidence to suggest a lack of price impact from the Unaddressed Statements.

## ii.     REVENUE SYNERGIES STATEMENTS

42.    Dr. Skinner states that the corrective information alleged by Plaintiffs on each of the three alleged corrective disclosure dates was "conceptually distinct" from the relevant truth concealed by the seven Alleged Misstatements classified as Revenue Synergies Statements.[71,72] The Revenue Synergies Statements are identified in **Exhibit 1**. Dr. Skinner's opinion on this relies on a two pronged approach: i) a mischaracterization of Plaintiffs' allegations,[73] which then allows Dr. Skinner to focus on a narrowed view of the Alleged Misstatements while ignoring the overall relationship between all of the Alleged Misstatements and the Undisclosed Worldpay

---

[71] Skinner Report ¶¶ 52 – 53.

[72] While Dr. Skinner's exhibit identifying Revenue Synergies Statements includes only six Alleged Misstatements, he references a seventh in a footnote of his report. Specifically, he states that "[c]ounsel also asked me to consider an August 4, 2022 statement that Plaintiffs allege was false or misleading…because it purportedly concealed the relevant truth that 'Defendants were only able to deliver revenue synergies because they manipulated the revenue synergy calculations and calculated revenue synergies as any new business acquired after the acquisition, as opposed to additional revenue that was the result of combining operations.'" Dr. Skinner asserts that his analyses and opinions regarding the Revenue Synergies Statements also apply to this August 4, 2022 statement, based on his understanding from counsel for Defendants that it allegedly conceals the same relevant truth. Accordingly, I treat this August 4, 2022 statement as part of Dr. Skinner's analysis of the Revenue Synergies Statements. *See,* Skinner Report footnote 93, Exhibit 2.

[73] Skinner Report ¶¶ 53 – 54.

Issues,[74] and ii) the fact that securities analysts did not explicitly link the alleged corrective information and the so-called Revenue Synergies Statements.[75] I will explain in detail below how Dr. Skinner's argument is flawed and the clear connection between the Revenue Synergies Statements and the corrective information.

43.    As I already explained above in **Section IV**, Dr. Skinner relies on a mischaracterization of Plaintiffs' allegations. By insinuating that the seven Revenue Synergies Statements are solely about whether the quantity of revenue synergies was incorrect, Dr. Skinner is blatantly ignoring the underlying truth alleged by Plaintiffs, that all of the Alleged Misstatements concealed the Undisclosed Worldpay Issues. Furthermore, Dr. Skinner relies on his review of analyst reports which, according to him, provide evidence of a difference in information between the Revenue Synergies Statements and the information released on the alleged corrective disclosures, since they did not discuss the specific statements he identified. This is flawed. First, there is no requirement, nor does Dr. Skinner refer to such a requirement, where analysts must discuss the alleged misstatements from any given plaintiff in a securities matter to establish price impact. Second, while analysts may not have made an explicit connection between the Company's previous revenue synergies figures and/or statements and the corrective information, analysts *did* rely on the information given by the Company to calculate their estimates,[76] in addition to discussing the alleged corrective information as shown below in **Section V.C.ii** through **Section V.C.iv**. Furthermore, the roles and responsibilities of analysts

---

[74] *See,* for example, Skinner Report ¶¶ 62, 69, 77, 88.

[75] Skinner Report ¶¶ 57 – 59.

[76] At least one analyst used synergies as a part of their EBITDA margin calculations. *See,* for example, "Details on Q2 Results," *Baird*, August 4, 2020; "Adjusting Estimates to Get Closer to Management Margin Comments," *Baird*, October 5, 2020; "Trimming Estimates (Likely Conservative, but Why Not Be for Now)," *Baird*, December 14, 2020.

are to be forward-looking, to better understand how the new information at hand might change their valuation and forecast of a company's future cash flows to provide investment recommendations to their clients.[77]  Their role or responsibilities do not lie in making a connection between a company's past statements and new disclosures.  Therefore, despite the abundant analyst commentary following the alleged corrective disclosures, the fact that analysts did not specifically comment on the Revenue Synergies Statements is neither surprising nor affirmative economic evidence suggesting a lack of price impact.

44.    Since Dr. Skinner's arguments are based on such a flawed premise, I will reply to his repetitive claims collectively rather than individually.  Aside from his flawed argument regarding analyst reports which I already addressed above, for the alleged corrective disclosure on August 4, 2022, Dr. Skinner lists the following as reasons why there is purportedly no causal link between the alleged corrective information and the Revenue Synergies Statements:

- Adjusted EBITDA margin and revenue synergies are distinct constructs, therefore the reduction in the adjusted EBITDA margin does not necessarily imply anything about revenue synergies from the Worldpay acquisition;[78]

- That the adjusted EBITDA margin refers only to 2Q22 while the revenue synergies are annualized;[79]

---

[77] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association – Research Reports*, Vol. II, No. 7, August 22, 2001 ("A securities analyst, generally employed by a brokerage firm, bank or investment institution, has the principal task of performing diligent and thorough investigations of specific securities, companies and industries. The results of these investigations are presented as a research report, which serves as a basis for making an investment recommendation. Analysts examine all aspects of the current and prospective financial condition of certain publicly traded companies. These examinations should cover all pertinent publicly available information about the company and its businesses. […] All analysts begin their work by engaging in what is largely a descriptive function: gathering and assessing all meaningful qualitative and quantitative information about a company's past and present, and presenting it in a coherent, readily intelligible manner. After completing what is principally an objective evaluation, ***an analyst must then go further, prognosticating and expressing specific judgments of his own about a company's and a security's future prospects***.").

[78] Skinner Report ¶¶ 62 – 63.

[79] Skinner Report ¶ 64.

- That the so-called Revenue Synergies Statements refer to the revenue synergies of the Company as a whole, unlike the adjusted EBITDA margin contraction for the Merchant Solutions segment;[80]

- That there is not necessarily a relationship between volume growth and revenue growth, nor one between volume growth and revenue synergies;[81]

- That disclosures regarding volumes for the Merchant Solutions segment refer only to 2Q22 while the revenue synergies are annualized;[82] and

- That disclosures about the volume for the Merchant Solutions segment do not necessarily imply anything about the revenue synergies that refer to the Company as a whole.[83]

45.  For the second alleged corrective disclosure on November 3, 2022, Dr. Skinner makes the following claims:

- Information about adjusted EBITDA margins and profitability for 3Q22 does not necessarily imply anything about revenue, or more specifically, revenue synergies related to the Worldpay acquisition,[84] and

- That there is a difference in timing between figures for a specific quarter (i.e., adjusted EBITDA margins for 3Q22) and annualized figures, such as revenue synergies.[85]

46.  For the final alleged corrective disclosure on February 13, 2023, Dr. Skinner argues that the following are evidence of a mismatch between the alleged corrective information and the Revenue Synergies Statements:

---

[80] Skinner Report ¶ 65.

[81] Skinner Report ¶ 69.

[82] Skinner Report ¶ 71.

[83] Skinner Report ¶ 72.

[84] Skinner Report ¶ 77.

[85] Skinner Report ¶ 78.

- The assessment of a goodwill impairment is "a complex accounting determination"[86] that did not even necessarily account for existing revenue synergies,[87] as a result, the impairment charge "does not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition,"[88] and

- That there is a myriad of potential reasons why FIS may have decided to pursue the planned spin-off of the Merchant Solutions segment, which does not necessarily imply anything about revenue synergies from the Worldpay acquisition.[89,90]

47.    Assuming that Plaintiffs' allegations are correct, there is a clear connection between the contractions of adjusted EBITDA margins in the Merchant Solutions segment and the revenue synergies related to the Worldpay acquisition.  For example, an internal document from May 2020 reveals the Defendants themselves understood that revenue in general and EBITDA margins were connected.[91]  Furthermore, analysts understood that the Company's EBITDA

---

[86] Skinner Report ¶ 82.

[87] Skinner Report ¶ 84.

[88] Skinner Report ¶ 84.

[89] Skinner Report ¶¶ 86 – 88.

[90] Dr. Skinner notes that Defendants' Counsel asked him to review a statement from CFO Erik Hoag on February 13, 2023, regarding the lack of product investment as a headwind for the Merchant Solutions segment and whether there was a tie between the disclosure and the Revenue Synergies Statements. Dr. Skinner then opines that there is a conceptual difference between disclosures regarding investing level and the relevant truth concealed in part by the Revenue Synergies Statements, therefore CFO Hoag's statements did not necessarily imply anything about the existence or amount of revenue synergies from the Worldpay acquisition. *See,* Skinner Report footnote 139. I disagree. According to Plaintiffs' allegations, the revenue synergies announced by FIS served as a proxy for investors to gauge the success of Worldpay's acquisition and its integration. Further, as proven by internal documents provided to me by Counsel, Defendants were aware of the failure of Worldpay's integration, see FIS_00309200 ("Lastly, several internal missteps have created further setbacks to the Worldpay business. Key decisions were, and continue to be, with a lack of understanding of the business; very limited knowledge of the business and market at OLT table … There has been zero additional investment … to enhance the Worldpay proposition.") Thus, if Plaintiffs' claims are accurate, CFO Hoag announcing a lack of investment reveals the failure of the Worldpay acquisition, which had been previously concealed by the Alleged Misstatements that touted its success with inflated revenue synergies figures.

[91] *See,* FIS_00323071 at page 2: ("2020 margin negatively impacted by revenue losses in high margin merchant portfolios, increased merchant losses and incremental costs for growth initiatives.").

margin projections were driven in part by revenue synergies from the Worldpay acquisition, as evidenced by a William Blair report:

> Management affirmed prior targets of posting 7%-9% annual organic revenue growth and 50 to 100 basis points of EBITDA margin expansion. We believe management's confidence is driven by strong new sales activity, ***revenue synergies from the acquisition of Worldpay***, new products, and a $22 billion of backlog.[92]

48.    On August 4, 2022 and November 3, 2022, when Defendants announced a contraction in the adjusted EBITDA margins in the Merchant Solutions, investors learned the partial truth about the failed acquisition and the true value of Worldpay because the alleged corrective information brought into question the success of the Worldpay acquisition including the revenue synergies touted by the Company throughout the Class Period.

49.    Furthermore, I understand from Counsel that Payrix[93] was acquired to turn around Worldpay's declining SMB[94] business and generate revenue that would have otherwise been unachievable with only Worldpay.[95]  Also I understand that internal documents reflect Defendants *knew* that pursuing this acquisition to meet their revenue synergies targets and avoid a goodwill impairment would put downward pressure on adjusted EBITDA margins.[96]

---

[92] "Competitive Position to Enable Commerce Remains Solidly Intact; Attractive Risk/Reward Profile," *William Blair*, November 4, 2021.

[93] Payrix is a fintech company that specializes in enabling software platforms to integrate and monetize payments. Its acquisition by FIS was announced on February 14, 2022.  *See*, FIS_00295612 at Slide 2 (Presentation titled "Payrix Investment Thesis," dated October 2021) and "FIS Acquisition of Payrix Expands Its E-Commerce, Embedded Payments and Finance Experiences for SMB Merchants via Platforms," *Business Wire*, February 14, 2022, 9:00 AM.

[94] "SMB means small to medium sized businesses." (*see*, Complaint footnote 2).

[95] FIS_00295612 at Slide 2 and Slide 6 (Presentation titled "Payrix Investment Thesis," dated October 2021).

[96] Payrix's adjusted EBITDA margins were projected to remain negative through 2022 and below 10% through 2026, implying that its consolidation would dilute FIS's margin profile in the near term, given FIS's 46.5% adjusted EBITDA margin in 2020. *See*, FIS_00295612 at Slide 7 (Presentation titled "Payrix Investment Thesis," dated October 2021), FIS_00579414 (Email titled "RE: Payrix – latest deck" dated October 19, 2021) and SEC Form 10-K for the fiscal year ended December 31, 2020, filed February 18, 2021, p. 42.

Therefore, it is logical that a reasonable investor would interpret a contraction in adjusted EBITDA margins as a partial revelation of the Undisclosed Worldpay Issues that were concealed by all of the Alleged Misstatements, including the Revenue Synergies Statements as categorized by Dr. Skinner.

50.    Dr. Skinner's argument regarding a timing difference between a quarterly figure (i.e., adjusted EBITDA margins or volume) and an annualized figure (i.e., revenue synergies) is irrelevant.  It is absurd to suggest that figures representing different time periods cannot be interpreted together.  While it is factually true that each figure represents a different time period, analysts still use the annualized figure and their projections to estimate the quarterly figure.[97] Because of this, there is a clear connection between an announcement of a disappointing quarterly figure and the misleading nature of an annualized figure used by investors to value the company at hand.

51.    Next, Dr. Skinner's argument that the decision that led to the goodwill impairment charge was so complex and it could have potentially ignored the revenue synergies is nonsensical.  The announcement of the goodwill impairment charge served as a clear signal to investors regarding the true value of Worldpay and that the Worldpay acquisition had not been successful whatsoever by fully revealing the Undisclosed Worldpay Issues.  In addition, the Revenue Synergies Statements served as a proxy for the success of the integration, allegedly misleading the market to believe it had been a rounding success.  Together, these facts

---

[97] *See,* for example, "Details on Q2 Results," *Baird*, August 4, 2020; "Adjusting Estimates to Get Closer to Management Margin Comments," *Baird*, October 5, 2020; "Trimming Estimates (Likely Conservative, but Why Not Be for Now)," *Baird*, December 14, 2020.

demonstrate a clear economic and causal link between the Revenue Synergies Statements and the goodwill impairment charge announced on the final alleged corrective disclosures.

52. Furthermore, while I do not pretend to know (and it is not necessary to) the precise details of the reasons why FIS decided to sell off its Merchant Solutions segment as the Company did not disclose such information, as a financial economist, I find it reasonable that a disclosure effectively announcing the de-merger of Worldpay would directly call into question the existence and nature of the synergies. This much was clearly understood by the Financial Times in an article published following the final alleged corrective disclosure, stating:

> Ferris' comments … suggest that the two commentary companies would be able to preserve some of the synergies. But this does nothing to ameliorate the grim picture, because if it's true, it would have been possible to achieve much of the cost savings and higher revenue without doing the deal in the first place. ***To put it another way: either tens of billions in synergy value are going to be lost in the spin-off, or the value of the synergies was wildly overstated in the first place. It can't be both***.

> … The lesson here for investors is an old one: M&A is very risky. Here is a company that did a huge deal, promised big synergies, invested a lot of money and management time in achieving them, said that it did achieve them, and reversed the deal a few years later anyways. This can only make sense if either the combination is so value-destroying that the tens of billions worth of synergies FIS achieved are not worth keeping, or ***those synergies were never really worth all that much***.[98]

53. It would be unreasonable to assume that since the term 'revenue synergies' was not explicitly included FIS's announcement on the final alleged corrective disclosure, that there is absolutely no relationship between the divestiture of the Merchant Solutions segment (effectively Worldpay) and revenue synergies. Furthermore, as evident by the Financial Times article, it is

---

[98] "Soft landing doubts creep in," *Financial Times*, February 14, 2023.

clear that at least some market participants saw this spin-off as a potential direct contradiction of Defendants' statements regarding revenue synergies.

54.    Finally, Dr. Skinner argues that following the corrective disclosures, and the next earnings date, April 27, 2023, analysts did not re-evaluate the existence or amount of revenue synergies that FIS had reported earlier in the Class Period.[99]  Instead, he adds, they continued to discuss the approximately $750 million of revenue synergies that FIS had previously reported, which he argues supports his opinion that the allegedly corrective information was different from the relevant truth allegedly concealed by the Revenue Synergies Statements.[100]  Dr. Skinner's argument is once again based on a mischaracterization of Plaintiffs' claims and too narrowly focused on the specific measure of revenue synergies.  It is important to reiterate that the relevant question at issue is whether the Alleged Misstatements impacted the price of FIS Common Stock.  Plaintiffs allege that *all* the Alleged Misstatements concealed the Undisclosed Worldpay Issues.  Regardless of whether FIS achieved $750M in revenue synergies and whether analysts changed that estimate after the alleged corrective disclosures, FIS had to take a goodwill impairment charge of $17.6 billion and spin-off the portion of its business that Worldpay comprised on the final alleged corrective disclosure date, which revealed to investors the Undisclosed Worldpay Issues, including the true value of the Worldpay acquisition and true extent to which the Worldpay acquisition was a failure.  Dr. Skinner's focus on the specific $750M revenue synergies estimate does not establish a lack of price impact from the Alleged Misstatements.

---

[99] Skinner Report ¶ 92.

[100] Skinner Report ¶¶ 92 – 97.

31

55.    As a result of the foregoing, Dr. Skinner has not established a lack of price impact from the Revenue Synergies Statements and there is a clear link between the Revenue Synergies Statements and the alleged corrective information.

### iii.    CROSS-SELLING STATEMENTS

56.    Next, Dr. Skinner similarly argues that the alleged corrective information was different from the relevant truth allegedly concealed by what he categorizes as the two Cross-Selling Statements.[101]  The Cross-Selling Statements are identified in **Exhibit 1** and are the following two Alleged Misstatements:

> "[FIS] [r]aises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, *in order to reflect strong cross-selling performance during the second quarter…*[102]

> I think the team has *done an excellent job driving cross sales through the Worldpay acquisition*. I mean, we exceeded more than $700 million in cross sales…[103]

57.    Dr. Skinner first notes that Plaintiffs do not clearly define how they measure cross-selling when they allege that "little to no cross-selling" occurred as a result of the Worldpay acquisition.[104]  He claims that to the extent Plaintiffs assess or measure the amount of cross-selling based on the amount of revenue synergies generated through cross-selling, the relevant truth allegedly concealed by the Cross-Selling Statements would have the same financial implications as the relevant truth allegedly concealed by the Revenue Synergies Statements.[105]

---

[101] Skinner Report Section VII.

[102] Complaint ¶ 197 and "FIS Reports Second Quarter 2021 Results," *Business Wire*, August 3, 2021, 7:00 AM.

[103] Complaint ¶ 209 and "FQ4 2021 Earnings Call Transcripts," *S&P Capital IQ*, February 15, 2022, 8:30 AM, p. 14.

[104] Skinner Report ¶ 106. *See also,* Complaint ¶¶ 198, 210.

[105] Skinner Report ¶ 106.

58.    Dr. Skinner adds that there is an even higher threshold to prove that the alleged corrective disclosures corrected the Cross-Selling Statements than there is to show they corrected the Revenue Synergies Statements because cross-selling is just one of several possible sources of revenue synergies.[106]  He reasons that even if Plaintiffs prove the alleged corrective disclosures revealed that revenue synergies were lower than what FIS had stated, it could be due to a shortfall in another source of revenue synergy other than cross-selling.[107]  Therefore, based on his analysis and reasoning with respect to the Revenue Synergies Statements, he concludes that the allegedly corrective information is conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.[108]

59.    As an initial matter, as I have already described above in **Section IV**, while Dr. Skinner discusses the Alleged Misstatements in separate categories, Plaintiffs allege that the Alleged Misstatements all concealed the overarching relevant truth of the Undisclosed Worldpay Issues.  Like the revenue synergies in general, the amount of cross-selling between the Merchant Solutions segment (containing Worldpay) and the other FIS business segments was viewed by the market as a gauge for the overall success of Worldpay's integration.  Indeed, both FIS and the market understood cross-selling as a key component of the merger.  For instance, shortly after the merger was complete, Defendant Norcross stated on the Q3 2019 earnings call that cross-selling was a "strong indicator of the success and scale" of the post-acquisition company:

> FIS has successfully generated 7 consecutive quarters of exceptionally strong sales. Merchant Solutions also saw continued strong sales momentum within our e-commerce portfolio, including 23 cross-sell wins in the quarter, accelerating from 14 wins in the second quarter. ***We think these cross-sell***

---

[106] Skinner Report ¶ 107.

[107] Skinner Report ¶ 108.

[108] Skinner Report ¶ 109.

*wins are another strong indicator of the success and scale that our newly combined company can deliver.*[109]

60. Later in the call, in response to an analyst's question about the e-commerce element of the Merchant Solutions segment, Defendant Norcross again characterized cross-sell wins as "important indicators" of growth:

> …So no, our e-com business, which is pure-play, really is growing very, very high; as Woody just said, greater than 20%. *I think the cross-sell wins are important indicators.* You're talking about first quarter, we did 16 of those. Second quarter came in at 14 wins. And then Q3 at 23 wins. So Mark, Shane and the group are really doing a nice job continuing to grow that business.[110]

61. Following the merger announcement, news outlets and analysts also reported on the significance of cross-selling specifically, with one source noting that the cross-selling synergies outweighed the cost synergies (savings in operating costs due to increased efficiencies following a merger)[111] and another anticipating the cross-selling benefits "to boost the stock further":

> Fidelity, known as FIS, and Worldpay say it will allow them to cross-sell services to each other's clients. They anticipate $400 million of cost synergies from the deal over three years, but *an even greater $500 million of revenue synergies from these cross-selling opportunities*.[112]

> …Berenberg analyst Tej Sthankiya initiated FIS (FIS) with a Buy rating and a price target of $171, saying its acquisition of Worldpay (WP) "propels" the company into the payment market at scale and boosts its organic growth rate to 6% from 4% "immediately". *The analyst expects the cross-selling e-commerce and loyalty payments from the deal to boost the stock further.*[113]

---

[109] "FQ3 2019 Earnings Call Transcripts," *S&P Capital IQ*, November 5, 2019, 8:30 AM.

[110] "FQ3 2019 Earnings Call Transcripts," *S&P Capital IQ*, November 5, 2019, 8:30 AM.

[111] Skinner Report ¶¶ 21 – 22, footnotes 29 and 32.

[112] "Paying up for Worldpay Might Make Sense--Heard on the Street," *Dow Jones Institutional News*, March 18, 2019, 12:07 PM.

[113] "06:30 EDT FIS initiated with a Buy at BerenbergBerenberg analyst Tej Sthankiya...," *thefly*, July 31, 2019.

62.   If Plaintiffs' claims are accurate, then because cross-selling was viewed as an indicator that Worldpay was being successfully integrated, then the poor Merchant Solutions segment results and eventual Worldpay spinoff and goodwill impairment charge revealed the Undisclosed Worldpay Issues, which were concealed by Defendants' claims of strong cross-selling performance.  As such, Dr. Skinner's attempt to sever the link between the Cross-Selling Statements and the alleged corrective disclosures fails.  Supporting the notion that the market tied the failure of the Worldpay acquisition to a lack of cross-selling is an article by the Telegraph, which stated the "overambitious" Worldpay merger had "disastrous impacts for shareholders" after the cross-selling FIS had promised "never materialized":

> An overambitious, ill-timed acquisition at the top of the market can have disastrous impacts for shareholders. Just ask investors in Fidelity National Information Services, or FIS for short, an American payment processing company. Since buying rival payments company Worldpay for $43bn (£34bn) in 2019, shares in FIS have lost 40pc of their value. The deal was meant to be a glorious marriage of FIS's and Worldpay's technology, but *the promised feast of cross-selling between the two companies' customers never materialised*. In January this year, FIS's new management decided it was time for a divorce. It sold 55pc of Worldpay to private equity for just over $12bn, representing a huge drop from the price it paid for the business less than five years ago.[114]

63.   Additionally, Dr. Skinner states that his argument is supported because he did not identify any analysts that linked the corrective information to the Cross-Selling Statements or to the extent of cross-selling between the legacy FIS and Worldpay businesses, however this is irrelevant.[115]  As discussed above, while analyst reports can be useful in disseminating new, value-relevant information to investors, they do not represent a proper test for whether there is a

---

[114] "Questor: This company has had a terrible five years – buy it now before the bounceback," *The Telegraph*, April 7, 2024, 3:00 PM.

[115] Skinner Report ¶ 111, Section VII.C.

causal economic connection between new information and specific past company statements.[116]

As Dr. Skinner states, cross-selling is one component of synergies.[117]  Even if analyst reports at the time did not specifically mention cross-selling separately from synergies in general, this does imply that cross-selling was not viewed by investors as important nor does it provide evidence of a lack of price impact.

64.    Dr. Skinner continues to argue that he did not identify any discussion in analyst reports following the corrective disclosures indicating that analysts had reevaluated the extent of cross-selling that occurred earlier in the Class Period, further supporting his argument that the allegedly corrective information was conceptually distinct from the relevant truth allegedly concealed by the Cross-Selling Statements.[118]  Again, Dr. Skinner is too narrowly focused on analysts explicitly discussing the extent to which cross-selling occurred, which is not the relevant question at hand and ignores Plaintiffs' claims that *all* the Alleged Misstatements collectively concealed the Undisclosed Worldpay Issues, which were then revealed to investors through the alleged corrective disclosures.  Therefore, Dr. Skinner's focus on whether or not analysts reevaluated the extent to which cross-selling occurred does not establish a lack of price impact from the Alleged Misstatements.

65.    In sum, the market viewed cross-selling as a key indicator of Worldpay's successful integration.  Further, the disappointing Merchant Solutions segment results and eventual goodwill impairment charge coupled with the Worldpay spinoff conveyed to investors the true value of the Worldpay acquisition and the true extent to the which the integration had

---

[116] *See*, supra ¶ 43.

[117] Skinner Report ¶ 106.

[118] Skinner Report ¶ 113.

failed.  Thus, the Cross-Selling Statements are logically and economically connected to the

alleged corrective disclosures, undermining Dr. Skinner's attempt to sever that link.  In

conclusion, Dr. Skinner has not established a lack of price impact from the Cross-Selling

Statements.

### iv.  GOODWILL STATEMENTS

66.  Dr. Skinner contends that the alleged corrective information on August 4, 2022 and

November 3, 2022 was different from the relevant truth allegedly concealed by the Goodwill

Statements.[119]  The Goodwill Statements are identified in **Exhibit 1**.  Notably, as I discussed

above in **Section III,** Dr. Skinner does not dispute that the final alleged disclosure, which

included the $17.6 billion goodwill impairment charge to Worldpay and the spin-off of the

Merchant Solutions segment on February 13, 2023, was economically linked to the Goodwill

Statements.  Even setting that aside, his attempts to decouple the first two of the three alleged

corrective disclosures from the Goodwill Statements are unpersuasive.

67.  Dr. Skinner first argues that the August 4, 2022 and November 3, 2022 alleged

disclosures concerned only short-term financial metrics like EBITDA margins, volume growth,

and profitability, and were therefore conceptually distinct from goodwill, which is based on

long-term value.[120]  Specifically, he says:

> …the alleged corrective information on August 4, 2022 and November 3,
> 2022 comprises specific measures of past financial performance for specific
> quarters: the adjusted EBITDA margins reported by the Company for its
> Merchant Solutions segment for Q2 2022 and Q3 2022; volume growth for

---

[119] Skinner Report Section VIII.

[120] Skinner Report ¶¶ 122 – 123.

the Merchant Solutions segment during Q2 2022; and the Company's profitability (including the adjusted EBITDA margin) for Q3 2022.[121]

68.    Dr. Skinner argues this is distinct from goodwill valuation, which requires "among other things (that include the associated accounting judgments and determinations), inputs and assumptions that go beyond and were not included in what Plaintiffs allege as corrective on August 4, 2022 or November 3, 2022."[122]   However, his characterization overlooks the nature of these two alleged corrective disclosures.  If Plaintiffs' claims are accurate, then Q2 2022 and Q3 2022 were not isolated weak quarters, but instead reflected a sustained pattern of underperformance due to the Undisclosed Worldpay Issues that stood in contrast to the Alleged Misstatements FIS had previously made about the success and value of the Worldpay acquisition.  Because goodwill is directly tied to the success and value of the Worldpay acquisition, disclosures that call these elements into questions inevitably cast doubt on the accuracy of the reported goodwill.

69.    Dr. Skinner also asserts that goodwill impairment is multifaceted with subjective elements, and that the August and November disclosures do not necessarily imply that FIS was required to record an impairment charge for any period from Q3 2021 through Q3 2022.[123]   He concludes that this is further evidence that the alleged corrective disclosures were conceptually distinct from the alleged relevant truth concealed by the so-called Goodwill Statements.[124]   To

---

[121] Skinner Report ¶ 123.

[122] Skinner Report ¶ 124.

[123] Skinner Report ¶ 124.

[124] Skinner Report ¶ 124.

support this point, Dr. Skinner contends that goodwill impairment tests[125] must be based on

information available as of the test date, and information disclosed on August 4, 2022 and

November 3, 2022, related specifically to Q2 and Q3 2022, respectively.[126]  As such, he expands,

"a test for impairment of the Merchant Solutions reporting unit's goodwill as of the end of Q3

2021…would not (and could not) reflect allegedly corrective information released several

quarters later, on August 4, 2022 or November 3, 2022."[127]  Furthermore, Dr. Skinner argues that

even for Q2 and Q3 2022, the allegedly corrective information does not necessarily indicate

goodwill impairment.  He notes that impairment determinations require "complex accounting

determinations that require considerable management judgment… including numerous estimates

and assumptions."[128]  Therefore, he reasons, the "allegedly corrective information does not

necessarily imply that management would (or should) have determined that…goodwill for the

Merchant Solutions reporting unit was impaired."[129]  Finally, Dr. Skinner argues that a

qualitative goodwill impairment test requires evaluating the totality of circumstances as of the

assessment date, including macroeconomic conditions, industry and market considerations, cost

---

[125] Skinner Report ¶¶ 27 – 28 ("The relevant accounting guidance requires that goodwill be tested for impairment at least annually. … An impairment of goodwill is recognized when there is an assessment and determination by management – performed in accordance with the relevant guidance under GAAP – that, in management's judgement, the carrying amount of the relevant reporting unit exceeds its assessed fair value at the goodwill impairment testing date. The impairment test consists of two steps. At the first step management has the option to perform an assessment of 'qualitative factors to determine whether it is more likely than not … that the fair value of a reporting unit is less than its carrying amount, including goodwill.' If management determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, it proceeds to the second step, under which management conducts a quantitative assessment to estimate the fair value of the reporting unit at the impairment testing date and compares that amount to the reporting unit's carrying amount. For GAAP reporting, the 'fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date.'")

[126] Skinner Report ¶ 125.

[127] Skinner Report ¶ 126.

[128] Skinner Report ¶ 128.

[129] Skinner Report ¶ 130.

factors, financial performance, and company-specific events known on the "as of" date of the assessment, rather than isolated facts.[130]  He adds that "[t]he allegedly corrective information on August 4, 2022 and November 3, 2022 did not contain the inputs necessary… to conduct such a qualitative test for goodwill impairment."[131]

70.    First, Dr. Skinner does not, and cannot, argue that he has established the lack of a causal link between the financial underperformance disclosed on the first two alleged corrective disclosures and the impairment of goodwill.  His only argument is that one does not *necessarily* imply the other.  In other words, he is saying it is *possible* for there to be short-term underperformance that does not reflect long-term impairment, but he offers no actual opinion that is true in this matter.  Furthermore, in making this point, Dr. Skinner's analysis fails to consider key facts alleged by Plaintiffs.  While I understand that Plaintiffs allege that Defendants were aware of the Undisclosed Worldpay Issues as of the start of the Class Period, the Complaint also alleges that due to several triggering events, Defendants knew that goodwill was impaired by no later than the third quarter of 2021.[132]  Indeed, by mid-2022, FIS was allegedly actively shopping Worldpay to private equity buyers at valuations below its publicly reported carrying value.[133]  Under GAAP, the expectation of a sale requires an interim goodwill impairment test.[134] FIS's pursuit of such a sale at reduced valuations is supportive of Plaintiffs' claims that Defendants already knew prior to the alleged corrective disclosures that Worldpay's fair value had declined materially, yet the Company continued to affirm the inflated goodwill figure.

---

[130] Skinner Report ¶ 130.

[131] Skinner Report ¶ 130.

[132] Complaint ¶¶122 – 142.

[133] Complaint ¶¶ 152 – 153.

[134] Complaint ¶¶ 152 – 153.

71.    Dr. Skinner argues that his point is supported because no analysts connected the August and November disclosures to goodwill or suggested an impairment should have been recognized.[135]  As stated above, this misunderstands both the role of analysts and the proper focus in determining whether a disclosure corrected a misstatement.[136]  A showing of price impact does not require that securities analysts explicitly flag every potential prior misstatement. Securities analysts are not the arbiters of what causal connections may exist between prior misstatements and subsequent adverse events.  Instead, if what Plaintiffs allege is correct (i.e., that the Alleged Misstatements concealed the Undisclosed Worldpay Issues), then the alleged corrective disclosures that revealed persistent underperformance and deteriorating financial fundamentals, which were inconsistent with the favorable assumptions underlying the goodwill valuation, represent corrective information.

72.    Finally, Dr. Skinner adds that he did not identify any discussion in the analyst reports following the alleged corrective disclosure dates indicating that the Company was required to record a goodwill impairment charge for the Merchant Solutions reporting unit in Q2 2022, Q3 2022, or any prior quarters.[137]  He argues there is no analyst commentary that reflects an understanding that the allegedly corrective information on August 4, 2022 and November 3, 2022 revealed that the Goodwill Statements were inaccurate when made, including that the Company was required to record a goodwill impairment for the Merchant Solutions reporting unit at the time of the Goodwill Statements.[138]  Here, Dr. Skinner imposes a requirement that is

---

[135] Skinner Report ¶ 132, Section VIII.C.

[136] *See*, supra ¶ 43.

[137] Skinner Report ¶ 133.

[138] Skinner Report ¶ 133.

41

inconsistent with Plaintiffs' claims.  There is nothing in Plaintiffs' claims to suggest that the market should have known after the first two corrective disclosures but before the last corrective disclosure that the Company should have recorded an impairment charge.  While the first two alleged corrective disclosures revealed the *partial* truth, according to Plaintiffs' claims, they did not reveal the full truth regarding the Undisclosed Worldpay Issues, including the true value of the Worldpay acquisition and the true extent to which the Worldpay acquisition was a failure.  Analysts not commenting on goodwill impairment charges prior to the final alleged corrective disclosure says nothing about whether the Alleged Misstatements impacted the price of FIS Common Stock.

73.    In sum, if Plaintiffs are able to prove their claims, then the August 4, 2022 and November 3, 2022 alleged corrective disclosures undermined the very assumptions on which the Worldpay goodwill was based and ultimately culminated in a massive impairment charge and need to spin off Worldpay from FIS.  Dr. Skinner's attempt to separate these disclosures from the Goodwill Statements disregards critical context and overlooks how the alleged disclosures reflected information directly relevant to goodwill valuation.  Thus, Dr. Skinner has not established a lack of price impact from the Goodwill Statements and there is a clear link between the Goodwill Statements and the alleged corrective information revealed on *all* three alleged corrective disclosures dates.

**B.    THERE WERE STATISTICALLY SIGNIFICANT PRICE DECLINES FOLLOWING THE ALLEGED CORRECTIVE DISCLOSURES**

74.    As I stated in my Report, an event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities.[139]  Dr. Skinner

---

[139] Coffman Report ¶ 50.

does not perform his own event study or address the event study I performed. Thus, there is no dispute that the market price of FIS Common Stock declined in a statistically significant manner, after controlling for market and industry effects, at beyond the 99% confidence level on all three alleged corrective disclosure dates (see **Exhibit 2**).[140]

75.    Specifically, on August 4, 2022, the first alleged corrective disclosure, my event study demonstrates the market price of FIS Common Stock fell by 7.13% ($7.42 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level (as well as the 99% confidence level) with a t-statistic of -6.97.

76.    On November 3, 2022, the second alleged corrective disclosure, my event study demonstrates the market price of FIS Common Stock fell by 23.35% ($18.56 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level (as well as the 99% confidence level) with a t-statistic of -24.85.

77.    On February 13, 2023, the third and final alleged corrective disclosure, my event study demonstrates the market price of FIS Common Stock fell by 12.93% ($9.75 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level (as well as the 99% confidence level) with a t-statistic of -9.33.

78.    Thus, the event study I have conducted provides economic evidence that investors clearly viewed information revealed on the alleged corrective disclosure dates as value-relevant.

---

[140] *See also*, Coffman Report Exhibit 7.

43

When portions of the relevant truth, that the Worldpay acquisition was not as successful or valuable as Defendants were portraying it, were revealed to the market, it caused the market price of FIS Common Stock to decline statistically significantly.[141]  Furthermore, Dr. Skinner does not even opine on what caused the price of FIS Common Stock to decline on the alleged corrective disclosure dates; his arguments are instead limited to whether the information revealed on these dates was "conceptually distinct" from the Alleged Misstatements.  In other words, Dr. Skinner does not offer a single alternative explanation for the price declines on the alleged corrective disclosure dates.  Accordingly, the event study I performed supports that the Alleged Misstatements impacted the price of FIS Common Stock.

**C.    ANALYST REPORTS RELIED ON BY DR. SKINNER DEMONSTRATE THAT THE MARKET WAS RELYING ON THE ALLEGED MISSTATEMENTS AND REACTING TO INFORMATION RELATED TO THE UNDISCLOSED WORLDPAY ISSUES AFTER THE ALLEGED CORRECTIVE DISCLOSURES**

79.    Dr. Skinner claims that he reviewed a total of 151 analyst reports from 35 unique contributors that were released during the one-week period following each alleged corrective disclosure.[142]  While Dr. Skinner produced over 900 analyst reports in connection with the backup materials to the Skinner Report he did not include any exhibits or documentation

---

[141] As I stated in my Report, an event study would also need to consider whether and to what extent any non-fraud related information (i.e. "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member. *See*, Coffman Report ¶ 84.

[142] Skinner Report ¶ 59.

summarizing his review of those analyst reports.  For example, in connection with the Revenue

Synergies Statements, Dr. Skinner claims the following:

> I did not find any commentary in the 40 analyst reports issued in the one-week period following the release of the adjusted EBITDA margin for the Merchant Solutions segment in Q2 2022 that linked that quarterly adjusted EBITDA margin information to the Revenue Synergies Statements, or to the existence or amount of previously reported revenue synergies.[143]

80.    However, nowhere in the Skinner Report, including in the appendix listing

documents considered, does Dr. Skinner specify which 40 analyst reports he reviewed in

reaching this conclusion.[144]  His blanket assertions regarding the absence of analyst commentary

relevant to the Alleged Misstatements are notably lacking in detail and transparency.  Without

identifying the specific reports relied upon, or providing any summary of their content, it is

difficult to assess his analysis.  As such, without being able to confirm from the Skinner Report

itself, I assume that in reaching his conclusions, Dr. Skinner relied on all of the analyst reports he

produced in connection with the backup materials to the Skinner Report (the "Skinner Analyst

Reports").

81.    In any event, regardless of the limitations in following Dr. Skinner's methodology,

the Skinner Analyst Reports themselves contain clear examples of analysts relying on the

Alleged Misstatements at the time they were made and reacting to information related to the

Undisclosed Worldpay Issues after the alleged corrective disclosures.  Dr. Skinner's assertion

that there is no analyst commentary linking the alleged corrective disclosures to the Alleged

Misstatements appears to overlook, or at least fails to account for, relevant commentary within

the very materials he produced.

---

[143] Skinner Report ¶ 66.

[144] Skinner Report, Appendix C.

82.    As I will discuss in turn below, the Skinner Analyst Reports contain evidence that analysts were (1) relying on the Alleged Misstatements at the time they were made and (2) reacting to new, relevant information related to the Undisclosed Worldpay Issues at the time of the alleged corrective disclosures.  This supports that information related to the Undisclosed Worldpay Issues was viewed as important by analysts at the time the Alleged Misstatements were made and ultimately when the Alleged Misstatements were corrected, which supports that the Alleged Misstatements had a price impact on FIS Common Stock.

### i.    ALLEGED MISSTATEMENTS

83.    Analysts clearly relied on the Alleged Misstatements at the time they were made, which is evident by their commentary immediately following the Alleged Misstatements.  Dr. Skinner does not dispute or address this.[145]

84.    For example, on the first day of the Class Period, May 7, 2020, Plaintiffs allege that Defendants made a false and misleading statement and omitted information.[146]  Following that Alleged Misstatement, analysts were still optimistic about the success and value of the Worldpay acquisition.  For example, William Blair stated that the "***Worldpay Integration Going Well and Long-Term Thesis Remains Intact***…" noting:

> Stock thoughts and risks: We believe ***the FIS/Worldpay combination will help accelerate FIS's organic growth and generate significant synergy opportunities***. We continue to believe Worldpay will bring unique value-added services to FIS's customer base (i.e., improved authorization, debit routing/omnichannel capabilities), FIS will help Worldpay expand into new

---

[145] Dr. Skinner testified during the Skinner Deposition that he did not review analyst commentary at the time the Alleged Misstatements were made.  *See*, Skinner Deposition 122:21 – 25 ("Q Did you consider -- let me rephrase. Did you review analyst commentary from the time, at the time the misstatement was made? A So I did not, as my report and we discussed before indicates…").

[146] *See*, "FIS Reports First Quarter 2020 Results," *Business Wire*, May 7, 2020, 7:00 AM; Complaint ¶ 184; and Skinner Report Exhibit 2: ("Revenue synergies of approximately $100 million, an increase of $20 million compared to the fourth quarter of 2019.").

geographies (i.e., Brazil), and the combined entity will remain a formidable leader in the global fintech market. Shares trade at 15.8 times 2021 adjusted EBITDA, which we believe is attractive given strong returns and lower earnings volatility; key risks include the integration of Worldpay and the overall macro economy.[147]

85.    Similarly, on May 7, 2020, Wells Fargo noted: "We believe the acquisition of Worldpay will accelerate revenue/EBITDA growth and bolster FCF generation."[148]

86.    Plaintiffs also allege that Defendants made an Alleged Misstatement on October 29, 2020 during the 3Q20 earnings conference call.[149]  In response to this, Compass Point Research wrote that they were "encouraged" by these statements:

> We also note realized synergy improvements to $150M run-rate on the revenue side, up from $115M in 2Q, and $385M in opex, up from $350M in 2Q. ***We are encouraged by the management's commentary on synergies***, as well as new wins in the banking segment, which will onboard in 2021, helping drive the company towards its 7-9% growth target. Overall we believe FIS shares at their current valuation premium over peers accurately reflect this growth reacceleration.[150]

87.    Analysts commented on another Alleged Misstatement when the Company mentioned in its Q2 2021 earnings press release that "[FIS] [r]aises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, in order to reflect strong cross-selling performance during the second quarter":[151]

---

[147] "COVID-Related Slowdown, but Worldpay Integration Going Well and Long-Term Thesis Remains Intact," *William Blair*, May 7, 2020.

[148] "FIS: 1Q EPS--Solid Growth, Pressure On Merchant Offset By Expense Mgmt.," *Wells Fargo*, May 7, 2020.

[149] *See*, "FQ3 2020 Earnings Call Transcripts," *S&P Capital IQ*, October 29, 2020, 9:00 AM; Complaint ¶ 188; and Skinner Report Exhibit 2: ("Touching on our Worldpay integration[,] [w]e are more than 2 years ahead of schedule. ***We have achieved $150 million in revenue synergies*** as we continue to see really strong traction with our Premium Payback solution. And we are significantly outperforming our initial expectations for merchant bank referrals.").

[150] "FIS 3Q20 Takeaways: Merchant Upside a Positive; Waiting on Resumption of Revenue Growth," *Compass Point Research*, October 29, 2020.

[151] *See*, "FIS Reports Second Quarter 2021 Results," *Business Wire*, August 3, 2021, 7:00 AM; and Complaint ¶ 197.

*RBC Capital Markets*: Increased revenue synergies. Q2/21 marked FIS' largest revenue synergy quarter since the merger as the company increased its revenue synergy run-rate by $150M or 50% to $450M. These cross-sells, furthermore, led management to increase its year-end revenue synergy target to $700M from last quarter's $600M. Additionally, the company noted that its cost synergy attainment continues to run ahead of schedule with it expecting to exit FY21 with $500M in opex synergies.[152]

*Credit Suisse*: What we liked: 1) Q3 & FY 2021 revenue guidance above Street by 1% and 2%, respectively, supported by $100mm increase to 2021 revenue synergy targets from cross-sell (e.g., added Walmart to premium payback for in-store & online with a ~50% attach rate when presented at checkout).[153]

88.     As another example, on November 16, 2021, Defendant Norcross mentioned at the RBC Global TIMT Virtual Conference that there is "no way you can say that FIS is losing share, just the exact opposite,"[154] which is an Alleged Misstatement.  Following the call, RBC reiterated this statement in a report:

> Company is a "disruptor" in Merchant, not a "disrupted". Despite investor "gravitation" (to use management's term) towards certain names, ***the company reiterated that it is not losing share in merchant acquiring***, as can be seen in the acceleration of the segment's revenue growth from ~8% prior to the merger to low-double digits as its ecommerce business grows 30%+ and becomes a larger share of segment revenue and global scale benefits accrue. Management noted that merchant acquiring is a large market, and, even though FIS is one of the largest global acquirers, there are certain verticals, such as card-not-present SMB, where it does not currently compete but can with its recently replatformed & integrated technology. Unlike its competitors, furthermore, the company does not want to own its own software but to use this "neutrality" to capture the payment flow driven by any software provider or ISV. FIS' scale provides not only unit cost advantages but also better data, which leads to better authorization and fraud rates. This advantage is especially seen in a number of wins, where global enterprises consolidate their acquiring with FIS, rather than using a large bank in each geography in which they operate.[155]

---

[152] "The negative rotation continues despite strong Q2/21," *RBC Capital Markets*, August 3, 2021.

[153] "Q2 2021 Recap," *Credit Suisse*, August 3, 2021.

[154] *See*, "Company Conference Presentation," *S&P Capital IQ*, November 16, 2021, 9:20 AM; and Complaint ¶ 207.

[155] "Highlights from the RBC Global TIMT Virtual Conference," *RBC Capital Markets*, November 16, 2021.

89.    The above-mentioned examples provide evidence that analysts relied on the Alleged Misstatements at the time they were made, a topic that Dr. Skinner is silent on.  This further supports that the Alleged Misstatements impacted the price of FIS Common Stock.

### ii.    AUGUST 4, 2022

90.    Plaintiffs allege that on August 4, 2022, investors learned the partial truth about the failed acquisition and the true value of Worldpay when Defendants announced disappointing financial results for its Merchant Solutions segment and stopped disclosing key performance metrics.[156]

91.    At 7:00 AM on August 4, 2022, FIS issued a press release containing earnings results for the second quarter of 2022.[157]  In the press release, FIS announced adjusted net earnings per share of $1.73,[158] which exceeded consensus analyst estimates of $1.71 per share.[159] Revenue for the second quarter was $3.72 billion,[160] which also beat consensus analyst estimates of $3.67 billion.[161]  However, FIS announced guidance that fell below market expectations. Specifically, FIS provided adjusted EPS guidance for the third quarter of 2022 and the full year 2022 of $1.74 – $1.78 per share and $7.00 – $7.10 per share, respectively.[162]  Analysts had been expecting $1.91 per share and $7.26 per share, respectively.[163]  Similarly, FIS stated that its

---

[156] Complaint ¶ 18.

[157] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[158] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[159] "BRIEF-FIS Reports Second Quarter 2022 Results," *Reuters News*, August 4, 2022, 7:36 AM.

[160] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[161] "BRIEF-FIS Reports Second Quarter 2022 Results," *Reuters News*, August 4, 2022, 7:36 AM.

[162] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[163] "BRIEF-FIS Reports Second Quarter 2022 Results," *Reuters News*, August 4, 2022, 7:36 AM.

revenue outlook for the third quarter of 2022 and the full year 2022 was $3.580 billion – $3.635 billion and $14.615 – $14.700 billion, respectively.[164] These figures fell short of analysts' expectations of $3.74 billion and $14.84 billion, respectively.[165] In changing its outlook, FIS provided the following commentary in the press release:

> The Company updated its full-year 2022 guidance to reflect changing macroeconomic factors including the impact of foreign exchange rates and increased interest rates. Additionally, the Company successfully announced the signing of two non-strategic divestitures. These factors are the primary drivers for the revision to the Company's full-year 2022 guidance.[166]

92.    The press release also contained adjusted EBITDA margin results of 47.1% for the Company's Merchant Solutions segment, which was far below analyst estimates of 50%.[167] Specifically, the press release stated:

> [Merchant Solutions] Adjusted EBITDA margin contracted by 280 basis points to 47.1%, primarily due to high contribution margins associated with e-commerce revenue affected by the Russia/Ukraine conflict, investment in geographic expansion to support our Global eCommerce business, and accelerated investment in e-commerce and Payrix sales channels to capitalize on developing secular growth trends.[168]

93.    Finally, the press release announced that James Woodall, then CFO ("Defendant Woodall") would be stepping down and be replaced by Erik Hoag ("Defendant Hoag"):

> The Company announced that James "Woody" Woodall will step down from his position as Corporate Executive Vice President and Chief Financial Officer, effective November 4, 2022, after over 14 years of distinguished service with the Company. The Company also announced the promotion of its Deputy Chief Financial Officer, Erik Hoag, to succeed Mr. Woodall as

---

[164] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[165] "BRIEF-FIS Reports Second Quarter 2022 Results," *Reuters News*, August 4, 2022, 7:36 AM.

[166] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[167] *See*, for example: "2Q22 Recap - Trimming Estimates as Results Remain Uneven," *J.P. Morgan*, August 5, 2022: ("Adj. EBITDA margins contracted by 280bps to 47.1%, *far below expectations (JPMe/Street ~50%)* and primarily attributable to: 1) high contribution margins from ecommerce revenue affected by Russia/Ukraine conflict, 2) investment in geographic expansion for global ecommerce business, and 3) Payrix sales channels.").

[168] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

Corporate Executive Vice President and Chief Financial Officer, effective November 4, 2022. To ensure a smooth transition of the Chief Financial Officer responsibilities, Woodall will remain with the Company through a transitionary period as Chief Financial Officer Emeritus.[169]

94.    That same morning, at 8:30 AM, FIS hosted a conference call to discuss the earnings results.[170]  During the call, FIS announced that it had won the business of powering the company Block's Cash App card, which "continues to show the strength of our issuer and acquiring capabilities coming together."[171]  Also on the call, Defendant Woodall described how foreign exchange, interest rates, and divestitures had a combined a $0.29 per share impact ($0.13, $0.13, and $0.03, respectively) on full year 2022 guidance.[172]

95.    In prior earnings presentations during the Class Period, FIS regularly included a slide outlining volume and transaction trends in the Company's Merchant Solutions segment.[173] Such a slide was absent from the earnings call presentation on August 4, 2022, such that an analyst during the conference call inquired about it: "…did you guys not disclose the merchant volume and transaction growth this quarter? I might have missed it, but curious on that."[174]

96.    Defendant Woodall's response to this question included that the Merchant Solutions segment "saw sequential volume decreases" during the quarter:

---

[169] "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.

[170] "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM.

[171] "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM.

[172] "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM, pp. 8 – 9.  *See also*, accompanying presentation to the earnings call, titled: "SECOND QUARTER 2022 EARNINGS CALL," *FIS*, August 4, 2022, p. 16.

[173] *See*, for example, "SECOND QUARTER 2020 EARNINGS CALL," *FIS*, August 4, 2020, p. 16; "THIRD QUARTER 2020 EARNINGS CALL," *FIS*, October 29, 2020, p. 12; "FOURTH QUARTER 2020 EARNINGS CALL," *FIS*, February 9, 2021, p. 19; "FIRST QUARTER 2021 EARNINGS CALL," *FIS*, May 6, 2021, p. 13; "THIRD QUARTER 2021 EARNINGS CALL," *FIS*, November 4, 2021, p. 16; "FOURTH QUARTER 2021 EARNINGS CALL," *FIS*, February 15, 2022, p. 18; and "FIRST QUARTER 2022 EARNINGS CALL," *FIS*, May 3, 2022, p. 19.

[174] "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM, p. 10.

51

> On the volume side, we saw sequential volume decreases in line with Fiserv, Visa, MasterCard and Global, very similar. Constant currency volume is about 6%, and we saw yields at a plus 5%.[175]

97. Analysts reacted to the information in the earnings press release and conference call, noting the importance of the Merchant Solutions segment and stating that while the results were mixed, FIS performed worse than its peers in this segment.

98. For example, Moffett Nathanson wrote that the stock was down in part due to the mixed performance in the "all-important" Merchant Solutions segment, which performed worse than its peers and industry benchmarks, raising questions about FIS's ability to reach its revenue targets:

> FIS closed down 7% (vs. the S&P ~flat) after reporting 2Q22 earnings last Thursday, despite quarterly revenues and EPS that were 1-2% better than consensus. The culprits? A modest reduction in FY22 guidance, primarily due to FX and interest-rate headwinds, and - *you guessed it - mixed performance in the all-important Merchant Solutions business. Mixed performance in Merchant Solutions has been the story of much of the last 2.5 years.* […]
>
> Merchant Solutions' revenues were solid (+12% on an organic, cc basis, 14% including the contribution from Payrix), with strength in eComm (+22% organic cc, +28% including Payrix), but volumes were weak (+6%), and while above estimates, *FIS's performance lagged peers* (Global Payments' and Fiserv's comparable businesses grew 14% and 17%, respectively). Margins were ~100 bps light, due to FX and wage pressures; EPS was in line. […]
>
> We are watching for a recovery in the merchant acquiring business and additional tuck-in M&A as the key catalysts for the stock. Like its 'deal stock' peers Fiserv (FISV, OP) and Global Payments (GPN, MP), FIS had its bull thesis disrupted by the COVID-19 pandemic—a thesis which previously centered on the strategic and financial benefits of the 2019 Worldpay merger. […]

---

[175] "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM, p. 11.

The underperformance of FIS's Merchant Acquiring revenues relative to the industry benchmarks raises questions about yield compression and FIS's ability to achieve its medium-term revenue objective.[176]

99.    Goldman Sachs similarly noted that FIS performed worse than its peers in the Merchant Solutions segment, and speculated that the underperformance, along with the Company's decision to remove the slide with volume metrics from the investor presentation, likely increased investors' concerns about the segment losing market share:

> Shares are down (~-7% following the print) driven by the company's reduced guidance, as a result of incremental FX headwinds, a significant increase in interest expense expectations into 2023 as well as inflationary pressures on the cost base, which resulted in a lower operating margin guide. In addition, *we believe the removal of ongoing disclosure around volumes, and the company's underperformance vs the networks and peers, which the company disclosed during the Q/A likely exacerbated the ongoing concerns about the Merchant business losing market share. While we acknowledge the headwinds in the Merchant business*, we would call out particular strength in Banking/Capital Markets, as well as the company's relatively stable top line expectations across the board, which we think reinforces our view that incremental downside from the quarter is largely a function of macro related impacts and cost inflation rather than top line headwinds. Looking forward, while *debates around the Merchant business are likely to remain topical*, we believe the remaining 65% of the business is likely to remain strong[.][177]

100.    Another analyst, J.P. Morgan, also discussed FIS's Merchant Solutions segment underperformance, noting that the quarter's results were worse than its peers in both revenue and volume:

> FIS Merchant vs. Peer Growth
>
> *FIS underperformed peers FISV and GPN in 2Q, both from a revenue and volume standpoint.* Beginning with revenue, the spread between FIS and FISV merchant revenue growth remained flat sequentially in 2Q, with FISV outperforming FIS by 5%. Similarly, the spread between FIS and

---

[176] "FIS 2Q22: The State of the All-Important Merchant Solutions Business - Market Shares, Yields, Volumes," *Moffett Nathanson*, August 8, 2022.

[177] "Fidelity National Information Services (FIS): Key Takeaways from 2Q22 EPS: Shares fall on macro related guide down," *Goldman Sachs*, August 4, 2022.

GPN merchant revenue growth also remained flat sequentially, with GPN outperforming FIS by 2%. On a volume standpoint, the spreads between FIS and FISV merchant volume growth rates widened by 1ppt sequentially, with FISV outperforming FIS by 6% in 2Q (vs. 5% in 1Q). Similarly, the spread between FIS and GPN merchant volume growth rates also widened by 1ppt sequentially (although a much larger spread), with GPN growing 11% more than FIS in 2Q (vs. 10% in 1Q).[178]

101.   Similarly, a Jefferies report compared the volumes in FIS's merchant segment to that of its peers, Global Payments (GPN) and Fiserv (FISV), and concluded that FIS's merchant volumes "underwhelm[ed]":

> ***Merchant volumes underwhelm***, decelerating to 6% Y/Y FXN growth and 4% Y/Y on a reported basis implying 1ppt of Q/Q improvement to 130% of '19 levels. Yields acted as a ~6% tailwind Y/Y, bridging to 12% organic FXN growth in Merchant (Payrix contributed 2ppt to segment level FXN growth of 14%). ***The 4% reported volume growth in 2Q compares to 9% for GPN and 10% for FISV***.[179]

102.   Baird updated its price target for FIS and noted that it was using a reduced premium for the Company due to volatility in the Merchant Solutions segment:

> Our new $120 price target reflects ~14.5X our NTM EPS a year from now of $8.20, using 12 months ending 6/30/24. This reflects a ~12% discount to the S&P's NTM P/E, below the 2017-2019 average of a ~15% premium. ***We assume a lower-than-normal premium, given some additional volatility from Merchant segment***, rising rates, slower-than-normal EPS growth, and bigger fears of disruption than during that period.[180]

103.   This evidence from analyst reports shows that the market was reacting to the disappointing financial results for FIS's Merchant Solutions segment and the Company's decision to stop disclosing key performance metrics.  That, coupled with the economic link

---

[178] "2Q22 Recap - Trimming Estimates as Results Remain Uneven," *J.P. Morgan*, August 5, 2022.

[179] "2Q Wrap: Lots of Moving Pieces," *Jefferies*, August 4, 2022.

[180] "Details on Q2 Results," *Baird*, August 4, 2022.

described above in **Section V.A** and the statistically significant price decline on this date, which is not disputed by Dr. Skinner (see **Section V.B**), supports a finding of price impact.

### iii.    NOVEMBER 3, 2022

104.  Plaintiffs allege that on November 3, 2022, investors learned more of the partial truth about the failed acquisition and the true value of Worldpay when Defendants again announced disappointing financial results for its Merchant Solutions segment.[181]

105.  At 7:00 AM on November 3, 2022, FIS issued a press release containing earnings results for the third quarter of 2022.[182]  In the press release, FIS announced adjusted net earnings per share of $1.74,[183] which fell short of consensus analyst estimates of $1.75 per share.[184] Revenue for the third quarter was $3.6 billion,[185] which also missed the consensus analyst estimate of $3.61 billion.[186]  FIS announced guidance that also fell below market expectations. Specifically, FIS provided adjusted EPS guidance for the fourth quarter of 2022 and the full year 2022 of $1.66 – $1.72 per share and $6.60 – $6.66 per share, respectively.[187]  Analysts had been expecting $2.07 per share and $7.02 per share, respectively.[188]  FIS lowered its revenue outlook for the fourth quarter of 2022 and the full year 2022 to $3.656 billion – $3.706 billion (previously $3.580 billion – $3.635 billion) and $14.470 – $14.520 billion (previously $14.615 –

---

[181] Complaint ¶ 19.

[182] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[183] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[184] "BRIEF-Fis Reports Third Quarter 2022 Results," *Reuters News*, November 3, 2022, 7:14 AM.

[185] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[186] "BRIEF-Fis Reports Third Quarter 2022 Results," *Reuters News*, November 3, 2022, 7:14 AM.

[187] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[188] "FIS sees Q4 EPS 1.66-$1.72 , consensus $2.07," *thefly*, November 3, 2022 and "FIS sees FY22 EPS $6.60-$6.66, consensus $7.02," *thefly*, November 3, 2022.

$14.700 billion), respectively.[189]  In changing its outlook, FIS provided the following commentary in the press release:

> The Company updated its fourth quarter and full-year 2022 guidance to align with changes in the macroeconomic environment, reduced visibility pertaining to non-recurring revenue streams, incremental costs associated with ongoing inflation, and new sales timing.[190]

106.  Also in the press release, FIS provided an update on adjusted EBITDA results for the Merchant Solutions segment, stating: "Adjusted EBITDA margin contracted by 430 basis points to 47.4% primarily due to inflationary cost pressures and accelerated investment in e-commerce and Payrix sales channels to capitalize on developing secular growth trends."[191]

107.  At 8:30 AM the same day, FIS hosted a conference call to discuss the earnings results.[192]  Defendant Norcross described "continued pressure":

> Our profit margins in the Banking and Merchant Solutions businesses saw a continued pressure in the quarter. This resulted in an overall adjusted EBITDA margin contracting by 150 basis points year-on-year, primarily a function of inflationary cost pressures such as wage inflation and downstream supplier increases as well as incremental macro headwinds such as consumer weakness in the U.K. …We are not pleased with the profitability performance of the business and are taking actions to address them.[193]

108.  Several analysts commented on the results of the Merchant Solutions segment, noting its underperformance and how it compared to peers in the industry:

> *Truist Securities*: Although today's -25% move (SPX -0.5%) reflects de-risked ests, and limits downside, *in our view, FIS will never again successfully compete in Merchant and could look to sell itself*. … Merchant game over. Once it's broken, it cannot be fixed, as we see it. We

---

[189] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM, and supra ¶ 88.

[190] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[191] "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.

[192] "FQ3 2022 Earnings Call Transcripts," *S&P Capital IQ*, November 3, 2022, 8:30 AM.

[193] "FQ3 2022 Earnings Call Transcripts," *S&P Capital IQ*, November 3, 2022, 8:30 AM.

are astounded by management's willingness to abandon the SMB acquiring market as it pursues a quixotic journey to transform itself into an eCommerce processor. … Although the UK is exerting downward cyclical pressure, which should abate w/ time, we think Fidelity is effectively a moribund Merchant co, likely to grow no faster than the market. As a result, we could envision the co entering an MOE w/another large Legacy FinTech. *Alternatively, the co could break itself apart, hoping the sum of parts is greater than the whole. …Our view is that FIS will sustain a structural discount as Merchant grows no faster than the market and its Modern Banking business remains volatile*.[194]

*Credit Suisse*: FIS Q3 revenues were ~in line with Street (and had been pre-announced at a high level), although the company reduced its FY 2022 guidance implying slower exit rates for revenues and reduced margins vs. prior. Without providing 2023 topline guide (to be announced with Q4 results, along with an update to the medium-term outlook), FIS sees its Merchant segment to be a MSD grower going forward vs. prior expectation of ~HSD-LDD growth, in part due to pressures in the partnered business (~25%+ of segment revenue that was down YoY driven by underlying weakness/share loss at its largely in-store only ISV partners). …*We note that the Merchant business continues to grow below industry levels and is less well positioned* …Target price $85 (vs. prior $120) based on 12x 2024E EPS. *We reduce our 2023 & 2024E EPS to $6.57/6.99 (vs. prior $7.71/ 8.67). Risks are mainly competitive (acquiring & bank technology), macro (SMB), merger integration*, bank consolidation, & FX.[195]

109.  Other analysts commented on how the disappointing results would weigh on FIS

Common Stock:

*Morgan Stanley*: [W]hile investors were likely waiting for FIS losses relative to the market to narrow, *management commentary around macro softness and strategic shifts around the SMB portfolio indicates that mid-single-digit growth is likely to continue over the medium-term. This could prove to dampen long-term optimism around the bull case and implies that share losses will continue* (given underlying market volumes growth of high-single-digits). It also likely means a lower total company long-term revenue guide relative to its current 7-9% outlook, with the company noting it will address this early next year. …*Within its Merchant business, SMB weakness in particular was noticeable, with revenue down 1% in the*

---

[194] "Structural Damage. Hold." *Truist Securities*, November 3, 2022.

[195] "Q3 2022 Earnings Recap; Updated 2019-base CAGR analysis," *Credit Suisse*, November 3, 2022.

*quarter, and management noting a strategic shift away from card present SMB to card-not-present SMB given changing market dynamics*.[196]

*Baird*: We think the stock is too cheap ~9X 2023E EPS, but may not rally much until we get 2023 guide in February; **the stock may be in the penalty box near term. Merchant growth is below peers**, and investors fear a slow Banking backlog. When combined with rising costs and higher interest expense, investors question whether 2023 EPS can grow.[197]

110. A few weeks later, on November 29, 2022, Berstein published a report stating "The FIS-Worldpay mega merger has been underwhelming. The revenue synergies have likely been modest at best. Worldpay has turned out to be a less attractive asset than originally perceived, and has added more earnings volatility and valuation discount to an otherwise steady-ish FIS business."[198]

111. The commentary from analysts supports that the market was reacting to the disappointing financial results for its Merchant Solutions segment and connected it to the stock price decline. This, coupled with the economic link described above in **Section V.A** and the undisputed statistically significant price on this date, supports a finding of price impact.

### iv.    FEBRUARY 13, 2023

112. Plaintiffs allege that on February 13, 2023, investors learned the full truth that the Worldpay acquisition was a failure and had been overvalued by billions of dollars when Defendants disclosed a $17.6 billion write down on the value of Worldpay and a spin-off of the segment of FIS's business that Worldpay operated in.[199]

---

[196] "Pressure Is Building," *Morgan Stanley*, November 4, 2022.

[197] "Details on Q3 Results," *Baird*, November 3, 2022.

[198] "FIS: Ready for a potential activist?," *Berstein*, November 29, 2022.

[199] Complaint ¶¶ 20 – 21.

113.  After market hours on Friday, February 10, 2023, Reuters published a news article stating that FIS could announce the spin-off of its Merchant Solutions business "as early as next week."[200]  The article noted: "Banking and payments conglomerate Fidelity National Information Services Inc is making preparations to break up, undoing a $43 billion acquisition it completed four years ago, people familiar with the matter said on Friday. FIS plans to pursue a tax-free spin-off of its merchant business, which processes payments for companies, the sources said."[201]

114.  FIS was previously planning to announce fourth quarter earnings results on Wednesday, February 15, 2023.[202]  However, following the Reuters article Friday evening, FIS announced on Sunday, February 12, 2023, that it had changed its earnings release date to Monday, February 13, 2023.[203]

115.  Then, at 6:58 AM on Monday, February 13, 2023, FIS issued a press release announcing its plan to pursue a tax-free spin-off of its Merchant Solutions business within the next 12 months.[204]  Specifically, the press release detailed how the Merchant Solutions business would operate as a separate publicly traded entity under the name Worldpay, "reestablishing and strengthening a brand that remains highly trusted among clients and partners."[205]

116.  One minute later, at 6:59 AM, FIS issued a press release containing earnings results for the fourth quarter and full year 2022.[206]  The Company reported fourth quarter adjusted

---

[200] "EXCLUSIVE-Payments giant FIS prepares to break up-sources," *Reuters*, February 10, 2023, 6:56 PM.

[201] "EXCLUSIVE-Payments giant FIS prepares to break up-sources," *Reuters*, February 10, 2023, 6:56 PM.

[202] "FIS to Report Fourth Quarter Earnings on February 15, 2023," *Business Wire*, February 3, 2023, 8:56 AM.

[203] "FIS Announces Date Change For Fourth Quarter Earnings to February 13, 2023," *Business Wire*, February 12, 2023, 5:00 PM.

[204] "FIS Announces Plans to Spin Off Merchant Business," *Business Wire*, February 13, 2023, 6:58 AM.

[205] "FIS Announces Plans to Spin Off Merchant Business," *Business Wire*, February 13, 2023, 6:58 AM.

[206] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.

earnings per share of $1.71 and revenue of $3.71 billion, which beat analyst expectations of

$1.70 per share and $3.68 billion, respectively.[207] FIS provided updated guidance that missed

analysts' expectations, however. Specifically, the Company announced that for the first quarter

of 2023, it expected adjusted earnings per share to be $1.17 to $1.23 per share (compared to the

consensus estimate of $2.08 per share) and revenue to be $3.38 billion to $3.43 billion

(compared to the consensus estimate of $3.81 billion).[208]

117. FIS also announced that it had recorded a non-cash goodwill impairment charge of

$17.6 billion related to Merchant Solutions segment.[209] To put this into perspective, the $17.6

billion impairment charge represented more than 36% of the $48.245 billion purchase price of

Worldpay.

118. The press release contained prepared remarks from Stephanie Ferris, then CEO

("Defendant Ferris") including: "[r]evenues and margins in our Merchant Solutions business

came under slightly more pressure than anticipated as a result of increasing recessionary impacts

in the UK and a shifting of consumer spend from goods to services in the US."[210]

119. The press release also noted that for the Merchant Solutions segment:

> Adjusted EBITDA margin contracted by 450 basis points as compared to
> the prior-year period to 47.8% primarily due to lower-margin revenue mix
> and cost inflation. In the quarter, global volume increased 2% on a reported
> basis, and 5% on a constant currency basis, as compared to the prior-year
> period to $580 billion.[211]

---

[207] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM and
"Fidelity National: Q4 Earnings Snapshot," *Associated Press Newswires*, February 13, 2023, 7:19 AM.

[208] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM and
"Fidelity National: Q4 Earnings Snapshot," *Associated Press Newswires*, February 13, 2023, 7:19 AM.

[209] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.

[210] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.

[211] "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.

120.  At 8:30 AM, FIS hosted a conference call to discuss the proposed spin-off and the earnings results.[212]  During the call, Defendant Ferris noted: "The thing that really pressed forward in terms of the Merchant separation though, was our inability to allocate capital and for it to grow properly."[213]

121.  The announcements of the Merchant spinoff and the Worldpay goodwill write down sparked a flurry of analyst commentary.  For instance, UBS reported that investors' disappointment with the spinoff, as opposed to a sale, likely contributed to the stock price decline following the announcement:

> Along with its earnings report, FIS announced it would execute a tax-free spin-out of its Merchant Solutions business. A strategic action on Merchant was contemplated and reported by several news outlets over the last few weeks. However, **based on our conversations with investors, they likely preferred a sale rather than a spin, we believe. While the stock is down today on these expectations**, combined with a weak Merchant top-line and '23 outlook (11% below Street's EPS at the midpoint of guide), we believe the separation of Merchant is a step in the right direction.[214]

122.  Deutsche Bank noted that "all focus" was on the Merchant Solutions segment spinoff, and commented on the "deteriorating organic profile" and "weakening fundamentals" of the Company:

> FIS reported an inline quarter with (revenue +4% organic cc, EPS of $1.71), **but all focus was on the announcement of a spinoff of the Merchant business, in effect reversing the merger joining FIS and Worldpay in 2019.** FIS cited the Merchant segment's need for M&A to be competitive in the face of share loss along with the RemainCo's inability to support it in order to maintain an IG credit rating. FIS had previously announced it achieved revenue synergies of ~$750m and cost synergies of ~$900m associated with the merger and **while questions remain around how much of these synergies will be reversed**, mgmt. expects to mitigate synergy erosion through commercial partnerships with Worldpay and continued cost

---

[212] "FQ4 2022 Earnings Call Transcripts," *S&P Capital IQ*, February 13, 2023, 8:30 AM.

[213] "FQ4 2022 Earnings Call Transcripts," *S&P Capital IQ*, February 13, 2023, 8:30 AM.

[214] "Merchant Spin Winds Back the Clock," *UBS*, February 13, 2023.

discipline (new cost saving target of ~$1.25bn by YE 2024). FIS' challenges were underscored by FY23 guidance (incl. Merchant) well below expectations, with organic revenue growth of (1)%-1% and EPS of $5.70-$6.00. Notably, the company took a different tact from peers and guidance explicitly contemplates a recession in the US/UK, as FIS appears to have taken advantage of the spin to reset expectations. While the spinoff of Merchant was likely a necessary ***step backwards in light of the deteriorating organic profile of the business, we continue to believe there is no quick fix solution for either the RemainCo or Worldpay given weakening fundamentals across the segments.***[215]

123.   Wells Fargo mentioned that they "struggle" with the spinoff news and noted that impairment charge "stood out":

> Updating our model and PT (to $65). Our view is ***that we struggle with this breakup*** given all the moving pieces yet to be resolved, the downbeat revenue/EPS outlook, and no credible 'share gain' story. Silver lining is the guide looks conservative. …Under the hood. ***The $17.6B impairment charge*** and the volume growth numbers in Merchant (implied share losses) ***both stood out.***[216]

124.   Morningstar noted the spinoff and the impairment charge:

> [W]e question whether the spinoff of Worldpay is the correct move. FIS' peers, ***Fiserv and Global Payments, completed very similar deals in 2019 and have not faced the issues that have plagued FIS***. To us, this suggests FIS' recent issues stem more from ***operational missteps*** (specifically underinvestment in the SMB space) and that the strategy behind the combination was not necessarily flawed from a long-term perspective. ***As a result of this decision, the company took a $17.6 billion goodwill impairment charge***.[217]

125.   Analysts at Moffett Nathanson commented on the news, explaining how at least a part of the stock reaction was due to the spin-off news:

> Today's announcement effectively unwinds FIS's 2019 acquisition of Worldpay…FIS also recorded a non-cash goodwill impairment charge of ***$17.6 B related to the Merchant Solutions reporting unit, a write-down***

---

[215] "Searching for Answers," *Deutsche Bank*, February 13, 2023.

[216] "FIS: The Struggle is Real," *Wells Fargo*, February 13, 2023.

[217] "Fidelity National Information Services Reports Weak Q4, Will Spin Off Acquiring Operations," *Morningstar*, February 13, 2023.

*that amounts to approximately half of the amount FIS originally paid for Worldpay* – that transaction was valued at ~$35 B at the time the deal was announced in March of 2019.[218]

…

Yesterday, in conjunction with the company's 4Q22 earnings report, FIS released *a new 2023 outlook that as well below investors' expectations* (e.g., 4% below on revenues, >10% on EPS) and announced the planned spin-off of the Merchant Solutions segment – *effectively capitulating and unwinding the troubled 2019 acquisition of Worldpay. FIS's stock sold off 13% on the news* … Considering the significant underperformance in the stock, several leadership changes completed (including the CEO and CFO), and a new strategic plan underway, the natural question from investors is "How low is low enough?..."[219]

126. Furthermore, William Blair noted the spinoff and the impairment charge:

Following new leadership and a strategic review that was launched late in 2022, *FIS announced that it will perform a tax-free spin of its merchant business* (slated for completion by year-end) and lowered growth objectives. Stephanie Ferris will continue to lead FIS, which will consist of the banking and capital markets businesses, while Worldpay's former CEO, Charles Drucker, will lead the merchant business. *FIS incurred a $17.6 billion goodwill impairment* related to the merchant business, and the spin essentially reverses the $48 billion acquisition of Worldpay (closed July 2019).[220]

127. Likewise, analysts from Citi highlighted the negative reaction to the spin-off and

the implications it had:

*Citi*: *Spinning-off the Merchant business as-is strikes us as a potential lost opportunity – we believe a re-org that consolidated Payments assets might have been a better approach* … the lack of detail on debt levels, M&A capability, commercial agreement, etc., make it difficult to perform a robust sum-of-the-parts (SOTP) analysis. Might the spin have been a hurried step after the Board/activists saw the deterioration in FY23 expectations? The disappointing FY23 outlook and normalized growth highlights the legacy

---

[218] "FIS: The Great Unwinding – Our Preliminary Perspective on the Merchant Spin," *Moffett Nathanson*, February 13, 2023.

[219] "How Low is Low Enough? Our Sum-of-the-Parts Valuation for Post-Spin FIS." *Moffett Nathanson,* February 14, 2023.

[220] "Disappointing Results and Guide, but Spin of Underperforming Merchant Business Could Lead to Significant Multiple Expansion," *William Blair*, February 13, 2023.

nature of the underlying assets and the extended timeline for the spin and portfolio-fixing increases the risk of the turnaround. ***The stock is likely range-bound at these lower levels until more details emerge***. … While we got a larger cost takeout target FIS' 4Q22 earnings, the lack of details around the announced Merchant Services spin could create the impression among investors that it was a hurried decision that was perhaps reactive to the lower-than-expected FY23 outcome. We would have preferred a reorganization that enabled a cleaner separation of payments, banking and capital markets assets rather than an "as is" spin of Merchant Services with the only certainty being that it will be led by Charles Drucker, former CEO of Worldpay. We view this as a potential lost opportunity to truly simplify the portfolio of assets. ***The earnings and spin-off decisions was not the "clearing event" we thought it would be… in fact, we think it actually adds to investor uncertainty around multi-year expectations***.[221]

128.   The commentary from analysts demonstrates that the market was reacting to the news of the spin-off and the $17.6 billion impairment charge.  Dr. Skinner does not address the economic connection between the corrective nature of the information released on this date and the Goodwill Statements (see **Section III**).  Further, Dr. Skinner does not dispute the statistically significant price decline on this date.  As a result of the foregoing, there is clear evidence of price impact on February 13, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2025

Chad Coffman

---

[221] "FIS Results and Spin-Off Plan Disappoint – Downgrade to Neutral," *Citi*, February 14, 2023.

**Exhibit 1**
**Plaintiffs' Alleged False and Misleading Statements**

| Date | Complaint Paragraph | Source | Statement | Skinner Report Classification | Defendant's Motion # | Defendant's Motion Classification |
|---|---|---|---|---|---|---|
| 5/7/20 | ¶ 184 | 1Q20 Press Release | "The Company achieved annual run-rate synergies exiting the first quarter 2020 as follows:<br>•*__Revenue synergies of approximately $100 million, an increase of $20 million compared to the fourth quarter of 2019__*<br>•Expense synergies of approximately $580 million, inclusive of approximately $275 million in interest expense savings, an increase of $115 million compared to the fourth quarter of 2019<br>As a result, *__the Company reiterated its previously-announced revenue synergy targets__* and increased its expense synergy target as follows:<br>•*__$200 million exiting 2020__*<br>•*__$550 million exiting 2022__*." | Revenue Synergies | A-1 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 8/4/20 | ¶ 186 | 2Q20 Earnings Call Transcript | "We continue to outpace expectations on our synergy goals and are well ahead of schedule to meet our aggressive 3-year synergy targets. *__At the end of the quarter, our teams have achieved more than . . . $115 million in annual revenue synergies.__* We have an additional $60 million in revenue synergies that we are in the process of implementing now, and we have a growing pipeline of cross-sell opportunities that will continue to drive additional growth." | Revenue Synergies | A-2 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 10/29/20 | ¶ 188 | 3Q20 Earnings Call Transcript | "Touching on our Worldpay integration[,] [w]e are more than 2 years ahead of schedule. *__We have achieved $150 million in revenue synergies__* as we continue to see really strong traction with our Premium Payback solution. And we are significantly outperforming our initial expectations for merchant bank referrals." | Revenue Synergies | A-3 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 2/9/21 | ¶ 190 | 4Q20 Earnings Call Transcript | "We also made great progress with the Worldpay integration, remaining well ahead of plan and *__exited the year generating more than $200 million in revenue synergies__* and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021." | Revenue Synergies | A-4 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 5/6/21 | ¶ 192 | 1Q21 Press Release | "Strong results and exceptional new sales performance across all operating segments drive increased outlook for full-year 2021[.] Increased revenue synergy targets as ramping volumes, cross-selling execution and continued geographic expansion accelerated first quarter synergy achievement[.] . . . The Company achieved annual run-rate synergies related to the Worldpay acquisition, exiting the first quarter of 2021 as follows: *__Revenue synergies of approximately $300 million on an annual run-rate basis, including ongoing execution of cross-sell opportunities, bank referral agreements, geographic expansion, ramping volumes and Merchant SMB sales initiatives."__* | Revenue Synergies | A-5 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 3/9/22 | ¶ 218 | Wolfe Fintech Forum Transcript | Analyst: "When you – if you could look back in the year and tell us what you think what positively surprised you about the year, whether it's the industry and how that was trending or it's specific to FIS or for that matter, negatively surprised you through the year before we go into '22 and looking forward, I think that would be helpful."<br>Norcross: "Well, let's look at positives first. . . . We really successfully completed the Worldpay integration. We blew out [m]any of our operating synergies going into that, whether it was on expense takeout or revenue. *__Revenue exceeded well over $700 million of cross-sales.__* We ended up getting over $900 million of cost takeout. So we feel great about that integration and how that went." | Revenue Synergies | A-8 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |

**Exhibit 1**
**Plaintiffs' Alleged False and Misleading Statements**

| Date | Complaint Paragraph | Source | Statement | Skinner Report Classification | Defendant's Motion # | Defendant's Motion Classification |
|---|---|---|---|---|---|---|
| 8/4/22 | ¶ 232 | 2Q22 Earnings Call Transcript | "[W]e are *hugely successful in terms of driving revenue synergies on the Worldpay transaction.* And as I came back into the company [I] was even more excited to look across the segments and see the demand and he[ar] the demand from customers." | Revenue Synergies | B-4 | Generic Statements About Worldpay or FIS's Market Share (June 2021 – August 2022) |
| 8/3/21 | ¶ 197 | 2Q21 Press Release | "[FIS] [r]aises year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, *in order to reflect strong cross-selling performance during the second quarter* . . . 'FIS delivered an exceptional quarter,' said Gary Norcross, FIS chairman and chief executive officer. 'Our transformation has created strong demand with our clients. Even as the world slowed, we continued to invest in our talent and our cloud-native solutions portfolio, creating a significant pipeline with our clients and prospects. With strong new sales and our largest revenue synergy quarter to-date, we are raising our guidance for the second time this year.'" | Cross-Selling | A-6 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 2/15/22 | ¶ 209 | 4Q21 Earnings Call Transcript | "Let me take the cross-segment sales. I think the team has *done an excellent job driving cross sales through the Worldpay acquisition.* I mean, *we exceeded more than $700 million in cross sales*, and so far we exceeded our original guide of what we thought we would get." | Cross-Selling | A-7 | Statements About Revenue Synergies or Cross Sales (May 2020 – March 2022) |
| 11/4/21 | ¶ 199 | 3Q21 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. . . . The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." | Goodwill | C-3 | Statements About Goodwill (November 2021 – November 2022) |
| 11/4/21 | ¶ 200 | 3Q21 Form 10-Q | $35.9 billion reported for Merchant Solutions goodwill as of 9/30/21. | Goodwill | C-1 | Statements About Goodwill (November 2021 – November 2022) |
| 11/4/21 | ¶ 203 | 3Q21 Form 10-Q | "Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of September 30, 2021, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. *Based on our interim impairment assessment as of September 30, 2021, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.*" | Goodwill | C-2 | Statements About Goodwill (November 2021 – November 2022) |
| 2/23/22 | ¶ 212 | 2021 Form 10-K | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. . . . The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." | Goodwill | C-6 | Statements About Goodwill (November 2021 – November 2022) |

Exhibit 1
Plaintiffs' Alleged False and Misleading Statements

| Date | Complaint Paragraph | Source | Statement | Skinner Report Classification | Defendant's Motion # | Defendant's Motion Classification |
|---|---|---|---|---|---|---|
| 2/23/22 | ¶ 213 | 2021 Form 10-K | "Goodwill impairment assessments require a significant amount of management judgment, and a meaningful change in one or more of the underlying forecasts, estimates, or assumptions used in testing goodwill for impairment could result in a material impact on the Company's results of operations and financial position. Based on the results of our assessments, $94 million of goodwill related to certain non-strategic businesses within the Corporate and Other segment was impaired in 2020. *For all other reporting units for all periods presented, goodwill was not impaired.*" . . . "*For Merchant Solutions in 2021, we performed a qualitative assessment for our annual assessment. In addition to the factors noted above that are considered when performing such an assessment, we considered actual results for 2021 and updated internal forecasts as compared to prior internal forecasts and other assumptions used in the 2020 quantitative annual assessment. As a result of the assessment, we determined that the indicated fair value of the reporting unit was estimated to be in excess of carrying amount by a similar percentage as determined by the prior year's quantitative assessment. We concluded for 2021 that it remained more likely than not that the fair value of the Merchant Solutions reporting unit continued to exceed its carrying amount.*" | Goodwill | C-5 | Statements About Goodwill (November 2021 – November 2022) |
| 2/23/22 | ¶ 215 | 2021 Form 10-K | $36.4 billion reported for Merchant Solutions goodwill as of 12/31/21. | Goodwill | C-4 | Statements About Goodwill (November 2021 – November 2022) |
| 5/3/22 | ¶ 220 | 1Q22 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. . . . The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." | Goodwill | C-9 | Statements About Goodwill (November 2021 – November 2022) |
| 5/3/22 | ¶ 221 | 1Q22 Form 10-Q | $36.1 billion reported for Merchant Solutions goodwill as of 3/31/22. | Goodwill | C-7 | Statements About Goodwill (November 2021 – November 2022) |
| 5/3/22 | ¶ 224 | 1Q22 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of March 31, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. *Based on our interim impairment assessment as of March 31, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.*" | Goodwill | C-8 | Statements About Goodwill (November 2021 – November 2022) |
| 8/4/22 | ¶ 226 | 2Q22 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. . . . The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." | Goodwill | C-12 | Statements About Goodwill (November 2021 – November 2022) |
| 8/4/22 | ¶ 227 | 2Q22 Form 10-Q | $35.2 billion reported for Merchant Solutions goodwill as of 6/30/22. | Goodwill | C-10 | Statements About Goodwill (November 2021 – November 2022) |

**Exhibit 1**
**Plaintiffs' Alleged False and Misleading Statements**

| Date | Complaint Paragraph | Source | Statement | Skinner Report Classification | Defendant's Motion # | Defendant's Motion Classification |
|---|---|---|---|---|---|---|
| 8/4/22 | ¶ 230 | 2Q22 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of June 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. *Based on our interim impairment assessment as of June 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.*" | Goodwill | C-11 | Statements About Goodwill (November 2021 – November 2022) |
| 11/4/22 | ¶ 234 | 3Q22 Form 10-Q | "The periodic report containing financial statements to which this certificate is an exhibit fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. . . . The information contained in the periodic report to which this certificate is an exhibit fairly presents, in all material respects, the financial condition and results of operations of the Company." | Goodwill | C-15 | Statements About Goodwill (November 2021 – November 2022) |
| 11/4/22 | ¶ 235 | 3Q22 Form 10-Q | $34.3 billion reported for Merchant Solutions goodwill as of 9/30/22. | Goodwill | C-13 | Statements About Goodwill (November 2021 – November 2022) |
| 11/4/22 | ¶ 238 | 3Q22 Form 10-Q | "We assess goodwill for impairment on an annual basis during the fourth quarter or more frequently if circumstances indicate potential impairment. We evaluated if events and circumstances as of September 30, 2022, indicated potential impairment of our reporting units. We performed a qualitative assessment by examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic and macroeconomic conditions. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. *Based on our interim impairment assessment as of September 30, 2022, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.*" | Goodwill | C-14 | Statements About Goodwill (November 2021 – November 2022) |
| 6/10/21 | ¶ 195 | Baird Conference Transcript | Analyst: "If we move to one of the other just big events of the last couple of years, the Worldpay acquisition[,] I often think of your legacy business, your historical [] business about 2/3 the banking business and then 1/3 now is Worldpay. How has that gone? Where are the things that went better or worse than expected? And where are you today as a merger?" Norcross: "We couldn't be more pleased with it. I hate to say it this way, *but we really haven't had negative surprises with Worldpay.* We typically do – as you go through due diligence, especially as you're starting to dig in on your revenue synergies and where you're going to see opportunities come with cross-sell and upsells to our base. *But frankly, everything [ha]s . . . hit as we expected, and many reasons and many examples have exceeded our expectations. And frankly, that's why you saw Woody and I both raise our overall revenue synergy guidance coming out of last quarter.*" | Unaddressed | B-1 | Generic Statements About Worldpay or FIS's Market Share (June 2021 – August 2022) |

**Exhibit 1**
**Plaintiffs' Alleged False and Misleading Statements**

| Date | Complaint Paragraph | Source | Statement | Skinner Report Classification | Defendant's Motion # | Defendant's Motion Classification |
|------|---------------------|--------|-----------|-------------------------------|----------------------|-----------------------------------|
| 11/16/21 | ¶ 205 | RBC Conference Transcript | "If you look at what's happened over the last several years is, look, we've had significant growth as a company. We've maintained our dividend at 10%. And frankly, our earnings have just outstripped that. And so it's really just a reflection of us saying let's get back to redeploying some capital. Let's target – how do we get back to roughly 1/3 of our cash flow going back to our shareholders through dividend over time. And so it's going to become very predictable. And so it just felt like when you look at where we are on the Worldpay integration, *we've got really Worldpay predominately behind us now. We've got all of our segments really hitting on all cylinders*, really have a competitive stack across the board. We're generating significant free cash flow. We're able to – we've got plenty of cash flow to not only maintain our investment, to maintain our growth, but continue to lean in on growth ideas. I'm sure we'll talk about the super user concept at some point in the meeting. And so just an opportunity for us to raise the dividend and say, look, let's get back to where that originally was and really start leaning in on our income guys as well that are looking for that and just one more way to really return value to our shareholders. So we'll continue to raise that. You'll see us over time move that back to where we're getting it back to about 1/3 payout." | Unaddressed | B-2 | Generic Statements About Worldpay or FIS's Market Share (June 2021 – August 2022) |
| 11/16/21 | ¶ 207 | RBC Conference Transcript | Analyst: "So that brings me to the competitive narrative and [M]erchant, which is why I think most people dialed in, right? Everyone wants to hear about this. So you gave a real deep dive during the last earnings call. It brought a lot of new insights, I think, for a lot of investors, myself included. But I wanted to give you opportunity to say like, what are the talking points? What are the takeaways from that information that you decided to be more transparent with to tell to the investment community about this competitive narrative around merchant?" Norcross: ". . . I think what people see when they look and really dig through all of that, *no way you can say that FIS is losing share, just the exact opposite*. No way to think that we can – when you look, we're actually a leader in the disruption, not going to be disrupt[ed], and that's hopefully the narrative that people are going to start realizing as they do their work." | Unaddressed | B-3 | Generic Statements About Worldpay or FIS's Market Share (June 2021 – August 2022) |

Sources: Complaint, Skinner Report, Defendants' Motion.

Note: I understand that Plaintiffs only allege that the portion of the statements above in emphasis (bold, italicized and underlined) are false and misleading and/or omitted material information. For completeness, I relied on Appendix I of Defendants' Motion, which displays addition language surrounding the emphasized statements, in constructing this Exhibit.

## Exhibit 2
## Event Study Analysis for FIS Common Stock on the Alleged Corrective Disclosures

| | | | | | FIS Common Stock | | | Event Study Results [1] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Date | Time | Market Date | Day | Closing Price | Volume (millions) | Raw Return | Abn. Return | Abn. Dollar Change | t-Stat | Sig Level [2] |
| 1 | 08/04/22 | 7:00 AM | 08/04/22 | Thu | $96.57 | 8.7 | -7.26% | -7.13% | -$7.42 | -6.97 | *** |
| 2 | 11/03/22 | 7:00 AM | 11/03/22 | Thu | $57.18 | 26.9 | -28.05% | -23.35% | -$18.56 | -24.85 | *** |
| 3 | 02/13/23 | 6:58 AM | 02/13/23 | Mon | $66.00 | 20.3 | -12.50% | -12.93% | -$9.75 | -9.33 | *** |

Sources: Complaint, S&P Capital IQ, and Factiva.

Notes:

(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal weighted index using the returns of the twelve companies listed as members of the S&P 500 Data Processing & Outsourced Services Index, excluding FIS. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, preliminary guidance updates, and the alleged corrective disclosure dates have been removed from estimation.

(2) * Denotes statistical significance at the 90% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. *** Denotes statistical significance at the 99% confidence level or greater.

# Appendix A
# Documents Considered

### Prior Reports and Depositions in this Matter

- Expert Report of Chad Coffman, CFA, dated March 3, 2025, including all data, documents, analyses and back-up materials provided in connection with that report.
- Deposition of Chad Coffman, CFA, dated April 10, 2025, including all exhibits introduced in connection with that deposition.
- Export Report of Douglas J. Skinner, dated May 2, 2025, including all documents and materials cited and the data, analyses, and back-up materials provided by Dr. Skinner to counsel for Plaintiffs that Dr. Skinner claims to have considered in connection with the Skinner Report.
- Deposition of Douglas J. Skinner, dated June 27, 2025, including all exhibits introduced in connection with that deposition.

### Court Documents

- Consolidated Amended Class Action Complaint for Violations of The Federal Securities Laws filed August 2, 2023, *In Re Fidelity National Information Services, Inc. Securities Litigation*, No. 3:23-cv-252-TJC-PDB.
- Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification filed May 2, 2025, *In Re Fidelity National Information Services, Inc. Securities Litigation*, No. 3:23-cv-252-TJC-PDB.

### SEC Filings

- FIS SEC Form 10-Q for the quarterly period ended September 30, 2019, filed November 5, 2019.
- FIS SEC Form 10-K for the fiscal year ended December 31, 2019, filed February 20, 2020.
- FIS SEC Form 10-Q for the quarterly period ended March 31, 2020, filed May 7, 2020.
- FIS SEC Form 10-K for the fiscal year ended December 31, 2020, filed February 18, 2021.
- FIS SEC Form 10-K for the fiscal year ended December 31, 2022, filed February 27, 2023.

### FIS Common Stock Data

- Historical data for FIS Common Stock was obtained from S&P Capital IQ.

### FIS News

- FIS conference call transcripts and presentations:

- o "FQ3 2019 Earnings Call Transcripts," *S&P Capital IQ*, November 5, 2019, 8:30 AM.
- o "SECOND QUARTER 2020 EARNINGS CALL," *FIS*, August 4, 2020.
- o "FQ1 2020 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2020, 8:30 AM.
- o "FQ3 2020 Earnings Call Transcripts," *S&P Capital IQ*, October 29, 2020, 9:00 AM.
- o "THIRD QUARTER 2020 EARNINGS CALL," *FIS*, October 29, 2020.
- o "FOURTH QUARTER 2020 EARNINGS CALL," *FIS*, February 9, 2021.
- o "FIRST QUARTER 2021 EARNINGS CALL," *FIS*, May 6, 2021.
- o "Company Conference Presentation," *S&P Capital IQ*, June 10, 2021, 9:30 AM.
- o "THIRD QUARTER 2021 EARNINGS CALL," *FIS*, November 4, 2021.
- o "Company Conference Presentation," *S&P Capital IQ*, November 16, 2021, 9:20 AM.
- o "FQ4 2021 Earnings Call Transcripts," *S&P Capital IQ*, February 15, 2022, 8:30 AM.
- o "FOURTH QUARTER 2021 EARNINGS CALL," *FIS*, February 15, 2022.
- o "FIRST QUARTER 2022 EARNINGS CALL," *FIS*, May 3, 2022.
- o "FQ2 2022 Earnings Call Transcripts," *S&P Capital IQ*, August 4, 2022, 8:30 AM.
- o "SECOND QUARTER 2022 EARNINGS CALL," *FIS*, August 4, 2022.
- o "FQ3 2022 Earnings Call Transcripts," *S&P Capital IQ*, November 3, 2022, 8:30 AM.
- o "FQ4 2022 Earnings Call Transcripts," *S&P Capital IQ*, February 13, 2023, 8:30 AM.
- "Paying up for Worldpay Might Make Sense--Heard on the Street," *Dow Jones Institutional News*, March 18, 2019, 12:07 PM.
- "FIS and Worldpay to Combine to Accelerate the Future of Finance and Commerce Globally," *Business Wire*, March 18, 2019.
- "FIS Closes Acquisition of Worldpay, Enhancing its Global Technology Leadership Serving Merchants, Banks and Capital Markets," *Business Wire*, July 31, 2019, 8:45 AM.
- "06:30 EDT FIS initiated with a Buy at BerenbergBerenberg analyst Tej Sthankiya...," *thefly*, July 31, 2019.
- "FIS Reports First Quarter 2020 Results," *Business Wire*, May 7, 2020, 7:00 AM.
- "FIS Reports Second Quarter 2021 Results," *Business Wire*, August 3, 2021, 7:00 AM.
- "FIS Acquisition of Payrix Expands Its E-Commerce, Embedded Payments and Finance Experiences for SMB Merchants via Platforms," *Business Wire*, February 14, 2022, 9:00 AM.
- "FIS Reports Second Quarter 2022 Results," *Business Wire*, August 4, 2022, 7:00 AM.
- "BRIEF-FIS Reports Second Quarter 2022 Results," *Reuters News*, August 4, 2022, 7:36 AM.

- "FIS Reports Third Quarter 2022 Results," *Business Wire*, November 3, 2022, 7:00 AM.
- "BRIEF-Fis Reports Third Quarter 2022 Results," *Reuters News*, November 3, 2022, 7:14 AM.
- "FIS sees FY22 EPS $6.60-$6.66, consensus $7.02," *thefly*, November 3, 2022.
- "FIS sees Q4 EPS 1.66-$1.72 , consensus $2.07," *thefly*, November 3, 2022.
- "FIS to Report Fourth Quarter Earnings on February 15, 2023," *Business Wire*, February 3, 2023, 8:56 AM.
- "EXCLUSIVE-Payments giant FIS prepares to break up-sources," *Reuters*, February 10, 2023, 6:56 PM.
- "FIS Announces Date Change For Fourth Quarter Earnings to February 13, 2023," *Business Wire*, February 12, 2023, 5:00 PM.
- "FIS Announces Plans to Spin Off Merchant Business," *Business Wire*, February 13, 2023, 6:58 AM.
- "FIS Reports Fourth Quarter and Full-Year 2022 Results," *Business Wire*, February 13, 2023, 6:59 AM.
- "Fidelity National: Q4 Earnings Snapshot," *Associated Press Newswires*, February 13, 2023, 7:19 AM.
- "Soft landing doubts creep in," *Financial Times*, February 14, 2023.
- "Questor: This company has had a terrible five years – buy it now before the bounceback," *The Telegraph*, April 7, 2024, 3:00 PM.

**FIS Analyst Reports**
- "FIS: 1Q EPS--Solid Growth, Pressure On Merchant Offset By Expense Mgmt.," *Wells Fargo*, May 7, 2020.
- "COVID-Related Slowdown, but Worldpay Integration Going Well and Long-Term Thesis Remains Intact," *William Blair*, May 7, 2020.
- "Details on Q2 Results," *Baird*, August 4, 2020.
- "Adjusting Estimates to Get Closer to Management Margin Comments," *Baird*, October 5, 2020.
- "FIS 3Q20 Takeaways: Merchant Upside a Positive; Waiting on Resumption of Revenue Growth," *Compass Point Research*, October 29, 2020.
- "Trimming Estimates (Likely Conservative, but Why Not Be for Now)," *Baird*, December 14, 2020.
- "Q2 2021 Recap," *Credit Suisse*, August 3, 2021.
- "The negative rotation continues despite strong Q2/21," *RBC Capital Markets*, August 3, 2021.
- "Competitive Position to Enable Commerce Remains Solidly Intact; Attractive Risk/Reward Profile," *William Blair*, November 4, 2021.

- "Highlights from the RBC Global TIMT Virtual Conference," *RBC Capital Markets*, November 16, 2021.
- "Details on Q2 Results," *Baird*, August 4, 2022.
- "Fidelity National Information Services (FIS): Key Takeaways from 2Q22 EPS: Shares fall on macro related guide down," *Goldman Sachs*, August 4, 2022.
- "2Q Wrap: Lots of Moving Pieces," *Jefferies*, August 4, 2022.
- "2Q22 Recap - Trimming Estimates as Results Remain Uneven," *J.P. Morgan*, August 5, 2022.
- "FIS 2Q22: The State of the All-Important Merchant Solutions Business - Market Shares, Yields, Volumes," *Moffett Nathanson*, August 8, 2022.
- "Details on Q3 Results," *Baird*, November 3, 2022.
- "Q3 2022 Earnings Recap; Updated 2019-base CAGR analysis," *Credit Suisse*, November 3, 2022.
- "Structural Damage. Hold." *Truist Securities*, November 3, 2022.
- "Pressure Is Building," *Morgan Stanley*, November 4, 2022.
- "Searching for Answers," *Deutsche Bank*, February 13, 2023.
- "Merchant Spin Winds Back the Clock," *UBS*, February 13, 2023.
- "FIS: The Great Unwinding – Our Preliminary Perspective on the Merchant Spin," *Moffett Nathanson*, February 13, 2023.
- "FIS: The Struggle is Real," *Wells Fargo*, February 13, 2023.
- "Fidelity National Information Services Reports Weak Q4, Will Spin Off Acquiring Operations," *Morningstar*, February 13, 2023.
- "Disappointing Results and Guide, but Spin of Underperforming Merchant Business Could Lead to Significant Multiple Expansions," *William Blair*, February 13, 2023.
- "FIS Results and Spin-Off Plan Disappoint – Downgrade to Neutral," *Citi*, February 14, 2023.
- "How Low is Low Enough? Our Sum-of-the-Parts Valuation for Post-Spin FIS." *Moffett Nathanson*, February 14, 2023.

## Academic Articles
- Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association – Research Reports*, Vol. II, No. 7, August 22, 2001.

## Bates Stamped Documents
- FIS_00295612.
- FIS_00309200.
- FIS_00579414.
- FIS_00323071.

# APPENDIX B

## CHAD W. COFFMAN, MPP, CFA

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:        (815) 382-0092
Email:         ccoffman@peregrine-econ.com

**EMPLOYMENT:**

### Peregrine Economics
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

### Global Economics Group, LLC
President (2008 - 2023)

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

**EDUCATION:**

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**    University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"

Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert Consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying Expert in In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey. Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York. Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert In Re PG&E Corporation Securities Litigation, Civil Action No. 3:18-cv-03509-EJD, United States District Court Northern District of California San Francisco Division. Filed declaration August 28, 2020. Filed expert report December 23, 2024. Deposition June 16, 2025.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024. Deposition August 6, 2024.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States

District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County). Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey. Filed expert report on November 1, 2021.

- Testifying Expert in In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York. Filed expert report December 1, 2021.

- Expert Declaration in Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York. Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.),  et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in <u>Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division</u>. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023. Filed expert report June 11, 2024. Filed expert reply report on November 8, 2024. Deposition December 3, 2024.

- Testifying Expert in <u>In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara</u>. Filed expert report December 12, 2022.

- Testifying Expert in <u>In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California</u>. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in <u>Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah.</u> Filed expert report March 3, 2023.

- Testifying Expert in <u>Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.</u> Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in <u>Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee, and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division.</u> Filed expert report March 20, 2023.

- Testifying Expert in <u>In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts.</u> Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in <u>In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California.</u> Filed expert report August 18, 2023.

- Testifying Expert in <u>Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division</u>. Filed expert report August 30, 2023.

Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024. Deposition June 18, 2024.

- Testifying Expert in <u>Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division.</u> Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in <u>John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey.</u> Filed declaration October 23, 2023.

- Testifying Expert in <u>In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division</u>. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024. Hearing testimony January 29-30, 2025.

- Testifying Expert in <u>Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois.</u> Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in <u>Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California.</u> Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in <u>In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division</u>. Filed expert report February 8, 2024.

- Testifying Expert in <u>Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina.</u> Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10, 2024. Filed declaration re: Plan of Allocation August 5, 2024.

- Testifying Expert in <u>Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California.</u> Filed expert report April 30, 2024. Filed expert rebuttal report August 15, 2024.

- Testifying Expert in <u>Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division.</u> Filed expert report April 30, 2024. Filed expert rebuttal report September 30, 2024. Deposition October 4, 2024.

- Testifying Expert in <u>Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York</u>. Filed expert report May 10, 2024. Deposition June 20, 2024. Filed expert rebuttal report August 23, 2024. Deposition September 13, 2024.

- Testifying Expert in <u>John Harvey Schneider, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan, Defendants, Case No. 1:22-cv-00398-DAE, United States District Court, Western District of Texas</u>. Filed expert report June 4, 2024. Deposition July 19, 2024. Filed expert rebuttal report October 4, 2024.

- Testifying Expert in <u>Stadium Capital LLC, on Behalf of All Others Similarly Situated, Plaintiff, v. Co-Diagnostics, Inc., Dwight H. Egan, and Brian L. Brown, Defendants, Case No.: 22-cv-6978 (AS), United States District Court, Southern District of New York.</u> Filed expert report July 26, 2024. Filed expert report November 20, 2024. Filed expert rebuttal report January 10, 2025. Deposition January 28, 2025.

- Testifying Expert <u>In Re Barclays PLC Securities Litigation, Case No 1:22-cv-08172-KPF, United States District Court Southern District of New York.</u> Filed expert report August 12, 2024.

- Testifying Expert <u>In Re The Honest Company, Inc. Securities Litigation, No. 2:21-CV-07405-MCS-AS, United States District Court Central District of California.</u> Filed expert report November 18, 2024. Filed expert rebuttal report December 15, 2024.

- Testifying Expert in <u>Albert Chow, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Enochian Biosciences Inc., Mark Dybul, Rene Sindlev, and Carl Sandler, Defendants, Case No. 8:22-cv-01374-JWH-JDE, United States District Court Central District of California</u>. Filed declaration re: Plan of Allocation December 9, 2024.

- Testifying Expert <u>In Re The Boeing Company Securities Litigation, Civil Action No. 1:24-cv-00151-LMB-LRV, United States District Court Eastern District of Virginia Alexandria Division</u>. Filed expert report December 13, 2024. Deposition January 14, 2025. Filed expert rebuttal report February 20, 2025. Filed expert report March 13, 2025. Filed expert rebuttal report May 2, 2025.

- Testifying Expert <u>In Re Fidelity National Information Services, Inc. Securities Litigation Case No. 3:23-cv-252-TJC-PDB, United States District Court Middle District of Florida Jacksonville Division.</u> Filed expert report March 3, 2025. Deposition April 10, 2025.

- Testifying Expert in <u>Highfields Capital I LP, Highfields Capital II LP, And Highfields Capital III L.P., Plaintiffs, v. Teva Pharmaceutical Industries, Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Schultz, Michael Mcclellan, And Yitzhak Peterburg, Defendants, Case No: 3:19-CV-603 (SRU), United States District Court District of Connecticut.</u> Filed expert report April 16, 2025.

- Testifying Expert in <u>Plumbers & Pipefitters Local Union #295 Pension Fund, Individually And On Behalf Of All Others Similarly Situated, Plaintiff, vs. CareDx, Inc., Peter Maag, And Reginald Seeto, Defendants, Case No. 3:22-cv-03023-TLT, United States District Court Northern District of California San Francisco Division.</u> Filed expert report April 18, 2025.

- Testifying Expert in <u>Kellie Black, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Snap Inc., Jeremi Gorman, and Evan Spiegel, Defendants, Case No.: 2:21-cv-08892, United States District Court Central District of California Western Division.</u> Filed expert report May 16, 2025. Deposition June 18, 2025.

- Testifying Expert in <u>Leslie Lilien, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Olaplex Holdings, Inc., et al., Defendants, Case No. 2:22-cv-08395-SVW(SKx), United States District Court Central District of California.</u> Filed expert report May 30, 2025.

- Testifying Expert in <u>City of Warwick Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Catalent Inc., John Chiminski, Alessandro Maselli, and Thomas Castellano, Defendants, Case No.: 3:23-cv-01108-ZNQ-JTQ, United States District Court District of New Jersey.</u> Filed expert report July 1, 2025.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert Consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert Consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities,"

*Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.