# Exhibit 11

**Transcript of the 8/12/25
Deposition of Chad Coffman**

Page 234

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

IN RE FIDELITY NATIONAL      )

INFORMATION SERVICES, INC.  ) Case No.

SECURITIES LITIGATION        ) 3:23-cv-252-TJC-PDB

VIDEOTAPED DEPOSITION OF

CHAD COFFMAN, CFA

VOLUME 2

August 12, 2025

10:00 a.m. CST

Chicago, Illinois

Reported by:

Janice M. Kocek, CSR, CLR

Job No. 7533231

Page 235

The videotaped deposition of CHAD COFFMAN, CFA, reported stenographically by Janice M. Kocek, License No. 084-002871, Certified Shorthand Reporter, Certified LiveNote Reporter, and Notary Public for the State of Illinois, held at Sidley & Austin, One South Dearborn, Chicago, Illinois, commencing at the hour of 10:00 a.m. CST, on the 12th day of August, 2025.

* * *

Page 236

APPEARANCES:

LABATON KELLER SUCHAROW LLP
BY: NICHOLAS D. MANNINGHAM, ESQ.
  GRACE HARMON, ESQ.
  140 Broadway, Floor 34
  New York, New York 10005
  212.907.0700
  nmanningham@labaton.com
  gharmon@labaton.com

    Appeared on behalf of the Lead
    Plaintiffs Nebraska Investment
    Council, North Carolina Retirement
    Systems, and North Carolina
    Supplemental Retirement Plans;

SIDLEY AUSTIN LLP
BY: JOHN M. SKAKUN III, ESQ.
  ELLEN A. WIENCEK, ESQ.
  HILLE R. SHEPPARD, ESQ.
  SARAH E. KING, ESQ.
  One South Dearborn Street
  Chicago, Illinois 60603
  312.853.7000
  jskakun@sidley.com
  ewiencek@sidley.com
  hsheppard@sidley.com
  sarah.king@sidley.com

    Appeared on behalf of the Defendants.

ALSO PRESENT:

  SCOT ZIARKO, Videographer

      * * * * *

Page 237

INDEX

TESTIMONY OF CHAD COFFMAN, CFA         PAGE
  Examination by Mr. Skakun          238


      DEPOSITION EXHIBITS
NUMBER     DESCRIPTION               PAGE
Exhibit 3    Expert Rebuttal Report of  239
      CHAD COFFMAN, CFA
      July 15, 2025


      REPORTER'S NOTE: All quotations
      are used for clarity and are
      reflected in the manner in which
      they were read into the record
      and do not necessarily indicate
      an exact quote from the document.

Page 238

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  This is the continuing deposition of Chad Coffman.  Today's date is August 12th, 2025.  The time is 10:00 a.m.

You may swear in the witness.

(Witness sworn.)

THE VIDEOGRAPHER:  You may begin.

CHAD COFFMAN, CFA, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SKAKUN:

Q.   Good morning, Mr. Coffman, welcome to day 2.  My first question is, have you altered any of the opinions you offer in your initial report in this case on class certification?

A.   No.

Q.   And you have reviewed your deposition from the first day of your -- sorry, your transcript of your first day of your deposition on April 10th, correct?

A.   Yes.

Q.   And do you stand by all of that

2 (Pages 235 - 238)

Page 239

testimony?

A. Yes.

(Coffman Deposition Exhibit 3 was marked for identification.)

BY MR. SKAKUN:

Q. I have marked as Exhibit 3 for your deposition your rebuttal report which I think is right there to your left, if you'd like a copy.

A. Thank you.

Q. Now, I'll try and call out your rebuttal report but I'll probably slip up a few times and just reference it as your report. Today I'm only going to be asking you questions about that so let's just -- you know, please let me know if you're confused but if I say report by accident, I mean your rebuttal report.

Now, my first question, is there anything in that report that you believe is confidential beyond information produced by FIS in this litigation?

A. I don't believe so.

Q. Thank you. And that rebuttal report states all of your opinions related to price impact in this case; is that right?

A. I think it provides a fair summary

Page 240

of my opinions on that subject, yes.

Q. In accordance with the federal rules, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I -- I don't know what all the federal rules are, but it's a statement of my opinions on price impact.

BY MR. SKAKUN:

Q. You're not offering any opinions on price impact that are not stated in that report, correct?

A. That's correct.

Q. And you considered defendant's opposition brief to class certification, right?

It's in Appendix A in your documents considered list.

A. Yes. I saw that document. I don't think I actually spent a lot of time looking at it but I did have it available to me, yes.

Q. Would it be fair to say that this rebuttal report states all of your opinions regarding the issues raised in that brief by defendants?

MR. MANNINGHAM: Objection.

THE WITNESS: Could I have that read

Page 241

back? I'm sorry.

(Record read as requested.)

THE WITNESS: The only reason I'm hesitating is it may be that some things I stated in my opening report might have something to do with what issues that were raised. Again, I didn't go through and make a comparison of everything in that brief and figure out that it only relates to this report. But certainly there's -- there's nothing beyond my two reports.

BY MR. SKAKUN:

Q. Thank you. Now, you understand the Court has currently set a hearing on class certification for September 3rd; is that right?

A. I don't know.

Q. Okay. Are you planning to attend that hearing?

A. I have not been asked one way or the other.

Q. Okay. Thank you.

So I want to just note a couple terms so we're on the same page for today.

So your report, I think, actually defines the term "alleged misstatements" to

Page 242

reference all 27 of the statements that are alleged to be false or misleading in this case. Right?

A. That's how I believe I referenced them, yes.

Q. So if I use that term, you'll understand what I mean?

A. Yes.

Q. And your rebuttal report also uses the phrase "alleged corrective disclosures" to refer to the three alleged corrective disclosure events in this case.

So if I use that term, you'll know what I mean, right?

A. Yes.

Q. And then your report also uses the term "relevant truth" to refer to information that the plaintiffs allege the alleged misstatements had concealed and that plaintiffs allege the alleged corrective disclosures revealed?

MR. MANNINGHAM: Objection.

BY MR. SKAKUN

Q. Do you understand that term if I use it that way?

3 (Pages 239 - 242)

Page 243

A.   I think that's consistent.  Let me just double-check the wording I used to define the relevant truth.

Q.   Are you flipping to paragraph 26?

A.   Yeah.  Yes.  So it's described in paragraph 26 is what I understand to be the relevant truth.

Q.   Right.

A.   That I at least assumed for the purpose of my opinions.

Q.   Okay.  Thank you.

And this rebuttal report offers opinions -- an opinion that there was price impact in this case; is that right?

A.   Yes, that there's strong evidence of price impact.  Economic evidence of price impact in this case.

Q.   And what is your understanding of price impact in a punitive securities class action like this one?

MR. MANNINGHAM:  Objection.

THE WITNESS:  That the alleged misstatements misstated or concealed something that -- that what I refer to as the relevant truth here and that there is

Page 244

economic evidence that when either that -- those statements had an impact themselves at the time they were made or when the relevant truth that was concealed by those statements came to light, that there is evidence of -- of movement in the market price.

BY MR. SKAKUN:

Q.   So let me just make sure I understand that, right.  So you, I think, gave two points there.  Let's start with the second one.  You say when the relevant truth came to light, there's evidence of movement in the market price, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Yes.  And that that provides some economic evidence that the alleged misstatements and/or omissions had an impact on the market price of the security.

BY MR. SKAKUN:

Q.   And then I think the first part which you said was those statements had an impact at the time they were made.  And what I want to understand is what you mean by "impact," right.

Page 245

That's kind of using the term.  I'm asking about it to define the term.

Do you mean movement in the stock price at the time they were made?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Yes.  And my understanding is there can be evidence of one or both of those.  It doesn't need to be both.  But one way to -- in my view to establish price impact or at least provide important economic evidence of price impact would be to show that the market price moved at the time the misstatements were -- and were made.  That's one way.

The other is to look at whether there's evidence that the market price moved upon the disclosure of some or all of the relevant truth.

BY MR. SKAKUN:

Q.   And if the market price moved at the time of the alleged misstatements, that's commonly known as front-end price impact, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I've seen it referred to that way, yes.

Page 246

BY MR. SKAKUN:

Q.   You've used that term in your reports previously, right?

A.   Yes.

Q.   Okay.  And you're aware that term has been used that way in court decisions, too, right?

A.   I've certainly seen examples of that, yes.

Q.   And when there is movement at the time of the alleged corrective disclosure, that's commonly called back-end price impact, right?

A.   Yes.

Q.   And you've used that term that way in previously your expert reports, too, correct?

A.   Yes.

Q.   And you're aware courts use the term that way in decisions as well, right?

A.   I have seen examples of that.  I don't know if they always do, but I've seen examples of it, yes.

Q.   And I want to make sure I understand.  You made a point about sort of an either or both.

4 (Pages 243 - 246)

Page 247

Is it fair to say that your position is price and impact can be shown if there is either front-end impact or back-end impact?

A. I think either could provide some evidence of price impact, yes. What the law requires in a securities case, I'm not opining on, but I believe the economic evidence could be shown either way.

Q. Do you agree, though, that if there is neither front-end impact or back-end impact there is no price impact from an economic perspective?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I -- I just want to be careful that when you say no evidence, are you saying there's literally no movement in the price or I -- I -- what I -- what I'm not sure is implicit in your question is this idea that there has to be a statistically significant price movement.

So if you could just clarify your question, because if -- I mean, if you're literally saying there's no evidence, absolutely no evidence whatsoever at -- either at the time of the

Page 248

misstatements or at the time of the revelation of the relevant truth, then I would agree with you, there's not evidence of price impact.

BY MR. SKAKUN:

Q. My question didn't have a statistically significant qualifier built in. I just want to start from the basic concept.

So let me ask it again.

Do you agree that if there is neither front-end impact nor back-end impact, there is no price impact?

MR. MANNINGHAM: Objection.

THE WITNESS: If there's literally no evidence of impact at the beginning, front end, and no evidence of impact at the end at the time of the disclosure of the relevant truth, and both of those things are true, then my understanding is there would not be evidence of price impact.

BY MR. SKAKUN:

Q. And when you say "impact" there, you mean movement in the stock price, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Yes, that's -- and,

Page 249

again, movement -- I want to be careful here that "movement" meaning we could be talking about any movement here. It doesn't necessarily need to be talking about a statistically significant movement.

And also -- yeah, I'll leave my answer there.

BY MR. SKAKUN:

Q. Okay. Understood.

There can be a fight about statistical significance, why that's required, what that entails. That's separate from the question I'm asking right now. So I appreciate that.

A. Okay.

Q. How did you determine that you believe there was price impact in this case?

A. Well, I started from the assumption that plaintiff's allegations are effectively true in the sense that there was a failure to disclose that the Worldpay acquisition was a failure and that the goodwill had been overstated and that Worldpay's business had actually suffered as a result of the acquisition.

Page 250

And then evaluated, you know, how would that sort of information come to light generally. And, you know, what are plaintiffs alleging the way that came to light. And they're alleging it came to light through financial underperformance in the segment of the business in which that acquisition is relevant.

And ultimately made a large goodwill write-down, which is entirely consistent with the -- there having been substantial value destruction from the time that -- at least relative to the amount that was paid for the Worldpay business to what the company was stating it was worth at the time.

So assuming plaintiffs' allegations are true that this is the alleged corrective disclosures, there's an economically coherent causal connection between the underperformance of the business and ultimately the goodwill write-down as that being how the -- the relevant truth came to light.

Q. Okay. Now, your rebuttal report talks about plaintiff's theory of liability.

Is that what you just described to

5 (Pages 247 - 250)

Page 251

me, right?

A.   In very general terms.  I mean, obviously their complaint is lengthy and there's a number of different things in there, but I think from a 10,000-foot level that's my understanding of their theory of the case, is that the alleged misstatements concealed what's described in paragraph 26.  And that that relevant truth came to light over the alleged corrective disclosures.

Q.   And you're not offering any opinion that plaintiff's theory of liability and their allegations are, in fact, true.  You assume them as true for the purposes of your report, correct?

A.   That's correct, yes.

Q.   Now, Mr. Coffman, your rebuttal report does not contend that there was a stock price increase associated with any of the alleged misstatements in this case, correct?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I don't believe it -- it reaches the conclusion that there was evidence of front-end price impact.  I have not performed sufficient analysis to

Page 252

conclude that didn't occur.

In other words, I -- I just simply didn't focus on that.  But I -- I don't believe I contend anywhere in the report that -- that front-end price impact occurred.

BY MR. SKAKUN:

Q.   Yes, so let's just make sure we're precise here, right.  You are not offering any opinion that there was front-end price impact in this case, correct?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I have not offered that opinion, no.

BY MR. SKAKUN:

Q.   And you have offered that opinion in prior cases, correct?

A.   I've analyzed that issue and described how there was some evidence of front-end price impact in other matters, I believe, yes.

Q.   And when you've offered an opinion that there was front-end price impact in other cases, you've always supported that with an event study; is that right?

Page 253

MR. MANNINGHAM:  Objection.

THE WITNESS:  That's how I would normally analyze it.  Whether that's always how I've done it, I don't recall but I believe so.  I just -- I'm not absolutely certain always.  But that would -- that would be my expectation.

MR. SKAKUN:  You're going to instruct him not to answer if I ask him whether you asked him to evaluate whether there was front-end price impact; is that right?

MR. MANNINGHAM:  Correct.

MR. SKAKUN:  Then we'll skip that.

BY MR. SKAKUN:

Q.   Mr. Coffman, you're aware, though, that plaintiffs have not argued in this case that there was any stock price increase associated with any alleged misstatements, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I don't know that I've seen all their pleadings.  I don't recall having seen it in what I've reviewed.

BY MR. SKAKUN:

Q.   And you would expect that in order to

Page 254

make that argument, they would need an opinion from you to support it; isn't that right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I don't know whether that's the case or not.

BY MR. SKAKUN:

Q.   Well, you would expect that in order to make a front-end price impact argument, plaintiffs in a punitive securities class action would need economic expert evidence to support that argument, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I'm not going to speculate about what they would need from a legal point of view.

BY MR. SKAKUN:

Q.   Are you familiar with the phrase "inflation maintenance theory"?

A.   Yes.

Q.   And you've used that phrase in prior of your reports, right?

(Stenographer clarification.)

THE WITNESS:  Yes, I believe I have.

BY MR. SKAKUN:

Q.   And you're aware it's used in case

6 (Pages 251 - 254)

Page 255

law, right?

A. I've seen reference to it, yes.

Q. What's your understanding of the inflation maintenance theory in a punitive securities class action?

A. My understanding is that when I -- when I hear or think of price maintenance theory, I think that there's a statement made to the market that it is in some way misleading or omits something and it doesn't necessarily have its own price impact in terms of moving the price at that time, but that had the full truth, relevant truth been disclosed at that time, the market price of the stock would have been much lower.

And so a corrective disclosure at that time would have lowered the price. And so the allegation is that the price is being maintained artificially high by failure to disclose the relevant truth.

Q. And you understand that this case is proceeding under an inflation maintenance theory?

MR. MANNINGHAM: Objection.

THE WITNESS: I generally understand

Page 256

from an economic point of view that plaintiffs are alleging that had the relevant truth been disclosed earlier, the market price would have fallen and that the market price was artificially inflated.

Whether you want to call that a price maintenance theory and what that may or may not mean in terms of legal theories, I don't know.

But from an economic point of view, it's consistent, I believe, with that. But whether it's -- that's what they're terming it or -- or, you know, whatever legal connotation that might have.

But I think from an economic point of view they're clearly alleging that there was artificial inflation at the price that -- based on failure to disclose the relevant truth.

BY MR. SKAKUN:

Q. And just to make sure I'm clear, from an economic perspective, your understanding is that this is an inflation maintenance case?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, again, I think

Page 257

I've described the best I can what that means from -- from an economic perspective. I don't pretend to know all the legal connotations that may or may not have, or legal arguments that may or may not be relevant to it.

But from an economic perspective, it's simply consistent with that had the relevant truth been disclosed, the market price would have been less. And therefore, there's artificial inflation in the price even though there might not be evidence that the stock price actually went up at the time of the alleged misstatements or omissions.

BY MR. SKAKUN:

Q. And from your perspective, you offer no opinion that there was front-end price impact.

So is it fair to say that this is an inflation maintenance case, in your eyes?

A. Again, given the meaning I've just described as what I understand. Again, I -- I know people sometimes use phrases that may have more legal connotations than I understand as an

Page 258

economist, but I've -- I've done the best I can to define my understanding of what inflation maintenance means.

And my belief is that plaintiffs' claims are consistent with that from an economic point of view. But whether that means something else in some way you're asking me about, I just don't know.

Q. Yeah, I'm just asking simple questions. So we don't need to worry about what the legal connotations are.

From your perspective as an economist, your understanding, though, is that the inflation maintenance theory would apply in a situation where there's no front-end price impact, right? It wouldn't be necessary if there was front-end price impact on a statement, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, it could be a combination of the two, right. I mean, you could theoretically have a false or misleading statement that moved the price up a little bit and so there's some evidence of front-end price impact even

7 (Pages 255 - 258)

Page 259

from making whatever positive statement that was.

But it's really concealing a much worse truth. And so in that case, the total price impact would not be accurately measured by looking just at the front-end price impact. There could be much greater consequences at the end.

So you could, in theory, have both sorts of evidence. But it doesn't necessarily mean that that's the proper measure of inflation, if you know what I mean.

BY MR. SKAKUN:

Q. I see. Because you have to measure the amount of the price impact?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, to calculate damages ultimately. I mean, in a loss causation analysis, one would have to quantify the total price impact, yes.

BY MR. SKAKUN:

Q. And is it your understanding that this is a case where the plaintiffs are alleging that price impact is shown by the back-end stock

Page 260

price drop?

MR. MANNINGHAM: Objection.

THE WITNESS: I -- my -- that's my understanding of the primary price impact evidence is on the back end, yes, when the relevant truth is disclosed.

BY MR. SKAKUN:

Q. What do you mean by the primary price impact evidence? What else are you thinking of?

A. Again, I haven't -- I -- I haven't analyzed front-end price impact. So whether there is or isn't evidence of front-end price impact is something I just haven't reached a conclusion on.

Q. Okay. So let's be clear then. The only evidence of price impact that you're offering in this case is for back-end price impact, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I believe that's a fair characterization, yes, in terms of where the timing of the price movements that I believe provide economic evidence of price impact, yes.

Page 261

BY MR. SKAKUN:

Q. Okay. Mr. Coffman, you're familiar with the Supreme Court's decision in the Goldman case; is that right?

A. I'm familiar with it, yes.

Q. Okay. Do you agree with the framework that decision sets out for analyzing inferences of price impact from back-end stock price drops?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't know that I would -- I would be speculating. I haven't looked at everything that was said in the Goldman case or the specific facts in that case well enough to know whether I would agree with that or not.

BY MR. SKAKUN:

Q. Do you disagree with it?

MR. MANNINGHAM: Objection.

THE WITNESS: As I sit here right now, I have no basis to -- to disagree with it.

BY MR. SKAKUN:

Q. Okay. Do you believe your analysis of price impact in this case based on the

Page 262

back-end price drops is consistent with the framework announced by the Supreme Court in Goldman?

MR. MANNINGHAM: Objection.

THE WITNESS: I didn't specifically analyze it in that light. I think it's consistent with my understanding of how -- of plaintiffs' theory of liability in the case and how economists would typically analyze those issues.

I -- I haven't specifically analyzed whether there's ways that may or may not be consistent with Goldman. That's just not how I view my role in the case.

BY MR. SKAKUN:

Q. We talked a little bit about how back-end price impact -- actually, strike that.

When price impact is premised on a back-end price drop, right, the inference that plaintiffs seek to draw is that the revelation of the relevant truth shows that the alleged misstatement, in fact, had an effect on the market price at the time by preventing it from dropping.

Is that a fair summary?

8 (Pages 259 - 262)

Page 263

MR. MANNINGHAM: Objection.

THE WITNESS: I think that is a fair summary of the -- the economic construct, which is the idea that had the relevant truth been disclosed earlier, the market price would have fallen and the best -- or typically most reasonable economic proxy for how much that would have been or at least that there's evidence that that would have been is to look at the market price movements at the time the relevant truth is actually disclosed.

BY MR. SKAKUN:

Q. And so that's a fair summary of the economic construct you used in reaching your price impact opinion in this rebuttal report?

A. Yes.

Q. Now, do you agree that for that inference to hold, there has to be an adequate connection between the alleged corrective disclosures and the alleged misstatements?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I don't know what you mean by "adequate." So let's start there. I just don't know what you mean by

Page 264

"adequate."

BY MR. SKAKUN:

Q. Well, let's leave that open-ended for the moment and we can talk about it.

But you agree there has to be some connection that is sufficient, right, in some -- whatever that means?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I mean, there has to be some connection, yes.

BY MR. SKAKUN:

Q. What kind of connection do you think there needs to be?

A. My understanding is there needs to be a causal connection.

Q. Why does it need to be causal for price impact?

A. Because my general understanding is that the losses that are suffered by the plaintiffs have to have a causal connection to the alleged misstatements and/or omissions.

Q. That's where I'm a little confused. Are you talking about a causal connection to the price drop with the relevant truth?

MR. MANNINGHAM: Objection.

Page 265

THE WITNESS: Well, I think there's both. I think there's did the information that -- was the stock price movement that's being measured caused by the relevant information that's at issue on the alleged corrective disclosures, and is the information that's being revealed as part of the relevant truth in some way causally connected to the alleged misstatements and/or omissions?

BY MR. SKAKUN:

Q. What is the causation that is happening between the alleged corrective disclosures and the alleged misstatements?

MR. MANNINGHAM: Objection.

THE WITNESS: That the relevant truth that's being disclosed on the -- sorry. I've got a tickle in my throat right now.

BY MR. SKAKUN:

Q. Do you need a moment?

A. Yeah, if you don't mind.

Q. Of course.

A. Yeah. Sorry. I've just got a bad tickle in my throat. Give me a second.

Yeah, that the relevant truth is --

Page 266

or the failure to disclose the relevant truth is what caused the stock price to be artificially inflated.

In other words, that there's a -- there's a -- a logical and causal economic connection between what's being concealed and what ultimately comes to light. I mean, in --

Go ahead. Sorry.

Q. No, please go.

A. No, no, no, I didn't want to -- I'm fine there.

Q. Let's -- let's break this down because I want to make sure I understand your perspective on this -- this connection.

So the inference is that if the relevant truth causes a stock price decline, and that relevant truth is connected to the alleged misstatements, then we can infer that the alleged misstatements had an impact on the stock price, right?

A. What -- I think the important term in that question is "connected," right, and I'm trying -- I want to make sure I understand what you mean by "connected."

Q. Yes. Well, and I want to understand.

9 (Pages 263 - 266)

Page 267

You say there has to be causal connection between the corrective disclosure and the alleged misstatement. And I think your answer went to there has to be a causal connection between the corrective disclosure and the stock price.

And what I don't understand is where is the causation between the corrective disclosure and the alleged misstatement.

Are you saying the corrective disclosure has to have caused the misstatement, that the misstatement caused the corrective disclosure? Right, there's two pieces here and I want to understand what's the connection, not between the corrective disclosure and the stock price, but between the corrective disclosure and the misstatement.

MR. MANNINGHAM: Objection.

THE WITNESS: Well, it's that the -- had the relevant truth been disclosed earlier, that it would have caused the stock price to be different.

And therefore, there's a causal connection between the loss that was -- that the misstatement and the loss that was

Page 268

suffered because had the relevant truth been disclosed earlier, the stock price would have fallen earlier. So that's the causal connection I'm talking about.

BY MR. SKAKUN:

Q. But there's two steps to that inference, right, both that the correct disclosure had to cause the stock drop and that there has to be a connection between the corrective disclosure and the misstatements such that you can infer that that stock drop would have happened earlier if the relevant truth had been disclosed at the time of the misstatement; is that right?

A. I think that's part of it, yes.

Q. So let's talk about that -- well, actually let's pause. You say it's a part of it.

What else is missing?

A. I can't think of anything that's missing from that, if we're talking a very general level. So I think that's right.

Q. Okay. So I want to talk more about the connection between the corrective disclosure and the misstatement itself.

Page 269

What do you believe is necessary in terms of connection between those two in order to support the inference that the stock drop would have happened at the time of the misstatement if the corrective disclosure had been made at the time of the misstatement?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think there needs to be a -- at least from my point of view as an economist, I'm not trying to say what's necessary from a legal point of view -- but as an economist that thinks about loss causation, I want there to be a clear economic connection between what information could have and should have been disclosed earlier, what I refer to as the relevant truth, and what actually ends up being disclosed.

So for example in this case, there's allegation that the goodwill of the Worldpay acquisition was overstated as a result of what was being concealed. Then at the end of the class period there's a goodwill write-down.

So to me, that there's --

Page 270

there's a coherent economic connection between the information that was allegedly concealed and the information that ultimately gets disclosed.

BY MR. SKAKUN:

Q. You said as an economist that thinks about loss causation. Did you mean price impact instead of loss causation in that answer?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think of loss causation as -- as sort of a more detailed measurement of price impact. But I don't think it's conceptually different in terms of thinking about -- so here's how I think of those slightly differently, is that at this stage I'm opining on whether there is economic evidence of price impact, some price impact.

I'm not attempting to quantify precisely how much that price impact was. That's -- that's a relevant distinction. So but the concept of loss causation and price impact are obviously related in some ways.

BY MR. SKAKUN:

10 (Pages 267 - 270)

Page 271

Q. Just -- just so the record's clear, though, your answer that you just gave me, is that about price impact in the opinion you're offering here or are you distinguishing loss causation in some way?

MR. MANNINGHAM: Objection.

BY MR. SKAKUN:

Q. I just want to make sure I'm clear on how to read your answer there --

A. Sure.

Q. -- since you said loss causation and I asked a question about price impact.

A. Right.

So could I have the initial question read back just so I -- I'm clear on which question I'm answering this about?

(Record read as requested.)

BY MR. SKAKUN:

Q. Let me ask the question before that. So I think what I said is -- so I want to talk more about the connection between the corrective disclosure and the misstatement.

"What do you believe is necessary in terms of connection between those two in order to support a price impact inference

Page 272

that the stock drop would have happened at the time of the misstatement?"

MR. MANNINGHAM: Objection.

THE WITNESS: Okay. And I believe I gave -- and so I started out my answer about using the term "loss causation." So I should have substituted "price impact" there, although obviously the terms are interrelated in some ways economically, but I meant to say price impact.

BY MR. SKAKUN:

Q. Thank you. That's what I figured. I just wanted to make sure the record was clear there and there wasn't some distinction I was missing that you were drawing in your answer.

A. Okay.

Q. So you used the phrase "clear economic connection."

What do you mean by that?

A. That there's a logical and coherent economic relationship between the information that was allegedly concealed and the information that's disclosed at the time of the corrective disclosures.

Q. Can you explain a little bit more

Page 273

what you mean by "logical and coherent" in this context?

A. Sure. That if there's an allegation that information was misleading or withheld from the market, one can think economically about what are the types of ways that relevant truth could come to light.

So for example, in a case where a company is alleged to have omitted or -- or downplayed the adverse effects of let's say an acquisition like in this case, that there is logical economic ways that information might come to light.

It could come to light through an explicit corrective disclosure that, you know, we lied, we failed to say X. It could come out more indirectly as financial underperformance that reflects that relevant truth, or an indication from an accounting perspective that value had been destroyed in that merger in a way that wasn't told to the market earlier.

So that's what I mean by there -- a clear logical connection between what's concealed and how that information would potentially come to light as an economic

Page 274

matter.

Q. Okay. Now, you agree that if there is no connection between an alleged misstatement and any alleged corrective disclosure, there would be no price impact, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Right. If the hypothetical you're giving me is that you could affirmatively determine there was absolutely no connection, then that would not provide evidence of price impact. That's my understanding.

BY MR. SKAKUN:

Q. And fair to say you also agree that if there is no clear logical economic connection between an alleged misstatement and any alleged corrective disclosure, there would be no price impact?

MR. MANNINGHAM: Objection.

THE WITNESS: As long as what's included in your definition of the misstatement is also all of the information that was allegedly omitted, yes, I agree with that.

So there has to be some logical

11 (Pages 271 - 274)

Page 275

economic connection between the -- the relevant truth that wasn't disclosed and what was revealed on the corrective disclosures for there to be price impact, yes.

BY MR. SKAKUN:

Q. And do you agree that in conducting a price impact analysis, at least conceptually, you have to evaluate each and every individual alleged misstatement to see if it has a connection to any alleged corrective disclosure?

MR. MANNINGHAM: Objection.

THE WITNESS: Could I have that read back, please?

(Record read as requested.)

THE WITNESS: I don't know what you mean by "necessary" there.

I mean, certainly you could conceive of an opinion that at least some subset of the misstatements have clear evidence of price impact and that might provide some relevant economic evidence that there's price impact in the case without addressing other misstatements. That's if you're trying to affirmatively

Page 276

say that there's at least some evidence of price impact.

I think if you're going to conclude there's absolutely no evidence of price impact or affirmatively say there's no price impact, you would have to analyze each and every one.

BY MR. SKAKUN:

Q. So let me get the situation a little more concrete.

If there are three alleged misstatements, if there is only a connection, clear logical economic connection between two of the alleged misstatements and the alleged corrective disclosures, there would not be any basis to infer price impact for the third alleged misstatement right?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't know about there would be no basis for it. Again, from an economic point of view, would I -- if I didn't even analyze that third misstatement, would I then say there's economic evidence related to price impact of that third statement? I wouldn't, but

Page 277

does that mean there's no basis for plaintiffs to include it somehow? I -- I'm not going to speculate about that.

But one could determine that certain statements there's evidence of price impact and other statements it's ambiguous or undetermined.

So I don't know that I can -- or there might be other noneconomic reasons for that basis. So I'm not going to speculate about that.

BY MR. SKAKUN:

Q. Do you believe that evidence of price impact for one alleged misstatement necessarily is evidence for price impact of a different alleged misstatement?

MR. MANNINGHAM: Objection. Incomplete hypothetical.

THE WITNESS: I think there's circumstance in which it could be. If the same relevant -- relevant truth is being concealed by two misstatements, does price impact evidence for one provide some economic evidence of price impact for the other? It could, yes.

Page 278

BY MR. SKAKUN:

Q. You would need that same relevant truth, right, for that to hold, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Again, I'm not going to speculate about what would be necessary from -- from a legal perspective. But from an economic perspective, there would need to be maybe not exactly the same but at least economically similar enough to make that a reasonable inference.

BY MR. SKAKUN:

Q. Okay. Thank you.

Now, you talk about a clear, logical economic connection.

Do you agree that if an alleged misstatement and the alleged corrective disclosures are about different subjects, that weighs against defining of a clear, logical economic connection?

MR. MANNINGHAM: Objection.

THE WITNESS: I guess it would depend on what you mean by "different subjects." So I -- I don't know that I could make that broad generalization, no.

12 (Pages 275 - 278)

Page 279

BY MR. SKAKUN:

Q. Well, what's your understanding of "different subjects"?

A. Well, I think different people could say different -- have different views as to what "different subjects" represents. So I think unless you're giving me a more specific example, I don't know that I can generalize.

Q. Well, I asked what's your understanding of different subjects, Mr. Coffman.

A. Well, if you're talking about things that have no logical connection to each other, that would clearly represent different subjects.

Q. Can you give me an example of things that would have no logical connection to each other in a punitive securities class action in your view?

MR. MANNINGHAM: Objection.

THE WITNESS: If a company has two completely different business lines that aren't interrelated and there's an alleged misstatement about one of those business lines and then there's adverse information disclosed about the other business line

Page 280

that has no logical connection to the alleged misstatement, those things would be clearly about different subjects.

I mean, that's an example. I mean, you could create an infinite number of those types of examples but that's kind of the example I have in mind.

BY MR. SKAKUN:

Q. So when you're talking about a logical connection, you can imagine a logical proposition having multiple layers, right, if A, then B; if B, then C; if C, then D.

How attenuated do you believe the logical connection can be for purposes of price impact analysis?

MR. MANNINGHAM: Objection.

THE WITNESS: I have no idea how to generalize that and give you a general answer to that.

BY MR. SKAKUN:

Q. Do you think a three-step logical connection would suffice for price impact?

MR. MANNINGHAM: Objection.

THE WITNESS: It would depend on the facts and circumstances. I'm not sure. I

Page 281

don't think that can be answered in a general way.

BY MR. SKAKUN:

Q. Okay. Have you ever offered a price impact opinion where you did not conclude that there was a clear logical economic connection between the alleged misstatements and alleged corrective disclosures?

MR. MANNINGHAM: Objection.

THE WITNESS: I mean, I have certainly been contacted and had -- had potential clients come to me with -- with theories in these types of cases where I didn't see the logical connection and made that clear and wasn't ultimately engaged.

I think there have been cases where there have been logical connections alleged by plaintiffs for some subset of disclosures or subset of misstatements where I've disagreed with that and therefore not affirmatively opined that there was a connection between things that were being alleged, at least for some subset of statements or disclosures.

So in some sense, yes. I don't

Page 282

recall a case where I've filed a report and the overall opinion was there's no price impact because if I didn't believe there was, I wouldn't get -- be asked to offer that opinion.

But certainly even in cases where I've offered evidence of loss causation or price impact there have been times plaintiffs have asked me to draw certain causal connections that I refuse to do that.

BY MR. SKAKUN:

Q. Okay. I want to understand the work that clear is doing in your understanding of the necessary connection.

Do you mean that the connection has to be direct as opposed to indirect?

MR. MANNINGHAM: Objection.

THE WITNESS: No, I'm -- that's not the distinction I'm drawing with clear. I --

BY MR. SKAKUN:

Q. Do you think an indirect connection would suffice to draw the price impact inference from a back-end stock drop?

13 (Pages 279 - 282)

Page 283

A.   What do you mean by "indirect" in that question?  Could you give me example just so I have a sense of what you're -- what you're talking about with that question?

Q.   Well, you say there has to be a logical connection and you can imagine there being multiple steps to that connection, right?  And I want to understand how direct versus indirect, right.  You can imagine -- you gave the example of, you know, a statement directly saying oh, we lied earlier in time, right?  That would be, you know, a mirror image of a false statement, right?

Then you can imagine a statement that says, well, you know, we're going to make something up, right, guidance was, you know, $1 per share and it came in at 80¢ per share, right.  Then you can imagine something that's further along and maybe says just, well, revenues were different than previously projected but that didn't change the ultimate earnings per share guidance.

And I want to understand how direct do you think -- versus indirect, does the logical connection have to be?

Page 284

MR. MANNINGHAM:  Objection.  Hypothetical.

THE WITNESS:  I think it really depends on the facts and circumstances of the individual case.  And I've certainly seen examples over my, you know, decades in working in these types of matters that I don't think there's a way to generalize that.

BY MR. SKAKUN:

Q.   Do you agree that in considering the facts and circumstances and whether there is a clear, logical economic connection between the alleged misstatement and the alleged corrective disclosures, the contents of those statements and disclosures have to be analyzed?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Well, I think it has to be both the contents of the disclosure and the contents of what's alleged to have been concealed as part of that disclosure.

So it can be not just the words that were said but what the -- the economic content of what's being concealed as well.

Page 285

BY MR. SKAKUN:

Q.   So both the contents of the statements and disclosures and plaintiffs' allegations, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I think one would want to look at both those things, yes.

BY MR. SKAKUN:

Q.   Mr. Coffman, can we go to -- it's heading -- well, it's right in front of paragraph 79 of your report.  It's on page 44.

There's a heading C that states that, "Analyst Reports Relied On By Dr. Skinner Demonstrate That The Market Was Relying On The Alleged Misstatements."

Do you see that?

A.   Yes.

Q.   Now, you don't use the phrase "price impact" here, do you?

A.   Not in that heading, no.

Q.   In fact, in that section you say "reliance," right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Yeah, this section is focused more on what the analyst reports

Page 286

were focused on both with respect to the alleged misstatements and the alleged corrective disclosures, not specifically making it a claim about price impact, although I think there's evidence in here that helps support price impact.  But that's -- I don't use the word "price impact" in the title of that section.

BY MR. SKAKUN:

Q.   And you don't use the word "price impact" because there's nothing in this section about movements in the stock prices, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Well, I think you would want to analyze my report as a whole and what relevance this information has for the price impact analysis as a whole.

But this section -- this section is not meant to provide the direct evidence of price movements, that's correct.  That's in a different section.

MR. MANNINGHAM:  I'd also -- I just want to object and say just to the characterization of this section as not including the words "price impact."

14 (Pages 283 - 286)

Page 287

If you want Mr. Coffman to read through it again, I just want to make it clear for the record that that is a mischaracterization of this section.

THE WITNESS: Yeah, and I think in my testimony I said it doesn't mention price impact in the -- in the title, but I have not gone through the -- the whole section to see whether it uses the word "price impact." I thought that was clear from my answer, but...

MR. MANNINGHAM: I'll represent that it does. I mean, if you're going to misrepresent and say it doesn't include the words "price impact," I think it's fair to note for the record that it does.

MR. SKAKUN: Thanks, Mr. Manningham.

BY MR. SKAKUN:

Q. Mr. Coffman, I think the record stands for what was asked and answered there.

MR. MANNINGHAM: Objection. It does not stand for -- it was a mischaracterization.

MR. SKAKUN: We can disagree about what was asked; what was said. And let's move on and stop.

Page 288

MR. MANNINGHAM: All right. So next time you're asked a question, allow Mr. Coffman the time to read through his entire report. If you're going to represent --

MR. SKAKUN: I asked him to flip through --

MR. MANNINGHAM: If you're going to represent that it does not say the words "price impact" and misrepresent the record --

(Simultaneous speaking.)

THE STENOGRAPHER: I'm sorry.

MR. MANNINGHAM: If you're going to misrepresent the record and say it doesn't use the term "price impact" and then not allow Mr. Coffman to read through that entire section, then, yes, I am going to state on the record that it does say "price impact."

And next time, please allow Mr. Coffman the opportunity to read through his entire section before misrepresenting the record.

MR. SKAKUN: Mr. Manningham, your

Page 289

statement is inappropriate. It's wasting time. It's also inaccurate because the video will show Mr. Coffman took the time to flip through his report in answering an open-ended question that I asked.

So simply saying something, which will be disproven by the video, does not make it true. I gave Mr. Coffman the time. We'll take this additional time at the end of it because --

MR. MANNINGHAM: No, you will not.

MR. SKAKUN: -- this is not appropriate.

MR. MANNINGHAM: No, you will not.

(Simultaneous speaking.)

MR. MANNINGHAM: If you're going to misrepresent and say it doesn't say the words "price impact" and try to rush him along, that is not appropriate, Mr. Skakun.

MR. SKAKUN: That's false. We're going to move on.

MR. MANNINGHAM: So are you saying it doesn't say the word "price impact"? We can go off the record if you want, if you don't want to waste time. But I'm not

Page 290

going to allow you to misrepresent what's in his report.

MR. SKAKUN: Mr. Manningham, we're moving on. If you're going to continue obstructing the deposition, we're going to have to deal with this separately.

MR. MANNINGHAM: That's fine.

BY MR. SKAKUN:

Q. Now, Mr. Coffman, are you offering an opinion on the legal element of reliance here?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I'm not offering an opinion on what I understand is the legal element of reliance except for my general understanding that plaintiffs are alleging reliance based on the fraud-on-the-market theory and that my prior report addresses market efficiency, which I believe is relevant economic evidence to the subject of reliance.

But I'm not offering a legal opinion that there was reliance in this matter.

BY MR. SKAKUN:

Q. Okay. And your understanding, right,

15 (Pages 287 - 290)

Page 291

is that the fraud-on-the-market theory is a way to indirectly prove reliance for all class -- potential class members, right?

MR. MANNINGHAM: Objection.

THE WITNESS: That's my general understanding of that legal theory, yes.

BY MR. SKAKUN:

Q. And you're not offering an opinion that every investor, every potential class member, relied on the alleged misstatements when transacting based on the analyst reports that you discuss in this section, right?

THE WITNESS: Could I have that read back, please?

(Record read as requested.)

THE WITNESS: I'm not offering an opinion that every investor reviewed and relied on specific statements.

BY MR. SKAKUN:

Q. Okay. Nor does this section or the analyst reports that you reference address every alleged misstatement in the case, right?

MR. MANNINGHAM: Objection.

If you want to go ahead and take your time to read through the section,

Page 292

please go ahead.

MR. SKAKUN: Mr. Manningham, that's not an appropriate objection.

MR. MANNINGHAM: You're asking him for the entire section, so please allow him -- we've already talked about this. If you're going to ask him about the entire section, allow him the opportunity to review it.

If you want to direct him to a more specific question, fine.

MR. SKAKUN: Mr. Coffman -- I mean, I'm sorry, Mr. Manningham, I said nothing while Mr. Coffman was flipping through his report, as the video shows.

MR. MANNINGHAM: Okay. I was just instructing the witness to take his time.

THE WITNESS: This section focuses on certain examples of how analysts reacted to certain revenue synergy statements.

(Witness reviewing documents.)

THE WITNESS: And the cross-selling, at least one cross-selling statement. And about an alleged misstatement that referenced FIS's market share.

Page 293

And I conclude that section discussing -- characterizing those as examples. I do not go through each and every misstatement in that section, but I provide examples.

BY MR. SKAKUN:

Q. Mr. Coffman, have you ever provided an opinion on direct evidence of reliance in a punitive securities class action?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't believe so. The reason I'm hesitating is I have done some work in opt-out cases where I was made aware of evidence of direct reliance and I may have cited to it.

But I don't think I was offering the opinion of that direct reliance.

MR. SKAKUN: We've been going about an hour. Why don't we take a break.

Can we go off the record, please?

THE WITNESS: Thank you.

THE VIDEOGRAPHER: The time is now 11:00 a.m. This is the end of Media 1. We're off the record.

Page 294

(Whereupon, a recess was taken from 11:00 a.m. to 11:15 a.m.)

THE VIDEOGRAPHER: The time is now 11:15 a.m. This is the beginning of Media 2. We're back on the record.

BY MR. SKAKUN:

Q. Mr. Coffman, can we go to page 26 of your report? It's on pages 14 to 15.

A. Okay.

Q. And do you see at the top of page 15 -- so we talked about this paragraph a little bit before when we talked about the relevant truth.

And at the top of page 15, do you see it says, "Plaintiffs allege that each and every one of the alleged misstatements concealed the same overall relevant truth: That the Worldpay acquisition was a failure from the start, that Worldpay's business had suffered as a result of the acquisition and that defendants had fraudulently overstated the value of Worldpay for years, ultimately leading to a goodwill impairment charge of $17.6 billion and FIS's decision to spin off the portion of its business that Worldpay comprised."

16 (Pages 291 - 294)

Page 295

And you defined that as the "Undisclosed Worldpay Issues."

Do you see that?

A. Yes.

Q. And that's the relevant truth we've been talking about that you use in your report, right?

A. Yes.

Q. And is it fair to say that your price impact opinion is premised on that definition of the relevant truth?

A. Yes.

Q. And to be even more precise, fair to say that your price impact opinion is premised on the allegation that all of the alleged misstatements concealed this relevant truth and all of the alleged corrective disclosures revealed this relevant truth, or partially revealed at the least, this relevant truth?

A. That's my understanding of plaintiffs' allegation, that's how I've analyzed the case.

Again, I want to be careful because I don't think my price impact decision is -- not price impact decision -- price impact

Page 296

opinion is premised --

Q. Excuse me, sorry.

A. -- necessarily on finding that that absolutely has to be true for every single alleged misstatement.

In other words, what I'm thinking of here is let's say there's several misstatements that that's the -- the finder of fact determines that's a reasonably accurate description of what's being concealed in terms of the allegations. I would still then have a price impact opinion subject to those particular statements.

So I'm not trying to say that it -- it's an all or nothing.

Q. I understood. Just to make sure I get that qualification right. You're saying there's 27 alleged misstatements. Say plaintiffs only prove that three of them were actually false or misleading.

That doesn't affect your price impact opinion as to those three, right?

MR. MANNINGHAM: Objection.

BY MR. SKAKUN:

Q. I shaded the hypothetical our way.

Page 297

But on the numbers --

A. I think that's a fair statement. But if for whatever reason, whether it doesn't even need to be that they weren't false or misleading --

Q. Okay.

A. -- that just like whatever the scope of the concealed truth was somehow different or a subset of the whole, like it -- it wouldn't necessarily impact that there's still evidence of price impact in this case.

Q. Okay. And it's fair to say that this -- this relevant truth is not specific to any particular alleged misstatement; you say it's the same for each and every alleged misstatement, right?

A. That's my general understanding, yes.

Q. And fair to say it's not specific to the contents of any alleged corrective disclosure, right; it's the same for each alleged corrective disclosure, right?

A. Well, I just want to be clear on that answer. I mean, my understanding is that the relevant truth that's being concealed is the same for all the alleged misstatements.

Page 298

That doesn't mean I didn't look at, analyze and think about each and every one of those statements. I just didn't look at it as a group and say, you know, without having thought about whether that's a -- whether that made sense or not.

And then when you say it's the same for the corrective disclosures, I mean, my understanding is generally that the plaintiffs are alleging that each of the corrective disclosures partially revealed this relevant truth, yes.

Q. Did you assume that FIS could have disclosed all of its relevant truth at the time of, say, the first alleged misstatement?

MR. MANNINGHAM: Objection.

THE WITNESS: I'm starting from the presumption that what's described here as the undisclosed Worldpay issues is something that could have been disclosed, at least to some degree, from the beginning of the class period.

BY MR. SKAKUN:

Q. Did you conduct any analysis to evaluate whether it could have been disclosed in

17 (Pages 295 - 298)

Page 299

full at the beginning of the class period?

A.  I didn't do any analysis myself to evaluate whether that was the truth or not, that it could be disclosed -- that the full relevant truth could be disclosed -- well, I have not done an independent analysis of exactly what could have been disclosed at different points in time.

Q.  Okay.

A.  If that's -- I think that's a fair way to say it.

Q.  Mr. Coffman, I want to talk a little bit more about the alleged corrective disclosures in this case.  So let's just start with some specifics.

So you're aware that the first two alleged corrective disclosures are the August 4th, 2022, earnings release for the second quarter of 2022, and the November 3rd, 2022, earnings release for the third quarter of 2022, right?

A.  That's my understanding, yes.

Q.  And do you agree that the specific statements in those earnings releases that plaintiffs allege were corrective were, let's

Page 300

say, substantially the same?  Generally speaking, they were disappointing financial results for the merchant segment.  Is that fair?

MR. MANNINGHAM:  Objection.

THE WITNESS:  That's a component of it.  I think it's fair to say both were underperformance of the -- of the merchant segment.  Obviously it's reporting on different quarters so it's literally referring to different things and different performance.

But -- and so there -- there are factual distinctions between the two.  But generally -- again, at a very high level I think that's fair.  But there's -- give me just a second.  I want to check a couple things.

(Witness reviewing documents.)

THE WITNESS:  I think also part of the August 4th disclosure was that defendants stopped announcing certain financial results as well.  But plaintiffs characterized that as, I think, part of what the market was taking from that disclosure as well.

Page 301

BY MR. SKAKUN:

Q.  Mr. Coffman, are you not aware that they did announce those exact same metrics in the earnings release?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Let me finish my answer to that first question and then I'll come back to that.

BY MR. SKAKUN:

Q.  Okay.  Sorry.  I thought you were done from the pause.

A.  Yeah, give me just a second.

(Witness reviewing documents.)

THE WITNESS:  And just to be clear, when I'm talking about disappointing financial results, I'm also including the future changes to guidance that were being announced as well.

So it's not just about that the individual quarters but that's part of the information that's being disclosed as well.  And those are obviously different numbers for the different disclosures.

And, again, in your question we're dealing with these disclosures at a

Page 302

very high level but that's -- that's my understanding of -- at a very high level of the information that was -- plaintiffs are claiming was corrective.

BY MR. SKAKUN:

Q.  So did you rely on the statements in the Q2 and Q3 2022 earnings releases about guidance in coming to your price impact opinions here?

A.  Well, I think the lower guidance is -- was important information that was contributing to the market's perception of how Worldpay was performing, or the merchant solution segment was performing.

And so I certainly wasn't excluding that information from what I was analyzing.

Q.  Mr. Coffman, is it your understanding that plaintiffs allege that the guidance statements in these earnings releases were corrective?

MR. MANNINGHAM:  Objection.

THE WITNESS:  I don't recall precisely whether that information was cited directly by plaintiffs in the complaint.

18 (Pages 299 - 302)

Page 303

BY MR. SKAKUN:

Q.   So where did you get that understanding then, if it's not in the complaint? Which it's not.

MR. MANNINGHAM:  Objection.

THE WITNESS:  Well, all I'm saying is that the -- the -- one of the ways investors would analyze surprising new earnings information is also to evaluate to what extent those were temporary period-specific effects or representative of longer-term issues with financial performance.

And so in analyzing the earnings information, the market participants -- participants would look at the guidance as well and to the extent this -- these disclosures were providing information in the market suggesting that the underperformance was likely to continue, that would be relevant -- in my view, that would be relevant corrective information given the nature of plaintiffs' claims.

BY MR. SKAKUN:

Q.   Okay.  Now, you're aware the third

Page 304

alleged corrective disclosure is the February 13th, 2023, earnings release for Q4 2022, right?

A.   That was part of it, yes.  I think they also cite to a Reuters article that came out even before the earnings announcement.  But that's -- that's the date in which there was market impact -- or alleged market impact from the corrective disclosure.

Q.   Well, Mr. Coffman, you understand that the plaintiffs' complaint alleges that the corrective information was revealed, quote, "on February 13, 2023"?

MR. MANNINGHAM:  Objection. Mischaracterization.

THE WITNESS:  I think the complaint talks about the Reuters article as well.  I haven't -- I mean, certainly the -- the -- the Reuters article comes out after market hours on Friday, the 10th.  So the -- any impact from that article would be coincident with the market price movement on Monday, February 13th, from the earnings announcement as well.

So I -- I'm just saying I don't

Page 305

-- as I sit here today, I don't have an understanding that the Reuters article is somehow not part of what's being considered the disclosure of corrective information.

BY MR. SKAKUN:

Q.   Mr. Coffman, you would agree that plaintiffs' allegations are set out in their complaint, right?

A.   That's my understanding of the complaint, yes.

Q.   And you're not creating new allegations in your report or your testimony here today from plaintiffs, right?  Whatever is in the complaint, that's what's in the complaint?

A.   No, I mean, I've -- I've given my understanding of their allegations in my report based on the complaint and -- and my discussion with plaintiffs' counsel.

But I -- I don't think I'm creating new allegations.  I'm just describing what I understand were the events that occurred around there that are related to the alleged corrective disclosure.

Q.   You referenced discussions with

Page 306

plaintiffs' counsel.  In those discussions, did plaintiffs' counsel instruct you to consider as allegations being made by plaintiff anything that's not in the complaint?

MR. MANNINGHAM:  Objection.

I just instruct the witness not to answer anything that could be privileged.

THE WITNESS:  I haven't evaluated every single thing that was in the complaint.  What I've -- have been asked to evaluate is what's laid out in my report.

BY MR. SKAKUN:

Q.   Okay.  So I'm going to ask a few questions.  I think that -- about the alleged corrective disclosures and I may reference all three alleged corrective disclosures.  I may reference the first two alleged corrective disclosures.  I may reference the third, or the last alleged corrective disclosure.

Do you understand if I make those references which ones I'm going to be talking about?

A.   Yes.

Q.   So I want to ask a few questions

19 (Pages 303 - 306)

Page 307

about the contents of the alleged corrective disclosures as they're identified in the complaint and alleged there.

And the first question is, do you agree that none of the alleged corrective disclosures referenced the subject of revenue synergies?

MR. MANNINGHAM: Objection.

THE WITNESS: I would have to go back to the complaint and look to see if -- and those disclosures themselves to see if they discussed in any way revenue synergies. I don't know for a fact off the top of my head whether they discussed revenue synergies.

BY MR. SKAKUN:

Q. Okay. Your report does not point to the contents of any alleged corrective statements in those disclosures that address the subject of revenue synergies, though, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think it depends on what you mean by addressed the subject of revenue synergies.

I mean, I don't point to any

Page 308

explicit mention of revenue synergies. That's different than saying that revenue synergies have nothing to do with what was being announced on those days or what the market took from those disclosures.

So I just want to draw that distinction. I don't point to an explicit use of the words "revenue synergies." But to say they don't relate to revenue synergies in some way, I would disagree with.

BY MR. SKAKUN:

Q. And my question was just there was no reference to the subject of revenue synergies in any of the alleged corrective disclosures?

MR. MANNINGHAM: Objection. Asked and answered.

BY MR. SKAKUN:

Q. Correct?

A. Again, I'm not certain as I sit here today whether there was or wasn't. I, in my report, am not pointing to a specific reference to them. But whether it exists or not, I just don't know off the top of my head.

Q. And your report does not point to the

Page 309

contents of -- I'm sorry. Strike that.

Your report does not point to any contents of any alleged corrective disclosure that referenced the subject of cross-sales either, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't recall an explicit mention by the company. And, again, going back to my prior answer, I think I do provide analysts -- an example of an analyst who -- who talked about revenue synergies in the wake of the final corrective disclosure, even though I don't cite to a specific mention of revenue synergies by the company itself.

BY MR. SKAKUN:

Q. Mr. Coffman, that wasn't my question. My question was, your report does not point to any contents of any alleged corrective disclosure that referenced the subject of cross-sales, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I think if you're asking do I explicitly point to the company itself making a disclosure about -- or that

Page 310

specifically uses the phrase "cross-sales," I don't believe I do.

BY MR. SKAKUN:

Q. Okay. And your report doesn't point to the contents of any alleged corrective disclosure that references the subject of market share either, correct?

MR. MANNINGHAM: Objection. Mischaracterization.

THE WITNESS:

(Witness reviewing documents.)

THE WITNESS: Well, in going through the August 4th disclosure, the company certainly provided financial information, including revenue, that may provide the market some information about market share.

Paragraph 96 talks about -- the Defendant Woodall talking about seeing sequential volume decreases. And in response to this disclosure, I note in paragraph 99 Goldman Sachs saying, "We believe the removal of ongoing disclosure around volumes, and the company's underperformance versus the networks and peers, which the company disclosed during

20 (Pages 307 - 310)

Page 311

the Q and A likely exacerbated the ongoing concerns about the merchant business losing market share.

So I think the market was clearly interpreting some of the new information they were providing as being relevant to market share.

I don't recall citing the company using the specific phrase "market share" on that particular date, though. I can try to continue answering your question by going through the other two corrective disclosures.

(Witness reviewing documents.)

THE WITNESS: Again, on -- on November 3rd, the company obviously provided updated performance metrics.

And in response, at least Credit Suisse states: "We note that the merchant business continues to grow below industry levels and is less well positioned."

Again, that's the same conclusion or -- or symptom that led Goldman Sachs to say that they were likely losing market share.

Page 312

Morgan Stanley also specifically points to, "Management's commentary implying that share losses will continue. That's in paragraph 109."

So again, I don't recall the company itself referencing market share specifically. But certainly they provided information that updated the market's views on the trend in market share.

BY MR. SKAKUN:

Q. Mr. Coffman, my question was about the contents of the alleged corrective disclosures themselves, not the market commentary.

A. Okay. But I think it's important that the economic meaning of what's disclosed goes beyond just the precise words that are being used.

I -- I'm not disagreeing with you that I don't recall and I don't cite to the company using the term "market share" specifically. I agree with that.

Again, I would have to go through the entire thing to be certain of that but I don't recall citing to that. But that doesn't

Page 313

mean that their statements had nothing to do with market share.

Q. I understand your position. And we'll come to that piece.

A. Okay.

Q. So -- oh, sorry. Are you still going?

A. Well, I was going to see if there was anything else I wanted to add based from the third corrective disclosure.

(Witness reviewing documents.)

THE WITNESS: I don't specifically reference that the company mentioned market share on the third corrective disclosure.

BY MR. SKAKUN:

Q. Okay. And so just to be clear, I want to ask -- my next questions are going to be still about the contents of the corrective disclosures themselves. We'll come to that second point on your views on what the market understood in a moment.

So Mr. Coffman, your report also does not point to the contents of any alleged corrective disclosure that referenced the subject of integration, correct?

Page 314

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I don't -- I don't recall referencing a specific use of the word "integration" by the company on one of the corrective disclosure dates. I would have to go back and review the entirety of those disclosures to give affirmative testimony that it's not there.

Certainly what's, I think, important and relevant, though, is that I believe all three of the disclosures had important consequences for how the market perceived the success of that integration and whether it was successful or not.

BY MR. SKAKUN:

Q. And Mr. Coffman, neither of the first two alleged corrective disclosures -- sorry, strike that.

Mr. Coffman, your report does not point to any contents of either the first two alleged corrective disclosures that reference the subject of goodwill, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Yeah, I -- just throughout this whole conversation we've

21 (Pages 311 - 314)

Page 315

been talking about the quote/unquote "contents" and I assume what you've meant in all of those questions is that what exactly the company disclosed on those corrective disclosure dates.

And I -- on the first two alleged corrective disclosures, I don't recall seeing explicit -- explicit mention by the company that there was impairment of goodwill.

Obviously, they've reported on the goodwill in those statements. So goodwill was a subject of what they reported on. But I don't remember a discussion of the -- or a disclosure that the goodwill was impaired in any way by the company itself on those days.

BY MR. SKAKUN:

Q. And Mr. Coffman, you understand that plaintiffs' complaint identifies specific pieces of those earnings releases that it -- plaintiffs allege were corrective, right? And it's those pieces of information that did not reference the subject of goodwill, correct?

MR. MANNINGHAM: Objection.

Page 316

THE WITNESS: Well, I don't think it used the term "goodwill." That doesn't mean from an economic point of view it doesn't have some relevance to goodwill.

But I don't recall it specifically mentioning a goodwill disclosure or about the impairment of goodwill at those times as part of the corrective information.

BY MR. SKAKUN:

Q. So let's talk about these inferences that you're drawing about what the market may have believed or understood from the contents of the alleged corrective disclosures. Okay?

A. Okay.

Q. Do you agree that the market did not believe that the revenue synergies had been overstated after the first alleged corrective disclosure date?

MR. MANNINGHAM: Objection.

THE WITNESS: Could I have that read back, please?

(Record read as requested.)

THE WITNESS: I haven't reached that conclusion, no.

Page 317

BY MR. SKAKUN:

Q. Did you reach a conclusion -- sorry. Strike that.

Your report does not state a conclusion that the market believed any revenue synergy numbers reported by the company had been overstated after the date of the first alleged corrective disclosure, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't cite to specific evidence of analysts or any particular investor reaching the conclusion that revenue synergies had been overstated.

That doesn't mean that the underperformance of the company didn't enter into the market's set of information it was considering about whether -- about its confidence in those revenue synergies or -- or the -- I'll leave it at that.

BY MR. SKAKUN:

Q. Would you give the same answer if I asked the question about the second alleged corrective disclosure?

A. Yes. Again, I -- I don't believe I pointed to a specific analyst or investor

Page 318

belief that specifically stated that revenue synergies specifically had been overstated.

That doesn't mean that the market's reduced value of the company doesn't reflect to some degree an understanding that the value of -- that the market value of what had been reported as revenue synergies was -- was declining.

Q. But you can't point to a single thing that was said by any investor, any analyst, any market participant whatsoever after the first two alleged corrective disclosures that supports that statement that it's possible that the reduced value of the company reflects to some degree an understanding that the market value of what had been reported as revenue synergies was declining?

MR. MANNINGHAM: Objection.

THE WITNESS: I'm not pointing to any specific evidence of that. I have not --

BY MR. SKAKUN:

Q. Thank you.

A. -- done a comprehensive review of all of the information that came out about people's market views on that subject around

22 (Pages 315 - 318)

Page 319

that time. But I'm not specifically pointing to evidence of that.

Q. Now, you referenced the market value of what had been reported as revenue synergies in response to my question about whether the amount of revenue synergies had been perceived to be overstated.

I want to ask about specifically the amount of revenue synergies reported, not their valuation by the market. You point to and are aware of no specific evidence that any investor or analyst or other market participant concluded that the amount of reported revenue synergies was inaccurate, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I do not point to any specific analyst or market participant reaching that conclusion after the first -- either of the first two corrective disclosures. Not saying it doesn't exist but I don't point to any.

BY MR. SKAKUN:

Q. Okay. If I asked you the same questions about cross-sales, you would give the same answers, right?

Page 320

MR. MANNINGHAM: Objection.

THE WITNESS: I think that's correct, yes.

BY MR. SKAKUN:

Q. Okay. Now, you're aware of Dr. Skinner's finding that analysts continue to reference the reported amount of $750 million in revenue synergies even after the last alleged corrective disclosure, right?

A. I'm aware he makes reference to that, yes.

Q. And you don't dispute that, in fact, analysts did continue to report the $750 million amount of revenue synergies even after that last alleged corrective disclosure, right?

MR. MANNINGHAM: Objection.

THE WITNESS: As I sit here, I don't have any specific reason to dispute that.

BY MR. SKAKUN:

Q. Okay. And you don't dispute that in your report either, right?

A. No.

Q. Okay. And would you agree that this at least suggests that analysts did not believe that the amount of revenue synergies had been

Page 321

inaccurately stated?

MR. MANNINGHAM: Objection.

THE WITNESS: I think that's inconsistent with what -- at least one of the analysts I quote.

(Witness reviewing documents.)

THE WITNESS: Sorry. Give me a sec.

BY MR. SKAKUN:

Q. Are you looking for paragraph 52?

A. Yes. I was thinking of the Financial Times article that's cited in paragraph 52 where the author clearly questions the value of the synergies being wildly overstated in the first place.

Q. So let's talk a little bit about that. First off, this isn't a securities analyst report, correct? It's an opinion piece published in the Financial Times.

MR. MANNINGHAM: Objection.

THE WITNESS: It was published in the Financial Times. I don't know whether the author is a securities analyst.

BY MR. SKAKUN:

Q. Do you know the author?

A. Not off the top of my head, no.

Page 322

Q. His name is Robert Armstrong. Are you familiar with the column he publishes in the Financial Times called Unhedged?

MR. MANNINGHAM: Objection.

THE WITNESS: I think I've seen it before. I haven't studied it carefully all the time but I'm aware of it.

BY MR. SKAKUN:

Q. But you're aware it's an opinion column, not a security analyst report, right?

A. I don't know if that's a fair characterization of all of those columns. I mean, it's not an analyst report, a traditional analyst report. I will agree to that.

Q. Thank you.

Have you ever cited opinion columns in your prior reports?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't know off the top of my head whether I have or have not.

BY MR. SKAKUN:

Q. Okay. You can't remember any instances of doing so before, though, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I've cited lots of

23 (Pages 319 - 322)

Page 323

articles over many years. I just don't recall.

BY MR. SKAKUN:

Q. Okay. You weren't able to find any actual analyst report issued after the last corrective disclosure that made similar commentary as in this opinion piece, right?

MR. MANNINGHAM: Objection.

(Witness reviewing documents.)

THE WITNESS: Well, again, I think -- I don't cite to an analyst that specifically talks about the synergies being inaccurate as reported at the time specifically.

I just note that the goodwill -- the company itself and analysts throughout the class period talked about the goodwill being premised on the existence of revenue synergies so I don't -- and other synergies.

So I don't think you can look at the goodwill write-down as completely independent of an acknowledgment that the revenue synergies, whatever they were reporting as revenue synergies, that that

Page 324

was creating the value that the company anticipated or that the market was being given information about what those synergies implied.

So I think that answers your question.

I want to go back to -- I saw something in here I just want to make note of with respect to a prior answer I gave.

You had asked me before about whether the corrective disclosures specifically mentioned market share and I was going through examples where -- at least for the two corrective disclosures, where the disclosed information led to conclusions about market share. And I realized that at paragraph 123 with respect to the third corrective disclosure, an analyst talking about how "the volume growth numbers that had been reported by the company implied share losses."

So even though the company didn't -- I'm not aware of the company explicitly mentioning the term "market share," the information that was disclosed

Page 325

on this day also led the market to imply that there had been share losses.

BY MR. SKAKUN:

Q. Okay. Thank you.

So I just want to flag -- I'm going to come back to that comment you made about how "analysts talked about goodwill being premised on the existence of revenue synergies."

I do want to come back to that later. But let's talk a little bit more about the revenue synergies.

And I think I hear a difference in what you're saying between the amounts of revenue synergies that were reported, in total 750 million, and the value of those revenue synergies, which would be premised on a multiple, by the trading multiple of revenues.

Does that make sense to you?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I don't know that it's based on multiples necessarily. What I'm saying is that -- and so that's a separate question whether -- like how one might value revenue synergies and all the ways one could do that. So I'm not saying

Page 326

anything about that specifically.

The distinction I was -- or the point I was trying to make is, at least my understanding of plaintiffs' claim here, is that the revenue synergy statements were misleading for a number of reasons.

One, that they didn't accurately reflect what the market understands are really revenue synergies. And two, by portraying the revenue synergies as having occurred was leading the market to believe that the Worldpay acquisition had been a success. And where the underlying truth was that wasn't the case.

And so that the -- my understanding of their allegation is that how the market would value the existence of those revenue synergies depends on the context in which they're actually occurring. Are they real revenue synergies? And is -- is the underlying business actually being supported by those revenue synergies in a way that's consistent with how the company described what a successful merger would look like?

24 (Pages 323 - 326)

Page 327

So that's the distinction I think I was drawing.

BY MR. SKAKUN:

Q. So let's unpack that a little bit.

So just to make sure we're both clear, right. Plaintiffs claim that the revenue synergies were inaccurately reported, but you understand they do not claim that any total revenue numbers reported by the company were inaccurate, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I'm not aware of any claim by plaintiffs that the total revenue was misstated.

BY MR. SKAKUN:

Q. Okay. Now, you've said two things about your understanding of plaintiffs' claims.

One, that the revenue synergy statements didn't accurately reflect what the market understands are really revenue synergies. And two, by portraying the revenue synergies having occurred was leading the market to believe that the Worldpay acquisition had been a success.

I want to ask about that point 1,

Page 328

okay. For your price impact opinions as stated in your rebuttal report, does it matter whether the market ever learned that the amounts reported as revenue synergies were or were not really revenue synergies?

MR. MANNINGHAM: Objection.

THE WITNESS: I guess the best answer I can give is that's uncertain whether it would matter. I can see a situation where it doesn't matter, where even if plaintiffs are wrong about the revenue synergies being overstated somehow, but the alleged misstatements and omissions still concealed the failure of the Worldpay acquisition. That's consistent with how I've analyzed price impact.

If it turns out that the revenue synergies themselves were misreported in some way or were misleading -- affirmatively misleading in some way, they were the wrong numbers or didn't represent what they were supposed to represent, that's also consistent with plaintiffs' theory of the case.

So I -- I certainly can see a

Page 329

situation where it doesn't matter. I don't know that I can conceive of all the situations where it might matter, though. So I -- it's -- I'm uncertain is the short answer.

BY MR. SKAKUN:

Q. I want to follow up on that first circumstance you identified.

So you believe that even if all of the revenue synergy statements accurately reported the amount of revenue synergies, there could still be price impact in this case for those statements?

MR. MANNINGHAM: Objection.

THE WITNESS: That's consistent with my understanding of plaintiffs' theory of liability, yes.

BY MR. SKAKUN:

Q. Okay. Thank you.

Now, I want to follow up on paragraph 52 where you quote this Financial Times opinion piece from Robert Armstrong.

And do you see where you bolded in your report "tens of billions in synergy value"?

A. Yes.

Page 330

Q. Right. Now, you understand that none of the challenge statements reference billions of synergy value, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think perhaps that's making reference to both revenue synergies and cost synergies. I don't know if, taken together, those were in the billions. I just don't recall.

BY MR. SKAKUN:

Q. So you don't actually know whether this article refers to revenue synergies, or revenue cost synergies, or even just cost synergies?

(Stenographer clarification.)

BY MR. SKAKUN:

Q. I think I said, you don't actually know whether this article refers to revenue synergies, or revenue and cost synergies, or just cost synergies?

A. Well, I think the prior sentence is making reference to both explicitly.

Q. Now, Mr. Armstrong doesn't write in his opinion piece that the value of the synergies, revenue and cost synergies, was

25 (Pages 327 - 330)

Page 331

wildly overstated. He says it could be that, or it could be that there will be dyssynergy from the split, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: He's noting both possibilities.

BY MR. SKAKUN:

Q. He doesn't take a position as to which one is the case, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't believe he does.

BY MR. SKAKUN:

Q. Did you conduct any investigation or analysis to look at whether there were reported dyssynergy values from the spinoff or separation of Worldpay?

MR. MANNINGHAM: Objection.

THE WITNESS: That's not a subject I've investigated, no.

Can we take a short break when we get a chance?

MR. SKAKUN: Oh, sure. Of course. Absolutely.

THE WITNESS: I've just got a tickle

Page 332

in my throat again and I'd just rather take a few minutes.

THE VIDEOGRAPHER: The time is p.m. This is the end of Media 2. We're off the record.

(Whereupon, a lunch recess was taken from 12:09 p.m. to 12:38 p.m.)

Page 333

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is now 12:38. This is the beginning of Media 3. We're back on the record.

CHAD COFFMAN, CFA, was called for continued examination, and having been previously duly sworn was examined and testified further as follows:

EXAMINATION

BY MR. SKAKUN:

Q. Mr. Coffman, I'd like to talk a little bit about goodwill now. So could you please turn to paragraph 72 of your report and take a look through that paragraph, please. I'm going to ask you several questions here.

(Witness reviewing documents.)

BY MR. SKAKUN:

Q. Okay. Mr. Coffman, you agree, right, that there's nothing in plaintiffs' claims to suggest that the market should have known after the first two alleged corrective disclosures but before the last alleged corrective disclosure that the company should have recorded an impairment charge, right?

MR. MANNINGHAM: Objection.

Page 334

THE WITNESS: Correct.

BY MR. SKAKUN:

Q. And --

A. I sorry. And, again, the point I'm making there is that while the first two corrective disclosures may have provided some information about the underperformance of the business, there was nothing in the market at that point in time that would have given the market the full understanding of the extent to which Worldpay -- or the market solution -- or that -- that Worldpay was impaired.

Q. And you're not holding yourself out as an expert on goodwill or accounting more generally, correct?

A. It depends on what you mean by "expert." I mean, in the sense that do I believe I have a better than layperson's understanding of goodwill and accounting issues surrounding goodwill? I do.

I don't hold myself out as a CPA. I don't -- I don't hold myself out on an expert as -- or on what companies should or should not say about goodwill or things like that.

But I don't -- but certainly the

26 (Pages 331 - 334)

Page 335

economic interpretation of goodwill and how the market perceives disclosures about goodwill and what economic meaning that has and the accounting that goes into that, I certainly believe I have more than a laymen's understanding of that.

Q.   You're not offering any opinions in this rebuttal report about technical accounting for goodwill, correct?

A.   I'm not offering any opinion about the technical accounting standards.  But the sort of an economic interpretation of goodwill and the accounting -- at least some of the accounting issues surrounding goodwill, I'm certainly aware of those and, like I said, have more -- more than a layman's understanding of it.

But I'm not offering a specific technical opinion about goodwill accounting, if -- if by "technical" you mean like exactly precisely how goodwill determinations are made, et cetera.

Q.   Do you understand what technical accounting is within the context of financial reporting?

Page 336

THE WITNESS:  Could I have that read back, please?

(Record read as requested.)

THE WITNESS:  The way I interpreted your question is the specific steps and techniques of performing accounting tests surrounding goodwill.

BY MR. SKAKUN:

Q.   And you're not offering any opinion in this rebuttal report regarding accounting for goodwill by FIS, correct?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Could I have that read back, please?

(Record read as requested.)

THE WITNESS:  Again, not about the technical accounting of it.  About the economic interpretation of the goodwill statements and how the market interprets goodwill statements and what those reflect in an economic way and how the market would interpret a goodwill write-down and some of the things that go into goodwill write-downs and what could lead to goodwill write-downs.

Page 337

I think that's certainly part of my background and part of what I'm thinking about in analyzing the plaintiffs' statements and the price impact inquiry here.  But I'm not offering a technical opinion about exactly how the accounting should or shouldn't have been done.

BY MR. SKAKUN:

Q.   You're not offering an opinion that goodwill was or should have been impaired earlier than the fourth quarter of 2022.  You're just assuming plaintiffs' allegations about that for purposes of your rebuttal report?

A.   Yes.

Q.   Thank you.

So let's go back to paragraph 68 in your report, please.  So do you see at the very bottom -- sorry, the last sentence of that paragraph says, "Goodwill is directly tied to the success and value of the Worldpay acquisition"?

Do you see that?

A.   Yes.

Q.   Now, Mr. Coffman, you know, of course, that there is no accounting rule or

Page 338

aspect of GAAP that ties goodwill to the success of an acquisition, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Well, I think it depends on what you -- what you talk about as success.  I mean, or -- or I guess more important here is what I understand is the reason plaintiffs are alleging it was -- the acquisition was a failure.

My understanding -- or how I'm using that term "failure" and how I understood them to be using it is that there was a destruction of -- of value in the acquisition and I think that destruction of value is relevant to a consideration of whether the goodwill on accounting statements might be supported or not.  So I think that it's relevant in that way.

BY MR. SKAKUN:

Q.   Well, you didn't say failure and you didn't say relevant.  You said that goodwill is directly tied to the success in the Worldpay acquisition.

Is it your position that the goodwill

27 (Pages 335 - 338)

Page 339

would have increased if the Worldpay acquisition had been successful?

MR. MANNINGHAM: Objection.

THE WITNESS: No, that's not how goodwill works.

BY MR. SKAKUN:

Q. Right.

A. If -- I mean, goodwill -- what I'm -- what I'm talking about tied to the success, my understanding is that the goodwill recorded on the financial statements was supported by the expectation of synergies and -- and growth in the business and that the -- and the value of Worldpay as a -- as it would be combined with FIS.

Q. Now, you understand goodwill is calculated as a residual, right, at the time of a transaction?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, if by "residual" you mean it's the difference between the market sale price and the fair value of the identifiable assets outside of goodwill, that's my general understanding, yes.

Page 340

BY MR. SKAKUN:

Q. And it's not increased over time, correct?

A. No.

Q. Even if the acquisition is successful, right?

A. Yeah, that's not the point I was making here.

Q. And you're aware that no accounting guidance references the success of the acquisition in determining or evaluating goodwill, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, my understanding is there's a relevant test, which is whether or not the fair value of the asset still supports the goodwill.

And so if the merger is successful in generating additional value, I mean, that might suggest or at least be relevant evidence to whether or not the goodwill is impaired. So that's the context in which I'm talking about it.

BY MR. SKAKUN:

Q. Are you aware of any published paper

Page 341

in finance, accounting, economics that says goodwill is tied to the success of an acquisition?

A. Well, I was being very specific to the facts and circumstances of this case, which is my understanding of the company's own statements that the value that they were paying for Worldpay related directly to their ability to generate synergies to support the goodwill that was being recorded.

So that's the context in which I'm talking about it here. I'm not trying to make a general accounting statement about goodwill being tied to the success of mergers in some more general way.

Q. So your statement is -- sorry. Strike that.

Your understanding is that the statements made at the time of the transaction about the expected revenue synergies was relevant to the value being paid for Worldpay, which is an input in the calculation of goodwill, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I think that's a fair

Page 342

statement, yes.

BY MR. SKAKUN:

Q. And you're aware that the numbers of revenue synergies discussed at the time of the transaction are lower than most of the revenue synergy statements at issue here?

MR. MANNINGHAM: Objection.

THE WITNESS: That's not something I independently investigated.

BY MR. SKAKUN:

Q. You don't know what relation the actual reported revenue synergy amounts were compared to the amounts that you say were used to justify the Worldpay purchase price that then was a variable in the calculation of goodwill?

MR. MANNINGHAM: Objection.

THE WITNESS: I didn't -- I didn't go study that particular issue, no.

BY MR. SKAKUN:

Q. Now, you wrote in your report that goodwill is directly tied to the success. So your understanding of something being directly tied is this chain of some amount of revenue synergies was used to justify the purchase price which was used to calculate the goodwill which

28 (Pages 339 - 342)

Page 343

is then evaluated later in time?

MR. MANNINGHAM: Objection.

BY MR. SKAKUN:

Q. Is that how you understand the trades "directly tied"?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I understand that the amount being paid and how the transaction and the benefits of the transaction were described to the market and why the purchase price that was being justified is directly tied to the revenue synergies that were expected and that that directly has implications for goodwill.

And that if in the absence of those revenue synergies it would call into question whether -- or if -- if the revenue synergies were something less than expected that that could influence the value of goodwill.

BY MR. SKAKUN:

Q. I want to make sure we're very precise here. When you say "if the revenue synergies were something less than expected that would influence the value of goodwill," that is

Page 344

only true if they were less than expected at the time the purchase price of Worldpay was set, correct?

THE WITNESS: Well, I think the revenue synergies are one of many things that could influence the -- the fair value of Worldpay. It's not the only thing.

BY MR. SKAKUN:

Q. That wasn't my question. You made a very specific statement that "if the revenue synergies were something less than expected, then that could influence the value of goodwill."

And I want to make sure that we're precise about what that means. Because the value of goodwill was set at the time of the transaction and you said "based on the revenue synergies expected at that time," right?

A. Well, I think that was an input into the -- what goodwill was ultimately recorded.

Q. And so the only way your statement is true is if the revenue synergies were, in fact, lower than expected at the time of the transaction, at the time Worldpay's value was determined, at the time goodwill was calculated,

Page 345

right?

MR. MANNINGHAM: Objection.

THE WITNESS: Could I have that read back, please?

(Record read as requested.)

THE WITNESS: Yeah, I guess in making the statement I was making in paragraph 68 I wasn't focused on the timing aspect of that in the specific way that you were referencing.

My point here is just the value of the goodwill recorded on the books is, at least as it was described by Worldpay and analysts, dependent on achieving synergies. And therefore, that's the direct economic link I'm drawing here. That's all I was saying.

BY MR. SKAKUN:

Q. I understand you're saying 68 is limited. I just want to make sure that you actually answer the question I asked in the sense of the timing point that I'm making here is correct, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I think the

Page 346

goodwill is set at the time of the transaction. I guess I'm losing the relevance of the rest of that question. Or what that question -- or even what the question is.

I mean, certainly the goodwill is set at the time of the transaction based on the expectations at that point in time.

BY MR. SKAKUN:

Q. Right. And the expectations at that time, you know were a specified amount of revenue synergies, right?

A. Again, I don't know precisely what role that played in the setting of goodwill. Again, the goodwill is a residual value, as we discussed before.

But I believe there were disclosures of anticipated synergies at the time the transaction was announced.

Q. And -- fair. We're all going off of your, right, suggestion that the revenue synergies were relevant to the setting of goodwill, certainly not defendants'?

MR. MANNINGHAM: Objection.

29 (Pages 343 - 346)

Page 347

BY MR. SKAKUN:

Q. I think we've gotten what we need here actually.

Now, Mr. Coffman, your report references some internal FIS documents. Do you recall that?

A. Yes.

Q. Okay. And you agree those documents were not available to market participants at any time during the class period or at the time of any of the alleged corrective disclosure events, right?

A. Not that I know of.

Q. And you agree that market participants do not rely on internal company documents that are not available to them, right?

A. I think that's fair, yes.

Q. Okay. Now, Mr. Coffman, you discussed Professor Skinner's expert report in a few different places in your report. And you recall, right, that Doctor -- Professor Skinner concluded that various different concepts were economically distinct, right?

A. Yes.

Q. Okay. So for example, Professor

Page 348

Skinner concluded that revenue synergies and EBITDA margins are economically distinct concepts.

Now, your report does not state that you disagree with that proposition, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, I -- I agree they are distinct concepts and terms. That doesn't mean they're not economically connected in critical ways. But I agree they're a distinct concepts.

BY MR. SKAKUN:

Q. And -- and your report would seek to draw some logical syllogistic connection between the two to draw an inference, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I don't know what you mean by syllogistic. I mean, the formula for EBITDA margin is revenue minus certain expenses divided by revenue. So to the extent revenue -- I mean, revenue and revenue synergies are clearly inextricably linked to EBITDA margin.

BY MR. SKAKUN:

Q. Well, let's just be very clear here.

Page 349

There's no allegation that any revenue was misstated at any point in time in this case, right, Mr. Coffman?

MR. MANNINGHAM: Objection.

THE WITNESS: I'm not aware of total revenue being alleged to have been misstated. I'm aware of claims that the claimed revenue synergies were not accurate.

BY MR. SKAKUN:

Q. Right. And that's just a claim that some portion of the reported revenue was designated as the synergy and that label was not accurate according to plaintiffs, not that the amount of revenue that was actually fed into the EBITDA margin calculation was inaccurate in any way, shape or form, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I -- yeah, I don't think I can say it any different. I'm not aware of the total revenue being alleged to have been misstated.

BY MR. SKAKUN:

Q. But you understand that EBITDA margins are calculated based on the total

Page 350

revenue, right?

A. Well, they're based on, especially if you're talking about an EBITDA margin of a particular segment, where particular revenue gets assigned from one segment to another, might have some influence.

But I don't -- I don't claim to understand precisely how -- whether the EBITDA margin for the merchant solutions portion of the company could have -- was tied to how revenue synergies were determined. I just don't know.

Q. But you -- you do know that there's no allegation that any segment revenue numbers were ever reported inaccurately, right?

MR. MANNINGHAM: Objection.

THE WITNESS: I'm not aware of an explicit allegation to that effect, no.

BY MR. SKAKUN:

Q. Are you aware of an implicit allegation to that effect?

A. I have not read it that way; but again, I -- plaintiffs' complaint speaks for itself, I think, and --

Q. Okay. So Professor Skinner also

30 (Pages 347 - 350)

Page 351

concluded that volume as reported by FIS and revenue synergies are economically distinct concepts.

And your report does not state that you disagree with that proposition either, right?

A.   I agree they're distinct concepts. I would also say that they're highly interrelated economically in terms of how one might affect the other. But they are distinct concepts, yes, I agree with that.

Q.   What's your understanding of volume as reported by FIS?

A.   Well, I think it might have different meaning in different context. But generally when talked about volume in this context in this segment I understand it to be some form of transaction volume.

Q.   And presumably you would need to understand what volume is when reported by FIS to know whether it's intertwined with revenue synergies, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Well, I mean, my general understanding is that the revenue

Page 352

synergies would be generated in some way by achieving greater volume than would have been achieved had the -- had the companies stayed separate, and that revenue is volume times some sort of price, and that EBITDA margin is a function -- or -- of revenue. So that's how I'm saying they're clearly economically interrelated. But they're definitely separate concepts.

BY MR. SKAKUN:

Q.   And I just want to stay at the conceptual level of to be able to accurately determine whether two things are interrelated, you actually have to know correctly what they are, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  At some level, yes.

BY MR. SKAKUN:

Q.   Okay. Now, Professor Skinner also concluded, as you know, that -- well, I'll skip -- I'll strike that.

Professor Skinner also concluded that particular measures of past financial performance are distinct from the subject of goodwill.

Page 353

And your report does not state that you disagree with that, right?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Could I have that read back, please.

(Record read as requested.)

THE WITNESS:  I agree those are distinct concepts. Again, there could be interrelation between them. But they're distinct concepts.

BY MR. SKAKUN:

Q.   And just to make sure we're clear, right, Professor Skinner says a number of things are distinct economic concepts. And your report doesn't state that you disagree with any of those distinctions. It's just that you think they can be related under particular circumstances?

A.   Yes. There could be causal relations between them.

Q.   Okay. Thank you.

MR. MANNINGHAM:  I think I'm going to be done. Can we go off the record for a few minutes.

THE VIDEOGRAPHER:  The time is 1:05

Page 354

p.m. This is the end of media 3. We're off the record.

(Whereupon, a recess was taken from 1:05 p.m. to 1:11 p.m.)

THE VIDEOGRAPHER:  The time is now 1:11 p.m. This is the beginning of media 4. We're back on the record.

BY MR. SKAKUN:

Q.   Mr. Coffman, I just want to ask a couple more questions going back to -- do you recall our discussion in connection with paragraph 68 of your report and goodwill being tied, directly tied to the success of the Worldpay acquisition? And I was asking you some questions about some timing pieces.

A.   Uh-huh.

Q.   And you made a statement that if revenue synergies were something less than expected then that could influence the value of goodwill.

Do you recall that?

MR. MANNINGHAM:  Objection.

THE WITNESS:  Yes.

BY MR. SKAKUN:

Q.   Okay. And I just want to make sure

31 (Pages 351 - 354)

Page 355

that we actually close this out because the question I then asked you was, "that's only true if the actual revenue synergies were less than what was expected at the time of the acquisition." Right?

MR. MANNINGHAM: Objection.

THE WITNESS: That might be true but it might not be true. It's possible that other adverse things happen where to -- to achieve the -- the market value to support the -- the goodwill there would then need to be even more revenue synergies to support that. So -- and because the goodwill impairment test my understanding is an overall value test, you know, it's not necessarily dependent just on goodwill relative to the expectations at the time the merger was completed.

BY MR. SKAKUN:

Q. So your testimony today is that even if the revenue synergies were in fact higher than expected at the time that goodwill was measured as a residual from the purchase price, because there could be external market effects that otherwise decreased the value of the

Page 356

acquired business, then more revenue synergies would be needed?

I'm not sure I understand your point or how it relates to the original proposition that you put forward here.

A. I was trying to answer your question, which is related to whether the amount of -- whether goodwill was impaired somehow is related to the amount of original -- originally expected revenue synergies at the time the merger was done. And could there somehow be a way that those aren't -- that there could be revenue synergies in excess that still might not support the goodwill. That was just an example I came up with.

Again, my statement in paragraph 68 is really just saying that my understanding is in this particular case that the value of Worldpay and the purchase price that was being paid for Worldpay, according to defendants, depended on the achievement of revenue synergies and therefore to the extent they didn't achieve those revenue synergies that could have an influence on goodwill. That's the only point I was making.

Page 357

Q. Right. And what I'm trying to make sure we're precise on is your references to "those revenue synergies."

Because the purchase price, as you say, that was being paid for Worldpay, and you say it was dependent on the achievement of revenue synergies, relates to a specific amount of revenue synergies from the time of the acquisition, correct?

A. Well, I think separately from the transaction price being offered, there was an estimate being put out in the market as to what revenue synergies would be?

Q. And that's what you connect to justifying the purchase pricing paid for Worldpay, right?

MR. MANNINGHAM: Objection.

THE WITNESS: Well, that's part of -- was part of the justification being provided by the company. And my -- again, the only point I'm making is that that under performance related -- relative to that impair the goodwill.

BY MR. SKAKUN:

Q. And what I'm trying to be precise of

Page 358

is your reference to "that," right? "That" is the estimate of revenue synergies put out at the time of the Worldpay transaction?

A. That's what I was making reference to.

Q. Thank you.

And you understand that the revenue synergy amounts in the revenue synergy statements were above, in many cases, the amount put out at the time of the Worldpay acquisition, correct?

MR. MANNINGHAM: Objection.

THE WITNESS: That's possible. I don't recall all the details of the specific statements and what -- how they related to the original expectations. I just didn't -- that wasn't the focus of my analysis.

BY MR. SKAKUN:

Q. And you don't know whether plaintiffs actually allege that the true revenue synergies amounts were lower than what was expected and stated at the time of the Worldpay acquisition, right?

MR. MANNINGHAM: Objection.

32 (Pages 355 - 358)

Page 359

THE WITNESS: Well, I understand their allegations to be that the revenue synergy statements overstated the revenue synergies and -- but I don't know by a specific amount that's being alleged.

BY MR. SKAKUN:

Q. And you don't even know which, if any, of the revenue synergy statements reported amounts that were greater or at the same amount as what was expected at the time of the Worldpay transaction a year or so before the class period started, right?

MR. MANNINGHAM: Objection.

THE WITNESS: That's not an analysis I've done.

MR. SKAKUN: Okay. Thank you. That's all I've got.

THE WITNESS: I wanted to, because you didn't explicitly ask me, mention that I, in my review preparing for this deposition noted two typos in the report that I just wanted to correct.

Paragraph 35 of my report, the last sentence says, "Dr. Skinner instead tries to dispute," and I meant to say

Page 360

"assert" instead of "dispute."

BY MR. SKAKUN:

Q. Ah, I remember reading that and figuring that was -- yep.

A. And then paragraph 43, about seven lines up from the bottom there's a sentence that starts "first."

Q. Got it.

A. Within that sentence, I make reference to "any given plaintiff." I meant to say "defendant" instead of "plaintiff."

Q. I see. Thank you.

A. That's it.

MR. MANNINGHAM: I'm guessing you don't have any follows up from that?

MR. SKAKUN: No.

MR. MANNINGHAM: We don't have anything. Thank you.

MR. SKAKUN: Before we go off the record, can we agree this transcript will not be designated confidential?

MR. MANNINGHAM: Yes, we're in agreement.

MR. SKAKUN: Thanks so much.

THE VIDEOGRAPHER: The time is now

Page 361

1:20 p.m. This is the end of Media 4. This concludes the deposition. We're off the record.

THE STENOGRAPHER: Mr. Manningham, do you need the transcript tomorrow as well?

MR. MANNINGHAM: Yes, please.

(Whereupon, the deposition of CHAD COFFMAN, CFA was concluded at 2:07 p.m.)

Page 362

STATE OF ILLINOIS  )
) SS:
COUNTY OF COOK    )

I, Janice M. Kocek, CSR, CLR, No. 084-002871, do hereby certify:

That the foregoing deposition of CHAD COFFMAN, CFA, was taken at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, were thereafter transcribed under my direction and supervision, and that the foregoing is a true record of same.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 12th day of July, 2025.

JANICE M. KOCEK, CSR, CLR
CSR NO. 084-002871

33 (Pages 359 - 362)