**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB<br><br>Honorable Timothy J. Corrigan<br><br>Honorable Patricia D. Barksdale |

**LEAD PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 2

I.     FACTUAL AND PROCEDURAL HISTORY ............................................. 2

II.    SETTLEMENT NEGOTIATIONS ............................................................ 5

III.   TERMS OF THE SETTLEMENT .............................................................. 5

MEMORANDUM OF LAW ................................................................................. 7

ARGUMENT ........................................................................................................ 7

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL ..................... 7

     A.    Standards Governing Approval of Class Action Settlements ................ 7

     B.    Approval of the Settlement is Likely Under Rule 23(e)(2) .................... 9

          1.    The Settlement Class Has Been Adequately Represented ........... 9

          2.    The Settlement Resulted from Good Faith, Arm's-Length Negotiations ........................................................................... 11

          3.    The Relief Provided by the Settlement Is Adequate ................. 12

               (a)    Many Challenges to Obtaining a Recovery Remained .... 12

               (b)    Effective Process for Distributing Relief to the Settlement Class ........................................................... 18

               (c)    Anticipated Legal Fees and Expenses ........................... 19

     C.    Settlement Class Members Are Treated Equitably .............................. 20

V.    PROPOSED NOTICE PROGRAM SHOULD BE APPROVED ................ 21

VI.   PRELIMINARY CERTIFICATION OF SETTLEMENT CLASS ............. 23

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
    406 U.S. 128 (1972) ..................................................................................24

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................. 23, 24

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..................................................................................24

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) ....................................................................9

*Borcea v. Carnival Corp.*,
    238 F.R.D. 664 (S.D. Fl. 2006) ................................................................24

*City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*,
    2024 WL 5468489 (S.D. Fla. Feb. 1, 2024) ..............................................9

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................. 15, 16

*Faught v. Am. Home Shield Corp.*,
    668 F.3d 1233 (11th Cir. 2012).................................................................20

*In re Flowers Food Sec. Litig.*,
    No. 16-cv-00222, slip op. (M.D. Ga. Dec. 11, 2019).............................20

*Gevaerts v. TD Bank, N.A.*,
    2015 WL 12533121 (S.D. Fla. Aug. 4, 2015).........................................22

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ..................................................................................13

*Gutter v. E.I. Dupont De Nemours & Co.*,
    2003 U.S. Dist. LEXIS 27238 (S.D. Fla. May 30, 2003) ......................12

*In re Health Ins. Innovations Sec. Litig.*,
    2020 WL 10486665 (M.D. Fla. Oct. 21, 2020) .......................................12

*In re HealthSouth Corp. Sec. Litig.*,
572 F.3d 854 (11th Cir. 2009) ..................................................................7

*In re Jan. 2021 Short Squeeze Trading Litig.*,
2023 WL 9035671 (S.D. Fla. Nov. 13, 2023) ...................................23

*Kukorinis v. Walmart, Inc.*,
2024 WL 3226772 (M.D. Fla. June 28, 2024) ................................11

*Lipuma v. Am. Express Co.*,
406 F. Supp. 2d 1298 (S.D. Fla. 2005) .......................................7, 8

*Lunsford v. Woodforest Nat'l Bank*,
2014 WL 12740375 (N.D. Ga. May 19, 2014) ................................11

*In re Miller Indus. Inc. Sec. Litig.*,
186 F.R.D. 680 (N.D. Ga. 1999) .....................................................23

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ........................................................................21

*Theodore v. Purecycle Techs., Inc., et al.*,
No. 21-cv-809, slip op. (M.D. Fla. Jun. 4, 2024) ...........................22

*Thorpe v. Walter Inv. Mgmt. Corp.*,
2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ................................17

*Turner v. Beneficial Corp.*,
242 F.3d 1023 (11th Cir. 2001) .......................................................23

*Turner v. Gen. Elec. Co.*,
2006 WL 2620275 (M.D. Fla. Sept. 13, 2006) ..................................7

*In re Wells Fargo Sec. Litig.*,
991 F. Supp. 1193 (N.D. Cal. 1998) ..................................................7

*Woznicki v. Raydon Corp.*,
2021 WL 7502541 (M.D. Fla. Aug. 25, 2021) ................................11

**Statutes**

15 U.S.C. § 78u-4(a)(4) ............................................................................20

15 U.S.C. § 78u-4(a)(7) ............................................................................22

**Rules**

Fed. R. Civ. P. 23 ................................................................................. 1, 8, 9

Fed. R. Civ. P. 23(a) .............................................................................. 23, 24

Fed. R. Civ. P. 23(b) .............................................................................. 23

Fed. R. Civ. P. 23(b)(3) ......................................................................... 24

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................... 21, 22

Fed. R. Civ. P. 23(e)(1) .......................................................................... 8, 22

Fed. R. Civ. P. 23(e)(1)(B) ..................................................................... 8

Fed. R. Civ. P. 23(e)(2) .......................................................................... 8, 9

Fed. R. Civ. P. 23(e)(2)(B) ..................................................................... 11

Fed. R. Civ. P. 23(e)(3) .......................................................................... 8

Fed. R. Civ. P. 23(f) ............................................................................... 14

Lead Plaintiffs Nebraska Investment Council ("NIC"), North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans ("Lead Plaintiffs"), on behalf of themselves and the proposed Settlement Class, hereby move this Court for entry of an order, pursuant to Rule 23 of the Federal Rules of Civil Procedure: (i) preliminarily approving the proposed class action Settlement; (ii) preliminarily certifying the Settlement Class, for purposes of the Settlement only; (iii) approving the form, content, and manner of providing notice to the Settlement Class; (iv) setting a hearing date to consider final approval of the Settlement, approval of the proposed Plan of Allocation for distributing the proceeds of the Settlement, and Lead Counsel's motion, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees and Litigation Expenses (the "Settlement Hearing"); (v) appointing Verita Global, LLC ("Verita") as the Claims Administrator; and (vi) granting such other and further relief as the Court may deem fair and proper.[1] Defendants do not oppose the relief requested in this motion. The motion is based on the incorporated Memorandum of Law and the Declaration of Michael P. Canty, dated December 19, 2025, with annexed exhibits, filed herewith. A proposed Preliminary Approval Order, which was negotiated by the Parties to the Settlement, is also submitted herewith.

---

[1] Capitalized terms used herein that are not defined have the same meanings as in the Stipulation and Agreement of Settlement (the "Stipulation"), dated December 17, 2025, which is filed as Exhibit 1 to the Canty Declaration.

## **PRELIMINARY STATEMENT**

If approved, the proposed Settlement will provide a recovery of $210,000,000 to the Settlement Class and resolve the claims in the Action against Defendants Fidelity National Information Services, Inc. ("FIS" or the "Company"), Gary Norcross, James Woodall, Stephanie Ferris,[2] and Thomas Warren (collectively, "Defendants"). The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement, filed herewith. If the Court grants preliminary approval, Lead Plaintiffs will provide notice of the Settlement to potential Settlement Class Members. The Settlement Hearing will then be conducted so that the Parties and Settlement Class Members may present arguments and evidence for (or against) the Settlement, and the Court can then make a final determination as to whether the Settlement is fair, reasonable, and adequate. The Court will also be asked to approve the proposed Plan of Allocation for distributing the proceeds of the Settlement and to consider Lead Counsel's Fee and Expense Application.

Lead Plaintiffs respectfully submit that the Settlement is an excellent result that should be preliminarily approved for the reasons stated herein.

## I.     **FACTUAL AND PROCEDURAL HISTORY**

FIS provides technology solutions and services for banks and other financial institutions. *See* Consolidated Amended Class Action Complaint for Violations of

---

[2] Pursuant to the terms of the Settlement, Lead Plaintiffs filed a stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), voluntarily dismissing Defendant Stephanie Ferris from the Action without prejudice. ECF No. 119.

Federal Securities Laws, dated August 2, 2023 (ECF No. 46) ("Complaint"), ¶54. On March 18, 2019, FIS announced that it was acquiring Worldpay, a merchant payment processing company, for $48 billion. *Id.* ¶¶57-59. As alleged in the Complaint, Defendants told investors that the acquisition would deliver significant revenue synergies, which they claimed would "come primarily from cross-selling to merchants and financial institutions globally." *Id.* ¶¶62-63. However, the Complaint alleges that Defendants failed to successfully integrate Worldpay into FIS's legacy operations, causing Worldpay's performance to decline after the acquisition. *Id.* ¶¶72-74, 87-92. The Complaint further alleges that the price of FIS common stock was artificially inflated as a result of the allegedly false or misleading statements or omissions, and declined when the truth was allegedly revealed through a series of partial corrective disclosures.

Lead Plaintiffs filed the operative Complaint on August 2, 2023, asserting claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. ECF No. 46. The Complaint was based on Lead Counsel's extensive factual investigation, which included the review and analysis of: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, news articles, and other public statements issued by or concerning the Company and Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; and (v) the applicable law governing the claims and potential defenses. Lead Counsel contacted or attempted to

3

contact approximately 700 former FIS employees and other persons with relevant knowledge and interviewed 87 of them (eleven of whom provided information that was used for confidential witness allegations in the Complaint), and consulted with experts on loss causation and damages issues, economics, accounting, and revenue synergies.

Defendants filed a motion to dismiss the Complaint on September 22, 2023. ECF No. 55. On November 13, 2023, Lead Plaintiffs filed their opposition (ECF No. 57), and on December 19, 2023, Defendants filed their reply (ECF No. 58). On September 30, 2024, the Court denied the motion to dismiss. ECF No. 60.

Discovery commenced shortly thereafter. On November 27, 2024, Lead Plaintiffs served their first set of requests for the production of documents and interrogatories, and on December 6, 2024, the Parties exchanged Rule 26(a)(1) initial disclosures. In furtherance of discovery, Lead Plaintiffs, Defendants, and third parties have collectively produced approximately 852,000 documents (approximately 3,750,000 pages). The Parties took or defended a total of 13 depositions in connection with fact and class discovery. Lead Plaintiffs were preparing to take 22 more depositions when the Action settled. Lead Plaintiffs defended the depositions of representatives from both NIC and North Carolina, as well as Lead Plaintiffs' expert at class certification, Mr. Chad Coffman, on two separate occasions. Lead Plaintiffs also deposed Defendants' class certification expert, Dr. Douglas Skinner.

Lead Plaintiffs filed a motion for class certification on March 3, 2025. ECF No. 75. Defendants filed their opposition on May 2, 2025 (ECF No. 88), and on July

15, 2025, Lead Plaintiffs filed their reply (ECF No. 97). On August 15, 2025, Defendants filed a sur-reply in opposition. ECF No. 108. The motion was pending when the Parties agreed to settle.

## II.    SETTLEMENT NEGOTIATIONS

Pursuant to Court order (ECF No. 83), the Parties agreed to participate in a mediation with the Honorable Layn R. Phillips (Ret.) of Phillips ADR Enterprises (the "Mediator"). On October 7, 2025, Lead Counsel and Defendants' Counsel, among others, participated in a full-day, in-person mediation session before the Mediator in New York City. In advance of the session, the Parties submitted detailed mediation statements to the Mediator, together with numerous supporting exhibits, addressing both liability and alleged damages. The session ended without any settlement being reached; however, the Parties continued discussions with the Mediator following the mediation to further explore the possibility of a settlement.

On November 14, 2025, the Parties accepted the Mediator's proposal to settle the Action, subject to the execution of a term sheet and settlement stipulation. The Term Sheet was executed by the Parties on November 17, 2025, and the Stipulation was executed on December 17, 2025.

## III.   TERMS OF THE SETTLEMENT

Pursuant to the Settlement, FIS has agreed to pay, or cause the payment by its insurers of, $210 million in cash into the Escrow Account. *See* Stipulation at ¶ 7. The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees and Litigation Expenses, Notice and Administration Expenses,

Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Settlement Class Members who submit timely and valid claims, in accordance with a plan of allocation approved by the Court. *Id.* at ¶¶ 10-11, 25-30. The Settlement is not a "claims-made" settlement and there is no reversion to Defendants if the Settlement reaches its Effective Date. *Id.* at ¶ 14.

In exchange for the payment of the Settlement Amount, upon the Effective Date of the Settlement, Lead Plaintiffs and each and every other Settlement Class Member will release and dismiss the "Released Plaintiffs' Claims" against the "Released Defendant Parties." *See* Stipulation at ¶¶ 1(ff), 1(jj), 5. The definition of Released Plaintiffs' Claims has been tailored to provide Defendants and the other Released Defendant Parties with "complete peace," while being limited to claims that were raised, or could have been raised, arising out of or relating to both the allegations and matters in the Action and transactions in FIS common stock during the Class Period. *See* Stipulation at ¶ 1(jj).[3] The Settlement does not release related derivative cases.

After approval of the Settlement and the Plan of Allocation, the Claims Administrator will process all claims received and will calculate their value according to the Plan of Allocation. At the completion of the administration, the Claims Administrator will distribute the Net Settlement Fund to eligible Claimants and will

---

[3] Defendants are also releasing any claims that they could have asserted against any of the Released Plaintiff Parties arising out of the institution, prosecution, or settlement of the claims in the Action. *See* Stipulation at ¶¶ 1(gg), 6.

continue to do so as long as it is economically feasible. *Id.* at ¶¶ 25-30. Once no

further distributions can be made, as discussed below, Lead Plaintiffs propose to

donate the unclaimed balance to the Council of Institutional Investors ("CII"), a

non-profit, non-sectarian 501(c) organization, or such other organization approved

by the Court.[4]

## MEMORANDUM OF LAW

## ARGUMENT

## IV.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.    Standards Governing Approval of Class Action Settlements

As a matter of public policy, settlement is strongly favored for resolving

disputes, especially in class actions. *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572

F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors pretrial settlement of

class action lawsuits."); *Turner v. Gen. Elec. Co.*, 2006 WL 2620275, at *2 (M.D. Fla.

Sept. 13, 2006) ("Settlements of complex cases contribute greatly to the efficient

utilization of scarce judicial resources, and achieve the speedy resolution of

justice."). "[T]here exists an overriding public interest in favor of settlement,

particularly in class actions that have the well-deserved reputation as being most

---

[4] CII is a non-profit, non-partisan association of U.S. public, corporate, and union benefit funds, state and local entities charged with investing public assets, foundations, and endowments that seeks to educate its members, policymakers, and the public about corporate governance, shareowner rights, and investment issues. *See* www. https://www.cii.org/about. It has been approved as a *cy pres* recipient in numerous securities class actions. *See, e.g., Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. 16-cv-02942, ECF No. 346 (C.D. Cal. Mar. 13, 2023); *In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1198 (N.D. Cal. 1998).

complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005).[5]

Rule 23 requires court approval for any class action settlement. A court's review of a class action settlement is a two-step process. First, the court performs a review of the terms of the proposed settlement to determine whether notice should be sent to the class. *See* Rule 23(e)(1). Second, after notice and a hearing, the Court determines whether to grant final approval of the settlement. *See* Rule 23(e)(2). A court may grant preliminary approval of a settlement upon a finding that it "***will likely be able to***" approve the settlement as fair, reasonable, and adequate at the final hearing and certify the class. *See* Rule 23(e)(1)(B).

Rule 23(e)(2) provides that in determining whether a settlement is fair, adequate, and reasonable, a court should consider whether:

    a.    the class representatives and class counsel have adequately represented the class;

    b.    the proposal was negotiated at arm's length;

    c.    the relief provided for the class is adequate, taking into account:

        i.    the costs, risks, and delay of trial and appeal;

        ii.    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        iii.    the terms of any proposed award of attorney's fees, including timing of payment; and

        iv.    any agreement required to be identified under Rule 23(e)(3)[6]; and

---

[5] All internal quotations and citations are omitted unless otherwise noted.

[6] Here, the only agreements of the Parties in connection with the Settlement are the Term Sheet, the Stipulation, and a confidential Supplemental Agreement Regarding Requests for Exclusion, dated December 17, 2025, concerning the circumstances under which FIS may terminate the Settlement based upon the exclusion requests received. It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to request exclusion, at the expense of the class. The Supplemental Agreement can be provided to the

*(Footnote continued on next page…)*

8

d.      the proposal treats class members equitably relative to each other.

Rule 23, as amended in December 2018, has not changed the crux for approving a proposed class settlement, *i.e.,* evaluating whether it is fair, adequate, and reasonable.[7] Applying the standards set forth above, it is respectfully submitted that the Settlement should be preliminarily approved and notice of the Settlement be provided to the Settlement Class.

## B.      Approval of the Settlement is Likely Under Rule 23(e)(2)

### 1.      The Settlement Class Has Been Adequately Represented

Lead Plaintiffs have vigorously litigated the claims in the Action, and the Settlement was achieved only after diligent, arm's-length, and mediated negotiations between counsel with considerable knowledge and expertise in the field of federal securities law. Lead Plaintiffs and Lead Counsel developed a deep understanding of the facts of the case and merits of the claims by, *inter alia*: (i) conducting an extensive investigation; (ii) drafting a detailed consolidated amended complaint; (iii) defeating an extensive motion to dismiss; (iv) moving for class certification; (v) researching, drafting, propounding, and responding to several discovery requests; (v) reviewing

---

Court *in camera* or under seal.

[7] At final approval, the Court may also consider factors set forth by the Eleventh Circuit, which substantially overlap the Rule 23(e)(2) factors. *See City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*, No. 9:22-CV-80418, 2024 WL 5468489, at *3 (S.D. Fla. Feb. 1, 2024) ("Given that the *Bennet* and the Rule 23(e)(2) factors overlap significantly, I consider them together."). The Eleventh Circuit factors include consideration of: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the anticipated complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

thousands of documents produced by Defendants and third parties; (vi) taking or defending a total of 13 depositions, including taking eight depositions in connection with fact discovery; (vii) consulting with experts in the fields of accounting, revenue synergies, damages, and loss causation; and (viii) exchanging extensive mediation briefing and participating in a mediation.

Lead Plaintiffs are sophisticated institutional investors and played a crucial role in the litigation as they have, among other things, reviewed and monitored the progress of the litigation and regularly conferred with Lead Counsel concerning its prosecution; reviewed periodic updates and other correspondence from Lead Counsel, including significant pleadings, briefs, and court orders; and responded to and produced documents pursuant to the discovery demands propounded by Defendants. Moreover, representatives from both NIC and North Carolina attended the full-day mediation on October 7, 2025 and played significant roles in the negotiations to achieve a settlement. With an informed understanding, Lead Plaintiffs agreed to the Settlement.

Lead Plaintiffs have had the benefit of the advice of knowledgeable counsel well-versed in securities class actions. Lead Counsel Labaton is highly experienced and has a long and successful track record in such cases. *See* Ex. 2 (firm resume). Labaton has served as lead counsel in a number of high-profile and successful matters. *See, e.g.*, *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-cv-08141 (S.D.N.Y.) (securing $1 billion recovery); *In re Dell Techs. Inc. Class V S'holders Litig.*, Consol. C.A. No. 2018-0816-JTL (Del. Ch.) (securing $1 billion shareholder settlement); *In re*

*HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (securing settlements of more than $600 million). Courts give considerable weight to the opinion of experienced and informed counsel. *See, e.g.*, *See Lunsford v. Woodforest Nat'l Bank,* 2014 WL 12740375, at *9 (N.D. Ga. May 19, 2014) ("The Court should give 'great weight to the recommendation of counsel for the parties, given their considerable experience in this type of litigation.'").

### 2. The Settlement Resulted from Good Faith, Arm's-Length Negotiations

Rule 23(e)(2)(B) asks whether "the [settlement] proposal was negotiated at arm's length." Courts recognize the importance of arm's-length negotiations. *See e.g., Woznicki v. Raydon Corp.*, 2021 WL 7502541, at *5 (M.D. Fla. Aug. 25, 2021), *report and recommendation adopted*, 2021 WL 7502549 (M.D. Fla. Oct. 26, 2021) ("The previous dealings between the parties and attorneys, including mediating with a retired magistrate judge, support the conclusion that the Agreement was negotiated at arm's length."). Additionally, courts consider whether the settlement negotiations were facilitated by a well-respected and experienced mediator. *See Kukorinis v. Walmart, Inc.,* 2024 WL 3226772, at *5 (M.D. Fla. June 28, 2024) (approving settlement and noting that the settlement agreement resulted from "arm's-length negotiations" between experienced counsel and with the assistance of a neutral and experienced mediator). Here, the Settlement was achieved only after a full-day mediation session, overseen by Judge Layn Phillips (Ret.). During the mediation, the Parties vigorously asserted arguments concerning liability and damages. With Lead

Plaintiffs and Defendants still meaningfully apart in their respective positions after the mediation, they agreed to continue negotiations through the Mediator. On November 14, 2025, the Parties agreed to resolve the Action and thereafter executed a Term Sheet, subject to the negotiation of non-financial terms for the Settlement and Court approval.

### 3.    The Relief Provided by the Settlement Is Adequate

### (a)    Many Challenges to Obtaining a Recovery Remained

Although Lead Plaintiffs and Lead Counsel believe that the claims asserted are strong, they recognize the significant challenges and risks they would face moving forward, as well as the expense and length of continued litigation through summary judgment motions, trial, and likely appeals.

While Lead Plaintiffs are confident in their claims, further litigation—including further proceedings regarding the pending class certification motion, summary judgment, and trial—presents clear risks. *See Gutter v. E.I. Dupont De Nemours & Co.*, 2003 U.S. Dist. LEXIS 27238, at *5 (S.D. Fla. May 30, 2003) ("[T]he risks associated with proceeding to trial in . . . complex securities litigation, particularly the risks associated with establishing materiality, causation and damages favor approval of the [s]ettlement."); *In re Health Ins. Innovations Sec. Litig.*, 2020 WL 10486665, at *8 (M.D. Fla. Oct. 21, 2020), *report and recommendation adopted*, 2020 WL 10486666 (M.D. Fla. Nov. 19, 2020) ("despite Lead Plaintiff's confidence regarding the ultimate outcome, there is an inherent risk in any litigation but particularly so in securities class action litigation").

**Risks to Obtaining Class Certification.** Most immediately, Lead Plaintiffs faced the prospect of losing a substantial amount of recoverable damages if Defendants were successful in limiting the Class Period at class certification. Specifically, in their opposition to Lead Plaintiffs' class certification motion, Defendants argued that Lead Plaintiffs' theory of liability was too broad and they attempted to limit the case to just Lead Plaintiffs' goodwill theory. To support their position, Defendants argued that the Court must perform a "mismatch" analysis under *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021). According to Defendants, the alleged misstatements about revenue synergies, Worldpay, and market share did not "match" any of the back-end corrective disclosures and, thus, the Court should not certify the Class Period alleged by Lead Plaintiffs. Additionally, Defendants argued that the alleged misstatements about goodwill (which did not start until November 4, 2021) did not "match" the first or second of the three alleged corrective disclosures and, therefore, at most only the goodwill statements could support an inference of price impact and only as to the last alleged corrective disclosure (*i.e.*, the corrective disclosure on February 13, 2023). If Defendants were successful, the class's claimed damages would have been reduced by over 85 percent.

Although Lead Plaintiffs believe that Defendants' arguments are without merit and ultimately would have been rejected by the Court, they nonetheless recognize that there was a risk of the Court agreeing with Defendants, in whole or in part, which would have drastically reduced the potential recovery for the class. Even if the

13

Court had rejected Defendants' argument, it is possible that Defendants would have filed a Rule 23(f) appeal, or continued to press this issue at summary judgment or trial.

**Risks Regarding Falsity and Scienter.** Lead Plaintiffs also faced significant challenges with respect to proving that the alleged misstatements were materially false or misleading. Defendants have strenuously argued that Lead Plaintiffs will not be able to prove that the alleged misstatements—*i.e.*, Defendants' statements allegedly touting revenue synergies or certifying that goodwill was not impaired— were false or misleading when made. For example, with respect to the revenue synergy statements, Defendants would have asserted that the statements were true and accurate when made. To support this, Defendants would have presented evidence that they had an internal system of checks and balances to validate every revenue synergy the Company publicly reported. Defendants would have presented further evidence that the revenue synergies were also approved by an independent validator, PwC. Using this and other evidence, Defendants would have argued that the revenue synergies were accurate and Lead Plaintiffs' view about how the revenue synergies were defined did not equate to securities fraud.

Similarly, Defendants would have asserted that the goodwill statements were not actionably false or misleading because they were highly subjective opinion statements based on reasonable accounting judgments. To support this argument, Defendants would continue to argue that the Company's Technical Accounting team evaluated potential triggering events and reasonably concluded that goodwill was not

impaired. Defendants would also point to the fact that FIS's independent auditor, KPMG, contemporaneously analyzed relevant information and agreed, in writing, with every relevant accounting judgment that Defendants made during the Class Period. Defendants also would have argued that they did not act intentionally or recklessly (*i.e.*, with scienter). Like with falsity, Defendants would argue that they did not act with scienter because the Individual Defendants reasonably relied on a robust internal and external validation process for revenue synergies and goodwill. For example, with respect to the revenue synergies, Defendants would have argued that every statement was supported by the Company's and PwC's synergy validation work—which negates any inference of an intent to defraud. Similarly, for the goodwill statements, Defendants would have argued that every Individual Defendant who made the challenged goodwill statements, and every member of the Technical Accounting team, genuinely believed the goodwill statements were accurate and based on reasonable accounting judgments. Indeed, at trial, it is likely that PwC and KPMG would stand by the Company's revenue synergy reporting and goodwill accounting judgments during the Class Period, which would have presented significant obstacles to convincing a jury that the Individual Defendants acted with an intent to defraud.

**Risks Regarding Loss Causation and Damages.** Lead Plaintiffs also faced considerable challenges in establishing loss causation and damages, particularly with respect to the alleged misstatements about revenue synergies or Worldpay. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear burden of proving

15

"that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"). Had the case continued, Defendants would have asserted, as they did at the class certification stage, that the alleged corrective disclosures did not reveal any alleged truth about revenue synergies or Worldpay. Defendants would also argue that Lead Plaintiffs would be unable to "disaggregate" the effect of information unrelated to the alleged fraud that the market learned at the time of the alleged corrective disclosures. For example, Defendants would argue that on the first two alleged corrective disclosure dates, August 4 and November 3, 2022, the Company also announced reductions in guidance, which had nothing to do with the alleged misstatements or omissions. Acceptance of any such arguments by the Court or a jury, in whole or part, would have dramatically limited any potential recovery for the class.

More specifically, if Lead Plaintiffs' claims survived class certification and summary judgment completely intact, and liability and damages were found 100% supported at trial, then maximum aggregate damages were estimated by Lead Plaintiffs' consulting damages expert at approximately $10.5 billion. However, this outcome was far from likely or the most reasonable damages outcome to assess, given Lead Plaintiffs' view that the evidence developed in discovery provided much stronger support for the class's claims late in the Class Period compared to earlier claims.

Analyses more aligned with the evidence and strengths of the case show different results, and represent a better comparator for evaluating the Settlement. For

16

example, if Defendants prevailed in showing that the revenue synergy statements and Worldpay statements made early in the Class Period did not "match" any of the corrective disclosures, or that the corrective disclosures did not reveal anything about the falsity of these statements, the Class Period would start on November 4, 2021, the date of the first goodwill statement that is alleged to have been false or misleading. In this scenario, estimated aggregate damages would drop to approximately $5.9 billion. Moreover, Defendants have also argued that the goodwill statements do not "match" the August 4, 2022 and November 3, 2022 corrective disclosures, and thus, the case should be limited to just the goodwill statements (starting the Class Period on November 4, 2021) and the final corrective disclosure (February 13, 2023). In this scenario, estimated aggregate damages would be approximately $1.8 billion.

Under these more realistic scenarios, the $210 million Settlement represents approximately 3.6% to 11.7% of estimated damages. These percentages are in line with other court-approved securities settlements. *See, e.g.*, *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class action settlement representing "10% of the most likely damages" as an "excellent" recovery). Additionally, the $210 million Settlement is fifteen times greater than the median reported recovery in securities class actions in 2024, which was $14 million. *See* Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements* – 2024 Review and Analysis at 4 (Cornerstone 2025), Canty Decl., Exhibit 3.

In addition to the substantial risks and uncertainty inherent in continued

litigation, further litigation of the Action would also have been expensive and time consuming for both sides. The fact that the Settlement eliminates this delay and expense, along with the risks and uncertainty discussed above, strongly favors preliminary approval.

### (b)    Effective Process for Distributing Relief to the Settlement Class

At the final Settlement Hearing, Lead Plaintiffs will ask the Court to approve the Plan of Allocation for distributing the proceeds of the Settlement to eligible Claimants. The proposed Plan of Allocation, which is reported in full in the Notice, was drafted with the assistance of Lead Plaintiffs' consulting damages expert and is consistent with the measure of damages under Section 10(b). *See* Notice at ¶¶ 52-72. The Plan provides for the calculation of a "Recognized Loss Amount" for each purchase of a share of eligible FIS publicly traded common stock that is listed in the Claim Form and for which adequate documentation is provided.

The Claims Administrator will calculate Claimants' Recognized Claims using the transactional information submitted in their Claim Forms, which can be mailed to the Claims Administrator, submitted online using the Settlement website, or, for large investors with hundreds of transactions, submitted via e-mail to the Claims Administrator's electronic filing team. Because most securities are held in "street name" by the brokers that buy them on behalf of clients, the Claims Administrator, Lead Counsel, and Defendants do not have Settlement Class Members' transactional data, and a claims process is required. Because the Settlement does not recover 100%

of alleged damages, the Claims Administrator will determine each Authorized
Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized
Claimant's total "Recognized Claim" compared to the aggregate Recognized Claims
of all Authorized Claimants.

Once the Claims Administrator has processed all submitted claims, notified
Claimants of deficiencies or ineligibility, processed responses, and made claim
determinations, distributions will be made to Authorized Claimants in the form of
checks and wire transfers. After an initial distribution of the Net Settlement Fund, if
there is any balance remaining in the Net Settlement Fund (whether by reason of tax
refunds, uncashed checks or otherwise), then, after the Claims Administrator has
made reasonable and diligent efforts to have Class Members cash their distributions,
any balance remaining in the Net Settlement Fund at least six (6) months after the
initial distribution will be re-distributed in an economical manner to Class Members
who have cashed their initial distributions, after payment of any unpaid costs or fees
incurred in administering the Net Settlement Fund for such re-distribution and
Taxes. Any balance that still remains in the Net Settlement Fund after re-
distribution(s), which is not feasible or economical to reallocate, will be contributed
to CII, or such other *cy pres* recipient approved by the Court. *See* Stipulation at ¶ 30.

### (c)    Anticipated Legal Fees and Expenses

In connection with seeking final approval of the Settlement, Lead Counsel will
move, on behalf of itself and other Plaintiffs' Counsel, for an award of attorneys' fees
under the "common fund" doctrine of no more than 22% of the Settlement Fund and

for Litigation Expenses of no more than $1,300,000, plus accrued interest. The expense request may include an application, pursuant to the PSLRA, for Lead Plaintiffs' reasonable costs and expenses (including lost wages resulting from time spent fulfilling their duties as lead plaintiffs) directly related to their representation of the Settlement Class. The PSLRA provides that such an award may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). The amount of the Fee and Expense Application is not the subject of any agreement between Defendants and Lead Plaintiffs. *See* Stipulation at ¶ 16-17.

An attorneys' fee of up to 22% of the Settlement Fund is an amount well-within percentages that courts in the Eleventh Circuit have approved in class actions. *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2012) ("25% is generally recognized as a reasonable fee award in common fund cases); *In re Flowers Food Sec. Litig.*, No. 16-cv-00222, slip op. at 2  (M.D. Ga. Dec. 11, 2019) (ECF No. 151) (awarding 33 1/3% of $21 million settlement). The factual support for Lead Counsel's fee and expense request will be detailed in its upcoming motion requesting fees and expenses.

### C.    Settlement Class Members Are Treated Equitably

The Settlement does not improperly grant preferential treatment to Lead Plaintiffs or any segment of the Settlement Class. Rather, all Settlement Class Members, including Lead Plaintiffs, will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court. All Settlement Class Members that were allegedly harmed as a result of the alleged

20

violations, and that submit an eligible claim, will receive their *pro rata* share of the Net Settlement Fund based on their "Recognized Claim" under the plan. *See generally* Notice at ¶¶ 52-72.

## V.    PROPOSED NOTICE PROGRAM SHOULD BE APPROVED

Rule 23(c)(2)(B) requires notice of a settlement of a class action to be "the best notice that is practicable under the circumstances." It must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).

Lead Counsel proposes to provide Settlement Class Members notice by: (i) individual mailing of the Postcard Notice to all Settlement Class Members who can be identified and located, using reasonably available shareholder lists from FIS's transfer agent, as well as information provided by third party banks, brokers, and other nominees about their customers; (ii) emailing of the Postcard Notice (to the extent emails are provided to the Claims Administrator); (iii) publication of the Summary Notice in *Investor's Business Daily,* as well as dissemination of the Summary Notice on the internet using *PR Newswire*; and (iv) posting documents on the Settlement website, from which copies of the Notice and Claim Form can be downloaded and claims can be completed using an online portal. *See* Exhibits A-1 to A-4 to the proposed Preliminary Approval Order. The Claims Administrator will also mail the Notice and Claim Form upon request. The Postcard Notice will provide important information regarding the Settlement and the rights of Settlement

Class Members, and will direct recipients to the website. Numerous courts have approved similar notice programs. *See, e.g., Gevaerts v. TD Bank, N.A.*, 2015 WL 12533121, at *10 (S.D. Fla. Aug. 4, 2015) (approving notice plan that required: direct mail postcard notice, publication notice, and a long form notice to published on settlement website); *Theodore v. Purecycle Technologies, Inc., et al.*, No. 21-cv-809 (M.D. Fla. Jun. 4, 2024), ECF No. 204 at 4-7 (approving notice program with summary notice and postcard notice).

The proposed notices are written in plain language and provide the relevant information and answers to most questions that Settlement Class Members will have. Consistent with Rules 23(c)(2)(B) and 23(e)(1), the forms of notice collectively describe, among other things, the nature of the Action; the definition of the Settlement Class; the terms of the Settlement; the maximum attorneys' fees and expenses that may be sought; the procedure for objecting or seeking exclusion; the procedures for submitting claims; the proposed Plan of Allocation; and the date and place of the Settlement Hearing. The long-form Notice also satisfies the PSLRA's separate disclosure requirements. *See* 15 U.S.C. § 78u-4(a)(7).

In connection with preliminary approval, the Court must set a Settlement Hearing date, and approve a schedule for mailing the notices, publication of the Summary Notice, requesting exclusion from the Settlement Class, objecting, filing motions in support of final approval and attorneys' fees and expenses, and submission of Claim Forms. Lead Plaintiffs propose the schedule attached in the annexed Addendum.

Lead Plaintiffs also request that the Court appoint Verita Global, LLC as the Claims Administrator to provide all notices approved by the Court, to process Claim Forms, and to administer the Settlement. Verita is a recognized leader in legal administration services. *See* Ex. 4. Lead Counsel selected Verita after a competitive bidding process.

## VI.    PRELIMINARY CERTIFICATION OF SETTLEMENT CLASS

As part of the Settlement, Lead Plaintiffs respectfully request that the Court preliminarily certify the proposed Settlement Class, as defined in ¶1(mm) of the Stipulation. The Parties have further stipulated to the appointment of Lead Plaintiffs as class representatives for the Settlement Class and Labaton as class counsel for the Settlement Class.

Courts have acknowledged the propriety of certifying a class solely for purposes of a class action settlement. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Within the Eleventh Circuit, there is an "inclination to certify classes in securities-fraud cases." *In re Miller Indus. Inc. Sec. Litig.*, 186 F.R.D. 680, 687 (N.D. Ga. 1999). That is because "securities class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damages suits." *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *8 (S.D. Fla. Nov. 13, 2023).

A settlement class, like other certified classes, must satisfy the requirements of Rule 23(a) and (b). *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1025 (11th Cir. 2001);

*Borcea v. Carnival Corp.*, 238 F.R.D. 664, 676-77 (S.D. Fl. 2006). However, the manageability concerns of Rule 23(b)(3) are not at issue for a settlement class. *See Amchem Prods.*, 521 U.S. at 593 ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested."). In the interest of brevity, the Court is respectfully referred to Lead Plaintiffs' previously filed motion for class certification for a complete recitation of the arguments supporting class certification. *See* ECF No. 75. In summary, pursuant to Rule 23(a): (i) the Settlement Class is so numerous that joinder of all members would be impracticable (ECF No. 75 at 10-11); (ii) there are questions of law or fact common to the Settlement Class (*id.* at 11-12); (iii) the claims or defenses of Lead Plaintiffs are typical of the claims or defenses of the Settlement Class (*id.* at 12-13); and (iv) Lead Plaintiffs and Lead Counsel will fairly and adequately protect the interests of the Settlement Class (*id.* at 13-15).

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Lead Plaintiffs submit that the proposed Settlement Class meets this standard: (i) common questions of both fact and law predominate, given the presumptions of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) or *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) (ECF No. 75 at 16-22); and (ii) a class action would be superior to other methods for the fair and efficient adjudication of the claims (*id.* at 23-24).

24

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court preliminarily certify the Settlement Class for purposes of the proposed Settlement.

## CONCLUSION

For all of the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant the Motion and enter the proposed Preliminary Approval Order negotiated by the Parties, filed herewith.

Dated: December 19, 2025          Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com

*Lead Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

**GRAYROBINSON, P.A.**
John A. Boudet (FL Bar No. 515670)
301 East Pine Street
Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
john.boudet@gray-robinson.com

25

*Liaison Counsel for Lead Plaintiffs Nebraska
Investment Council, North Carolina Retirement
Systems, and North Carolina Supplemental
Retirement Plans*

## ADDENDUM

Lead Plaintiffs respectfully propose the following schedule for Settlement-related events, each of which is reflected in the proposed Preliminary Approval Order.

| | |
|---|---|
| Deadline for commencing mailing of Postcards | *10 business days after entry of the Preliminary Approval Order (the "Notice Date")* |
| Deadline for publication and transmission of Summary Notice | *Within 14 calendar days of the Notice Date* |
| Deadline for filing motions in support of the Settlement, the Plan of Allocation, and Lead Counsel's Fee and Expense Request | *No later than 35 calendar days before the Settlement Hearing* |
| Deadline for filing reply papers in further support of Lead Plaintiffs and Lead Counsel's motions | *No later than 7 calendar days before the Settlement Hearing* |
| Deadline for submission of Claim Forms | *Postmarked or received no later than 10 calendar days before the Settlement Hearing* |
| Settlement Hearing | *At the Court's convenience, approximately 90 calendar days after entry of the Preliminary Approval Order* |

## <u>LOCAL RULE 3.01(G) CERTIFICATE</u>

I HEREBY CERTIFY that I have conferred with counsel for defendants in this action and they do not oppose the relief requested by this motion.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 19, 2025.


<u>/s/ Michael P. Canty</u>
Michael P. Canty

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 19, 2025, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 19, 2025.


_/s/ Michael P. Canty_
Michael P. Canty