IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


IN RE:  FIDELITY NATIONAL       Jacksonville, Florida
INFORMATION SERVICES, INC.
SECURITIES LITIGATION           Case No. 3:23-cv-252-TJC-PDB

                                February 12, 2026

                                11:03 a.m. to 12:12 p.m.

_____ Courtroom 10D



MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
SENIOR UNITED STATES DISTRICT JUDGE



COURT REPORTER:

        Heather Randall, RPR
        221 North Hogan Street, #185
        Jacksonville, Florida 32202
        Telephone:  (904) 549-1307
        randall4817@yahoo.com

        (Proceedings recorded by mechanical stenography; transcript
                                            produced by computer.)

A P P E A R A N C E S


FOR PLAINTIFFS NEBRASKA INVESTMENT COUNCIL, NORTH CAROLINA RETIREMENT SYSTEMS, AND NORTH CAROLINA SUPPLEMENTAL RETIREMENT PLANS:

        MICHAEL CANTY, ESQUIRE
        JAMES CHRISTIE, ESQUIRE
        NICOLE ZEISS, ESQUIRE
                Labaton Keller Sucharow, LLP
                140 Broadway
                New York, New York 1005

        JOHN BOUDET, ESQUIRE
                GrayRobinson, PA
                301 East Pine Street
                Suite 1400
                Orlando, Florida 32801



FOR THE DEFENDANT FIDELITY NATIONAL INFORMATION SERVICES, INC.:

        CAROLINE WONG, ESQUIRE
        JOHN SKAKUM, ESQUIRE
                Sidley Austin, LLP
                One South Dearborn
                Chicago, Illinois 60603

        ERIC BILIK, ESQUIRE
        KIMBERLY MYDOCK, ESQUIRE
                McGuireWoods, LLP
                50 North Laura Street
                Suite 3300
                Jacksonville, Florida 32202

DEBBIE SEGERS, ESQUIRE
                Vice President and Senior Deputy General Counsel of
                Fidelity National Information Services, Inc.

P R O C E E D I N G S

February 12, 2026                                    11:03 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session, the Honorable Timothy J. Corrigan presiding.

Please be seated.

THE COURT:  Good morning.  This is In Re:  Fidelity National Information Services, Inc., Securities Litigation.  That's Case No. 3:23-cv-252.

Starting with the plaintiff, I'll take appearances, please.

MR. CANTY:  Good morning, Your Honor.  On behalf of the proposed settlement class, Michael Canty from Labaton Keller Sucharow, and I'm joined by my colleagues who will put their appearances on the record as well.

MS. ZEISS:  Good morning, Your Honor.  Nicole Zeiss also from Labaton.

MR. CHRISTIE:  Good morning, Your Honor.  James Christie from Labaton Keller Sucharow.

MR. BOUDET:  Good morning, Your Honor.  John Boudet of GrayRobinson, local counsel for plaintiffs.

THE COURT:  Thank you.

MR. CANTY:  Thank you, Your Honor.

MR. BILIK:  Good morning, Your Honor.  Eric Bilik

from McGuireWoods for Fidelity National Information Services, Inc.  And with me to my left is Debbie Segers.  She's the senior vice president and senior deputy general counsel.  To my right is John Skakum with Sidley along with Caroline Wong from Sidley.  And last, but not least, is Kimberly Mydock from McGuireWoods.

THE COURT:  Very good.  Sometimes I'll ask local counsel to introduce their cocounsel, and I've had embarrassing moments when they can't remember their names.

MR. BILIK:  I practiced, Your Honor.

THE COURT:  All right.  Well, we're here today on an Unopposed Motion for Preliminary Approval of a Class Action Settlement.  Typically unopposed motions are granted without much to do, but, of course, an unopposed motion to -- for preliminary approval of a $210,000,000 class action probably needs a little attention.

In preparation I've read the Lead Plaintiffs' Unopposed Motion for Preliminary Approval, Doc 120.  There's a bunch of attachments to it, all -- they're all numbered 120-something, and I've read all of those.  And I went back and looked at some of the moving papers and the things that we had done previously.

I'm trying to recall -- I did not look at this, and I meant to.  Have we had a substantive hearing in this case, or is this our first substantive meeting?  Did we do everything

else on the papers or did we have a --

MR. CANTY:  Your Honor, we appeared, I believe, by Zoom at the beginning of this case on the motion to dismiss.

THE COURT:  Okay.  All right.  I thought you looked familiar, but I couldn't. . .

MS. WONG:  Your Honor, if I may?  I think we might have had an appearance on lead counsel's motion -- or motion for appointment of lead counsel, lead plaintiffs.  I don't think that we had a hearing on the motion to dismiss.

MR. CANTY:  Thank you, Counsel.

That is correct, Your Honor.  I apologize.  It was on appointment of lead counsel.

THE COURT:  Okay.  But I did -- in September of '24 I denied the motion to dismiss.  It looks like we did have a status conference in March of '25.  And out of that came a global mediation effort, it looks like.  And I did enter a case scheduling order in May of '25.  And then, of course, eventually the case settled.

Okay.  So I re-familiarized myself a little bit with the issues that I addressed in the motion to dismiss, and -- and so I'm ready to discuss this.  I do have a -- some questions, not too many but some.  So I guess usually the way this works is the plaintiff kind of takes the laboring oar.

So who is going to speak for the plaintiff?

MR. CANTY:  Michael Canty on behalf of the

plaintiffs.  Thank you, Your Honor.

THE COURT:  So why don't you just talk for a minute about the settlement and what -- and so forth.  I know it's in your papers, but I'll -- that'll trigger me to ask a few questions of you.

MR. CANTY:  Yes, Your Honor.  In short, this is an outstanding result for the class.  This is a $210,000,000 settlement --

THE COURT:  By the way, you're pretty tall.  There is a button there that can raise that.  Right there.

MR. CANTY:  Thank you.

THE COURT:  Go ahead.

MR. CANTY:  Thank you.  In short, this is an outstanding result for the class, a $210,000,000 settlement on behalf of the shareholders in this case.

Just by way of perspective, since the passage of the PSLRA, this would be a top 100 settlement of all time in the last 30 years since the passage of the PSLRA by Congress in December of 1995.

We engaged in significant discovery in this case, reviewed over three-and-a-half-million documents, conducted numerous depositions.  And that really formed the ability to determine the strengths and weaknesses of this case.  And based on that, we engaged a respected mediator, a retired federal judge.  And during that mediation we worked to try to resolve

this, recognizing that -- both the strengths and weaknesses that the defense case had and that the plaintiffs' case had.

We were not able to result -- resolve the case at the initial mediation.  But through a series of targeted discussions with the mediator, we ultimately were able to get to a settlement of $210,000,000.

THE COURT:  Well, I don't deny $210,000,000 is a lot of money, even today.  I think I saw your expert said the case was worth 10.5 billion dollars.  So was the expert on contingency or what?  But all kidding aside, if you zoom the money back down and you said 10.5 billion is your best day, 210,000,000 doesn't sound quite as impressive in that context. So talk to me about that.

MR. CANTY:  Yes, Your Honor.  That would be -- would be quite a great day if that were the outcome.  I'm sure defendants would have something to say about that.  I've tried a lot of cases and I've done a lot of these securities cases, and I can tell you that they are hard fought, that you wouldn't essentially need to have everything to break you away.

And in my experience, there are a number of hurdles between where we are now and where we would have to get to that number, namely the strength of the false and misleading statements in the corrective disclosures.

At summary judgment the defendants -- well, at class certification, certainly, the defendants were going to

challenge whether or not the corrective disclosures were, in fact, corrective of the false -- allegedly false and misleading statements that we've alleged.  So that's number one.  They would -- if we were successful there, no doubt the defendants would have taken the appeal to the appellate court on those issues which would have delayed the case even further.

Certainly they would have raised these issues at a summary judgment motion and asked for judgment on -- you know, on the pleadings that, in fact, the case was much smaller, that it dealt only specifically with the WorldPay impairment.

And lastly, and I think most importantly, is at trial they would have made this argument before a jury.  And I can tell you that in my experience -- I've tried a lot of cases, and the one thing I know about juries is they have an uncanny ability to compromise and to look at a case critically.  And, certainly, I think the likelihood of them finding that this case would have survived in its totality was very, very small.

And knowing that --

THE COURT:  Can you give me an idea of -- you know, you see 42 cents a share,  32 cents a share.  I understand how this stuff works.  But, you know, if you have 100 shares, it's not too big of a deal.  Are -- do you have any sense of really what we're talking about here in terms of how many -- how do you know how many shares are outstanding?  Is that just publicly available, or what's the -- and what's the number of

shares outstanding?

MR. CANTY:  Yes.  We would get the number of -- total number of shares outstanding with respect to the damage here. But individuals have to file claims --

THE COURT:  Right.

MR. CANTY:  -- so to determine specifically the number of the eligible shares to collect is not something we have.  We would get that through the claims process.

So what we would do is, we would get the information from the beneficial holders of those shares and they would file.  When they file those claims under the Notice Provision, they would provide their trading data.  And they would tell the claims administrator when they purchased, and if they sold, when they sold.

THE COURT:  Well, then, where -- if you don't know all that, why -- where -- how are you coming up with the 32 cents and 42 cents --

MR. CANTY:  That's --

THE COURT:  -- and so forth?  Where does that number come from?

MR. CANTY:  That comes from the total flow of shares that were -- that were purchased and sold during the class period.  We don't know how many will actually file a claim. So --

THE COURT:  Well, we know it's -- won't be very many,

right?

MR. CANTY:  I respectfully disagree, Your Honor.  We just had a case out in Phoenix where at final approval, we had over 50 percent claims rate.

THE COURT:  Really?

MR. CANTY:  Yes.

THE COURT:  I've never seen that before.

MR. CANTY:  Yes.  This --

THE COURT:  You usually see five percent or ten percent or something like that.

MR. CANTY:  Yes, Your Honor.  Those are typically in consumer cases where you're talking about a de minimis amount.

This case here, with respect to the total amount of the settlement and the large percentage that are held by institutional investors, all go to the side of a higher claims rate.

THE COURT:  Well, let me ask this, you probably would know, I would think -- let me get the right names.

I was looking for the names of the lead --

MR. CANTY:  The lead plaintiffs.

THE COURT:  -- plaintiffs.  It was North --

MR. CANTY:  The Nebraska Investment Council --

THE COURT:  Yeah.  And the North --

MR. CANTY:  And the North Carolina Retirement Funds.

THE COURT:  Right.  How many -- how many shares do

they have?

MR. CANTY:  I don't have that number in front of me. I could see if we can get that number for you, Your Honor.

THE COURT:  Okay.  I mean, a lot?

MR. CANTY:  Yes.  I mean, certainly they had enough to move for lead plaintiff under the PSLRA.  They have to have the largest loss to take control of the case under the statute.

THE COURT:  Is that right?

MR. CANTY:  Yes.

THE COURT:  So we think -- you think that you're -- the lead plaintiffs are the -- have the largest loss?

MR. CANTY:  They -- well, that moved for -- under the PSLRA, Your Honor, parties have the opportunity to come before the Court and ask to lead the case.  I think if you recall from the hearing that we had on that --

THE COURT:  Didn't we -- wasn't it contested or it was something -- there was something about it that was different.

MR. CANTY:  There was an initial -- there was an initial fund that moved the file of the case, Your Honor.

THE COURT:  Oh, yeah.  Palm Bay Police and Firefighters?

MR. CANTY:  Correct.

THE COURT:  Is that right?  And that was Ms. Saxena and her gang.

MR. CANTY:  That's correct.

THE COURT:  I don't mean gang.  Her law firm.

MR. CANTY:  Yes, Your Honor.

THE COURT:  I've just had her in a number of cases. But she was involved -- now she's in the derivative action, right?

MR. CANTY:  I believe that's correct, Your Honor.

So under the PSLRA, parties have the opportunity to come forward and -- with the certification saying that, based on an analysis they have the largest loss, and that under the statute they would be the presumptive lead.

Congress, when they passed the PSLRA, wanted large institutional investors to lead these cases.  So North Carolina and Nebraska collectively had the largest loss of those that sought to lead the case.  I can't say definitively that there's not a hedge fund or some large financial institution that will have a larger loss than the two of them.  They did not move this Court to lead the case.

THE COURT:  So out of the -- do you think most of the -- because I've had -- I've had security class action settlements over the years too.  But are we talking -- are we expecting most of the claims to come from institutional investors?

MR. CANTY:  Yes.  Our understanding is there's -- it's a -- slightly higher than normal on the number of

percentage of holders are held by institutions.  I think it is somewhere in the 80 --

MR. CHRISTIE:  It's over 90.

MR. CANTY:  Over 90 percent are held by institutional investors.

So, again, that -- to my argument before, that all goes to a higher --

THE COURT:  So they're more likely to make a claim because they actually might be able to understand the notice and -- even though it's barely written in English.  I'm being facetious.  But, you know, really, I worry about that more in consumer cases than I do in these cases where I figure most of the people that really care are probably -- are used to reading these things and are sophisticated.

But I read the notice, I guess, last night, and it sure had a lot of information in it.

MR. CANTY:  Your Honor --

THE COURT:  And -- yeah, go ahead.

MR. CANTY:  With respect to the notice -- and I appreciate that -- our claims administrator will work with claimants.  So to the extent that a claimant provided information that's not sufficient, we don't immediately reject the claim.  They will work with that claimant.

So if there's a retail investor or somebody that has 100 or 200 shares that's looking to collect and they're

otherwise eligible, they will work with them to correct whatever deficiencies they have in the information that they've provided.  You know, we want -- we want more involvement.  We want more claims filed.  We're certainly not going to nit-pick if they didn't file the initial instructions in the Notice Provision.  So our claims administrator does work with claimants to make sure that they correct any issues.

THE COURT:  So I want to understand -- I think I do, but I want you to tell me.  So I'm just going to give you a hypothetical.

MR. CANTY:  Yes, Your Honor.

THE COURT:  So let's say there's 100 eligible claimants out there -- they don't opt out so they're going to be bound by it one way or the other -- but only 10 out of the 100 make a claim, are those 10 going to split up the $210,000,000 minus attorney's fees?  In other words, will all of the money be distributed and it will just increase the payments to those who actually make claims?

MR. CANTY:  If it's finally approved by the Court, yes, that's correct, Your Honor.

THE COURT:  And there won't ever be a ceiling because, in theory, those claimants are not going to be made whole no matter what?

MR. CANTY:  That is correct.  That is correct.  But ultimately it's subject to the Court's approval -- final

approval.

THE COURT:  I understand that.  But preliminary approval's pretty important because -- and -- because once -- once you kind of put the train on the tracks, it's kind of hard to take it back off.  It's not impossible.  And -- okay.  So that answers my question.

So that 210,000,000 minus attorney's fees and costs and administrative expenses, that's going to get divvied up among the claimants no matter how many of them there are?

MR. CANTY:  Correct.

THE COURT:  And somehow it's pro rata -- I tried to read it and understand it a little bit, but I -- it was -- it's basically pro rata, I guess?

MR. CANTY:  That's -- what we will do is we'll take the total number of damages and then we will allocate that over what's left in the common fund.  So, you know, if it's -- it will never be dollar for dollar, like you said.  But if the total number of damaged shares equals -- let's just use an easy math -- $420,000,000 of damages, then everybody would get 50 cents.  I'm not saying that's the case.  I'm just using that as an example.

THE COURT:  I understand.  I have to admit when I got into the part -- I think it was in the notice -- about short sales and stuff, I didn't really understand what you-all were saying, but maybe people who read that stuff understand it.

16

What are you trying to say there?

MR. CANTY:  I believe they're out.

MR. CHRISTIE:  You wouldn't want an investor --

THE COURT:  I'll tell you want, when you're -- if you don't mind standing up, that would be good.

MR. CHRISTIE:  Yes, Your Honor.  The reason for that is just to ensure that no investor has a windfall by both benefiting from the stock drops --

MR. CANTY:  Correct.

MR. CHRISTIE:  -- if they did hold the short position and then recover it in the settlement as well.  So you're required to show your short sales in order to kind of make sure that that result doesn't occur.

THE COURT:  And is that part of the claims process?

MR. CANTY:  Yes.

MR. CHRISTIE:  Yes, as provided in your trading records to the administrator.

THE COURT:  And the attorney's fees, I should have looked it up, but there's a lead case in the Eleventh -- there's a lead case in the Eleventh Circuit.  I take it it would be applicable -- I think it's applicable even in securities actions on common -- this is essentially a common fund case, right?

MR. CANTY:  Yes, sir.

THE COURT:  So if I recall correctly, the case puts a

benchmark at 25 percent, I think.  And I've, over the years, had -- I've gone up, I've gone down, I've gone -- you know, depending on what I thought.

I saw you-all are -- only are asking for 22 percent. When you do the math, it's $46,000,000.  And, I don't know, that just seems like a lot of money.

So I'm not saying I won't do it.  I am saying I'm going to need -- when you file your motion, I'm going to need to see -- compare -- compare some cases.  You said this is a top 100 settlement, so there may not be that many directly -- I mean, if you've got a $2,000,000 class action settlement, that's different than a $210,000,000 class action settlement. And I recognize the fees are going to be, you know, a lot of money, because $210,000,000 is a lot of money.

But I just want you to be -- I want you to understand that I do take my responsibility to the class very seriously. And knowing that every dollar that goes to the attorneys is a dollar that doesn't go to the class.  You know, I need to -- do not expect it to be a rubber stamp.  That's all I'm saying.

And I want to see -- so don't file some perfunctory thing, expect I'm going to -- I need to -- and, of course, an odd and maybe not great thing about that is that they're not going to say anything, because they already -- you know, they don't care, right?  They know they are going to pay the 210- and they don't care what happens after that.

So nobody, except me, is going to be asking questions about the fees.  And I just want you-all to be prepared to answer those questions.  And I also -- I want the timing of this to be that when we have a final hearing, I want to see what happened.

MR. CANTY:  Yes, Your Honor.

THE COURT:  I don't want to -- I don't want -- I've had situations where people try to get me to a final hearing, go ahead and approve the fees and everything, while the claims process is still ongoing.  And we don't even know what we've got and what we don't and who was benefitted and who wasn't. So I want -- I want the timing of it so that we can all know what really happened.

And I think that's -- obviously the final approval, I would still have to approve it before you could disburse the money, but we would know what we're dealing with.  We would know how many people -- how many entities applied.  We would know what the pro rata is approximately and so forth.  We could run pro formas on that.

So those are my -- those are my observations and concerns.  I'm happy to hear from you.

MR. CANTY:  Yes.  Thank you.  With respect to the fees, Your Honor -- and I certainly appreciate that the fiduciary for the class is the Court, right?  There's a -- there's tension now between counsel and the class because we're

looking for fees.

But there's also another fiduciary, and that's the lead plaintiffs. And here we have two sophisticated lead plaintiffs, the State of North Carolina and the State of Nebraska. And I can tell you that that 22 percent was negotiated by those two parties. So we're happy to provide you that information. And, in fact, it will be slightly less than 22 percent when we ask, because there was a compromise between the two clients. But I will -- we'll put that in our final approval paperwork. And we'll certainly have the backup information for you on that.

With respect to the final approval, we will come to the final approval with specific metrics with respect to how many claims we've received, what the claims rate looks like, how many have been accepted, how many have been rejected, how many we're working on to perfect, so to speak, if they have some issues with the claim. So we're happy to do that.

THE COURT: What kind of payout are you looking for for the lead plaintiffs? I don't think that was in the papers. It said you were going to ask for it, but it didn't say how much.

MR. CANTY: So we've had experience with North Carolina and Nebraska in the past. And I can tell you it's essentially for the approximate number of hours they worked on the case times what their rate is. I believe in past cases

it's been a few thousand dollars, I think no more than 5- or $10,000 for their lost --

THE COURT: Oh, really? Okay.

MR. CANTY: So we're not looking for -- you know, they -- Your Honor, this is why when Congress passed the PSLRA, they really wanted large state institutions and large public pension funds to lead these cases because they understand their role as a fiduciary for the class.

THE COURT: There is a case in the Eleventh Circuit called Johnson, I believe, that -- and it's been a while since I looked at it, but it calls into question fee awards to lead plaintiffs. I don't remember if it applies in federal securities actions or not.

But you-all -- you're probably aware of it because most people are that do this kind of work. But you will need to be prepared to address that so that I make sure I have the authority to make an award to lead plaintiffs without running afoul of my superior court.

MR. CANTY: Yes, Your Honor.

THE COURT: I feel like since -- when it first came out probably five years ago, or maybe even longer, it was a big problem for these cases. I feel like people have figured out work-arounds, and sometimes it may not even apply to a securities class action. I just don't remember.

But I'm just forewarning you that I'm going to be

looking to understand my authority to award lead plaintiffs. But it doesn't sound like we're talking about a lot of money. I thought you were going to tell me it was more, so that's not much of an issue.

All right.  Let me see what my other questions are here.  So there is a law firm Baylor, Evnen, Wolfe & Tannehill that is included, it looks like, in the settlement --

MR. CANTY:  Yes, Your Honor.

THE COURT:  -- agreement?

MR. CANTY:  Yes.

THE COURT:  But they're not on our docket.  We don't know who they are.  So who --

MR. CANTY:  They are outside counsel to the Nebraska Investment Fund.  They were actively involved in this litigation.  They assisted with discovery.  They were present at the mediation.  They were present at the depositions.  They are located in Lincoln, Nebraska, and they work with the Nebraska Investment Council.

THE COURT:  Are they potential beneficiaries of fees?

MR. CANTY:  Yes.  They -- yes, Your Honor.

THE COURT:  Well, I guess they probably should have filed a notice of appearance and complied with the local rules, shouldn't they?  If they were participating in discovery and doing all that stuff, shouldn't they have gotten pro hac vice and been part of the case?

MR. CANTY:  They are outside counsel to the Nebraska Investment Council.  If -- but we will certainly have them put one in, Your Honor.  We don't want to run afoul of the local rule, but --

THE COURT:  Well, I just meant -- I mean, did they actually -- when you say participated in discovery, were they just the liaison with the client, or did they actually, like, take depositions?

MR. CANTY:  No.  No.  No.  To be clear, Your Honor, they were liaison for the client.  We, Labaton Keller Sucharow, did all of the discovery collection.  We defended and took all the depositions.

THE COURT:  They -- I'm not too worried about it, then, if that's -- that's really between -- I assume the law firms have understandings with each other about how this is going to go?

MR. CANTY:  Yes, Your Honor.

THE COURT:  So Ms. Ferris was dismissed out, I guess, as part of the deal, but her name pops up in several of the documents.  Is that okay or should she be removed from them?  I just happened to see her name several times, and I didn't know if that was a problem or not.

MR. CANTY:  Not for the plaintiffs.  She's been dismissed from the case.  And ultimately the case will be dismissed upon --

THE COURT:  Who represents Ms. Ferris?

MS. WONG:  Your Honor, we represent all of the defendants including Ms. Ferris.

THE COURT:  Okay.  And you're not worried about the references that I'm -- I don't even know exactly.  I know in the course of reading the papers I saw her name several times, and I didn't -- she's not apparently a party to the settlement, right, so she's not on the hook or anything and she's out of the case?  Is that --

MS. WONG:  Well, she has been dismissed from the case.  Those references to her in the settlement papers are there on purpose.  In particular, she is purposely included, along with all of the other defendants, in the scope of the releases.

THE COURT:  Release, yeah.  Okay.  That makes sense.

All right.  Since most of these are institutional investors, are you -- are you feeling like notice and all of that will be easily accomplished?  I mean, people will know what's going on?

MR. CANTY:  Yes.  Your Honor, this is essentially the gold standard in notice.  We do direct notice to the beneficial holders of the shares.  We do a PR -- a Newswire press release, which is really effective.  People are looking for that.  The institutional investors looked at that.  We're doing an ad in Investor's Business Daily.  So we've essentially blanketed the

landscape to make sure that they know.  We also have a website that we've set up.  So with the large number of institutional investors, we're confident that notice is sufficient.  And, again, this is essentially the gold standard in securities cases.

THE COURT:  I'm just looking through the proposed order now to see -- Ms. Schlaeger, my law clerk, had a few little notes here, but nothing that we can't deal with.  I just want to see if there's any questions that I had of you.

We're going to ask you to submit a Word version of this to our chambers box.

MR. CANTY:  Yes, Your Honor.

THE COURT:  So Ms. Schlaeger will talk to you about that after I leave.

MR. CANTY:  Yes, Your Honor.

THE COURT:  So at paragraph 26 of the proposed order, there's a paragraph called Use of This Order, and it's got all of this stuff in it.  But I had two questions -- or I had one question about that.  Is there somewhere -- does this -- is there somewhere where it says the order can be used in construing or effectuating the settlement, or is that obvious or am I -- did I just miss it somewhere?

MR. CANTY:  Your Honor, the purpose of this provision is that, if for some reason the case is not finally approved -- this settlement is not finally approved, then we go back to a

litigation posture. We cannot use this in the litigation to show culpability on behalf of the defendants.

THE COURT: Right. But what I'm saying is, though, shouldn't there be a provision that -- or is it necessary -- or is it just obvious that the Court obviously can use the order to construe -- construe the agreement and effectuate the settlement? If -- to the extent this isn't meant to be exclusive, I think it's probably fine, but I just wanted to make sure.

The other thing is, is there -- okay.

MR. CANTY: Your Honor, in paragraph 4 of the proposed order is where it's preliminarily approved where it says, "The Court finds and preliminarily concludes for purposes of the settlement only that the prerequisites of the class action certification under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure have been satisfied for the settlement class defined herein."

THE COURT: Yeah. All right. I'm looking at the notice now. Again, just some minor little things that we'll probably -- I'm looking at the summary and the postcard. I'm looking at the claim. As I said, I did read these last night so I'm not feeling the need to read them word for word again.

And Ms. Schlaeger has made some just -- some grammatical and other minor suggestions that she will probably provide to you on the notices and the other associated papers.

So we -- so I'll need -- as I said, I'll need a Word version of the order granting preliminary approval so I can -- we've got a few little things I want to incorporate, the fact that we held the hearing today.  I want to do a few other things and -- but the essence of it seems fine.  But I'll -- obviously I'll have to make that my own before I enter it, but I expect it'll -- I expect it'll look very, very similar to what you have.

MR. CANTY:  Your Honor, may I ask a question?

THE COURT:  Yeah.

MR. CANTY:  With respect to that document, do you want the exhibits as well in Word form?  Were there any changes to the exhibits, or was it just the order?

MS. SCHLAEGER:  I think just the order.

MR. CANTY:  Okay.  Thank you.

THE COURT:  Because I think what's going to happen is, I think Ms. Schlaeger is going to send you-all just some markup of the notices and the other associated documents.  And as I'm looking at it, none of it is -- it's not -- I don't think you're going to have any problem with any of it.  And I probably wouldn't have a lot of problem if you didn't adopt some of them.  So I'll just -- this is really -- it's really for two reasons:  One to prove you read them; and, two, to just give you some feedback on the forms and the notices.

MR. CANTY:  Yes, Your Honor.

THE COURT: All right. Mr. Canty, you can have a seat. Thank you.

MR. CANTY: Thank you, Your Honor.

THE COURT: Does any counsel for Fidelity wish to be heard on any aspect of this?

MS. WONG: Yes, Your Honor. Just a few comments. May I come up to the podium?

Thank you, Your Honor. Caroline Wong with Sidley Austin on behalf of defendants. Just a few remarks and then a housekeeping matter. I just want to underscore that this was an exceptionally hard-fought litigation. The parties came at this case with very different views about the substantive issues.

As plaintiffs' counsel noted, we do feel strongly that had the case proceeded to summary judgment, we would have been able to show, based on the evidence developed during discovery, that none of the 27 challenged statements in the case was false or misleading. We also feel strongly that we would have been able to show that none of the defendants acted with the requisite scienter. We would have had arguments about the element of loss causation as well supported by expert testimony. Prevailing on summary judgment as to any one of those elements would have defeated the claims in the case.

In addition, not only would we have had strong class certification arguments, as plaintiffs' counsel noted, but we

did have strong class certification arguments that were fully briefed and pending before the Court as of the time of the mediation and of the subsequent execution of the settlement agreement.  In particular, we feel very strongly about the arguments we raised about the Supreme Court's recent decision in the *Goldman* case.  Again, we've fully briefed those issues, including with a sur-reply accepted by the Court.

Plaintiffs' motion actually notes at page 13 that had we won our class certification arguments, that that would have reduced plaintiffs' own calculation of total potential damages by 85 percent.  So those arguments alone would have substantially reduced the potential exposure in this case.  And, again, Your Honor, that's before even accounting for these very strong arguments we believe we had regarding the elements of falsity, scienter, and loss causation headed into summary judgment.

THE COURT:  What's -- I'm just wondering, what's 15 percent of 10.5 billion?  I'm wondering if it's 210,000,000.

MS. WONG:  It's higher than that.  It's about 1.5.

THE COURT:  Is it?

MS. WONG:  1.4, 1.5 billion, Your Honor.

THE COURT:  Oh, okay.  Yeah, you're right.

MS. WONG:  I also --

THE COURT:  I was just -- I mean, I know that's not how you-all did it.  I just wondered if -- sometimes things

happen by coincidence.  I was -- but this isn't one of those.

Okay.  Go ahead.

MS. WONG:  Yes.  Well, again, Your Honor, we felt strongly that even that figure would need to be discounted by our other arguments on the substantive issues in the case.

I also want to underscore --

THE COURT:  Well, I assume you would have had experts that thought that the damages were substantially less than 10.5 billion, I'm guessing.

MS. WONG:  That is also true, Your Honor.

I also want to underscore that the parties reached the settlement only after working extensively with former federal Judge Layn Phillips.  We had significant time and opportunity to have each side discuss with Judge Phillips our respective views of the case.  And only after extensive discussions were we able to reach this settlement.  We do think that it's a fair, appropriate, adequate resolution of the case. Again, Your Honor, I wanted to underscore that we felt very strongly about our merits defenses.

The one housekeeping item, Your Honor, the settlement agreement has some provisions regarding defendants' compliance with 28 U.S.C., Section 1715 from the Class Action Fairness Act.  Those provisions have some requirements regarding notices that defendants are required to send to various government officials regarding --

THE COURT:  Attorney general and some other people?

MS. WONG:  Exactly, Your Honor.  We did send those notices.  We sent them timely.  They went out on December 19, 2025.  We plan to file a notice and declaration confirming compliance, if that's all right with Your Honor, so that --

THE COURT:  That's fine.

MS. WONG:  -- that's formally on the docket.

THE COURT:  Have you-all ever heard from any of those folks?  I've been -- I mean, I know you're supposed to do it, but I've never heard -- I've never heard anybody say they ever heard anything back.

MS. WONG:  We usually hear back from a few.  And I believe we heard back from at least one office in this case just to confirm receipt of the notice that we --

THE COURT:  But nobody's ever tried to interfere with the settlement or anything like that?

MS. WONG:  Not in any matter I've worked on, Your Honor.

THE COURT:  All right.  That'll be fine.  And I'll receive that whenever you're ready to file it.

MS. WONG:  Thank you.  Unless Your Honor has other questions, we will. . .

THE COURT:  I am not calling to mind immediately the *Goldman* case.  Can you just give me, like, 30 seconds on what that case -- the Supreme Court case you referenced?  What's the

upshot of that?

MS. WONG:  Absolutely.  So the *Goldman* case deals specifically with class certification in the context of securities class action cases like this one.  And it elaborates on the standards that plaintiffs are governed by for purposes of invoking the presumption -- the rebuttable presumption of reliance under the Supreme Court's prior *Basic* decision and its -- and the line of cases coming out of that.

The key takeaway from *Goldman* is that one way defendants -- one of the many ways, but one way defendants can rebut the presumption of reliance is by showing that there is a mismatch in the contents of the statements that have been challenged as false or misleading, sometimes known in the parlance as front-end statements and the -- so a mismatch between those and the alleged corrective disclosures; so in other words, the back-end statements that take place around the time of these stock price drops that plaintiffs point to as relating to the harm that they claim.

There can be different types of mismatch.  So, for instance, there can be a subject matter mismatch.  The topic or the subject of the challenged statements might be different than whatever the alleged corrective disclosures are about.

There can also can be a mismatch in the level of generality in which the statements are framed.  So, for example, if you have a front-end statement that addresses a

very specific issue and a back-end alleged corrective disclosure that in some way relates to the same issue or topic but it is -- but it's stated at a much more general level, not the same level of specificity, then there'll be a mismatch between those as well.

THE COURT:  How would that case and what you're talking about, how would that -- what would your argument have been in this case?

MS. WONG:  So the arguments that we made proceeded category by category.  There were several categories of challenged statements in the case.  One category was about revenue synergies.  The statements about -- the challenged statements about revenue synergies were all very specific.  For instance, there were statements noting that the company had achieved X-million dollars of revenue synergies within a given period.

One of the arguments that we made was that those statements about revenue synergies did not have a subject matter match and in some instances did not have a level of generality match with the alleged corrective disclosure that the plaintiffs were pointing to.  There was also a category of statements challenged in the case about goodwill and a couple of others as well.  And so we had various mismatched arguments as to each of those categories.

THE COURT:  So if you get a mismatch, that means

you're not -- that's a defense to the liability, then, on mismatch?

MS. WONG:  So, Your Honor, it's -- it's really a class certification issue under *Goldman*.  Those issues certainly do overlap with the types of analyses courts engage in in looking at loss causation.  But they are --

THE COURT:  So does it go to, like, technicality or commonality, that type of thing?  What's the -- what's the class certification hook?

MS. WONG:  It goes to predominance.

THE COURT:  Predominance.

MS. WONG:  So the --

THE COURT:  I knew it was going to be one of those.

MS. WONG:  Yes.  The rebuttal presumption of reliance is what allows securities plaintiffs to meet the predominance requirement.  So that's -- that's all where the *Goldman* analysis sits.

THE COURT:  So you felt like -- you-all felt like you had a pretty good argument on that?

MS. WONG:  Absolutely, Your Honor.

THE COURT:  Okay. All right.  Well, that's helpful. I appreciate it.  Is there anything else that -- because obviously one of the things that I'm supposed to evaluate is the relative strength of the case, how likely is it that the case would have been successful or not, whether the parties

made advised decisions about buying off the risk and so forth. And so your discussion with me is helpful.  I appreciate it.

Is there anything else that you want to say on behalf of Fidelity?

MS. WONG:  No, other than thank you very much, Your Honor, for the time and attention you've given the case.

THE COURT:  Thank you.  I don't know if you're in a position to do this or anybody on your team, but is there anybody -- and I don't want to have an argument about the derivative claims without somebody being here on the other side.  But is there a way, without -- maybe do it in a hypothetical way so we're not talking about the case.  But is there -- what's left -- once the class action is settled, what's left over in the derivative side?  I've got two derivative actions, a lot of the same people are involved.

Is there anybody here that's on the derivative cases? Are you on it?  Okay.  Maybe you can -- I have to be careful because I can't get into arguing the case or anything.  But I just want to know, is there a relationship between what we're doing today and the derivative cases, is what I'm trying to figure out?

MS. WONG:  Your Honor, I -- my colleague, Mr. Skakum, and our colleagues from McGuireWoods, we represent FIS and three officer defendants in both of the derivative cases.  This is the City of Hialeah Employees' Retirement System case and

the McCollum cases.  Those cases are not within the scope of or otherwise affected by the release in the settlement stipulation.

THE COURT:  I saw that.

MS. WONG:  Yes.

THE COURT:  There's a carve-out basically, right?

MS. WONG:  Exactly, Your Honor.  That's very standard.  And so as a technical matter, the straightforward answer is just the settlement agreement in this case does not have an effect on those pending matters.  There are pending motions to dismiss in both of those cases, and those are in the process of being briefed.

THE COURT:  Okay.  All right.

MR. SKAKUM:  Your Honor, may I -- just a little bit of context to your question?

THE COURT:  That's fine.  I appreciate Ms. Wong's statements.  And I'm happy to hear from you, but I can only go so far with that, because --

MR. SKAKUM:  I was going to give you hypotheticals.

THE COURT:  All right.

MR. SKAKUM:  To your point.  Generally speaking, in these situations where you have companion securities in derivative cases, the securities cases typically settle first.  They are the larger-dollar exposure.  And then usually that allows the parties to bring their attention to resolve the

derivative cases.  That's the pattern you will see across the country.  I just wanted to give you that hypothetical illustrative.

THE COURT:  I think I got that.  But I appreciate it. Thank you.

And thank you.

MS. WONG:  Thank you.

THE COURT:  I appreciate it.

MR. CANTY:  Your Honor?

THE COURT:  Yeah.

MR. CANTY:  One last matter.  With respect to the proposed order, I have conferred with defense counsel, and we have a proposed date subject to the Court's approval for final approval.  That was left blank in the order.  The parties are available on May 19th, but certainly we will make ourselves available at the Court's convenience.

THE COURT:  Well, we need to -- so here is where we are, I'm disposed toward granting the motion for preliminary approval of the class action settlement.  I need to see a final order.  I need to approve that order and I need to sign it, but I'm disposed toward it, with the caveat, as I mentioned, that I -- that at the final hearing, I do expect to be asking questions about it, and I want to see what happened and I also want to see -- I also want to have a discussion of attorney's fees.

Having said that, we do need to set up a schedule. And we have -- we got your proposed schedule.  Sorry, I'm just loading up my calendar here so we can talk about some dates. We took your proposed timeline and we actually put dates on it instead of 14 days from this and 7 days from that, because that always confuses me, so. . .

And my general observation was it seemed like a pretty aggressive timeline.  I just scheduled a jury trial over the top of a date we were going to propose, so I need to -- I need to recalibrate here.

All right.  Mr. Canty, you were going to say something about scheduling?  You were proposing a date for a final hearing?

MR. CANTY:  Yes, Your Honor.

THE COURT:  Okay.

MR. CANTY:  It was May 19th, but, again, subject to the Court's approval.  If the Court wants to push it out --

THE COURT:  Tell me -- we've got these dates, e-mail updated -- order granting preliminary approval, would enter probably next week.  Notice date March 10th or so, March 20th, ten days after the notice date; deadline for nominee purchasers, March 24th; deadline for publication or summary notice.

Anyway, we have actual dates attached to this that I think are consistent with the kind of timelines you-all were

looking at.  The question I have is -- but, first of all, I've got to figure out when I can do it, because the time frame we're in is a little bit jammed up right now.

But, secondly, I want to make sure that everything's been done, or as much of everything, so that you can present me with those metrics and everything.  I don't want to have a hearing on -- with half pieces of information.

So that -- so I guess the question is -- for example, here I'm looking at a postdate deadline for submission of claim forms, May 15th, and you're talking about having a hearing on May 18th.  Well, that --

MR. CANTY:  That wouldn't work, Your Honor.  I agree with that.

THE COURT:  Yeah.  So I'm going to look for a -- I mean, I can back into this or we can go forward.  Let's do this, let's go forward.  And I'm going to call out some dates and then I'll -- and then we'll get to a final hearing date.

So we were assuming -- if we get a proposed order from you-all in Word within the next day or so, we're assuming we'll enter the order of preliminary approval next week.  We've got a scheduling issue.  If we could get it out -- we'll probably get it out early, mid next week.  So, then -- let's say it goes out the middle of next week, we would then set a date that would be ten days -- the notice date would go out ten business days after the entry of the order?  Is that sufficient

or --

MR. CANTY:  Yes.

THE COURT:  Okay.  All right.  So that would be a little bit in March somewhere.

MR. CANTY:  Like, March 4th?

THE COURT:  Yeah, or so.  And -- depending when we get the order out.  Because we'll actually put dates in the order.  March 20th, deadline for nominee purchasers, is what we had.  March 24th, deadline for publication of summary notice. April 21st, deadline for filing motions in support of the settlement.

Why would replies be necessary?  You -- I think you had that built in.  But who's going to reply?

MS. ZEISS:  Nicole Zeiss, Your Honor.  That is so that we can tell you if we received opt-outs, if we've received objections.

THE COURT:  Okay.

MS. ZEISS:  And also that is when we would explain the claims results.

THE COURT:  Okay.  And what -- I had a class action settlement -- really, the first one I've ever had where I had actual objectors and they litigated it and so forth.

Is there -- do you-all ever know whether that's going happen?  Is it likely to happen, unlikely to happen, what?

MR. CANTY:  I will say it's -- I don't want to

40

venture to guess, Your Honor, to be quite candid.  I have not seen it a lot in securities cases, but it has happened.  But I think based on the settlement we have here, I am hopeful that we don't have objections.

THE COURT:  Okay.

MR. CANTY:  There certainly may be opt-outs.  Again, I don't want to venture to guess as to whether or not the parties will opt out.

THE COURT:  Okay.

MR. CANTY:  We're hopeful that doesn't happen.

THE COURT:  All right.  Then we'll put in a deadline for class members to opt out or file objections with the Court, a deadline for submission of claim forms.  And then we have to set the hearing, right?

And, Ms. Wong, I don't mean to leave you out of this, are these -- is that -- are you-all comfortable with the sequencing there?

MS. WONG:  Yes, Your Honor.  I think that sounds fine.  I will just say, having some guidance from the Court that you're planning to issue the preliminary approval order early or mid next week, that's very helpful for our planning purposes.  I appreciate you setting the expectations on that.

THE COURT:  Well, if we get the -- I mean, because we don't have a lot of changes to it.  But we've got to get it from you, we've got to play around with it a little bit.  We

have a few things, and then I have to read it again.  And then I've got a little bit of a scheduling issue next week.  But I think -- I think I ought to have a chance to read it.  And if I have a chance to read it, then we can probably enter it, I'm guessing, mid next week.  If it doesn't happen then, it would happen, at the latest, the following Monday, so -- if that's helpful to you all.

MS. WONG:  It is.  Thank you, Your Honor.  I will talk with plaintiffs' counsel afterwards, and we'll see if we can get the Word version later to you today to keep things moving.

THE COURT:  Okay.  That's fine, yeah.  But here -- here's my -- I'm just having trouble sequencing the hearing here.  And so we just need to -- it may be a little later than you-all want it, but it's not going to be the end of the world. And I assume you-all have calendars available, so you can tell me.

All right.  I could -- I know this seems harder than it should be.  But the truth of it is, is that right now the best time -- how about Thursday, July 9th?  I know that's farther out than what you're asking for, but you should know everything by then.  But I just -- I've got trials in June, I've got other scheduling.  May's too -- I think May's too quick.  So that's what I'm offering right now.

Does anybody want to be heard?

MR. CANTY:  Yes, Your Honor.  We'll certainly take July 9th.  If the opportunity opens up, if your trial settles, we'd like to come in in June if that's possible.

THE COURT:  Okay.  Yeah, I don't think it will, that's why I'm --

MR. CANTY:  Okay.

THE COURT:  -- dancing around it.  So it's a criminal case, but it's unusual and it has two phases to it.  I don't think it's going to plead out, so I think -- I had to block off two weeks in June.  And that's my problem.  Okay.

MR. CANTY:  Your Honor?

THE COURT:  Yeah.

MR. CANTY:  With respect to the deadline for the claims submission, we had ten days.  We would suggest making -- maybe making that a little longer --

THE COURT:  I will tell you what, why don't you-all do this -- let's do this -- because now if it's July 9th, you've got more time.

Is July 9th good with Fidelity?

MS. WONG:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.  So let's assume -- why don't you-all do this, when you submit the Word version, give me a schedule.  And that schedule should assume that I enter the actual preliminary approval order on that following Monday instead of trying to -- so let me get back to my calendar here.

So if I enter the preliminary approval order on --

MR. CANTY: You said the 23rd, Your Honor?

THE COURT: -- 23rd -- actually I'm okay. I see. Yeah, I was wrong on my timing here.

So let -- give me until -- Tuesday, February 17th, I will enter the order. Okay? All right. And -- assuming I get the Word version from you-all today or first thing tomorrow or something. All right?

And what I'd like you to do when you submit that -- I assume you-all have time. If you need an extra day, we can do it on the 18th. But I would like you-all to get together and come up -- if you know the order is going be entered on February 17th, preliminary approval, and you know that the final hearing is July 9th, I'd like you to populate the schedule with real dates, not 14 from this or whatever. Real dates, okay?

MR. CANTY: Yes, sir.

THE COURT: Do you-all think you can come together and do that between now and Tuesday when you submit the proposed order, or do you need more time?

MR. CANTY: No, Your Honor. We will have it for you.

THE COURT: Okay. So if you submit -- if you submit that order and timeline, I will probably just adopt it. I will set it for hearing -- final hearing on July 9th.

MR. CANTY: Thank you, Your Honor.

THE COURT:  Does that work?

MS. WONG:  It does.  Thank you, Your Honor.

THE COURT:  Sorry about that.

Okay.  I am -- as I said, I am -- we're heading toward preliminary approval.  We'll get an order from you-all, we'll get a timeline from you-all, and then we'll go from there.  If you need a status or something, let me know; but, otherwise, I guess the next time we would get together would be July 9th, right?

MR. CANTY:  Thank you, Your Honor.

THE COURT:  Okay.

MS. WONG:  Thank you, Your Honor.

THE COURT:  Good to see everybody.

We're in recess.

THE COURTROOM SECURITY OFFICER:  All rise.

(Judge exits the courtroom at 12:11 p.m.)

(Judge enters the courtroom at 12:12 p.m.)

THE COURT:  I guess there'll be a date for a motion for final approval and attorney's fees and so forth, right? That will be in there somewhere?

MR. CANTY:  Yes, Your Honor.

THE COURT:  If there is -- and that will probably be before -- if there's -- I want to make sure I get that information and the information that you can give me on performance and metrics and so forth, I want to make sure I get

that in sufficient time before the hearing.  So just make sure you build in -- don't give it to me on July 7th, is what I'm saying.  Give me some time.  We've got July 4th.  So give me it with a reasonable time so that we'll have a chance to look at all of that and we will be ready to go for the hearing.  Okay?

MR. CANTY:  Yes, Your Honor.

THE COURT:  All right.  Thanks.

(Proceedings concluded at 12:12 p.m.)

- - -

46

## CERTIFICATE

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


        I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


        DATED this 24th day of February, 2026.


                    s/Heather N. Randall_____
                    Heather Randall, RPR, FPR-C