# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB<br><br>Honorable Timothy J. Corrigan<br><br>Honorable Patricia D. Barksdale |

# LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND <u>MEMORANDUM IN SUPPORT THEREOF</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................i

MEMORANDUM OF POINTS AND AUTHORITIES ......................................2

PRELIMINARY STATEMENT ...........................................................................2

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM ........................4

ARGUMENT.......................................................................................................6

I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
     ADEQUATE, AND WARRANTS FINAL APPROVAL............................6

     A.   Standards for Final Approval .............................................. 6

     B.   Approval of the Settlement under Rule 23(e)(2) ................. 8

          1.   Lead Plaintiffs and Lead Counsel Have Adequately
               Represented the Settlement Class .............................. 8

          2.   The Settlement Is the Product of Good Faith, Informed, and
               Arm's-Length Negotiations by Experienced Counsel............... 10

          3.   The Settlement Provides Significant and Certain Benefits to
               the Settlement Class, Considering the Costs, Risks, and Delay
               of Litigation and Other Rule 23(e)(2) Factors......................... 11

               (a)   Risks of Continued Litigation...................................... 12

               (b)   The Expense and Duration of Continued Litigation ...... 20

               (c)   The Effective Process for Distributing Relief ................. 20

               (d)   The Settlement Does Not Excessively Compensate
                     Lead Counsel................................................................ 21

          4.   Settlement Class Members Are Treated Equitably................... 21

5.   The Remaining Eleventh Circuit Factors Support Approval of the Settlement .................................................................. 22

II.   THE PLAN OF ALLOCATION SHOULD BE APPROVED ................... 23

III.   NOTICE SATISFIED RULE 23, DUE PROCESS AND THE PSLRA ..... 24

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984)...........................................................8, 11, 12, 22

*In re Blue Cross Blue Shield Antitrust Litig.*,
  2022 WL 4587618 (N.D. Ala. Aug. 9, 2022)................................................... 23

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ...................................................................... 14

*In re Chicken Antitrust Litig. Am. Poultry*,
  669 F.2d 228 (5th Cir. 1982) ........................................................................... 24

*City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*,
  2024 WL 5468489 (S.D. Fla. Feb. 1, 2024)..................................................... 8

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................................... 17

*Edge v. Fernandez*,
  2026 WL 937243 (M.D. Fla. Apr. 7, 2026) ..................................................... 25

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd,* 999 F.3d 1247
  (11th Cir. 2021) ............................................................................................. 23

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  594 U.S. 113 (2021) .................................................................................15, 16

*In re Health Ins. Innovations Sec. Litig.*,
  2020 WL 10486665 (M.D. Fla. Oct. 21, 2020)................................................ 12

*In re Health Ins. Innovations Sec. Litig.*,
  2021 WL 1341881 (M.D. Fla. Mar. 23, 2021).................................................. 22

*In re HealthSouth Corp. Sec. Litig.*,
  334 F. App'x. 248 (11th Cir. 2009) .................................................................. 7

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009)........................................................................... 6

*Kukorinis v. Walmart, Inc.*,
   2024 WL 3226772 (M.D. Fla. June 28, 2024) .................................................. 10

*Lunsford v. Woodforest Nat'l Bank*,
   2014 WL 12740375 (N.D. Ga. May 19, 2014) ................................................. 10

*MacPhee v. MiMedx Grp., Inc.*,
   73 F.4th 1220 (11th Cir. 2023) ................................................................... 17, 18

*Mashburn v. Nat'l Healthcare, Inc.*,
   684 F. Supp. 660 (M.D. Ala. 1988) ................................................................... 6

*In re Netbank, Inc. Sec. Litig.*,
   2011 WL 13353222 (N.D. Ga. Nov. 9, 2011) .................................................. 12

*Saccoccio v. JPMorgan Chase Bank, N.A.*,
   297 F.R.D. 683 (S.D. Fla. 2014) ...................................................................... 10

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ................................................ 24

*Wilson v. EverBank*,
   2016 WL 457011 (S.D. Fla. Feb. 3, 2016) ...................................................... 11

**Docketed Cases**

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
   No. 1:20-CV-09568 (S.D.N.Y. Mar. 27, 2025) ............................................... 19

*In re Teva Sec. Litig.*,
   No. 3:17-cv-00558 (D. Conn. Jun. 2, 2022) ................................................... 19

**Statutes**

15 U.S.C. § 78u-4(a)(4) ........................................................................................ 22

15 U.S.C. § 78u4(a)(7) ......................................................................................... 25

**Rules**

Fed. R. Civ. P. 23 ...................................................................................... 1, 4, 7, 25

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 25

Fed. R. Civ. P. 23(e)(1)(B) ................................................................................... 25

- ii -

Fed. R. Civ. P. 23(e)(2).....................................................................................*passim*

Fed. R. Civ. P. 23(e)(2)(A).................................................................................... 8

Fed. R. Civ. P. 23(e)(2)(B) .................................................................................. 10

Fed. R. Civ. P. 23(e)(2)(C) ...............................................................................7, 12

Fed. R. Civ. P.  23(e)(3) ........................................................................................ 7

Fed. R. Civ. P. 23(f) ............................................................................................ 17

Fed. R. Civ. P. 41(a)(1)(A)(ii) .............................................................................. 2

Lead Plaintiffs Nebraska Investment Council ("NIC"), North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans (together with "NIC," "Lead Plaintiffs"), on behalf of themselves and the proposed Settlement Class, will move this Court on July 9, 2026, at 10 a.m., for entry of an order, pursuant to Rule 23 of the Federal Rules of Civil Procedure: (i) approving the proposed class action Settlement; (ii) certifying the proposed Settlement Class, for purposes of the Settlement only; (iii) approving the proposed Plan of Allocation for distributing the proceeds of the Settlement; and (iv) granting such other and further relief as the Court may deem fair and proper.[1] Defendants do not oppose the relief requested in this motion. The motion is based on the incorporated Memorandum of Law and the Declaration of Michael P. Canty, dated May 14, 2026, ("Canty Declaration" or "Canty Decl."), with annexed exhibits, filed herewith.[2]

A proposed Judgment, which was negotiated by the Parties, and a proposed order approving the Plan of Allocation will be filed on June 18, 2026 with Lead

---

[1] Capitalized terms used herein that are not defined have the same meanings as in the Stipulation and Agreement of Settlement (the "Stipulation"), dated as of December 17, 2025. ECF No. 120-2.

[2] The Canty Declaration is an integral part of this submission and, for the sake of brevity in this motions and memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs of the Canty Declaration.

Internal quotation marks and citations within quotations are omitted throughout unless otherwise specified.

Plaintiffs' reply papers, after the May 28, 2026 deadline for objecting or seeking exclusion from the Settlement Class has passed.

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans respectfully submit this memorandum of law in support of their motion, on behalf of the proposed Settlement Class, for final approval of the Settlement of the above-captioned class action (the "Action") in the amount of $210,000,000, in cash, pursuant to the terms of the Stipulation and Agreement of Settlement, dated December 17, 2025. The Settlement is with Defendants Fidelity National Information Services, Inc. ("FIS" or the "Company"), Gary Norcross, James Woodall, Stephanie Ferris,[3] and Thomas Warren (collectively herein, "Defendants").

The Settlement is a very favorable result for the Settlement Class. It is within the top 100 securities class action settlements of all time, and believed to be the largest private, federal securities class action settlement in Florida history. Additionally, it is 12 times greater than the median reported recovery in securities class actions in 2025, which was $17 million.[4] As described below and in the accompanying Canty

---

[3] Pursuant to the terms of the Settlement, Lead Plaintiffs filed a stipulation of dismissal, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), voluntarily dismissing Ms. Ferris from the Action without prejudice. ECF No. 119.

[4] *See The Top 100 U.S. Class Action Settlements of All Time* (ISS/SCAS Dec. 31, 2025), Canty Decl. Ex. 3, at 13; Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in*
*(continued … )*

Declaration, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all, particularly in light of the possibility that the Court would, as a matter of law, credit Defendants' price impact arguments or find that the alleged corrective disclosures did not cause the losses for which Lead Plaintiffs seek to recover. In choosing to settle at this time, Lead Plaintiffs and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through a highly contested class certification process, summary judgment, and trial, as well as the duration and complexity of the legal proceedings that remained ahead.

The decision to settle was informed by a well-developed understanding of the strengths and weaknesses of the claims. Lead Plaintiffs litigated the Action with the utmost persistence and tenacity and were prepared to litigate their claims to trial. Lead Counsel, aided by Plaintiffs' Counsel, conducted a rigorous investigation of the claims at issue; prepared a detailed consolidated amended complaint; successfully opposed a motion to dismiss the amended complaint; obtained and analyzed approximately 2.8 million pages of documents produced by Defendants and third parties; participated in 13 depositions; moved for class certification; and engaged in arm's-length negotiations with a highly regarded Mediator. *See* Canty Decl. Sections III-V.

---

*Securities Class Action Litigation: 2025 Full-Year Review* (NERA Econ. Rsch. Assoc. Jan. 2026), Ex. 4 at 24. All exhibits herein are annexed to the Canty Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ -__." The first numerical reference is to the designation of the entire exhibit attached to the Declaration and the second alphabetical reference is to the exhibit designation within the exhibit itself.

3

Additionally, the Settlement has the full support of Lead Plaintiffs, sophisticated institutional investors that were actively involved throughout the litigation, diligently representing the Settlement Class. *See* Declaration of Timothy Melton and William Watts on behalf of North Carolina Retirement Systems and North Carolina Supplemental Retirement Plans, Ex. 1; and Declaration of Kyle Hanson on behalf of Nebraska Investment Council, Ex. 2.

The proposed Plan of Allocation for the distribution of the proceeds of the Settlement is a fair and reasonable method for distributing the Net Settlement Fund to eligible Claimants and should also be approved by the Court.

Given the foregoing considerations and the factors addressed below, Lead Plaintiffs respectfully submit that: (i) the Settlement meets the standards for final approval under Rule 23 and is a fair, reasonable, and adequate result for the Settlement Class; and (ii) the Plan of Allocation is a fair and reasonable method for allocating the Net Settlement Fund to Settlement Class Members who submit valid Claim Forms.

**PRELIMINARY APPROVAL AND THE NOTICE PROGRAM**

On February 18, 2026, the Court entered an order preliminarily approving the proposed Settlement, preliminarily certifying the Settlement Class,[5] and approving the forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order", ECF No. 125). Pursuant to and in compliance with the Preliminary Approval Order, beginning on March 4, 2026, the Court-appointed Claims

---

[5] *See* ECF No. 125 at 2-4. Nothing has occurred to alter the propriety of this determination.

Administrator, Verita Global, LLC ("Verita"), caused the Postcard Notice to be disseminated to potential Settlement Class Members and banks, brokers, and other nominees ("Nominees"). *See* Declaration of Lance Cavallo, dated May 13, 2026 ("Mailing Decl."), Ex. 5. To date, 841,390 Postcard Notices have been disseminated to potential class members or their Nominees. *Id.*, ¶¶2-9. In addition, Verita caused the Summary Notice to be transmitted over *PR Newswire* and published in *Investor's Business Daily* ("IBD"). *Id.*, ¶10 and Ex. C attached thereto.

The Claim Form, Postcard Notice, and the long-form Notice, along with other Settlement related documents, were posted on a website established by Verita for purposes of the Settlement. *Id.*, ¶¶12-13. The Settlement website also provides important dates and deadlines in connection with the Settlement, as well as access to downloadable copies of relevant documents, such as the Complaint, the Stipulation, and the Preliminary Approval Order, and access to an online claim portal. *Id.*, ¶13 Copies of the Postcard Notice, long-form Notice, and Claim Form are also available on Lead Counsel's website, www.labaton.com. ¶111.

The notices collectively describe, *inter alia*, the claims, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum attorneys' fees and expenses, the proposed Plan of Allocation, the right to object, and the right to seek exclusion from the Settlement Class. *See generally* Ex. 5-A to C. The notices also give the deadlines for objecting, seeking exclusion, and submitting claims,[6]

---

[6] Given that the claim deadline is May 28, 2026 and the majority of claims are submitted

*(continued … )*

and advise potential Settlement Class Members of the scheduled Settlement Hearing before this Court. *Id.* To date, the Settlement Class's reaction to the proposed Settlement has been positive. While the deadline (May 28, 2026) for objecting or seeking exclusion has not yet passed, to date there have been no objections to any aspect of the Settlement and only one request for exclusion from a non-class member.

## ARGUMENT

### I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

#### A. Standards for Final Approval

Courts have long recognized a strong public policy in favor of class action settlements. *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors pretrial settlement of class action lawsuits."). This is particularly true in complex securities cases. *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 667 (M.D. Ala. 1988) ("Due to the notable unpredictability of results in complex securities litigation and the distinct possibility of litigation spanning up to a decade or more, securities fraud class actions readily lend themselves to settlement.").

Rule 23(e)(2) provides that a class action settlement must obtain court approval, and should be approved if found to be "fair, reasonable, and adequate" upon consideration of whether:

---

right at the deadline, the Claims Administrator will report on the claims received in Lead Plaintiffs' June 18, 2026 reply papers. Ex. 5, ¶16.

6

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

(i)      the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3);[7] and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Rule 23, which was amended in December 2018, has not changed the well-established standard for approving a proposed class settlement, *i.e.* evaluating whether it is fair, adequate, and reasonable.[8] Courts in this District may also consider the

---

[7] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the parties in connection with a proposed settlement. Here, in addition to the Stipulation, the Parties executed a settlement Term Sheet and on December 17, 2025 they entered into a Confidential Supplemental Agreement Regarding Requests for Exclusion, concerning the circumstances under which FIS can terminate the Settlement based upon the number of exclusion requests received. *See In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x. 248, 250 n.4 (11th Cir. 2009) ("The threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out."). The Term Sheet, Stipulation, and the Supplemental Agreement are the only agreements concerning the Settlement entered into by the Parties.

[8] The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.

following factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), which substantially overlap with the Rule 23(e)(2) factors:

> (1) The likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*See City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*, 2024 WL 5468489, at *2-3 (S.D. Fla. Feb. 1, 2024) ("Given that the *Bennett* and the Rule 23(e)(2) factors overlap significantly, I consider them together."). Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), as well as the application of relevant, non-duplicative factors traditionally considered by the Eleventh Circuit.

### B. Approval of the Settlement under Rule 23(e)(2)

#### 1. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Lead Plaintiffs vigorously litigated the claims in the Action, and the Settlement was achieved only after diligent, arm's-length, and mediated negotiations between counsel with considerable knowledge and expertise in the field of federal securities law.

Lead Plaintiffs and Lead Counsel developed a deep understanding of the facts of the case and merits of the claims by, *inter alia*: (i) conducting an extensive

8

investigation of the claims and defenses; (ii) drafting a detailed consolidated amended complaint; (iii) defeating an extensive motion to dismiss; (iv) moving for class certification; (v) serving and responding to discovery requests; (v) obtaining and analyzing approximately 3.75 million pages of documents produced by Defendants, third parties, and Lead Plaintiffs; (vi) taking nine and defending four depositions; (vii) consulting with experts in the fields of accounting, revenue synergies, damages, and loss causation; and (viii) exchanging extensive mediation briefing and participating in a mediation session before a respected and experienced Mediator. *See generally* Canty Decl., Sections III-V.

Lead Plaintiffs are sophisticated institutional investors that played a crucial role in the litigation by, among other things, reviewing and monitoring the progress of the litigation and regularly conferring with Lead Counsel concerning its prosecution; reviewing periodic updates and other correspondence from Lead Counsel, including pleadings, briefs, and court orders; and responding to and producing documents pursuant to the discovery demands propounded by Defendants, ultimately producing approximately 13,550 documents (901,000 pages) to Defendants. Representatives from both NIC and North Carolina sat for a deposition in connection with class certification. Additionally, representatives from both NIC and North Carolina attended the full-day mediation on October 7, 2025 and played significant roles in the negotiations to achieve a settlement. *See generally* Exs. 1 & 2. With an informed understanding, Lead Plaintiffs agreed to the Settlement.

Lead Plaintiffs also had the benefit of the advice of knowledgeable counsel well-versed in securities class actions. Lead Counsel is highly qualified and experienced and has a long and successful track record in such cases (*see* Ex. 6-C (firm resume) and was able to successfully conduct the litigation against skilled opposing counsel.[9] Accordingly, the Settlement Class has been, and remains well represented. Moreover, Courts give considerable weight to the opinion of experienced and informed counsel. *See Lunsford v. Woodforest Nat'l Bank*, 2014 WL 12740375, at *9 (N.D. Ga. May 19, 2014) ("The Court should give 'great weight to the recommendation of counsel for the parties, given their considerable experience in this type of litigation.'").

### 2. The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations by Experienced Counsel

In weighing whether to approve a settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Courts presume that a proposed settlement is fair and reasonable when, as was the case here, it is the result of arm's-length negotiations between counsel. *See Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("There is a presumption of good faith in the negotiation process . . ."). Moreover, the involvement of an experienced mediator supports approval. *See, e.g.*, *Kukorinis v. Walmart, Inc.*, 2024 WL 3226772, at *5 (M.D. Fla. June 28, 2024) (approving settlement and noting the arm's-length negotiations between experienced counsel and the assistance of a neutral

---

[9] Defendants were represented by a very well-regarded law firms, Sidley Austin LLP and McGuireWoods LLP.

mediator); *Wilson v. EverBank*, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016) (finding that settlement negotiations overseen by a "nationally renowned" mediator weighed in favor of final settlement approval).

The Settlement was achieved after a formal mediation session on October 7, 2025, which included the submission of robust mediation materials to the Mediator. ¶67. During the mediation, the Parties vigorously asserted arguments concerning liability and damages. With Lead Plaintiffs and Defendants still meaningfully apart in their respective positions after the mediation, they agreed to continue negotiations through the Mediator. ¶68. On November 14, 2025, the Parties agreed to resolve the Action and thereafter executed a Term Sheet on November 17, 2025, subject to the negotiation of non-financial terms for the Settlement and Court approval. *Id*. At all times during the mediation and follow-up discussions, Lead Counsel and Defendants' Counsel zealously negotiated on behalf of their side's best interests.

### 3.    The Settlement Provides Significant and Certain Benefits to the Settlement Class, Considering the Costs, Risks, and Delay of Litigation and Other Rule 23(e)(2) Factors

In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This Rule 23(e)(2) factor encompasses four of the six factors considered under the traditional *Bennett* analysis: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and

reasonable; [and] (4) the complexity, expense, and duration of litigation." 737 F.2d at 986.

In assessing this factor, courts balance the continuing risks of litigation against the benefits of settlement. The proposed Settlement provides for a certain near-term recovery of $210 million to be allocated among Settlement Class Members following the deduction of Court-approved fees and expenses. In contrast, if the Action continued, the hurdles faced by the Settlement Class would be substantial. While Lead Plaintiffs are confident in their claims, further litigation—including the pending class certification motion, summary judgment, and trial—presented clear risks and significant challenges. *See In re Health Ins. Innovations Sec. Litig.*, 2020 WL 10486665, at *8 (M.D. Fla. Oct. 21, 2020), *report and recommendation adopted*, 2020 WL 10486666 (M.D. Fla. Nov. 19, 2020) ("there is an inherent risk in any litigation but particularly so in securities class action litigation"); *In re Netbank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011) ("the complexity of securities class action litigation is 'notably difficult and notoriously uncertain.'").

### (a)    Risks of Continued Litigation

**Material Falsity and Scienter**. Despite the Court's denial of Defendants' Motion to Dismiss, Lead Plaintiffs faced ongoing challenges to proving Defendants made materially false and misleading statements. To prevail on their Section 10(b) and Rule 10b-5 claims, Lead Plaintiffs would need to prove that each of the 27 challenged statements was materially false or misleading when made. The challenged statements fell into three categories: (1) eight statements reporting revenue synergies or cross sales;

12

(2) four statements about the integration of Worldpay or FIS's market share; and (3) fifteen statements about the goodwill reported for the Merchant Solutions segment. Defendants mounted vigorous defenses to each category, which posed strong risks of an adverse outcome at summary judgment or trial. ¶79.[10]

With respect to the revenue synergy statements, Defendants likely would have argued that the publicly reported synergies were true and accurate when made. Defendants have maintained that FIS had a robust internal system to validate every revenue synergy the Company publicly reported. Critically, Defendants would likely have sought to establish that the revenue synergies were independently validated by a major accounting firm. Using this evidence, Defendants would have argued that the revenue synergies were calculated appropriately and that Lead Plaintiffs' disagreement about how the synergies were defined did not amount to securities fraud. ¶¶80-81.

Regarding the goodwill statements, Defendants argued that their goodwill impairment assessments were opinion statements grounded in reasonable accounting judgments. Defendants likely would have presented evidence that FIS's Technical Accounting team evaluated potential triggering events every quarter and prepared detailed memos documenting its impairment conclusions. Defendants likely would have relied on the fact that KPMG, FIS's independent auditor, contemporaneously

---

[10] At the February 2026 preliminary approval hearing, counsel for Defendants reemphasized their confidence, stating: "we would have been able to show, based on the evidence developed during discovery, that none of the 27 challenged statements [were] false or misleading. We also feel strongly that we would have been able to show that none of the defendants acted with the requisite scienter." *See* Ex. 11, Feb. 12, 2026 Hearing Tr. at 27:15-20.

13

reviewed and agreed in writing with every relevant accounting judgment Defendants made during the Class Period. The concurrence of an independent auditor would have been a persuasive fact to a jury and could have presented obstacles to Lead Plaintiffs' ability to prove falsity. ¶¶82-83.

With respect to proving scienter, Defendants would have argued that the alleged misstatements were not made with the requisite fraudulent intent. Defendants would have presented the same documentation supporting their falsity counterarguments to negate scienter. For the revenue synergy statements, Defendants likely would have argued that the Individual Defendants reasonably relied on FIS's multi-layered synergy validation process, which negated any inference of intentional fraud. ¶85. With respect to the goodwill statements, Defendants likely would have argued that because the goodwill statements were opinions, the Eleventh Circuit required Lead Plaintiffs to show that the Individual Defendants "actually believe[d]" the statements were false. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019). ¶¶86-87.

While Lead Plaintiffs believed they could deduce sufficient evidence to support their scienter allegations, the strength of Defendants' counterevidence and the demanding scienter standard in the Eleventh Circuit created a real risk that a jury could conclude the Individual Defendants acted in good faith reliance on established internal processes and the concurrence of independent third-party auditors. ¶88.

**Class Certification.** Lead Plaintiffs' motion for class certification was fully briefed and pending when the Parties agreed to settle. If Defendants were successful in any of their arguments, particularly those that could have shortened the Class

14

Period, Lead Plaintiffs faced the prospect of losing a substantial amount of recoverable damages—potentially more than 85%. ¶¶33-42, ¶99.

In opposing class certification, Defendants argued that the alleged misrepresentations did not actually affect, or impact, the market price of FIS's common stock. Defendants argued that the Court must perform a "mismatch" analysis under *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021). ¶¶100-102.[11] According to Defendants, the alleged misstatements about revenue synergies, Worldpay, and market share did not "match" any of the back-end corrective disclosures and, thus, there is no evidence those statements impacted the stock price, and the Court should not certify the Class Period alleged by Lead Plaintiffs. Additionally, Defendants argued that the alleged misstatements about goodwill (which did not start until November 4, 2021) did not "match" the first or second of the three alleged corrective disclosures. Therefore, according to Defendants, only the goodwill statements could support an inference of price impact and only as to the last alleged corrective disclosure (*i.e.*, the corrective disclosure on February 13, 2023). ¶102.

Had Defendants prevailed on their full mismatch argument, the results would have been devastating to the class's potential recovery. The Class Period would have started on November 4, 2021 (the date of the first goodwill statement), rather than May

---

[11] Indeed, at the February 2026 preliminary approval hearing, counsel for Defendants emphasized that "we feel very strongly about the arguments we raised about the Supreme Court's recent decision in the *Goldman* case…. we've fully briefed those issues, including with a sur-reply accepted by the Court." Ex. 11 at 28:4-7.

15

7, 2020, and the certified claims would have been limited solely to the goodwill statements and the February 13, 2023 corrective disclosure. As explained below, in this scenario, estimated class wide damages would have dropped to approximately $1.8 billion, before the disaggregation of any non-fraud related information. Even a partial victory for Defendants—for example, eliminating the revenue synergy and integration statements but retaining the full set of goodwill statements and all three corrective disclosures—would have reduced estimated aggregate damages to approximately $5.9 billion, before disaggregation. ¶103.

Lead Plaintiffs vigorously opposed Defendants' mismatch arguments at class certification. For example, Lead Plaintiffs argued that *Goldman's* mismatch framework was explicitly premised on the generic nature of the misstatements in that case and does not apply to cases like this one with specific, detailed misstatements. ¶104. However, this was the first case in the Eleventh Circuit to require full application of the *Goldman* mismatch test at class certification, which is a new and evolving area of law, and post-*Goldman* decisions in other circuits have granted defendants substantial relief on similar arguments. ¶105. Although Lead Plaintiffs believe that Defendants' arguments ultimately would have been rejected by the Court, they nonetheless recognize that there was a risk of the Court agreeing with Defendants, in whole or in part. Even if the Court had rejected Defendants' arguments, Defendants would have undoubtedly filed a Rule 23(f) appeal and continued to press these issues at summary judgment and trial. ¶106.

**Loss Causation and Damages.** Even if Lead Plaintiffs were successful in proving material falsity and scienter with respect to the alleged misstatements, and maintaining certification through trial, they faced ongoing challenges and uncertainty with respect to proving loss causation and damages for the full Class Period. ¶¶89-98; *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"). The Eleventh Circuit imposes a stringent loss causation standard, requiring plaintiffs to show that the alleged corrective disclosures in fact corrected the alleged misstatements. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023) (requiring plaintiffs to "eliminate other possible explanations for the price drop").

Defendants contended that the three alleged corrective disclosures did not reveal any truth about the revenue synergy or Worldpay integration statements. Defendants argued that the first two corrective disclosures (on August 4, 2022 and November 3, 2022) concerned adjusted EBITDA margins, volume decreases, and profitability—which they argued, with the support of their expert Dr. Douglas Skinner, were unrelated to revenue synergies, cross sales, integration, or goodwill. Further, Defendants argued that not a single analyst report associated any of the corrective disclosures with the amount or existence of revenue synergies and that analysts continued to report on FIS's $750 million revenue synergies even after the last corrective disclosure. ¶91.

Separately, Defendants would have also argued that confounding information

17

contributed materially to the stock price declines on the alleged corrective disclosure dates, and that Lead Plaintiffs could not adequately "disaggregate" the fraud-related losses from the non-fraud-related losses—which would eliminate or substantially reduce recoverable damages. ¶¶92-93. For example, on each of the first two corrective disclosure dates, FIS also reduced forward guidance due to macroeconomic headwinds—including inflation, interest rate hikes, and the impact of the Russia–Ukraine conflict—that were unrelated to the alleged misstatements. ¶92.

Lead Plaintiffs consulted with experts in the fields of damages and loss causation who analyzed class wide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. Lead Plaintiffs' primary damages expert has estimated that maximum damages were approximately $10.5 billion if the full Class Period and each corrective disclosure remained in the case. ¶93. If disaggregation of confounding information was required, damages even in the best-case full Class Period scenario could be reduced by almost 50% to approximately $5.7 billion. *Id.*

Given these issues, a better comparator for evaluating the Settlement also takes into consideration Defendants' arguments and aligns with the evidence obtained to date, which provided much stronger support for the class's claims late in the Class Period compared to earlier claims. Analysis more aligned with the strengths of the case leads to lower damages estimates. For example, if Defendants prevailed in showing that the revenue synergy statements and Worldpay statements made early in the Class Period did not "match" any of the corrective disclosures, or that the corrective

disclosures did not reveal anything about the falsity of these statements, the Class Period would start on November 4, 2021, the date of the first goodwill statement that is alleged to have been false or misleading. In this scenario—where only the goodwill statements remain but all three corrective disclosures were still in the case—estimated aggregate damages would drop to approximately $5.9 billion, without accounting for disaggregation. ¶¶94-95.

But Defendants would also likely argue that in this scenario—where the Class Period starts on November 4, 2022 (the first Goodwill statement)—the first two corrective disclosures did not in fact reveal anything about Worldpay's goodwill, and therefore, only the final corrective disclosure (February 13, 2023) actually corrected the goodwill statements. If the Court were to agree with this argument, Lead Plaintiffs' expert estimates that aggregate damages would drop to approximately $1.8 billion, without disaggregation, and $1.1 billion, with disaggregation. ¶96.

Under these scenarios starting at the $5.9 billion level, the $210 million settlement represents approximately 3.6% to 11.7% of estimated damages without disaggregation, and approximately 6% to 19% of estimated damages, with disaggregation. ¶97. These percentages compare favorably to similar court-approved securities settlements. *See, e.g.*, *In re: Alibaba Grp. Holding Ltd. Sec. Litig.*, No. 1:20-CV-09568 (S.D.N.Y. Mar. 27, 2025), ECF No. 143 (final approval motion for $433.5 million settlement representing 3.73% of maximum damages) and ECF No. 151 (judgment approving settlement); *In re Teva Sec. Litig.*, No. 3:17-cv-00558 (D. Conn. Jun. 2, 2022), ECF No. 950-1 (final approval motion for $420 million settlement

19

representing 3.4% recovery of maximum damages) and ECF No. 964 (judgment approving settlement). According to NERA's full-year 2025 report, for cases with total NERA-defined investor losses of between $1 billion and $4.9 billion, the median percentage of recovery from 2016 to 2025 was 1.3% of estimated losses. *See*, NERA Report, Ex. 4 at 27. For cases with NERA-defined losses of $5 billion to $9.999 billion, the median percentage of recovery was 0.7%. *Id*.

Accordingly, in light of all these substantial risks, and compared to the certain and prompt recovery of $210 million, Lead Plaintiffs and Lead Counsel believe the Settlement is a very favorable result.

### (b)    The Expense and Duration of Continued Litigation

Although the case was well-advanced, further litigation would have been expensive and time-consuming for both sides. Absent the Settlement, achieving a recovery for the Settlement Class would have potentially required completing complex and expensive expert discovery; briefing anticipated motions for summary judgment; trial preparation and trial; and post-trial motions and appeals, among other things. The fact that the Settlement eliminates this delay and expense favors final approval.

### (c)    The Effective Process for Distributing Relief

The Settlement, like most securities class action settlements, will be effectuated with the assistance of an established and experienced claims administrator, Verita. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Potential Settlement Class Members can submit, either by mail or online, the Court-approved Claim Form. Based on trade information provided

20

by Claimants, the Claims Administrator will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation,[12] and ultimately determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation, ¶27; Ex. 5-B, ¶¶52-61. Lead Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation, ¶33(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id.*

### (d)    The Settlement Does Not Excessively Compensate Lead Counsel

As discussed in Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, the requested fee award of 21.76% of the Settlement Fund would be reasonable in light of counsel's efforts, the result obtained for the Settlement Class, and the risks in the litigation. Additionally, the Court's approval of attorneys' fees is entirely separate from its approval of the Settlement, and neither Lead Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.[13]

### 4.    Settlement Class Members Are Treated Equitably

The Settlement does not improperly grant preferential treatment to Lead

---

[12] Approval of the Plan of Allocation is discussed in Section II, below.

[13] Additionally, the provision that any Court-awarded attorneys' fees be paid upon the later of the award or entry of the Judgment is reasonable and consistent with common practice in similar cases. The Stipulation requires that if the Settlement is terminated or the fee award is modified, Lead Counsel must repay the amount with interest. *See* Stipulation at ¶18.

21

Plaintiffs or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Lead Plaintiffs, will receive a *pro rata* distribution from the Net Settlement Fund pursuant to the plan of allocation approved by the Court.[14] Moreover, Lead Counsel developed the proposed Plan of Allocation with the assistance of Lead Plaintiffs' damages expert and it is consistent with the Settlement Class's theories of damages under the Exchange Act. ¶¶115-116.

### 5. The Remaining Eleventh Circuit Factors Support Approval of the Settlement

When assessing a proposed settlement, courts in this Circuit also consider the opposition to the Settlement (fifth *Bennett* factor) and the stage of the proceedings when the settlement was achieved (sixth *Bennett* factor). *See Bennett*, 737 F. 2d at 986. Both of these factors support approval of the Settlement.

While the deadline to object or request exclusion (May 28, 2026) has not yet passed, there have been no objections and only one request for exclusion (submitted by a non-class member). ¶112; *see Malespin*, 2023 WL 11820921, at *1 (granting final approval after noting that "no class member opted out of the settlement or objected to its terms."); *see also In re Health Ins. Innovations Sec. Litig.,* 2021 WL 1341881, at *9

---

[14] Although Lead Plaintiff North Carolina is seeking reimbursement of its reasonable costs and expenses (including lost wages) directly related to its participation in the Action, pursuant to the PSLRA, this would not constitute preferential treatment. *See* 15 U.S.C. § 78u-4(a)(4) (reimbursement of a plaintiff's costs and expenses is explicitly contemplated, in addition to receiving a *pro rata* portion of the recovery).

(M.D. Fla. Mar. 23, 2021) (absence of "objections or requests for exclusion" "weighs heavily in favor of the Settlement being fair and reasonable.").[15]

The stage of proceedings at the time of settlement also supports approval. Lead Counsel, with the assistance of other Plaintiffs' Counsel, conducted a rigorous investigation of the claims prior to preparing a detailed amended complaint; successfully opposed a motion to dismiss; engaged in substantial fact discovery; moved for certification of the class; and prepared for settlement negotiations with Defendants. *See* ¶¶23-68. Accordingly, Lead Plaintiffs and Lead Counsel respectfully submit that they had "sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at \*10 (N.D. Ga. Mar. 17, 2020) *aff'd,* 999 F.3d 1247 (11th Cir. 2021). In sum, all of the factors to be considered under Rule 23(e)(2) and Eleventh Circuit precedent support final approval of the Settlement.

## II.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

A plan for allocating settlement proceeds should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *See In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587618, at \*28 (N.D. Ala. Aug. 9, 2022); *see also Malespin*, 2023 WL 11820921, at \*2 (considering whether "we should approve the proposed plan of allocation as a fair and reasonable method to allocate the net settlement fund among Settlement Class Members"). A plan does not need to be tailored to fit each and every

---

[15] Lead Plaintiffs will file reply papers no later than June 18, 2026 that address any objections and any requests for exclusion received after this submission.

class member with precision but will be found fair and reasonable where there is a "rough correlation" between class members' injuries and the settlement distribution. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 240 (5th Cir. 1982).

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members who submit valid claims. The Plan is set forth in full in the long-form Notice. *See* Ex. 5-B, ¶¶52-72. It provides for the distribution of the Net Settlement Fund based upon each Settlement Class Member's "Recognized Claim," as calculated by the formulas described in the Notice. In developing the Plan, Lead Plaintiffs' damages expert considered the amount of artificial inflation in the per share price of FIS common stock during the Class Period that was allegedly caused by Defendants' alleged wrongdoing. *Id.*, ¶56.

The proposed Plan is designed to fairly and rationally allocate the Settlement among the class. To date, no objections to the proposed plan have been received. ¶119; *see Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *4 (S.D. Fla. 2016) (finding lack of objections to support approval of proposed plan of allocation).

## III.    NOTICE SATISFIED RULE 23, DUE PROCESS AND THE PSLRA

Notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). In granting preliminary approval of the Settlement, the Court approved Lead Plaintiffs' proposed notice plan. ECF No. 125 at 6-10. The contents of the notices here provide the necessary information for Settlement Class Members to make an informed

decision regarding the Settlement and contain all of the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u4(a)(7).

The notice program's combination of individually mailed Postcard Notices to all Settlement Class Members who could be identified with reasonable effort, supplemented by the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23, due process, and the PSLRA. *See, e.g.*, *Edge v. Fernandez,* 2026 WL 937243, at *3 (M.D. Fla. Apr. 7, 2026) (approving similar notice program that included mailing postcard notices to potential class members and nominees followed by publication notice and posting notice on a settlement website).

As of May 13, 2026, a total of 841,390 copies of the Postcard Notice have been disseminated to Settlement Class Members and Nominees. *See* Ex. 5, ¶¶2-9. In addition, Verita caused the Summary Notice to be issued and transmitted over *PR Newswire*, and published in *IBD*. *Id*., ¶10.[16] Additional information, as well as access to copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Complaint, are available on the Settlement website maintained by the Claims Administrator: www.FISSecuritiessettlement.com. *Id*., ¶¶12-13.

**CONCLUSION**

For the reasons set forth herein and in the Canty Declaration, Lead Plaintiffs

---

[16] Lead Plaintiffs filed a notice explaining that "due to an inadvertent processing error by *IBD*, the summary notice was in advertently not published in *IBD* on Monday, March 16, as arranged by the Claims Administrator, due to an error by the publication." ECF No. 128.

respectfully request that the Court grant final approval of the Settlement, approve the

Plan of Allocation for the distribution of the proceeds of the Settlement, and certify

the Settlement Class for purposes of the Settlement only. Proposed orders will be

submitted with Lead Plaintiffs' reply papers, after the deadline for objecting and

seeking exclusion from the Settlement Class has passed.

Dated: May 14, 2026                      Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com

*Lead Counsel for Lead Plaintiffs Nebraska
Investment Council, North Carolina Retirement
Systems, and North Carolina Supplemental
Retirement Plans*

**GRAYROBINSON, P.A.**
John A. Boudet (FL Bar No. 515670)
301 East Pine Street
Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
john.boudet@gray-robinson.com

26

*Liaison Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

27

## LOCAL RULE 3.01(G) CERTIFICATE

I HEREBY CERTIFY that we have conferred with counsel for Defendants in this Action and they do not oppose the relief requested by this motion.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026.


*/s/ Michael P. Canty*
Michael P. Canty

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 14, 2026, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026.


/s/ *Michael P. Canty*
Michael P. Canty