**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE FIDELITY NATIONAL INFORMATION SERVICES, INC. SECURITIES LITIGATION | Case No. 3:23-cv-252-TJC-PDB<br>Honorable Timothy J. Corrigan<br>Honorable Patricia D. Barksdale |

**LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES AND MEMORANDUM IN SUPPORT THEREOF**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

MEMORANDUM OF LAW ........ 2

PRELIMINARY STATEMENT ........ 2

ARGUMENT ........ 4

I. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND WARRANT THE COURT'S APPROVAL ........ 4

A. The Settlement Creates a Common Fund from Which a "Percentage-of-the-Fund" Fee Would Be Appropriate ........ 4

B. The Requested Fee of 21.76% Is Comparable to Awards in Similar Cases ........ 5

C. Lead Counsel's Fee Request Is Fair and Reasonable under Eleventh Circuit Authority ........ 7

1. The Time and Labor Required ........ 8

2. The Novelty and Difficulty of the Issues ........ 10

3. The Skill Required to Perform the Legal Services Properly, and the Experience, Reputation, and Ability of the Attorneys ........ 14

4. The Preclusion of Other Employment ........ 15

5. The Customary and Contingent Nature of the Fee ........ 15

6. The Amount Involved and Results Achieved ........ 16

7. Awards in Similar Cases ........ 18

8. Reaction of the Class to Date ........ 18

II. LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION EXPENSES IS REASONABLE ........ 19

III. A PSLRA AWARD TO LEAD PLAINTIFF NORTH CAROLINA WOULD BE REASONABLE ........ 21

CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrews v. Plains All Am. Pipeline L.P.*,
2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) .................................................. 7

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd, Hubbard v. BankAtlantic Bancorp, Inc. Sec. Litig.*, 688 F.3d 713 (11th Cir. 2012)...................................... 16

*Blum v. Stenson*,
465 U.S. 886 (1984) .........................................................................4, 10

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ............................................................................ 4

*Cabot E. Broward 2 LLC v. Cabot*,
2018 WL 5905415 (S.D. Fla. Nov. 9, 2018) ................................................... 6

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
946 F.2d 768 (11th Cir. 1991)...........................................................*passim*

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
587 F. Supp. 2d 1266 (N.D. Ga. 2008) ........................................................ 19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 4126533 (N.D. Cal. Aug. 3, 2016).................................................... 7

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ......................................................... 6

*Christine Asia Co. Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019).................................................... 7

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
2012 WL 12540344 (N.D. Ga. Oct. 26, 2012)...........................................10, 14

*In re Comverse Tech., Inc. Sec. Litig.*,
2010 WL 2653354 (E.D.N.Y. June 24, 2010) ................................................... 7

*David v. Am. Suzuki Motor Corp.*,
2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) .......... 14

*In re Domestic Air Transp. Antitrust Litig.*,
148 F.R.D. 297 (N.D. Ga. 1993) .......... 4

*Edge v. Fernandez*,
2026 WL 936499 (N.D. Fla. Apr. 7, 2026) .......... 22

*In re Equifax Inc. Customer Data Breach Sec. Litig.*,
2020 WL 256132 (N.D. Ga. Mar. 17, 2020),
*aff'd and rev'd in part*, 999 F.3d 1247 (11th Cir. 2021) .......... 5, 6, 10, 20

*Faught v. Am. Home Shield Corp.*,
668 F.3d 1233 (11th Cir. 2011) .......... 5

*In re Friedman's Inc. Sec. Litig.*,
2009 WL 1456698 (N.D. Ga. May 22, 2009) .......... 16, 19

*Goldman Sachs Grp, Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .......... 13

*In re Health Ins. Innovations Sec. Litig.*,
2021 WL 1341881 (M.D. Fla. Mar. 23, 2021) .......... 5, 10, 16, 22

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) .......... 6

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (11th Cir. 1974) .......... 8, 22

*Johnson v. NPAS Sols., LLC*,
975 F.3d 1244 (11th Cir. 2020) .......... 21

*Kukorinis v. Walmart, Inc.*,
2024 WL 3226772 (M.D. Fla. June 28, 2024) .......... 15

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
2015 WL 5626414 (N.D. Ala. Sept. 14, 2015) .......... 6

*Mashburn v. Nat'l Healthcare, Inc.*,
684 F. Supp. 679 (M.D. Ala. 1988) .......... 10

*Missouri v. Jenkins*,
491 U.S. 274 (1989) .......... 10

*In re NetBank, Inc. Sec. Litig.*,
2011 WL 13353222 (N.D. Ga. Nov. 9, 2011) .......... 11, 15

*Pinto v. Princess Cruise Lines Ltd.*,
513 F. Supp. 2d 1334 (S.D. Fla. 2007) .......... 15

*Pub. Emps.' Ret. Sys. of Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
2023 WL 11974622 (N.D. Ga. May 31, 2023) .......... 22

*In re Rayonier Inc. Sec. Litig.*,
2017 WL 4542852 (M.D. Fla. Oct. 5, 2017) .......... 6

*Ressler v. Jacobson*,
822 F. Supp. 1551 (M.D. Fla. 1992) .......... 13, 14

*Robbins v. Koger Props., Inc.*,
116 F.3d 1441 (11th Cir. 1997) .......... 15, 16

*Rodriguez v. ALFI, Inc.*,
2024 WL 1091798 (S.D. Fla. Mar. 11, 2024) .......... 22

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) .......... 7

*In re Sunbeam Sec. Litig.*,
176 F. Supp. 2d 1323 (S.D. Fla. 2001) .......... 6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) .......... 6

*Thorpe v. Walter Inv. Mgmt. Corp.*,
2016 WL 10518902 (S.D. Fla. Oct. 14, 2016) .......... 17

*In re U.S. Foodservice Inc. Pricing Litig.*,
2014 WL 12862264 (D. Conn. Dec. 9, 2014) .......... 7

*Waters v. Int'l Precious Metal Corp.*,
190 F.3d 1291 (11th Cir. 1999) .......... 9

**DOCKETED CASES**

*In re: Alibaba Grp. Holding Ltd. Sec. Litig.*,
No. 1:20-CV-09568, slip op. (S.D.N.Y. Mar. 27, 2025) .......... 17

*Messiha v. Citrix Sys., Inc.*,
No. 0:22-cv-62327-RAR, slip op. (S.D. Fla. Nov. 4, 2024) .............................. 22

*In re Pfizer Inc. Sec. Litig.*,
No. 1:04-cv-09866- LTS-HBP, slip op. (S.D.N.Y. Dec. 21, 2016) .......................... 7

*Steinberg v. OPKO, Health, Inc.*,
Case No. 1:18-cv-23786, slip op. (S.D. Fla. Apr. 29, 2021) ................................ 22

**STATUTES & RULES**

15 U.S.C. §78u-4(a)(6) ........................................................................ 5

15 U.S.C. § 78u-4(a)(4) ........................................................................ 1, 21, 23

Fed. R. Civ. P. Rule 23(h) ........................................................................ 4

Court-appointed Lead Counsel Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), on behalf of itself and other Plaintiffs' Counsel,[1] will move this Court on July 9, 2026, at 10 a.m., for an Order, pursuant to Federal Rules of Civil Procedure 23(e) and 54(d): (i) awarding attorneys' fees in the amount of 21.76% of the Settlement Fund; (ii) awarding Litigation Expenses in the amount of $1,039,881.61, plus accrued interest, from the Settlement Fund; and (iii) approving Lead Plaintiff North Carolina's request for $4,050.00 related to their representation of the Settlement Class, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(4).[2] Defendants take no position on the relief requested in this motion. The motion is based on the incorporated Memorandum of Law and the Declaration of Michael P. Canty, dated May 14, 2026, ("Canty Declaration" or "Canty Decl.") with annexed exhibits, filed herewith.[3]

Pursuant to the Preliminary Approval Order, any objections to this motion must be received by May 28, 2026. A proposed Order will be submitted with Lead Counsel's

[1] "Plaintiffs' Counsel" are Labaton Keller Sucharow LLP, Liaison Counsel GrayRobinson, P.A., and NIC's outside counsel Baylor Evnen Wolfe & Tannehill, LLP.

[2] All capitalized terms used and not otherwise defined in this memorandum have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated as of December 17, 2025 (the "Stipulation"), previously filed with the Court (ECF No. 120-2).

[3] The Canty Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter* alia: the history of the Action; the nature of the claims asserted; the litigation efforts; and the risks and uncertainties of continued litigation. Citations to "¶" in this memorandum refer to paragraphs of the Canty Declaration. All exhibits referenced below are attached to the Canty Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Canty Declaration and the second alphabetical reference is to the exhibit designation within the exhibit itself. Emphasis is added and citations are omitted unless otherwise noted.

reply papers on June 18, 2026, after the deadline for objections has passed.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

As detailed in the Stipulation and Agreement of Settlement, the proposed Settlement, if approved by the Court, will resolve this litigation in its entirety in exchange for a cash payment of $210,000,000. This recovery represents a very favorable result for the Settlement Class as it provides substantial, near-term compensation to Settlement Class Members, while avoiding the risks associated with pursuing the Action through highly contested class certification proceedings, summary judgment, a potential trial, and the inevitable appeals that would follow.

The $210 million all-cash recovery, which is among the top 100 securities settlements of all time and believed to be the largest private, federal securities class action settlement in Florida history, was achieved through the skill, experience, and effective advocacy of Lead Counsel in the face of considerable challenges and an aggressive defense mounted by Defendants, who were represented by able and knowledgeable counsel. The Settlement was reached only after Lead Counsel, with the assistance of Plaintiffs' Counsel, vigorously pursued the claims for nearly three years, overcoming Defendants' motion to dismiss and building the case through discovery, which included the review and analysis of approximately 2.8 million pages of documents produced by Defendants and third parties and participation in 13 depositions. Lead Counsel also engaged in robust settlement negotiations with Defendants, including the exchange of mediation briefing and participation in a full-

day mediation session, with the assistance of an experienced and highly respected Mediator. This dedication of effort has resulted in a very favorable and significant cash recovery for the Settlement Class.

For these efforts, Lead Counsel, on behalf of Plaintiffs' Counsel, respectfully requests an award of attorneys' fees in the amount of 21.76% of the Settlement Fund. As discussed herein, the requested 21.76% fee is below the 25% "benchmark" regularly awarded in the Eleventh Circuit in securities class actions. The requested fee also represents a reasonable multiplier of 1.8 on Plaintiffs' Counsel's "lodestar" of more than $25 million. In addition, Lead Counsel seeks payment of Litigation Expenses in the amount of $1,039,881.61, plus accrued interest. These expenses, as discussed below, were reasonable and necessary for the successful prosecution of the case.

Finally, Lead Plaintiffs—institutional investors who oversaw the prosecution of the Action—approve of and endorse the requested fee. *See* Declaration of Timothy Melton and William Watts on Behalf of North Carolina Retirement Systems and North Carolina Supplemental Retirement Plans (Ex. 1) and Declaration of Kyle Hanson on Behalf of the Nebraska Investment Council (Ex. 2). This endorsement is particularly significant because the PSLRA was enacted to encourage sophisticated institutional investors to seek lead plaintiff status and oversee securities class actions. Moreover, although 841,390 Postcard Notices have been disseminated advising that Lead Counsel would seek fees not to exceed 22% of the Settlement Fund and expenses not to exceed $1.3 million, not a single Settlement Class Member has filed an

objection. *See* Declaration of Lance Cavallo, dated May 13, 2026 ("Mailing Decl."), Ex. 5.

In sum, Lead Counsel respectfully requests that the Court approve the requested attorneys' fees and Litigation Expenses for the reasons set forth below.

## ARGUMENT

### I. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND WARRANT THE COURT'S APPROVAL

#### A. The Settlement Creates a Common Fund from Which a "Percentage-of-the-Fund" Fee Would Be Appropriate

Pursuant to Rule 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). As the Supreme Court has recognized, a "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *see also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 353 (N.D. Ga. 1993) (fees are awarded "to compensate successful attorneys" for the "benefits they have achieved . . . the risks . . . taken in prosecuting a long and complex case," and "the hours and expenses . . . invested in the case").

The Supreme Court has also suggested that the percentage-of-recovery method is the appropriate method for awarding fees under the common fund doctrine. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class . . . .").

Likewise, the Eleventh Circuit has held that, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774; *accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011); *see also In re Health Ins. Innovations Sec. Litig.*, 2021 WL 1341881, at *10 (M.D. Fla. Mar. 23, 2021) *report and recommendation adopted*, 2021 WL 1186838 (M.D. Fla. Mar. 30, 2021) ("The Eleventh Circuit . . . has made clear that the percentage of recovery method is the most appropriate for evaluating common fund fee requests."); *In re Equifax Inc. Customer Data Breach Sec. Litig.*, 2020 WL 256132, at *31 (N.D. Ga. Mar. 17, 2020), *aff'd and rev'd in part*, 999 F.3d 1247 (11th Cir. 2021) (this method is the "exclusive method in this Circuit for calculating fees in a common fund case").[4]

As explained below, the factors courts consider when assessing percentage-of-recovery requests demonstrate the reasonableness of the requested fee.

### B. The Requested Fee of 21.76% Is Comparable to Awards in Similar Cases

The requested fee of 21.76% is a reasonable percentage of the Settlement Fund and is at the lower end of the range of fee awards frequently approved by courts within the Eleventh Circuit. The Eleventh Circuit has established that 25% of a settlement fund is the "benchmark" fee award in common fund cases. *Camden I*, 946 F.2d at 774-

[4] The use of the percentage method also comports with the PSLRA, which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff shall not exceed a ***reasonable percentage*** of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. §78u-4(a)(6).

75 ("[t]he majority of common fund fee awards fall between 20% to 30% of the fund" and district courts consider the middle of that range – 25% – a "benchmark" that "may be adjusted in accordance with the individual circumstances of each case"); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *1 (M.D. Fla. Oct. 5, 2017) (noting that courts are establishing 25% as the benchmark for common fund cases in the Eleventh Circuit); *Equifax Data Breach*, 2020 WL 256132, at *31 ("[t]ypically, awards range from 20% to 30%, and 25% is considered the 'benchmark percentage'" in common fund cases).

A review of percentage fee awards approved by courts within the Eleventh Circuit, and elsewhere, in large common fund settlements supports that a 21.76% fee would be fair and reasonable here. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (awarding 30% of $410 million settlement); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (awarding 25% of $110 million settlement); *Cabot E. Broward 2 LLC v. Cabot*, 2018 WL 5905415, at *2 (S.D. Fla. Nov. 9, 2018) (awarding 33.33% of $100 million settlement); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2015 WL 5626414, at *1 (N.D. Ala. Sept. 14, 2015) (awarding 30% of $90 million settlement); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *3 (awarding 30% of $73 million settlement); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *16-17 (N.D. Cal. Apr. 3, 2013) (awarding 28.5% of $1.08 billion settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 & n.354 (S.D.N.Y. 2009) (awarding 33.3% of $586

million settlement); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) (awarding 27.5% of $576.75 million settlement); *In re Pfizer Inc. Sec. Litig.*, No. 1:04-cv-09866- LTS-HBP, slip op. at 2 (S.D.N.Y. Dec. 21, 2016) (ECF No. 727) (awarding 28% of $486 million settlement) (Ex. 8);[5] *In re U.S. Foodservice Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) (awarding 33.33% of $297 million settlement); *Christine Asia Co. Ltd. v. Yun Ma*, 2019 WL 5257534, at *20 (S.D.N.Y. Oct. 16, 2019) (awarding 25% of $250 million settlement); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *15-16 (S.D.N.Y. July 21, 2020) (awarding 25% of $240 million); *Andrews v. Plains All Am. Pipeline L.P.*, 2022 WL 4453864, at *4 (C.D. Cal. Sept. 20, 2022) (awarding 32% of $230 million settlement); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million settlement).

Additionally, according to NERA Economic Research, the median attorneys' fee award in settlements of $100 million to $500 million was 25%. *See* Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA, Inc. Jan. 2026), Ex. 4 at 31.

It is respectfully submitted that Lead Counsel's 21.76% fee request is reasonable when compared to fees awarded in other significant settlements.

### C. Lead Counsel's Fee Request Is Fair and Reasonable under Eleventh Circuit Authority

In *Camden I*, the Eleventh Circuit recommended that district courts consider

[5] Copies of unreported "slip" opinions are submitted herewith as Exhibit 8.

several factors in determining whether a requested fee is reasonable, including:

> (1) the time and labor required; (2) the novelty and the difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

946 F.2d at 772 n.3 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (11th Cir. 1974)). *Camden I* also recognized additional factors for consideration in awarding a percentage fee award, including "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel. . . and the economics involved in prosecuting a class action." *Id*. at 775. An analysis of the most relevant factors confirms that the fee requested here is fair and reasonable.[6]

### 1. The Time and Labor Required

A review of the time and effort expended by Plaintiffs' Counsel supports the requested fee. The Canty Declaration details the breadth and depth of counsel's efforts to prosecute the Settlement Class's claims against Defendants, the time expended, and the diligence of those efforts. Indeed, the Settlement was reached at a point in the litigation where Lead Counsel had committed extensive resources to understanding the facts and challenges posed by the claims and defenses at issue, and the factors that

[6] With respect to the seventh and eleventh factors, respectively, there were no particular time limitations at issue in the Action and Lead Counsel have represented the Lead Plaintiffs in a number of securities class actions over the past five years.

would impact any recovery. Lead Counsel, *inter alia*: (i) conducted a comprehensive factual investigation of the claims at issue, including dozens of interviews with former FIS employees and other persons with potentially relevant knowledge; (ii) drafted the detailed Complaint; (iii) researched and drafted a successful opposition to Defendants' comprehensive motion to dismiss the Complaint; (iv) engaged in extensive discovery, including taking or defending 13 depositions and analyzing approximately 3.75 million pages of documents produced by Defendants, Lead Plaintiffs, and third parties; (v) moved for class certification; (vi) consulted with experts on matters involving accounting for goodwill, revenue synergies, damages, market efficiency and loss causation; and (viii) engaged in extensive settlement negotiations and formal mediation with a highly experienced Mediator. *See generally* Canty Decl. at §§III.-V.

Plaintiffs' Counsel expended more than 49,000 hours in connection with the prosecution and resolution of the Action resulting in a "lodestar" of $25,169,143. ¶141; *see also* Ex. 6-A, Ex. 7-A, and Ex. 9 (Summary Table of Lodestars and Expenses). While not required in the Eleventh Circuit, an analysis of the requested fee under the "lodestar/multiplier" approach further supports the reasonableness of a 21.76% award. *See, e.g., Waters v. Int'l Precious Metal Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999) ("while we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we may refer to that figure for comparison"). Here, based on the $210 million Settlement, a 21.76% fee award would result in a "multiplier" of

approximately 1.8.[7] Lead Counsel's work will continue beyond approval of the Settlement, with no additional compensation. ¶141 fn. 13.

This multiplier is well within the range of multipliers frequently within the Eleventh Circuit. *See, e.g., Equifax Data Breach*, 2020 WL 256132, at *39 (awarding fee representing 2.62 multiplier as "consistent with multipliers approved in other cases"); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2012 WL 12540344, at *5 & n.4 (N.D. Ga. Oct. 26, 2012) (finding multiplier of 4 times lodestar "well within" the accepted range). Accordingly, the time and labor required amply demonstrate the reasonableness of the attorneys' fee request.

### 2. The Novelty and Difficulty of the Issues

Lead Plaintiffs and Lead Counsel faced all the "multi-faceted, complex legal questions, including proving falsity, scienter, materiality, causation and damages" endemic to cases based on alleged violations of federal securities law. *In re Health Ins. Innovations Sec. Litig.*, 2021 WL 1341881, at *11. Indeed, courts have acknowledged that "securities class action litigation is 'notably difficult and notoriously uncertain.'"

[7] The multiplier is calculated by dividing the $45,696,000 fee request by the $25,169,143 lodestar. It is appropriate to use counsel's current hourly rates in order to compensate for the delay in payment and inflation. *See Missouri v. Jenkins,* 491 U.S. 274, 284 (1989); *see also Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 700 (M.D. Ala. 1988). Plaintiffs' Counsel's hourly rates are comparable to those used by counsel in other complex securities or shareholder litigation. They are also commensurate with rates used by peer defense-side law firms litigating matters of a similar magnitude, as shown by an analysis of defense firm hourly rates compiled by Labaton from bankruptcy court filings nationwide in 2025. *See* Ex. 10; *see also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (explaining that courts should consider whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation").

*In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011). This Action was no exception.

Lead Counsel confronted a number of significant challenges to establishing Defendants' liability and damages in the Action. ¶¶78-98. Despite the Order on the Motion to Dismiss, Lead Plaintiffs faced ongoing risks with respect to proving that Defendants made materially false and misleading statements with scienter. The 27 challenged statements fell into three categories: (1) eight statements reporting specific amounts of revenue synergies or cross sales; (2) four statements about the integration of Worldpay into FIS or FIS's market share; and (3) fifteen statements about the goodwill reported for the Merchant Solutions segment. Defendants mounted vigorous defenses to each category, which posed strong risks of an adverse outcome at summary judgment or trial, and required sophisticated analysis and substantial legal effort on the part of Lead Counsel.[8] ¶79.

With respect to the revenue synergy statements, Defendants likely would have argued that the publicly reported synergies were true and accurate when made. ¶¶80-81. Regarding the goodwill statements, Defendants argued that their goodwill impairment assessments were opinion statements grounded in reasonable accounting judgments. Defendants likely would have presented evidence that FIS's Technical

[8] At the preliminary approval hearing, counsel for Defendants reemphasized their confidence, stating: "we would have been able to show, based on the evidence developed during discovery, that none of the 27 challenged statements [were] false or misleading. We also feel strongly that we would have been able to show that none of the defendants acted with the requisite scienter." *See* Feb. 12, 2026 Hearing Tr. at 27:15-20, Ex. 11.

Accounting team evaluated potential triggering events every quarter and prepared detailed memos documenting its impairment conclusions. ¶82; *see also* Settlement Memo., §I.B.3.(a).

Lead Counsel also faced challenges in proving that Defendants made the alleged false statements intentionally or recklessly (*i.e.*, with scienter). ¶¶84-88. For example, with respect to the revenue synergy statements, Defendants would have argued that the Individual Defendants reasonably relied on FIS's multi-layered synergy validation process, which negated any inference of intentional fraud. ¶85; Settlement Memo., §I.B.3.(a).

Even assuming that Lead Counsel were able to marshal sufficient factual and expert testimony to prove liability, Lead Plaintiffs would have confronted considerable additional challenges in establishing loss causation and damages. Lead Counsel dedicated significant time and resources to crafting rebuttals to Defendants' arguments in this regard. Had the Action continued, Defendants would likely assert that the three alleged corrective disclosures did not reveal any allegedly concealed truth about the revenue synergy or Worldpay integration statements. Defendants would also argue that Lead Plaintiffs would be unable to disaggregate the effect of information unrelated to the alleged fraud that was disclosed alongside the alleged corrective disclosures. Prevailing on these matters was critical to the class's ability to recover maximum damages, but also extremely complex and expert driven. ¶¶89-98; Settlement Memo., §I.B.3.(a).

Moreover, Lead Plaintiffs' extensive motion for class certification was fully briefed and pending when the Parties agreed to settle. In opposing class certification, Defendants argued that the alleged misrepresentations did not actually affect, or impact, the market price of FIS's common stock. Defendants argued that the alleged misstatements about revenue synergies, Worldpay, and market share did not "match" any of the back-end corrective disclosures using the framework established in *Goldman Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113 (2021), and thus did not impact FIS's stock price, and the Court should not certify the Class Period alleged by Lead Plaintiffs. Lead Counsel vigorously argued that *Goldman*'s framework was explicitly premised on the generic nature of the misstatements in that case and does not apply to cases like this one with specific, detailed misstatements. However, the *Goldman* analysis is a relatively new and evolving area of law, and this was the first case in the Eleventh Circuit to require full application of the *Goldman* mismatch test at class certification. As such, there were substantial risks the Court would grant Defendants' motion in whole or in part. ¶¶99-106; Settlement Memo., §I.B.3.(a).

Although Lead Plaintiffs and Lead Counsel believe they could rebut these arguments with factual evidence and expert testimony, survive summary judgment, and prevail at trial, each of these issues required, and would continue to require, a considerable amount of legal and factual expertise and would likely be resolved through a battle of experts, the outcome of which is notoriously difficult to assess. *See, e.g., Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) ("In the 'battle of experts,' it is impossible to predict with any certainty which arguments would find

favor with the jury."). Accordingly, this factor also supports the requested fee award.

#### 3. The Skill Required to Perform the Legal Services Properly, and the Experience, Reputation, and Ability of the Attorneys

In determining a reasonable fee, the Court should consider "the skill and acumen required to successfully investigate, file, litigate, and settle a complicated class action lawsuit such as this one," *David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362, at *8 n.15 (S.D. Fla. Apr. 15, 2010), and "the experience, reputation, and ability of the attorneys" involved. *Camden I*, 946 F.2d at 772 n.3.

As discussed above, this was a complex case involving numerous contested facts and legal issues requiring skilled counsel to represent the class and bring about the Settlement. Lead Counsel is among the nation's preeminent law firms in this area of practice and has served as lead or co-lead counsel on behalf of major institutional investors in numerous class litigations since the enactment of the PSLRA. ¶135; Ex. 6-C. Thus, the experience, reputation, and ability of counsel support the fee request.

The Court should also consider the "quality of the opposition" plaintiff's counsel faced in awarding the fee. *Ressler,* 149 F.R.D. at 654; *Columbus Drywall,* 2012 WL 12540344, at *4. Defendants are represented by Sidley Austin LLP and McGuireWoods LLP, experienced and nationally recognized defense firms. The ability of Lead Counsel to obtain such a favorable Settlement for the Settlement Class in light of such qualified legal opposition confirms the quality of the representation. This factor supports Lead Counsel's fee request.

### 4. The Preclusion of Other Employment

When Lead Counsel undertook to represent Lead Plaintiffs in this matter, it was with the expectation that a significant amount of time and effort in its prosecution, and large sums in expenses, would be required. The time spent by Plaintiffs' Counsel here was at the expense of the time that they could have devoted to other matters. Accordingly, this factor supports the requested fee.

### 5. The Customary and Contingent Nature of the Fee

Fees in class action lawsuits of this nature are typically contingent because virtually no individual possesses a large enough stake in the litigation to justify paying attorneys on an hourly basis. Courts have consistently recognized that contingency risk is a major factor in determining the award of fees. *See Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) ("attorneys' risk is '"perhaps the foremost" factor' in determining an appropriate fee award"); *In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 ("courts have recognized that contingent risk is an important factor in determining fee awards"); *see also Kukorinis v. Walmart, Inc.*, 2024 WL 3226772, at *12 (M.D. Fla. June 28, 2024) (approving fee award and noting class counsel's considerable contingency risk).

Success in contingent litigation is never guaranteed. Plaintiffs' counsel in securities litigation often spend years in litigation, dedicating thousands of hours and millions of dollars, yet receiving little compensation. Even a victory at the trial stage is not a guarantee of success. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing jury verdict of $81.3 million in securities class action on

loss causation grounds and judgment entered for defendant).[9] As explained above, Lead Plaintiffs faced a number of hurdles that could have resulted in a smaller recovery for the Settlement Class.

**6. The Amount Involved and Results Achieved**

"The amount involved and the results obtained is considered the 'most important factor' in determining an award of attorneys' fees." *In re Health Ins. Innovations Sec. Litig*., 2021 WL 1341881, at *12. Indeed, "[i]t is …well-settled that one of the primary determinants of the quality of the work performed is the result obtained." *In re Friedman's Inc. Sec. Litig.*, 2009 WL 1456698, at *3 (N.D. Ga. May 22, 2009). The proposed Settlement is within the top 100 securities class action settlements of all time, believed to be the largest private, federal securities class action settlement in Florida history, and 12 times greater than the median reported recovery in securities class actions in 2025, which was $17 million. *See* ISS Report, Ex. 3 at 13; NERA Report, Ex. 4 at 24.

The Settlement also represents a meaningful portion of the Settlement Class's reasonably recoverable damages, as estimated under various potential scenarios analyzed by Lead Plaintiffs' damages expert. Although maximum estimated aggregate damages could have been approximately $10.5 billion, this estimate assumes that Defendants were not successful in challenging the alleged statements and related

[9] *See also In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011), *aff'd, Hubbard v. BankAtlantic Bancorp, Inc. Sec. Litig.*, 688 F.3d 713 (11th Cir. 2012) (in case tried by Labaton, overturning jury verdict in favor of plaintiff class, estimated at $42 million, and granting judgment as a matter of law to defendants).

corrective disclosures at class certification (and later at summary judgment and trial), that the Class Period stayed intact, and that no disaggregation was required. ¶9.

For example, if Defendants were successful in challenging the non-goodwill statements at class certification and shortening the Class Period, estimated damages would have been reduced to approximately $5.9 billion. With disaggregation, damages in this scenario would drop to approximately $3.3 billion. ¶¶95, 125. Moreover, if Defendants were successful in arguing that the goodwill statements do not "match" the first two corrective disclosures (on August 4, 2022 and November 3, 2022), the case could have been limited to just the final corrective disclosure on February 13, 2023, reducing estimated aggregate damages to approximately $1.8 billion. And with disaggregation, damages in this scenario would be approximately $1.1 billion. ¶¶96, 125.

Under more realistic scenarios starting at the $5.9 billion level, the $210 million Settlement represents approximately 3.6% to 11.7% of estimated damages without disaggregation. With disaggregation, the $210 million settlement represents approximately 6% to 19% of estimated damages. ¶¶97, 125. These recovery percentages are in line with other court-approved securities settlements. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.,* 2016 WL 10518902, at *3 (S.D. Fla. Oct. 14, 2016) (approving $24 million settlement representing 5.5% of maximum damages and noting settlement is an "excellent recovery"); *In re: Alibaba Grp. Holding Ltd. Sec. Litig.*, No. 1:20-CV-09568, slip op. (S.D.N.Y. Mar. 27, 2025), ECF No. 143 (final approval motion for $433.5 million settlement representing 3.73% of maximum damages) and

ECF No. 151 (judgment approving settlement) (Ex. 8). According to NERA's full-year 2025 report, for cases with total NERA-defined investor losses of between $1 billion and $4.9 billion, the median percentage of recovery from 2016 to 2025 was 1.3% of estimated losses. *See* NERA Report, Ex. 4 at 27. For cases with NERA-defined losses of $5 billion to $9.999 billion, the median percentage of recovery was 0.7%. *Id.*

**7. Awards in Similar Cases**

As discussed above, the requested fee of 21.76% of the Settlement Fund is within the range of attorneys' fees typically awarded in class action cases with similar recoveries. *See supra* Section I.B.

**8. Reaction of the Class to Date**

841,390 Postcard Notices have been provided to potential Settlement Class Members and their brokers and nominees. *See* Ex. 5, ¶¶2-9. Additionally, the Summary Notice was published in *Investor's Business Daily* on March 23, 2026 and transmitted over the internet using *PR Newswire* on March 18, 2026. *Id.,* ¶10. Defendants also served notice pursuant to the Class Action Fairness Act of 2005. *See* ECF No. 127.

The notices state that Lead Counsel will apply for fees not to exceed 22% of the Settlement Fund and payment of Litigation Expenses in an amount not to exceed $1.3 million, plus interest on both amounts, and that the deadline for filing objections to Lead Counsel's request for fees and expenses is May 28, 2026. *See* Ex. 5-A and 5-B. To date, not a single objection to the fee and expense amounts set forth in the notices

has been received.[10] ¶120. "The lack of numerous objections is evidence that the requested fee is fair." *Friedman's*, 2009 WL 1456698, at *3.

## II. LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION EXPENSES IS REASONABLE

Lead Counsel also requests an award of reasonable and necessary Litigation Expenses incurred by Plaintiffs' Counsel to prosecute the Action. Since the inception of the case, Plaintiffs' Counsel have incurred $1,039,881.61 in expenses. It is well established that "class counsel's reasonable and necessary out-of-pocket expenses should be reimbursed." *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1272 (N.D. Ga. 2008).

The amount requested is detailed in Plaintiffs' Counsel's individual firm declarations. *See* Ex. 6-B (Declaration on Behalf of Labaton Keller Sucharow, LLP) and Ex. 7-B (Declaration on Behalf of GrayRobinson, P.A.). Lead Counsel submits that the expenses, which include expert and consultant fees, mediation fees, and the costs of electronic discovery, depositions, electronic research, duplicating, and work-related meals, hotels, and transportation, were reasonably and necessarily incurred in prosecuting and resolving the Action.

The largest component of Plaintiffs' Counsel's expenses (*i.e.*, $457,005.96, or approximately 44% of their total expenses) was incurred for experts and consultants. At various stages of the litigation, Lead Counsel consulted with experts in the fields of

[10] Should any objections be filed, they will be addressed in Lead Counsel's reply papers due June 18, 2026.

market efficiency, loss causation, and damages, as well as experts with knowledge regarding issues related to accounting for goodwill and revenue synergies. Lead Counsel also obtained counsel for some of the witnesses in connection with responding to Defendants' discovery requests. ¶149.

The next largest expense (*i.e.*, $299,859.99 or approximately 29% of total expenses) was for document hosting and management. For example, Lead Counsel retained a vendor to host the documents produced in the Action in a sophisticated electronic database and litigation support platform. Lead Counsel used the database to, among other things: (i) process documents so they would be in a searchable format; (ii) convert and upload hard documents so that they would be searchable; and (iii) review the approximately 2.8 million pages of documents produced by Defendants and third parties. ¶150.

Another substantial component of Plaintiffs' Counsel's Litigation Expenses (*i.e.*, $58,835.55 or 6% of the total) was incurred for the costs of court reporters, videographers, and transcripts in connection with the 13 depositions the Parties took or defended during the course of the Action. ¶151. Lead Plaintiffs' share of the Mediator's fees totaled $50,765.00. ¶152.

The remaining expenses for which Plaintiffs' Counsel seek reimbursement were necessary for the successful prosecution and settlement of the claims and are of the type for which payment is routinely approved. *See Equifax Data Breach*, 2020 WL 256132, at *40 (awarding expenses for "court reporter fees; document and database reproduction and analysis; e-discovery costs; expert witness fees; travel for meetings

and hearings; paying the mediator; and other customary expenditures" and finding such expenses "are reasonable and were necessarily incurred on behalf of the class").

## III. A PSLRA AWARD TO LEAD PLAINTIFF NORTH CAROLINA WOULD BE REASONABLE

Lead Plaintiff North Carolina also requests reimbursement in the amount of $4,050, pursuant to 15 U.S.C. §78u-4(a)(4), incurred in connection with the time it dedicated to representing the class. Ex. 1, ¶13. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4).

As set forth in its declaration, North Carolina: (i) communicated regularly with Plaintiffs' Counsel regarding case developments and strategy; (ii) reviewed briefs, pleadings, and other court filings; (iii) searched for and compiled documents for production to Defendants; (iv) responded to written discovery, including interrogatories; (v) sat for a deposition in connection with class certification; (vi) prepared for and attended the mediation in New York; and (vii) analyzed Defendants' settlement proposals, ultimately authorizing acceptance of the Settlement. *See* Ex. 1, ¶¶5-6, 11-13. These efforts required North Carolina's representatives to dedicate approximately 40.5 hours and resources to the Action, which they would have otherwise devoted to their regular duties. *Id.*, ¶¶11-13.

The Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244, 1249 (11th Cir. 2020), does not prohibit approval of this request. The fact that

the request here is specifically allowed by federal statute, the PSLRA, differentiates it from the common law based incentive payments that the Eleventh Circuit ruled were improper. In fact, after *Johnson*, courts within the Eleventh Circuit have continued to approve awards to lead plaintiffs for their time and expenses under the PSLRA. *See, e.g., Edge v. Fernandez,* 2026 WL 936499, at *2 (N.D. Fla. Apr. 7, 2026) (awarding lead plaintiffs $15,000.00 each as reimbursement directly related to their time representing the class); *Messiha v. Citrix Sys., Inc.*, No. 0:22-cv-62327-RAR, slip op. at 12 (S.D. Fla. Nov. 4, 2024) (awarding each of the five lead plaintiffs $4,000 for their time related to their representation of the class) (Ex. 8); *Rodriguez v. ALFI, Inc.*, 2024 WL 1091798, at *2 (S.D. Fla. Mar. 11, 2024) (awarding $1,500 to each of the three lead plaintiffs for their time directly related to their representation of the class); *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 2023 WL 11974622, at *2 (N.D. Ga. May 31, 2023) (awarding $32,450 to institutional investor lead plaintiff as reimbursement for its time directly related to its representation of the class); *Steinberg v. OPKO, Health, Inc.*, Case No. 1:18-cv-23786 MARTIN EZ-OTAZO-REYES, slip op. at 10 (S.D. Fla. Apr. 29, 2021), ECF No. 131 (awarding $17,500) (Ex. 8); *In re Health Ins. Innovations Sec. Litig.*, 2021 WL 1341881, at *13 (awarding $3,125 and noting that the requested costs and expenses are "reasonable and consistent with other such awards approved in other securities litigation class actions in this district").

Accordingly, the PSLRA reimbursement request here is appropriate, reasonable, and justified under the circumstances before the Court.

## CONCLUSION

For the reasons discussed above, Lead Counsel respectfully requests, on behalf of Plaintiffs' Counsel, that the Court award: (i) 21.76% of the Settlement Fund as attorneys' fees, which includes accrued interest; (ii) Litigation Expenses incurred by Plaintiffs' Counsel in the amount of $1,039,881.61, plus accrued interest; and (iii) $4,050 to Lead Plaintiff North Carolina, pursuant to 15 U.S.C. §78u-4(a)(4). A proposed Order will be submitted with Lead Counsel's reply papers on June 18, 2026, after the deadline for objections has passed.

Dated: May 14, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: *<u>/s/Michael P. Canty</u>*
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com

*Lead Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

**GRAYROBINSON, P.A.**
John A. Boudet (FL Bar No. 515670)
301 East Pine Street, Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690

john.boudet@gray-robinson.com

*Liaison Counsel for Lead Plaintiffs Nebraska Investment Council, North Carolina Retirement Systems, and North Carolina Supplemental Retirement Plans*

## LOCAL RULE 3.01(G) CERTIFICATE

I HEREBY CERTIFY that we have conferred with counsel for defendants in this action and they take no position on the motion.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026.

*/s/ Michael P. Canty*
Michael P. Canty

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 14, 2026, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026.

*/s/ Michael P. Canty*
Michael P. Canty